# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AT HOME GROUP INC., *et al.*,[1] | ) | Case No. 25-11120 (●) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## MOTION OF DEBTORS FOR
## ENTRY OF INTERIM AND FINAL ORDERS
## (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
## POSTPETITION SENIOR SECURED FINANCING AND (B) UTILIZE CASH
## COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) GRANTING
## LIENS AND SUPERPRIORITY CLAIMS, (IV) MODIFYING THE AUTOMATIC STAY,
## (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state as follows in support of this motion (this "<u>Motion</u>"):[2]

## **Preliminary Statement**

1.      The Debtors commence these chapter 11 cases with approximately $1.6 million in available cash on hand.  To maintain ordinary-course business operations and facilitate an expeditious deleveraging restructuring transaction with the support of their stakeholders, the

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/AtHome.  The location of the Debtors' service address for purposes of these chapter 11 cases is:  9000 Cypress Waters Blvd, Coppell, Texas 75019.

[2]   A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the (a) *Declaration of Jeremy Aguilar, Chief Financial Officer of At Home Group Inc. and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "<u>First Day Declaration</u>") and the (b) *Declaration of Jaimie Baird in Support of the Motion of Debtors Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "<u>Baird Declaration</u>"), each filed contemporaneously herewith.  Capitalized terms not defined herein shall have the meanings ascribed to such terms in the First Day Declaration, the Baird Declaration, the DIP Documents (as defined herein), or the DIP Orders (as defined herein), as applicable.

Debtors require immediate access to capital.  The commitment by an ad hoc group of lenders holding approximately 96% of the Pari First Lien Obligations (collectively, the "Ad Hoc Group") to provide $200 million of new money delayed draw term loans will provide the liquidity necessary to satisfy the Debtors' operational needs and bridge the Company through its existing liquidity trough.  The Debtors have also been negotiating the consensual use of cash collateral with the agent and lenders under the Prepetition ABL Credit Facility (collectively, the "Prepetition ABL Secured Parties").  The DIP Facility and access to Cash Collateral on the terms set forth in the Interim Order (as defined herein) are necessary at the outset of these chapter 11 cases to ensure that the Debtors will have sufficient liquidity to stabilize the Debtors' operations, fund these chapter 11 cases, and avoid irreparable harm to the Debtors' estates.

2.     As described in the First Day Declaration and the Baird Declaration, due to the unpredictability of the tariff landscape, persistent macroeconomic headwinds, and internal pressures associated with the Prepetition ABL Credit Facility, the Company determined it needed additional liquidity in the near term to fund its operations.  Prior to the filing of these chapter 11 cases, the Debtors entered into discussions with third parties, existing stakeholders, and their advisors on financing alternatives and the Debtors' near-term liquidity needs.  Through their proposed investment banker, PJT Partners LP ("PJT"), the Debtors reached out to various stakeholders across their capital structure, as well as third parties, to explore strategic alternatives aimed at addressing near term liquidity pressures, including a third-party capital raise or fulsome recapitalization with the Debtors' existing lenders.  During this time, the Debtors and its advisors were also progressing constructive discussions with the Prepetition ABL Agent regarding the various financing options available to the Company to avoid the risk of the Prepetition ABL Agent implementing certain reserves that could potentially limit the Company's go-forward options.

3.      Despite their best efforts, the Debtors' continued decline in performance, compounded by global macroeconomic headwinds and tariff uncertainty, intensified existing operational pressures and made addressing the Debtors' overleveraged capital structure and sizeable debt obligations extremely challenging.  Faced with increasingly constrained liquidity and in the absence of a viable out-of-court alternative, the Debtors and their advisors determined that a chapter 11 filing could allow the Debtors to obtain access to the liquidity necessary to restructure their balance sheet and right size their lease portfolio.

4.      With comprehensive restructuring negotiations proceeding in parallel, on May 23, 2025, the Debtors entered into the Omnibus Forbearance Agreement and the Prepetition ABL Forbearance Agreement (each as defined herein) (collectively, the "Forbearance Agreements") with the Ad Hoc Group and the Prepetition ABL Agent, respectively, pursuant to which the consenting lenders agreed not to exercise certain rights and remedies under the applicable dent documents until June 30, 2025.  The Forbearance Agreements enabled the Debtors to avoid a near-term, disorganized, and value-destructive chapter 11 filing and afforded the parties additional time to negotiate the terms of an orderly chapter 11 filing.

5.      In June 2025, the Debtors instructed PJT to begin a thorough marketing process to explore third-party debtor-possession financing options.  Baird Decl. ¶ 13.  As described further in the Baird Declaration, PJT contacted fifteen sophisticated third-party financial institutions that are experienced in providing emergency debtor-in-possession financings in special situations.  *Id.* Of the parties PJT contacted, five signed confidentiality agreements and received financial diligence from the Debtors.  *Id.*  None of these five parties submitted an actionable proposal.  *Id*

6.      In parallel with the third-party marketing process, the Debtors continued to engage with the Ad Hoc Group and the Prepetition ABL Secured Parties regarding debtor-in-possession

financing and the consensual use of cash collateral.  In the final days leading up to the Petition Date, and after several rounds of extensive, hard-fought negotiations with the Ad Hoc Group and the Prepetition ABL Secured Parties, the Debtors reached an agreement in principle with the DIP Lenders (as defined herein) to provide a debtor-in-possession financing facility.  The DIP Facility will be fully backstopped by the Ad Hoc Group, while the group of lenders under the Term Loan Facility, the Senior Secured Notes, the Exchange Notes, and the Cayman Notes (collectively, the "Pari First Lien Secured Parties") will be offered the opportunity to participate in the syndication of the DIP Facility.  The DIP Facility consists of:  (a) new money first-out delayed draw term loans in an aggregate amount of $200 million available upon entry of the Interim Order; and (b) a second-out roll up facility in an aggregate principal amount of approximately $400 million representing the 2:1 roll-up of obligations under the Term Loan Facility, the Senior Secured Notes, the Exchange Notes, and the Cayman Notes (collectively, the "Pari First Lien Obligations") held by the DIP Lenders (the "DIP Roll-Up").

7.    The DIP Facility is the product of good-faith, arm's-length negotiations between the Debtors and the DIP Lenders over the last several weeks.  *See* Baird Decl. ¶¶ 23, 25.  During that time, the Debtors and the DIP Lenders (through their respective advisors) exchanged multiple drafts of term sheets outlining the terms of the DIP Facility and held numerous phone conferences negotiating the same.  The DIP Facility will provide the Debtors with access to the amount of capital that the Debtors, in consultation with their advisors, believe is necessary to effectively and efficiently administer these chapter 11 cases and to maintain operations during these chapter 11 cases without significant interruption.  First Day Decl. ¶¶ 83-84.  Notwithstanding the failure of the third-party marketing process to produce an actionable competing offer, the Debtors' negotiating efforts resulted in final terms markedly better than those initially proposed by the DIP

Lenders and the Prepetition ABL Secured Parties.  *See* Baird Decl. *Id* ¶ 25.  As described in the Baird Declaration, despite the DIP Lenders' bargaining power as the Debtors' only viable financing option, these negotiations resulted in certain concessions by the DIP Lenders, including a lower, payable-in-kind, interest rate, reduced fees, more favorable milestones, and less restrictive covenants.  *Id*.

8.      As discussed below, the DIP Roll-Up constitutes a key aspect of the DIP Facility and was required by the DIP Lenders as consideration for the extension of postpetition financing. The DIP Facility will provide the Debtors with access to crucially needed liquidity that will enable the Debtors to, among other things, honor employee wages and benefits, fund general and corporate operating needs, make payments to critical vendors, and administer these chapter 11 cases, in each case in accordance with the Approved Budget.  As security for the DIP Obligations, each of the Debtors will guarantee the obligations under the DIP Facility and grant the liens described herein.

9.      The relief requested by this Motion is necessary to preserve the Debtors' operations and maximize the value of the Debtors' estates for the benefit of all creditors.  For the reasons set forth in this Motion, the First Day Declaration, and the Baird Declaration, the DIP Facility and continued use of Cash Collateral, on the terms set forth in the Interim Order, are necessary to avoid immediate and irreparable harm and are in the best interests of the Debtors, their estates, and all stakeholders.  The Debtors respectfully request that the Court enter the Interim Order.

## Relief Requested

10.     The Debtors seek entry of an interim order, filed contemporaneously herewith (the "Interim Order"), and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"):[3]

(i)     authorizing At Home Group Inc. (the "Borrower") to obtain postpetition financing ("DIP Financing") pursuant to a senior secured, first-lien priming, and superpriority debtor-in-possession multiple draw term loan credit facility (the "DIP Facility") subject to the terms and conditions set forth in that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), by and among the Borrower, the DIP Guarantors (as defined herein), as guarantors, the several financial institutions or other entities from time to time party thereto as "Lenders" (the "DIP Lenders")[4] and GLAS USA LLC, as administrative agent and collateral agent, in such capacities, together with its successors and permitted assigns, the "DIP Agent" and, collectively, with the DIP Lenders, the "DIP Secured Parties"); which DIP Facility shall consist of:  (a) new money first-out delayed draw term loans (the "Tranche A DIP Loans") in an aggregate principal amount of up to $200 million (the "New Money Amount" and the commitments in respect thereof, the "New Money Commitments"); and (b) a roll-up of Pari First Lien Obligations (as defined below) into second-out term loans (the "Tranche B DIP Loans") in the amount of up to $400 million (the "Roll-Up Amount" and the commitments in respect thereof together with the New Money Commitments, the "DIP Commitments" and such loans, the "DIP Loans") from the DIP Lenders, of which (1) immediately upon the Closing Date (as defined herein), $75 million of Tranche A DIP Loans will become available for borrowing (the "Initial Draw"), immediately upon the completion of the Initial Syndication (as defined in the DIP Credit Agreement), $150 million of Tranche B DIP Loans will be issued to roll-up certain Pari First Lien Obligations on the terms set forth herein, and (2) immediately upon entry of the Final Order granting such relief, the remaining $125 million of all Tranche A DIP Loans up to the New Money Amount will become available for borrowing and the remaining $250 million of the Tranche B DIP Loans up to the Roll-Up Amount will be issued to roll up certain Pari First Lien Obligations on the terms set forth in the DIP Credit Agreement;

---

[3]     The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

[4]     So long as the Fronting Lender is a holder of DIP Loans pursuant to the Fronting Arrangement, the Fronting Lender shall be included in the definition of DIP Lenders.  For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Fronting Lender, by acting in such capacity, does not make any commitments, undertake any obligations, or waive any rights, including whether to take or not take any action or to exercise or seek to exercise any rights or remedies, in each case, in connection with any other claims or interests it may hold against any of the Debtors.

(ii)     authorizing the Debtors to jointly and severally guarantee the DIP Loans and the other DIP Obligations (as defined herein) (such Debtors, other than the Borrower, the "DIP Guarantors," and together with the Borrower, the "DIP Loan Parties");

(iii)    authorizing the DIP Loan Parties, as applicable, to execute, deliver and perform under the DIP Credit Agreement, each Credit Document and all other loan documentation related to the DIP Facility, including, without limitation, as applicable, security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security agreements, notes, the fee letters, and such other documents that may be reasonably requested by the DIP Agent and the DIP Lenders in connection with the DIP Facility, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the Interim Order, the Final Order, the DIP Credit Agreement, and any other Credit Documents, the "DIP Documents");

(iv)    authorizing the DIP Loan Parties to incur and guarantee loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation backstop fees, unused facility fees, upfront fees, exit fees or premiums, administrative agency fees, and any other fees payable pursuant to the DIP Documents), costs, expenses and other liabilities (including the DIP Fees and Expenses (as defined in the Interim Order)), and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "DIP Obligations"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(v)     granting to the DIP Agent, for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the DIP Loan Parties subject and subordinate to the Carve Out (as defined herein), and the Prepetition ABL 507(b) Claim (as defined herein) solely with respect to the ABL Priority Collateral;

(vi)    granting to the DIP Agent, for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable, and automatically perfected liens pursuant to sections 364(c)(2)–(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all DIP Collateral (as defined in the Interim Order), including, without limitation, all Cash Collateral and the DIP Proceeds Account (as defined in the DIP Credit Agreement)), on the terms described herein, subject only to and effective upon entry of the Final Order, any Avoidance Proceeds, in each case subject and subordinate to the Carve Out, the Prepetition ABL Liens (as defined herein) solely on the ABL Priority Collateral and such other liens as and solely to the extent set forth herein or in the DIP Documents;

(vii)   subject to entry of the Final Order granting such relief, waiving (a) the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral (together,

the "Collateral") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(viii)    subject to entry of the Final Order granting such relief, waiving the equitable doctrine of "marshaling" and other similar doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) with respect to any of the Prepetition Collateral (including the Cash Collateral) for the benefit of any party other than the Prepetition Secured Parties;

(ix)    authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral solely in accordance with the Interim Order, the Approved Budget, and the DIP Documents;

(x)    authorizing the Debtors to pay the principal, interest, fees, expenses, reimbursements, and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(xi)    subject to the restrictions set forth in the DIP Documents and the Interim Order, authorizing the Debtors to use the Prepetition Collateral, including Cash Collateral, and provide adequate protection to the Prepetition Secured Parties, for any reason provided for under the Bankruptcy Code, including resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay"), the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and, where applicable, the priming of their respective interests in the Prepetition Collateral (including Cash Collateral);

(xii)    vacating and modifying the Automatic Stay to the extent set forth herein and as necessary to permit the Debtors and their affiliates, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the Interim Order, the DIP Documents, and, upon entry, the Final Order, and to deliver any notices of termination described below and as further set forth herein;

(xiii)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and, upon entry, the Final Order;

(xiv)    scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to the Final Order, as set forth in the DIP Motion and the DIP Documents filed with this Court (as defined herein); and

(xv)    granting related relief.

11.    In support of this Motion, the Debtors submit the Baird Declaration and the First Day Declaration.

**Jurisdiction and Venue**

12.     The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 4001, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1(b), 4001-2, 9006-1, and 9013-1(m).

**Background**

15.     At Home Group Inc. (together with its Debtor and non-Debtor affiliates, "At Home" or the "Company") is a national home décor and furnishings brand that offers its customers a broad assortment of everyday and seasonal products for any room in the home.  Headquartered in Coppell, Texas, the Debtors primarily derive their revenue from merchandise sold in their large format retail locations and through their e-commerce website.  The Debtors currently employ approximately 7,170 individuals and operate in 40 states with 260 retail locations and two distribution centers.  As described in the First Day Declaration, the Debtors commenced these

chapter 11 cases with a restructuring support agreement in place with the support of holders of approximately 96% of the Debtors' first lien debt.

16.     On June 16, 2025 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.   The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   Concurrent with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.   No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

### <u>Concise Statements Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2[5]</u>

17.     The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| **Borrowers**<br>4001(c)(1)(B) | At Home Group Inc., a Delaware corporation<br><br>*See* [DIP Credit Agreement, Preamble.] |
| **Guarantors**<br>Bankruptcy Rule<br>4001(c)(1)(B) | Ambience Intermediate, Inc., the Borrower (other than with respect to its own obligations), each subsidiary of the Borrower on the Closing Date (other than the Excluded Subsidiary (as defined in the DIP Credit Agreement)), and each subsidiary of the Borrower that becomes a party hereto after the Closing Date.<br><br>*See* [DIP Credit Agreement, § 1.1.] |

---

[5]   The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Credit Agreement and the Interim Order.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the Baird Declaration, the DIP Documents, or the DIP Orders, as applicable.

