**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AT HOME GROUP INC., *et al.*,[1] | ) | Case No. 25-11120 (●) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF**
**JAMES BAIRD IN SUPPORT OF THE**
**MOTION OF DEBTORS FOR ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING**
**THE DEBTORS TO (A) OBTAIN POSTPETITION SENIOR**
**SECURED FINANCING AND (B) UTILIZE CASH COLLATERAL,**
**(II) GRANTING ADEQUATE PROTECTION, (III) GRANTING LIENS**
**AND SUPERPRIORITY CLAIMS, (IV) MODIFYING THE AUTOMATIC STAY,**
**(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, James H. Baird, III, hereby declare under penalty of perjury as follows:

1.      I am a Partner in the Restructuring and Special Situations Group at PJT Partners LP ("PJT"). PJT is a global investment banking firm listed on the New York Stock Exchange and has its principal offices located at 280 Park Avenue, New York, New York 10017. PJT is the proposed investment banker for the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases.[2] For the past several months, my team and I have worked closely with the Debtors on their current restructuring process. As such, I am familiar with the Debtors' day-to-day operations, business affairs, financial performance, and restructuring efforts.

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/AtHome. The location of the Debtors' service address for purposes of these chapter 11 cases is: 9000 Cypress Waters Blvd, Coppell, Texas 75019.

[2]    The Debtors anticipate filing an application to retain PJT as their investment banker, effective as of the commencement of their chapter 11 cases, shortly hereafter.

2.      I submit this declaration (this "Declaration") in support of the relief requested in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion").[3] Pursuant to the DIP Motion, the Debtors are seeking approval of a priming superpriority senior secured debtor-in-possession financing delayed draw term loan (the "DIP Facility") in the amount of $600 million, of which $200 million is comprised of a new money commitment, and the use of the Prepetition ABL Secured Parties' (as defined below) cash collateral (the "Cash Collateral") on a consensual basis.  I submit this Declaration in support of my view that the proposed debtor-in-possession financing facility is (a) the product of an arm's-length, good-faith negotiation process, (b) the best and, in fact, only available postpetition financing option currently available to the Debtors under the circumstances, and (c) contains reasonable economic terms and conditions, taken as a whole, under the circumstances.

3.      Except as otherwise indicated, all statements set forth in this Declaration are based on my experience, my personal knowledge of the Debtors' operations, finances, and restructuring initiatives, information I learned from my review of relevant documents, information supplied to me by members of the Debtors' management and/or their other advisors, or information that I received from employees of PJT working directly with me or under my supervision.  I am not being compensated specifically for this testimony other than through payments received by PJT as

---

[3]      A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Jeremy Aguilar, Chief Financial Officer of At Home Group Inc. and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration, the DIP Orders, or the DIP Motion, as applicable.

a professional proposed to be retained by the Debtors, subject to approval by the Court.[4]  I am

authorized to submit this Declaration on behalf of the Debtors, and, if called to testify as a witness,

I could and would testify competently to the statements set forth in this Declaration.

### Qualifications

4.     PJT is a leading global financial advisory firm with more than 1,000 employees in

eleven offices in the United States, Europe, and Asia.  The firm offers integrated advisory services

for mergers and acquisitions, restructuring and special situations, and fund placement.  PJT is an

industry leader and has advised companies and creditors in all aspects of complex restructurings

and bankruptcies.  The firm has extensive experience providing financial advisory and investment

banking services to financially distressed companies, including the representation of both debtors

and lenders in the procurement and provision of postpetition financing.  PJT is a registered

broker-dealer with the United States Securities and Exchange Commission, is a member of the

Securities Investor Protection Corporation, and is regulated by the Financial Industry Regulatory

Authority.

5.     I joined PJT when it first spun off from The Blackstone Group L.P. ("Blackstone")

in 2015.  I started at Blackstone in 2002 and over the years have held numerous positions there,

including as a Managing Director in the Restructuring and Reorganization Group immediately

prior to the spin-off.  I hold a Master of Business Administration with a concentration in finance

from Columbia Business School and a Bachelor of Arts from Bowdoin College.