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | **DIP Lenders**:  The Ad Hoc Group and certain consenting stakeholders party to the RSA (as defined herein) as of the Petition Date that are comprised of holders of certain of the Debtors' Pari First Lien Obligations and/or each of their designated affiliate(s) or managed entities (collectively, the "Backstop Parties") and the Pari First Lien Secured Parties that affirmatively elect to purchase from the Fronting Lender their allocated share of a portion of the Tranche A DIP Loan Commitment, subject to the Holdback (as defined below) and the Initial Syndication (as defined in the DIP Credit Agreement) and pursuant to Syndication Procedures (as defined in the DIP Credit Agreement) acceptable to the Backstop Parties and the Debtors.<br><br>**Required DIP Lenders**:  DIP Lenders holding a majority of the aggregate outstanding principal amount of the Tranche A DIP Loans and New Money Commitments and a majority of the aggregate outstanding amount of Tranche B DIP Loans (the "Required DIP Lenders").<br><br>**Fronting Lender**:  Barclays Bank PLC<br><br>"Holdback" means, with respect to.  the Backstop Parties, 50% of the New Money Commitment.<br><br>*See* [DIP Credit Agreement,] § 1.1; Interim Order ¶ J(xi). |
| **DIP Agent**<br><br>Bankruptcy Rule 4001(c)(1)(B) | GLAS USA LLC will act as administrative agent and collateral agent with respect to the DIP Facility.<br><br>*See* [DIP Credit Agreement, Preamble.] |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(M) | The DIP Facility shall terminate and all DIP Obligations shall be payable in full in cash on the date of the earliest to occur of:  (a) four (4) months from the Closing Date (or such later date as may be agreed to in writing by the Borrower and the Supermajority Required Lenders (as defined in the DIP Credit Agreement)), (b) conversion of any of the chapter 11 cases to a case under Chapter 7 of the Bankruptcy Code without the prior written consent of the Supermajority Required Lenders, (c) dismissal of any of the chapter 11 cases without the prior written consent of the Supermajority Required Lenders, (d) the appointment of a trustee or examiner without the prior written consent of the Supermajority Required Lenders (but not including the appointment of a fee examiner to assist in reviewing applications for compensation by professionals), (e) the date of consummation of a sale of all or substantially all of the assets of the Credit Parties (as defined in the Credit Agreement), (f) the effective date of an Acceptable Plan (as defined in the DIP Credit Agreement), (g) the date the Obligations shall have become due and payable in full under the Credit Documents, whether by acceleration or otherwise and (h) if the Final DIP Order is not entered by the date that is thirty-five (35) days after the Petition Date (which date may be extended with the prior written consent of the Required Lenders).<br><br>*See* [DIP Credit Agreement, § 1.1.] |
| **Commitments**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A)<br><br>**"Roll-Up" Provisions**<br><br>Local Rule 4001-2(a)(i)(O) | **Tranche A DIP Loans:** Subject to the terms and conditions set forth in the Interim Order and in the DIP Orders, each DIP Lender (who, for the avoidance of doubt shall be the Fronting Lender as of the Closing Date) severally agrees to make the Tranche A DIP Loans to the Borrower, which Tranche A DIP Loans (i) shall not exceed, for any such DIP Lender, the Tranche A Delayed Draw Loan Commitment of such DIP Lender, (ii) shall not exceed, in the aggregate, the total Tranche A DDTL Commitment, (iii) shall be made (x) on the Closing Date in an amount equal to $[75,000,000] (the "Initial Tranche A Delayed Draw Term Loans") and (y) from time to time (but no more than once in any consecutive fourteen (14) calendar day period) commencing on the date of the entry by the Court of the Final Order and prior to the Tranche A DDTL Commitment Expiration Date, in accordance with |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | the terms and conditions hereof, in an amount not to exceed the greater of (x) the "DIP Draw Amount" set forth in the Approved Budget for the two week period commencing on the date of such Borrowing and (y) $25,000,000, (iii) shall be denominated in Dollars, (iv) may, at the option of the Borrower, be incurred and maintained as, and/or converted into, ABR Loans or Term SOFR Loans; provided that all such Tranche A Delayed Draw Term Loans made by each of the Tranche A Lenders pursuant to the same Borrowing shall, unless otherwise provided in the Interim Order, consist entirely of Tranche A Delayed Draw Term Loans of the same Type and (v) may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed. On the Maturity Date, all outstanding Tranche A Delayed Draw Term Loans shall be repaid in full.  It is understood and agreed that the Fronting Lender shall initially provide the Tranche A Delayed Draw Term Loans on the Closing Date and thereafter, such Tranche A Delayed Draw Term Loans and related Tranche A Delayed Draw Loan Commitments shall be assigned to the Backstop Lenders pursuant to the Fronting Arrangement and in accordance with the Syndication Procedures, and thereafter may be assigned by the Backstop Lenders. |
| | **Tranche B DIP Loans:**  Subject to the terms and conditions of the Interim DIP Order and this Agreement (including, without limitation, the Syndication Procedures), effective (x) immediately upon the entry by the Bankruptcy Court of the Interim DIP Order and the completion of the Initial Syndication to the Backstop Lenders (such date, the "Initial Tranche B Roll-Up Date"), and without any further action by any party to this Agreement or the Credit Documents, the Bankruptcy Court or any other Person, (i) $150,000,000 of Prepetition Secured Obligations held by or owing to the Backstop Lenders (or any of their respective designated Approved Funds) as of the Initial Tranche B Roll-Up Date that are Prepetition Secured Lenders shall be, on the Initial Tranche B Roll-Up Date, automatically deemed (on a cashless basis, with two dollars of Tranche B Roll-Up Loans for every dollar of Tranche A Delayed Draw Term Loans assigned to such Lender by the Fronting Lender on the Initial Tranche B Roll-Up Date) to constitute Tranche B Roll-Up Loans under this Agreement (the "Initial Tranche B Roll-Up Loans" and together with the Initial Tranche A Delayed Draw Term Loans, the "Initial Term Loans") based upon each such Person's (or any of their respective designated Approved Funds) allocated share of principal amount of Tranche A Delayed Draw Term Loans and (y) immediately upon the later of (A) the entry by the Bankruptcy Court of the Final DIP Order and (B) the competition of the Syndication (such date, the "Final Tranche B Roll-Up Date"), and without any further action by any party to this Agreement or the Credit Documents, the Bankruptcy Court or any other Person (i) $250,000,000 of Prepetition Secured Obligations held by or owed to the Lenders (or any of their respective designated Approved Funds) as of the Final Tranche B Roll-Up Date that are Prepetition Secured Lenders shall be, on the Final Tranche B Roll-Up Date, automatically deemed (on a cashless basis, with two dollars of Tranche B Roll-Up Loans for every dollar of unfunded Tranche A DDTL Commitment of such Lender as of the Final Tranche B Roll-Up Date (before any funding of Tranche A Delayed Draw Term Loans on such date) to constitute Tranche B Roll-Up Loans under this Agreement (the "Final Tranche B Roll-Up Loans") based upon each such Person's (or any of their respective designated Approved Funds) allocated share of unfunded Tranche A DDTL Commitments (before any funding of Tranche A Delayed Draw Term Loans on such date) as of such date, which Tranche B Roll-Up Loans shall be due and payable in accordance with the terms and conditions set forth in this Agreement and (ii) from and after the Initial Tranche B Roll-Up Date or Final Tranche B Roll-Up Date, as applicable, the outstanding aggregate amount of the Prepetition Secured Obligations held by each such Lender (or any of its designated Approved Funds that is an Eligible Assignee) shall be automatically and irrevocably deemed reduced by such amount of Tranche B Term Loans allocated to each such Lender (or any of its designated Approved Funds that is an Eligible Assignee); provided that any Prepetition Secured Party that is a Prepetition Cayman Holder shall roll |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | up 100% of the Prepetition Cayman Obligations held by such Prepetition Secured Party before any roll up of any other Prepetition Secured Obligations held by such Prepetition Secured Party.<br><br>*See* [DIP Credit Agreement, § 2.1.] |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E) | <u>Conditions to Effectiveness</u>.  The effectiveness of the DIP Credit Agreement is subject to the satisfaction of usual and customary conditions precedent for debtor-in-possession credit facilities agented by the DIP Agent of this size, type and purpose (the first date on which all of such conditions to effectiveness of the DIP Facility shall have been satisfied, or waived by the Required DIP Lenders, being the "<u>Closing Date</u>"), including, without limitation, the following conditions precedent:<br><br>i.     as conditions precedent to effectiveness of the DIP Facility:<br><br>    a.    the DIP Credit Agreement and all DIP Documents required to be executed by the Closing Date shall have been duly executed and delivered to the DIP Agent and the DIP Lenders;<br><br>    b.    the Interim Order shall have been entered, in form and substance acceptable to the Required DIP Lenders and the Debtors, approving the DIP Facility, including the "roll up" of Pari First Lien Obligations as set forth in the Interim Order;<br><br>    c.    the DIP Lenders shall have received the Initial Approved Budget, together with a certification by an Authorized Officer of the Borrower certifying that such Initial Approved Budget was prepared in good faith based on reasonable assumptions;<br><br>    d.    no Tariff Event (as defined in the DIP Credit Agreement) shall have occurred;<br><br>    e.    no default or Event of Default (as defined herein) shall have occurred and be continuing;<br><br>    f.    each of the representations and warranties shall be true and correct in all material respects on the Closing Date (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date);<br><br>    g.    the RSA shall be in full force and effect; and<br><br>    h.    all fees required to be paid on the Closing Date pursuant to the DIP Credit Agreement, the Agent Fee Letter, the Lender Fee Letter, the Backstop Fee Letter and all out-of-pocket costs and expenses required to be paid on the Closing Date pursuant to the Credit Documents and (b) the DIP Professional Fees for which the Credit Parties have received an invoice to the extent invoiced at least one (1) Business Day prior to the Closing Date (except as otherwise reasonably agreed by the Borrower) shall, upon the initial borrowings under the Credit Facilities, have been, or will be substantially simultaneously, paid (which amounts may be offset against the proceeds of the Credit Facility).<br><br>ii.    as conditions precedent to each subsequent drawing (with a maximum of one (1) draw per calendar week in an amount no less than $25.0 million):<br><br>    a.    the DIP Lenders shall have received a borrowing request consistent with the Approved Budget);<br><br>    b.    all representations and warranties under the DIP Loan Agreement shall be true and correct in all material respects (without any repetition of materiality qualifiers |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | included therein) as of the date hereof (or, if relating to an earlier time, as of such earlier time); <br><br> c.   no Tariff Event (as defined in the DIP Credit Agreement) shall have occurred; <br><br> d.   no Prohibited Variance or Prohibited Professional Fee Variance (each as defined herein) shall have occurred; <br><br> e.   the RSA shall be in full force and effect; <br><br> f.   the DIP Agent shall have received an Approved Budget that is in form and substance acceptable to the Required Lenders in their sole discretion; <br><br> g.   no default or Event of Default shall have occurred and be continuing; <br><br> h.   Credit Parties shall have paid (i) all DIP Professional Fees for which the Credit Parties have received an invoice at least one (1) Business Day prior to the date of such Credit Event or such DIP Professional Fees will be paid concurrently with the proceeds of the Loans constituting such Borrowing, and (ii) all other fees and expenses due and payable to Administrative Agent and Lenders as of the date of such Notice of Borrowing; and <br><br> i.   there shall have been no Material Adverse Effect (as defined in the DIP Credit Agreement) <br><br> *See* [DIP Credit Agreement, §§ 6, 7.] |
| **Interest Rates** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(i)(B) | <u>Interest Rate</u>. At any time prior to the occurrence of an Event of Default (as defined below), interest on the DIP Obligations outstanding at such time shall accrue at a rate per annum equal to (x) with respect to the Tranche A DIP Loans, Term SOFR + 8.00% per annum and (y) with respect to the Tranche B DIP Loans, Term SOFR + 4.00% per annum.  All interest on the Tranche A DIP Loans and the Tranche B DIP Loans shall be payable in kind by being capitalized and added to the principal amount of outstanding Tranche A DIP Loans or Tranche B DIP Loans, as applicable, on the last day of each fiscal quarter in arrears. <br><br> <u>Default Rate</u>. Upon an Event of Default, interest on the DIP Obligations shall accrue at the otherwise applicable interest rate plus an additional 4.00% per annum, which shall be payable in kind by being capitalized and added to the principal amount of outstanding DIP Loans, on the last day of each fiscal quarter in arrears. <br><br> *See* [DIP Credit Agreement, § 2.8.] |
| **Use of DIP Facility and Cash Collateral** <br><br> Bankruptcy Rule 4001(b)(l)(B)(ii) <br><br> Local Rule 4001-2(a)(i) | Subject to the Carve-Out, the proceeds of the Borrowings of Tranche A Delayed Draw Term Loans shall be used solely for (i) working capital and general corporate purposes, (ii) to make payments in an amount not to exceed the Borrowing Base Shortfall to the ABL True Up Account in accordance with the DIP Credit Agreement and (iii) costs of the administration of the Chapter 11 Cases, including to pay professional fees and expenses, in each case of clauses (i), (ii) and (iii), in accordance with the Approved Budget (provided that the Approved Budget will not operate as a cap on professional fees) and as expressly permitted by the DIP Orders. <br><br> *See* [DIP Credit Agreement, § 9.12.] |
| **Adequate Protection** <br> Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Subject in all cases to the Carve Out, the Prepetition Permitted Senior Liens, the Challenge Period, and, to the extent set forth in <u>Exhibit 1</u> attached to the Interim Order, the DIP Liens, the Pari First Liens, the Prepetition ABL Liens, and the Superpriority DIP Claims, the Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(i)(B), (G), (K) | Prepetition Collateral (including Cash Collateral) to the extent of any Diminution in Value (as defined below) of their interests therein (the "Adequate Protection Rights").   In consideration of the foregoing, each Prepetition Agent, as applicable, and for the benefit of the applicable Prepetition Secured Parties, is hereby granted the following as Adequate Protection on account of their Adequate Protection Rights, and as an inducement to the Prepetition Secured Parties to consent to the priming of the Prepetition Liens and use of the Prepetition Collateral (including Cash Collateral) as set forth in the Interim Order (collectively, the "Adequate Protection Obligations"): |

    a.   Each of the Pari First Lien Agents, for itself and for the benefit of its applicable Pari First Lien Secured Parties, is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) on account of its Adequate Protection Rights, for the aggregate diminution in the value of its respective interests in the Prepetition Collateral (including Cash Collateral), if any, from and after the Petition Date for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, including Cash Collateral, the priming of the Prepetition Liens by the DIP Priming Liens pursuant to the DIP Documents, and the Interim Order, the payment of any amounts under the Carve Out or pursuant to the Interim Order or any other order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the Automatic Stay (the "Diminution in Value"), a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (including, without limitation, subject to entry of the Final Order granting such relief, the Avoidance Proceeds) (the "Pari First Lien Adequate Protection Liens"), in accordance with the priorities set forth in the Interim Order and reflected in Exhibit 1 attached to the Interim Order and subject and subordinate to (i) Prepetition Permitted Senior Liens, (ii) the Carve Out, (iii) the DIP Liens, and (iv) and in the case of ABL Priority Collateral, (x) the Prepetition ABL Liens and (y) the ABL Adequate Protection Liens (as defined below).