6.     I have over twenty years of experience advising financially distressed companies,

municipalities, creditors, and sponsors in chapter 11 restructurings, out-of-court workouts, and

---

[4]    Pursuant to PJT's engagement letter with the Debtors, subject to Court approval thereof, PJT will be entitled to
       receive certain fees in connection with the transactions described herein.

other special situations. I have worked across numerous industries, including municipals, gaming, media and telecom, retail, automotive, industrials, aerospace, financials, real estate, insurance, and oil and gas. Select public transactions on which I have worked include: AIG, Ascend Performance Materials, Centric Brands, Covia, Cumulus Media, Detroit, Everstream, Ford Motor Company, General Motors, Gibson Brands, Houghton Mifflin, Hovnanian Enterprises, iHeartMedia, ILFC, J. Crew, Loyalty Ventures, Noranda Aluminum, Puerto Rico, Sequa, Tailored Brands, and Weight Watchers.

7.      PJT was initially retained by the Debtors on or around February 2023 to provide financial advisory services in connection with the liability management transaction described herein, which was ultimately consummated in May 2023. Subsequently, the Debtors engaged PJT as investment banker on or around February 11, 2025 to provide advisory and investment banking services in connection with the Debtors' review of strategic alternatives to address their capital structure and liquidity needs, which led to the Debtors' decision to file for these chapter 11 cases. In that capacity, I, along with other members of the PJT team, have been directly involved in the matters leading up to the Debtors' chapter 11 filings, including the negotiations regarding debtor-in-possession financing. Based on PJT's work for the Debtors over the past four months, I am familiar with the Debtors' day-to-day operations, business affairs, financial performance, and restructuring efforts.

8.      Since PJT's initial engagement by the Debtors, PJT has worked with the Debtors' management, financial staff, and other professionals, including Kirkland & Ellis, LLP, the Debtors' legal counsel, and AlixPartners, LLP ("Alix"), the Debtors' restructuring advisor, to assist the Debtors in evaluating strategic and restructuring alternatives. PJT's work has included, among other things: (i) analyzing the Debtors' liquidity and projected cash flows in coordination

with management and the Alix team; (ii) understanding the Debtors' businesses, operations, and finances; (iii) reviewing and analyzing the Debtors' balance sheet and capital structure alternatives; (iv) providing strategic advice to the Debtors' board of directors and management; (v) participating in negotiations with the Debtors' existing lenders and other parties in interest; (vi) evaluating out-of-court financing alternatives; (vii) soliciting, negotiating, and analyzing debtor-in-possession financing proposals and consensual use of cash collateral; and (viii) assisting the Debtors in connection with preparations for commencement of these chapter 11 cases, including work relating to the proposed DIP Facility.

## The Debtors' Need for DIP Financing and Access to Cash Collateral

9.      As further described in the First Day Declaration, the Debtors are in urgent need of liquidity to operate their businesses in the ordinary course through the chapter 11 cases.  Based on my professional experience, the Debtors' existing cash balance, and cash flow forecasts prepared by Alix and management, I do not believe the Debtors can prudently operate their businesses or fund the costs of these chapter 11 cases solely with the use of existing cash collateral.  I also believe, based on PJT's prepetition marketing efforts, that the DIP Facility, taken as a whole, is the best, and in fact, only, source of new-money postpetition financing currently available to the Debtors.  Accordingly, I believe entry into the proposed DIP Facility is necessary, value-maximizing, and will provide the Debtors with sufficient liquidity to continue to operate their businesses in the ordinary course during these chapter 11 cases.

## The Debtors' Efforts to Obtain Financing

10.      As described in greater detail in the First Day Declaration, the Debtors took various cost-saving and liquidity management measures from 2022 through 2025 in response to the headwinds faced by the business, including the closing of the liability management transaction in May 2023, which provided $200 million of new capital in addition to approximately $65 million

of incremental liquidity through payment-in-kind ("PIK") interest over two years on the exchanging Senior Unsecured Notes.  These measures provided meaningful incremental liquidity and helped the Debtors navigate through certain of its near-term challenges.  Unfortunately, ongoing business pressures continued and, toward the beginning of 2025, the Debtors were projecting a need for additional liquidity within the year.  In response, beginning in February 2025, the Debtors began to explore a range of strategic alternatives to alleviate pressure on its business, including seeking a capital infusion from its existing stakeholders as well as third parties.  As part of these efforts, the Debtors and their advisors engaged with an ad hoc group of lenders holding approximately 96% of the Pari First Lien Obligations and more than 99% of the Prepetition Cayman Notes Obligations (collectively, the "Ad Hoc Group" and each of their designated affiliates or managed entities, the "Backstop Parties"), as well as with the agent and lenders under the Prepetition ABL Credit Facility (collectively, the "Prepetition ABL Secured Parties").  These discussions focused on exploring various transaction and financing alternatives, including a potential out-of-court capital raise in conjunction with amendments to the Prepetition ABL Credit Agreement.