    b.   Each of the Pari First Lien Agents, for itself and for the benefit of its applicable Pari First Lien Secured Parties, is hereby granted, subject and subordinate to the Carve Out, an allowed superpriority administrative expense claim on account of such Pari First Lien Secured Parties' Adequate Protection Rights for the Diminution of Value as provided for in section 507(b) of the Bankruptcy Code (the "Pari First Lien 507(b) Claim"), which Pari First Lien 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof in accordance with the priorities set forth in the Interim Order (including, without limitation, subject to entry of the Final Order granting such relief, the Avoidance Proceeds.  The Pari First Lien 507(b) Claims shall be subject and subordinate only to (1) the Carve Out, (2) the DIP Superpriority Claims, and (3) solely with respect to the ABL Priority Collateral, the Prepetition ABL Obligations and the Prepetition ABL 507(b) Claim.

    c.   The Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), on account of its Adequate Protection Rights for the Diminution of Value a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (including, without limitation, subject to entry of the Final Order granting such relief, the Avoidance Proceeds) (the "ABL Adequate Protection Liens" and, together with the

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | Pari First Lien Adequate Protection Liens, the "Adequate Protection Liens"), in accordance with the priorities set forth in Exhibit 1 attached to the Interim Order, and in the case of the ABL Priority Collateral, senior to all liens other than any applicable Prepetition ABL Permitted Senior Liens, but in the case of DIP Priority Collateral subject and subordinate to (i) the Prepetition Permitted Senior Liens, (ii) the Carve Out, (iii) the DIP Liens, (iv) the Pari First Liens, and (v) the Pari First Lien Adequate Protection Liens. |
| | d. The Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders, is hereby granted, subject and subordinate to the Carve Out, an allowed superpriority administrative expense claim on account of such Prepetition ABL Secured Parties' Adequate Protection Rights for Diminution of Value as provided for in section 507(b) of the Bankruptcy Code (the "Prepetition ABL 507(b) Claim" and, together with the Pari First Lien 507(b) Claims, the "Adequate Protection 507(b) Claims"), which Prepetition ABL 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof in accordance with the priorities set forth in the Interim Order (including, without limitation, subject to entry of the Final Order granting such relief, the Avoidance Proceeds). With respect to the ABL Priority Collateral, the Prepetition ABL 507(b) Claim shall be senior to all other claims of any kind. With respect to the DIP Priority Collateral, the Prepetition ABL 507(b) Claim shall be subject and subordinate only to the Carve Out, the DIP Superpriority Claims, the Pari First Lien 507(b) Claims, the Prepetition Permitted Senior Liens, and the prepetition claims of the Pari First Lien Secured Parties. |
| | e. As further adequate protection, subject to the Carve Out as set forth in the Interim Order, the DIP Loan Parties shall provide current cash payments of all reasonable and documented out-of-pocket prepetition and postpetition fees and expenses of: (A) Dechert LLP, legal counsel to the Ad Hoc Group and the DIP Lenders, (B) Evercore Inc., as financial advisor to the Ad Hoc Group and the DIP Lenders, (C) Potter Anderson & Corroon LLP, as local counsel to the Ad Hoc Group and the DIP Lenders, (D) the Pari First Lien Agents and a single law firm as legal counsel to the Pari First Lien Agents, (E) Maples and Calder (Cayman) LLP, and, in each case, with respect to the preceding clauses (A) to (E), relating in any way to the provision of legal and financial services related to the DIP Credit Agreement, the Prepetition Secured Obligations, the Debtors, or the chapter 11 cases, and, with respect to any financial advisors, applicable engagement letters, fee letters, or similar arrangements (such fees and expenses, the "Pari First Lien Adequate Protection Fees and Expenses"). |
| | f. As further adequate protection, subject to the Carve Out, the DIP Loan Parties shall provide current cash payments of all reasonable and documented out-of-pocket prepetition and postpetition fees and expenses of, (x) prior to the occurrence of a ABL Cash Collateral Termination Event: (i) Choate, Hall, & Stewart LLP, (ii) Reed Smith LLP, (iii) Berkeley Research Group, LLC, and (iv) Gordon Brothers Asset Advisors, LLC ("GB") and (y) after the occurrence of an ABL Cash Collateral Termination Event, the reasonable and documented out-of-pocket postpetition fees and expenses of the advisors set forth in items (i) through (iv) above, *plus*, at the election of the Prepetition ABL Agent, the reasonable and documented out-of-pocket expenses of an investment banking advisor selected by the ABL Agent (the "ABL Adequate Protection Fees and Expenses" and, together with the Pari First Lien Adequate Protection Fees and Expenses, the "Adequate Protection Fees and Expenses"). |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | g.   From and after entry of the Interim Order, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, shall receive current cash payments during the chapter 11 cases of all accrued interest and fees (including Letter of Credit Fees and Fronting Fees) on the Prepetition ABL Obligations under the Prepetition ABL Credit Agreement as such interest and fees become due and payable and as set forth in the following sentence, at the applicable contractual non-default rate thereunder and in the amounts specified in the Prepetition ABL Credit Agreement, and with default rate interest with respect to the foregoing to accrue and become payable upon the occurrence of an ABL Cash Collateral Termination Event.  The interest and fee payment date shall be paid on the same cadence and in a manner consistent with the prepetition ABL Credit Agreement; *provided* that the Debtors' or any party in interest's rights are fully reserved to seek a determination (i) that adequate protection payments (as set forth in the Interim Order should be recharacterized under section 506(b) of the Bankruptcy Code as payment on account of the secured portion of the Prepetition ABL Obligations as of the Petition Date and (ii) with respect to the accrual and amount of default interest. <br><br> h.   If the Debtor delivers a Borrowing Base Certificate (as defined in the Prepetition ABL Credit Agreement and consistent with the terms hereof) to the DIP Agent and Prepetition ABL Agent that provides a Borrowing Base (as defined in the Prepetition ABL Credit Agreement) that is less than the sum of (i) the aggregate principal amount of Prepetition ABL Revolving Credit Loans at such time, (ii) the face amount of letters of credit outstanding under the Prepetition ABL Credit Facility at such time and (iii) the Minimum Availability Threshold (as defined in the Prepetition ABL Credit Agreement, but without regard to the "Total Revolving Credit Commitment" thereunder) (a "<u>True Up Event</u>," and the amount of such shortfall, the "<u>Borrowing Base Shortfall</u>"), the Debtors shall, by the end of the second business day thereafter, deposit cash in an amount equal to the Borrowing Base Shortfall (the "<u>ABL True Up</u>") into a controlled segregated reserve account maintained by the Prepetition ABL Agent (the "<u>ABL True Up Account</u>"), with all funds held in the ABL True Up Account deemed ABL Priority Collateral and subject to all liens on ABL Priority Collateral in the same priority set forth in <u>Exhibit 1</u> attached to the Interim Order; *provided* that the Borrowing Base shall be adjusted on a dollar-for-dollar basis by the amount of cash then held in the ABL True Up Account, which shall be reflected in each Borrowing Base Certificate.  The Debtors may withdraw cash from the ABL True Up Account at any time by delivering an updated Borrowing Base Certificate to the DIP Agent and the Prepetition ABL Agent along with an officer's certificate certifying that following such withdrawal no True Up Event shall be in effect. <br><br> The Prepetition ABL Secured Parties shall also receive such other adequate protection as is set forth in the DIP Orders. <br><br> *See* Interim Order ¶ 20. |
| **Repayment Features / Provisions Limiting Repayment**<br>Local Rule 4001-2(a)(i)(I) | **Mandatory Prepayments**: In addition to other customary mandatory prepayment provisions for transactions of this type and, other than with respect to ABL Priority Collateral (in each case, to the extent the ABL Obligations remain outstanding), and unless otherwise agreed to by the Required DIP Lenders, the Debtors shall, within five (5) Business Days of the receipt thereof, offer (which such offer, for the avoidance of doubt, may be rejected by each DIP Lender in their sole discretion) to prepay the outstanding principal amount of DIP Loans in an amount equal to (i) 100% of the net cash proceeds from the non-ordinary course sale or disposition of any DIP Collateral, and sales of subsidiaries; (ii) 100% of the net cash proceeds from incurrence of indebtedness or issuance of equity, (iii) 100% of insurance proceeds, including condemnation and similar |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | proceeds unless reinvested in the business on terms to be mutually agreed (including an aggregate cap on the amount to be reinvested); and (iv) other extraordinary receipts not provided for or assumed in the Approved Budget, including any proceeds recovered from litigation settlements; *provided*, that, at the option of the Required DIP Lenders, each such mandatory prepayment under clauses (i), (ii), (iii) or (iv) above may take the form of an immediate dollar-for-dollar permanent reduction in the DIP Loan Commitment in lieu of such mandatory prepayment. |
| | Proceeds from any mandatory prepayment shall first be applied toward the repayment of the Tranche A DIP Loans on a pro rata basis and then to the repayment of the Tranche B DIP Loans on a pro rata basis. |
| | *See* [DIP Credit Agreement, § 5.2.] |
| | **Voluntary Prepayments**: Permitted, in whole only, subject to limitations as to minimum amounts, without premium or penalty. Proceeds from any voluntary prepayment shall first be applied toward repayment of the Tranche A DIP Loans on a pro rata basis and then to the repayment of the Tranche B DIP Loans on a pro rata basis. For the avoidance of doubt, no partial voluntary prepayment of the DIP Loans shall be permitted. |
| | *See* [DIP Credit Agreement, § 5.1.] |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(B) | The DIP Facility includes the following fees:<br><br>a. **Backstop Fee**: 5.00% of the initial principal amount of the New Money Commitment payable pro rata to the Backstop Parties in proportion to their backstop allocation of New Money Commitment, which shall be earned, due and payable in-kind on the Closing Date by adding the amount of such fee to the principal amount of the Tranche A DIP Facility.<br><br>b. **Unused Facility Fee**: 4.00% per annum of the average daily unused portion of the maximum amount approved to be funded with respect to the Tranche A DIP Loan Commitment. The Unused Facility Fee shall be payable in kind by being capitalized and added to the principal amount of outstanding Tranche A DIP Loans, on the last day of each fiscal quarter in arrears from the Closing Date until the Termination Date.<br><br>c. **Upfront Fee**: 3.00% of the initial principal amount of the Tranche A DIP Loan Commitment actually funded payable pro rata to the DIP Lenders in proportion to their allocation of Tranche A DIP Loan Commitments, which shall be earned, due and payable in-kind (x) with respect to the Initial Tranche A DIP Draw, on the Closing Date and (y) with respect to each Additional Tranche A DIP Draw, on such date of funding, in each case, by adding the amount of such fee to the principal amount of the Tranche A DIP Facility (and which shall be allocated to the DIP Lenders in accordance with the syndication mechanics).<br><br>d. **Exit Fee**: 3.00% of the principal amount of the Tranche A DIP Loans funded. The Exit Fee shall be fully earned on the Closing Date and payable in-kind on the Termination Date by adding the amount of such fee to the principal amount of the Tranche A DIP Facility pro rata to the DIP Lenders in proportion to their holding of Tranche A DIP Loans.<br><br>e. **Agency Fee**: The Debtors shall pay an agency fee to the DIP Agent commencing on the Closing Date in an amount to be agreed between the Debtors and the DIP Agent and acceptable to the Required DIP Lenders. |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | *See* [DIP Credit Agreement, § 6.11.] |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E)<br>4001-2(a)(iii) | The Approved Budget is attached to the Interim Order as <u>Exhibit 3</u>.<br><br>Commencing on the second Thursday to occur after the Closing Date and on the Thursday of each four (4) week period thereafter (or, if such day is not a Business Day, the next succeeding Business Day), an update to the Approved Budget (each such updated budget to the extent approved in accordance with the following proviso, an "<u>Approved Budget</u>"); provided that, for the avoidance of doubt, any updated budget delivered by the Credit Parties that is not in form and substance satisfactory to the Required Lenders shall not be an Approved Budget for any purpose hereunder; provided further that, neither the Initial Approved Budget nor any subsequent Approved Budget shall be modified in any manner without the prior written consent of the Required Lenders. The Required Lenders shall use commercially reasonable efforts to, within five (5) Business Days of their receipt of an updated budget, inform the Borrower whether such updated budget is an Approved Budget; provided that to the extent not expressly approved by Required Lenders, such updated budget shall not be an Approved Budget for any purpose hereunder. Until replaced by an updated Approved Budget, the prior Approved Budget shall remain in effect.<br><br>*See* [DIP Credit Agreement, § 9.1(g); Interim Order ¶ 18.] |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(i)(E)<br>4001-2(a)(iii) | Commencing on the second Friday after the Closing Date, and on each Friday thereafter (or the next business day if such Friday is not a business day), the Debtors shall deliver to the DIP Agent a variance report for the immediately preceding Variance Period comparing the actual cash receipts and cash disbursements of the Debtors, during such Variance Period, on a line-item basis, from the values set forth in the Approved Budget (each, a "<u>Budget Variance Report</u>") with an explanation of each Prohibited Variance (as defined below) and each Prohibited Professional Fee Variance (as defined below), if any, accompanied by an officer's certificate attesting to the truth and accuracy in all material respects of such Budget Variance Report.  The Borrower and each other Credit Party shall not permit (i) (1) (x) actual "Total Receipts" for the initial Variance Period (which, for avoidance of doubt shall end on the second Friday after the Closing Date (the "<u>Initial Variance Period</u>")) to be less than 82.5% of forecasted "Total Receipts" set forth in the Approved Budget for such Variance Period and (y) actual "Total Operating Disbursements" to be more than 117.5% of forecasted "Total Operating Disbursements" set forth in the Approved Budget for the Initial Variance Period and (2) (x) actual "Total Receipts" for the each Variance Period after the Initial Variance Period to be less than 87.5% of forecasted "Total Receipts" set forth in the Approved Budget for such Variance Period and (y) actual "Total Operating Disbursements" to be more than 112.5% of forecasted "Total Operating Disbursements" set forth in the Approved Budget for the each Variance Period after the Initial Variance Period (any such variance, a "<u>Prohibited Variance</u>"); *provided* that, for the avoidance of doubt, "Total Operating Disbursements" shall exclude Restructuring Professional Fees and fees payable to Hilco Real Estate, LLC and any advisor to the Lenders; and (ii) actual "Total Pro Fee Cash Payments" since the Closing Date to the date of such Budget Variance Report to be more than 110% of forecasted "Total Pro Fee Cash Payments" set forth in the Initial Approved Budget through the date of such Budget Variance Report (any such variance, a "<u>Prohibited Professional Fee Variance</u>," *provided* that neither the Approved Budget nor any Prohibited Professional Fee Variance will operate as a cap on any professional fees incurred by the Debtor Professionals).  Until replaced by an updated Approved Budget, the prior Approved Budget shall remain in effect.