11.    In parallel with those discussions, PJT commenced a marketing process for new money financing to address the Debtors' liquidity constraints and separately reached out to (a) six third parties and (b) certain of the Debtors' existing lenders in the capital structure.  Of those six third parties, two submitted proposals for a new "first-in last-out" facility and two indicated their intent to also submit financing proposals subject to certain conditions.  Ultimately these proposals did not provide the Debtors the liquidity needed to bridge through the expected challenges to the business, particularly given the increasing uncertainty around tariffs in April 2025, and it became clear that a holistic recapitalization was needed.

12.     Given the Debtors' declining liquidity, the Debtors and their advisors engaged in negotiations with the Ad Hoc Group and the Prepetition ABL Secured Parties around financing in the context of a recapitalization.  The Ad Hoc Group made it clear that they were unwilling to indefinitely fund the Debtors' operations outside of a chapter 11 filing.  In the absence of a viable out-of-court alternative, the Debtors and their advisors determined that a chapter 11 filing could allow the Debtors to raise the liquidity necessary to comprehensively restructure their balance sheet and right size their lease portfolio.  On or around May 27, 2025, the Debtors began to explore potential third-party sources of debtor-in-possession financing, and in parallel negotiated the provisions of a debtor-in-possession financing facility from the Ad Hoc Group.

13.     Starting on June 5, 2025, PJT contacted fifteen sophisticated third-party financial institutions that were experienced in and able to provide emergency debtor-in-possession financings in complex distressed situations.  Of the fifteen third-parties contacted, five signed non-disclosure agreements and received financial diligence from the Debtors, but none submitted an actionable proposal.  Based on my participation in the process and my experience, these efforts were unsuccessful because, among other things, the Prepetition Secured Parties hold liens on substantially all of the Debtors' assets and have told the Debtors that they are unwilling to agree to third-party debtor-in-possession financing on either a *pari passu* or priming basis.  This view is consistent with the feedback we received from the third-party financing sources that declined the opportunity to provide financing.  Specifically, third-party financing sources contacted by PJT were not interested in providing debtor-in-possession financing because, among other reasons, they (a) did not wish to provide a financing facility on a junior basis, (b) were not interested in providing a priming facility on a nonconsensual basis and undertaking a value-destructive "priming fight," (c) did not want to lend against the Debtors' limited pool of unencumbered assets,

and/or (d) they did not expect to be able to achieve a competitive refinancing of the Prepetition ABL Credit Facility on the timeline required for the Debtors.

14.　　In parallel with the solicitation of third-party proposals, PJT and the Debtors' other advisors continued to engage with the Ad Hoc Group (in their capacity as lenders under the DIP Facility, the "DIP Lenders") regarding the terms on which the Debtors could obtain delayed-draw term loan debtor-in-possession financing and the consensual use of cash collateral from the Prepetition Secured Parties. Those negotiations were ultimately successful and resulted in the DIP Facility.

**The Terms of the Proposed DIP Facility**

15.　　As noted in the DIP Motion, in the days leading up to the Petition Date, and after several rounds of negotiations with the Ad Hoc Group and the Prepetition ABL Secured Parties, the Debtors reached agreements with both lender groups to provide a DIP Facility and access to the consensual use of Cash Collateral. The DIP Facility is fully backstopped by the Ad Hoc Group, while the Pari First Lien Secured Parties who sign the RSA will be offered the opportunity to participate in the syndication of the DIP Facility. The DIP Facility is a $600 million senior secured superpriority term loan facility, composed of: (a) a senior tranche funded with new money first-out delayed draw term loans in an aggregate amount of $200 million (the "New Money Amount" and the commitments in respect thereof, "New Money Commitments"), $75 million of which will be available upon entry of the Interim Order (the "Tranche A DIP Facility"); and (b) a junior superpriority "roll-up" tranche facility in an aggregate principal amount of $400 million (the "Tranche B DIP Facility"), representing a 2:1 roll-up and conversion on a cashless basis of the Pari First Lien Obligations held by the DIP Lenders (the "DIP Roll-Up" and the commitments in respect thereof together with the New Money Commitments, the "DIP Commitments" and such

loans, the "DIP Loans"). Fifty percent of the DIP Facility is allocated directly to the Backstop Parties (the "Holdback") as consideration for backstopping the DIP Facility, while the remaining fifty percent is being offered on a *pro rata* basis to all holders of Pari First Lien Obligations who sign the RSA. The Debtors' and the Prepetition ABL Secured Parties also agreed, in connection with the DIP Facility, to the consensual use of Cash Collateral on the terms and conditions set forth in the Interim Order.