<br><br>*See* [DIP Credit Agreement,] § 9(h); Interim Order ¶ 18. |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(i)(M), (S) | The DIP Documents shall contain the following events of default (any such event, an "<u>Event of Default</u>"), subject to customary cure provisions: (i) nonpayment of DIP Obligations (including, without limitation, all principal, interest and fees); (ii) non-performance of covenants and obligations under the DIP Credit Agreement and other DIP Documents, with customary grace periods for certain affirmative covenants; (iii) cross default on other material post-petition funded indebtedness in excess of $10 million (other than any indebtedness the payment of which is stayed as a result of the filing of the chapter 11 cases); (iv) inaccuracy of any representation or warranty in any material respect when made; (v) the Debtors, directly or indirectly, contesting, delaying, impeding or taking any other action, (including the commencement by or on behalf of the Debtors of an avoidance action or other legal proceeding seeking any of the following relief or seeking the entry of any order by the Bankruptcy Court or any other court with appropriate jurisdiction) objecting, challenging, invalidating, avoiding, subordinating, disallowing, recharacterizing or limiting in any respect, as applicable, either (a) the enforceability, extent, priority, characterization, perfection, validity or non-avoidability of any of the liens securing the DIP Obligations or (b) the validity, enforceability, characterization or non-avoidability of any of the DIP Obligations; (vi) entry by the Bankruptcy Court of an order (a) directing the appointment of an examiner with expanded powers or a chapter 11 trustee without the prior written consent of the Required DIP Lenders (but not including the appointment of a fee examiner to assist in reviewing applications for compensation by professionals), (b) converting the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing the Bankruptcy Cases, or (d) terminating or modifying the exclusive right of the Debtors to file a plan under section 1121 of the Bankruptcy Code; (vii) any Prohibited Variance shall have occurred; (viii) any Event of Default under any DIP Order shall have occurred; (ix) the filing of a chapter 11 plan by the Debtors that is not an Acceptable Plan except a plan that repays the DIP Obligations in full in cash on the effective date of such plan; (x) an Acceptable Plan is withdrawn or modified in any respect without the prior written consent of the Required DIP Lenders except in favor of an alternative plan or transaction that repays the DIP Obligations in full in cash on the effective date of such plan; (xi) the failure to meet any of the Milestones without the written consent of the Required DIP Lenders; (xii) any of the Debtors filing a pleading seeking to vacate or modify any DIP Order over the objection of the Required DIP Lenders; (xiii) the entry of an order without the prior consent of the Required DIP Lenders amending, supplementing or otherwise modifying any DIP Order; (xiv) reversal, vacation or stay of the effectiveness of any DIP Order without the written consent of the Required DIP Lenders; (xv) any sale of all or substantially all assets of the Debtors pursuant to section 363 of the Bankruptcy Code, unless (a) the proceeds of such sale indefeasibly satisfy the DIP Obligations in full in cash and (b) such sale is supported by the Required DIP Lenders; (xvi) the granting of relief from the automatic stay in the Bankruptcy Cases to permit foreclosure or enforcement on assets of any Debtor in excess of $5,000,000; (xvii) payment of or granting adequate protection with respect to prepetition debt, other than as expressly agreed in the DIP documentation, in any DIP Order; (xviii) the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or lien (except as contemplated in the Interim Order) which is senior to or *pari passu* with the DIP Lenders' claims under the DIP Facility (except as would result in the payment in full of the DIP Facility and the adequate protection payments with respect to the Pari First Lien Obligations as are described in the Interim Order); (xix) cessation of the DIP Liens or the Superpriority DIP Claims to be valid, perfected and enforceable in all respects; (xx) subject to the Carve Out, any of the Debtors use cash collateral or DIP Loans for any item other than those set forth in the Approved Budget; (xxi) any uninsured judgments are entered with respect to any post-petition liabilities against any of the Debtors or any of their respective properties in an aggregate amount in excess of $5,000,000, (xxii) the termination of the RSA; (xxiii) the Debtors' failure to |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | deliver a Borrowing Base Certificate within two (2) Business Days after such Borrowing Base Certificate is required to be delivered pursuant to the Interim DIP Order; or (xxiv) the Debtors' failure to fund the ABL True Up Account in accordance with the Interim DIP Order within two (2) Business Days of a True Up Event<br><br>*See* [DIP Credit Agreement, § 11.]<br><br>The below events each shall constitute an "<u>ABL Cash Collateral Termination Event</u>", unless waived by the Prepetition ABL Agent and the requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement:<br><br>(i)    The termination of the DIP Commitments, other than in connection with a draw of New Money Commitments or a mandatory prepayment of the DIP Loans that the Required DIP Lenders determine to address through a reduction in DIP Commitments;<br><br>(ii)    The DIP Lenders' failure to fund (1) the Initial Draw within five (5) calendar days of the Petition Date or (2) each additional projected draw of loans under the DIP Facility within ten (10) Business Days of the date as and when (and in at least the amount) set forth in the Initial Approved Budget (or, as applicable, any other Approved Budget to which the Prepetition ABL Agent has consented in writing in its reasonable discretion); and as a result of such failure to fund the Debtors' unrestricted cash falls below $[20] million;<br><br>(iii)    The Debtors' use of the Cash Collateral constituting ABL Priority Collateral in any manner that is not in accordance with the Approved Budget or that is otherwise prohibited by the DIP Orders, unless the Required DIP Lenders have waived or modified the Approved Budget and/or the Prohibited Variances contained therein;<br><br>(iv)    The delivery of a DIP Termination Declaration by the DIP Agent;<br><br>(v)    The termination of the RSA for any reason other than the occurrence of the Plan Effective Date (as defined in the RSA);<br><br>(vi)    The filing of any chapter 11 plan that does not result in the Payment in Full of the Prepetition ABL Obligations on the effective date of such plan, unless the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement has consented in writing to the filing of such a plan prior to the date of filing;<br><br>(vii)    The Court's entry of an order (i) terminating or modifying the exclusive right of the Debtors to file a plan under section 1121 of the Bankruptcy Code, (ii) appointing a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3)–(4) of the Bankruptcy Code (but not including the appointment of a fee examiner to assist in reviewing applications for compensation by professionals), (iii) dismissing any of the Debtors' chapter 11 cases, or (iv) converting any of the Debtors' chapter 11 cases to a case under chapter 7 of the Bankruptcy Code;<br><br>(viii)    The Debtors' failure to make any payment of interest, fees or expenses owed to the Prepetition ABL Agent on its own behalf or on behalf of the Prepetition ABL Secured Parties pursuant to the Interim Order within two (2) Business Days after such payment becomes due (for the avoidance of doubt, excluding ABL Adequate Protection Fees and Expenses);<br><br>(ix)    The Debtors' failure to fund the ABL True Up Account in accordance with the terms of the Interim Order within two (2) Business Days of a True Up Event;<br><br>(x)    The Debtors' failure to deliver any Borrowing Base Certificate within one (1) Business Day after the date which such Borrowing Base Certificate is required to be delivered under the Interim Order; |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | (xi)    The filing by any Debtor of a motion or pleading to stay, vacate, reverse, amend or modify the Interim Order, or the stay, reversal, vacation, amendment, or modification of the Interim Order, each of the foregoing in a manner materially adverse to the Prepetition ABL Secured Parties without the prior written consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement;<br><br>(xii)    The Debtors' failure to timely comply with the ABL Milestones;<br><br>(xiii)    [The closure of any stores other than the store closures authorized at the outset of these chapter 11 cases pursuant to the order approving the Store Closing Motion filed contemporaneously herewith, as may be supplemented from time-to-time, up to an aggregate total previously disclosed to, and approved by, the Prepetition ABL Agent prior to the Petition Date (collectively, the "Initial Store Closures" or otherwise with the prior written consent of the Required DIP Lenders, the "Permitted Store Closures");]<br><br>(xiv)    Any sale of ABL Priority Collateral (other than with respect to the Permitted Store Closings and sales of inventory in the ordinary course of business) without the prior written consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement;<br><br>(xv)    Any Debtor attempts to invalidate or reduce the Prepetition ABL Secured Obligations, other than by payment thereof;<br><br>(xvi)    The Prepetition ABL Liens, the ABL Adequate Protection Liens, or the ABL 507(b) Claims cease to be valid, perfected and enforceable in all respects;<br><br>(xvii)    The Debtors create, incur, or suffer to exist any claim or lien on ABL Priority Collateral that is pari passu with or senior to the ABL Adequate Protection Liens or the ABL 507(b) Claims, other than the Carve Out, while any portion of the Prepetition ABL Obligations or the payment obligations set forth in the Interim Order (the "ABL Adequate Protection Payments") remains outstanding, or the Court grants any application by any party seeking payment of any claim on a superpriority administrative claim basis with respect to the ABL Priority Collateral pari passu with or senior to the ABL 507(b) Claims, other than the Carve Out, without the prior written consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement;<br><br>(xviii)    The filing by any Debtor of any motion, pleading, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of the Prepetition ABL Liens securing the Prepetition ABL Obligations or asserting any other cause of action against and/or with respect to the Prepetition ABL Obligations, any Prepetition ABL Secured Party's claim in respect of such Prepetition ABL Obligations, or the Prepetition ABL Collateral securing such Prepetition ABL Obligations (or the Debtors' support of any such motion, pleading, application, or adversary proceeding commenced by any third party);<br><br>(xix)    The filing by any Debtor of any application, motion or borrowing request seeking to: incur, without the prior written consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement, any indebtedness from any party secured by a lien on, or, otherwise having a claim against or recourse to, as the case may be, the Debtors, the Prepetition Collateral or the DIP Collateral, unless, with respect to the ABL Priority Collateral, such liens or claims are junior and subordinated in all respects to the Prepetition ABL Liens, the Prepetition ABL Obligations, the ABL Adequate Protection Liens, and the ABL 507(b) Claims (or the Debtors' support of any such motion, pleading, application, or adversary proceeding commenced by any third party); |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | (xx)    The filing by any Debtor of a motion or pleading seeking an order, or the entry of an order by the Court or any other court of competent jurisdiction (i) approving claims for recovery of amounts with respect to ABL Priority Collateral under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation or the disposition of the ABL Priority Collateral; (ii) avoiding or requiring repayment or disgorgement of any portion of the ABL Adequate Protection Payments made by or on behalf of the Debtors hereunder; or (iii) seeking use of Cash Collateral that is ABL Priority Collateral other than as set forth in the Interim Order without the consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement (or the Debtors' support of any such motion, pleading, application or adversary proceeding commenced by any third party); and |
| | (b)    The Debtor's failure to timely satisfy any Milestones as (defined in the DIP Credit Agreement as in effect on the date hereof) as and when required unless extended by the Required DIP Lenders in accordance with the DIP Documents; provided that in the event the DIP Milestones in respect of the (x) final hearing to approve the DIP Facility or (y) the filing of the Plan and Disclosure Statement are extended by the DIP Lenders by more than ten (10) business days from the date set forth in the DIP Credit Agreement on the Closing Date, then an ABL Cash Collateral Termination Date shall occur if such DIP Milestone, with respect to (x) or (y) has not been satisfied within (10) business days from the date set forth in the DIP Credit Agreement on the Closing Date. |
| | *See* [Interim Order ¶ 14.] |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Prepetition Secured Parties and the DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facilities and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facilities or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification, the Prepetition Secured Parties and the DIP Secured Parties shall be and hereby are indemnified (as applicable) as provided in the Prepetition Credit Documents and the DIP Documents, as applicable. |
| | *See* [Interim Order ¶ 33.] |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)  Local Rule 4001-2(a)(i)(H) | The DIP Documents shall contain the following milestones (collectively, the "Milestones"), which may be extended in writing (email from counsel being sufficient) by an agreement among the Required DIP Lenders and the Debtors: |
| | i.    on or prior to the Petition Date, the Debtors' board shall have approved a restructuring support agreement (the "RSA") that contemplates the filing of an Acceptable Plan and sets forth the key terms of such Acceptable Plans; |
| | ii.    the Debtors shall file a motion seeking approval of the DIP Facility on or about the Petition Date; |
| | iii.    the Debtors shall file an Acceptable Plan with an associated disclosure statement no later than twenty-one (21) days after the Petition Date; |
| | iv.    the Interim Order, in form and substance reasonably acceptable to the Required DIP Lenders and DIP Agent, approving the DIP Facility on an interim basis, shall be entered by the Court no later than five (5) business days after the Petition Date; |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | v.   the Final Order, in form and substance reasonably acceptable to the Required DIP Lenders and DIP Agent, approving the DIP Documents attached thereto on a final basis, shall be entered by the Court no later than thirty-five (35) days after the Petition Date; <br><br> vi.   an order (the "Disclosure Statement Order") approving a disclosure statement, which disclosure statement shall be reasonably acceptable to the Required DIP Lenders, for an Acceptable Plan, shall be entered by the Court no later than thirty-nine (39) days after the filing of an Acceptable Plan; <br><br> vii.   an order (the "Confirmation Order") confirming an Acceptable Plan, shall be entered by the Court no later than sixty (60) days after entry of the Disclosure Statement Order; and <br><br> viii.   such confirmed Acceptable Plan shall become effective by no later than fourteen (14) days after entry of the Confirmation Order. <br><br> *See* [DIP Credit Agreement, Exhibit C.] <br><br> The ABL Milestones: <br><br> i.   On or prior to the Petition Date, the Debtors' board shall have approved the RSA that contemplates the filing of an Acceptable Plan and sets forth the key terms of such Acceptable Plan; and <br><br> ii.   An order confirming an Acceptable Plan, shall be entered in the Bankruptcy Cases by no later than one hundred forty (140) days after the Petition Date or such later date agreed in writing by the Prepetition ABL Agent in its sole discretion. <br><br> *See* Interim Order, Exhibit 2. |
| **Entities with Interests in Cash Collateral** <br><br> Bankruptcy Rule 4001(c)(1)(B) | The Prepetition Secured Parties have an interest in the Cash Collateral. <br><br> *See* Interim Order ¶ F. |
| **Carve Out** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(i)(F) | The Interim Order provides a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors pursuant to section 1103 of the Bankruptcy Code. <br><br> *See* Interim Order ¶ 6. |
| **Liens and Priorities** <br> Bankruptcy Rule 4001(c)(l)(B)(i) <br><br> Local Rule 4001-2(a)(i)(D) and (G) | The liens contemplated by the DIP Credit Agreement and the Interim Order will follow the priority set forth in Exhibit 1 to the Interim Order. <br><br> *See* [DIP Credit Agreement § 8.25;] Interim Order ¶¶ 7,8., Exhibit 1. |
| **506(c) Waiver; 552(b) Waiver** <br> Bankruptcy Rule 4001(c)(l)(B)(x); 4001(c)(1)(B) <br><br> Local Rule | The Final Order shall include a waiver of any surcharge to the DIP Collateral, the ABL Collateral, and the Pari First Lien Collateral under section 506(c) of the Bankruptcy Code or otherwise. <br><br> The Pari First Lien Secured Parties, the DIP Lenders, and the Prepetition ABL Lenders shall each, subject to the Final Order, be entitled to the benefit of section 552(b) of the Bankruptcy Code, and the Debtors shall waive the "equities of the case exception" under |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| 4001-2(a)(i)(B)<br>4001-2(a)(i)(V)<br>4001-2(a)(i)(W) | section 552(b) of the Bankruptcy Code with respect to the Pari First Lien Secured Parties, the DIP Lenders, and/or the Prepetition ABL Lenders.<br><br>*See* Interim Order ¶ 17. |
| **Release**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii) | Subject to entry of the Final Order, and in consideration of and as a condition to consenting to the use of Cash Collateral and the DIP Agent and the DIP Lenders making the DIP Facility available under the DIP Credit Agreement and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the Interim Order and the DIP Documents (including the Carve Out provisions), each of the Debtors, the Debtors' estates, on its own behalf and on behalf of its and their respective past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits (x) the DIP Agent, the DIP Lenders (including, for the avoidance of doubt, the Fronting Lender), and the DIP Secured Parties, and (y) subject to expiration of the time period set forth in the Interim Order, the Pari First Lien Secured Parties, the Prepetition ABL Agent and the Prepetition ABL Secured Parties, and, in each case, each of their respective Representatives in such capacity (collectively, the "<u>Released Parties</u>"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise (collectively, the "<u>Released Claims</u>"), in each case arising out of or related to (as applicable) the Pari First Lien Documents, the Prepetition ABL Credit Documents, the DIP Documents, the respective obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the Interim Order; *provided* that the releases set forth in this section shall not release any claims against a Released Party or liabilities that a court of competent jurisdiction determines results from the bad faith, gross negligence, material breach, fraud, or willful misconduct of such Released Party.  For the avoidance of doubt, nothing in this release shall relieve the DIP Secured Parties or the Debtors of their Obligations under the DIP Documents.<br><br>*See* Interim Order ¶ 15. |