16.     The DIP Loans and Cash Collateral, if approved, are anticipated to be used, as applicable, (i) for working capital and general corporate purposes, (ii) to fund the administration of the chapter 11 cases, (iii) to fund the Carve Out, and (iv) to fund transaction costs, fees and expenses, in the case of each of the foregoing (other than funding the Carve Out), in accordance with the Approved Budget or as otherwise approved by the DIP Lenders.

**A.     The DIP Facility Interest and Fees.**

17.     In connection with the DIP Facility and the Interim Order, the Debtors have agreed to grant liens on certain unencumbered property on a first priority priming basis and pay interest and certain fees to the DIP Secured Parties, including a backstop fee, an unused facility fee, an upfront fee, an exit fee, and an agency fee. Specifically, the Debtors have agreed to pay:

(a)     ***Interest Rates***: Interest on the DIP Obligations outstanding at such time shall accrue at a rate per annum equal to (x) with respect to the Tranche A DIP Loans, Term SOFR + 8.00% per annum and (y) with respect to the Tranche B DIP Loans, Term SOFR + 4.00% per annum.

(b)     ***Fees***:

(i)     *Backstop Fee*: 5.00% of the initial principal amount of the Tranche A DIP Loan Commitment payable pro rata to the Backstop Parties in proportion to their backstop allocation of Tranche A DIP Loan Commitment;

(ii)     *Unused Facility Fee*: 4.00% per annum of the average daily unused portion of the maximum amount approved to be funded with respect to the Tranche A DIP Loan Commitment;

(iii)   *Upfront Fee*:  3.00% of the initial principal amount of the Tranche A DIP Loan Commitment actually funded payable pro rata to the DIP Lenders in proportion to their allocation of Tranche A DIP Loan Commitments;

(iv)   *Exit Fee*:  3.00% of the principal amount of the Tranche A DIP Loans funded; and

(v)   *Agency Fee*:  an agency fee to the DIP Agent commencing on the Closing Date in an amount to be agreed between the Debtors and the DIP Agent and acceptable to the Required DIP Lenders.

18.      The Backstop Parties are seeking, upon entry of the Interim Order, a Backstop Fee that compensates them for an upfront commitment to provide the full amount of the DIP Facility, subject to certain milestones and conditions as further described in the DIP Credit Agreement.  The Backstop Parties and the broader group of DIP Lenders agreed that all interest and fees associated with the DIP Facility—including the Backstop Fee, Upfront Fee, and Exit Fee—would be paid in kind rather than in cash, reducing the cash burden of the DIP Facility on the Debtors during the chapter 11 cases.

**B.      The Milestones and Conditions Precedent.**

19.      The DIP Documents also contain certain milestones and conditions precedent that the Debtors must meet throughout the chapter 11 cases.  The milestones and conditions precedent were negotiated by the DIP Lenders as a condition to providing the DIP Facility and are anticipated to provide the Debtors with adequate time to implement the value-maximizing restructuring as further detailed in the RSA.  Negotiations around the milestones and conditions precedent were hard fought and resulted in significantly more flexible terms than initially proposed by the DIP Lenders.

**C.      The DIP Facility Provides Certain Adequate Protection to Secured Creditors.**

20.      The DIP Lenders conditioned their DIP financing proposals on, among other things, superpriority status and postpetition priming liens on substantially all of the Debtors' assets.

Additionally, the DIP Facility provides the Prepetition Secured Parties with customary adequate protection liens, including replacement liens, on the Prepetition Collateral and additional liens on unencumbered assets.  Notably, to help facilitate the Prepetition ABL Secured Parties' consent, the DIP Lenders have agreed to accept liens junior to the liens securing the Prepetition ABL Credit Facility with respect to the ABL Priority Collateral.

### The Terms of the Proposed DIP Facility Are the
### Best and Only Postpetition Financing Arrangements Available to the Debtors

21.     Based on the Debtors' and their advisors' efforts to secure postpetition financing, my experience in raising DIP financing, current market conditions, the Debtors' circumstances, and my involvement in the efforts to secure postpetition financing for the Debtors, the proposed DIP Facility, taken as a whole, is the best, and indeed only, financing option currently available to the Debtors.  In addition to providing the Debtors with liquidity at the outset of these chapter 11 cases necessary to avoid immediate and irreparable harm, entry into the DIP Facility will also provide the Debtors with access to the use of Cash Collateral on a fully consensual basis.  Such liquidity will allow the Debtors to fund their businesses in the ordinary course during these chapter 11 cases, ensure uninterrupted operations, and preserve the value of the Debtors' estates for the benefit of all stakeholders. I believe that there are no alternative sources of financing currently available on both better and more executable terms, taken as a whole, than the DIP Facility.