| **Stipulations to Prepetition Liens and Claims & Challenge Period**<br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(i)(B)<br>4001-2(a)(i)(L) | The Debtors' stipulations, admissions, agreements, and releases contained in the Interim Order shall be binding upon the Debtors in all circumstances and for all purposes upon the expiration of the time period set forth in the Interim Order.  The Debtors' stipulations, admissions, agreements and releases contained in the Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the chapter 11 cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless:  (a) such committee or any other party in interest with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), including a chapter 7 trustee or chapter 11 trustee, has timely filed an adversary proceeding or contested matter (subject to the limitations contained in the Interim Order, including, *inter alia*, in this paragraph) by no later than (i) seventy-five (75) calendar days after the entry of the Interim Order; and (ii) any such later date as (x) has been agreed to by the Prepetition ABL Agent with respect to the |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | Prepetition ABL Obligations or the Prepetition ABL Liens, or (y) has been agreed to by the applicable Pari First Lien Agent (acting in accordance with its respective Pari First Lien Documents) with respect to the Pari First Lien Obligations or the Pari First Liens or (iv) has been ordered by the Court for cause upon a motion filed and served within any applicable period in clauses (i) or (ii) (the time period established by the foregoing clauses (i)-(ii), the "Challenge Period"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligation or the Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests, or defenses (collectively, the "Challenges") against the Prepetition Secured Parties, their affiliates, and/or their respective subsidiaries, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "Representative" and, collectively, the "Representatives") in connection with matters related to the Prepetition Credit Documents, the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released, and barred.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then:  (1) the Debtors' stipulations, admissions, agreements and releases contained in the Interim Order shall be binding on all parties in interest; (2) the obligations of the DIP Loan Parties under the Prepetition Credit Documents, including the Prepetition Secured Obligations, shall constitute allowed claims not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise, except under the Intercreditor Agreements), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in the chapter 11 cases, and any subsequent chapter 7 case(s); (3) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual (other than pursuant to the Intercreditor Agreements), or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in the chapter 11 cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non -statutory committees appointed or formed in the chapter 11 cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Credit Documents, the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Collateral shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | and releases contained in the Interim Order shall nonetheless remain binding and preclusive on each other statutory or nonstatutory committee appointed or formed in the chapter 11 cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in the Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these chapter 11 cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Credit Documents, the Prepetition Secured Obligations, or the Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay the chapter 11 cases or confirmation of any plan of reorganization.<br><br>*See* Interim Order ¶ 30. |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Local Rule 4001-2(a)(i)(S) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order.<br><br>*See* Interim Order ¶ 47. |
| **Limitation on Remedies Hearing**<br><br>Local Rule 4001-2(a)(i)(T), (Q) | The DIP Documents shall include provisions modifying the automatic stay to the extent necessary to permit the DIP Agent (acting at the direction of the Required DIP Lenders) to take any or all of the following actions, at the same time or different times, in each case without further order or application of the Court, but subject to the terms of the Interim Order, including, without limitation, the funding of the Carve Out and the Remedies Notice Period (as defined herein), and immediately upon the occurrence of an Event of Default: (i) deliver a notice of an Event of Default to the Debtors; (ii) declare the termination, reduction or restriction of any further DIP Loan Commitment to the extent any such DIP Loan Commitment remains unfunded; (iii) declare the termination of the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations); (iv) declare all applicable DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors; and (v) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (other than Cash Collateral that constitutes ABL Priority Collateral); *provided* that, such declaration shall be subject to the Carve Out and effective five (5) Business Days following delivery of a notice of an Event of Default by the DIP Agent to the Debtors (and their lead restructuring counsel); (any such declaration of the foregoing (i) through (vi), a "<u>DIP Termination Declaration</u>" and the date of such DIP Termination Declaration, the "<u>DIP Termination Declaration Date</u>"). The DIP Termination Declaration shall be given by electronic mail (or other electronic means) to the Debtors (and their lead restructuring counsel), counsel to a Creditors' Committee (if appointed), counsel to the Prepetition ABL Agent, and to the U.S. Trustee. The automatic stay otherwise applicable to the DIP Agent, the DIP Lenders and the Pari First Lien Secured Parties shall be modified so that, five (5) Business Days after the date a Termination Declaration is delivered (the "<u>Remedies Notice Period</u>"): (A) the DIP Agent acting at the direction of the Required DIP Lenders shall be entitled to exercise its rights and remedies in accordance with the respective DIP Documents and the DIP Orders and shall be permitted to satisfy the relevant DIP Obligations, Superpriority DIP Claims and DIP Liens, subject to the Carve Out , the Prepetition ABL Intercreditor Agreement, and the Prepetition |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | Permitted Senior Liens (if any), (B) the applicable Pari First Lien Secured Parties shall be entitled to exercise their rights and remedies to satisfy their respective Pari First Lien Obligations, Pari First Lien Adequate Protection Obligations, Pari First Lien 507(b) Claims, and Pari First Lien Adequate Protection Liens, in each case (A) and (B), subject to and consistent with (i) the Carve Out, (ii) the rights of the Prepetition ABL Secured Parties in respect of the ABL Priority Collateral (in each case, to the extent the Prepetition ABL Obligations have not been Paid in Full), (iii) the DIP Orders, (iv) the DIP Documents, (v) the Prepetition ABL Intercreditor Agreement, and (vi) any Prepetition Permitted Senior Liens, as applicable. Following expiration of the Remedies Notice Period, whether or not the maturity of any of the DIP Obligations shall have been accelerated, the automatic stay imposed under section 105 or section 362(a) of the Bankruptcy Code or otherwise will automatically be terminated with respect to the DIP Secured Parties and the Pari First Lien Secured Parties, unless (a) the DIP Agent (acting at the direction of the Required DIP Lenders), the Required DIP Lenders, or the Pari First Lien Secured Parties that hold at least a majority of Pari First Lien Obligations, as applicable, elect otherwise in a written notice to the Debtors and/or (b) the Bankruptcy Court has determined that an Event of Default has not occurred and/or is not continuing or the Bankruptcy Court orders otherwise. Following expiration of the Remedies Notice Period and termination of the automatic stay, the DIP Agent, DIP Lenders, and the Pari First Lien Secured Parties shall, subject to the Prepetition ABL Intercreditor Agreement, be permitted to proceed to protect, enforce and exercise all other rights and remedies provided for in the DIP Documents and the Pari First Lien Debt Documents and under applicable law, including, but not limited to, by (w) bringing any action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in any such DIP Document or Pari First Lien Debt Document or any instrument pursuant to which such DIP Obligations or Pari First Lien Obligations are evidenced, (x) subject to the rights of the Prepetition ABL Secured Parties and the Prepetition ABL Intercreditor Agreement, foreclosing on all of or any portion of the DIP Collateral or Pari First Lien Collateral including freezing any Cash Collateral held in the Debtors' accounts (in each case, except to the extent constituting ABL Priority Collateral, including the Collection Accounts and the ABL True Up Account), (y) immediately setting-off any and all amounts in accounts maintained by the Debtors (other than to the extent constituting ABL Priority Collateral, including the Collection Accounts and the ABL True Up Account) against the DIP Obligations or the Pari First Lien Obligations, or otherwise enforcing any and all rights against any DIP Collateral or Pari First Lien Collateral in the possession of the DIP Agent, the Pari First Lien Agents, or otherwise, including, without limitation, disposition of the DIP Collateral or the Pari First Lien Collateral and application of net cash proceeds thereof to satisfaction of the DIP Obligations and the Pari First Lien Obligations, and (z) subject to the Prepetition ABL Intercreditor Agreement, taking any other actions or exercising any other rights or remedies permitted under the DIP Orders, the DIP Documents, the Pari First Lien Debt Documents or applicable law, other than with respect to the ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full) in each case without further notice to or order of the court unless the Debtors, the Creditors' Committee (if appointed), and/or any other party in interest have obtained an order of the Bankruptcy Court preventing such action. During the Remedies Notice Period, (i) the Debtors shall be prohibited from requesting any further draws under the DIP Facility (subject to the Carve-Out) and (ii) the Debtors, the Creditors' Committee (if appointed), and/or any other party in interest shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Bankruptcy Court solely to contest whether an Event of Default has occurred and/or is continuing and the DIP Agent (acting at the direction of the Required DIP Lenders in accordance with the terms of the Interim Order), the Required DIP Lenders and the Pari First Lien Secured Parties shall consent to such emergency hearing; provided that if a request for such hearing is made prior to the end of the Remedies Notice Period, then the |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | Remedies Notice Period will be continued until the Bankruptcy Court hears and rules with respect thereto. For the avoidance of doubt, the DIP Agent, the DIP Lenders and the Pari First Lien Secured Parties shall not exercise any rights or remedies while the hearing is pending.  Except as expressly provided for in the DIP Orders, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agent, the DIP Lenders, the Pari First Lien Secured Parties, or the Prepetition ABL Secured Parties.  The foregoing shall be subject to the Prepetition ABL Intercreditor Agreement.<br><br>Immediately upon the occurrence of an ABL Cash Collateral Termination Event (as defined in the Interim Order), the Automatic Stay is hereby modified to the extent necessary to permit the Prepetition ABL Agent to take any or all of the following actions, at the same time or different times, in each case without further order or application of the Court, but subject to the terms of the Interim Order, including, without limitation, the Carve out and the ABL Remedies Notice Period (as defined herein):  (i) deliver a notice of an ABL Cash Collateral Termination Event to the Debtors; (ii) declare all applicable Prepetition ABL Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors; (iii) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral that constitutes ABL Priority Collateral; *provided* that, such declaration shall be effective five (5) Business Days following delivery of an ABL Termination Declaration (as defined below); and (iv) at any time going forward by written email notice (the "<u>Designation Notice</u>") to counsel of the Debtors designating some or all of the Debtors' Stores (as defined in the Motion of Debtors for *Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, (III) Modifying Customer Programs at the Closing Stores, and (IV) Granting Related Relief* (the "<u>Store Closing Motion</u>")) to be closed and the assets therein sold in accordance with the "Agency Agreement" (as defined in the Store Closing Motion) (such designated Stores, the "<u>Designated Stores</u>"), at which time, after the later of (A) the expiration of the ABL Remedies Notice Period and (B) the date of delivery of the applicable Designation Notice, the Debtors' store closing consultants shall have initiated "Sales" (as defined in the Store Closing Motion) at such Designated Stores; (any such declaration of the foregoing (i) through (iv), an "<u>ABL Termination Declaration</u>" and the date of such ABL Termination Declaration, the "<u>ABL Termination Declaration Date</u>", and together with the DIP Termination Declaration Date, the "<u>Termination Declaration Date</u>").  The ABL Termination Declaration shall be given by electronic mail (or other electronic means) to the Debtors (and their lead restructuring counsel), counsel to a Creditors' Committee, to the U.S. Trustee, counsel to each of the Pari First Lien Agents, counsel to the Ad Hoc Group, and counsel to the DIP Agent.  The Automatic Stay otherwise applicable to the Prepetition ABL Agent and the Prepetition ABL Secured Parties shall be modified so that, five (5) business days after the date an ABL Termination Declaration is delivered (the "<u>ABL Remedies Notice Period</u>"): (A) the Prepetition ABL Agent shall be entitled to exercise its rights and remedies in respect to the ABL Priority Collateral in accordance with the respective Prepetition ABL Credit Documents and the DIP Orders and shall be permitted to satisfy the relevant Prepetition ABL Obligations, the Prepetition ABL 507(b) Claim and Prepetition ABL Liens.  Following expiration of the ABL Remedies Notice Period, the Automatic Stay imposed under section 362(a) of the Bankruptcy Code shall automatically be terminated with respect to the Prepetition ABL Secured Parties, unless (a) the Prepetition ABL Agent elects otherwise in a written notice to the Debtors (email from counsel being sufficient), (b) the Court has determined that an ABL Cash Collateral Termination Event has not occurred and/or is not continuing, or (c) the Court orders |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
|  | otherwise. Following expiration of the ABL Remedies Notice Period and termination of the Automatic Stay, the Prepetition ABL Agent and the Prepetition ABL Secured Parties shall, subject to the Prepetition ABL Intercreditor Agreement, be permitted to proceed to protect, enforce, and exercise all other rights and remedies provided for in the Prepetition ABL Credit Documents, and under applicable law, including, but not limited to, by (w) bringing any action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in any such Prepetition ABL Credit Document or any instrument pursuant to which such Prepetition ABL Obligations are evidenced, (x) subject to the rights of the DIP Secured Parties and the Pari First Lien Secured Parties and the Prepetition ABL Intercreditor Agreement, foreclosing on all of or any portion of the Prepetition ABL Collateral including freezing any Cash Collateral that constitutes ABL Priority Collateral held in the Debtors' accounts, (y) immediately setting off any and all amounts in the Collection Accounts, Collateral Agent Account, ABL True Up Account or any other accounts maintained by the Debtors (to the extent such funds in such account constitute ABL Priority Collateral) against the Prepetition ABL Obligations, or otherwise enforcing any and all rights against any Prepetition ABL Priority Collateral in the possession of the Prepetition ABL Agent, or otherwise, including, without limitation, disposition of the Prepetition ABL Priority Collateral and application of net cash proceeds thereof to satisfaction of the Prepetition ABL Obligations, and (z) taking any other actions or exercising any other rights or remedies permitted under the DIP Orders, the Prepetition ABL Credit Documents, or applicable law, in each case, without further notice to or order of the Court unless the Debtors, the Creditors' Committee (if appointed), and/or any other party in interest have obtained an order of the Court preventing such action. During the ABL Remedies Notice Period, (A) the Debtors, the Creditors' Committee (if appointed), and/or any other party in interest shall be entitled to seek an emergency hearing within the ABL Remedies Notice Period with the Court solely to contest whether ABL Cash Collateral Termination Event has occurred and is continuing and the Prepetition ABL Agent and the Required Prepetition ABL Lenders shall consent to such emergency hearing; *provided* that if a request for such hearing is made prior to the end of the ABL Remedies Notice Period, then the ABL Remedies Notice Period will be continued until the Court hears and rules with respect thereto and (B) the Debtors shall be authorized to use Cash Collateral constituting ABL Priority Collateral solely to the extent necessary to avoid immediate irreparable harm. For the avoidance of doubt, the Prepetition ABL Agent and the Prepetition ABL Secured Parties shall not exercise any rights or remedies while such hearing is pending. Except as expressly provided for in the DIP Orders, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Prepetition ABL Agent or the Prepetition ABL Secured Parties. The foregoing shall be subject to the Prepetition ABL Intercreditor Agreement.<br><br>*See* Interim Order ¶¶ 13-14. |
| **Marshaling**<br><br>Local Rule 4001-2(a)(i)(X) | Subject to entry of the Final Order granting such relief, in no event shall the DIP Agent, the other DIP Secured Parties, any Prepetition Agent or the other Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Secured Obligation, or the Prepetition Collateral. Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to each Prepetition Agent or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any Prepetition Collateral.<br><br>*See* Interim Order ¶ 16. |