22.     *First*, the proposed DIP Facility is expected to provide the Debtors with access to the amount of capital that the Debtors, in consultation with their advisors, believe is necessary to administer these chapter 11 cases effectively and efficiently.

23.     *Second*, the terms of the proposed DIP Facility are the result of the negotiations and the marketing process described above, which, as described herein, enabled the Debtors to obtain DIP financing on terms, taken as a whole, that are reasonable under the current

circumstances described herein and in the DIP Motion.  As previously noted, the Debtors, with the assistance of their advisors, solicited and considered other sources of postpetition financing, but were unable to secure any alternative postpetition financing proposals on better and more executable terms, taken as a whole, than the DIP Facility.  Accordingly, the DIP Facility is the result of the Debtors' reasonable and informed determination that no alternative sources of postpetition financing are currently available to the Debtors (whether unsecured or secured) on terms better than the DIP Facility.

24.     *Third*, the overall DIP Facility recognizes the willingness of the DIP Lenders and Backstop Parties to provide the Debtors with critical incremental liquidity that will bridge the Debtors through these chapter 11 cases, despite significant macroeconomic uncertainty. These commitments were conditioned on, among other things, (i) the payment of fees under the DIP Credit Agreement, including the Upfront Fee, the Exit Fee, and the Backstop Fee (each as defined in the DIP Credit Agreement), (ii) customary forms of adequate protection, including replacement liens and superpriority status for adequate protection claims, (iii) the Holdback, and (iv) the DIP Roll-Up.

25.     *Fourth*, the economic terms proposed under the DIP Facility, such as the contemplated pricing, fees, and interest rates, are customary for DIP financings of this type. Additionally, the fees are structured on a payment-in-kind basis, which are projected to allow the Debtors to maintain sufficient liquidity during the pendency of these chapter 11 cases.  As a result of several rounds of negotiations, the Debtors were able to achieve more favorable terms, including a lower, payable-in-kind, interest rate, reduced fees, more favorable milestones, more flexible conditions precedent, and less restrictive covenants.  In my view, based on my discussions during the negotiation process, such economic terms were negotiated at arm's length, are an integral

component of the DIP Facility, and are, taken as a whole, appropriate and represent the best terms currently available to the Debtors under the current circumstances.

26.    ***Fifth***, the DIP Facility provides the Debtors with flexibility at emergence, as it may be either repaid in cash or converted into equity.  If the Debtors elect the equitization option, approximately $600 million in DIP Facility obligations—together with all accrued PIK interest and fees as of the emergence date—would be converted into equity in the reorganized Debtors. This conversion would significantly reduce post-emergence leverage, resulting in a substantially improved capital structure and enhanced financial flexibility in light of continued macroeconomic uncertainty.  Importantly, the Debtors also retain the option to repay the DIP Facility in cash upon exit.

27.    ***Finally***, the DIP Facility, a result of the Debtors' negotiations with the Ad Hoc Group and part of the overall RSA, provides the Debtors with a clear path to consummating a value-maximizing restructuring and successfully emerging from their chapter 11 cases.

28.    Overall, based on my experience, the lack of postpetition financing alternatives currently available to the Debtors, the circumstances of these cases, and the tangible benefit to the estates of having a substantial postpetition financing commitment, I believe that the DIP Facility, taken as a whole, is fair and reasonable and allows the Debtors to move forward with financing supported by key stakeholders in the Debtors prepetition capital structure.

### Conclusion

29.    Accordingly, I believe that the proposed DIP Facility, taken as a whole, is the best source of financing currently available to address the Debtors' liquidity needs while preserving value for the benefit of all stakeholders. In my professional opinion, the terms of the DIP Facility, including the DIP Roll-Up, are reasonable under the circumstances, are the product of good faith, arm's-length negotiations, and will maximize the value of the Debtors for the benefit of all

stakeholders.  Thus, I believe that the DIP Facility is in the best interests of the Debtors and their creditors and should be approved.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

PJT PARTNERS LP

Dated:  June 16, 2025

_____

Name:  James H. Baird, III
Title:    Partner