**Explanation for Inclusion of Significant Provisions Pursuant to Local Rule 4001-2(a)(i)**

**I.      The Significant Provisions Are Appropriate and Justified Under the Circumstances of These Chapter 11 Cases.**

18.     Local Rule 4001-2(a)(i) requires that the Debtors explain the reason for including certain significant provisions described in Local Rules 4001-2(a)(i)(N)–(X) (collectively, the "Significant Provisions").[6]  The Debtors believe that each of the Significant Provisions and the Carve Out is justified and necessary in the context and circumstances of these chapter 11 cases.

**A.      The DIP Roll-Up Is Appropriate.**

19.     Local Rule 4001-2(a)(i)(O) requires explicit disclosure of provisions that apply the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise has the effect of converting prepetition debt to postpetition debt.  *See* Local Rule 4001-2(a)(i)(O).  Here, the DIP Roll-Up consists of a roll-up of Pari First Lien Obligations into Tranche B DIP Loans in the aggregate amount of up to $400 million, of which:  (i) upon entry of the Interim Order and the completion of the Initial Syndication, the Pari First Lien Obligations in the aggregate amount of $150 million shall be automatically deemed "rolled up" and converted on a cashless basis into Tranche B DIP Loans; and (ii) upon the later of (x) the entry of the Final Order and (y) the completion of the Syndication, the Pari First Lien Obligations in an aggregate amount of $250 million shall be automatically deemed "rolled up" and converted on a cashless basis into Tranche B DIP Loans.  The Prepetition Intercompany Note Obligations will also be deemed repaid on a dollar-for-dollar basis with the "roll up" of the Prepetition Cayman Notes Obligations.

20.     As discussed in further detail below, the DIP Roll-Up is a key condition for the DIP Lenders to provide the DIP Facility.  The DIP Agent and the DIP Lenders would not be willing to

---

[6]     Local Rules 4001-2(a)(i)(N) and 4001-2(a)(i)(P) are not applicable.  Local Rules 4001-2(a)(i)(U)–(X) are only applicable upon entry of the Final Order.

provide the DIP Facility or extend credit to the Debtors thereunder, without a 2:1 roll-up of the Pari First Lien Obligations.  Without agreeing to the DIP Roll-Up, the Debtors also would not have been able to secure the support of the Ad Hoc Group for the comprehensive restructuring contemplated in the RSA, which is a crucial step toward ensuring a smooth transition into these chapter 11 cases.  Given these circumstances, the DIP Roll-Up is reasonable, appropriate, a sound exercise of the Debtors' business judgment, and the Debtors request that it be approved.

**B.      The Findings of Validity, Perfection, or Amount of Prepetition Liens and Challenge Period Are Appropriate.**

21.      Local Rule 4001-2(a)(i)(Q) requires explicit disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order to investigate such matters.  *See* Local Rule 4001-2(a)(i)(Q).  Here, the Interim Order complies with this requirement by providing any statutory committee appointed in these chapter 11 cases, and all parties in interest in each case, with requisite standing to file an adversary proceeding challenging the validity, extent, perfection, or priority of the Prepetition Liens on the Prepetition Collateral, the validity, allowability, priority, or amount of the Prepetition Secured Obligations, or the Stipulations by the earlier of (i) seventy-five (75) days after the entry of the Interim Order and (ii) the commencement of a hearing to consider confirmation of a chapter 11 plan.  *See* Interim Order ¶ 30.

**C.      The Provisions Immediately Approving All Terms and Conditions of the DIP Documents Are Appropriate.**

22.      Local Rule 4001-2(a)(i)(R) requires explicit disclosure of provisions that immediately approve all terms and conditions of the underlying loan agreement.  *See* Local Rule 4001-2(a)(i)(R).  Here, the Interim Order provides that upon entry, the parties to the DIP Facility are authorized to enter into their respective obligations and that, upon execution, the DIP

Documents shall constitute valid and binding obligations of the Debtors.  Moreover, to the extent the DIP Documents conflict with the Interim Order, the Interim Order controls. *See* Interim Order ¶ 2.  This provision is necessary and appropriate for the Debtors to access the DIP Facility and to provide all parties with the assurances that the Debtors' postpetition entry into the DIP Facility is valid.  Without this provision, the Debtors would be unable to access the DIP Facility or use Cash Collateral on an interim basis.

   **D.    The Provisions Modifying the Automatic Stay, Providing for a Remedies Notice Period, and Providing for a Default Notice Hearing Are Appropriate.**

   23.    Local Rules 4001-2(a)(i)(S) and (T) require explicit disclosure of provisions that modify the automatic stay upon an Event of Default without a remedies notice period of at least five (5) days and provisions that seek to limit what parties in interest may raise at an emergency hearing scheduled during the remedies notice period.  *See* Local Rules 4001-2(a)(i)(S)–(T).  Here, the Interim Order provides for a five (5)-day remedies notice period for all Events of Default and ABL Cash Collateral Termination Events.  *See* Interim Order ¶¶ 13-14.  During the Remedies Notice Period or the ABL Remedies Notice Period, as applicable, the Debtors shall be entitled to seek an emergency hearing to consider (a) whether an Event of Default or an ABL Cash Collateral Termination Event, as applicable, has occurred and/or is occurring and (b) any appropriate relief; *provided* that if a request for such hearing is made prior to the end of the Remedies Notice Period or the ABL Remedies Notice Period, then the Remedies Notice Period or the ABL Remedies Notice Period, as applicable, will be continued until the Court hears and rules with respect thereto. During the Remedies Notice Period or the ABL Remedies Notice Period, notwithstanding anything to the contrary in the Interim Order, the DIP Agent, the DIP Lenders, the Pari First Lien Parties, and the Prepetition ABL Secured Parties, as applicable, shall not exercise any rights or remedies while the hearing is pending.  The automatic stay pursuant to section 362 of the Bankruptcy Code

shall be automatically modified with respect to the DIP Secured Parties and the Pari First Lien Secured Parties at the end of the Remedies Notice Period, and with respect to the Prepetition ABL Secured Parties at the end of the ABL Remedies Notice Period, without further notice or order of the Court, unless (a) the DIP Agent (acting at the direction of the Required DIP Lenders), the Required DIP Lenders, the Pari First Lien Secured Parties that hold at least a majority of Pari First Lien Obligations, or the Prepetition ABL Agent, as applicable, elect otherwise in a written notice to the Debtors, and/or (b) the Court has determined that an Event of Default or an ABL Cash Collateral Termination Event has not occurred and/or is not continuing or the Court orders otherwise. *See* Interim Order ¶ ¶ 13-14.

24.     In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases. Accordingly, the Significant Provisions in the Interim Order should be approved.

### The Debtors' Prepetition Capital Structure and Need for the DIP Facility

**I.      Prepetition Capital Structure.**

25.     As of the Petition Date, the Debtors have an aggregate principal amount of approximately $1.998 billion in total funded debt obligations, consisting of the borrowings under the (a) Prepetition ABL Credit Facility, (b) the Term Loan Facility, (c) the Senior Secured Notes, (d) the Cayman Notes, (e) the Exchange Notes, and (f) the Senior Unsecured Notes (each as defined below).

| Funded Debt | Maturity | Approximate Principal Outstanding |
|---|---|---|
| *At Home Group Inc. Secured Debt* | | |
| Prepetition ABL Credit Facility | July 23, 2026 | $378 million |
| *Secured Debt[7]* | | |
| Term Loan Facility | July 24, 2028 | $579 million |
| Senior Secured Notes | July 15, 2028 | $300 million |
| Cayman Notes | May 12, 2028 | $200 million |
| Exchange Notes | May 12, 2028 | $483 million |
| *At Home Group Inc. Unsecured Debt* | | |
| Senior Unsecured Notes | July 15, 2029 | $58 million |
| *Total:* | | *$1.998 billion* |

### A.    Prepetition ABL Credit Facility.

26.    Debtor At Home Group Inc. is party to that certain agreement, dated as of July 23, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Credit Agreement"), by and among Ambience Intermediate, Inc., as the holding company, At Home Group Inc., as borrower, At Home Group Inc.'s wholly-owned domestic subsidiary borrowers party thereto from time to time, certain financial institutions party thereto from time to time (the "Prepetition ABL Lenders"), and Bank of America, N.A., as administrative agent, collateral agent, lender, and letter of credit issuer (the "Prepetition ABL Agent").  The Prepetition ABL Credit Agreement provides for an asset-based revolving credit facility in the aggregate principal amount of $675 million with a sublimit for the issuance of letters of credit of $50 million and a sublimit for the issuance of swingline loans of $40 million (the "Prepetition ABL Credit Facility," the obligations thereunder, the "Prepetition ABL Secured Obligations," and the liens and security interests granted in connection therewith, including under

---

[7]    At Home Group Inc. is also obligated under a $200 million secured intercompany note, as further explained herein.

the DIP Orders, the "Prepetition ABL Liens").  The Prepetition ABL Credit Facility bears interest at the aggregate of USD SOFR plus 1.510% and matures on July 23, 2026.

27.     The guarantors under the Prepetition ABL Credit Agreement are Ambience Intermediate, Inc., At Home Group Inc., other than with respect to its own obligations, At Home Holding II Inc., At Home Holding III Inc., At Home Companies LLC, At Home Stores LLC, At Home Gift Card LLC, At Home Procurement Inc., At Home RMS Inc., At Home Properties LLC, and its subsidiaries.  The Prepetition ABL Credit Facility is secured by:  (a) substantially all of the assets of At Home Group Inc. and the other guarantors under the Prepetition ABL Credit Agreement, excluding certain excluded property (the "Collateral") and including accounts, deposit accounts, cash and other assets therein, securities accounts, commodity accounts, inventory, and proceeds thereof (the "Prepetition ABL Collateral"); and (b) a pledge of the equity interests of At Home Group Inc. for Ambience Intermediate, Inc.  The Prepetition ABL Secured Parties have a first priority lien on the Prepetition ABL Collateral and a second priority lien on all non-Prepetition ABL Collateral.  As of the Petition Date, the outstanding principal amount of the Prepetition ABL Credit Facility is approximately $378 million.

28.     On May 23, 2025, the parties to the Prepetition ABL Credit Agreement entered into that certain Forbearance Agreement and Second Amendment to ABL Credit Agreement (the "Prepetition ABL Forbearance Agreement") with respect to certain anticipated events of default under the Prepetition ABL Credit Agreement, including, among other things, failure to comply with the requirements to deliver a clean audit opinion, annual and quarterly financials, a budget, and related compliance certificates.

**B.     Term Loan Facility.**

29.     Debtor At Home Group Inc. is party to that certain agreement, dated as of July 23, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "Term

Loan Credit Agreement"), by and among Ambience Intermediate, Inc., as the holding company, At Home Group Inc., as borrower, certain financial institutions party thereto from time to time, and Wilmington Trust, National Association, as administrative and collateral agent (successor to Bank of America, N.A.). The Term Loan Credit Agreement provides for a first lien term loan facility in the aggregate principal amount of $600 million (the "Term Loan Facility"). The Term Loan Facility bears interest at the aggregate of USD SOFR plus 4.250% subject to a 25 basis point step-down upon the achievement of a certain first lien debt leverage ratio and matures on July 24, 2028. The guarantors under the Term Loan Credit Agreement are Ambience Intermediate, Inc., At Home Group Inc., other than with respect to its own obligations, At Home Holding II Inc., At Home Holding III Inc., At Home Companies LLC, At Home Stores LLC, At Home Gift Card LLC, At Home Procurement Inc., At Home RMS Inc., At Home Properties LLC, and the At Home Subsidiaries. The Term Loan Facility is secured by a second priority lien on the Prepetition ABL Collateral and a first priority lien on all non-Prepetition ABL Collateral. As of the Petition Date, the outstanding principal amount of the Term Loan Facility is approximately $579 million.

30.     On May 23, 2025, the parties to the Term Loan Credit Agreement entered into that certain Omnibus Forbearance Agreement (the "Omnibus Forbearance Agreement") with respect to certain upcoming interest payments to extend the Company's liquidity runway, including a $4.3 million interest payment due under the Term Loan Credit Agreement on June 2, 2025.

### C.    Senior Secured Notes Indenture.

31.     Debtor At Home Group Inc. is party to that certain indenture, dated as of July 12, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "Senior Secured Notes Indenture"), by and among At Home Group Inc., as issuer, and U.S. Bank Trust Company, National Association, as trustee and notes collateral agent. The Senior Secured Notes Indenture provides for the issuance of $300 million aggregate principal amount of 4.875% senior

secured notes due July 15, 2028 (the "Senior Secured Notes"). The guarantors under the Senior Secured Notes Indenture are At Home Group Inc., At Home Holding II Inc., At Home Holding III Inc., At Home Companies LLC, At Home Stores LLC, At Home RMS Inc., At Home Gift Card LLC, At Home Procurement Inc., At Home Properties LLC, and the At Home Subsidiaries. The Senior Secured Notes are secured by a second priority lien on the Prepetition ABL Collateral and a first priority lien on all non-Prepetition ABL Collateral. As of the Petition Date, the outstanding principal amount of the Senior Secured Notes is approximately $300 million.

> **D.      Senior Unsecured Notes Indenture.**

32.      Debtor At Home Group Inc. is party to that certain indenture, dated as of July 12, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "Senior Unsecured Notes Indenture"), by and among At Home Group Inc., as issuer, and U.S. Bank Trust Company, National Association, as trustee. The Senior Unsecured Notes Indenture provides for the issuance of $500 million aggregate principal amount of 7.125% senior unsecured notes due July 15, 2029 (the "Senior Unsecured Notes"). The guarantors under the Senior Unsecured Notes Indenture are At Home Group Inc., At Home Holding II Inc., At Home Holding III Inc., At Home Companies LLC, At Home Stores LLC, At Home RMS Inc., At Home Gift Card LLC, At Home Procurement Inc., At Home Properties LLC, and the At Home Subsidiaries. The Senior Unsecured Notes are subordinated to all secured indebtedness, including the Prepetition ABL Credit Facility, the Term Loan Facility, and the Senior Secured Notes. As of the Petition Date, the outstanding principal amount of the Senior Unsecured Notes is approximately $58 million.

> **E.      Cayman Notes Indenture and Intercompany Note.**

33.      Non-Debtor At Home Cayman is party to that certain indenture, dated as of May 12, 2023 (as amended, restated, supplemented, or otherwise modified from time to time,

the "Cayman Notes Indenture"), by and among At Home Cayman, as issuer, certain guarantors party thereto from time to time, and Wilmington Trust, National Association, as trustee and notes collateral agent. The Cayman Notes Indenture provides for the issuance of $200 million aggregate principal amount of 11.50% senior secured notes due May 12, 2028 (the "Cayman Notes"). The guarantors under the Cayman Notes Indenture are At Home Cayman Holdings, Ambience Intermediate, Inc., At Home Group Inc., other than with respect to its own obligations, At Home Holding II Inc., At Home Holding III Inc., At Home Companies LLC, At Home Stores LLC, At Home RMS Inc., At Home Gift Card LLC, At Home Procurement Inc., At Home Properties LLC, and the At Home Subsidiaries. The Cayman Notes are secured by a second priority lien on the Prepetition ABL Collateral and a first priority lien on all non-Prepetition ABL Collateral. As of the Petition Date, the outstanding principal amount of the Cayman Notes is approximately $200 million.

34.     The net proceeds of the Cayman Notes were subsequently lent to At Home Group Inc. pursuant to an intercompany note. As such, Debtor At Home Group Inc. is party to that certain intercompany note, dated as of May 12, 2023 (as amended, restated, supplemented, or otherwise modified from time to time, the "Intercompany Note"), by and among At Home Group Inc., At Home Cayman, certain guarantors party thereto from time to time, and Delaware Trust Company, as administrative agent and intercompany note collateral agent. The Intercompany Note provides for the issuance to At Home Group Inc. of a $200 million intercompany note which matures on May 12, 2028. The Intercompany Note bears interest at a fixed rate of 11.50% per annum. The guarantors under the Intercompany Note are Ambience Intermediate, Inc., At Home Group Inc., other than with respect to its own obligations, At Home Holding II Inc., At Home Holding III Inc., At Home Companies LLC, At Home Stores LLC, At Home RMS Inc., At Home Gift Card LLC,

At Home Procurement Inc., At Home Properties LLC, and the At Home Subsidiaries. The Intercompany Note is secured by a second priority lien on the Prepetition ABL Collateral and a first priority lien on all non-Prepetition ABL Collateral. As of the Petition Date, the outstanding principal amount of the Intercompany Note is approximately $200 million. On May 23, 2025, the parties to the Cayman Notes Indenture and the Intercompany Note entered into the Omnibus Forbearance Agreement with respect to an $11.5 million interest payment due under the Cayman Notes Indenture on May 15, 2025, and a $11.5 million interest payment due under the Intercompany Note on May 15, 2025.

      **F.**     **Exchange Notes Indenture.**

    35.    Debtor At Home Group Inc. is party to that certain indenture, dated as of May 12, 2023 (as amended, restated, supplemented, or otherwise modified from time to time, the "Exchange Notes Indenture"), by and among At Home Group Inc., as issuer, certain guarantors party thereto from time to time, and Wilmington Trust, National Association, as trustee and notes collateral agent. The Exchange Notes Indenture provides for the issuance of $412,538,220 aggregate principal amount of 7.125%/8.625% cash/payment-in-kind toggle senior secured notes due May 12, 2028 (the "Exchange Notes"). The Exchange Notes bear interest at a fixed rate of 7.125% if paid in cash or 8.625% if paid in-kind, with At Home Group Inc. having the option to elect at its own discretion whether to pay in cash or pay in-kind. The guarantors under the Exchange Notes Indenture are Ambience Intermediate, Inc., At Home Group Inc., other than with respect to its own obligations, At Home Holding II Inc., At Home Holding III Inc., At Home Companies LLC, At Home Stores LLC, At Home RMS Inc., At Home Gift Card LLC, At Home Procurement Inc., At Home Properties LLC, and the At Home Subsidiaries. The Exchange Notes are secured by a second priority lien on the Prepetition ABL Collateral and a first priority lien on

all non-Prepetition ABL Collateral.  As of the Petition Date, the outstanding principal amount of the Exchange Notes is approximately $483 million.

**G.    Equity Interests.**

36.    The Debtors transitioned from a publicly traded to a privately held company when H&F acquired the Company in July 2021.  As of the Petition Date, Ambience Parent, Inc. has 152,346,716.50 of shares outstanding.  H&F holds 99.192% of Ambience Parent, Inc.'s shares, all of which constitute voting shares, through four different funds.  The remaining 0.808% shares constitute non-voting shares and are held by various individuals who have held or currently hold management positions at the Company.

**The DIP Facility**

**I.    The Debtors' Need to Access the DIP Facility and Use of Cash Collateral.**

37.    As further described in the First Day Declaration and the Baird Declaration, the Debtors require immediate access to the DIP Facility in addition to the continued use of Cash Collateral to fund operations, capital expenditures, and the administrative costs of these chapter 11 cases.  As part of the contingency planning process, the Debtors and their advisors analyzed the Debtors' anticipated go-forward liquidity needs and the amount of postpetition financing required to support the Debtors' ongoing business operations and fund the administrative costs of this chapter 11 process.  *See* First Day Decl. ¶¶ 81-82.  Through this analysis, the Debtors and their advisors developed the Approved Budget, which provides an accurate reflection of the Debtors' likely funding requirements in the initial 13 weeks of these chapter 11 cases (including detailed line items for categories of cash flows anticipated to be received or disbursed during this period), as well as longer-term monthly forecasts.  *Id*.

38.    Based on this analysis, the Debtors require incremental liquidity to fund postpetition operations and chapter 11 administrative costs and demonstrate to trade partners,

customers, employees, and other constituents that the Debtors will continue to operate in the ordinary course and have sufficient liquidity to do so. *See* First Day Decl. ¶¶ 81-82. Based on the Debtors' forecasts, the Debtors would be unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover the projected restructuring costs of these chapter 11 cases without access to the postpetition financing provided by the DIP Facility. *Id.*

39.     Specifically, access to the proposed DIP Facility and Cash Collateral will provide stability to the Debtors' business operations and facilitate a smooth entry into these chapter 11 cases. Further, the DIP Facility will ensure the Debtors' ability to operate as a going concern during these cases, preserving value of the Debtors' estates for the benefit of their stakeholders. Absent the ability to access the funds available under the DIP Facility and Cash Collateral, the Debtors would likely face a value-destructive and immediate interruption to their operations and lose support from key stakeholders on which the Debtors' business depends, including vendors, suppliers, and employees. *See* First Day Decl. ¶¶ 81-83. These interruptions, in turn, would hinder the Debtors' ability to maximize the value of their estates, as the Debtors would be forced to curtail their operations significantly, to the detriment of all stakeholders. *Id.*

## II.     Alternative Sources of Financing Are Not Readily Available.

40.     The Debtors do not have any alternative sources of financing readily available with terms better than those included in the DIP Facility. Given the compressed time frame to negotiate the DIP Documents and the RSA leading up to the Petition Date, along with the complexities of the Debtors' business and significant liquidity challenges, it was impossible to approach a broad range of traditional financing sources with respect to DIP financing. As a result, the Debtors and their advisors embarked on a very targeted approach to solicit financing from parties that are familiar with the Debtors' business and best-suited to provide financing on an expedited basis.

Case 25-11120-JKS    Doc 16    Filed 06/16/25    Page 43 of 64

41.      As described in the Baird Declaration, the Debtors and their advisors engaged with the DIP Lenders, the Debtors' existing investors, and other key stakeholders on the terms of a potential financing.  In the weeks preceding the Petition Date, the Debtors, with the assistance of PJT, also contacted several third-party financial institutions regarding providing postpetition financing to the Debtors.  *See* Baird Decl. ¶¶ 13.  The Debtors received no third-party financing proposals.  Due to the Debtors' inability to secure senior financing without near-unanimity across their capital structure, no material unencumbered collateral, and the Company's inability to continue meeting its obligations, including to landlords and to its key vendors, there were no financing alternatives that could provide new money on an expedited timeline while also providing security to potential new money lenders.  Accordingly, the Debtors engaged in negotiations with the Ad Hoc Group and the Prepetition ABL Secured Parties to (i) provide near-term DIP financing and access to cash collateral and (ii) engage with the Debtors' other lenders to build greater consensus for a restructuring.  *Id.* ¶¶ 13-14.

42.      The DIP Facility is market-tested and the product of good-faith, arm's-length negotiations.  *See* Baird Decl. ¶¶ 23, 25, 27.  The DIP Facility provides critical liquidity to the Debtors on reasonable terms, and represents the best, and likely only, available financing option for the Debtors under the facts and circumstances of these chapter 11 cases.  *Id* ¶ 13.  Accordingly, the DIP Facility is in the best interest of the Debtors' estates and represent a sound exercise of the Debtors' reasonable business judgment.

## Basis for Relief

**I.      The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

      **A.      Entry into the DIP Documents Is a Sound Exercise of the Debtors' Business Judgment.**

43.     The Court should authorize the Debtors, as a sound exercise of their business judgment, to execute and deliver the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

44.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

45.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) ("Viewed in isolation, several of the terms of the [postpetition financing] might appear to be extreme or even unreasonable.  Certainly, many of them favor the DIP Lenders.  But, taken in context, and considering the relative circumstances of the parties, the Court does not believe that the terms are unreasonable."); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  Courts may also appropriately take into consideration noneconomic benefits to a debtor offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

2009 WL 2902568, at *4 (Bankr.  S.D.N.Y. July 6, 2009) (emphasis added).

46.     The Debtors' decision to move forward with the DIP Facility is a sound exercise of their business judgment following an arm's-length process and careful evaluation of alternatives (or lack thereof).  The Debtors require an immediate capital infusion in the form the DIP Facility and access to Cash Collateral to operate their business postpetition, finance working capital and

payroll, maintain favorable relations with landlords, vendors, suppliers, customers, and other contract counterparties, fund these chapter 11 cases, and preserve the Debtors' assets during the pendency of these cases. *See* First Day Decl. ¶ 83. Accordingly, the Debtors' access to the DIP Facility will enable the Debtors to stabilize their cash flows, continue operating in the ordinary course, and preserve going-concern value throughout the chapter 11 process. *Id.* ¶ 84. In particular, the Debtors believe that the Initial Approved Budget and any subsequent Approved Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the applicable Approved Budget. *Id.* ¶ 82. On the other hand, absent an expedient and fully funded chapter 11 cases, the Debtors will face a heightened business disruption that would significantly damage their business operations and going-concern value and materially impair creditors' recoveries.

47.    The Debtors negotiated the DIP Credit Agreement and other DIP Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best and only financing available under the circumstances. *See* Baird Decl. ¶ 21. The Debtors, in consultation with their advisors, determined that the DIP Lenders' financing proposal represents the only viable postpetition financing option available to the Debtors. *Id.* The DIP Facility provides the Debtors with market-tested postpetition financing on the best and only available terms and are necessary for the Debtors to continue operating their business and complete the value-maximizing transactions pursuant to the the RSA. *Id.* ¶¶ 21, 27. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents, as it is a sound exercise of the Debtors' business judgment.

**B.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

48.    The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the

Bankruptcy Code. More specifically, the Debtors propose to provide to the DIP Lenders, subject to the Carve Out and ABL Liens (solely (i) with respect to ABL Priority Collateral and (ii) to the extent any ABL Secured Obligations remain outstanding), continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral, which include substantially all of the Debtors' assets, and, specifically, (a) a priming security interest in and lien on the DIP Collateral to the extent such DIP Collateral is subject to prepetition liens that secure the prepetition secured obligations of the Pari First Lien Secured Parties, (b) a junior security interest in and lien on the DIP Collateral to the extent such DIP Collateral is subject to the Prepetition Permitted Senior Liens and (c) a first priority senior security interest in and lien on all property of the Debtors that is not subject to a valid, perfected and non-avoidable lien, subject to and as further provided for in the DIP Documents and the Interim Order.

49. The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c); *see also In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

   a. the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code—*i.e.*, by allowing a lender only an administrative claim;

   b. the credit transaction is necessary to preserve the assets of the estate; and

> c.  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *see also L.A. Dodgers LLC*, 457 B.R. at 312–13 (Bankr. D. Del. 2011); *Ames Dep't Stores*, 115 B.R. at 37–40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).

50.    As described above and as set forth in the Baird Declaration, the Debtors recognized that it would be particularly difficult to secure financing because time was limited and substantially all of the Debtors' cash and material assets are encumbered by existing liens under their prepetition debt.  *See* Baird Decl. ¶ 13.  Absent access to the DIP Facility, which will provide the Debtors with sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  *See* First Day Decl. ¶ 83.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Credit Agreement, are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors have met the standard for obtaining postpetition financing under section 364(c) of the Bankruptcy Code.

51.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court may:

> authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving superpriority claims in favor of the DIP Lenders is reasonable

48

and appropriate.

52.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the requisite number under the applicable of Prepetition Secured Parties have consented to being "primed" or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

53.     Here, the DIP Lenders, who represent more than 96% of the Prepetition Secured Parties, affirmatively consented to, and actively participated in providing, the proposed DIP Facility.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Moreover, as more fully discussed herein and as set forth in the Interim Order, the Debtors propose to provide an adequate protection package to protect the interests of the Prepetition Secured Parties, including the Prepetition ABL Secured Parties, whose security interests in and liens on the Prepetition Collateral are being primed.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

### C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.

54.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa 1987).  Moreover, in circumstances where only a few lenders

likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Snowshoe*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that the bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that the section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37–39 (finding that the debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

55.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.,* 15 B.R. 660, 663 (D. Colo. 1981) (holding that bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

56.     As discussed above, the Debtors, with the assistance of their advisors, ran a marketing process to gauge third-party lenders' interest in providing DIP financing. *See* Baird Decl. ¶ 13.  To avoid an expensive priming fight in connection with an alternative postpetition financing facility, the Debtors would either need to (a) obtain the Prepetition Secured Parties' consent to an alternative financing priming their liens or (b) identify a third-party lender willing to

provide postpetition financing on a junior basis. *Id.* Of the potential third-party lenders that PJT contacted to solicit proposals for DIP financing, only five parties executed a nondisclosure agreement and received access to additional diligence information, and none were willing to provide DIP financing on a junior or unsecured basis. *Id.* Despite the Debtors' prepetition efforts and the DIP marketing process undertaken by the Debtors and their advisors, the Debtors do not have any actionable alternative financing or restructuring solutions. Moreover, any attempt to prime the Prepetition Secured Parties, would likely result in expensive and distracting litigation and valuation dispute at the very outset of these chapter 11 cases, which would interfere with the Debtors' orderly reorganization of their business. Further, the Debtors do not believe they have sufficient unencumbered assets to secure adequate DIP financing to fund a non-consensual chapter 11 case. *Id.*

57.    Thus, the Debtors have determined that the DIP Facility provides the most favorable terms while reducing execution risks and providing the incremental liquidity necessary to fund the chapter 11 cases. *See* Baird Decl. ¶ 13. Accordingly, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

### D.    The Debtors Should Be Authorized to Use Cash Collateral.

58.    Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including Cash Collateral. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, the Prepetition ABL Secured Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order. As described in the First Day

Declaration, access to Cash Collateral on an interim basis is essential to the continued operation of the Debtors' business and smooth entry into these chapter 11 cases.  *See* First Day Decl. ¶ 13. Accordingly, use of the Cash Collateral is in the best interests of the Debtors' estates and all of their stakeholders, including the Prepetition ABL Secured Parties, and should be approved.

> **E.      Adequate Protection provided to the Prepetition Secured Parties Is Appropriate.**

59.      Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  *See* 11 U.S.C. § 363(e).  Section 364(d)(1) of the Bankruptcy Code also provides adequate protection for the secured creditors whose interest in properties are primed in connection with the debtors' obtaining of postpetition financing. *See* 11 U.S.C. § 364(d)(1)(B).  Further, section 362(d)(1) of the Bankruptcy Code provides that the automatic stay may be lifted for cause, including the lack of adequate protection for a party's interests in property due to the imposition of the automatic stay.  *See* 11 U.S.C. § 362(d)(1).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case-by-case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) (holding that "the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (holding that "what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on

Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

60.    As described herein and as set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with a variety of adequate protection to protect against the postpetition Diminution in Value, if any, of the Prepetition Collateral, including the Cash Collateral, resulting from the Debtors' sale, lease, or use of the Prepetition Collateral, the imposition and enforcement of the automatic stay pursuant to section 362 of the Bankruptcy Code, and the priming of the Prepetition Secured Parties' respective interests in the Prepetition Collateral. The Adequate Protection package includes, among other protections, (a) replacement liens on the DIP Collateral in accordance with the priorities set forth in the Interim Order, (b) allowed, superpriority administrative expense claims in accordance with the priorities set out in the Interim Order, (c) the reasonable and documented fees and expenses of counsel and other professionals, as set forth in the Interim Order, (d) ongoing interest payments in cash on account of the Prepetition ABL Obligations to the extent provided for under section 506(b) of the Bankruptcy Code as set forth in the Interim Order, and (e) such other adequate protection for the Prepetition ABL Secured Parties as set forth in the Interim Order (collectively, the Adequate Protection Package").  In light of the foregoing, the proposed Adequate Protection Package to be provided for the benefit of the Prepetition Secured Parties is appropriate.  The Debtors' provision of the Adequate Protection Package is not only necessary to protect against any Diminution in Value, but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Prepetition Collateral, including DIP Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

61.     The proposed Adequate Protection Obligations are appropriate and are sufficient to protect the Prepetition Secured Parties from any potential Diminution in Value to the Cash Collateral.  The Debtors' provision of the Adequate Protection Obligations is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

### F.     The DIP Roll-Up is Appropriate.

62.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).   The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

63.     Repaying prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.   The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to the relief requested herein.  *See, e.g.*, *In re Am. Tire Distrib., Inc.*, No. 14-12391 (CTG) (Bankr. D. Del. Nov. 22, 2024) (authorizing DIP facilities of approximately $1,200 million, including $250 million of new money DIP term loans and a $375 million roll-up of prepetition term loan obligations upon entry of the interim order and an additional $375 million

roll-up of the prepetition term loan obligations upon entry of the final order (3:1 roll-up)); *In re Wheel Pros, LLC,* No. 24-11939 (JTD) (Bankr. D. Del. Sept. 10, 2024) (authorizing DIP facilities of approximately $285 million, including $110 million of new money DIP term loans and a roll-up of approximately $175 million of a prepetition ABL facility); *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. June 10, 2024) (authorizing a $180 million DIP facility, including $45 million of new money DIP term loans and a $135 million roll-up of prepetition first lien term loans (3:1 roll-up)); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. June 6, 2024) (authorizing DIP facilities of approximately $225 million, including $25 million of new money DIP term loans and a roll-up of approximately $63 million of prepetition term loans and approximately $136 million of a prepetition ABL facility (2.5:1 roll-up with respect to the prepetition term loans)); *In re Sientra, Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. Mar. 11, 2024) (authorizing a $90 million DIP facility, including $22.5 million of new money DIP term loans and a $67 million roll-up of the prepetition debt obligations (2.9:1 roll-up)).[8]

64.      Here, the proposed DIP Roll-up is an exercise of the Debtors' sound business judgment.  As set forth above, the DIP Credit Agreement provides for a junior "roll up" tranche facility in an aggregate principal amount of approximately $400 million, representing a 2:1 roll up and conversion on a cashless basis of the Pari First Lien Obligations held by the DIP Lenders.  The Debtors submit that the DIP Roll-Up is reasonable under the circumstances of these chapter 11 cases.  This repayment is a sound exercise of the Debtors' business judgment and is a material component of the structure of the DIP Facility.  Without continued access to the additional liquidity provided under the DIP Facility, the Debtors will be unable to fund the administration of these

---

[8]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

chapter 11 cases. The DIP Roll-Up is a material component of the DIP Facility structure and was required by the DIP Lenders as a condition to their new money commitment.

65.     As discussed herein and in the Baird Declaration, the DIP Roll-Up was the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, is an integral component of the overall terms of the DIP Facility, and was required by the DIP Lenders as consideration for the extension of postpetition financing. *See* Baird Decl. ¶ 29. Without access to the additional liquidity provided under the DIP Facility and continued access to the Cash Collateral, the Debtors will be unable to fund the necessary administrative costs of these chapter 11 cases. Given the Debtors' projected cash burn and the fact that no other party has put forward an actionable financing proposal, among other reasons, the DIP Roll-Up pursuant to the Interim Order is reasonable, appropriate, a sound exercise of the Debtors' business judgment, and ultimately in the best interest of all stakeholders given the alternatives.

## II.     The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agent and the DIP Lenders Under the DIP Documents.

66.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agents and the DIP Lenders. These fees are customary and reasonable under the circumstances. Additionally, they are comparable to fees agreed upon in similar DIP financings. These interest and fees are summarized below:

    a.     **Interest Rate:** At any time prior to the occurrence of an Event of Default (as defined below), interest on the DIP Obligations outstanding at such time shall accrue at a rate per annum equal to (x) with respect to the Tranche A DIP Loans, Term SOFR + 8.00% per annum and (y) with respect to the Tranche B DIP Loans, Term SOFR + 4.00% per annum. All interest on the Tranche A DIP Loans and the Tranche B DIP Loans shall be payable in kind by being capitalized and added to the principal amount of outstanding Tranche A DIP Loans or Tranche B DIP Loans, as applicable, on the last day of each fiscal quarter in arrears.

b.    **Default Rate:** Upon an Event of Default, interest on the DIP Obligations shall accrue at the otherwise applicable interest rate plus an additional 4.00% per annum, which shall be payable in kind by being capitalized and added to the principal amount of outstanding DIP Loans, on the last day of each month in arrears.

c.    **Backstop Fee:** 5.00% of the initial principal amount of the New Money Commitment payable pro rata to the Backstop Parties in proportion to their backstop allocation of New Money Commitment, which shall be earned, due and payable in-kind on the Closing Date by adding the amount of such fee to the principal amount of the Tranche A DIP Facility.

d.    **Unused Facility Fee**: 4.00% per annum of the average daily unused portion of the maximum amount approved to be funded with respect to the New Money Commitment. The Unused Facility Fee shall be payable in kind by being capitalized and added to the principal amount of outstanding Tranche A DIP Loans, on the last day of each fiscal quarter in arrears from the Closing Date until the Termination Date.

e.    **Upfront Fee**: 3.00% of the initial principal amount of the New Money Commitment actually funded payable pro rata to the DIP Lenders in proportion to their allocation of New Money Commitments, which shall be earned, due and payable in-kind (x) with respect to the Initial Tranche A DIP Draw, on the Closing Date, and (y) with respect to New Money Commitments, on the date of entry of the Final DIP Order, in each case, by adding the amount of such fee to the principal amount of the Tranche A DIP Facility (and which shall be allocated to the DIP Lenders in accordance with the syndication mechanics).

f.    **Exit Fee**: 3.00% of the principal amount of the Tranche A DIP Loan funded. The Exit Fee shall be fully earned on the Closing Date and payable in-kind on the Termination Date by adding the amount of such fee to the principal amount of the Tranche A DIP Facility pro rata to the DIP Lenders in proportion to their holding of Tranche A DIP Loan.

g.    **Agency Fee:** The Debtors shall pay an agency fee to the DIP Agent commencing on the Closing Date in an amount

to be agreed between the Debtors and the DIP Agent and
acceptable to the Required DIP Lenders.

67.     Courts in this district have approved similar aggregates in fees in large chapter 11

cases.  *See, e.g.*, *In re Marelli Automotive Lighting USA LLC,* No. 25-11034 (CTG) (Bankr. D.

Del. June 12, 2025) (approving a commitment fee of 4 percent of the DIP loans, a ticking fee of 3

percent per annum of the unfunded commitment with respect to the DIP loans, and a backstop fee

of 5 percent); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. March 19, 2025)

(approving a commitment fee accruing at a rate equal to 0.50 percent per annum on the average

daily amount of the available DIP commitment, a letter of credit fee of 4 percent, and an agency

fee); *In re Am. Tire Distrib., Inc.*, No. 14 12391 (CTG) (Bankr. D. Del. Nov. 22, 2024) (approving

a commitment fee of 5 percent of the new money DIP loan and an exit fee of 6 percent); *In re

Wheel Pros, Inc.*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) (approving a closing fee of

3 percent, an exit fee of 5 percent, and a letter of credit fee of 4.25 percent); *In re Vyaire Med.,

Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. Jun. 10, 2024) (approving a commitment fee of 2 percent

of the new money DIP loan, a backstop fee of 5 percent, and an exit fee of 1.25 percent).[9]

68.     There is ample justification for this Court to approve the payment of such interest

and fees, which are part of the DIP Documents.  As set forth in the Baird Declaration, the Debtors

believe that the interest and fees to be paid under the DIP Facility are necessary and reasonable

under the circumstances of these chapter 11 cases, and are the result of arm's-length and good-faith

negotiations between the Debtors and the DIP Lenders.  It is understood and agreed by all parties

that the interest and fees are integral components of the overall terms of the DIP Facility and were

required by the DIP Lenders as consideration for the extension of postpetition financing.  *See* Baird

---

[9]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.

Decl. ¶¶ 17-18. Thus, they should not be viewed separately but rather as a part of the overall, substantial benefits provided under the DIP Facility. Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facility.

**III.    The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection Under Section 364(e) of the Bankruptcy Code.**

69.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

70.    As explained herein and the Baird Declaration, the DIP Documents are the result of: (a) the Debtors' reasonable and informed determination that no alternative sources of postpetition financing are readily available to the Debtors (whether unsecured or secured) on terms better than the DIP Facility, and (b) arm's-length, good-faith negotiations between the Debtors and DIP Lenders. The DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and the DIP Documents. Further, upon realizing there was a lack of interest from third-party lenders to provide postpetition financing through a DIP marketing process, the Debtors and their advisors determined that the DIP Facility, supported by a majority of the

Prepetition Secured Parties, represent the best and the only available financing option. *Id.* ¶¶ 13-14.

71.     Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Agents and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Secured Parties are entitled to all of the protections afforded thereby.

**IV.     The Automatic Stay Should Be Modified on a Limited Basis.**

72.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Secured Parties and the Pari First Lien Secured Parties to file financing statements, security agreements, mortgages, leasehold mortgages, notices of liens, and other similar documents to validate and perfect the liens and security interests granted to them in the Interim Order.  The proposed Interim Order further provides that the automatic stay be modified to the extent necessary to implement the terms of the Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default or an ABL Cash Collateral Termination Event, and an appropriate opportunity for the Debtors to obtain appropriate relief from the Court, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Secured Parties, the Pari Fist Lien Secured Parties, or the Prepetition ABL Secured Parties, as applicable, to exercise all rights and remedies in accordance with the DIP Documents, or applicable law.

73.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Marelli Automative Lighting USA LLC,* No. 25-11034 (CTG) (Bankr. D. Del. June 12, 2025) (modifying

automatic stay as necessary to effectuate the terms of the order and following occurrence of an event of default); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. March 19, 2025) (same); *In re Am. Tire Distrib., Inc.*, No. 14-12391 (CTG) (Bankr. D. Del. Nov. 22, 2024) (same); *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) (same); *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. July 11, 2024) (same). [10]

## V.   Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm.

74.   Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to use cash collateral and to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Bankruptcy Rule 4001(b)(2), 4001(c)(2).   Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

75.   For the reasons noted above, in the First Day Declaration, and in the Baird Declaration, the Debtors have an immediate need for the liquidity provided by the DIP Facility. *See* First Day Decl. ¶ 83; Baird Decl. ¶ 9.  The proposed DIP Facility is critical to the Debtors' ability to fund its operations while providing sufficient liquidity without creating a value-destructive "priming" or valuation dispute at the outset of these chapter 11 cases.  *See* First Day Decl. ¶¶ 82-84.  Access to the proceeds of the DIP Facility and Cash Collateral are essential

---

[10]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

to the Debtors' orderly operation of their business, maintaining business relationships with their vendors and suppliers, paying wages and benefits, and satisfying other essential working capital needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest. Without such access, the Debtors would be unable to maintain their business during these chapter 11 cases and would suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest, including the Prepetition Secured Parties. *Id.*

76.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 4001(c), the Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility and to use Cash Collateral. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### Request for Final Hearing

77.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after twenty-one days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### Notice

78.     The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) the United

States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) counsel to the Ad Hoc Group and the DIP Lenders; (g) counsel to the Prepetition ABL Agent; and (h) any party that is entitled to notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request entry of the DIP Orders, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  June 16, 2025
Wilmington, Delaware

/s/ Joseph M. Mulvihill

| | |
|---|---|
| **YOUNG CONAWAY STARGATT & TAYLOR, LLP** | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Robert S. Brady (DE Bar No. 2847) | Nicole L. Greenblatt, P.C. (*pro hac vice* pending) |
| Edwin J. Harron (DE Bar No. 3396) | Matthew C. Fagen, P.C. (*pro hac vice* pending) |
| Joseph M. Mulvihill (DE Bar No. 6061) | Elizabeth H. Jones (*pro hac vice* pending) |
| Rodney Square | 601 Lexington Avenue |
| 1000 North King Street | New York, New York 10022 |
| Wilmington, Delaware 19801 | Telephone:    (212) 446-4800 |
| Telephone:    (302) 571-6600 | Facsimile:    (212) 446-4900 |
| Facsimile:    (302) 571-1253 | Email:    nicole.greenblatt@kirkland.com |
| Email:    rbrady@ycst.com | matthew.fagen@kirkland.com |
| eharron@ycst.com | elizabeth.jones@kirkland.com |
| jmulvihill@ycst.com | |

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*