**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AT HOME GROUP INC., *et al.*,[1] | ) | Case No. 25-11120 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Re: Docket No. 16, 17, 18 107, 268, 271, 275, 279, 283, 310, & 313 |

**NOTICE OF FILING OF PROPOSED FINAL ORDER (I) AUTHORIZING THE
DEBTORS TO (A) OBTAIN POSTPETITION SENIOR SECURED FINANCING AND
(B) UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION,
(III) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (IV) MODIFYING THE
AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that, on June 16, 2025, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 16] (the "DIP Motion"), the *Declaration of James Baird in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 17], and the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection,*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are:  At Home Group Inc. (9563); Ambience Parent, Inc. (6231); Ambience Intermediate, Inc. (0692); At Home Holding II Inc. (9755); At Home Holding III Inc. (9930); At Home Companies LLC (6921); At Home Stores LLC (4961); At Home RMS Inc. (5235); At Home Gift Card LLC (0357); At Home Procurement Inc. (1777); At Home Properties LLC (2759); At Home Assembly Park Drive Condominium Association (N/A); 1600 East Plano Parkway, LLC (4757); 1944 South Greenfield Road LLC (4377); 2301 Earl Rudder Frwy S LLC (N/A); 3551 S 27th Street LLC (9350); 300 Tanger Outlet Blvd LLC (N/A); 3002 Firewheel Parkway LLC (2759); 2016 Grand Cypress Dr LLC (N/A); 8651 Airport Freeway LLC (0523); Transverse II Development (8595); Rhombus Dev, LLC (4783); 1000 Turtle Creek Drive LLC (9177); 19000 Limestone Commercial Dr, LLC (3711); 4801 183A Toll Road, LLC (3909); 7050 Watts Rd LLC (N/A); 4700 Green Road LLC (9049); 361 Newnan Crossing Bypass LLC (N/A); 4304 West Loop 289 LLC (4302); 10460 SW Fellowship Way LLC (N/A); 1720 N Hardin Blvd LLC (N/A); Compass Creek Parkway LLC (N/A); 10800 Assembly Park Dr LLC (6145); Nodal Acquisitions, LLC (N/A); 15255 N Northsight Blvd LLC (N/A); 3015 W 86th St LLC (N/A); 9570 Fields Ertel Road LLC (N/A); 1376 E. 70th Street LLC (9942); 11501 Bluegrass Parkway LLC (3626); 12990 West Center Road LLC (9396); 334 Chicago Drive, LLC (2864); and 4200 Ambassador Caffery Pkwy LLC (5119). The location of the Debtors' service address for purposes of these chapter 11 cases is:  9000 Cypress Waters Blvd, Coppell, Texas 75019.

*(III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 18] with the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, on June 17, 2025, the Court entered an order [Docket No. 107] (the "Interim Order"),[2] granting the relief requested in the DIP Motion on an interim basis and scheduling a hearing to consider the relief requested in the DIP Motion on a final basis for July 14, 2025 at 1:00 p.m. (ET), which was subsequently adjourned to July 18, 2025 at 10:00 a.m. (ET). *See* Docket No. 284.

**PLEASE TAKE FURTHER NOTICE** that, on July 11, 2025, the following objections to the DIP Motion were filed: *Objection of ARC NPHUBOH001, LLC, Boulevard at Box Hill 5, LLC, Brixton Everett, LLC, Broadstone Net Lease, FR Huntington Square LLC, RR Town Center Associates, LLC, Seritage SRC Finance LLC, Store Master Funding III, LLC, and Yavapai-Prescott Indian Tribe* [Docket No. 268]; *Objection of DLC Management Corporation, North River Village GEC, LLC, Pyramid Management Group, LLC, Rivercrest Realty Associates, LLC, and Urban Edge Properties to Final Relief Under Debtors' DIP Financing Motion* [Docket No. 271]; *Joinder of ROP Eastridge Plaza, LLC to Objection of ARC NPHUBOH001, LLC, Boulevard at Box Hill 5, LLC, Brixton Everett, LLC, Broadstone Net Lease, FR Huntington Square LLC, RR Town Center Associates, LLC, Seritage SRC Finance LLC, Store Master Funding III, LLC, and Yavapai-Prescott Indian Tribe* [Docket No. 275]; *Objection of the Official Committee of Unsecured Creditors' Committee* [Docket No. 279] (the "Committee Objection"); and *Omnibus Objection of 5Rivers CRE, LLC, Brixmor Property Group Inc., Benderson Development Company LLC, Brookfield Properties Retail, Inc., Kite Realty Group, NNN REIT, Inc., Realty Income Corporation, SITE Centers Corp., TLM Realty Holdings LLC, and Oleta Partners Biscayne Parcel LLC to Motions of Debtors to Approve Store Closing Procedures and Post-Petition Financing and Request for Adequate Protection of Certain Landlords* [Docket No. 283].

**PLEASE TAKE FURTHER NOTICE** that, on July 15, 2025, the following replies in support of the DIP Motion were filed: *Debtors' Omnibus Reply In Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 310]; and *Ad Hoc Group Reply In Support of Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 313].

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "Proposed Final

---

2    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion or the Interim Order, as applicable.

Order"), which is attached hereto as **Exhibit 1**.  For the convenience of the Court and other interested parties, a blackline comparing the Proposed Final Order against the Interim Order is attached hereto as **Exhibit 2**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend to seek entry of the Proposed Final Order, in substantially the form attached hereto, at the hearing scheduled before the Honorable J. Kate Stickles, United States Bankruptcy Judge, on **July 18, 2025, at 10:00 a.m. prevailing Eastern Time**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve all rights to further revise or modify the Proposed Final Order, and the exhibits attached thereto.

*[Remainder of page intentionally left blank]*

Dated:  July 17, 2025
Wilmington, Delaware

/s/ Joseph M. Mulvihill
<div style="display:flex;">
<div>

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (DE Bar No. 2847)
Edwin J. Harron (DE Bar No. 3396)
Joseph M. Mulvihill (DE Bar No. 6061)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253
Email:             rbrady@ycst.com
                       eharron@ycst.com
                       jmulvihill@ycst.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

</div>
<div>

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Matthew C. Fagen, P.C. (*pro hac vice* pending)
Elizabeth H. Jones (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:             nicole.greenblatt@kirkland.com
                       matthew.fagen@kirkland.com
                       elizabeth.jones@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

</div>
</div>

## **EXHIBIT 1**

**Proposed Final Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AT HOME GROUP INC., *et al.*,[1] | ) | Case No. 25-11120 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 16, 107** |

### FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND (C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "DIP Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m) (if applicable), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), and 507 of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are: At Home Group Inc. (9563); Ambience Parent, Inc. (6231); Ambience Intermediate, Inc. (0692); At Home Holding II Inc. (9755); At Home Holding III Inc. (9930); At Home Companies LLC (6921); At Home Stores LLC (4961); At Home RMS Inc. (5235); At Home Gift Card LLC (0357); At Home Procurement Inc. (1777); At Home Properties LLC (2759); At Home Assembly Park Drive Condominium Association (N/A); 1600 East Plano Parkway, LLC (4757); 1944 South Greenfield Road LLC (4377); 2301 Earl Rudder Frwy S LLC (N/A); 3551 S 27th Street LLC (9350); 300 Tanger Outlet Blvd LLC (N/A); 3002 Firewheel Parkway LLC (2759); 2016 Grand Cypress Dr LLC (N/A); 8651 Airport Freeway LLC (0523); Transverse II Development (8595); Rhombus Dev, LLC (4783); 1000 Turtle Creek Drive LLC (9177); 19000 Limestone Commercial Dr, LLC (3711); 4801 183A Toll Road, LLC (3909); 7050 Watts Rd LLC (N/A); 4700 Green Road LLC (9049); 361 Newnan Crossing Bypass LLC (N/A); 4304 West Loop 289 LLC (4302); 10460 SW Fellowship Way LLC (N/A); 1720 N Hardin Blvd LLC (N/A); Compass Creek Parkway LLC (N/A); 10800 Assembly Park Dr LLC (6145); Nodal Acquisitions, LLC (N/A); 15255 N Northsight Blvd LLC (N/A); 3015 W 86th St LLC (N/A); 9570 Fields Ertel Road LLC (N/A); 1376 E. 70th Street LLC (9942); 11501 Bluegrass Parkway LLC (3626); 12990 West Center Road LLC (9396); 334 Chicago Drive, LLC (2864); and 4200 Ambassador Caffery Pkwy LLC (5119). The location of the Debtors' service address for purposes of these chapter 11 cases is: 9000 Cypress Waters Blvd, Coppell, Texas 75019.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the DIP Motion, the DIP Credit Agreement (as defined herein), or the *Declaration of Jeremy Aguilar, Chief Financial Officer of At Home Group Inc. and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 4] (the "First Day Declaration"), as applicable.

title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002,

4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

Rules 2002-1 and 4001-2 of the Local Rules of the United States Bankruptcy Court for the District

of Delaware (the "Local Rules"), seeking entry of this final order (the "Final Order"), as applicable,

among other things:

(i)    authorizing the Debtors to jointly and severally guarantee the DIP Loans and the other DIP Obligations (as defined herein) (such Debtors, other than the Borrower, the "DIP Guarantors," and together with the Borrower, the "DIP Loan Parties");

(ii)    authorizing At Home Group Inc. (the "Borrower") to obtain postpetition financing ("DIP Financing") pursuant to a senior secured, first-lien priming, and superpriority debtor-in-possession multiple draw term loan credit facility (the "DIP Facility") subject to the terms and conditions set forth in that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement attached in substantially final form as Schedule 1 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement") to the Interim Order (as defined herein), by and among the Borrower, the DIP Guarantors (as defined herein), as guarantors, the several financial institutions or other entities from time to time party thereto as "Lenders" (the "DIP Lenders")[3] and GLAS USA LLC, as administrative agent and collateral agent, in such capacities, together with its successors and permitted assigns, the "DIP Agent" and, collectively, with the DIP Lenders, the "DIP Secured Parties"); which DIP Facility shall consist of: (a) new money first-out delayed draw term loans (the "Tranche A DIP Loans") in an aggregate principal amount of up to $200 million (the "New Money Amount" and the commitments in respect thereof, the "New Money Commitments"); and (b) a roll-up of Pari First Lien Obligations (as defined below) into second-out term loans (the "Tranche B DIP Loans") in the amount of up to $400 million (the "Roll-Up Amount" and the commitments in respect thereof together with the New Money Commitments, the "DIP Commitments" and such loans, the "DIP Loans") from the DIP Lenders, of which (1) immediately upon the Closing Date (as defined herein), $75 million of Tranche A DIP Loans became available for borrowing (the "Initial Draw"), immediately upon the completion of the Initial Syndication, $150 million of Tranche B DIP Loans was issued to roll-up certain Pari First Lien Obligations on the terms set forth herein, and (2) upon the later of (x) the entry of this Final Order and (y) the completion of the Syndication, the remaining $125 million of all Tranche A DIP

---

[3]    So long as the Fronting Lender is a holder of DIP Loans pursuant to the Fronting Arrangement, the Fronting Lender shall be included in the definition of DIP Lenders. For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Fronting Lender, by acting in such capacity, does not make any commitments, undertake any obligations, or waive any rights, including whether to take or not take any action or to exercise or seek to exercise any rights or remedies, in each case, in connection with any other claims or interests it may hold against any of the Debtors.

Loans up to the New Money Amount will become available for borrowing and the remaining $250 million of the Tranche B DIP Loans up to the Roll-Up Amount will be issued to roll up certain Pari First Lien Obligations on the terms set forth in the DIP Credit Agreement;

(iii)    authorizing the DIP Loan Parties, as applicable, to execute, deliver and perform under the DIP Credit Agreement, each Credit Document and all other loan documentation related to the DIP Facility, including, without limitation, as applicable, security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security agreements, notes, the fee letters, and such other documents that may be reasonably requested by the DIP Agent and the DIP Lenders in connection with the DIP Facility, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the Interim Order, this Final Order, the DIP Credit Agreement, and any other Credit Documents, the "DIP Documents");

(iv)    authorizing the DIP Loan Parties to incur and guarantee loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation backstop fees, unused facility fees, upfront fees, exit fees or premiums, administrative agency fees, and any other fees payable pursuant to the DIP Documents), costs, expenses and other liabilities (including the DIP Fees and Expenses (as defined herein)), and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "DIP Obligations"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(v)    granting to the DIP Agent, for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the DIP Loan Parties subject and subordinate to the Carve Out (as defined herein), and the Prepetition ABL 507(b) Claim (as defined herein) solely with respect to the ABL Priority Collateral (as defined herein);

(vi)    granting to the DIP Agent, for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable, and automatically perfected liens pursuant to sections 364(c)(2)–(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all DIP Collateral (as defined herein), including, without limitation, all Cash Collateral (as defined herein) and the DIP Proceeds Account (as defined in the DIP Credit Agreement)), on the terms described herein, any Avoidance Proceeds (as defined herein), in each case subject and subordinate to the Carve Out, the Prepetition ABL Liens (as defined herein) solely on the ABL Priority Collateral and such other liens as and solely to the extent set forth herein or in the DIP Documents;

(vii)    waiving (a) the Debtors' right to surcharge the Prepetition Collateral (as defined herein) and the DIP Collateral (together, the "Collateral") pursuant to section 506(c)

3

of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(viii)   waiving the equitable doctrine of "marshaling" and other similar doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) with respect to any of the Prepetition Collateral (including the Cash Collateral) for the benefit of any party other than the Prepetition Secured Parties (as defined herein);

(ix)   authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral (as defined herein) solely in accordance with this Final Order, the Approved Budget (as defined herein), and the DIP Documents;

(x)   authorizing the Debtors to pay the principal, interest, fees, expenses, reimbursements, and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(xi)   subject to the restrictions set forth in the DIP Documents and the Interim Order and this Final Order, authorizing the Debtors to use the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), and provide adequate protection to the Prepetition Secured Parties, for any reason provided for under the Bankruptcy Code, including resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay"), the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and, where applicable, the priming of their respective interests in the Prepetition Collateral (including Cash Collateral);

(xii)   vacating and modifying on a final basis the Automatic Stay to the extent set forth herein and as necessary to permit the Debtors and their affiliates, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of this Final Order, the DIP Documents, and to deliver any notices of termination described below and as further set forth herein; and

(xiii)   waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Final Order.

The Court having held a hearing on the interim relief requested in the DIP Motion on June 17, 2025 (the "Interim Hearing"); and the Court having entered on June 17, 2025 the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens And Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,*

*(IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 107] (the "<u>Interim Order</u>"); and the Court having considered the final relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Jaimie Baird in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens And Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 17] (the "<u>Baird Declaration</u>"), the First Day Declaration, the available DIP Documents, and the evidence submitted and arguments made at the Interim Hearing and the final hearing held on July 18, 2025 (the "<u>Final Hearing</u>"); and due and sufficient notice of the Final Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b)–(d) and all applicable Local Rules; and the Final Hearing having been held and concluded; and all objections, if any, to the final relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the final relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing the DIP Loan Parties' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE FINAL HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. For the avoidance of doubt,

A.    **Petition Date**.  On June 16, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").  On June 17, 2025, this Court entered an order approving the joint administration of the chapter 11 cases.

B.    **Debtors in Possession**.  The Debtors continue to operate their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

C.    **Jurisdiction and Venue**.  The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules, to the entry of this Final Order by the Court to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for the chapter 11 cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and procedural bases for the relief sought in the DIP Motion and granted in this Final Order are sections 105, 361, 362, 363, 364(c), 364(d), 364(e), 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Local Rules 2002-1, 4001-2, and 9013-1.

---

the Debtors' failure to satisfy reporting and other obligations that are covenants herein may give rise to an Event of Default (as defined herein), but shall not constitute a violation of this Final Order.

D.    **Committee Formation**.  On June 27, 2025, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

E.    **Notice**.  The Final Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2).  Proper, timely, adequate, and sufficient notice of the DIP Motion and the Final Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, as evidenced by the *Affidavit of Service* [Docket No. 231], and no other or further notice of the DIP Motion with respect to the relief requested at the Final Hearing or the entry of this Final Order shall be required.

F.    **Cash Collateral**.  The Debtors' use of Cash Collateral[5] shall be subject to the terms of this Final Order and the Debtors' authority to use Cash Collateral of the Prepetition Secured Parties and the DIP Secured Parties, as applicable, may be terminated in accordance with paragraph 13 and paragraph 14 of this Final Order.

G.    **Relief Necessary**.  The relief granted in the Interim Order was necessary to avoid immediate and irreparable harm to the Debtors' Estates.  The final relief granted herein is a proper exercise of the Debtors' business judgment to incur the DIP Facility to support, among other things, the orderly continuation of the operation of the Debtors' businesses, to maintain business relationships with vendors, suppliers, and customers, to make capital expenditures in the ordinary course of business, to pay adequate protection as set forth herein, and to satisfy other working capital and operational needs.

---

[5]    As used herein, the term "Cash Collateral" shall have the mean ascribed to it in section 363(a) of the Bankruptcy Code.

H.    **Debtors' Stipulations and Acknowledgements**.    After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest to assert a Challenge (as defined herein) set forth specifically in paragraph 30 hereof, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree, as follows (collectively, the admissions, stipulations, acknowledgements, and agreements set forth in this paragraph H, the "Debtors' Stipulations"):

(i)    *Prepetition Cayman Notes*.    Pursuant to that certain indenture for the 11.50% senior secured notes due 2028 (collectively, the "Prepetition Cayman Notes") dated as of May 12, 2023 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Cayman Notes Indenture," and collectively with the other Notes Documents (as defined in the Prepetition Cayman Notes Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "Prepetition Cayman Notes Documents") by and among (a) non-Debtor At Home Cayman, as issuer (the "Prepetition Cayman Notes Issuer"), (b) the Debtor guarantors party thereto (collectively, the "Prepetition Cayman Notes Guarantors"), and (d) Wilmington Trust, National Association, as trustee and notes collateral agent (solely in such capacity, the "Prepetition Cayman Notes Trustee") for the benefit of the holders of the Prepetition Cayman Notes (the "Prepetition Cayman Notes Noteholders" and, together with the Prepetition Cayman Notes Trustee, the "Prepetition Cayman Notes Secured Parties"), the Prepetition Cayman Notes Issuer issued the Prepetition Cayman Notes to the Prepetition Cayman Notes Noteholders and the Prepetition Cayman Notes Guarantors guaranteed on a joint and several basis the obligations of the Prepetition Cayman Notes Issuer under the

Prepetition Cayman Notes Indenture and the other Prepetition Cayman Notes Documents (the "Prepetition Cayman Notes Obligations");

(ii)     *Prepetition Exchange Notes*.  Pursuant to that certain indenture for the senior secured 7.125%/8.625% Cash/PIK toggle senior secured notes due 2028 (collectively, the "Prepetition Exchange Notes") dated as of May 12, 2023 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Exchange Notes Indenture," and collectively with the other Notes Documents (as defined in the Prepetition Exchange Notes Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Exchange Notes Documents"), by and among (a) At Home Group Inc. (the "Company"), as issuer (the "Prepetition Exchange Notes Issuer"), (b) the Debtor guarantors party thereto (collectively, the "Prepetition Exchange Notes Guarantors"), and (c) Wilmington Trust, National Association, as trustee and notes collateral agent (solely in such capacity, the "Prepetition Exchange Notes Trustee") for the benefit of the holders of Prepetition Exchange Notes (the "Prepetition Exchange Notes Noteholders" and, together with the Prepetition Exchange Notes Trustee, the "Prepetition Exchange Notes Secured Parties"), the Prepetition Exchange Notes Issuer issued the Prepetition Exchange Notes to the Prepetition Exchange Notes Noteholders and the Prepetition Exchange Notes Guarantors guaranteed on a joint and several basis the obligations of the Prepetition Exchange Notes Issuer under the Prepetition Exchange Notes Indenture and the other Prepetition Exchange Notes Documents (the "Prepetition Exchange Notes Obligations");

(iii)     *Prepetition 4.875% Notes*.  Pursuant to that certain indenture for the senior secured 4.875% senior secured notes due 2028 (collectively, the "Prepetition 4.875% Notes") dated

as of July 12, 2021 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition 4.875% Notes Indenture," and collectively with the other Notes Documents (as defined in the 4.875% Notes Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition 4.875% Notes Documents"), by and among (a) the Company, as issuer (the "Prepetition 4.875% Notes Issuer"), (b) the Debtor guarantors party thereto (collectively, the "Prepetition 4.875% Notes Guarantors"), and (c) U.S. Bank National Association, as trustee and notes collateral agent (solely in such capacity, the "Prepetition 4.875% Notes Trustee") for the benefit of the holders of 4.875% Notes (the "Prepetition 4.875% Notes Noteholders" and, together with the Prepetition 4.875% Notes Trustee, the "Prepetition 4.875% Notes Secured Parties"), the Prepetition 4.875% Notes Issuer issued the Prepetition 4.875% Notes to the Prepetition 4.875% Notes Noteholders and the Prepetition 4.875% Notes Guarantors guaranteed on a joint and several basis the obligations of the Prepetition 4.875% Notes Issuer under the Prepetition 4.875% Notes Indenture and the other Prepetition 4.875% Notes Documents (the "Prepetition 4.875% Notes Obligations");

(iv)    *Prepetition Intercompany Note*.  Pursuant to that certain Intercompany Note (the "Prepetition Intercompany Note"), dated as of May 12, 2023 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Intercompany Note Agreement," and collectively with the other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Intercompany Note Documents"), by and among (a) the Company, as issuer (the "Prepetition Intercompany Note Issuer"), (b) the guarantors party thereto (collectively, the "Prepetition Intercompany Note Guarantors"), (d)

Delaware Trust Company, as administrative and intercompany notes collateral agent (solely in such capacity, the "<u>Prepetition Intercompany Note Agent</u>") and (e) At Home Cayman, as holder (collectively, the "<u>Prepetition Intercompany Note Holder</u>," and collectively with the Prepetition Intercompany Note Agent, the "<u>Prepetition Intercompany Note Secured Parties</u>"), the Prepetition Intercompany Note Issuer issued the Prepetition Intercompany Note to the Prepetition Intercompany Note Holder and the Prepetition Intercompany Note Guarantors guaranteed on a joint and several basis the obligations of the Prepetition Intercompany Note Issuer under the Prepetition Intercompany Note Agreement and the other Prepetition Intercompany Note Documents (the "<u>Prepetition Intercompany Note Obligations</u>");

(v)     *Prepetition Term Loan Credit Agreement*.  Pursuant to that Term Loan Credit Agreement dated as of July 23, 2021 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "<u>Prepetition Term Loan Agreement</u>," and collectively with the other Credit Documents (as defined in the Prepetition Term Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "<u>Prepetition Term Loan Documents</u>" and together with the Prepetition Cayman Notes Documents, the Prepetition Exchange Notes Documents, the Prepetition 4.875% Notes Documents, Prepetition Intercompany Note Documents**,** the "<u>Pari First Lien Documents</u>"), by and among (a) the Company, as borrower (the "<u>Prepetition Term Loan Borrower</u>"), (b) Ambience Intermediate, Inc. ("<u>Holdings</u>"); (c) the guarantors party thereto (collectively, the "<u>Prepetition Term Loan Guarantors</u>"), (d) Wilmington Trust, National Association (as successor to Bank of America, N.A.), as administrative agent and collateral agent (solely in such capacity, the "<u>Prepetition Term Loan Agent</u>" and together with the Prepetition Cayman Notes Trustee, the Prepetition Exchange Notes Trustee, the

Prepetition 4.875% Notes Trustee, and the Prepetition Intercompany Note Agent, the "Pari First Lien Agents") and (e) the lenders from time to time party thereto (collectively, the "Prepetition Term Loan Lenders," and collectively with the Prepetition Term Loan Agent, the "Prepetition Term Loan Secured Parties," and collectively with the Prepetition Cayman Notes Secured Parties, the Prepetition Exchange Note Secured Parties, the Prepetition 4.875% Notes Secured Parties, and the Prepetition Intercompany Note Secured Parties, the "Pari First Lien Secured Parties"), the Prepetition Term Loan Lenders provided term loans (the "Prepetition Term Loans") and other financial accommodations to the Prepetition Term Loan Borrower pursuant to Prepetition Term Loan Documents, and the Prepetition Term Loan Guarantors guaranteed on a joint and several basis the "Obligations" (as defined in the Prepetition Term Loan Agreement, the "Prepetition Term Loan Obligations" and together with the Prepetition Cayman Notes Obligations, the Prepetition Exchange Notes Obligations, the Prepetition 4.875% Notes Obligations, and the Prepetition Intercompany Note Obligations, the "Pari First Lien Obligations") under the Prepetition Term Loan Agreement;

(vi) *Prepetition 4.875% Notes Obligations*. The Prepetition 4.875% Notes Issuer and the Prepetition 4.875% Notes Guarantors were justly and lawfully indebted and liable to the Prepetition 4.875% Notes Secured Parties for the Prepetition 4.875% Notes Obligations without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $300,000,000 of the outstanding Prepetition 4.875% Notes, which notes were issued by the Prepetition 4.875% Notes Issuer pursuant to, and in accordance with the terms of the Prepetition 4.875% Notes Documents, *plus* accrued and unpaid interest thereon and any premiums, fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition 4.875% Notes Documents), costs, charges, indemnities, and other obligations incurred in connection therewith

(whether arising before or after the Petition Date) as provided in the Prepetition 4.875% Notes Documents, which Prepetition 4.875% Notes Obligations have been guaranteed on a joint and several basis by each of the Prepetition 4.875% Notes Guarantors;

        (vii)    *Prepetition ABL Facility*.  Pursuant to that certain Asset-Based Revolving Credit Agreement dated as of July 23, 2021 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "<u>Prepetition ABL Credit Agreement</u>," and collectively with the other Credit Documents (as defined in the Prepetition ABL Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived or otherwise modified prior to the Petition Date, the "<u>Prepetition ABL Credit Documents</u>"), among (a) the Company, (b) the Company's subsidiary borrowers from time to time party thereto (together with the Company, the "<u>Prepetition ABL Borrowers</u>"), (c) Holdings, (d) the other guarantors party thereto (the "<u>Prepetition ABL Guarantors</u>"), (e) Bank of America, N.A., as administrative agent and collateral agent (solely in such capacity, the "<u>Prepetition ABL Agent</u>" and together with the Pari First Lien Agents, the "<u>Prepetition Agents</u>"), and (f) the lenders from time to time party thereto (collectively, the "<u>Prepetition ABL Lenders</u>," and collectively with the Prepetition ABL Agent and other "Secured Parties" (as defined in the Prepetition ABL Credit Agreement), the "<u>Prepetition ABL Secured Parties</u>" and together with the Pari First Lien Secured Parties, the "<u>Prepetition Secured Parties</u>"), the Prepetition ABL Secured Parties provided revolving credit (the "<u>Prepetition ABL Revolving Credit Loans</u>"), certain banking products, cash management services, treasury, derivative obligations and other financial accommodations to, and issued letters of credit for the account of, the Prepetition ABL Borrowers and their subsidiaries pursuant to the Prepetition ABL Credit Documents, and the Prepetition ABL Guarantors guaranteed on a joint and several basis the "Obligations" (as defined in the Prepetition

ABL Credit Agreement, the "Prepetition ABL Obligations" and together with the Pari First Lien Obligations, the "Prepetition Secured Obligations") under the Prepetition ABL Credit Agreement;

(viii)    *Prepetition Equal Priority Intercreditor Agreement*.    Pursuant to and to the extent set forth in that certain Equal Priority Intercreditor Agreement, dated as of July 23, 2021 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time (including pursuant to any joinders thereto), the "Prepetition Equal Priority Intercreditor Agreement"), by and among Holdings, the Company, the other grantors from time to time party thereto, the Prepetition Term Loan Agent, the Prepetition 4.875% Notes Trustee, and each Additional Agent (as defined therein) from time to time party thereto (including the Prepetition Cayman Notes Trustee, the Prepetition Exchange Notes Trustee, and the Prepetition Intercompany Notes Trustee), the parties thereto agreed, among other things, to:  (a) be bound by the waterfall and turnover provisions contained therein with respect to the Shared Collateral (as defined therein), (b) consent to, or not oppose, certain actions taken, or rights asserted, by the Controlling Collateral Agent (as defined therein), and (c) refrain from taking certain actions with respect to the Shared Collateral;

(ix)    *Prepetition ABL Intercreditor Agreement*.    Pursuant to and to the extent set forth in that certain ABL Intercreditor Agreement, dated as of July 23, 2021 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time (including pursuant to any joinders thereto), the "Prepetition ABL Intercreditor Agreement" and, together with the Pari First Lien Documents, the Prepetition ABL Credit Documents, the Prepetition Equal Priority Intercreditor Agreement, the "Prepetition Credit Documents") by and among the Prepetition ABL Agent and the Pari First Lien Agents, Holdings, the Company, as borrower, and the Subsidiaries of the Company (as referred to therein), as from time to time party thereto, the parties thereto agreed, among other things:  (a) that the Prepetition ABL Liens (as defined herein) on the Prepetition ABL

Priority Collateral (as defined herein) are senior to the Pari First Liens (as defined herein) on such collateral, (b) that the Pari First Liens on the Pari First Lien Priority Collateral (as defined herein) are senior to the Prepetition ABL Liens on such collateral, and (c) to be bound by the other provisions contained therein;

(x)    *Prepetition Cayman Notes Obligations*.    The Prepetition Cayman Notes Issuer and the Prepetition Cayman Notes Guarantors were justly and lawfully indebted and liable to the Prepetition Cayman Notes Secured Parties for the Prepetition Cayman Notes Obligations without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $200,000,000 of the outstanding Prepetition Cayman Notes, which notes were issued by the Prepetition Cayman Notes Issuer pursuant to, and in accordance with the terms of, the Prepetition Cayman Notes Documents, *plus* accrued and unpaid interest thereon and any premiums, fees, expenses and disbursements (including any attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Cayman Notes Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Cayman Notes Documents, which Prepetition Cayman Notes Obligations have been guaranteed on a joint and several basis by each of the Prepetition Cayman Notes Guarantors;

(xi)    *Prepetition Exchange Notes Obligations*.    The Prepetition Exchange Notes Issuer and the Prepetition Exchange Notes Guarantors were justly and lawfully indebted and liable to the Prepetition Exchange Notes Secured Parties for the Prepetition Exchange Notes Obligations without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $483,000,000 of the outstanding Prepetition Exchange Notes, which notes were

issued by the Prepetition Exchange Notes Issuer pursuant to, and in accordance with the terms of, the Prepetition Exchange Notes Documents, *plus* accrued and unpaid interest thereon and any premiums, fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition Exchange Notes Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Exchange Notes Documents, which Prepetition Exchange Notes Obligations has been guaranteed on a joint and several basis by each of the Prepetition Exchange Notes Guarantors;

(xii)     *Prepetition Term Loan Obligations*.  The Prepetition Term Loan Borrower and the Prepetition Term Loan Guarantors were justly and lawfully indebted and liable to the Prepetition Term Loan Secured Parties for the Prepetition Term Loan Obligations without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than $578,000,000 in outstanding principal amount of term loans as of the Petition Date, *plus* interest and fees thereon, which loans were made or issued by the Prepetition Term Loan Lenders pursuant to, and in accordance with the terms of, the Prepetition Term Loan Documents, *plus*, to the extent not otherwise included, accrued and unpaid interest thereon and any premiums, fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition Term Loan Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Term Loan Documents, which Prepetition Term Loan Obligations has been guaranteed on a joint and several basis by each of the Prepetition ABL Guarantors;

(xiii)     *Prepetition Intercompany Note Obligations*.  The Prepetition Intercompany Note Issuer and the Prepetition Intercompany Note Guarantors were justly and lawfully indebted and

liable to the Prepetition Intercompany Note Secured Parties for the Prepetition Intercompany Note Obligations without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than $200,000,000 in outstanding principal amount as of the Petition Date, *plus* interest and fees thereon, which note was issued by the Prepetition Intercompany Note Issuer pursuant to, and in accordance with the terms of, the Prepetition Intercompany Note Documents, *plus*, to the extent not otherwise included, accrued and unpaid interest thereon and any premiums, fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition Intercompany Note Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Intercompany Note Documents which Prepetition Intercompany Note Debt has been guaranteed on a joint and several basis by each of the Prepetition Intercompany Note Guarantors;

(xiv)   *Prepetition ABL Obligations*.  The Prepetition ABL Borrowers, Holdings, and the other Prepetition ABL Guarantors were justly and lawfully indebted and liable to the Prepetition ABL Secured Parties for the Prepetition ABL Obligations without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than (a) $ 377,925,499.82 in outstanding principal amount of Prepetition ABL Revolving Credit Loans as of the Petition Date, *plus* interest and fees thereon (the "<u>Prepetition ABL Revolving Debt</u>"), *plus* approximately $12,526,627.00 of the aggregate stated principal amount available for drawing under all outstanding letters of credit and all unpaid reimbursement obligations with respect to drawn letters of credit (the "<u>Prepetition Letters of Credit</u>"), and treasury, cash management, bank product, and derivative obligations, in each case as of the Petition Date (the "<u>Prepetition Letters of Credit</u>"), which loans, Prepetition Letters of Credit, treasury, cash management, bank product and derivative obligations were made or issued by the Prepetition ABL

Secured Parties pursuant to, and in accordance with the terms of, the Prepetition ABL Credit Documents, *plus*, to the extent not otherwise included, accrued and accruing and unpaid premiums, interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition ABL Credit Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition ABL Credit Documents, which Prepetition ABL Obligations have been guaranteed on a joint and several basis by each of the Prepetition ABL Guarantors;

(xv)     *Validity of Prepetition Secured Obligations*.     The Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Cayman Notes Issuer, the Prepetition Exchange Note Issuer, the Prepetition 4.875% Note Issuer, the Prepetition Intercompany Note Issuer, the Prepetition Term Loan Borrower, the Prepetition ABL Borrowers, the Prepetition Cayman Note Guarantors, the Prepetition Exchange Note Guarantors, the Prepetition 4.875% Note Guarantors, the Prepetition Intercompany Note Guarantors, the Prepetition ABL Guarantors, and the Prepetition Term Loan Guarantors, as applicable, enforceable in accordance with their respective terms and no portion of the Prepetition Secured Obligations or any payment made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Prepetition Credit Documents prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim or cause of action (including any Avoidance Actions), choses in action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law;

(xvi)     *Validity, Perfection and Priority of Prepetition Pari First Liens*.  As of the Petition Date, pursuant to and in connection with the Pari First Lien Documents, the Debtor issuers, borrowers,

and guarantors party thereto granted to each of the Pari First Lien Agents, in each case, for the benefit of themselves and applicable Pari First Lien Secured Parties, a security interest in and continuing lien on (the "Pari First Liens") substantially all of such Debtors' assets and property (in each case, subject to any "Excluded Property" (as defined in the Pari First Lien Documents), including, (i) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the Non-ABL Priority Collateral (as defined in the Prepetition ABL Intercreditor Agreement) (which, for the avoidance of doubt, may include certain Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Pari First Lien Priority Collateral"), and (ii) a valid, binding, properly perfected, enforceable, junior priority security interest in and continuing lien on the ABL Priority Collateral (as defined in the Prepetition ABL Intercreditor Agreement) (which, for the avoidance of doubt, includes certain Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "Pari First Lien Junior Collateral" and, together with the Pari First Lien Priority Collateral, the "Pari First Lien Collateral"), which Pari First Liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim (as defined in the Bankruptcy Code) or applicable non-bankruptcy law, subject and subordinate only to the liens of the Prepetition ABL Agent on the ABL Priority Collateral and certain other liens permitted by the Pari First Lien Documents, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected (or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code), non-avoidable and senior in priority to the Pari First Liens as of the Petition Date (the "Pari First Lien Permitted Senior Liens");

(xvii)    *Validity, Perfection and Priority of Prepetition ABL Liens*.  As of the Petition Date, pursuant to and in connection with the Prepetition ABL Credit Documents, the Prepetition ABL Borrowers, Holdings, and the other Prepetition ABL Guarantors granted to the Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Secured Parties, a security interest in and continuing lien on (the "Prepetition ABL Liens" and, together with the Pari First Liens, the "Prepetition Liens") substantially all of their assets and property (subject to any "Excluded Property" as defined in the Prepetition ABL Credit Documents), including, (i) a valid, binding, properly perfected, enforceable, first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in the Prepetition ABL Intercreditor Agreement) (which, for the avoidance of doubt, includes certain Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition ABL Priority Collateral" and, together with assets of the Debtors of the type constituting Prepetition ABL Priority Collateral, including the ABL True Up Account (as defined herein) and amounts therein (but, for the avoidance of doubt, excluding the proceeds of the DIP Facility held in the DIP Proceeds Account (as defined in the DIP Credit Agreement as in effect on the date hereof)), and all Avoidance Proceeds related thereto, the "ABL Priority Collateral"), and (ii) a valid, binding, properly perfected, enforceable, junior priority security interest in and continuing lien on the Non-ABL Priority Collateral (as defined in the Prepetition ABL Intercreditor Agreement), which, for the avoidance of doubt, may include certain Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "Prepetition ABL Junior Collateral" and, together with the Prepetition ABL Priority Collateral, the "Prepetition ABL Collateral" and, together with the Pari First Lien Collateral, the "Prepetition Collateral"), which Prepetition ABL Liens are not subject to avoidance, recharacterization,

subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law, subject and subordinate only to the liens of each Pari First Lien Agent on the Pari First Lien Priority Collateral and certain other liens permitted by the Prepetition ABL Credit Documents, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected (or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code), non-avoidable and senior in priority to the Prepetition ABL Liens as of the Petition Date (the "Prepetition ABL Permitted Senior Liens" and, together with the Pari First Lien Permitted Senior Liens, the "Prepetition Permitted Senior Liens").

(xviii)  *No Control.*  None of the Prepetition Secured Parties control (or have in the past controlled) the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of any actions taken with respect to, in connection with, related to or arising from the Prepetition Credit Documents.

(xix)  *No Claims or Causes of Action.*  No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties and each of their respective Representatives (as defined herein) (in each case, in their capacity as such) under or relating to any agreements by and among the Debtors and any Prepetition Secured Party that is in existence as of the Petition Date.

(xx)  *Cash Collateral.*  Except as otherwise provided in the Prepetition Credit Documents (including cash or accounts that constitute "Excluded Property" under the Prepetition Credit Documents), all of the Debtors' cash, including, without limitation, the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral,

21

constitutes Cash Collateral of the Prepetition ABL Secured Parties and the Pari First Lien Secured Parties for purposes of section 363(a) of the Bankruptcy Code and is Prepetition Collateral of the Prepetition Secured Parties.

(xxi)    *Debtors' Stipulations Regarding Initial Funding*.    In accordance with the Interim Order, this Court authorized, among other things:  (a) the Borrower to obtain DIP Financing pursuant to the DIP Credit Agreement; (b) the DIP Guarantors to jointly and severally guarantee the DIP Loans and the other DIP Obligations; and (c) the DIP Loan Parties to execute, deliver the DIP Documents, and perform under the DIP Credit Agreement in accordance with and subject to the terms of the Interim Order and the DIP Documents.  On June 17, 2025, the Court entered the Interim Order, and the Debtors were authorized to borrow the Interim DIP Loans on the terms and conditions set forth in the DIP Documents and in the Interim Order.  Pursuant to the Interim Order and the DIP Documents, (a) the Initial Draw of $75,000,000 of Tranche A New Money DIP Loans was made immediately available upon the Closing Date, and (b) $150,000,000 of prepetition debt was authorized to be rolled up into Tranche B DIP Loans upon completion of the Initial Syndication and entry of the Interim Order.

I.    **Findings Regarding Corporate Authority**.  Each of the Debtors has all requisite power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

J.    **Findings Regarding the DIP Financing and Use of Cash Collateral**.

(i)    Good and sufficient cause has been shown for the entry of this Final Order and for authorization of the DIP Loan Parties to obtain financing pursuant to the DIP Documents, to use Cash Collateral on the terms described herein, and incur the DIP Roll-Up Obligations (as defined

herein), in each case, to, among other things, administer their chapter 11 cases and fund their operations.

(ii)    As set forth in the First Day Declaration and the Baird Declaration, the Debtors have a critical need to obtain the DIP Financing and to use Prepetition Collateral (including Cash Collateral) in each case on a final basis, in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs and to fund expenses of these chapter 11 cases.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, the incurrence of new indebtedness under the DIP Documents, and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern value of the Debtors' estates.  The terms of the proposed financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.  The Debtors' use of Cash Collateral alone would be insufficient to meet the Debtors' cash disbursement needs during the period of effectiveness of this Final Order.  The Debtors and their estates will suffer irreparable harm if financing is not obtained and permission to use Cash Collateral is not granted. The adequate protection provided in the Interim Order and this Final Order and the other benefits and privileges contained therein and herein are consistent with, and authorized by, the Bankruptcy Code.

(iii)    As set forth in the First Day Declaration and the Baird Declaration, the DIP Financing is the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, financing arrangements, capital structure and the circumstances of these

chapter 11 cases, the Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without granting to the DIP Secured Parties the DIP Liens and the DIP Superpriority Claims (each as defined herein) and incurring the Adequate Protection Obligations (as defined herein), in each case as provided for herein subject and subordinate to the Carve Out to the extent set forth herein, under the terms and conditions set forth in the Interim Order, this Final Order, and in the DIP Documents.

(iv)    The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Prepetition Collateral and acquire equipment, inventory, and other personal property, all of which constitute Prepetition Collateral under the Prepetition Credit Documents that are subject to the Prepetition Secured Parties' security interests as set forth in the Prepetition Credit Documents, as applicable.

(v)    The Debtors desire to use a portion of the cash, rents, income, offspring, products, proceeds, and profits described in the preceding paragraph in their business operations that constitute Cash Collateral of the Prepetition Secured Parties under section 363(a) of the Bankruptcy Code.  Certain prepetition rents, income, offspring, products, proceeds, and profits, in existence as of the Petition Date or hereafter created or arising, including balances of funds in the Debtors' prepetition and postpetition operating bank accounts, also constitute Cash Collateral.

(vi)    Based on the DIP Motion, the Baird Declaration, the First Day Declaration, and the record presented to the Court at the Interim Hearing and the Final Hearing, the terms of the DIP Financing, the terms of the adequate protection granted to the Prepetition Secured Parties as

provided in paragraph 20 of the Interim Order and paragraph 20 herein (the "Adequate Protection"), and the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to the Interim Order, this Final Order, and the DIP Documents are, in each case, fair and reasonable, reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(vii)    The DIP Financing, the Adequate Protection and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the DIP Loan Parties, the DIP Secured Parties, and the Prepetition Secured Parties, and all of the DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation, all loans made to and guarantees issued by the DIP Loan Parties pursuant to the DIP Documents and any other DIP Obligations shall be deemed to have been extended by the DIP Agent and the other DIP Secured Parties in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and each of the DIP Agent and the other DIP Secured Parties (and each of their successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(viii)    The Pari First Lien Secured Parties and the Prepetition ABL Secured Parties have acted in good faith regarding the DIP Financing and the Debtors' continued use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of and performance under the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined herein)), in accordance with the terms hereof, and the Pari First Lien Secured

25

Parties and the Prepetition ABL Secured Parties (and each of their respective successors and assigns) shall be entitled to the full protection of sections 363(m) (if applicable) and 364(e) of the Bankruptcy Code in the event that this Final Order or any provision thereof is vacated, reversed or modified, on appeal or otherwise.

(ix)    The Prepetition Secured Parties are entitled to the Adequate Protection provided in this Final Order as and to the extent set forth herein pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to this Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral, including the Cash Collateral, and, to the extent their consent is required, the requisite Prepetition Secured Parties have consented or are deemed hereby to have consented to the use of the Prepetition Collateral, including the Cash Collateral, on the terms set forth in the Interim Order and this Final Order, in each case, and the priming of the Pari First Liens by the DIP Liens pursuant to the terms set forth in the Interim Order and this Final Order, in each case, and the DIP Documents; *provided* that nothing in this Final Order or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Final Order and in the context of the DIP Financing authorized by this Final Order to the extent such consent has been or is deemed to have been given, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) other than as contemplated by the DIP Financing authorized by this Final Order, or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties to seek new, different or

additional adequate protection, or assert any rights of any of the Prepetition Secured Parties, and the rights of any other party in interest, including the DIP Loan Parties, to object to such relief are hereby preserved.

(x)     The Pari First Lien Secured Parties would not have otherwise consented to the use of their Collateral (including Cash Collateral), subordination of their liens to the DIP Liens (as defined below), and the DIP Lenders would not have provided the DIP Financing or extended credit to the DIP Loan Parties thereunder without (i) the roll-up of the Pari First Lien Obligations with the Tranche B DIP Loans and (ii) the agreement of the Debtors to consent to the jurisdiction of this Court in all matters arising out of or relating to the DIP Financing, the DIP Documents, and the DIP Liens.

(xi)     The Debtors have prepared and delivered to the advisors to the DIP Secured Parties an initial budget, attached to the DIP Credit Agreement (the "Initial DIP Budget"), a summary of which is attached to the Interim Order as Schedule 2.[6]  The Initial DIP Budget reflects, among other things, the Debtors' anticipated operating receipts, anticipated operating disbursements, anticipated non-operating disbursements, net operating cash flow and liquidity for each calendar week covered thereby.  The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement, and once approved by the Required DIP Lenders[7] in accordance with the DIP Credit Agreement, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget shall constitute, without duplication, an "Approved

---

[6]     The current Approved Budget is attached hereto as **Exhibit 3**.

[7]     "Required DIP Lenders" means the DIP Lenders holding a majority of the aggregate outstanding principal amount of the Tranche A DIP Loans and New Money Commitments and a majority of the aggregate outstanding amount of Tranche B DIP Loans.

Budget"). A copy of any subsequent Approved Budget shall be promptly provided to the Creditors' Committee. There shall be no decreases to the fees and expenses of the Committee Professionals reflected in the Approved Budget without the express written consent of the Creditors' Committee. The Initial DIP Budget is reasonable under the circumstances. The DIP Secured Parties relied, in part, upon the DIP Loan Parties' agreement to comply with the Approved Budget (subject to permitted variances under the DIP Documents; *provided* that notwithstanding anything else to the contrary in the DIP Documents, except with respect to the Carve Out Reserves, the Approved Budget will not operate as a cap on professional fees, including professional fees incurred by the Debtor Professionals or the Committee Professionals), the other DIP Documents, and the Interim Order and this Final Order in determining to enter into the postpetition financing arrangements provided for in this Final Order.

(xii)    Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition Collateral.

K.    **Immediate Entry**. Sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2. Absent granting the relief set forth in this Final Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Financing and the permitted use of Prepetition Collateral (including Cash Collateral), in accordance with the Interim Order, this Final Order and the DIP Documents, are in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties. The DIP Motion and this Final Order comply with the requirements of Local Rule 4001-2.

L.    **Roll-Up**.    Upon entry of the Interim Order and the completion of the Initial Syndication, certain Prepetition Cayman Notes Obligations, Prepetition Exchange Notes Obligations, Prepetition 4.875% Notes Obligations, and Prepetition Term Loans held by the DIP Lenders (or their designees) in an aggregate amount of $150,000,000 (the "Initial Roll-Up Amount"), as specified in the DIP Credit Agreement, were automatically deemed "rolled up" and converted on a cashless basis into Tranche B DIP Loans on the terms set forth in the DIP Documents. Upon the later of (x) the entry of this Final Order and (y) the completion of the Syndication (the "Subsequent Roll-Up Date"), certain Prepetition Cayman Notes Obligations, Prepetition Exchange Notes Obligations, Prepetition 4.875% Notes Obligations, and Prepetition Term Loans held by the DIP Lenders (or their designees) in an aggregate amount of $250,000,000 (the "Final Roll-Up Amount") as specified in the DIP Credit Agreement, shall be automatically deemed "rolled up" and converted on a cashless basis into Tranche B DIP Loans on the terms set forth in the DIP Documents. In each case, any Prepetition Cayman Notes Obligations, Prepetition Exchange Notes Obligations, Prepetition 4.875% Notes Obligations, and Prepetition Term Loans subject to the "roll-up" shall automatically be deemed to be substituted and exchanged for, and shall be deemed to be, Tranche B DIP Loans for all purposes hereunder as if originally funded on the Closing Date, in the case of the roll-up on the completion of the Initial Syndication, and on the Subsequent Roll-Up Date, in the case of the roll-up on the Subsequent Roll-Up Date (collectively, the "DIP Roll-Up Obligations"). Any Pari First Lien Obligation that is "rolled-up" into a DIP Roll-Up Obligation shall be cancelled, extinguished, and of no further force or effect and the holders thereof shall, promptly following such discharge, transfer or otherwise deliver any securities, instruments or loans with respect to such obligation to the Debtors to evidence such cancellation. The Prepetition Intercompany Note Obligations shall be deemed repaid on a dollar-for-dollar basis with any "roll

up" of the Prepetition Cayman Notes Obligations.  The conversion (or "roll-up") is authorized pursuant to the Interim Order and this Final Order, as compensation for, in consideration for, and solely on account of, the agreement of certain Pari First Lien Secured Parties constituting DIP Lenders to fund amounts, and provide other consideration to the Debtors under the DIP Facility and not as payments under, adequate protection for, or otherwise on account of, any obligations under the Pari First Lien Documents.  Notwithstanding any other provision of this Final Order or the DIP Documents, all rights of the Pari First Lien Secured Parties shall be fully preserved.  The Pari First Lien Secured Parties would not otherwise consent to the use of their Cash Collateral, and the DIP Agent and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder, without the inclusion of the DIP Roll-Up Obligations in the DIP Obligations upon entry of this Final Order.  Moreover, the roll-up of the Pari First Lien Obligations with the Initial Roll-Up Amount into DIP Obligations enabled the Debtors to obtain urgently needed financing to administer these chapter 11 cases and fund their operations.

M. **Prepetition Permitted Senior Liens; Continuation of Prepetition Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Prepetition Permitted Senior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, any statutory committee appointed in these chapter 11 cases, the DIP Loan Parties, the DIP Agent, the other DIP Secured Parties, each Prepetition Agent, or the other Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted Senior Lien and/or security interests.  The right of a seller of goods to reclaim goods under section 546(c) of the Bankruptcy Code is not a Prepetition Permitted Senior Lien, as used herein, and is expressly subject to the DIP Liens (as defined herein) and the Prepetition Liens.

The Prepetition Liens and the DIP Liens are continuing liens and the DIP Collateral is and will continue to be encumbered by such liens.

N.    **Intercreditor Agreements**.    Pursuant to section 510 of the Bankruptcy Code, the Prepetition ABL Intercreditor Agreement, the Prepetition Equal Priority Intercreditor Agreement, and any other applicable intercreditor or subordination provisions contained in any of the other Prepetition Credit Documents (the "Intercreditor Agreements") (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights and remedies of such parties with respect to replacement liens, administrative expense claims and superpriority administrative expense claims granted or amounts payable in respect thereof by the Debtors under this Final Order or otherwise), and (iii) shall not be deemed to be amended, altered, or modified by the terms of this Final Order or the DIP Documents, unless expressly set forth herein or therein.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before this Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    *Motion Granted*.    The final relief sought in the DIP Motion is granted, the final relief described herein is authorized and approved, and the use of Cash Collateral on a final basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Final Order.  All objections to this Final Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled with prejudice on the merits.

2.      _Authorization of the DIP Financing and the DIP Documents_.

(a)      The DIP Loan Parties are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  The Borrower is hereby authorized to borrow money pursuant to the DIP Credit Agreement and the Debtors who are DIP Guarantors are hereby authorized to provide a guaranty of payment in respect of the DIP Obligations, subject to any limitations on borrowing under the DIP Documents, which borrowings shall be used for all purposes permitted under the DIP Documents and this Final Order (and subject to and in accordance with the Approved Budget) (subject to permitted variances under the DIP Documents) up to the aggregate amount of the Initial Draw.

(b)      In furtherance of the foregoing and without the need for further approval of this Court, each DIP Loan Party is authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages, financing statements and other similar documents), and to pay all fees, expenses and indemnities in connection with or that may be reasonably required, necessary, or desirable for the DIP Loan Parties' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)      the execution and delivery of, and performance under, each of the DIP Documents;

(ii)      the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Loan Parties and the DIP Agent (acting in accordance with the terms of the DIP Credit Agreement and at the direction of the Required DIP Lenders, to the extent

required), may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other nonmaterial modifications to and under the DIP Documents (and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder.  Copies of any amendments to the DIP Documents shall be promptly provided to the Creditors' Committee. Updates, modifications, and supplements to the Approved Budget shall not require any further approval of this Court;

> (iii)    the non-refundable payment to the DIP Agent and the other DIP Secured Parties, as the case may be, of all reasonable and documented fees, whether paid pursuant to the Interim Order or this Final Order, and rights received as consideration under, or in connection with, the DIP Facility, including any amendment fees, prepayment premiums, unused facility fees, early termination fees, right of equitization, servicing fees, audit fees, liquidator fees, structuring fees, administrative agent's, collateral agent's or security trustee's fees, upfront fees, closing fees, commitment fees, exit fees, closing date fees, backstop fees, prepayment fees or agency fees, rights under the DIP Credit Agreement, indemnities and professional fees (the payment of which fees shall be irrevocable, and shall be, and shall be deemed to have been, approved upon entry of the Interim Order and this Final Order, whether any such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law

or otherwise by any person or entity); and any amounts due (or that may become due) in respect of any indemnification and expense reimbursement obligations, in each case referred to in the DIP Credit Agreement or DIP Documents, and the costs and expenses as may be due from time to time in accordance with the DIP Documents, including, without limitation, reasonable and documented fees and expenses of the following professionals retained by, or on behalf of, any of the DIP Agent or the other DIP Lenders:  (A) Dechert LLP ("Dechert") as counsel to the ad hoc group of DIP Lenders and secured noteholders and lenders (the "Ad Hoc Group") and Potter Anderson & Corroon LLP; (B) Evercore Inc., as financial advisor to Dechert LLP as counsel to the Ad Hoc Group; (C) Moses & Singer LLP, as legal counsel to the DIP Agent; (D) Dentons US LLP, as legal counsel to the Fronting Lender; (E) any other local legal counsel or other advisors (including in any foreign jurisdictions), and any other advisors as are permitted under the DIP Documents, and (F) in the event of an actual or potential conflict, additional counsel or local legal counsel to the extent necessary, in each case, as provided for in the DIP Documents, (collectively, the "DIP Fees and Expenses") and in accordance with applicable engagement letters, fee letters, or similar agreements, without the need to file retention motions or fee applications; and

(iv)     the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens (as defined herein) and the DIP Superpriority Claims (as defined herein) and perfection of the DIP Liens as permitted herein and therein, and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith, in each case in accordance with the terms of the DIP Documents.

(c)     From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP

Credit Agreement, respectively, and this Final Order, and the Approved Budget (subject to permitted variances under the DIP Documents).

3.    _Authorization to Borrow_.    Subject to the terms, conditions, and limitations on availability set forth in the DIP Documents, the Approved Budget, and the Interim Order and this Final Order, the Debtors are hereby authorized to (a) borrow under the DIP Facilities, and (b) use the Cash Collateral for the purposes described in this Final Order subject to the occurrence of the Closing Date (as defined in the applicable DIP Credit Agreement, the "Closing Date").

4.    _DIP Roll-Up Obligations_.    Upon the entry of the Interim Order and the completion of the Initial Syndication, the roll-up of the Initial Roll-Up Amount was approved.  Upon completion of the Subsequent Roll-Up Date, the Final Roll-Up Amount shall be automatically deemed "rolled up" and converted on a cashless basis into Tranche B DIP Loans on the terms set forth in the DIP Documents.  Notwithstanding anything to the contrary herein, the DIP Roll-Up Obligations and any DIP Liens and DIP Superpriority Claims on account thereof are subject to any Challenges (as defined below) that may be raised prior to expiration of the time period set forth in paragraph 30.

5.    _DIP Obligations_.    Upon entry of the Interim Order and the execution and delivery of the DIP Documents, the DIP Documents became legal, valid, binding and non-avoidable obligations of the DIP Loan Parties, enforceable against each DIP Loan Party and their estates in accordance with the terms of the DIP Documents, the Interim Order and this Final Order, and any successors thereto, including any trustee appointed in the chapter 11 cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the chapter 11 cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  Upon entry of this Final Order, the DIP Obligations included all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the DIP Loan Parties to any of the DIP Agent

or the other DIP Secured Parties, in such capacities, in each case, under, or secured by, the DIP Documents (including this Final Order), including all principal, interest, costs, fees, expenses, premiums, indemnities and other amounts under the DIP Documents (including this Final Order).  The DIP Loan Parties shall be jointly and severally liable for the DIP Obligations.  Except as expressly set forth in this Final Order, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agent and/or the other DIP Secured Parties (including their Representatives (as defined herein)) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

6.      *Carve Out*.

(a)      *Carve Out*.  As used in the Interim Order and this Final Order, the "Carve Out" means the sum of:  (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) (x) subject to the following clause (y), to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or

firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee, pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first Business Day following delivery by the Prepetition ABL Agent or the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; *provided* (y) Allowed Professional Fees of Committee Professionals under this clause (iii) shall not exceed (x) the lesser of (A) the aggregate amounts budgeted for such Allowed Professional Fees of Committee Professionals in the Approved Budget through the first business day following delivery of a Carve Out Trigger Notice, and (B) the aggregate amount of such Allowed Professional Fees of Committee Professionals actually incurred through the first business day following delivery of a Carve Out Trigger Notice *minus* (y) the aggregate amount of Allowed Professional Fees of Committee Professionals previously paid as of the time of determination of the amount of obligations under this clause (iii) (the amounts set forth in this clause (iii)(y) being the "Committee Pre-Carve Out Trigger Notice Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first business day following delivery by the Prepetition ABL Agent or the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap" of which the foregoing $2,500,000 shall be funded into the Funded Reserve Account (as defined herein) from proceeds from the Interim Draw of DIP Term Loans.  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition ABL Agent or the DIP Agent (acting at the direction of the Required DIP Lenders), as applicable, to the Debtors, their

lead restructuring counsel, the U.S. Trustee, counsel to the Creditors' Committee and Prepetition ABL Agent or the DIP Agent, as applicable, which notice may be delivered by the Prepetition ABL Agent or the DIP Agent, as applicable, following the occurrence and during the continuation of a ABL Cash Collateral Termination Event and upon termination of the Debtors' right to use Cash Collateral by the Prepetition ABL Agent or following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Credit Agreement, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)　　Fee Estimates.  Not later than 7:00 p.m. New York time on the third Business Day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the unpaid amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); provided that within one (1) Business Day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional Weekly Statement (the "Final Statement") setting forth a good-faith estimate of unpaid amount of fees and expenses incurred during the period commencing on the calendar day after the prior Calculation Date and concluding on the Termination Declaration Date (and the Debtors shall cause each such Weekly Statement or Final Statement to be delivered promptly to the Prepetition ABL Agent and the DIP Agent).  If any Professional Person fails to deliver a Weekly Statement or Final Statement within two (2) calendar days after such Weekly Statement or Final Statement is due, such Professional

Person's entitlement to any funds in the Pre-Carve Out Trigger Notice Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement or Final Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person, unless otherwise ordered by the Court.

      (c)    <u>Carve Out Reserves</u>.

      (i)    Commencing on June 26, 2025, and on or before the Thursday of each week thereafter until a Termination Declaration Date, the Debtors shall utilize all cash on hand as of such date (other than cash on deposit in the ABL True Up Account) and cash in the DIP Proceeds Account to fund a reserve in an amount equal to the sum of (A) the greater of (1) the aggregate unpaid amount of all Estimated Fees and Expenses of Debtor Professionals reflected in the Weekly Statements delivered on the immediately prior Wednesday (or next succeeding Business Day) to the Debtors and the Prepetition ABL Agent and the DIP Agent and (2) the aggregate amount of unpaid Allowed Professional Fees of Debtors Professionals contemplated to be incurred in the Approved Budget during such week, *plus* (B) the lesser of (1) the aggregate unpaid amount of all Estimated Fees and Expenses of Committee Professionals reflected in the Weekly Statements delivered on the immediately prior Wednesday (or next succeeding Business Day) to the Debtors and the Prepetition ABL Agent and the DIP Agent and (2) the aggregate amount of unpaid Allowed Professional Fees of Committee Professionals contemplated to be incurred in the Approved Budget during such week, *plus* (C) the Post-Carve Out Trigger Notice Cap, which amount shall be funded into the Funded Reserve Account (as defined herein) from proceeds from the Interim Draw of DIP Term Loans in accordance with this paragraph 6(a), *plus* (D) an amount equal to the amount of Allowed

Professional Fees set forth in the Approved Budget for the next week occurring after the most recent Calculation Date. The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust at an authorized depository under the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* for the U.S. Trustee (the "<u>Funded Reserve Account</u>") to pay such Allowed Professional Fees (the "<u>Funded Reserves</u>") prior to any and all other claims, and all payments of Allowed Professional Fees incurred prior to the Termination Declaration Date shall be paid first from such Funded Reserve Account. The Funded Reserve Account shall be recalculated each week so that at any given time it holds no more than the sum of clauses (c)(i)(A), (B), and (C) in this paragraph 6.

(ii)    On the day on which a Carve Out Trigger Notice is given by either the Prepetition ABL Agent or DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee, if any, (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall constitute a demand to the Debtors, and the Debtors shall utilize the Funded Reserve Account, cash in the DIP Proceeds Account and, to the extent insufficient, utilize all cash on hand as of such date (excluding, for the avoidance of doubt, any ABL Priority Collateral and amounts held in any Controlled Account or ABL True Up Account), to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees plus the amounts set forth in paragraph 6(a)(i)–(ii); *provided* that any such draw from the DIP Proceeds Account shall be honored notwithstanding any conditions in the DIP Term Loan Documents. The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such then unpaid Estimated Fees and Expenses (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.

(iii)    On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize cash in the Funded Reserve Account, cash in

the DIP Proceeds Account, and all cash on hand as of such date (excluding, for the avoidance of doubt, any ABL Priority Collateral and amounts held in any Controlled Account or ABL True Up Account), to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap; *provided* that any such draw from the DIP Proceeds Account shall be honored notwithstanding any conditions in the DIP Term Loan Documents.  The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.

(iv)     For the avoidance of doubt, the DIP Agent, for the benefit of the DIP Secured Parties, shall maintain a first-priority security interest in the Funded Reserve Account and the Carve Out Reserves, junior only to the Carve Out, in the amount of the Post-Carve Out Trigger Notice Cap.  No other party, including the Prepetition ABL Secured Parties, shall be entitled to a *pari passu* or residual interest in the Funded Reserve Account until the DIP Agent (for the benefit of the DIP Secured Parties) has received payment in full in an amount equal to the Post-Carve Out Trigger Notice Cap.  To the extent that the Funded Reserve Account contains more than the Post-Carve Out Trigger Notice Cap after accounting for payments made on account of Pre-Carve Out Amounts and Post-Carve Out Amounts, then the DIP Agent, for the benefit of the DIP Secured Parties, shall be granted and hold a *pari passu*, first-priority secured interest in the Funded Reserve Account, and the Carve Out Reserves, junior only to the Carve Out, with the residual interest to be *pro rata* based on the funds deposited by each set of DIP Secured Parties into such accounts and reserves, which accounts and proceeds thereof to be utilized in accordance with this paragraph 6.

(d)    <u>Application of Carve Out Reserves</u>.

(i)    All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (a)(i) through (a)(iii) of the definition of Carve Out set forth above (the "<u>Pre-Carve Out Amounts</u>"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until the obligations set forth in clauses (a)(i) through (a)(iii) are paid in full.

(ii)    All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "<u>Post-Carve Out Amounts</u>").

(iii)    If either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 6(d), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively (subject to the limits contained in the Post-Carve Out Trigger Notice Cap), shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in paragraph 6(d), prior to making any payments to the DIP Agent (as set forth above) on account of the DIP Obligations until indefeasibly Paid in Full, and thereafter to the Prepetition Secured Parties in accordance with their rights and priorities as set forth in the Interim Order and this Final Order and the Lien/Claim Priorities **<u>Exhibit 1</u>** attached hereto.

(iv)    Following delivery of a Carve Out Trigger Notice, neither the DIP Agent nor the Pari First Lien Secured Parties shall sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, for the avoidance of doubt the Prepetition ABL Agent shall be

permitted to sweep and foreclose on ABL Priority Collateral and cash deposited in the Controlled Accounts and the ABL True Up Account.

(v)    Furthermore, notwithstanding anything to the contrary in this Final Order, (A) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (B) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall (as described below), and (C) subject to the limitations with respect to the DIP Agents, DIP Lenders, and the Prepetition Secured Parties set forth in this paragraph 6, in no way shall the Initial DIP Budget, any subsequent Approved Budget, the Carve Out, the Post-Carve Out Trigger Notice Cap, or the Carve Out Reserves, or any of the foregoing, be construed as a cap or limitation on the amount of the Allowed Professional Fees of Debtor Professionals or Committee Professionals due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in the Interim Order, this Final Order, the Prepetition ABL Credit Agreement, or the DIP Credit Agreement, the Carve Out shall be senior to all liens and claims securing the Prepetition ABL Credit Agreement, the DIP Credit Agreement, the Adequate Protection Liens, and the 507(b) Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations; *provided* that, in no event, shall (i) the funds in the Controlled Account after a Carve Out Trigger Notice has been sent; or (ii) ABL True Up Account be used for the Carve Out; *provided, further*, that the Prepetition ABL Agent shall be permitted to sweep and foreclose on cash deposited in the Controlled Accounts, ABL True UP Account, and ABL Priority Collateral free and clear of all liens, claims, and encumbrances.

(e)    <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or

reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in the Interim Order or this Final Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)        _Payment of Allowed Professional Fees Prior to the Termination Declaration Date_.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(g)        _Payment of Carve Out On or After the Termination Declaration Date_.  Following the delivery of the Carve Out Trigger Notice, all Allowed Professional Fees shall be paid from the applicable Carve Out Reserve, and no Professional Person shall seek payment of any Allowed Professional Fees from any other source until the applicable Carve Out Reserve has been exhausted.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Final Order, the DIP Documents, the Bankruptcy Code, and applicable law.

7.        _DIP Superpriority Claims_.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations constitute allowed superpriority administrative expense claims against the DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the DIP Loan Parties, now existing or hereafter arising, of any kind

whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Loan Parties and all proceeds thereof (including, the proceeds (the "Avoidance Proceeds") of any claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions")) in accordance with the DIP Documents, and this Final Order, subject and subordinate only to the Carve Out and to the rights of the Prepetition ABL Secured Parties with respect to ABL Priority Collateral (to the extent the Prepetition ABL obligations have not been Paid in Full[8]) in accordance with the priority set forth herein; *provided that* (a) the DIP Superpriority Claims in respect of the DIP Roll-Up Obligations shall not be payable from or have

---

[8] As used herein "Paid in Full" or "Payment in Full" with respect to the Prepetition ABL Obligations means the indefeasible repayment in full in cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the Prepetition ABL Credit Agreement and this Final Order, the cash collateralization or repayment in full in cash of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable facility.  The Prepetition ABL Obligations shall not be deemed to have been Paid in Full until such time as, (a) with respect to the Prepetition ABL Credit Documents and Prepetition ABL Obligations, the Challenge Deadline (as defined herein) shall have passed without the timely and proper commencement of a Challenge, or, if a Challenge is timely and properly asserted prior to the Challenge Deadline, upon the final, non-appealable disposition of such Challenge, (b) any and all applicable adequate protection payments have been made, and (c) with respect to the Prepetition ABL Credit Documents, a countersigned payoff letter has been received by the Prepetition ABL Agent in form and substance reasonably satisfactory to the Prepetition ABL Agent in its sole discretion, including a release from any obligations or subordination with respect to the Carve Out.

recourse to the Avoidance Proceeds or proceeds of commercial tort claims the Debtors or their estates hold, in each case, against Prepetition Secured Parties and (b) the DIP Secured Parties shall exercise commercially reasonable efforts to collect from the other assets of the Debtors (or their estates) first before turning to any Avoidance Proceeds or the proceeds of commercial tort claims.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  Notwithstanding anything contained herein or in any of the DIP Documents to the contrary, the DIP Superpriority Claims shall at all times be, solely in respect of any assets or property that constitute Prepetition ABL Collateral or the proceeds, products, rents, and profits thereof, junior in right of payment to the Carve Out, the Prepetition ABL 507(b) Claim, and the Prepetition ABL Obligations.

8.     *DIP Liens*.  As security for the DIP Obligations, effective and automatically and properly perfected upon the date of the Interim Order (and ratified and continuing with this Final Order) and without the necessity of the execution, recordation, or filing by the DIP Loan Parties or any of the DIP Secured Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, intellectual property filing or other similar documents, any notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Agent or the other DIP Secured Parties, the following valid, binding, continuing, enforceable and non-avoidable security interests and liens (all security interests and liens granted to the DIP Agent, for its benefit and for the benefit of the other DIP Secured Parties, pursuant to the Interim Order, this Final Order, and the DIP Documents, the "DIP Liens") were, by the Interim Order, and hereby are, granted on a final basis to the DIP Agent for its own benefit and the benefit of the other DIP Secured Parties (all property in clauses (a) through (e), below being

collectively referred to as the "DIP Collateral" with the relative priorities of the various liens as set forth in **Exhibit 1**):

(a)        *Liens on Unencumbered Property*.  Subject and subordinate only to the Carve Out and pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the DIP Loan Parties (whether maintained with any of the DIP Secured Parties or otherwise) and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, proceeds of commercial tort claims and proceeds of claims that may constitute commercial tort claims (known and unknown) (but not the commercial tort claims themselves), chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (the "Unencumbered Property"), in each case other than the Avoidance Actions, but for the avoidance of doubt, "Unencumbered Property" shall include the Avoidance Proceeds;

*provided that* (a) the DIP Roll-Up Obligations shall not be secured by the Avoidance Proceeds or the proceeds of commercial tort claims of the DIP Loan Parties and (b) the DIP Secured Parties shall exercise commercially reasonable efforts to collect from the proceeds of the other assets of the Debtors (or their estates) first before turning to any Avoidance Proceeds or the proceeds of commercial tort claims.    For the avoidance of doubt, Unencumbered Property does not include ABL Priority Collateral.    Notwithstanding anything in the Interim Order, this Final Order, or the DIP Documents to the contrary, in no event shall DIP Collateral (and the DIP Liens and Adequate Protection Liens thereon) include:    (a) any leasehold interest in non-residential real property that prohibits or restricts the granting of liens thereon (except as permitted pursuant to applicable non-bankruptcy law), but shall include the proceeds of the sale or other disposition of such leases; (b) any security deposits held by a landlord under any non-residential real property lease or the Debtors' interest in any pre-paid rent under any such lease (but shall include the Debtors' revisionary interests therein), in each case, unless such lien is expressly permitted under such lease and (c) any other "Excluded Property" (as defined in the DIP Documents).

(b)    *Liens Priming Certain Prepetition Secured Parties' Liens*.    Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest (in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties (the "DIP Priming Liens") of the same nature, scope, and type as the Pari First Lien Priority Collateral (the "DIP Priority Collateral") wherever located. Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be subject only to (i) the Carve Out, and (ii) Prepetition Permitted Senior Liens, and the DIP Priming Liens shall be (A) senior in all respects to the other Prepetition Liens on DIP Priority Collateral, (B) senior to any Adequate Protection Liens (as defined herein) on DIP Priority Collateral, and (C) not subordinate to any lien,

security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition Liens with respect to the Pari First Lien Collateral shall be primed by and made subject and subordinate to the DIP Priming Liens.

(c)     *Junior Liens Priming Certain Prepetition Secured Parties' Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior priority priming security interest in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties that is ABL Priority Collateral, regardless of where located, which security interest and lien shall prime the Pari First Liens on the ABL Priority Collateral (the "DIP Priming Second Liens").  Notwithstanding anything herein to the contrary, the DIP Priming Second Liens shall be subject and subordinate only to (i) the Carve Out, (ii) Prepetition Permitted Senior Liens, and (iii) solely with respect to ABL Priority Collateral, the Prepetition ABL Liens and the ABL Adequate Protection Liens (in each case of this clause (iii), solely to the extent the Prepetition ABL Obligations have not been Paid in Full), and the DIP Priming Second Liens shall be (A) senior in all respects to the Prepetition Liens on ABL Priority Collateral other than the Prepetition ABL Liens, (B) senior to any Adequate Protection Liens on ABL Priority Collateral other than the ABL Adequate Protection Liens, and (C) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Pari First Liens with respect to the ABL Priority Collateral shall be primed by and made subject and subordinate to the DIP Priming Second Liens.

(d)     *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the DIP Loan Parties that, on

or as of the Petition Date, is subject to either (i) valid, perfected and non-avoidable Prepetition Permitted Senior Liens, or (ii) valid and non-avoidable Prepetition Permitted Senior Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code, which shall be immediately junior and subordinate only to any such Prepetition Permitted Senior Liens and the Carve Out but (y) (1) senior to the Pari First Liens and the Pari First Lien Adequate Protection Liens (as defined below) on all Pari First Lien Priority Collateral subject to such Prepetition Permitted Senior Liens and (2) junior to the ABL Adequate Protection Liens and the Prepetition ABL Liens but senior to the Pari First Lien Adequate Protection Liens (as defined below) and the Pari First Liens on all ABL Priority Collateral subject to such Prepetition Permitted Senior Liens; and

(e)      *Liens Senior to Certain Other Liens*.  Subject to the Carve Out, the DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Final Order, any lien, security interest or claim heretofore or hereinafter granted in any of the chapter 11 cases or any Successor Cases, including any lien or security interest granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, or (C) any intercompany or affiliate liens of the DIP Loan Parties or security interests of the DIP Loan Parties; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code; *provided* that solely with respect to the ABL Priority Collateral, the DIP Liens and the Superpriority DIP Claims shall have the priority set forth in **Exhibit 1** attached hereto.

9.     _Exclusion of SCF Collateral Account from DIP Collateral_.   Notwithstanding anything to the contrary in this Final Order or any of the DIP Documents, all funds held in the account established by the Debtors in connection with their supply chain financing program (the "SCF Program"), and maintained pursuant to that certain Amended and Restated Open Account Processing Agreement, dated as of July 26, 2023, by and between Wells Fargo Bank, N.A. and At Home Procurement Inc. (as amended by that certain Waiver and First Amendment to Amended and Restated Open Account Processing Agreement, dated as of June 12, 2025, and as further amended or modified from time to time in accordance with the terms thereof, the "SCF Agreement") (such account, the "SCF Collateral Account"), shall be excluded from the DIP Collateral for all purposes under the DIP Orders and the DIP Documents.  The DIP Liens and DIP Superpriority Claims shall not attach to, and the DIP Secured Parties shall have no lien upon, security interest in, or claim against, the SCF Collateral Account or any cash, funds, or other amounts maintained therein, provided that such funds are used exclusively in connection with the operation and administration of the SCF Program in the ordinary course of business.

10.     _No Obligation to Extend Credit_.  Subject to the Carve Out, the DIP Secured Parties shall have no obligation to make any loan or advance or purchase any note under the DIP Documents unless all of the conditions precedent under the DIP Documents, including this Final Order, have been satisfied in full or waived by the Required DIP Lenders, as applicable and, in accordance with the terms of the relevant DIP Documents.

11.     _No Monitoring Obligation_.  The DIP Secured Parties shall have no obligation or responsibility to monitor the Debtors' use of the DIP Financing, and the DIP Secured Parties may rely upon the Debtors' representation that the use of the DIP Financing at any time is in accordance with the requirements of this Final Order and the other DIP Documents.

12.  *Events of Default*.  The occurrence and continuance of any Event of Default (as defined in the DIP Credit Agreement) shall, after notice by the DIP Agent (acting at the direction of Required DIP Lenders in accordance with the terms of this Final Order) in writing to the Debtors, counsel to the Debtors, counsel to any statutory committee appointed in these chapter 11 cases, and the U.S. Trustee, constitute an event of default under this Final Order, enforceable solely by the DIP Secured Parties (each an "Event of Default").

13.  *Protection of DIP Lenders' and Prepetition ABL Secured Parties' Rights*.

(a)  So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding DIP Commitments under the DIP Documents, the Prepetition Secured Parties shall subject to the applicable Intercreditor Agreement:  (i) other than the Prepetition ABL Secured Parties with respect to the ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full), have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Documents or this Final Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral, including in connection with the Adequate Protection Liens; (ii) other than with respect to ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full), be deemed to have consented to any transfer, disposition or sale of, or release of liens on, the DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent the transfer, disposition, sale or release is authorized under the DIP Documents or consented to by the Required DIP Lenders under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than as necessary to give effect to this Final Order, other than,

(x) solely as to this clause (iii), the applicable agent under the Prepetition Credit Documents filing financing statements or other documents to perfect the liens granted pursuant to the Interim Order, this Final Order, or the DIP Documents, or (y) as may be required by applicable state law or foreign law to complete a previously commenced process of perfection or to continue the perfection of valid and non-avoidable liens or security interests existing as of the Petition Date; and (iv) other than with respect to ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full), deliver or cause to be delivered, at the DIP Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or court-approved disposition.

(b)     Except with respect to the Prepetition ABL Secured Parties with respect to the ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full), to the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders, and such Prepetition Secured Party and the applicable Prepetition Agent shall, other than the Prepetition ABL Secured Parties with respect to the ABL Priority Collateral, comply with the instructions of the DIP Agent with respect to the exercise of such control.

(c)     Except with respect to the Prepetition ABL Secured Parties with respect to the ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full) any

proceeds of Prepetition Collateral subject to the DIP Priming Liens received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by any of the Prepetition Agents, shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements.  Except with respect to the Prepetition ABL Secured Parties with respect to the ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full), any proceeds of Prepetition Collateral subject to DIP Liens ranking *pari passu* to the Prepetition Liens received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by any of the Prepetition Agents, shall be segregated and held in trust and forthwith paid over to the DIP Agent in the same form as received with any necessary endorsements for application in accordance with this Final Order.  Except with respect to the ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full), the DIP Agent is hereby authorized to make any such endorsements as agent for each of the Prepetition Agents or any such Prepetition Secured Parties.  The authorizations in this paragraph are coupled with an interest and are irrevocable.

(d)     Until Payment in Full of the Prepetition ABL Obligations, solely with respect to the ABL Priority Collateral, the enforcement rights of the DIP Secured Parties or Prepetition Secured Parties (other than the Prepetition ABL Secured Parties) with respect to ABL Priority Collateral shall be subject to the terms of the Prepetition ABL Intercreditor Agreement as if the DIP Agent was party thereto as Equal Priority Collateral Agent and Intercreditor Agent (each as defined in the Prepetition ABL Intercreditor Agreement).

(e)    The Automatic Stay is hereby modified to the extent necessary to permit the DIP Agent (acting at the direction of the Required DIP Lenders) to take any or all of the following actions, at the same time or different times, in each case without further order or application of the Court, but subject to the terms of this Final Order, including, without limitation, the funding of the Carve Out and the Remedies Notice Period (as defined herein), and immediately upon the occurrence of an Event of Default (i) deliver a notice of an Event of Default to the Debtors; (ii) declare the termination, reduction, or restriction of any further DIP Commitment to the extent any such DIP Commitment remains unfunded; (iii) declare the termination of the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations); (iv) declare all applicable DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors; and (v) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (other than Cash Collateral that constitutes ABL Priority Collateral); *provided* that, such declarations shall be subject to the Carve Out and effective five (5) business days following delivery of a notice of an Event of Default by the DIP Agent to the Debtors (and their lead restructuring counsel); (any such declaration of the foregoing (i) through (v), a "DIP Termination Declaration" and the date of such DIP Termination Declaration, the "DIP Termination Declaration Date").  The DIP Termination Declaration shall be given by electronic mail (or other electronic means) to the Debtors (and their lead restructuring counsel), counsel to the Creditors' Committee, counsel to the Prepetition ABL Agent, and to the U.S. Trustee.  The Automatic Stay otherwise applicable to the DIP Agent, the DIP Lenders, and the Pari First Lien Secured Parties shall be modified so that, five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"):  (A)  the DIP Agent acting at

the direction of the Required DIP Lenders shall be entitled to exercise its rights and remedies in accordance with the respective DIP Documents and the DIP Orders and shall be permitted to satisfy the relevant DIP Obligations, Superpriority DIP Claims and DIP Liens, subject to the Carve Out, and Prepetition ABL Intercreditor Agreement, and the Prepetition Permitted Senior Liens (if any), (B) the applicable Pari First Lien Secured Parties shall be entitled to exercise their rights and remedies to satisfy their respective Pari First Lien Obligations, Pari First Lien Adequate Protection Obligations, Pari First Lien 507(b) Claims, and Pari First Lien Adequate Protection Liens, in each case (A) and (B), subject to and consistent with (i) the Carve Out, (ii) the rights of the Prepetition ABL Secured Parties in respect of the ABL Priority Collateral (in each case, to the extent the Prepetition ABL Obligations have not been Paid in Full), (iii) the DIP Orders, (iv) the DIP Documents, (v) the Prepetition ABL Intercreditor Agreement and (vi) any Prepetition Permitted Senior Liens, as applicable.  Following expiration of the Remedies Notice Period, whether or not the maturity of any of the DIP Obligations shall have been accelerated, the Automatic Stay imposed under section 105 or section 362(a) of the Bankruptcy Code or otherwise will automatically be terminated with respect to the DIP Secured Parties and the Pari First Lien Secured Parties, unless (a) the DIP Agent (acting at the direction of the Required DIP Lenders), the Required DIP Lenders, or the Pari First Lien Secured Parties that hold at least a majority of Pari First Lien Obligations, as applicable, elect otherwise in a written notice to the Debtors and/or (b) the Court orders otherwise. Following expiration of the Remedies Notice Period and termination of the Automatic Stay, the DIP Agent, the DIP Lenders, and the Pari First Lien Secured Parties shall, subject to the Prepetition ABL Intercreditor Agreement, be permitted to proceed to protect, enforce and exercise all other rights and remedies provided for in the DIP Documents and the Pari First Lien Debt Documents, and under applicable law, including, but not limited to, by (w) bringing any action at law or other appropriate

proceeding, whether for the specific performance of any covenant or agreement contained in any such DIP Document or Pari First Lien Debt Document or any instrument pursuant to which such DIP Obligations or Pari First Lien Obligations are evidenced, (x) subject to the rights of the Prepetition ABL Secured Parties and the Prepetition ABL Intercreditor Agreement, foreclosing on all of or any portion of the DIP Collateral or Pari First Lien Collateral including freezing any Cash Collateral held in the Debtors' accounts (in each case, except to the extent constituting ABL Priority Collateral, including the Controlled Accounts and ABL True Up Account), (y) immediately setting-off any and all amounts in accounts maintained by the Debtors (other than to the extent constituting ABL Priority Collateral, including the Controlled Accounts and ABL True Up Account) against the DIP Obligations or the Pari First Lien Obligations, or otherwise enforcing any and all rights against any DIP Collateral or Pari First Lien Collateral in the possession of the DIP Agent, the Pari First Lien Agents, or otherwise, including, without limitation, disposition of the DIP Collateral or the Pari First Lien Collateral and application of net cash proceeds thereof to satisfaction of the DIP Obligations and the Pari First Lien Obligations, and (z) subject to the Prepetition ABL Intercreditor Agreement, taking any other actions or exercising any other rights or remedies permitted under the DIP Orders, the DIP Documents, the Pari First Lien Debt Documents or applicable law, other than with respect to the ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full) in each case without further notice to or order of the court unless the Debtors, the Creditors' Committee, and/or any other party in interest have obtained an order of the Court preventing such action.  During the Remedies Notice Period, (i) the Debtors shall be prohibited from requesting any further draws under the DIP Facility (subject to the Carve Out) and (ii) the Debtors, the Creditors' Committee, and/or any other party in interest shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court and the DIP Agent (acting at the direction of the Required

DIP Lenders in accordance with the terms of this Final Order), the Required DIP Lenders and the Pari First Lien Secured Parties shall consent to such emergency hearing; provided that if a request for such hearing is made prior to the end of the Remedies Notice Period, then the Remedies Notice Period will be continued until the Court hears and rules with respect thereto. For the avoidance of doubt, the DIP Agent, the DIP Lenders, and the Pari First Lien Secured Parties shall not exercise any rights or remedies while the hearing is pending. Except as expressly provided for in the DIP Orders, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agent, the DIP Lenders, the Pari First Lien Secured Parties, or the Prepetition ABL Secured Parties. The foregoing shall be subject to the Prepetition ABL Intercreditor Agreement. Notwithstanding anything to the contrary herein, the DIP Agent, the DIP Lenders, the Pari First Lien Secured Parties, or the Pari First Lien Agents may only enter upon a leased premises of the Debtors following an Event of Default and expiration of the Remedies Notice Period in accordance with: (a) any agreement in writing between the DIP Agent, the DIP Lenders, the Pari First Lien Secured Parties, or the Pari First Lien Agents and any applicable landlord; (b) pre-existing rights of the DIP Agent, the DIP Lenders, the Pari First Lien Secured Parties, or the Pari First Lien Agents under applicable law; (c) consent of the applicable landlord; or (d) further order of this Court following notice and a hearing; *provided*, *however*, that counterparties to unexpired leases reserve any and all rights pursuant to section 365(d)(3) of the Bankruptcy Code and similar laws.

(f)  No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of the Interim Order, this Final Order, or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent

of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported

termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any

other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision

of adequate protection to any party.

14.    *ABL Cash Collateral Termination Events and Modification of the Automatic Stay*.

Immediately upon the occurrence of an ABL Cash Collateral Termination Event (as defined below),

the Automatic Stay is hereby modified to the extent necessary to permit the Prepetition ABL Agent

to take any or all of the following actions, at the same time or different times, in each case without

further order or application of the Court, but subject to the terms of this Final Order, including,

without limitation, the Carve Out and the ABL Remedies Notice Period (as defined herein):

(i) deliver a notice of an ABL Cash Collateral Termination Event to the Debtors; (ii) declare all

applicable Prepetition ABL Obligations to be immediately due and payable, without presentment,

demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors; (iii)

declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral

that constitutes ABL Priority Collateral; *provided* that, such declaration shall be effective five (5)

Business Days following delivery of an ABL Termination Declaration (as defined below); and (iv) at

any time going forward by written email notice (the "Designation Notice") to counsel of the Debtors

designating some or all of the Debtors' non-Closing Stores (as defined in the Store Closing Motion)

to be closed and the assets therein sold in accordance with the Sale Guidelines (as defined in the

Store Closing Motion) (such designated Stores and Distribution Centers, the "Designated Stores"),

at which time, after the later of (A) the expiration of the ABL Remedies Notice Period and (B) the

date of delivery of the applicable Designation Notice, the Agent (as defined in the Store Closing

Motion) shall have initiated "Sales" (as defined in the Store Closing Motion) at such Designated

Stores; (any such declaration of the foregoing (i) through (iv), an "<u>ABL Termination Declaration</u>" and the date of such ABL Termination Declaration, the "<u>ABL Termination Declaration Date</u>", and together with the DIP Termination Declaration Date, the "<u>Termination Declaration Date</u>").  The ABL Termination Declaration shall be given by electronic mail (or other electronic means) to the Debtors (and their lead restructuring counsel), counsel to a Creditors' Committee, to the U.S. Trustee, counsel to each of the Pari First Lien Agents, counsel to the Ad Hoc Group, and counsel to the DIP Agent.  The Automatic Stay otherwise applicable to the Prepetition ABL Agent and the Prepetition ABL Secured Parties shall be modified so that, five (5) business days after the date an ABL Termination Declaration is delivered (the "<u>ABL Remedies Notice Period</u>"): (A) the Prepetition ABL Agent shall be entitled to exercise its rights and remedies in respect to the ABL Priority Collateral in accordance with the respective Prepetition ABL Credit Documents and the DIP Orders and shall be permitted to satisfy the relevant Prepetition ABL Obligations, the Prepetition ABL 507(b) Claim and Prepetition ABL Liens.  Following expiration of the ABL Remedies Notice Period, the Automatic Stay imposed under section 362(a) of the Bankruptcy Code shall automatically be terminated with respect to the Prepetition ABL Secured Parties, unless (a) the Prepetition ABL Agent elects otherwise in a written notice to the Debtors (email from counsel being sufficient) or (b) the Court orders otherwise.  Following expiration of the ABL Remedies Notice Period and termination of the Automatic Stay, the Prepetition ABL Agent and the Prepetition ABL Secured Parties shall, subject to the Prepetition ABL Intercreditor Agreement, be permitted to proceed to protect, enforce, and exercise all other rights and remedies provided for in the Prepetition ABL Credit Documents, and under applicable law, including, but not limited to, by (w) bringing any action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in any such Prepetition ABL Credit Document or any instrument pursuant

to which such Prepetition ABL Obligations are evidenced, (x) subject to the rights of the DIP Secured Parties and the Pari First Lien Secured Parties and the Prepetition ABL Intercreditor Agreement, foreclosing on all of or any portion of the Prepetition ABL Collateral including freezing any Cash Collateral that constitutes ABL Priority Collateral held in the Debtors' accounts, (y) immediately setting off any and all amounts in the Controlled Accounts, Collateral Agent Account, ABL True Up Account or any other accounts maintained by the Debtors (to the extent such funds in such account constitute ABL Priority Collateral) against the Prepetition ABL Obligations, or otherwise enforcing any and all rights against any Prepetition ABL Priority Collateral in the possession of the Prepetition ABL Agent, or otherwise, including, without limitation, disposition of the Prepetition ABL Priority Collateral and application of net cash proceeds thereof to satisfaction of the Prepetition ABL Obligations, and (z) taking any other actions or exercising any other rights or remedies permitted under the DIP Orders, the Prepetition ABL Credit Documents, or applicable law, in each case, without further notice to or order of the Court unless the Debtors, the Creditors' Committee, and/or any other party in interest have obtained an order of the Court preventing such action. During the ABL Remedies Notice Period, (A) the Debtors, the Creditors' Committee, and/or any other party in interest shall be entitled to seek an emergency hearing within the ABL Remedies Notice Period with the Court and the Prepetition ABL Agent and the Required Prepetition ABL Lenders shall consent to such emergency hearing; *provided* that if a request for such hearing is made prior to the end of the ABL Remedies Notice Period, then the ABL Remedies Notice Period will be continued until the Court hears and rules with respect thereto and (B) the Debtors shall be authorized to use Cash Collateral constituting ABL Priority Collateral solely to the extent necessary to avoid immediate irreparable harm. For the avoidance of doubt, the Prepetition ABL Agent and the Prepetition ABL Secured Parties shall not exercise any rights or remedies while such hearing is

pending.  Except as expressly provided for in the DIP Orders, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Prepetition ABL Agent or the Prepetition ABL Secured Parties.  This paragraph 14 shall be subject to the Prepetition ABL Intercreditor Agreement.  The below events each shall constitute an "ABL Cash Collateral Termination Event"), unless waived by the Prepetition ABL Agent and the requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement:

(i)     The termination of the DIP Commitments, other than in connection with a draw of New Money Commitments or a mandatory prepayment of the DIP Loans that the Required DIP Lenders determine to address through a reduction in DIP Commitments;

(ii)     The DIP Lenders' failure to fund (1) the Initial Draw within five (5) calendar days of the Petition Date, or (2) each additional projected draw of loans under the DIP Facility as and when (and in at least the amount) set forth in the Initial Approved Budget (or, as applicable, any other Approved Budget to which the Prepetition ABL Agent has consented to in writing in its reasonable discretion); *provided* that each additional draw subject to (2) above may be extended by five (5) Business Days if during such period (A) the Borrowers satisfy the conditions precedent to borrow additional Tranche A DIP Loans and (y) the Debtors' unrestricted cash does not fall below $45 million as a result of such failure to fund;

(iii)     The DIP Credit Agreement shall be modified in any manner (by amendment or otherwise) which limits or restricts in any material respect the requirement that any unfunded amounts of all DIP Commitments be funded no later than one (1) Business Day prior to the date that an Acceptable Plan is effective (as provided in Section 2.3(a) of the DIP Credit Agreement as in effect on the date hereof);

(iv)    The Debtors' use of the Cash Collateral constituting ABL Priority Collateral in any manner that is not in accordance with the Approved Budget or that is otherwise prohibited by the DIP Orders, unless the Required DIP Lenders have waived or modified the Approved Budget and/or the Prohibited Variances contained therein;

(v)    The delivery of a DIP Termination Declaration by the DIP Agent;

(vi)    The termination of the RSA for any reason other than the occurrence of the Plan Effective Date (as defined in the RSA);

(vii)    The filing of any chapter 11 plan that does not result in the Payment in Full of the Prepetition ABL Obligations on the effective date of such plan, unless the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement has consented in writing to the filing of such a plan prior to the date of filing;

(viii)    The Court's entry of an order (i) terminating or modifying the exclusive right of the Debtors to file a plan under section 1121 of the Bankruptcy Code, (ii) appointing a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3)–(4) of the Bankruptcy Code (but not including the appointment of a fee examiner to assist in reviewing applications for compensation by professionals), (iii) dismissing any of the Debtors' chapter 11 cases, or (iv) converting any of the Debtors' chapter 11 cases to a case under chapter 7 of the Bankruptcy Code;

(ix)    The Debtors' failure to make any payment of interest, fees or expenses owed to the Prepetition ABL Agent on its own behalf or on behalf of the Prepetition ABL Secured Parties pursuant to this Final Order within two (2) Business Day after such payment becomes due (for the avoidance of doubt, excluding ABL Adequate Protection Fees and Expenses);

(x)     The Debtors' failure to fund the ABL True Up Account in accordance with the terms of this Final Order within two (2) Business Days of a True Up Event;

(xi)     The Debtors' failure to deliver any Borrowing Base Certificate within one (1) Business Day after the date which such Borrowing Base Certificate is required to be delivered under this Final Order;

(xii)     The filing by any Debtor of a motion or pleading to stay, vacate, reverse, amend or modify this Final Order, or the stay, reversal, vacation, amendment, or modification of this Final Order, each of the foregoing in a manner materially adverse to the Prepetition ABL Secured Parties without the prior written consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement;

(xiii)     The Debtors' failure to timely comply with the ABL Milestones set forth on **Exhibit 2** hereto;

(xiv)     The closure of any stores other than the store closures authorized at the outset of these chapter 11 cases pursuant to the order approving the Store Closing Motion,[9] as may be supplemented from time to time solely with the prior written consent of the Prepetition ABL Agent (collectively, the "Initial Store Closures" or otherwise with the prior written consent of the Prepetition ABL Agent, the "Permitted Store Closures");

(xv)     Any sale of ABL Priority Collateral (other than with respect to the Permitted Store Closings and sales of inventory in the ordinary course of business) without the prior

---

[9]     "Store Closing Motion" means the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, (III) Modifying Customer Programs at the Closing Stores, and (IV) Granting Related Relief* [Docket No. 15].

written consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement;

(xvi)   Any Debtor attempts to invalidate or reduce the Prepetition ABL Secured Obligations, other than by payment thereof;

(xvii)   The Prepetition ABL Liens, the ABL Adequate Protection Liens, or the ABL 507(b) Claims cease to be valid, perfected and enforceable in all respects;

(xviii)   The Debtors create, incur, or suffer to exist any claim or lien on ABL Priority Collateral that is *pari passu* with or senior to the ABL Adequate Protection Liens or the ABL 507(b) Claims, other than the Carve Out, while any portion of the Prepetition ABL Obligations or the payment obligations set forth in paragraphs 20(f) and 20(g) of this Final Order (the "ABL Adequate Protection Payments") remains outstanding, or the Court grants any application by any party seeking payment of any claim on a superpriority administrative claim basis with respect to the ABL Priority Collateral *pari passu* with or senior to the ABL 507(b) Claims, other than the Carve Out, without the prior written consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement;

(xix)   The filing by any Debtor of any motion, pleading, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of the Prepetition ABL Liens securing the Prepetition ABL Obligations or asserting any other cause of action against and/or with respect to the Prepetition ABL Obligations, any Prepetition ABL Secured Party's claim in respect of such Prepetition ABL Obligations, or the Prepetition ABL Collateral securing such Prepetition ABL Obligations (or the Debtors' support of any such motion, pleading, application, or adversary proceeding commenced by any third party);

(xx)    The filing by any Debtor of any application, motion or borrowing request seeking to: incur, without the prior written consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement, any indebtedness from any party secured by a lien on, or, otherwise having a claim against or recourse to, as the case may be, the Debtors, the Prepetition Collateral or the DIP Collateral, unless, with respect to the ABL Priority Collateral, such liens or claims are junior and subordinated in all respects to the Prepetition ABL Liens, the Prepetition ABL Obligations, the ABL Adequate Protection Liens, and the ABL 507(b) Claims (or the Debtors' support of any such motion, pleading, application, or adversary proceeding commenced by any third party);

(xxi)    The filing by any Debtor of a motion or pleading seeking an order, or the entry of an order by the Court or any other court of competent jurisdiction (i) approving claims for recovery of amounts with respect to ABL Priority Collateral under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation or the disposition of the ABL Priority Collateral; (ii) avoiding or requiring repayment or disgorgement of any portion of the ABL Adequate Protection Payments made by or on behalf of the Debtors hereunder; or (iii) seeking use of Cash Collateral that is ABL Priority Collateral other than as set forth herein without the consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement (or the Debtors' support of any such motion, pleading, application or adversary proceeding commenced by any third party); and

(xxii)    The Debtor's failure to timely satisfy any Milestones as (defined in the DIP Credit Agreement as in effect on the date hereof) as and when required unless extended by the Required DIP Lenders in accordance with the DIP Documents or otherwise ordered by the Court; *provided* that in the event the DIP Milestones in respect of the (x) final hearing to approve the DIP

Facility or (y) the filing of the Plan and Disclosure Statement are extended by the DIP Lenders by more than ten (10) business days from the date set forth in the DIP Credit Agreement on the Closing Date, then an ABL Cash Collateral Termination Date shall occur if such DIP Milestone, with respect to (x) or (y) has not been satisfied within (10) business days from the date set forth in the DIP Credit Agreement on the Closing Date.

15.     *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve Out (other than with respect to ABL Priority Collateral), no costs or expenses of administration of the chapter 11 cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or Prepetition Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or Prepetition Agent, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, the DIP Secured Parties, Prepetition Agents, any Prepetition Secured Party, and nothing contained in this Final Order shall be deemed to be a consent by the DIP Agent, the other DIP Secured Parties, each Prepetition Agent or the other Prepetition Secured Parties to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

16.     *No Marshaling*.  Except as expressly set forth herein, in no event shall the DIP Agent, the other DIP Secured Parties, any Prepetition Agent or the other Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Secured Obligation, or the Prepetition Collateral.  Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to each

Prepetition Agent or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any Prepetition Collateral.

17.     _Payments Free and Clear_.   Any and all payments or proceeds applied to pay or, remitted for payment of, DIP Obligations or Adequate Protection Obligations pursuant or in accordance with the provisions of the Interim Order, this Final Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by through or on behalf of the Debtors; _provided_ that (1) in the case of any such payments made with proceeds of ABL Priority Collateral (other than payment of reasonable and documented out-of-pocket postpetition costs and expenses pursuant to or in accordance with the provisions of this Final Order) such payments shall be subject to the Prepetition ABL Intercreditor Agreement and (2) no such payments shall be made with proceeds of ABL Priority Collateral without the consent of the Prepetition ABL Agent after the occurrence of an ABL Cash Collateral Termination Event and any such payment so received shall be subject to the Prepetition ABL Intercreditor Agreement.

18.     _Use of Cash Collateral; Approved Budget_.

(a)     The Debtors are hereby authorized subject to the terms and conditions of this Final Order, to use all Cash Collateral in accordance with the DIP Documents, the Interim Order, this Final Order, and Approved Budget (subject to permitted variances under the DIP Documents); _provided_ that (i) the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth, (ii) except on the terms and conditions of this Final Order and the DIP Documents, including with respect to the Carve Out, the Debtors shall be enjoined and prohibited from at any

times using the Cash Collateral absent further order of the Court, and (iii) nothing herein shall impede the Debtors' ability and entitlement to fund the Carve Out as provided in paragraph 6 hereof.

(b)      Commencing on the second Friday after the Closing Date, and on each Friday thereafter (or the next business day if such Friday is not a business day), the Debtors shall deliver to the DIP Agent (and the Creditors' Committee) a variance report for the immediately preceding Variance Period[10] comparing the actual cash receipts and cash disbursements of the Debtors, during such Variance Period, on a line-item basis, from the values set forth in the Approved Budget (each, a "Budget Variance Report") with an explanation of each Prohibited Variance (as defined below) and each Prohibited Professional Fee Variance (as defined below), if any, accompanied by an officer's certificate attesting to the truth and accuracy in all material respects of such Budget Variance Report.  The Borrower and each other Credit Party shall not permit (i) (1) (x) actual "Total Receipts" for the initial Variance Period (which, for avoidance of doubt shall end on the second Friday after the Closing Date (the "Initial Variance Period")) to be less than 82.5% of forecasted "Total Receipts" set forth in the Approved Budget for such Variance Period and (y) actual "Total Operating Disbursements" to be more than 117.5% of forecasted "Total Operating Disbursements" set forth in the Approved Budget for the Initial Variance Period and (2) (x) actual "Total Receipts" for the each Variance Period after the Initial Variance Period to be less than 87.5% of forecasted "Total Receipts" set forth in the Approved Budget for such Variance Period and (y) actual "Total Operating Disbursements" to be more than 112.5% of forecasted "Total Operating Disbursements" set forth in the Approved Budget for the each Variance Period after the Initial Variance Period (any such variance, a "Prohibited Variance"); *provided* that, for the avoidance of doubt, "Total Operating

---

[10]      "Variance Period" shall mean each rolling cumulative four-week period; provided that with respect to any Variance Period that would commence prior to the Closing Date, such Variance Period shall only include the period of time from and after the Closing Date.

Disbursements" shall exclude Restructuring Professional Fees[11] and fees payable to Hilco Real Estate, LLC ("Hilco") and any advisor to the Lenders; and (ii) actual "Total Pro Fee Cash Payments"[12] since the Closing Date to the date of such Budget Variance Report to be more than 110% of forecasted "Total Pro Fee Cash Payments" set forth in the Initial Approved Budget through the date of such Budget Variance Report (any such variance, a "Prohibited Professional Fee Variance," *provided* that neither the Approved Budget nor any Prohibited Professional Fee Variance will operate as a cap on any professional fees incurred by the Debtor Professionals or the Committee Professionals). Until replaced by an updated Approved Budget, the prior Approved Budget shall remain in effect.

19. *Disposition of DIP Collateral*. The DIP Loan Parties shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, without the prior written consent of the DIP Agent and the Required DIP Lenders (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent or the Required DIP Lenders, or an order of this Court), except: (i) for sales of the Debtors' inventory in the ordinary course of business as permitted by the DIP Documents; (ii) prior to the occurrence of an ABL Cash Collateral Termination Event, sales, transfers, or dispositions of the ABL Priority Collateral, which have been consented to by the Prepetition ABL Agent (and, at any time prior to a Cash Collateral Termination Event, the Required DIP Lenders) and after the occurrence of an ABL Cash Collateral Termination Event,

---

[11] "Restructuring Professional Fees" shall mean the Debtors' projected or actual (as the case may be) disbursements in respect of restructuring professional fees (including, without limitation, payments made to the secured parties on account of professional fees and professional fee payments to other creditors or creditor groups) during the applicable Variance Period.

[12] "Total Pro Fee Cash Payments" shall mean the aggregate payments made to all professionals included in the line item having same name in the Initial Approved Budget; *provided* that any payments made to (w) Hilco, (x) any advisor to the DIP Lenders, (y) any advisor to the Prepetition ABL Agent, and (z) any professionals retained by the Debtors pursuant to the OCP Motion, in each case, shall not be included in Total Professional Fee Cash Payment.

sales, transfers, or dispositions of the ABL Priority Collateral, which have been consented to by the Prepetition ABL Agent; (iii) as otherwise not prohibited by the DIP Documents and this Final Order; (iv) as otherwise permitted by an order of the Court and consented to by the Required DIP Lenders; or (v) included in the Approved Budget (subject to permitted variances under the DIP Documents). If the Required DIP Lenders consent to a transfer of DIP Collateral free and clear of the DIP Liens, then (i) such DIP Collateral shall also be transferred free and clear of all Adequate Protection Liens (other than the ABL Adequate Protection Liens with respect to ABL Priority Collateral) and (ii) to the extent the DIP Liens attach to the proceeds of such transfer, such released Adequate Protection Liens shall also attach to such proceeds in accordance with the priorities set forth herein and reflected in **Exhibit 1.**

20.     *Adequate Protection of Prepetition Secured Parties*.  Pursuant to sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, the Prepetition Secured Parties are entitled to adequate protection of their respective interests in the Prepetition Collateral (including Cash Collateral) (the "Adequate Protection Rights").  In consideration of the foregoing, each Prepetition Agent, as applicable, and for the benefit of the applicable Prepetition Secured Parties, was granted pursuant to the Interim Order (which is hereby ratified and continuing with this Final Order) the following as Adequate Protection on account of their Adequate Protection Rights, and as an inducement to the Prepetition Secured Parties to consent to the priming of the Prepetition Liens and use of the Prepetition Collateral (including Cash Collateral) as set forth in this Final Order (collectively, the "Adequate Protection Obligations"):

(a)     *Pari First Lien Adequate Protection Liens*.  Each of the Pari First Lien Agents, for itself and for the benefit of its applicable Pari First Lien Secured Parties, is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the

execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) on account of its Adequate Protection Rights, for the aggregate diminution in the value of its respective interests in the Prepetition Collateral (including Cash Collateral), if any, from and after the Petition Date for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, including Cash Collateral, the priming of the Prepetition Liens by the DIP Priming Liens pursuant to the DIP Documents, and this Final Order, the payment of any amounts under the Carve Out or pursuant to this Final Order or any other order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the Automatic Stay (the "Diminution in Value"), a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (but excluding Avoidance Proceeds and the proceeds of commercial tort claims) (the "Pari First Lien Adequate Protection Liens"), in accordance with the priorities set forth herein and reflected in **Exhibit 1** attached hereto and subject and subordinate to (i) Prepetition Permitted Senior Liens, (ii) the Carve Out, (iii) the DIP Liens, and (iv) and in the case of ABL Priority Collateral, (x) the Prepetition ABL Liens and (y) the ABL Adequate Protection Liens (as defined below); *provided that* each of the Pari First Lien Agents, for itself and for the benefit of its applicable Pari First Lien Secured Parties, shall exercise commercially reasonable efforts to collect from the proceeds of the other assets of the Debtors (or their estates) first before turning to any Avoidance Proceeds or the proceeds of commercial tort claims.

(b)     *Pari First Lien Section 507(b) Claim*.  Each of the Pari First Lien Agents, for itself and for the benefit of its applicable Pari First Lien Secured Parties, is hereby granted, subject and subordinate to the Carve Out, an allowed superpriority administrative expense claim on account of such Pari First Lien Secured Parties' Adequate Protection Rights for the Diminution of Value as

provided for in section 507(b) of the Bankruptcy Code (the "Pari First Lien 507(b) Claim"), which Pari First Lien 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof in accordance with the priorities set forth herein (including, without limitation, the Avoidance Proceeds and proceeds of commercial tort claims)); *provided that* each of the Pari First Lien Agents, for itself and for the benefit of its applicable Pari First Lien Secured Parties, shall exercise commercially reasonable efforts to collect from the proceeds of the other assets of the Debtors (or their estates) first before turning to any Avoidance Proceeds or the proceeds of commercial tort claims. The Pari First Lien 507(b) Claims shall be subject and subordinate only to (1) the Carve Out, (2) the DIP Superpriority Claims, and (3) solely with respect to the ABL Priority Collateral, the Prepetition ABL Obligations and the Prepetition ABL 507(b) Claim.

(c) *ABL Adequate Protection Liens*. The Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), on account of its Adequate Protection Rights for the Diminution of Value a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (but excluding Avoidance Proceeds and the proceeds of commercial tort claims) (the "ABL Adequate Protection Liens" and, together with the Pari First Lien Adequate Protection Liens, the "Adequate Protection Liens"), in accordance with the priorities set forth in **Exhibit 1** attached hereto, and in the case of the ABL Priority Collateral, senior to all liens other than any applicable Prepetition ABL Permitted Senior Liens, but in the case of DIP Priority Collateral subject and subordinate to (i) the Prepetition Permitted Senior Liens, (ii) the Carve Out, (iii) the DIP Liens, (iv) the Pari First Liens, and (v) the Pari First Lien Adequate Protection Liens); *provided that* the Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders, shall exercise commercially

reasonable efforts to collect from the proceeds of the other assets of the Debtors (or their estates) first before turning to any Avoidance Proceeds or the proceeds of commercial tort claims.

(d)     _Prepetition ABL Secured Parties' Section 507(b) Claim_.   The Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders, is hereby granted, subject and subordinate to the Carve Out, an allowed superpriority administrative expense claim on account of such Prepetition ABL Secured Parties' Adequate Protection Rights for Diminution of Value as provided for in section 507(b) of the Bankruptcy Code (the "Prepetition ABL 507(b) Claim" and, together with the Pari First Lien 507(b) Claims, the "Adequate Protection 507(b) Claims"), which Prepetition ABL 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof in accordance with the priorities set forth herein (including, without limitation, the Avoidance Proceeds and proceeds of commercial tort claims); _provided that_ the Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders, shall exercise commercially reasonable efforts to collect from the proceeds of the other assets of the Debtors (or their estates) first before turning to any Avoidance Proceeds or the proceeds of commercial tort claims.  With respect to the ABL Priority Collateral, the Prepetition ABL 507(b) Claim shall be senior to all other claims of any kind.  With respect to the DIP Priority Collateral, the Prepetition ABL 507(b) Claim shall be subject and subordinate only to the Carve Out, the DIP Superiority Claims, the Pari First Lien 507(b) Claims, the Prepetition Permitted Senior Liens, and the prepetition claims of the Pari First Lien Secured Parties.

(e)     _Pari First Lien Secured Parties Adequate Protection Fees and Expenses_.  As further adequate protection, subject to the Carve Out as set forth in the Interim Order and the Final Order, the DIP Loan Parties shall provide current cash payments of all reasonable and documented out-of-pocket prepetition and postpetition fees and expenses of:  (A) Dechert LLP, legal counsel to

the Ad Hoc Group and the DIP Lenders, (B) Evercore Inc., as financial advisor to the Ad Hoc Group and the DIP Lenders, (C) Potter Anderson & Corroon LLP, as local counsel to the Ad Hoc Group and the DIP Lenders, (D) the Pari First Lien Agents and two law firms, one as lead counsel and one as local counsel, to each of the Pari First Lien Agents, (E) Maples and Calder (Cayman) LLP, and, in each case, with respect to the preceding clauses (A) to (E), relating in any way to the provision of legal and financial services related to the DIP Credit Agreement, the Prepetition Secured Obligations, the Debtors, or the chapter 11 cases, and, with respect to any financial advisors, applicable engagement letters, fee letters, or similar arrangements (such fees and expenses, the "Pari First Lien Adequate Protection Fees and Expenses").  The Pari First Lien Adequate Protection Fees and Expenses shall be subject to the review procedures set forth in paragraph 27 of this Final Order.

(f)      *Prepetition ABL Secured Parties' Adequate Protection Fees and Expenses*. As further adequate protection, subject to the Carve Out, the DIP Loan Parties shall provide current cash payments of all reasonable and documented out-of-pocket prepetition and postpetition fees and expenses of, (x) prior to the occurrence of a ABL Cash Collateral Termination Event:  (i)  Choate, Hall, & Stewart LLP, (ii) Reed Smith LLP, (iii) Berkeley Research Group, LLC, and (iv) Gordon Brothers Asset Advisors, LLC ("GB") and (y) after the occurrence of an ABL Cash Collateral Termination Event, the reasonable and documented out-of-pocket postpetition fees and expenses of the advisors set forth in items (i) through (iv) above, *plus*, at the election of the Prepetition ABL Agent, the reasonable and documented out-of-pocket expenses of an investment banking advisor selected by the ABL Agent (the "ABL Adequate Protection Fees and Expenses" and, together with the Pari First Lien Adequate Protection Fees and Expenses, the "Adequate Protection Fees and Expenses").  The ABL Adequate Protection Fees and Expenses shall be subject to the review procedures set forth in paragraph 27 of this Final Order.

(g)     *ABL Postpetition Interest Payments*.  From entry of the Interim Order and continuing after entry of this Final Order, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, shall receive current cash payments during the chapter 11 cases of all accrued interest and fees (including Letter of Credit Fees and Fronting Fees) on the Prepetition ABL Obligations under the Prepetition ABL Credit Agreement as such interest and fees become due and payable and as set forth in the following sentence, at the applicable contractual non-default rate thereunder and in the amounts specified in the Prepetition ABL Credit Agreement, and with default rate interest with respect to the foregoing to accrue and become payable upon the occurrence of an ABL Cash Collateral Termination Event.  The interest and fee payment date shall be paid on the same cadence and in a manner consistent with the prepetition ABL Credit Agreement; *provided* that, in accordance with paragraph 30, any party in interest's rights are fully reserved to seek a determination that adequate protection payments (as set forth in this paragraph 20(g)) should be recharacterized under section 506(b) of the Bankruptcy Code as payment on account of the secured portion of the Prepetition ABL Obligations as of the Petition Date.

(h)     *ABL ABR Rollover*.  Notwithstanding anything to the contrary herein or in the Prepetition ABL Credit Agreement, upon the termination of any applicable Interest Period (as defined in the Prepetition ABL Credit Agreement), each Term SOFR Loan (as defined in the Prepetition ABL Credit Agreement) shall automatically convert to and be deemed to be an ABR Loan (as defined in the Prepetition ABL Credit Agreement) for all purposed under the Prepetition ABL Credit Agreement; provided that no break funding payments shall be payable in connection therewith.

(i)     *ABL Cash Collateral Borrowing Base*.  The definition of "Borrowing Base" used in the determination of any True Up Event or Borrowing Base Shortfall (each as defined below)

shall be the "Borrowing Base" as defined in, and calculated and otherwise determined in accordance with, the Prepetition ABL Credit Agreement on the date hereof and initially set forth in the most recent Borrowing Base Certificate (as defined in the Prepetition ABL Credit Agreement) delivered prior to the Petition Date and thereafter in the most recent Borrowing Base Certificate delivered prior to any such date of determination, but modified as provided below herein (the "Cash Collateral Borrowing Base"), *provided* that (x) notwithstanding anything to the contrary in the Prepetition ABL Credit Agreement, the Cash Collateral Borrowing Base shall not otherwise reflect any new or increased reserves or any modifications of eligibility criteria or advance rates (other than (i) increases in reserves resulting from mathematical calculations; (ii) the Store Closing Reserves (as defined herein); (iii) the Lease Reserves (as defined herein); and (iv) reserves that are not "Discretionary Reserves" as defined in the ABL Forbearance Agreement;[13] *provided* that any such reserves may not be implemented as a result of recommendation of any "Monthly Desktop Appraisal") (for the avoidance of doubt, subject to increase on account of seasonal advance rates in accordance with the Prepetition ABL Credit Agreement) set forth in the Prepetition ABL Credit Agreement, (y) the Cash Collateral Borrowing Base will be calculated using any updated Borrowing Base Certificates (as defined in the Prepetition ABL Credit Agreement) as and when required to be delivered pursuant to paragraph 20(k) below, and (z) the Cash Collateral Borrowing Base shall be increased (on a dollar-for-dollar basis) by the amount of cash then held in the ABL True Up Account (as defined herein).

(j)    *ABL Adequate Protection Information Rights*.  The Debtors shall provide to the Prepetition ABL Agent (and the Creditors' Committee) at the same time as such reporting is provided to the DIP Lenders and/or the DIP Agent all reporting required to be provided to the DIP

---

[13]    "ABL Forbearance Agreement" means that Forbearance Agreement and Second Amendment to ABL Credit Agreement dated May 23, 2025 among, the At Home Group Inc. and the other Debtors party thereto, the Prepetition ABL Agent, and the Prepetition ABL Lenders party thereto.

Lenders or DIP Agent under the DIP Documents.  At the reasonable request of the Prepetition ABL Agent, the Debtors shall cause Hilco to provide the Prepetition ABL Agent with updates and information relating to store closing sales (including performance of such store closing sales), all as reasonably requested by the Prepetition ABL Agent.  Additionally, at the request of the Prepetition ABL Agent, the Debtors shall hold weekly lender update calls with the Prepetition ABL Agent and the Prepetition ABL Lenders to discuss, among other things, status of milestones, RSA, financial performance of the Debtors and liquidity projections and budget updates.  The Debtors shall provide the Prepetition ABL Agent (and the Creditors' Committee) with all other reporting required under each of the Prepetition ABL Credit Documents when due in accordance with its terms.

(k)      *Borrowing Base Reporting.*  On the fourth business day of each week, the Debtors shall deliver to the Prepetition ABL Agent, with copies to the DIP Agent and the Creditors' Committee, a Borrowing Base Certificate, with all the information required to be provided in connection therewith, in each case in the format customarily delivered with each Borrowing Base Certificate delivered prior to the Petition Date, setting forth the Cash Collateral Borrowing Base (i) calculated as of the last day of the immediately preceding calendar week (with weeks, for purpose of the Borrowing Base Certificate, beginning on Sunday and ending on Saturday); (ii) calculated as of the last business day of the immediately preceding fiscal month, twenty calendar days (or, if such day is not a business day, the next business day) following the end of each fiscal month which monthly Borrowing Base Certificates shall reconcile all weekly inventory roll forwards, and (iii) including such Borrowing Base information as necessary for the calculation of reserves; *provided, however*, that with respect to the weekly Borrowing Base Certificates required to be delivered under

clause (i) above, only the Weekly Back-Up Information[14] shall be required to be rolled forward on a weekly basis, and each other component that does not constitute Weekly Back Up-Information may be rolled forward on a monthly basis; *provided further*, that the Debtors shall use commercially reasonable efforts to roll forward each input on a weekly basis to the extent practicable.

(l)     *Appraisals*.  Notwithstanding anything to the contrary in the Prepetition ABL Credit Agreement, the Prepetition ABL Agent will not be entitled to request access for and/or request any new inspections, appraisals, and field examinations (including, without limitation, with respect to Prepetition ABL Priority Collateral); *provided* that the Borrower will, and will cause each of the other DIP Loan Parties to, at the prior written request of the Prepetition ABL Agent from time to time, and at the expense of the Debtors, cooperate with the Prepetition ABL Agent (including any appraisers retained by the Prepetition ABL Agent) to (i) permit to be conducted monthly "desktop" Collateral appraisals, including reviews of inventory levels (the foregoing, collectively, "Monthly Desktop Appraisals") (and shall promptly deliver all data and other information necessary for the Prepetition ABL Agent (or any appraisers retained by the Prepetition ABL Agent) to complete the Monthly Desktop Appraisals on or before five (5) business days after the most recent fiscal month then ending (commencing with the fiscal month ending June 30, 2025); and (ii) deliver any information reasonably requested in writing by the Prepetition ABL Agent or its representatives in connection with such appraisals, collateral audits or valuations of the Collateral (subject to the same exclusions set forth in the penultimate sentence of Section 9.2(a) of the Prepetition ABL Credit Agreement).  In the discretion of the Prepetition ABL Agent, the Appraised Liquidation Values set forth in the most recent Monthly Desktop Appraisal shall be used for purposes of calculating the Cash

---

[14]     "Weekly Back-Up Information" means the following Borrowing Base components (in each case, consistent with the Debtors' past practice under the Prepetition ABL Credit Agreement): eligible credit card accounts, eligible trade accounts, eligible inventory, eligible in-transit inventory and qualified cash.

Collateral Borrowing Base as described in paragraph 20(i) above.  Solely to the extent that any field examination is conducted in accordance with this paragraph 20(l), the Prepetition ABL Agent, at the expense of the Debtors, may retain a field examiner to determine the amount of the Landed Cost Reserve and the Debtors shall cooperate with and provide all information reasonably requested by the Prepetition ABL Agent or the field examiner to determine the amount of the Landed Cost Reserve.  Notwithstanding the foregoing, the Prepetition ABL Agent shall be permitted to request access for and/or request any new inspections, appraisals, and field examinations from time to time, at the Prepetition ABL Agent's own expense, for valuation purposes only, which (i) do not impact the calculation of the Cash Collateral Borrowing Base and (ii) do not unreasonably interfere with the ordinary course activities and operations of the Debtors as in effect at such time.

(m)    _Store Closing Reserve_.  The Prepetition ABL Agent may implement a reserve against the Cash Collateral Borrowing Base with respect to the remaining inventory located at any store that has commenced a "store closing sale" (a "Closing Store") in an amount to reflect the then prevailing discount with respect to such remaining inventory, which reserve shall be implemented (without duplication of any other reserves implemented under the Prepetition ABL Credit Agreement) commencing as of the final four (4) weeks of such store closing sale (such last four week period to be as determined in accordance either with the applicable pre-store closing sales curve forecast prepared by the Debtors in consultation with the Agent (as defined in the Store Closing Motion) or the final four weeks of the applicable store closing timeline) (the "End of Sale Term") in the following amounts:  (x) 5% of the value (as set forth in the Debtors' books and records) of inventory located in each such Closing Store during the first two weeks of such End of Sale Term and (y) 10% of the value (as set forth in the Debtors' books and records) of inventory located in each such Closing Store during the remaining End of Sale Term (the foregoing, the "Store Closing

Reserve"). Store Closing Reserves shall not include amounts in the ABL Reserves to the extent that the ABL Reserves address the same matter or circumstance.

(n)     *Lease Reserve*. The Prepetition ABL Agent shall have the right to implement a Reserve to the extent (i) a lease has not yet been assumed; and (ii) liquidation sales have not commenced at such location by September 16, 2025 ("Lease Reserve"). Such Lease Reserve shall be determined in good faith by the Prepetition ABL Agent (in consultation with GB) as appropriate to reflect any decrease in the Appraised Liquidation Value for such inventory at such location assuming it were required to be fully liquidated by the termination of the lease assumption/rejection period.

(o)     *ABL True Up*. If the Debtor delivers a Borrowing Base Certificate (as defined in the Prepetition ABL Credit Agreement and consistent with the terms hereof) to the DIP Agent and Prepetition ABL Agent that provides a Borrowing Base (as defined in the Prepetition ABL Credit Agreement) that is less than the sum of (i) the aggregate principal amount of Prepetition ABL Revolving Credit Loans at such time, (ii) the face amount of letters of credit outstanding under the Prepetition ABL Credit Facility at such time and (iii) the Minimum Availability Threshold (as defined in the Prepetition ABL Credit Agreement, but without regard to the "Total Revolving Credit Commitment" thereunder) (a "True Up Event," and the amount of such shortfall, the "Borrowing Base Shortfall"), the Debtors shall, by the end of the second business day thereafter, deposit cash in an amount equal to the Borrowing Base Shortfall (the "ABL True Up") into a controlled segregated reserve account maintained by the Prepetition ABL Agent (the "ABL True Up Account"), with all funds held in the ABL True Up Account deemed ABL Priority Collateral and subject to all liens on ABL Priority Collateral in the same priority set forth in **Exhibit 1** attached hereto, *provided* that the Borrowing Base shall be adjusted on a dollar-for-dollar basis by the amount of cash then held in the ABL True Up

Account, which shall be reflected in each Borrowing Base Certificate.  The Debtors may withdraw cash from the ABL True Up Account at any time by delivering an updated Borrowing Base Certificate to the DIP Agent and the Prepetition ABL Agent along with an officer's certificate certifying that following such withdrawal no True Up Event shall be in effect.

(p)    *Cash Dominion*.  From and after the date of the entry of this Final Order, all collections and proceeds of any ABL Priority Collateral and all Cash Collateral that does not constitute identifiable DIP Priority Collateral that shall at any time come into the possession, custody, or control of any Debtor, shall (x) be promptly deposited in one or more Controlled Accounts (or to the extent different, the same accounts in which such collections and proceeds of the ABL Priority Collateral were deposited under the Prepetition ABL Credit Agreement; *provided* that all such accounts shall be swept on a daily basis to a Controlled Account ("ZBA Accounts")) and (y) amounts in such Controlled Accounts shall be remitted daily to the Collateral Agent Account (as defined under the ABL Credit Agreement), which shall be subject to the sole dominion and control of the Prepetition ABL Agent; *provided* that, prior to the occurrence of an ABL Cash Collateral Termination Event, amounts in such Controlled Accounts and ZBA Accounts (other than the ABL True Up Account) shall be available to the Debtors to be used, first, in the event of a True Up Event, to cover any Borrowing Base Shortfall, and thereafter, in accordance with the Approved Budget (subject to permitted variances under the DIP Documents).  Following the Debtors submission to the Prepetition ABL Agent of a notice to use Cash Collateral (a "Cash Collateral Draw Notice"), the Prepetition ABL Agent shall disburse funds from any Controlled Account (or the Collateral Agent Account (but for the avoidance of doubt, not the ABL True Up Account) to the Debtors' operating accounts as appropriate to fund the amounts specified in the Cash Collateral Draw Notice; *provided*

that the Prepetition ABL Agent shall not be required to disburse such funds if an ABL Cash Collateral Termination Event has occurred (subject to the requirement of paragraph 14).

21.    *Maintenance of Collateral*.  The DIP Loan Parties shall continue to maintain and insure the Prepetition Collateral and DIP Collateral in amounts and for the risks, and by the entities, as required under the Prepetition Credit Documents and the DIP Documents.

22.    *No Further Consent*.  The Pari First Lien Secured Parties' consent or are deemed to consent, as applicable, to the priming of the Pari First Liens and the Pari First Lien Adequate Protection Liens by DIP Priming Liens and DIP Priming Second Liens and to the Debtors' use of Pari First Lien Collateral including Cash Collateral is limited solely to the DIP Financing authorized by this Final Order.  Nothing in the Interim Order, this Final Order, or the DIP Documents shall (x) be construed as the affirmative consent by any of the Pari First Lien Secured Parties for the use of Cash Collateral other than on the terms set forth in this Final Order and in the context of the DIP Financing authorized by this Final Order to the extent such consent has been or is deemed to have been given, (y) be construed as a consent by any Pari First Lien Secured Parties to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) other than as contemplated by the DIP Financing authorized by this Final Order, or (z) prejudice, limit or otherwise impair the rights of any of the Pari First Lien Secured Parties to seek new, different or additional adequate protection, or assert any rights of any of the Pari First Lien Secured Parties.

23.    *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties; *provided* that any of the Prepetition Secured Parties (subject to any applicable contractual limitations on such rights)

may request further or different adequate protection and the DIP Loan Parties or any other party in interest may contest any such request.

24.    *Perfection of DIP Liens and Adequate Protection Liens*.

(a)    Without in any way limiting the automatically valid effective perfection of the DIP Liens granted pursuant to paragraph 8 of this Final Order and the Adequate Protection Liens granted pursuant to paragraph 20 hereof, the DIP Agent, the other DIP Secured Parties, and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the DIP Loan Parties and the Prepetition Secured Parties (as applicable), as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of securities, or to amend or modify security documents, or enter into intercreditor agreements, or to subordinate existing liens and any other similar action or action in connection therewith in a manner not inconsistent herewith or take any other action in order to document, validate and perfect the liens and security interests granted to them hereunder the ("Perfection Actions").  Whether or not the DIP Agent, on behalf of the DIP Secured Parties, or the Prepetition Secured Parties shall take such Perfection Actions, the liens and security interests granted hereunder shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Final Order), at the time and on the date of entry of this Final Order.  Upon the request of the DIP Agent, each Prepetition Agent, each of the Prepetition Secured Parties and the DIP Loan Parties, without any further consent of any party, is authorized (in the case of the DIP Loan Parties) and directed (in the case of the Prepetition Secured Parties), and such direction is hereby deemed to constitute required direction under the applicable DIP Documents or Prepetition Credit Documents, to execute such instruments

and agreements (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens in all jurisdictions required under the DIP Credit Agreement, including all local law documentation therefor determined to be reasonably necessary by the DIP Agent; *provided*, *however*, that no action need be taken in a foreign jurisdiction that would jeopardize the validity and enforceability of the Prepetition Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A certified copy of this Final Order may, in the discretion of the DIP Agent (acting at the direction of the Required DIP Lenders in accordance with the terms of this Final Order) and each Prepetition Agent (as applicable), be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are authorized and directed to accept a certified copy of this Final Order for filing and/or recording, as applicable.  The Automatic Stay shall be modified to the extent necessary to permit, but not obligate, the DIP Agent and each Prepetition Agent to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

25.     *Release*.  In consideration of and as a condition to consenting to the use of Cash Collateral and the DIP Agent and the DIP Lenders making the DIP Facility available under the DIP Credit Agreement and providing other credit and financial accommodations to the Debtors pursuant to the provisions of this Final Order and the DIP Documents (including the Carve Out provisions), each of the Debtors, the Debtors' estates, on its own behalf and on behalf of its and their respective past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits (x) the DIP Agent, the DIP Lenders (including, for the avoidance of doubt, the Fronting Lender), and the DIP Secured Parties, and (y) subject to expiration of the time period set forth in paragraph 30, the Pari First Lien Secured Parties,

the Prepetition ABL Agent and the Prepetition ABL Secured Parties, and, in each case, each of their respective Representatives in such capacity (as defined herein) (collectively, the "Released Parties"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise (collectively, the "Released Claims"), in each case arising out of or related to (as applicable) the Pari First Lien Documents, the Prepetition ABL Credit Documents, the DIP Documents, the respective obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Final Order; *provided* that the releases set forth in this section shall not release any claims against a Released Party or liabilities that a court of competent jurisdiction determines results from the bad faith, gross negligence, material breach, fraud, or willful misconduct of such Released Party. For the avoidance of doubt, nothing in this release shall relieve the DIP Secured Parties or the Debtors of their Obligations under the DIP Documents.

26.     *Preservation of Rights Granted Under this Final Order*.

(a)     Other than (i) the Carve Out, (ii) and other claims and liens expressly granted or permitted by the Interim Order, this Final Order, or the DIP Credit Agreement, no claim or lien

having a priority superior to or *pari passu* the Prepetition ABL Liens or with those granted by this Final Order to the DIP Secured Parties or the Prepetition Secured Parties shall be permitted while any of the Prepetition ABL Obligations, DIP Obligations, or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided herein or permitted under the Interim Order, this Final Order, or the DIP Credit Agreement, the DIP Liens, the Prepetition ABL Liens, and the Adequate Protection Liens shall not be:  (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties or the Prepetition ABL Loan Parties; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the DIP Loan Parties or the Prepetition ABL Loan Parties.

(b)    Upon notice of an Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Credit Agreement.  Notwithstanding any order that may be entered dismissing any of the chapter 11 cases under section 1112 of the Bankruptcy Code or converting these chapter 11 cases to cases under chapter 7: (A) the DIP Superpriority Claims, the Adequate Protection 507(b) Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and Adequate Protection Obligations shall have been paid in full (and that such DIP Superpriority Claims,

Adequate Protection Rights, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (B) the other rights granted by this Final Order, including with respect to the Carve Out, shall not be affected; and (C) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Final Order.

(c)      If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or each Prepetition Agent, as applicable, of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens, the Adequate Protection Liens, or the Carve Out. Notwithstanding any such reversal, modification, vacatur or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Obligations, or Adequate Protection Liens incurred by the DIP Loan Parties and granted to the DIP Agent, the DIP Secured Parties, each Prepetition Agent, or the other Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent and each Prepetition ABL Agent, as applicable, of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Final Order, and the DIP Agent, the DIP Secured Parties, each Prepetition Agent, and the other Prepetition Secured Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges and benefits arising under sections 363(m) (if applicable) and 364(e) of the Bankruptcy Code, the Interim Order, this Final Order, and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)     Except as expressly provided in the Interim Order, this Final Order, or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, the Adequate Protection Rights and all other rights and remedies of the DIP Agent, the other DIP Secured Parties, each Prepetition Agent, and the other Prepetition Secured Parties granted by the provisions of the Interim Order, this Final Order, and the DIP Documents and the Carve Out shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the chapter 11 cases or terminating the joint administration of these chapter 11 cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the chapter 11 cases and, pursuant to section 1141 (d)(4) of the Bankruptcy Code, the DIP Loan Parties have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations in connection with such chapter 11 plan.  The terms and provisions of the Interim Order, this Final Order, and the DIP Documents shall continue in these chapter 11 cases, in any Successor Cases if these chapter 11 cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Secured Parties, each Prepetition Agent, and the other Prepetition Secured Parties granted by the provisions of the Interim Order, this Final Order, and the DIP Documents shall continue in full force and effect until the DIP Obligations and the Adequate Protection Rights are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated (and in the case of rights and remedies of each Prepetition Agent

and the other Prepetition Secured Parties, shall remain in full force and effect thereafter), and the Carve Out shall continue in full force and effect.

27.    _Payment of Fees and Expenses_.  The invoices with respect to the professional fees and expenses payable under paragraphs 2, 20(e) and 20(f) of this Final Order shall not be required to comply with the U.S. Trustee guidelines, nor shall the applicable professionals be required to file fee applications with the Court with respect to any fees or expenses payable hereunder, and all invoices therefor may be in summary form only (and shall not be required to contain individual time entries, and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine), and shall, by email, be provided to counsel to the Debtors, counsel to any Creditors' Committee, and the U.S. Trustee (the "Fee Notice Parties"); _provided, however_, that such applicable professionals may be required to submit more detailed and/or unredacted invoices to the U.S. Trustee upon request by the U.S. Trustee_; provided further, however_, if no formal objection to payment of the requested fees and expenses is made in writing by any of the Fee Notice Parties within ten (10) business days after delivery of such invoices (the "Fee Objection Period"), which Fee Objection Period may be extended by agreement of the parties or order of the Court, then, upon the expiration of the Fee Objection Period, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors and, in any event, no later than five (5) business days after expiration of the Fee Objection Period; _provided_, _further_, _however_, if a formal objection is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, the undisputed portion shall promptly be paid by the Debtors, and in any event,

no later than five (5) business days after expiration of the Fee Objection Period, and the disputed portion shall only be paid upon resolution of such objection by the applicable parties or by order of the Court.  Notwithstanding the foregoing, the Debtors are authorized to and shall pay, upon the initial funding of the DIP Financing, the DIP Fees and Expenses and Adequate Protection Fees and Expenses incurred on or prior to such date without the need for any professional engaged by, or on behalf of, the DIP Secured Parties or the Prepetition Secured Parties to first deliver a copy of its invoice or other supporting documentation to the Fee Notice Parties (other than the Debtors). Subject to this paragraph 27, none of the DIP Fees and Expenses or Adequate Protection Fees and Expenses payments required to be made pursuant to this Final Order shall be subject to claim, counterclaim, challenge, setoff, subordination, recharacterization, defense, avoidance or disgorgement in the chapter 11 cases or any Successor Cases.

28.    *Letters of Credit*.  The Debtors are hereby authorized to maintain and to renew existing Letters of Credit (as defined in the Prepetition ABL Credit Agreement) issued under the Prepetition ABL Credit Agreement prior to the Petition Date on an uninterrupted basis, in accordance with the same practices and procedures as were in effect prior to the Petition Date and subject to availability under the Borrowing Base (excluding the requirement to certify that no default or Event of Default is continuing and the requirement to bring down representations and warranties, in each case solely to the extent such certification or bring down cannot be made as a result of the chapter 11 cases), in each case subject to the terms of the Prepetition ABL Credit Agreement (except as set forth in the prior parenthetical), and to take all actions reasonably appropriate with respect thereto.  The Letter of Credit Issuer (as defined in the Prepetition ABL Credit Agreement) shall, upon the Debtors' request, continue to extend, renew, or otherwise modify (but not increase) any Letters of Credit in accordance with their existing terms consistent with their prior course of dealing.

29.     _Limits to Lender Liability_.   Nothing in the Interim Order, this Final Order, the DIP

Documents, or any other documents related to these transactions shall in any way be construed or

interpreted to impose or allow the imposition upon the DIP Secured Parties (in each case, in their

capacities as such) of any liability for any claims arising from the prepetition or postpetition activities

of the DIP Loan Parties in the operation of their business, or in connection with their restructuring

efforts.   So long as the DIP Secured Parties comply with their obligations under the DIP Documents

and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP

Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of

the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion

from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier,

servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or

destruction of the DIP Collateral shall be borne by the DIP Loan Parties.

30.     _Effect of Stipulations on Third Parties_.   The Debtors' stipulations, admissions,

agreements, and releases contained in the Interim Order and this Final Order shall be binding upon

the Debtors in all circumstances and for all purposes.   The Debtors' stipulations, admissions,

agreements and releases contained in paragraph H of the Interim Order and this Final Order shall be

binding upon all other parties in interest, including, without limitation, any statutory or non-statutory

committees appointed or formed in the chapter 11 cases and any other person or entity acting or

seeking to act on behalf of the Debtors' estates including any chapter 7 or chapter 11 trustee or

examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes

unless:   (a) such committee or any other party in interest with requisite standing (subject in all

respects to any agreement or applicable law that may limit or affect such entity's right or ability to

do so), including a chapter 7 trustee or chapter 11 trustee, has timely filed an adversary proceeding

or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph) by no later than (i) seventy-five (75) calendar days after the entry of the Interim Order; and (ii) any such later date as (x) has been agreed to by the Prepetition ABL Agent with respect to the Prepetition ABL Obligations or the Prepetition ABL Liens, or (y) has been agreed to by the applicable Pari First Lien Agent (acting in accordance with its respective Pari First Lien Documents) with respect to the Pari First Lien Obligations or the Pari First Liens or (iv) has been ordered by the Court for cause upon a motion filed and served within any applicable period in clauses (i) or (ii) of this paragraph 30 (the time period established by the foregoing clauses (i)–(ii), the "Challenge Period"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligations or the Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests, or defenses (collectively, the "Challenges") against the Prepetition Secured Parties, their affiliates, and/or their respective subsidiaries, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "Representative" and, collectively, the "Representatives") in connection with matters related to the Prepetition Credit Documents, the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released, and

barred.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then:  (1) the Debtors' stipulations, admissions, agreements and releases contained in the Interim Order and this Final Order shall be binding on all parties in interest; (2) the obligations of the DIP Loan Parties under the Prepetition Credit Documents, including the Prepetition Secured Obligations, shall constitute allowed claims not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise, except under the Intercreditor Agreements), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in the chapter 11 cases, and any subsequent chapter 7 case(s); (3) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual (other than pursuant to the Intercreditor Agreements), or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in the chapter 11 cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in the chapter 11 cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation,

any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Credit Documents, the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Collateral shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in the Interim Order and this Final Order shall nonetheless remain binding and preclusive on each other statutory or nonstatutory committee appointed or formed in the chapter 11 cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in the Interim Order or this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these chapter 11 cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Credit Documents, the Prepetition Secured Obligations, or the Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay the chapter 11 cases or confirmation of any plan of reorganization; *provided*, *however*, that any trustee appointed prior to the expiration of the Challenge Period will have the longer of (x) the remaining Challenge Period and (y) thirty (30) days from the date of such trustee's appointment to commence a Challenge.  The timely filing of a motion seeking standing to file a Challenge before the termination of the Challenge Period that attaches a proposed pleading commencing such Challenge shall toll the Challenge Deadline only as to the party that timely filed such standing motion until such motion is resolved or adjudicated by the Court.  Any pleadings filed in any Challenge proceeding shall set forth

with specificity the basis for such Challenge (and any Challenge not so specified prior to the Challenge Deadline shall be deemed forever waived, released, and barred). The Court may fashion any appropriate remedy following a successful Challenge. The Prepetition Secured Parties agree not to object to the standing of the Creditors' Committee to raise any issues on behalf of the estates of any Debtor that is a limited liability company on the basis that the Creditors' Committee cannot have standing to raise such issues under applicable non-bankruptcy law because such Debtor entity is a limited liability company.

31.     _Limitation on Use of DIP Financing Proceeds and Collateral._  Notwithstanding any other provision of the Interim Order, this Final Order, or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral), or any portion of the Carve Out, may be used directly or indirectly for any of the following:  (a) in connection with the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, the Pari First Lien Secured Parties, the Prepetition ABL Secured Parties or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, in each case in their respective capacity as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, Superpriority DIP Claims, Pari First Lien Obligations, the Pari First Liens, the Prepetition ABL Obligations, the Prepetition ABL Liens and/or the Adequate Protection Obligations and Adequate Protection Liens granted under the DIP Orders, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Pari First Lien Obligations, the Prepetition ABL Obligations and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations, the Pari First Lien Obligations or the Prepetition ABL Obligations granted under the Interim Order, the Final DIP

Order, the DIP Documents, or the applicable Pari First Lien Debt Documents or Prepetition ABL Credit Documents, including, in the case of each of (i) and (ii), without limitation, any claims or challenges relating to the allocation of value as between encumbered or unencumbered assets of the Debtors or claims alleged for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) except for the right of the Debtors and the Creditors' Committee to contest whether an Event of Default has occurred and/or is continuing during the Remedies Notice Period or the ABL Remedies Notice Period, to prevent, hinder, or otherwise delay or interfere with the Pari First Lien Secured Parties', the Prepetition ABL Secured Parties' the DIP Agent's, or the DIP Lenders', as applicable, enforcement or realization on the Pari First Lien Obligations, Prepetition ABL Obligations Pari First Lien Collateral, Prepetition ABL Collateral DIP Obligations, DIP Collateral, the Adequate Protection Obligations and Adequate Protection Liens and the liens, claims and rights granted to such parties under this Final Order each in accordance with the DIP Documents, the applicable Pari First Lien Debt Documents, the applicable Prepetition ABL Credit Documents and the DIP Orders; (c) to seek to subordinate, recharacterize, disallow, or avoid any of the DIP Obligations, Pari First Lien Obligations or the Prepetition ABL Obligations; (d) to seek to modify any of the rights and remedies granted to the Pari First Lien Secured Parties, the Prepetition ABL Secured Parties, the DIP Agents, or the DIP Lenders under this Final Order, the Pari First Lien Debt Documents, the Prepetition ABL Credit Documents or the DIP Documents, as applicable; (e) to apply to the Court for authority to approve superpriority claims or grant liens or security interests in the DIP Collateral or any portion thereof that are, in each case, senior to, or on parity with, the DIP Liens, Superpriority DIP Claims, Adequate Protection Liens and Adequate Protection 507(b) Claims granted to the Pari First Lien Secured Parties and the Prepetition ABL Secured Parties; (f) to make any payment in

respect of Committee Professionals in excess of the amounts set forth in the Initial Approved Budget, or (g) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are included in the Approved Budget, approved or authorized by the Court, agreed to in writing by the Required DIP Lenders, or as expressly permitted under the Interim Order, this Final Order, or permitted under the DIP Documents (including the Approved Budget subject to permitted variances under the DIP Documents), in each case, unless all DIP Obligations, Pari First Lien Obligations, Prepetition ABL Obligations, Adequate Protection Obligations and claims granted to the DIP Agent, DIP Lenders, the Pari First Lien Secured Parties or the Prepetition ABL Secured Parties under this Final Order, have been refinanced or paid in full in cash or otherwise agreed to in writing by the Required DIP Lenders.  Notwithstanding the above, the Creditors' Committee may use the proceeds of the DIP Collateral to investigate but not to prosecute (A) the claims and liens of the Pari First Lien Secured Parties and the Prepetition ABL Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Pari First Lien Secured Parties and the Prepetition ABL Secured Parties, in each case, subject to an aggregate cap of no more than $150,000. Notwithstanding the above, prior to the earlier of the entry of this Final Order or the completion of the Special Committee's investigation, the Special Committee may use the proceeds of the DIP Collateral to investigate but not to prosecute (A) the claims and liens of the Pari First Lien Secured Parties and (B) potential claims, counterclaims, causes of action, or defenses against the Pari First Lien Secured Parties.

32.  *Indemnification*.  Without limitation to any other right to indemnification, the Prepetition Secured Parties (subject to any Challenges that may be raised prior to expiration of the time period set forth in paragraph 30) and the DIP Secured Parties shall be and hereby are indemnified (as applicable) as provided in the Prepetition Credit Documents and the DIP Documents, as applicable.

33.    _Final Order Governs_.  In the event of any inconsistency between the provisions of this Final Order, the Interim Order, the Prepetition Credit Documents, and the DIP Documents (including, but not limited to, with respect to the Adequate Protection Obligations), the provisions of this Final Order shall govern.

34.    _Binding Effect; Successors and Assigns_.  The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these chapter 11 cases, including, without limitation, the DIP Agent, the DIP Secured Parties, the Prepetition ABL Agent, the Prepetition ABL Secured Parties, each Pari First Lien Agent, the Pari First Lien Secured Parties, any other Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in these chapter 11 cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Secured Parties, the Prepetition ABL Agent, the Prepetition ABL Secured Parties, each Pari First Lien Agent, the Pari First Lien Secured Parties, any other Prepetition Secured Parties and the Debtors and their respective successors and assigns; _provided_ that the DIP Agent, the other DIP Secured Parties, each Prepetition Agent and the other Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

35.    _Limitation of Liability_.

(a)    Nothing in the Interim Order, this Final Order, the DIP Documents, the Prepetition Credit Documents or any other documents related to the transactions contemplated

hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party, any Pari First Lien Secured Party, or any Prepetition ABL Secured Party of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts. The DIP Secured Parties, Pari First Lien Secured Parties, and the Prepetition ABL Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Debtors.

(b)      In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral or Prepetition Collateral (including Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to the Interim Order, this Final Order, the DIP Documents or Prepetition Credit Documents, none of the DIP Secured Parties or Prepetition Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code). Furthermore, nothing in the Interim Order or this Final Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Agent, other DIP Secured Parties, the Prepetition ABL Agent, each Prepetition ABL Secured

Party, each Pari First Lien Agent or other Pari First Lien Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

36.    *Master Proof of Claim*.    The Prepetition Cayman Notes Trustee, Prepetition Exchange Notes Trustee, Prepetition 4.875% Notes Trustee, Prepetition Intercompany Note Agent, Prepetition Term Loan Agent, and the Prepetition ABL Agent, and/or any other Prepetition Secured Parties shall not be required to file proofs of claim in the chapter 11 cases or any Successor Case to assert claims on behalf of themselves or the Prepetition Secured Parties for payment of the Prepetition Secured Obligations arising under the Prepetition Credit Documents, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts under the Prepetition Credit Documents. The statements of claim in respect of such indebtedness set forth in the Interim Order and Final Order are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status.  However, to facilitate the processing of claims, each of the Prepetition Cayman Notes Trustee, Prepetition Exchange Notes Trustee, Prepetition 4.875% Notes Trustee, Prepetition Intercompany Note Agent, Prepetition Term Loan Agent, and the Prepetition ABL Agent is hereby authorized, but not directed or required, to file in the Debtors' lead chapter 11 case *In re At Home Group Inc.,* Case No. 25-11120 (JKS), a master proof of claim on behalf of its respective Prepetition Secured Parties on account of any and all of their respective claims arising under the applicable Prepetition Credit Documents and hereunder (each, a "Master Proof of Claim") against each of the Debtors.  Upon the filing of a Master Proof of Claim by the Prepetition Cayman Notes Trustee, Prepetition Exchange Notes Trustee, Prepetition 4.875% Notes Trustee, Prepetition Intercompany Note Agent, Prepetition Term Loan Agent, and the Prepetition ABL Agent, as applicable, it shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of

the Debtors of any type or nature whatsoever with respect to the applicable Prepetition Credit Documents, and the claim of each applicable Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if it had filed a separate proof of claim in each of these chapter 11 cases. The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims. The provisions of this paragraph and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these chapter 11 cases. The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements, or other documents will be provided upon written request to counsel to each Prepetition Agent, as applicable. The DIP Agent and the other DIP Secured Parties shall similarly not be required to file proofs of claim with respect to their DIP Obligations under the DIP Documents, and the evidence presented with the DIP Motion and the record established at the Final Hearing are deemed sufficient to, and do, constitute proofs of claim with respect to their obligations, secured status, and priority.

37.    _Insurance_.  To the extent that each Prepetition Agent is listed as loss payee under the Borrower's or DIP Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee under the insurance policies, (in any such case with the same priority of liens and claims thereunder relative to the priority of (x) the Prepetition Liens and Adequate Protection Liens and (y) the DIP Liens, as set forth herein) and, except with respect to the ABL Priority Collateral prior to the

indefeasible payment in full of the Prepetition ABL Obligations, shall act in that capacity and distribute any proceeds recovered or received in respect of the insurance policies, to the indefeasible payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and termination of the DIP Commitment and thereafter to the payment of the applicable Prepetition Secured Obligations, *provided* that nothing herein is intended to alter the rights, if any of a lessor under any non-residential real property lease with respect to such insurance proceeds.

38.    *Credit Bidding*.    Subject to section 363(k) of the Bankruptcy Code and the lien priorities set forth herein and the rights of parties in interest under paragraph 13 and the Prepetition ABL Intercreditor Agreement, (a) the DIP Agent (acting at the direction of the Required DIP Lenders) shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral, (b) the Prepetition ABL Agent shall have the right to credit bid, in accordance with the Prepetition ABL Credit Documents, in any sale of any ABL Priority Collateral, and (c) subject to any Challenges (as defined below) that may be raised prior to expiration of the time period set forth in paragraph 30, each Prepetition Agent shall have the right, consistent with the provisions of the Prepetition Credit Documents, as applicable (and providing for the DIP Obligations to be indefeasibly repaid in full in cash and the termination of the DIP Commitments), to credit bid up to the full amount of the applicable Prepetition Secured Obligations in the sale of the applicable collateral, as applicable, in each case outside the ordinary course of business, without the need for further Court order authorizing the same and whether any such sale is effectuated through sections 363(k), 1123, or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, in each case unless the Court for cause orders otherwise pursuant to section 363(k) of the Bankruptcy Code; *provided* that neither the DIP Obligations nor any

Prepetition Secured Obligation may be credit bid without the consent of the Prepetition ABL Agent (acting in accordance with the Prepetition ABL Credit Documents) in any disposition of any ABL Priority Collateral unless such sale provides for indefeasible payment in full in cash to the Prepetition ABL Agent and the Prepetition ABL Lenders of all Prepetition ABL Obligations on the closing date of such sale.  Notwithstanding anything to the contrary herein, any credit bidding of the DIP Roll-Up Obligations shall be subject to any Challenges (as defined below) that may be raised prior to expiration of the time period set forth in paragraph 30.

39.     _Treatment of DIP Claims_.   On the Maturity Date (as defined in the DIP Credit Agreement, and as may extended in accordance with the terms thereof), the Borrower shall pay the then unpaid and outstanding amount of the DIP Obligations pursuant to the provisions of the DIP Documents.

40.     _Special Provisions Regarding Texas Taxing Authorities_.   Notwithstanding any other provisions in this Final Order or any final orders pertaining to post-petition financing or the use of cash collateral in these Chapter 11 Cases, any statutory liens on account of ad valorem taxes held by the Texas Taxing Authorities[15] (the "Tax Liens") shall maintain their prepetition lien priority as provided by applicable nonbankruptcy law and will not be primed by nor made subordinate to any

---

[15] "Texas Taxing Authorities" means all ad valorem taxing jurisdictions represented by the firms of Linebarger Goggan Blair and Sampson, LLP, Perdue Brandon Fielder Collins and Mott LLP, and McCreary Veselka Bragg and Allen, P.C. including but not limited to Bexar County, Cypress-Fairbanks Independent School District, Dallas County, Ector CAD, City of El Paso, Fort Bend County, Harris County Emergency Service District #09, Harris County Emergency Service District #13, Harris County Emergency District #47, Hidalgo County, City of Humble, Lewisville Independent School District, Lone Star College System, Montgomery County, Northwest Independent School District, Nueces County, Smith County, Tarrant County, City of Webster, Lubbock Central Appraisal District, Plano Independent School District, Frisco Independent School District, Carrollton-Farmers Branch Independent School District, City of Garland, Garland Independent School District, Tyler Independent School District, Fort Bend Independent School District, Fort Bend County Municipal Utility District #143, Fort Bend County Levee Improvement District #2, Clear Creek Independent School District, City of Houston, Woodlands Metro Center Municipal Utility District, County of Brazos, County of Comal, County of Denton, and County of Williamson, Texas.

liens granted to any party hereby to the extent the Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by the Texas Taxing Authorities are fully preserved. Further, as adequate protection for the asserted secured tax claims of the Texas Taxing Authorities (the "Tax Claims"), the Debtors shall set aside the amount of $1,591,980.00 in a segregated account from the proceeds of the sale of any of the Debtors' assets located within the jurisdiction of the applicable Texas Taxing Authority (the "Tax Reserve"). The asserted liens of the Texas Taxing Authorities shall attach to the Tax Reserve to the same extent and with the same priority as the liens they now assert against the property of the Debtors. These funds shall be on the order of adequate protection and shall constitute neither the allowance of the Tax Claims nor a cap on the amounts the Texas Taxing Authorities may be entitled to receive. The funds may be distributed only upon agreement between the Texas Taxing Authorities and the Debtors, or by subsequent order of the Court, duly noticed to the Texas Taxing Authorities.

41.     *Governing Order*.  Notwithstanding the relief granted in any other order by this Court, (i) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be subject to this Final Order, including compliance with the Approved Budget (subject to permitted variances under the DIP Documents) and all other terms and conditions hereof, and (ii) to the extent there is any inconsistency between the terms of such other order and this Final Order, this Final Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

42.     *Effectiveness*.  This Final Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy

Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy

Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately

effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of

this Final Order.

43.    *Lien and Claim Priority Annex Governs*.  The relative priorities of each of the DIP

Liens, the Prepetition ABL Liens, the Pari First Liens, the ABL Adequate Protection Liens, the Pari

First Lien Adequate Protection Liens, the Superpriority DIP Claims, the Adequate Protection Liens,

the ABL 507(b) Claims, the Pari First Lien 507(b) Claims, the Superpriority DIP Claims, and all

other liens and administrative claims granted pursuant to the Interim Order and this Final Order shall

be dictated by lien and claim priority annex set forth in **Exhibit 1**.  To the extent there is an

inconsistency between this Final Order and the lien and claim priority annex set forth in **Exhibit 1**,

the lien and priority annex set forth in **Exhibit 1** shall control.

44.    *Headings*.  Section headings used herein are for convenience only and are not to

affect the construction of or to be taken into consideration in interpreting this Final Order.

45.    *Payments Held in Trust*.  Except as expressly permitted in this Final Order or the DIP

Documents, in the event that any person or entity receives any payment on account of a security

interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives

any other payment with respect thereto from any other source prior to indefeasible payment in full

in cash of all DIP Obligations under the DIP Documents, and termination of the DIP Commitments

in accordance with the DIP Documents, such person or entity shall be deemed to have received, and

shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the applicable

DIP Agent and the DIP Lenders and shall immediately turn over the proceeds to the DIP Agent, or

as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Final Order.

46.   _No Third-Party Rights_.   Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

47.   _Necessary Action_.   The Debtors are authorized to take all actions as are necessary or appropriate to implement the terms of this Final Order.   In addition, the Automatic Stay is modified with respect to non-Debtor affiliates of the Debtors to take all actions as are necessary or appropriate for the Debtors to implement the terms of this Final Order.

48.   _Replacement Agent_.   Notwithstanding the resignation or replacement of any collateral agent or administrative agent, including the DIP Agent in either capacity, and any of the Prepetition Agents, the DIP Liens on the DIP Collateral, the Prepetition Liens on the Prepetition Collateral, and the Adequate Protection Liens shall remain continuously and properly perfected, notwithstanding the transfer of control, possession, or title of any Prepetition Collateral or DIP Collateral to a new collateral agent or administrative agent.

49.   _Stub Rent Escrow Account_.   The Debtors shall establish an escrow account or segregated account (the "Stub Rent Escrow Account") to hold an amount equal to no more than $9,300,000, for payment of allowed claims under section 503(b) of the Bankruptcy Code related to the Debtors' postpetition contractual rent obligations to their applicable landlords for the period of the Petition Date to June 30, 2025 (any such claims, the "Stub Rent Claims") (which cash shall remain part of the DIP Collateral, Prepetition Collateral and subject to the DIP Liens, Prepetition Liens and the Adequate Protection Liens until payment of the Stub Rent Claims (or release thereof) in accordance with the terms of this paragraph 49).   The Debtors shall deposit into the Stub Rent

Escrow Account:  (i) $3,000,000 by no later than the week beginning July 21, 2025, (ii) $4,300,000 by no later than week beginning September 1, 2025, and (iii) $2,000,000 by no later than the week beginning September 22, 2025.  Notwithstanding anything in this Final Order to the contrary, the DIP Liens, the Adequate Protection Liens, and the Prepetition Liens encumbering the Stub Rent Escrow Account shall be subject and subordinate to the rights of landlords to receive payment on account of all allowed Stub Rent Claims in accordance with this paragraph 49 and no lien on the amounts contained in the Stub Rent Escrow Account shall prevent use of such amounts to pay allowed Stub Rent Claims.

        (a)      The Debtors shall use the amounts held in the Stub Rent Escrow Account to solely pay Stub Rent Claims in amounts that (a) are allowed under section 503(b) by a Bankruptcy Court order or (b) agreed to by the Debtors and the applicable holder of a Stub Rent Claim without further order of the Bankruptcy Court.  Subject to sub-paragraph (c) of this paragraph 49, Allowed Stub Rent Claims shall be paid on the later of (i) the date such Stub Rent Claim is allowed by Bankruptcy Court order and (ii) the Effective Date of the Plan; *provided* that the Debtors and any holder of a proposed Stub Rent Claim may agree to alternative treatment, including timing of payment, of any such holders' proposed Stub Rent Claim without further order of the Bankruptcy Court and the Debtors shall be authorized, but not directed, to release amounts from the Stub Rent Escrow Account prior to such date with the consent of the DIP Agent and the Prepetition ABL Agent to make payments on such Stub Rent Claims; *provided further* that, if any Stub Rent Claim is allowed in connection with the assumption or assumption and assignment of a lease prior to the Effective Date, then such Stub Rent Claim shall be paid at the time of assumption or assumption and assignment of the applicable lease.  The amount on deposit in the Stub Rent Escrow Account shall be subject to reduction (or release) on a weekly basis to account for any satisfaction in respect of

any portion of Stub Rent Claims benefitting from the Stub Rent Escrow Account, including in connection with any assumptions of leases, assumptions and assignments of leases, or other lease dispositions. The Stub Rent Escrow Account shall in no event have more than the then net outstanding estimated Stub Rent Claims and any amounts in excess thereof shall be released from the Stub Rent Escrow Account and returned to the Debtor for application to the DIP Obligations.

(b)      The Debtors shall fund the Stub Rent Escrow Account in accordance with this paragraph 49 and the Approved Budget, and this Order and the Approved Budget may not be amended, updated or replaced to alter the timing of the funding of the Stub Rent Escrow Account, without the consent of the Committee.

(c)      In the event a Stub Rent Claim held by a landlord that filed an objection to the DIP Motion at Docket Nos. 268, 271, 275, or 283 seeking adequate protection with respect to their leases (an "Objecting Landlord") becomes payable in accordance with subparagraph (a) of this paragraph 49 (an "Objecting Landlord Stub Rent Claim"), to satisfy the requested adequate protection with respect to such Objecting Landlord Stub Rent Claims, such claims shall be paid out of the first funds deposited into the Stub Rent Escrow Account prior to any other Stub Rent Claims other than previously paid Objecting Landlord Stub Rent Claims.  As further adequate protection for Objecting Landlords, any Objecting Landlord Stub Rent Claim held by an Objecting Landlord whose lease is rejected prior to the Effective Date shall be paid its Objecting Landlord Stub Rent Claim from the Stub Rent Escrow Account within two business days after the rejection date of the lease.

50.      _Retention of Jurisdiction_.  The Court shall have jurisdiction to resolve any and all disputes arising under or related to the DIP Loans, the DIP Documents, and/or the provisions of this Final Order, and to enforce all of the conditions of the DIP Documents and this Final Order.

51.    _Interim Order_.  Except as specifically amended or otherwise modified hereby, all of the provisions of the Interim Order and any actions taken by the Debtors, the DIP Secured Parties, or the Prepetition Secured Parties in accordance therewith shall remain in effect and are hereby ratified by this Final Order.

52.    _Notice of Entry of Final Order_.  Pursuant to the Local Rules, the Debtors shall promptly serve copies of this Final Order to the parties having been given notice of the Final Hearing and to any party that has filed a request for notices with this Court.

Dated:   Wilmington, Delaware
             July ___, 2025

_____
Hon. J. Kate Stickles
United States Bankruptcy Judge

**Exhibit 1**

| Priority | DIP Collateral that constitutes ABL Priority Collateral[16] | DIP Collateral that constitutes DIP Priority Collateral | Liens on Unencumbered Property | Claims with respect to ABL Priority Collateral | Claims with respect to the DIP Priority Collateral | Claims with respect to Unencumbered Property |
|---|---|---|---|---|---|---|
| *First* | Prepetition Permitted Senior Liens | Carve Out and Prepetition Permitted Senior Liens | Carve Out | Carve Out | Carve Out | Carve Out |
| *Second* | ABL Adequate Protection Liens | DIP Liens | DIP Liens* | ABL 507(b) Claims | Superpriority DIP Claims | Superpriority DIP Claims |
| *Third* | Prepetition ABL Liens | Pari First Lien Adequate Protection Liens | Pari First Lien Adequate Protection Liens* | Superpriority DIP Claims | Pari First Lien 507(b) Claims | Pari First Lien 507(b) Claims |
| *Fourth* | Carve Out | Pari First Liens | ABL Adequate Protection Liens* | Pari First Lien 507(b) Claims | ABL 507(b) Claims | ABL 507(b) Claims |
| *Fifth* | DIP Liens | ABL Adequate Protection Liens | | | | |

---

[16]     Notwithstanding anything to the contrary contained herein, prior to the date on which a Carve Out Trigger Notice is given, cash collateral consisting of ABL Priority may be utilized to fund amounts in accordance with paragraph 6(c) (Carve Out Reserves) of this Final Order.

\*        (a) DIP Liens securing the DIP Roll-Up Obligations and (b) Adequate Protection Liens, in each case, shall not encumber Avoidance Proceeds and proceeds of commercial tort claims.

| _**Sixth**_ | Pari First Lien Adequate Protection Liens | Prepetition ABL Liens | | | | |
|---|---|---|---|---|---|---|
| _**Seventh**_ | Pari First Liens | | | | | |

## **EXHIBIT 2**

## **ABL MILESTONES**

1.      On or prior to the Petition Date, the Debtors' board shall have approved a restructuring support agreement (the "RSA") that contemplates the filing of an Acceptable Plan and sets forth the key terms of such Acceptable Plan;

2.      On or prior to thirty-five (35) days after the Petition Date, Court shall have approved the Debtors' motion seeking extension of the lease assumption/rejection deadline to 210 days from the Petition Date pursuant to Section 365(d)(4) of the Bankruptcy Code; and

3.      An order (the "Confirmation Order") confirming an Acceptable Plan, shall be entered in the Bankruptcy Cases by no later than one hundred twenty (120) days after the Petition Date or such later date agreed in writing by the Prepetition ABL Agent in its sole discretion.

"Acceptable Plan" means a chapter 11 plan, which plan shall provide for payment in full of the Prepetition ABL Obligations upon the effective date of such plan.

## Exhibit 3

**Approved Budget**

*$ in thousands*

| | Week 24 | Week 25 | Week 26 | Week 27 | Week 28 | Week 29 | Week 30 | Week 31 | Week 32 | Week 33 | Week 34 | Week 35 | Week 36 | Weeks 24-36 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Beginning Date* | 7/6/2025 | 7/13/2025 | 7/20/2025 | 7/27/2025 | 8/3/2025 | 8/10/2025 | 8/17/2025 | 8/24/2025 | 8/31/2025 | 9/7/2025 | 9/14/2025 | 9/21/2025 | 9/28/2025 | 7/6/2025 |
| *End Date* | 7/12/2025 | 7/19/2025 | 7/26/2025 | 8/2/2025 | 8/9/2025 | 8/16/2025 | 8/23/2025 | 8/30/2025 | 9/6/2025 | 9/13/2025 | 9/20/2025 | 9/27/2025 | 10/4/2025 | 10/4/2025 |
| | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* |
| **Operating Receipts** | | | | | | | | | | | | | | |
| **Total Receipts** | 35,906 | 27,813 | 32,984 | 34,616 | 35,582 | 37,063 | 38,627 | 36,535 | 35,545 | 35,182 | 34,445 | 33,958 | 32,211 | 450,468 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Accounts Payable & Freight[1] | 15,710 | 21,795 | 21,542 | 30,866 | 22,782 | 14,817 | 18,279 | 28,282 | 15,490 | 18,387 | 14,540 | 14,404 | 22,716 | 259,611 |
| Payroll | 9,278 | 1,077 | 9,055 | 1,077 | 9,392 | 1,366 | 11,235 | 1,378 | 17,533 | 1,288 | 9,880 | 1,369 | 9,667 | 83,595 |
| Landlord[2] | - | - | - | 14,980 | 9,903 | - | - | - | 24,569 | - | - | - | 23,451 | 72,903 |
| Tariffs, Taxes & Other | 1,003 | 12,688 | 9,073 | 1,416 | 1,048 | 2,688 | 16,147 | 1,130 | 1,396 | 1,031 | 24,887 | 1,321 | 1,128 | 74,957 |
| **Total Operating Disbursements** | 25,991 | 35,560 | 39,669 | 48,340 | 43,125 | 18,870 | 45,662 | 30,790 | 58,988 | 20,706 | 49,307 | 17,094 | 56,963 | 491,065 |
| **Total Net Operating Cash Flow** | 9,915 | (7,747) | (6,685) | (13,724) | (7,543) | 18,193 | (7,035) | 5,745 | (23,442) | 14,476 | (14,862) | 16,864 | (24,751) | (40,598) |
| **Financing** | | | | | | | | | | | | | | |
| ABL Borrowings / (Payments) | (10,417) | (4,670) | (2,825) | (2,646) | 5,731 | (925) | (1,670) | 396 | (1,599) | 935 | 584 | 2,706 | 1,984 | (12,417) |
| DD DIP Loan | - | 50,000 | - | - | - | - | - | - | 25,000 | - | 25,000 | - | 25,000 | 125,000 |
| Interest and Bank Fees | - | (2,494) | (33) | (40) | - | - | (2,547) | (40) | - | - | (2,547) | (40) | - | (7,741) |
| **Total Finance Cash Flow** | (10,417) | 42,837 | (2,859) | (2,686) | 5,731 | (925) | (4,217) | 356 | 23,401 | 935 | 23,036 | 2,666 | 26,984 | 104,841 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| Restructuring Professional Fees[3] | 3,765 | 2,025 | 2,445 | 1,495 | 3,765 | 1,385 | 1,210 | 1,110 | 1,395 | 4,820 | 995 | 995 | 9,410 | 34,815 |
| Estimated Stub Rent Reserve[4] | - | - | 3,000 | - | - | - | - | - | 4,300 | - | - | 2,000 | - | 9,300 |
| Other BK Costs[5] | - | 2,000 | - | - | - | - | - | - | - | - | - | - | 10,200 | 12,200 |
| **Total Non-Operating Disbursements** | 3,765 | 4,025 | 5,445 | 1,495 | 3,765 | 1,385 | 1,210 | 1,110 | 5,695 | 4,820 | 995 | 2,995 | 19,610 | 56,315 |
| **Total Net Cash Flow** | (4,267) | 31,065 | (14,989) | (17,905) | (5,578) | 15,883 | (12,462) | 4,990 | (5,736) | 10,592 | 7,179 | 16,535 | (17,378) | 7,929 |
| Beginning Bank Balance | 57,024 | 52,757 | 83,822 | 68,833 | 50,927 | 45,350 | 61,232 | 48,770 | 53,761 | 48,025 | 58,616 | 65,795 | 82,331 | 57,024 |
| ***Ending Bank Balance*** | *52,757* | *83,822* | *68,833* | *50,927* | *45,350* | *61,232* | *48,770* | *53,761* | *48,025* | *58,616* | *65,795* | *82,331* | *64,953* | *64,953* |

[1] Accounts Payable & Freight consist of Merchandise Vendors, Generating Operating Expenses, and Inbound/Outbound Transportation
[2] Landlord Line Item includes all rent and monthly escrows for all CAM, Insurance, Taxes, and Other contractual LL reimbursements
[3] Restructuring Professional Fees includes Debtor, ABL, DIP, and UCC advisors
[4] Estimated amount of stub rent claims to be paid under the plan subject to ongoing review and reconciliation
[5] Other BK costs include Utility Adequate Assurance, Cure Costs, and Other expenses

**EXHIBIT 2**

**Blackline**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| AT HOME GROUP INC., *et al.*,[1] | Case No. 25-11120 (JKS) |
| Debtors. | (Jointly Administered) |
|  | **Re: Docket No. 16, 107** |

## ~~INTERIM~~ FINAL ORDER
## (I) AUTHORIZING THE
## DEBTORS TO (A) OBTAIN
## POSTPETITION FINANCING,
## (B) USE CASH COLLATERAL, AND
## (C) GRANT LIENS AND PROVIDE
## SUPERPRIORITY ADMINISTRATIVE
## EXPENSE CLAIMS, (II) GRANTING
## ADEQUATE PROTECTION TO CERTAIN
## PREPETITION SECURED PARTIES,
## (III) MODIFYING THE AUTOMATIC STAY,
## AND (IV) ~~SCHEDULING A FINAL HEARING, AND (V)~~ GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are: At Home Group Inc. (9563); Ambience Parent, Inc. (6231); Ambience Intermediate, Inc. (0692); At Home Holding II Inc. (9755); At Home Holding III Inc. (9930); At Home Companies LLC (6921); At Home Stores LLC (4961); At Home RMS Inc. (5235); At Home Gift Card LLC (0357); At Home Procurement Inc. (1777); At Home Properties LLC (2759); At Home Assembly Park Drive Condominium Association (N/A); 1600 East Plano Parkway, LLC (4757); 1944 South Greenfield Road LLC (4377); 2301 Earl Rudder Frwy S LLC (N/A); 3551 S 27th Street LLC (9350); 300 Tanger Outlet Blvd LLC (N/A); 3002 Firewheel Parkway LLC (~~N/A~~2759); 2016 Grand Cypress Dr LLC (N/A); 8651 Airport Freeway LLC (0523); Transverse II Development (8595); Rhombus Dev, LLC (4783); 1000 Turtle Creek Drive LLC (9177); 19000 Limestone Commercial Dr, LLC (3711); 4801 183A Toll Road, LLC (3909); 7050 Watts Rd LLC (N/A); 4700 Green Road LLC (9049); 361 Newnan Crossing Bypass LLC (N/A); 4304 West Loop 289 LLC (4302); 10460 SW Fellowship Way LLC (N/A); 1720 N Hardin Blvd LLC (N/A); Compass Creek Parkway LLC (N/A); 10800 Assembly Park Dr LLC (~~N/A~~6145); Nodal Acquisitions, LLC (N/A); 15255 N Northsight Blvd LLC (N/A); 3015 W 86th St LLC (N/A); 9570 Fields Ertel Road LLC (N/A); 1376 E. 70th Street LLC (9942); 11501 Bluegrass Parkway LLC (3626); 12990 West Center Road LLC (9396); 334 Chicago Drive, LLC (2864); and 4200 Ambassador Caffery Pkwy LLC (5119). The location of the Debtors' service address for purposes of these chapter 11 cases is: 9000 Cypress Waters Blvd, Coppell, Texas 75019.

Upon the motion (the "DIP Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m) (if applicable), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2002-1 and 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of this ~~interim~~final order (~~this "Interim~~the "Final Order")~~ and the Final Order (as defined herein)~~, as applicable, among other things:

    (i)    authorizing the Debtors to jointly and severally guarantee the DIP Loans and the other DIP Obligations (as defined herein) (such Debtors, other than the Borrower, the "DIP Guarantors," and together with the Borrower, the "DIP Loan Parties");

    (ii)    authorizing At Home Group Inc. (the "Borrower") to obtain postpetition financing ("DIP Financing") pursuant to a senior secured, first-lien priming, and superpriority debtor-in-possession multiple draw term loan credit facility (the "DIP Facility") subject to the terms and conditions set forth in that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement attached ~~hereto~~ in substantially final form as Schedule 1 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement") to the Interim Order (as defined herein), by and among the Borrower, the DIP Guarantors (as defined herein), as guarantors, the several financial institutions or other entities from time to time party thereto as "Lenders" (the "DIP Lenders")[3] and GLAS USA LLC, as administrative agent and collateral agent, in such capacities, together with its successors and permitted assigns, the "DIP Agent" and, collectively, with the DIP Lenders, the "DIP Secured Parties"); which DIP

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the DIP Motion, the DIP Credit Agreement (as defined herein), or the *Declaration of Jeremy Aguilar, Chief Financial Officer of At Home Group Inc. and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 4] (the "First Day Declaration"), as applicable.

[3]    So long as the Fronting Lender is a holder of DIP Loans pursuant to the Fronting Arrangement, the Fronting Lender shall be included in the definition of DIP Lenders. For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Fronting Lender, by acting in such capacity, does not make any commitments, undertake any obligations, or waive any rights, including whether to take or not take any action or to exercise or seek to exercise any rights or remedies, in each case, in connection with any other claims or interests it may hold against any of the Debtors.

Facility shall consist of:  (a) new money first-out delayed draw term loans (the "Tranche A DIP Loans") in an aggregate principal amount of up to $200 million (the "New Money Amount" and the commitments in respect thereof, the "New Money Commitments"); and (b) a roll-up of Pari First Lien Obligations (as defined below) into second-out term loans (the "Tranche B DIP Loans") in the amount of up to $400 million (the "Roll-Up Amount" and the commitments in respect thereof together with the New Money Commitments, the "DIP Commitments" and such loans, the "DIP Loans") from the DIP Lenders, of which (1) immediately upon the Closing Date (as defined herein), $~~75,000,000~~75 million of Tranche A DIP Loans ~~will be~~bec~~o~~ame available for borrowing (the "Initial Draw"), immediately upon the completion of the Initial Syndication, $~~150,000,000~~150 million of Tranche B DIP Loans ~~will be~~was issued to roll-up certain Pari First Lien Obligations on the terms set forth herein, and (2) ~~immediately~~ upon the later of (x) the entry of ~~the~~this Final Order ~~granting such relief~~and (y) the completion of the Syndication, the remaining $~~125,000,000~~125 million of all Tranche A DIP Loans up to the New Money Amount will become available for borrowing and the remaining $~~250,000,000~~250 million of the Tranche B DIP Loans up to the Roll-Up Amount will be issued to roll up certain Pari First Lien Obligations on the terms set forth in the DIP Credit Agreement;

(iii)    authorizing the DIP Loan Parties, as applicable, to execute, deliver and perform under the DIP Credit Agreement, each Credit Document and all other loan documentation related to the DIP Facility, including, without limitation, as applicable, security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security agreements, notes, the fee letters, and such other documents that may be reasonably requested by the DIP Agent and the DIP Lenders in connection with the DIP Facility, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with ~~this~~the Interim Order, ~~the~~this Final Order, the DIP Credit Agreement, and any other Credit Documents, the "DIP Documents");

(iv)    authorizing the DIP Loan Parties to incur and guarantee loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation backstop fees, unused facility fees, upfront fees, exit fees or premiums, administrative agency fees, and any other fees payable pursuant to the DIP Documents ~~(provided that the unused facility fees and exit fees shall be subject to entry of the Final Order)~~), costs, expenses and other liabilities (including the DIP Fees and Expenses (as defined herein), and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "DIP Obligations"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(v)    granting to the DIP Agent, for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the

Bankruptcy Code in respect of all DIP Obligations of the DIP Loan Parties subject and subordinate to the Carve Out (as defined herein), and the Prepetition ABL 507(b) Claim (as defined herein) solely with respect to the ABL Priority Collateral (as defined herein);

(vi)    granting to the DIP Agent, for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable, and automatically perfected liens pursuant to sections 364(c)(2)–(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all DIP Collateral (as defined herein), including, without limitation, all Cash Collateral (as defined herein) and the DIP Proceeds Account (as defined in the DIP Credit Agreement)), on the terms described herein, ~~subject only to and effective upon entry of the Final Order,~~ any Avoidance Proceeds (as defined herein), in each case subject and subordinate to the Carve Out, the Prepetition ABL Liens (as defined herein) solely on the ABL Priority Collateral and such other liens as and solely to the extent set forth herein or in the DIP Documents;

(vii)    ~~subject to entry of the Final Order granting such relief,~~ waiving (a) the Debtors' right to surcharge the Prepetition Collateral (as defined herein) and the DIP Collateral (together, the "Collateral") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(viii)    ~~subject to entry of the Final Order granting such relief,~~ waiving the equitable doctrine of "marshaling" and other similar doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) with respect to any of the Prepetition Collateral (including the Cash Collateral) for the benefit of any party other than the Prepetition Secured Parties (as defined herein);

(ix)    authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral (as defined herein) solely in accordance with this ~~Interim~~Final Order, the Approved Budget (as defined herein), and the DIP Documents;

(x)    authorizing the Debtors to pay the principal, interest, fees, expenses, reimbursements, and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(xi)    subject to the restrictions set forth in the DIP Documents and ~~this~~the Interim Order and this Final Order, authorizing the Debtors to use the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), and provide adequate protection to the Prepetition Secured Parties, for any reason provided for under the Bankruptcy Code, including resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay"), the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and, where

applicable, the priming of their respective interests in the Prepetition Collateral (including Cash Collateral);

(xii)  vacating and modifying on a final basis the Automatic Stay to the extent set forth herein and as necessary to permit the Debtors and their affiliates, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of this ~~Interim~~Final Order, the DIP Documents~~, and, upon entry, the Final Order~~, and to deliver any notices of termination described below and as further set forth herein; and

(xiii)  waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this ~~Interim Order and, upon entry, the~~ Final Order~~; and~~.

~~(xiv)  scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed final order (the "Final Order" and, together with this Interim Order, the "DIP Orders"), as set forth in the DIP Motion and the DIP Documents filed with this Court (as defined herein).~~

The Court having held a hearing on the interim relief requested in the DIP Motion on June 17, 2025 (the "Interim Hearing"); and the Court having entered on June 17, 2025 the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens And Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 107] (the "Interim Order"); and the Court having considered the ~~interim~~final relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Jaimie Baird in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens And Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 17] (the "Baird Declaration"), the First Day Declaration, the available DIP Documents, and the evidence submitted and arguments made at the ~~i~~Interim Hearing and the

final hearing held on ~~June~~July 1~~7~~8, 2025 (the "~~Interim~~Final Hearing"); and due and sufficient notice of the ~~Interim~~Final Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b)–(d) and all applicable Local Rules; and the ~~Interim~~Final Hearing having been held and concluded; and all objections, if any, to the ~~interim~~final relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the ~~interim~~final relief requested in the DIP Motion ~~is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise~~ is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing the DIP Loan Parties' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE ~~INTERIM~~FINAL HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

A.    **Petition Date**.  On June 16, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").  On June 17, 2025, this Court entered an order approving the joint administration of the chapter 11 cases.

---

[4]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  For the avoidance of doubt, the Debtors' failure to satisfy reporting and other obligations that are covenants herein may give rise to an Event of Default (as defined herein), but shall not constitute a violation of this ~~Interim~~Final Order.

B.  **Debtors in Possession**.  The Debtors continue to operate their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, or examiner, or statutory committee has been appointed in these chapter 11 cases.

C.  **Jurisdiction and Venue**.  The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules, to the entry of this InterimFinal Order by the Court to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for the chapter 11 cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and procedural bases for the relief sought in the DIP Motion and granted in this InterimFinal Order are sections 105, 361, 362, 363, 364(c), 364(d), 364(e), 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Local Rules 2002-1, 4001-2, and 9013-1.

D.  **Committee Formation**.  As of the date hereofOn June 27, 2025, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code (athe "Creditors' Committee").

E.  **Notice**.  The InterimFinal Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2).  Under the exigent circumstances set forth herein, pProper,

timely, adequate, and sufficient notice of the DIP Motion and the ~~Interim~~Final Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, as evidenced by the *Affidavit of Service* [Docket No. 231], and no other or further notice of the DIP Motion with respect to the relief requested at the ~~Interim~~Final Hearing or the entry of this ~~Interim~~Final Order shall be required.

      F.    **Cash Collateral**.  The Debtors' use of Cash Collateral[5] shall be subject to the terms of this ~~Interim~~Final Order and the Debtors' authority to use Cash Collateral of the Prepetition Secured Parties and the DIP Secured Parties, as applicable, may be terminated in accordance with paragraph 13 and paragraph 14 of this ~~Interim~~Final Order.

      G.    **~~Immediate and Irreparable Harm~~Relief Necessary**.  The relief granted ~~herein is~~in the Interim Order was necessary to avoid immediate and irreparable harm to the Debtors ~~and their'~~ eEstates ~~pending the~~.  The Ffinal ~~Hearing, and it~~relief granted herein is a proper exercise of the Debtors' business judgment to incur the DIP Facility to support, among other things, the orderly continuation of the operation of the Debtors' businesses, to maintain business relationships with vendors, suppliers, and customers, to make capital expenditures in the ordinary course of business, to pay adequate protection as set forth herein, and to satisfy other working capital and operational needs.

      H.    **Debtors' Stipulations and Acknowledgements**.  ~~Subject to the time period set forth in paragraph 32 of this Interim Order, after~~After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest to assert a Challenge (as defined herein) set forth specifically in paragraph 30 hereof, the Debtors, on their behalf and on

---

[5]    As used herein, the term "Cash Collateral" shall have the mean ascribed to it in section 363(a) of the Bankruptcy Code.

behalf of their estates, admit, stipulate, acknowledge, and agree, as follows (collectively, the admissions, stipulations, acknowledgements, and agreements set forth in this paragraph H, the "Debtors' Stipulations"):

(i)      *Prepetition Cayman Notes*.   Pursuant to that certain indenture for the 11.50% senior secured notes due 2028 (collectively, the "Prepetition Cayman Notes") dated as of May 12, 2023 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Cayman Notes Indenture," and collectively with the other Notes Documents (as defined in the Prepetition Cayman Notes Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "Prepetition Cayman Notes Documents") by and among (a) non-Debtor At Home Cayman, as issuer (the "Prepetition Cayman Notes Issuer"), (b) the Debtor guarantors party thereto (collectively, the "Prepetition Cayman Notes Guarantors"), and (d) Wilmington Trust, National Association, as trustee and notes collateral agent (solely in such capacity, the "Prepetition Cayman Notes Trustee") for the benefit of the holders of the Prepetition Cayman Notes (the "Prepetition Cayman Notes Noteholders" and, together with the Prepetition Cayman Notes Trustee, the "Prepetition Cayman Notes Secured Parties"), the Prepetition Cayman Notes Issuer issued the Prepetition Cayman Notes to the Prepetition Cayman Notes Noteholders and the Prepetition Cayman Notes Guarantors guaranteed on a joint and several basis the obligations of the Prepetition Cayman Notes Issuer under the Prepetition Cayman Notes Indenture and the other Prepetition Cayman Notes Documents (the "Prepetition Cayman Notes Obligations");

(ii)      *Prepetition Exchange Notes*.   Pursuant to that certain indenture for the senior secured 7.125%/8.625% Cash/PIK toggle senior secured notes due 2028 (collectively,

9

the "Prepetition Exchange Notes") dated as of May 12, 2023 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Exchange Notes Indenture," and collectively with the other Notes Documents (as defined in the Prepetition Exchange Notes Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Exchange Notes Documents"), by and among (a) At Home Group Inc. (the "Company"), as issuer (the "Prepetition Exchange Notes Issuer"), (b) the Debtor guarantors party thereto (collectively, the "Prepetition Exchange Notes Guarantors"), and (c) Wilmington Trust, National Association, as trustee and notes collateral agent (solely in such capacity, the "Prepetition Exchange Notes Trustee") for the benefit of the holders of Prepetition Exchange Notes (the "Prepetition Exchange Notes Noteholders" and, together with the Prepetition Exchange Notes Trustee, the "Prepetition Exchange Notes Secured Parties"), the Prepetition Exchange Notes Issuer issued the Prepetition Exchange Notes to the Prepetition Exchange Notes Noteholders and the Prepetition Exchange Notes Guarantors guaranteed on a joint and several basis the obligations of the Prepetition Exchange Notes Issuer under the Prepetition Exchange Notes Indenture and the other Prepetition Exchange Notes Documents (the "Prepetition Exchange Notes Obligations");

(iii)    *Prepetition 4.875% Notes*.  Pursuant to that certain indenture for the senior secured 4.875% senior secured notes due 2028 (collectively, the "Prepetition 4.875% Notes") dated as of July 12, 2021 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition 4.875% Notes Indenture," and collectively with the other Notes Documents (as defined in the 4.875% Notes Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and

restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition 4.875% Notes Documents"), by and among (a) the Company, as issuer (the "Prepetition 4.875% Notes Issuer"), (b) the Debtor guarantors party thereto (collectively, the "Prepetition 4.875% Notes Guarantors"), and (c) U.S. Bank National Association, as trustee and notes collateral agent (solely in such capacity, the "Prepetition 4.875% Notes Trustee") for the benefit of the holders of 4.875% Notes (the "Prepetition 4.875% Notes Noteholders" and, together with the Prepetition 4.875% Notes Trustee, the "Prepetition 4.875% Notes Secured Parties"), the Prepetition 4.875% Notes Issuer issued the Prepetition 4.875% Notes to the Prepetition 4.875% Notes Noteholders and the Prepetition 4.875% Notes Guarantors guaranteed on a joint and several basis the obligations of the Prepetition 4.875% Notes Issuer under the Prepetition 4.875% Notes Indenture and the other Prepetition 4.875% Notes Documents (the "Prepetition 4.875% Notes Obligations");

(iv)     *Prepetition Intercompany Note*.  Pursuant to that certain Intercompany Note (the "Prepetition Intercompany Note"), dated as of May 12, 2023 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Intercompany Note Agreement," and collectively with the other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Intercompany Note Documents"), by and among (a) the Company, as issuer (the "Prepetition Intercompany Note Issuer"), (b) the guarantors party thereto (collectively, the "Prepetition Intercompany Note Guarantors"), (d) Delaware Trust Company, as administrative and intercompany notes collateral agent (solely in such capacity, the "Prepetition Intercompany Note Agent") and (e) At Home Cayman, as holder (collectively, the "Prepetition Intercompany Note Holder," and collectively with the Prepetition Intercompany Note Agent, the "Prepetition Intercompany Note Secured

Parties"), the Prepetition Intercompany Note Issuer issued the Prepetition Intercompany Note to the Prepetition Intercompany Note Holder and the Prepetition Intercompany Note Guarantors guaranteed on a joint and several basis the obligations of the Prepetition Intercompany Note Issuer under the Prepetition Intercompany Note Agreement and the other Prepetition Intercompany Note Documents (the "Prepetition Intercompany Note Obligations");

(v)     *Prepetition Term Loan Credit Agreement*.  Pursuant to that Term Loan Credit Agreement dated as of July 23, 2021 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Term Loan Agreement," and collectively with the other Credit Documents (as defined in the Prepetition Term Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Term Loan Documents" and together with the Prepetition Cayman Notes Documents, the Prepetition Exchange Notes Documents, the Prepetition 4.875% Notes Documents, Prepetition Intercompany Note Documents, the "Pari First Lien Documents"), by and among (a) the Company, as borrower (the "Prepetition Term Loan Borrower"), (b) Ambience Intermediate, Inc. ("Holdings"); (c) the guarantors party thereto (collectively, the "Prepetition Term Loan Guarantors"), (d) Wilmington Trust, National Association (as successor to Bank of America, N.A.), as administrative agent and collateral agent (solely in such capacity, the "Prepetition Term Loan Agent" and together with the Prepetition Cayman Notes Trustee, the Prepetition Exchange Notes Trustee, the Prepetition 4.875% Notes Trustee, and the Prepetition Intercompany Note Agent, the "Pari First Lien Agents") and (e) the lenders from time to time party thereto (collectively, the "Prepetition Term Loan Lenders," and collectively with the Prepetition Term Loan Agent, the "Prepetition Term Loan Secured Parties," and collectively with the

Prepetition Cayman Notes Secured Parties, the Prepetition Exchange Note Secured Parties, the Prepetition 4.875% Notes Secured Parties, and the Prepetition Intercompany Note Secured Parties, the "Pari First Lien Secured Parties"), the Prepetition Term Loan Lenders provided term loans (the "Prepetition Term Loans") and other financial accommodations to the Prepetition Term Loan Borrower pursuant to the Prepetition Term Loan Documents, and the Prepetition Term Loan Guarantors guaranteed on a joint and several basis the "Obligations" (as defined in the Prepetition Term Loan Agreement, the "Prepetition Term Loan Obligations" and together with the Prepetition Cayman Notes Obligations, the Prepetition Exchange Notes Obligations, the Prepetition 4.875% Notes Obligations, and the Prepetition Intercompany Note Obligations, the "Pari First Lien Obligations") under the Prepetition Term Loan Agreement;

(vi)     *Prepetition 4.875% Notes Obligations*.  The Prepetition 4.875% Notes Issuer and the Prepetition 4.875% Notes Guarantors were justly and lawfully indebted and liable to the Prepetition 4.875% Notes Secured Parties for the Prepetition 4.875% Notes Obligations without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $300,000,000 of the outstanding Prepetition 4.875% Notes, which notes were issued by the Prepetition 4.875% Notes Issuer pursuant to, and in accordance with the terms of the Prepetition 4.875% Notes Documents, *plus* accrued and unpaid interest thereon and any premiums, fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition 4.875% Notes Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition 4.875% Notes Documents, which Prepetition 4.875% Notes Obligations have been guaranteed on a joint and several basis by each of the Prepetition 4.875% Notes Guarantors;

(vii)    *Prepetition ABL Facility*.  Pursuant to that certain Asset-Based Revolving Credit Agreement dated as of July 23, 2021 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition ABL Credit Agreement," and collectively with the other Credit Documents (as defined in the Prepetition ABL Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived or otherwise modified prior to the Petition Date, the "Prepetition ABL Credit Documents") , among (a) the Company, (b) the Company's subsidiary borrowers from time to time party thereto (together with the Company, the "Prepetition ABL Borrowers"), (c) Holdings, (d) the other guarantors party thereto (the "Prepetition ABL Guarantors"), (e) Bank of America, N.A., as administrative agent and collateral agent (solely in such capacity, the "Prepetition ABL Agent" and together with the Pari First Lien Agents, the "Prepetition Agents"), and (f) the lenders from time to time party thereto (collectively, the "Prepetition ABL Lenders," and collectively with the Prepetition ABL Agent and other "Secured Parties" (as defined in the Prepetition ABL Credit Agreement), the "Prepetition ABL Secured Parties" and together with the Pari First Lien Secured Parties, the "Prepetition Secured Parties"), the Prepetition ABL Secured Parties provided revolving credit (the "Prepetition ABL Revolving Credit Loans"), certain banking products, cash management services, treasury, derivative obligations and other financial accommodations to, and issued letters of credit for the account of, the Prepetition ABL Borrowers and their subsidiaries pursuant to the Prepetition ABL Credit Documents, and the Prepetition ABL Guarantors guaranteed on a joint and several basis the "Obligations" (as defined in the Prepetition ABL Credit Agreement, the "Prepetition ABL Obligations" and together with the Pari First Lien Obligations, the "Prepetition Secured Obligations") under the Prepetition ABL Credit Agreement;

(viii)    *Prepetition Equal Priority Intercreditor Agreement.*  Pursuant to and to the extent set forth in that certain Equal Priority Intercreditor Agreement, dated as of July 23, 2021 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time (including pursuant to any joinders thereto), the "Prepetition Equal Priority Intercreditor Agreement"), by and among Holdings, the Company, the other grantors from time to time party thereto, the Prepetition Term Loan Agent, the Prepetition 4.875% Notes Trustee, and each Additional Agent (as defined therein) from time to time party thereto (including the Prepetition Cayman Notes Trustee, the Prepetition Exchange Notes Trustee, and the Prepetition Intercompany Notes Trustee), the parties thereto agreed, among other things, to:  (a) be bound by the waterfall and turnover provisions contained therein with respect to the Shared Collateral (as defined therein), (b) consent to, or not oppose, certain actions taken, or rights asserted, by the Controlling Collateral Agent (as defined therein), and (c) refrain from taking certain actions with respect to the Shared Collateral;

(ix)    *Prepetition ABL Intercreditor Agreement*.  Pursuant to and to the extent set forth in that certain ABL Intercreditor Agreement, dated as of July 23, 2021 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time (including pursuant to any joinders thereto), the "Prepetition ABL Intercreditor Agreement" and, together with the Pari First Lien Documents, the Prepetition ABL Credit Documents, the Prepetition Equal Priority Intercreditor Agreement, the "Prepetition Credit Documents") by and among the Prepetition ABL Agent and the Pari First Lien Agents, Holdings, the Company, as borrower, and the Subsidiaries of the Company (as referred to therein), as from time to time party thereto, the parties thereto agreed, among other things:  (a) that the Prepetition ABL Liens (as defined herein) on the Prepetition ABL Priority Collateral (as defined herein) are senior to the Pari First Liens (as defined

herein) on such collateral, (b) that the Pari First Liens on the Pari First Lien Priority Collateral (as defined herein) are senior to the Prepetition ABL Liens on such collateral, and (c) to be bound by the other provisions contained therein;

(x)     *Prepetition Cayman Notes Obligations*.  The Prepetition Cayman Notes Issuer and the Prepetition Cayman Notes Guarantors were justly and lawfully indebted and liable to the Prepetition Cayman Notes Secured Parties for the Prepetition Cayman Notes Obligations without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $200,000,000 of the outstanding Prepetition Cayman Notes, which notes were issued by the Prepetition Cayman Notes Issuer pursuant to, and in accordance with the terms of, the Prepetition Cayman Notes Documents, *plus* accrued and unpaid interest thereon and any premiums, fees, expenses and disbursements (including any attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Cayman Notes Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Cayman Notes Documents, which Prepetition Cayman Notes Obligations have been guaranteed on a joint and several basis by each of the Prepetition Cayman Notes Guarantors;

(xi)     *Prepetition Exchange Notes Obligations*.  The Prepetition Exchange Notes Issuer and the Prepetition Exchange Notes Guarantors were justly and lawfully indebted and liable to the Prepetition Exchange Notes Secured Parties for the Prepetition Exchange Notes Obligations without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $483,000,000 of the outstanding Prepetition Exchange Notes, which notes were issued by the Prepetition Exchange Notes Issuer pursuant to, and in accordance

16

with the terms of, the Prepetition Exchange Notes Documents, *plus* accrued and unpaid interest thereon and any premiums, fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition Exchange Notes Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Exchange Notes Documents, which Prepetition Exchange Notes Obligations has been guaranteed on a joint and several basis by each of the Prepetition Exchange Notes Guarantors;

(xii)    *Prepetition Term Loan Obligations*.    The Prepetition Term Loan Borrower and the Prepetition Term Loan Guarantors were justly and lawfully indebted and liable to the Prepetition Term Loan Secured Parties for the Prepetition Term Loan Obligations without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than $578,000,000 in outstanding principal amount of term loans as of the Petition Date, *plus* interest and fees thereon, which loans were made or issued by the Prepetition Term Loan Lenders pursuant to, and in accordance with the terms of, the Prepetition Term Loan Documents, *plus*, to the extent not otherwise included, accrued and unpaid interest thereon and any premiums, fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition Term Loan Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Term Loan Documents, which Prepetition Term Loan Obligations has been guaranteed on a joint and several basis by each of the Prepetition ABL Guarantors;

(xiii)    *Prepetition Intercompany Note Obligations*.    The Prepetition Intercompany Note Issuer and the Prepetition Intercompany Note Guarantors were justly and lawfully indebted and

17

liable to the Prepetition Intercompany Note Secured Parties for the Prepetition Intercompany Note Obligations without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than $200,000,000 in outstanding principal amount as of the Petition Date, *plus* interest and fees thereon, which note was issued by the Prepetition Intercompany Note Issuer pursuant to, and in accordance with the terms of, the Prepetition Intercompany Note Documents, *plus*, to the extent not otherwise included, accrued and unpaid interest thereon and any premiums, fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition Intercompany Note Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Intercompany Note Documents which Prepetition Intercompany Note Debt has been guaranteed on a joint and several basis by each of the Prepetition Intercompany Note Guarantors;

(xiv)    *Prepetition ABL Obligations*.  The Prepetition ABL Borrowers, Holdings, and the other Prepetition ABL Guarantors were justly and lawfully indebted and liable to the Prepetition ABL Secured Parties for the Prepetition ABL Obligations without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than (a) $ 377,925,499.82 in outstanding principal amount of Prepetition ABL Revolving Credit Loans as of the Petition Date, *plus* interest and fees thereon (the "Prepetition ABL Revolving Debt"), *plus* approximately $12,526,627.00 of the aggregate stated principal amount available for drawing under all outstanding letters of credit and all unpaid reimbursement obligations with respect to drawn letters of credit (the "Prepetition Letters of Credit"), and treasury, cash management, bank product, and derivative obligations, in each case as of the Petition Date (the "Prepetition Letters of Credit"), which loans, Prepetition Letters of Credit, treasury, cash management, bank product and derivative obligations were made or issued by the

Prepetition ABL Secured Parties pursuant to, and in accordance with the terms of, the Prepetition ABL Credit Documents, *plus*, to the extent not otherwise included, accrued and <u>accruing and</u> unpaid premiums, interest thereon and fees, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition ABL Credit Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition ABL Credit Documents, which Prepetition ABL Obligations have been guaranteed on a joint and several basis by each of the Prepetition ABL Guarantors;

(xv)    *Validity of Prepetition Secured Obligations*.    The Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Cayman Notes Issuer, the Prepetition Exchange Note Issuer, the Prepetition 4.875% Note Issuer, the Prepetition Intercompany Note Issuer, the Prepetition Term Loan Borrower, the Prepetition ABL Borrowers, the Prepetition Cayman Note Guarantors, the Prepetition Exchange Note Guarantors, the Prepetition 4.875% Note Guarantors, the Prepetition Intercompany Note Guarantors, the Prepetition ABL Guarantors, and the Prepetition Term Loan Guarantors, as applicable, enforceable in accordance with their respective terms and no portion of the Prepetition Secured Obligations or any payment made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Prepetition Credit Documents prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim or cause of action (including any Avoidance Actions), choses in action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law;

(xvi)    *Validity, Perfection and Priority of Prepetition Pari First Liens*.    As of the Petition Date, pursuant to and in connection with the Pari First Lien Documents, the Debtor issuers,

borrowers, and guarantors party thereto granted to each of the Pari First Lien Agents, in each case, for the benefit of themselves and applicable Pari First Lien Secured Parties, a security interest in and continuing lien on (the "Pari First Liens") substantially all of such Debtors' assets and property (in each case, subject to any "Excluded Property" (as defined in the Pari First Lien Documents), including, (i) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the Non-ABL Priority Collateral (as defined in the Prepetition ABL Intercreditor Agreement) (which, for the avoidance of doubt, may include certain Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Pari First Lien Priority Collateral"), and (ii) a valid, binding, properly perfected, enforceable, junior priority security interest in and continuing lien on the ABL Priority Collateral (as defined in the Prepetition ABL Intercreditor Agreement) (which, for the avoidance of doubt, includes certain Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "Pari First Lien Junior Collateral" and, together with the Pari First Lien Priority Collateral, the "Pari First Lien Collateral"), which Pari First Liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim (as defined in the Bankruptcy Code) or applicable non-bankruptcy law, subject and subordinate only to the liens of the Prepetition ABL Agent on the ABL Priority Collateral and certain other liens permitted by the Pari First Lien Documents, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected (or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code), non-avoidable and senior in priority to the Pari First Liens as of the Petition Date (the "Pari First Lien Permitted Senior Liens");

(xvii)  *Validity, Perfection and Priority of Prepetition ABL Liens*.  As of the Petition Date, pursuant to and in connection with the Prepetition ABL Credit Documents, the Prepetition ABL Borrowers, Holdings, and the other Prepetition ABL Guarantors granted to the Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Secured Parties, a security interest in and continuing lien on (the "Prepetition ABL Liens" and, together with the Pari First Liens, the "Prepetition Liens") substantially all of their assets and property (subject to any "Excluded Property" as defined in the Prepetition ABL Credit Documents), including, (i) a valid, binding, properly perfected, enforceable, first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in the Prepetition ABL Intercreditor Agreement) (which, for the avoidance of doubt, includes certain Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition ABL Priority Collateral" and, together with assets of the Debtors of the type constituting Prepetition ABL Priority Collateral, including the ABL True Up Account (as defined herein) and amounts therein (but, for the avoidance of doubt, excluding the proceeds of the DIP Facility held in the DIP Proceeds Account (as defined in the DIP Credit Agreement as in effect on the date hereof)), and~~, subject to entry of the Final Order,~~ all Avoidance Proceeds related thereto, the "ABL Priority Collateral"), and (ii) a valid, binding, properly perfected, enforceable, junior priority security interest in and continuing lien on the Non-ABL Priority Collateral (as defined in the Prepetition ABL Intercreditor Agreement), which, for the avoidance of doubt, may include certain Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (the "Prepetition ABL Junior Collateral" and, together with the Prepetition ABL Priority Collateral, the "Prepetition ABL Collateral" and, together with the Pari First Lien Collateral, the "Prepetition Collateral"), which

Prepetition ABL Liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law, subject and subordinate only to the liens of each Pari First Lien Agent on the Pari First Lien Priority Collateral and certain other liens permitted by the Prepetition ABL Credit Documents, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected (or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code), non-avoidable and senior in priority to the Prepetition ABL Liens as of the Petition Date (the "Prepetition ABL Permitted Senior Liens" and, together with the Pari First Lien Permitted Senior Liens, the "Prepetition Permitted Senior Liens").

(xviii)  *No Control*.  None of the Prepetition Secured Parties control (or have in the past controlled) the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of any actions taken with respect to, in connection with, related to or arising from the Prepetition Credit Documents.

(xix)  *No Claims or Causes of Action*.  No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties and each of their respective Representatives (as defined herein) (in each case, in their capacity as such) under or relating to any agreements by and among the Debtors and any Prepetition Secured Party that is in existence as of the Petition Date.

(xx)  *Cash Collateral.*  Except as otherwise provided in the Prepetition Credit Documents (including cash or accounts that constitute "Excluded Property" under the Prepetition Credit Documents), all of the Debtors' cash, including, without limitation, the cash in their deposit

accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition ABL Secured Parties and the Pari First Lien Secured Parties for purposes of section 363(a) of the Bankruptcy Code and is Prepetition Collateral of the Prepetition Secured Parties.

(xxi)    *Debtors' Stipulations Regarding Initial Funding*.  In accordance with the Interim Order, this Court authorized, among other things:  (a) the Borrower to obtain DIP Financing pursuant to the DIP Credit Agreement; (b) the DIP Guarantors to jointly and severally guarantee the DIP Loans and the other DIP Obligations; and (c) the DIP Loan Parties to execute, deliver the DIP Documents, and perform under the DIP Credit Agreement in accordance with and subject to the terms of the Interim Order and the DIP Documents.  On June 17, 2025, the Court entered the Interim Order, and the Debtors were authorized to borrow the Interim DIP Loans on the terms and conditions set forth in the DIP Documents and in the Interim Order.  Pursuant to the Interim Order and the DIP Documents, (a) the Initial Draw of $75,000,000 of Tranche A New Money DIP Loans was made immediately available upon the Closing Date, and (b) $150,000,000 of prepetition debt was authorized to be rolled up into Tranche B DIP Loans upon completion of the Initial Syndication and entry of the Interim Order.

I.    **Findings Regarding Corporate Authority**.  Each of the Debtors has all requisite power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

J.    **Findings Regarding the DIP Financing and Use of Cash Collateral**.

(i)    Good and sufficient cause has been shown for the entry of this ~~Interim~~Final Order and for authorization of the DIP Loan Parties to obtain financing pursuant to the DIP Documents, to use Cash Collateral on the terms described herein, and incur the DIP Roll-Up

23

Obligations (as defined herein), in each case, to, among other things, administer their chapter 11 cases and fund their operations.

(ii)    As set forth in the First Day Declaration and the Baird Declaration, the Debtors have ~~an immediate and~~a critical need to obtain the DIP Financing and to use Prepetition Collateral (including Cash Collateral) in each case on ~~an interim~~a final basis, in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs and to fund expenses of these chapter 11 cases.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, the incurrence of new indebtedness under the DIP Documents, and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern value of the Debtors' estates.  The terms of the proposed financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.  The Debtors' use of Cash Collateral alone would be insufficient to meet the Debtors' cash disbursement needs during the period of effectiveness of this ~~Interim~~Final Order.  The Debtors and their estates will suffer ~~immediate and~~ irreparable harm if ~~immediate~~ financing is not obtained and permission to use Cash Collateral is not granted.  The adequate protection provided in ~~this~~the Interim Order and this Final Order and the other benefits and privileges contained therein and herein are consistent with, and authorized by, the Bankruptcy Code.

(iii)    As set forth in the First Day Declaration and the Baird Declaration, the DIP Financing is the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, financing arrangements, capital structure and the circumstances of

24

these chapter 11 cases, the Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without granting to the DIP Secured Parties the DIP Liens and the DIP Superpriority Claims (each as defined herein) and incurring the Adequate Protection Obligations (as defined herein), in each case as provided for herein subject and subordinate to the Carve Out to the extent set forth herein, under the terms and conditions set forth in ~~this~~the Interim Order, this Final Order, and in the DIP Documents.

(iv)    The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Prepetition Collateral and acquire equipment, inventory, and other personal property, all of which constitute Prepetition Collateral under the Prepetition Credit Documents that are subject to the Prepetition Secured Parties' security interests as set forth in the Prepetition Credit Documents, as applicable.

(v)    The Debtors desire to use a portion of the cash, rents, income, offspring, products, proceeds, and profits described in the preceding paragraph in their business operations that constitute Cash Collateral of the Prepetition Secured Parties under section 363(a) of the Bankruptcy Code.  Certain prepetition rents, income, offspring, products, proceeds, and profits, in existence as of the Petition Date or hereafter created or arising, including balances of funds in the Debtors' prepetition and postpetition operating bank accounts, also constitute Cash Collateral.

(vi)    Based on the DIP Motion, the Baird Declaration, the First Day Declaration, and the record presented to the Court at the Interim Hearing and the Final Hearing, the terms of the DIP Financing, the terms of the adequate protection granted to the Prepetition Secured Parties as

25

provided in paragraph 20 of ~~this~~the Interim Order and paragraph 20 herein (the "Adequate Protection"), and the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to ~~this~~the Interim Order, this Final Order, and the DIP Documents are, in each case, fair and reasonable, reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(vii)    The DIP Financing, the Adequate Protection and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the DIP Loan Parties, the DIP Secured Parties, and the Prepetition Secured Parties, and all of the DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation, all loans made to and guarantees issued by the DIP Loan Parties pursuant to the DIP Documents and any other DIP Obligations shall be deemed to have been extended by the DIP Agent and the other DIP Secured Parties in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and each of the DIP Agent and the other DIP Secured Parties (and each of their successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this ~~Interim~~Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(viii)    The Pari First Lien Secured Parties and the Prepetition ABL Secured Parties have acted in good faith regarding the DIP Financing and the Debtors' continued use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of and

performance under the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined herein)), in accordance with the terms hereof, and the Pari First Lien Secured Parties and the Prepetition ABL Secured Parties (and each of their respective successors and assigns) shall be entitled to the full protection of sections 363(m) (if applicable) and 364(e) of the Bankruptcy Code in the event that this ~~Interim~~Final Order or any provision thereof is vacated, reversed or modified, on appeal or otherwise.

(ix)     The Prepetition Secured Parties are entitled to the Adequate Protection provided in this ~~Interim~~Final Order as and to the extent set forth herein pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to this Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral, including the Cash Collateral, and, to the extent their consent is required, the requisite Prepetition Secured Parties have consented or are deemed hereby to have consented to the use of the Prepetition Collateral, including the Cash Collateral, on the terms set forth in ~~this~~the Interim Order and this Final Order, in each case, and the priming of the Pari First Liens by the DIP Liens pursuant to the terms set forth in ~~this~~the Interim Order and this Final Order, in each case, and the DIP Documents; *provided* that nothing in this ~~Interim~~Final Order or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this ~~Interim~~Final Order and in the context of the DIP Financing authorized by this ~~Interim~~Final Order to the extent such consent has been or is deemed to have been given, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the

Prepetition Collateral (whether senior or junior) other than as contemplated by the DIP Financing authorized by this ~~Interim~~Final Order, or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties to seek new, different or additional adequate protection, or assert any rights of any of the Prepetition Secured Parties, and the rights of any other party in interest, including the DIP Loan Parties, to object to such relief are hereby preserved.

(x)    The Pari First Lien Secured Parties would not have otherwise consented to the use of their Collateral (including Cash Collateral), subordination of their liens to the DIP Liens (as defined below), and the DIP Lenders would not have provided the DIP Financing or extended credit to the DIP Loan Parties thereunder without (i) the roll-up of the Pari First Lien Obligations with the Tranche B DIP Loans and (ii) the agreement of the Debtors to consent to the jurisdiction of this Court in all matters arising out of or relating to the DIP Financing, the DIP Documents, and the DIP Liens.

(xi)    The Debtors have prepared and delivered to the advisors to the DIP Secured Parties an initial budget, attached to the DIP Credit Agreement (the "Initial DIP Budget"), a summary of which is attached ~~hereto~~to the Interim Order as Schedule 2.[6]  The Initial DIP Budget reflects, among other things, the Debtors' anticipated operating receipts, anticipated operating disbursements, anticipated non-operating disbursements, net operating cash flow and liquidity for each calendar week covered thereby.  The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement, and once approved by the Required DIP Lenders[67] in accordance with the DIP Credit Agreement, shall

---

[6]    The current Approved Budget is attached hereto as **Exhibit 3**.

[67]    "Required DIP Lenders" means the DIP Lenders holding a majority of the aggregate outstanding principal amount of the Tranche A DIP Loans and New Money Commitments and a majority of the aggregate outstanding amount of Tranche B DIP Loans.

modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget shall constitute, without duplication, an "Approved Budget"). A copy of any subsequent Approved Budget shall be promptly provided to the Creditors' Committee. There shall be no decreases to the fees and expenses of the Committee Professionals reflected in the Approved Budget without the express written consent of the Creditors' Committee. The Initial DIP Budget is reasonable under the circumstances. The DIP Secured Parties are relyingrelied, in part, upon the DIP Loan Parties' agreement to comply with the Approved Budget (subject to permitted variances under the DIP Documents; *provided* that notwithstanding anything else to the contrary in the DIP Documents, other than the professional fees of Committee Professionalsexcept with respect to the Carve Out Reserves, the Approved Budget will not operate as a cap on professional fees, including professional fees incurred by the Debtor Professionals or the Committee Professionals), the other DIP Documents, and thisthe Interim Order and this Final Order in determining to enter into the postpetition financing arrangements provided for in this InterimFinal Order.

(xii)    Upon entry of the Final Order granting such relief, eEach of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition Collateral.

K.    **Immediate Entry**. Sufficient cause exists for immediate entry of this InterimFinal Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2. Absent granting the relief set forth in this InterimFinal Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Financing and the permitted use of Prepetition

Collateral (including Cash Collateral), in accordance with ~~this~~the Interim Order, this Final Order and the DIP Documents, are ~~therefore~~ in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.  The DIP Motion and this ~~Interim~~Final Order comply with the requirements of Local Rule 4001-2.

   L.  **Roll-Up**.  Upon entry of ~~this~~the Interim Order and the completion of the Initial Syndication, certain Prepetition Cayman Notes Obligations, Prepetition Exchange Notes Obligations, Prepetition 4.875% Notes Obligations, and Prepetition Term Loans held by the DIP Lenders (or their designees) in an aggregate amount of $150,000,000 (the "Initial Roll-Up Amount"), as specified in the DIP Credit Agreement, ~~shall be~~were automatically deemed "rolled up" and converted on a cashless basis into Tranche B DIP Loans on the terms set forth in the DIP Documents.  Upon the later of (x) the entry of ~~the~~this Final Order and (y) the completion of the Syndication (the "Subsequent Roll-Up Date"), certain Prepetition Cayman Notes Obligations, Prepetition Exchange Notes Obligations, Prepetition 4.875% Notes Obligations, and Prepetition Term Loans held by the DIP Lenders (or their designees) in an aggregate amount of $250,000,000 (the "Final Roll-Up Amount") as specified in the DIP Credit Agreement, shall be automatically deemed "rolled up" and converted on a cashless basis into Tranche B DIP Loans on the terms set forth in the DIP Documents.  In each case, any Prepetition Cayman Notes Obligations, Prepetition Exchange Notes Obligations, Prepetition 4.875% Notes Obligations, and Prepetition Term Loans subject to the "~~roll-up~~roll-up" shall automatically be deemed to be substituted and exchanged for, and shall be deemed to be, Tranche B DIP Loans for all purposes hereunder as if originally funded on the Closing Date, in the case of the roll-up on the completion of the Initial Syndication, and on the Subsequent Roll-Up Date, in the case of the roll-up on the Subsequent Roll-Up Date (collectively, the "DIP Roll-Up Obligations").  Any Pari First Lien Obligation that is "rolled-up"

into a DIP Roll-Up Obligation shall be cancelled, extinguished, and of no further force or effect and the holders thereof shall, promptly following such discharge, transfer or otherwise deliver any securities, instruments or loans with respect to such obligation to the Debtors to evidence such cancellation.  The Prepetition Intercompany Note Obligations shall be deemed repaid on a dollar-for-dollar basis with any "roll up" of the Prepetition Cayman Notes Obligations.  The conversion (or "roll-up") is authorized pursuant to ~~this~~the Interim Order and this Final Order, as compensation for, in consideration for, and solely on account of, the agreement of certain Pari First Lien Secured Parties constituting DIP Lenders to fund amounts, and provide other consideration to the Debtors under the DIP Facility and not as payments under, adequate protection for, or otherwise on account of, any obligations under the Pari First Lien Documents.  Notwithstanding any other provision of this ~~Interim~~Final Order or the DIP Documents, all rights of the Pari First Lien Secured Parties shall be fully preserved.  The Pari First Lien Secured Parties would not otherwise consent to the use of their Cash Collateral, and the DIP Agent and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder, without the inclusion of the DIP Roll-Up Obligations in the DIP Obligations upon entry of this ~~Interim~~Final Order.  Moreover, the roll-up of the Pari First Lien Obligations with the Initial Roll-Up Amount into DIP Obligations enabled the Debtors to obtain urgently needed financing to administer these chapter 11 cases and fund their operations.

M.    **Prepetition Permitted Senior Liens; Continuation of Prepetition Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Prepetition Permitted Senior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, any statutory committee appointed in these chapter 11 cases, the DIP Loan Parties, the

DIP Agent, the other DIP Secured Parties, each Prepetition Agent, or the other Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted Senior Lien and/or security interests. ~~Subject to entry of the Final Order, the~~The right of a seller of goods to reclaim goods under section 546(c) of the Bankruptcy Code is not a Prepetition Permitted Senior Lien, as used herein, and is expressly subject to the DIP Liens (as defined herein) and the Prepetition Liens.  The Prepetition Liens and the DIP Liens are continuing liens and the DIP Collateral is and will continue to be encumbered by such liens.

N.    **Intercreditor Agreements**.  Pursuant to section 510 of the Bankruptcy Code, the Prepetition ABL Intercreditor Agreement, the Prepetition Equal Priority Intercreditor Agreement, and any other applicable intercreditor or subordination provisions contained in any of the other Prepetition Credit Documents (the "Intercreditor Agreements") (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights and remedies of such parties with respect to replacement liens, administrative expense claims and superpriority administrative expense claims granted or amounts payable in respect thereof by the Debtors under this ~~Interim~~Final Order or otherwise), and (iii) shall not be deemed to be amended, altered, or modified by the terms of this ~~Interim~~Final Order or the DIP Documents, unless expressly set forth herein or therein.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before this Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.        *Motion Granted*.  The ~~interim~~final relief sought in the DIP Motion is granted, the ~~interim~~final relief described herein is authorized and approved, and the use of Cash Collateral on ~~an interim~~a final basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this ~~Interim~~Final Order.  All objections to this ~~Interim~~Final Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled with prejudice on the merits.

2.        *Authorization of the DIP Financing and the DIP Documents*.

(a)        The DIP Loan Parties are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  The Borrower is hereby authorized to borrow money pursuant to the DIP Credit Agreement and the Debtors who are DIP Guarantors are hereby authorized to provide a guaranty of payment in respect of the DIP Obligations, subject to any limitations on borrowing under the DIP Documents, which borrowings shall be used for all purposes permitted under the DIP Documents and this ~~Interim~~Final Order (and subject to and in accordance with the Approved Budget) (subject to permitted variances under the DIP Documents) up to the aggregate amount of the Initial Draw.

(b)        In furtherance of the foregoing and without the need for further approval of this Court, each DIP Loan Party is authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages, financing statements and other similar documents), and to pay all fees, expenses and indemnities in connection with or that may be reasonably required, necessary, or desirable for the DIP Loan

Parties' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)       the execution and delivery of, and performance under, each of the DIP Documents;

(ii)      the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Loan Parties and the DIP Agent (acting in accordance with the terms of the DIP Credit Agreement and at the direction of the Required DIP Lenders, to the extent required), may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other nonmaterial modifications to and under the DIP Documents (and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder. Copies of any amendments to the DIP Documents shall be promptly provided to the Creditors' Committee. Updates, modifications, and supplements to the Approved Budget shall not require any further approval of this Court;

(iii)     the non-refundable payment to the DIP Agent and the other DIP Secured Parties, as the case may be, of all reasonable and documented fees, whether paid pursuant to the Interim Order or this Final Order, and rights received as consideration under, or in connection with, the DIP Facility, including any amendment fees, prepayment premiums, unused facility fees, early termination fees, right of equitization, servicing fees, audit fees, liquidator fees, structuring fees, administrative agent's, collateral agent's or security trustee's fees, upfront fees,

closing fees, commitment fees, exit fees, closing date fees, backstop fees, prepayment fees or agency fees, rights under the DIP Credit Agreement, indemnities and professional fees (the payment of which fees shall be irrevocable, and shall be, and shall be deemed to have been, approved upon entry of ~~this~~the Interim Order and this Final Order, whether any such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise by any person or entity)~~;~~ ~~*provided* that any unused facility fee and exit fee shall be subject to entry of the Final Order~~; and any amounts due (or that may become due) in respect of any indemnification and expense reimbursement obligations, in each case referred to in the DIP Credit Agreement or DIP Documents, and the costs and expenses as may be due from time to time in accordance with the DIP Documents, including, without limitation, reasonable and documented fees and expenses of the following professionals retained by, or on behalf of, any of the DIP Agent or the other DIP Lenders:  (A) Dechert LLP ("Dechert") as counsel to the ad hoc group of DIP Lenders and secured noteholders and lenders (the "Ad Hoc Group") and Potter Anderson & Corroon LLP; (B) Evercore Inc., as financial advisor to Dechert LLP as counsel to the Ad Hoc Group; (C) Moses & Singer LLP, as legal counsel to the DIP Agent; (D) Dentons US LLP, as legal counsel to the Fronting Lender; (E) any other local legal counsel or other advisors (including in any foreign jurisdictions), and any other advisors as are permitted under the DIP Documents, and (F) in the event of an actual or potential conflict, additional counsel or local legal counsel to the extent necessary, in each case, as provided for in the DIP Documents, (collectively, the "DIP Fees and Expenses") and in

accordance with applicable engagement letters, fee letters, or similar agreements, without the need to file retention motions or fee applications; and

(iv)    the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens (as defined herein) and the DIP Superpriority Claims (as defined herein) and perfection of the DIP Liens as permitted herein and therein, and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith, in each case in accordance with the terms of the DIP Documents.

(c)    From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Credit Agreement, respectively, and (until entry of the this Final Order) this Interim Order, and the Approved Budget (subject to permitted variances under the DIP Documents).

3.    *Authorization to Borrow*.    To prevent immediate and irreparable harm to the Debtors' estates, s Subject to the terms, conditions, and limitations on availability set forth in the DIP Documents, the Approved Budget, and this the Interim Order and this Final Order, the Debtors are hereby authorized to (a) borrow under the DIP Facilities, and (b) use the Cash Collateral for the purposes described in this Interim Final Order subject to the occurrence of the Closing Date (as defined in the applicable DIP Credit Agreement, the "Closing Date").

4.    *DIP Roll-Up Obligations*.    Upon the entry of this the Interim Order and the completion of the Initial Syndication, the roll-up of the Initial Roll-Up Amount is approved. was approved.  Upon completion of the Subsequent Roll-Up Date, the Final Roll-Up Amount shall be automatically deemed "rolled up" and converted on a cashless basis into Tranche B DIP Loans on the terms set forth in the DIP Documents.  Notwithstanding anything to the contrary herein, the DIP Roll-Up Obligations and any DIP Liens and DIP Superpriority Claims on account thereof are

subject to any Challenges (as defined below) that may be raised prior to expiration of the time period set forth in paragraph 30.

5. *DIP Obligations*. Upon entry of ~~this~~the Interim Order and the execution and delivery of the DIP Documents, ~~which~~the DIP Documents ~~shall be~~became legal, valid, binding and non-avoidable obligations of the DIP Loan Parties, enforceable against each DIP Loan Party and their estates in accordance with the terms of the DIP Documents, the Interim Order and this ~~Interim~~Final Order, and any successors thereto, including any trustee appointed in the chapter 11 cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the chapter 11 cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon entry of this ~~Interim~~Final Order, the DIP Obligations ~~will~~included all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the DIP Loan Parties to any of the DIP Agent or the other DIP Secured Parties, in such capacities, in each case, under, or secured by, the DIP Documents (including this ~~Interim~~Final Order), including all principal, interest, costs, fees, expenses, premiums, indemnities and other amounts under the DIP Documents (including this ~~Interim~~Final Order). The DIP Loan Parties shall be jointly and severally liable for the DIP Obligations. Except as expressly set forth in this ~~Interim~~Final Order, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agent and/or the other DIP Secured Parties (including their "Representatives (as defined herein)) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset,

recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

6.     *Carve Out*.

(a)     *Carve Out*.  As used in ~~this~~the Interim Order and this Final Order, the "Carve Out" means the sum of:  (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) (x) subject to the following clause (y), to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee ~~(if appointed)~~, pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first Business Day following delivery by the Prepetition ABL Agent or the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; *provided* (y) Allowed Professional Fees of Committee Professionals under this clause (iii) shall not exceed (x) the lesser of (A) the aggregate amounts budgeted for such Allowed Professional Fees of Committee Professionals in the Approved Budget through the first business day following delivery of a Carve Out Trigger Notice, and (B) the aggregate amount of such Allowed Professional Fees of Committee Professionals actually incurred through the first

business day following delivery of a Carve Out Trigger Notice *minus* (y) the aggregate amount of Allowed Professional Fees of Committee Professionals previously paid as of the time of determination of the amount of obligations under this clause (iii) (the amounts set forth in this clause (iii)(y) being the "Committee Pre-Carve Out Trigger Notice Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first business day following delivery by the Prepetition ABL Agent or the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap" of which the foregoing $2,500,000 shall be funded into the Funded Reserve Account (as defined herein) from proceeds from the Interim Draw of DIP Term Loans. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition ABL Agent or the DIP Agent (acting at the direction of the Required DIP Lenders), as applicable, to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Creditors' Committee ~~(if appointed)~~ and Prepetition ABL Agent or the DIP Agent, as applicable, which notice may be delivered by the Prepetition ABL Agent or the DIP Agent, as applicable, following the occurrence and during the continuation of a ABL Cash Collateral Termination Event and upon termination of the Debtors' right to use Cash Collateral by the Prepetition ABL Agent or following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Credit Agreement, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     Fee Estimates.   Not later than 7:00 p.m. New York time on the third Business Day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate

39

of the unpaid amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); *provided* that within one (1) Business Day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional Weekly Statement (the "Final Statement") setting forth a good-faith estimate of unpaid amount of fees and expenses incurred during the period commencing on the calendar day after the prior Calculation Date and concluding on the Termination Declaration Date (and the Debtors shall cause each such Weekly Statement or Final Statement to be delivered promptly to the Prepetition ABL Agent and the DIP Agent).  If any Professional Person fails to deliver a Weekly Statement or Final Statement within two (2) calendar days after such Weekly Statement or Final Statement is due, such Professional Person's entitlement to any funds in the Pre-Carve Out Trigger Notice Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement or Final Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person, unless otherwise ordered by the Court.

        (c)      Carve Out Reserves.

        (i)      Commencing on ~~July~~June 26, 2025, and on or before the Thursday of each week thereafter until a Termination Declaration Date, the Debtors shall utilize all cash on hand as of such date (other than cash on deposit in the ABL True Up Account) and cash in the DIP

Proceeds Account to fund a reserve in an amount equal to the sum of (A) the greater of (1) the aggregate unpaid amount of all Estimated Fees and Expenses of Debtor Professionals reflected in the Weekly Statements delivered on the immediately prior Wednesday (or next succeeding Business Day) to the Debtors and the Prepetition ABL Agent and the DIP Agent and (2) the aggregate amount of unpaid Allowed Professional Fees of Debtors Professionals contemplated to be incurred in the Approved Budget during such week, *plus* (B) the lesser of (1) the aggregate unpaid amount of all Estimated Fees and Expenses of Committee Professionals reflected in the Weekly Statements delivered on the immediately prior Wednesday (or next succeeding Business Day) to the Debtors and the Prepetition ABL Agent and the DIP Agent and (2) the aggregate amount of unpaid Allowed Professional Fees of Committee Professionals contemplated to be incurred in the Approved Budget during such week, *plus* (C) the Post-Carve Out Trigger Notice Cap, which amount shall be funded into the Funded Reserve Account (as defined herein) from proceeds from the Interim Draw of DIP Term Loans in accordance with this paragraph 6(a), *plus* (D) an amount equal to the amount of Allowed Professional Fees set forth in the Approved Budget for the next week occurring after the most recent Calculation Date.  The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust at an authorized depository under the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* for the U.S. Trustee (the "Funded Reserve Account") to pay such Allowed Professional Fees (the "Funded Reserves") prior to any and all other claims, and all payments of Allowed Professional Fees incurred prior to the Termination Declaration Date shall be paid first from such Funded Reserve Account.  The Funded Reserve Account shall be recalculated each week so that at any given time it holds no more than the sum of clauses (c)(i)(A), (B), and (C) in this paragraph 6.

(ii)     On the day on which a Carve Out Trigger Notice is given by either the Prepetition ABL Agent or DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee, if any, (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors, and the Debtors shall utilize the Funded Reserve Account, cash in the DIP Proceeds Account and, to the extent insufficient, utilize all cash on hand as of such date (excluding, for the avoidance of doubt, any ABL Priority Collateral and amounts held in any Controlled Account or ABL True Up Account), to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees plus the amounts set forth in paragraph 6(a)(i)–(ii); *provided* that any such draw from the DIP Proceeds Account shall be honored notwithstanding any conditions in the DIP Term Loan Documents.  The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such then unpaid Estimated Fees and Expenses (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.

(iii)    On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize cash in the Funded Reserve Account, cash in the DIP Proceeds Account, and all cash on hand as of such date (excluding, for the avoidance of doubt, any ABL Priority Collateral and amounts held in any Controlled Account or ABL True UPUp Account), to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap; *provided* that any such draw from the DIP Proceeds Account shall be honored notwithstanding any conditions in the DIP Term Loan Documents.  The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice

Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves")
prior to any and all other claims.

(iv)     For the avoidance of doubt, the DIP Agent, for the benefit of the DIP
Secured Parties, shall maintain a ~~first priority~~first-priority security interest in the Funded Reserve
Account and the Carve Out Reserves, junior only to the Carve Out, in the amount of the
Post-Carve Out Trigger Notice Cap.  No other party, including the Prepetition ABL Secured
Parties, shall be entitled to a *pari passu* or residual interest in the Funded Reserve Account until
the DIP Agent (for the benefit of the DIP Secured Parties) has received payment in full in an
amount equal to the Post-Carve Out Trigger Notice Cap.  To the extent that the Funded Reserve
Account contains more than the Post-Carve Out Trigger Notice Cap after accounting for payments
made on account of Pre-Carve Out Amounts and Post-Carve Out Amounts, then the DIP Agent,
for the benefit of the DIP Secured Parties, shall be granted and hold a *pari passu*, first-priority
secured interest in the Funded Reserve Account, and the Carve Out Reserves, junior only to the
Carve Out, with the residual interest to be *pro rata* based on the funds deposited by each set of DIP
Secured Parties into such accounts and reserves, which accounts and proceeds thereof to be
utilized in accordance with this paragraph 6.

(d)     Application of Carve Out Reserves.

(i)     All funds in the Pre-Carve Out Trigger Notice Reserve shall be used
first to pay the obligations set forth in clauses (a)(i) through (a)(iii) of the definition of Carve Out
set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve
Out Trigger Notice Cap, until the obligations set forth in clauses (a)(i) through (a)(iii) are paid in
full.

(ii)     All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts").

(iii)     If either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 6(ed), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively (subject to the limits contained in the Post-Carve Out Trigger Notice Cap), shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in paragraph 6(ed), prior to making any payments to the DIP Agent (as set forth above) on account of the DIP Obligations until indefeasibly Paid in Full, and thereafter to the Prepetition Secured Parties in accordance with their rights and priorities as set forth in ~~this~~the Interim Order and this Final Order and the Lien/Claim Priorities **Exhibit 1** attached hereto.

(iv)     Following delivery of a Carve Out Trigger Notice, neither the DIP Agent nor the Pari First Lien Secured Parties shall sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, for the avoidance of doubt the Prepetition ABL Agent shall be permitted to sweep and foreclose on ABL Priority Collateral and cash deposited in the Controlled Accounts and the ABL True Up Account.

(v)     Furthermore, notwithstanding anything to the contrary in this ~~Interim~~Final Order, (A) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (B) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall (as described below), and (C) subject to the limitations with

respect to the DIP Agents, DIP Lenders, and the Prepetition Secured Parties set forth in this paragraph 6, in no way shall the Initial DIP Budget, any subsequent Approved Budget, the Carve Out, the Post-Carve Out Trigger Notice Cap, or the Carve Out Reserves, or any of the foregoing, be construed as a cap or limitation on the amount of the Allowed Professional Fees of Debtor Professionals or Committee Professionals due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in ~~this~~the Interim Order, this Final Order, the Prepetition ABL Credit Agreement, or the DIP Credit Agreement, the Carve Out shall be senior to all liens and claims securing the Prepetition ABL Credit Agreement, the DIP Credit Agreement, the Adequate Protection Liens, and the 507(b) Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations; *provided* that, in no event, shall (i) the funds in the Controlled Account after a Carve Out Trigger Notice has been sent; or (ii) ABL True Up Account be used for the Carve Out; *provided, further*, that the Prepetition ABL Agent shall be permitted to sweep and foreclose on cash deposited in the Controlled Accounts, ABL True UP Account, and ABL Priority Collateral free and clear of all liens, claims, and encumbrances.

(e)    No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in ~~this~~the Interim Order or this Final Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)  <u>Payment of Allowed Professional Fees Prior to the Termination Declaration</u> <u>Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(g)  <u>Payment of Carve Out On or After the Termination Declaration Date</u>. Following the delivery of the Carve Out Trigger Notice, all Allowed Professional Fees shall be paid from the applicable Carve Out Reserve, and no Professional Person shall seek payment of any Allowed Professional Fees from any other source until the applicable Carve Out Reserve has been exhausted.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this ~~Interim~~Final Order, the DIP Documents, the Bankruptcy Code, and applicable law.

7.  *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations ~~shall~~ constitute allowed superpriority administrative expense claims against the DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c) ~~(subject to entry of the Final Order)~~, 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "<u>DIP Superpriority</u>

Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Loan Parties and all proceeds thereof (including, ~~upon entry of the Final Order granting such relief,~~ the proceeds (the "Avoidance Proceeds") of any claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions")) in accordance with the DIP Documents, and this ~~Interim~~Final Order, subject and subordinate only to the Carve Out and to the rights of the Prepetition ABL Secured Parties with respect to ABL Priority Collateral (to the extent the Prepetition ABL obligations have not been Paid in Full[78]) in accordance with the priority set forth herein; *provided that* (a) the DIP Superpriority Claims in respect of the DIP Roll-Up Obligations shall not be payable from or have recourse to the Avoidance Proceeds or proceeds of commercial tort claims the Debtors or their estates hold, in each case, against Prepetition Secured Parties and (b) the DIP Secured Parties shall exercise commercially reasonable efforts to collect from the other assets of the Debtors (or their estates) first before turning to any Avoidance Proceeds or the proceeds of commercial tort claims.  The DIP Superpriority Claims shall be entitled to the full protection of

---

[78] As used herein "Paid in Full" or "Payment in Full" with respect to the Prepetition ABL Obligations means the indefeasible repayment in full in cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the Prepetition ABL Credit Agreement and this ~~Interim~~Final Order, the cash collateralization or repayment in full in cash of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable facility.  The Prepetition ABL Obligations shall not be deemed to have been Paid in Full until such time as, (a) with respect to the Prepetition ABL Credit Documents and Prepetition ABL Obligations, the Challenge Deadline (as defined herein) shall have passed without the timely and proper commencement of a Challenge, or, if a Challenge is timely and properly asserted prior to the Challenge Deadline, upon the final, non-appealable disposition of such Challenge, (b) any and all applicable adequate protection payments have been made, and (c) with respect to the Prepetition ABL Credit Documents, a countersigned payoff letter has been received by the Prepetition ABL Agent in form and substance reasonably satisfactory to the Prepetition ABL Agent in its sole discretion, including a release from any obligations or subordination with respect to the Carve Out.

section 364(e) of the Bankruptcy Code in the event that this ~~Interim~~Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  Notwithstanding anything contained herein or in any of the DIP Documents to the contrary, the DIP Superpriority Claims shall at all times be, solely in respect of any assets or property that constitute Prepetition ABL Collateral or the proceeds, products, rents, and profits thereof, junior in right of payment to the Carve Out, the Prepetition ABL 507(b) Claim, and the Prepetition ABL Obligations.

8.    *DIP Liens*.  As security for the DIP Obligations, effective and automatically and properly perfected upon the date of ~~this~~the Interim Order (and ratified and continuing with this Final Order) and without the necessity of the execution, recordation, or filing by the DIP Loan Parties or any of the DIP Secured Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, intellectual property filing or other similar documents, any notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Agent or the other DIP Secured Parties, the following valid, binding, continuing, enforceable and non-avoidable security interests and liens (all security interests and liens granted to the DIP Agent, for its benefit and for the benefit of the other DIP Secured Parties, pursuant to ~~this~~the Interim Order, this Final Order, and the DIP Documents, the "DIP Liens") ~~are~~were, by the Interim Order, and hereby are, granted on a final basis to the DIP Agent for its own benefit and the benefit of the other DIP Secured Parties (all property in clauses (a) through (e), below being collectively referred to as the "DIP Collateral" with the relative priorities of the various liens as set forth in **Exhibit 1**):

(a)    *Liens on Unencumbered Property*.  Subject and subordinate only to the Carve Out and pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing,

enforceable, fully-perfected first priority senior security interest in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and ~~non~~ non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the DIP Loan Parties (whether maintained with any of the DIP Secured Parties or otherwise) and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, proceeds of commercial tort claims and proceeds of claims that may constitute commercial tort claims (known and unknown) (but not the commercial tort claims themselves), chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (the "Unencumbered Property"), in each case other than the Avoidance Actions, but for the avoidance of doubt, ~~and, subject to entry of the Final Order granting such relief,~~ "Unencumbered Property" shall include the Avoidance Proceeds; *provided that* (a) the DIP Roll-Up Obligations shall not be secured by the Avoidance Proceeds or the proceeds of commercial tort claims of the DIP Loan Parties and (b) the DIP Secured Parties shall exercise commercially reasonable efforts to collect

from the proceeds of the other assets of the Debtors (or their estates) first before turning to any Avoidance Proceeds or the proceeds of commercial tort claims.   For the avoidance of doubt, Unencumbered Property does not include ABL Priority Collateral.  Notwithstanding anything in ~~this~~the Interim Order, this Final Order, or the DIP Documents to the contrary, in no event shall DIP Collateral (and the DIP Liens and Adequate Protection Liens thereon) include: (a) any leasehold interest in non-residential real property that prohibits or restricts the granting of liens thereon (except as permitted pursuant to applicable non-bankruptcy law), but shall include the proceeds of the sale or other disposition of such leases; (b) any security deposits held by a landlord under any non-residential real property lease or the Debtors' interest in any pre-paid rent under any such lease (but shall include the Debtors' revisionary interests therein), in each case, unless such lien is expressly permitted under such lease and (c) any other "Excluded Property" (as defined in the DIP Documents).

    (b)  *Liens Priming Certain Prepetition Secured Parties' Liens*.   Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest (in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties (the "DIP Priming Liens") of the same nature, scope, and type as the Pari First Lien Priority Collateral (the "DIP Priority Collateral") wherever located.  Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be subject only to (i) the Carve Out, and (ii) Prepetition Permitted Senior Liens, and the DIP Priming Liens shall be (A) senior in all respects to the other Prepetition Liens on DIP Priority Collateral, (B) senior to any Adequate Protection Liens (as defined herein) on DIP Priority Collateral, and (C) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition Liens with

respect to the Pari First Lien Collateral shall be primed by and made subject and subordinate to the DIP Priming Liens.

(c)        *Junior Liens Priming Certain Prepetition Secured Parties' Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior priority priming security interest in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties that is ABL Priority Collateral, regardless of where located, which security interest and lien shall prime the Pari First Liens on the ABL Priority Collateral (the "DIP Priming Second Liens").  Notwithstanding anything herein to the contrary, the DIP Priming Second Liens shall be subject and subordinate only to (i) the Carve Out, (ii) Prepetition Permitted Senior Liens, and (iii) solely with respect to ABL Priority Collateral, the Prepetition ABL Liens and the ABL Adequate Protection Liens (in each case of this clause (iii), solely to the extent the Prepetition ABL Obligations have not been Paid in Full), and the DIP Priming Second Liens shall be (A) senior in all respects to the Prepetition Liens on ABL Priority Collateral other than the Prepetition ABL Liens, (B) senior to any Adequate Protection Liens on ABL Priority Collateral other than the ABL Adequate Protection Liens, and (C) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Pari First Liens with respect to the ABL Priority Collateral shall be primed by and made subject and subordinate to the DIP Priming Second Liens.

(d)        *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the DIP Loan Parties that, on or as of the Petition Date, is subject to either (i) valid, perfected and non-avoidable

Prepetition Permitted Senior Liens, or (ii) valid and non-avoidable Prepetition Permitted Senior Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code, which shall be immediately junior and subordinate only to any such Prepetition Permitted Senior Liens and the Carve Out but (y) (1) senior to the Pari First Liens and the Pari First Lien Adequate Protection Liens (as defined below) on all Pari First Lien Priority Collateral subject to such Prepetition Permitted Senior Liens and (2) junior to the ABL Adequate Protection Liens and the Prepetition ABL Liens but senior to the Pari First Lien Adequate Protection Liens (as defined below) and the Pari First Liens on all ABL Priority Collateral subject to such Prepetition Permitted Senior Liens; and

(e)      *Liens Senior to Certain Other Liens*.  Subject to the Carve Out, the DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this ~~Interim~~Final Order, any lien, security interest or claim heretofore or hereinafter granted in any of the chapter 11 cases or any Successor Cases, including any lien or security interest granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, or (C) any intercompany or affiliate liens of the DIP Loan Parties or security interests of the DIP Loan Parties; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code; *provided* that solely with respect to the ABL Priority Collateral, the DIP Liens and the Superpriority DIP Claims shall have the priority set forth in **Exhibit 1** attached hereto.

9.      *Exclusion of SCF Collateral Account from DIP Collateral*.    Notwithstanding anything to the contrary in this ~~Interim~~Final Order or any of the DIP Documents, all funds held in the account established by the Debtors in connection with their supply chain financing program (the "SCF Program"), and maintained pursuant to that certain Amended and Restated Open Account Processing Agreement, dated as of July 26, 2023, by and between Wells Fargo Bank, N.A. and At Home Procurement Inc. (as amended by that certain Waiver and First Amendment to Amended and Restated Open Account Processing Agreement, dated as of June 12, 2025, and as further amended or modified from time to time in accordance with the terms thereof, the "SCF Agreement") (such account, the "SCF Collateral Account"), shall be excluded from the DIP Collateral for all purposes under the DIP Orders and the DIP Documents.  The DIP Liens and DIP Superpriority Claims shall not attach to, and the DIP Secured Parties shall have no lien upon, security interest in, or claim against, the SCF Collateral Account or any cash, funds, or other amounts maintained therein, provided that such funds are used exclusively in connection with the operation and administration of the SCF Program in the ordinary course of business.

10.      *No Obligation to Extend Credit*.  Subject to the Carve Out, the DIP Secured Parties shall have no obligation to make any loan or advance or purchase any note under the DIP Documents unless all of the conditions precedent under the DIP Documents, including this ~~Interim~~Final Order, have been satisfied in full or waived by the Required DIP Lenders, as applicable and, in accordance with the terms of the relevant DIP Documents.

11.      *No Monitoring Obligation*.  The DIP Secured Parties shall have no obligation or responsibility to monitor the Debtors' use of the DIP Financing, and the DIP Secured Parties may rely upon the Debtors' representation that the use of the DIP Financing at any time is in accordance with the requirements of this ~~Interim~~Final Order and the other DIP Documents.

12.    _Events of Default_.    The occurrence and continuance of any Event of Default (as defined in the DIP Credit Agreement) shall, after notice by the DIP Agent (acting at the direction of Required DIP Lenders in accordance with the terms of this ~~Interim~~Final Order) in writing to the Debtors, counsel to the Debtors, counsel to any statutory committee appointed in these chapter 11 cases, and the U.S. Trustee, constitute an event of default under this ~~Interim~~Final Order, enforceable solely by the DIP Secured Parties (each an "Event of Default").

13.    _Protection of DIP Lenders' and Prepetition ABL Secured Parties' Rights_.

(a)    So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding DIP Commitments under the DIP Documents, the Prepetition Secured Parties shall subject to the applicable Intercreditor Agreement:  (i) other than the Prepetition ABL Secured Parties with respect to the ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full), have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Documents or this ~~Interim~~Final Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral, including in connection with the Adequate Protection Liens; (ii) other than with respect to ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full), be deemed to have consented to any transfer, disposition or sale of, or release of liens on, the DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent the transfer, disposition, sale or release is authorized under the DIP Documents or consented to by the Required DIP Lenders under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than as necessary to give effect

to this ~~Interim~~Final Order, other than, (x) solely as to this clause (iii), the applicable agent under the Prepetition Credit Documents filing financing statements or other documents to perfect the liens granted pursuant to ~~this~~the Interim Order, this Final Order, or the DIP Documents, or (y) as may be required by applicable state law or foreign law to complete a previously commenced process of perfection or to continue the perfection of valid and non-avoidable liens or security interests existing as of the Petition Date; and (iv) other than with respect to ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full), deliver or cause to be delivered, at the DIP Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or court-approved disposition.

(b)    Except with respect to the Prepetition ABL Secured Parties with respect to the ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full), to the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders, and such Prepetition Secured Party and the applicable Prepetition Agent shall, other than the Prepetition ABL Secured Parties with respect to the ABL Priority Collateral, comply with the instructions of the DIP Agent with respect to the exercise of such control.

(c)      Except with respect to the Prepetition ABL Secured Parties with respect to the ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full) any proceeds of Prepetition Collateral subject to the DIP Priming Liens received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by any of the Prepetition Agents, shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements. Except with respect to the Prepetition ABL Secured Parties with respect to the ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full), any proceeds of Prepetition Collateral subject to DIP Liens ranking *pari passu* to the Prepetition Liens received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by any of the Prepetition Agents, shall be segregated and held in trust and forthwith paid over to the DIP Agent in the same form as received with any necessary endorsements for application in accordance with this ~~Interim~~Final Order.  Except with respect to the ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full), the DIP Agent is hereby authorized to make any such endorsements as agent for each of the Prepetition Agents or any such Prepetition Secured Parties. The authorizations in this paragraph are coupled with an interest and are irrevocable.

(d)      Until Payment in Full of the Prepetition ABL Obligations, solely with respect to the ABL Priority Collateral, the enforcement rights of the DIP Secured Parties or Prepetition Secured Parties (other than the Prepetition ABL Secured Parties) with respect to ABL Priority Collateral shall be subject to the terms of the Prepetition ABL Intercreditor Agreement as

if the DIP Agent was party thereto as Equal Priority Collateral Agent and Intercreditor Agent (each as defined in the Prepetition ABL Intercreditor Agreement).

(e)    The Automatic Stay is hereby modified to the extent necessary to permit the DIP Agent (acting at the direction of the Required DIP Lenders) to take any or all of the following actions, at the same time or different times, in each case without further order or application of the Court, but subject to the terms of this ~~Interim~~Final Order, including, without limitation, the funding of the Carve Out and the Remedies Notice Period (as defined herein), and immediately upon the occurrence of an Event of Default (i) deliver a notice of an Event of Default to the Debtors; (ii) declare the termination, reduction, or restriction of any further DIP Commitment to the extent any such DIP Commitment remains unfunded; (iii) declare the termination of the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations); (iv) declare all applicable DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors; and (v) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (other than Cash Collateral that constitutes ABL Priority Collateral); *provided* that, such declarations shall be subject to the Carve Out and effective five (5) business days following delivery of a notice of an Event of Default by the DIP Agent to the Debtors (and their lead restructuring counsel); (any such declaration of the foregoing (i) through (v), a "<u>DIP Termination Declaration</u>" and the date of such DIP Termination Declaration, the "<u>DIP Termination Declaration Date</u>").  The DIP Termination Declaration shall be given by electronic mail (or other electronic means) to the Debtors (and their lead restructuring counsel), counsel to ~~a~~<u>the</u> Creditors' Committee ~~(if appointed)~~, counsel to the Prepetition ABL Agent, and to the U.S. Trustee.  The Automatic Stay

otherwise applicable to the DIP Agent, the DIP Lenders, and the Pari First Lien Secured Parties shall be modified so that, five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"): (A) the DIP Agent acting at the direction of the Required DIP Lenders shall be entitled to exercise its rights and remedies in accordance with the respective DIP Documents and the DIP Orders and shall be permitted to satisfy the relevant DIP Obligations, Superpriority DIP Claims and DIP Liens, subject to the Carve Out, and Prepetition ABL Intercreditor Agreement, and the Prepetition Permitted Senior Liens (if any), (B) the applicable Pari First Lien Secured Parties shall be entitled to exercise their rights and remedies to satisfy their respective Pari First Lien Obligations, Pari First Lien Adequate Protection Obligations, Pari First Lien 507(b) Claims, and Pari First Lien Adequate Protection Liens, in each case (A) and (B), subject to and consistent with (i) the Carve Out, (ii) the rights of the Prepetition ABL Secured Parties in respect of the ABL Priority Collateral (in each case, to the extent the Prepetition ABL Obligations have not been Paid in Full), (iii) the DIP Orders, (iv) the DIP Documents, (v) the Prepetition ABL Intercreditor Agreement and (vi) any Prepetition Permitted Senior Liens, as applicable.  Following expiration of the Remedies Notice Period, whether or not the maturity of any of the DIP Obligations shall have been accelerated, the Automatic Stay imposed under section 105 or section 362(a) of the Bankruptcy Code or otherwise will automatically be terminated with respect to the DIP Secured Parties and the Pari First Lien Secured Parties, unless (a) the DIP Agent (acting at the direction of the Required DIP Lenders), the Required DIP Lenders, or the Pari First Lien Secured Parties that hold at least a majority of Pari First Lien Obligations, as applicable, elect otherwise in a written notice to the Debtors and/or (b) the Court ~~has determined that an Event of Default has not occurred and/or is not continuing or the Court~~ orders otherwise.  Following expiration of the Remedies Notice Period and termination of

the Automatic Stay, the DIP Agent, the DIP Lenders, and the Pari First Lien Secured Parties shall, subject to the Prepetition ABL Intercreditor Agreement, be permitted to proceed to protect, enforce and exercise all other rights and remedies provided for in the DIP Documents and the Pari First Lien Debt Documents, and under applicable law, including, but not limited to, by (w) bringing any action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in any such DIP Document or Pari First Lien Debt Document or any instrument pursuant to which such DIP Obligations or Pari First Lien Obligations are evidenced, (x) subject to the rights of the Prepetition ABL Secured Parties and the Prepetition ABL Intercreditor Agreement, foreclosing on all of or any portion of the DIP Collateral or Pari First Lien Collateral including freezing any Cash Collateral held in the Debtors' accounts (in each case, except to the extent constituting ABL Priority Collateral, including the Controlled Accounts and ABL True Up Account), (y) immediately setting-off any and all amounts in accounts maintained by the Debtors (other than to the extent constituting ABL Priority Collateral, including the Controlled Accounts and ABL True Up Account) against the DIP Obligations or the Pari First Lien Obligations, or otherwise enforcing any and all rights against any DIP Collateral or Pari First Lien Collateral in the possession of the DIP Agent, the Pari First Lien Agents, or otherwise, including, without limitation, disposition of the DIP Collateral or the Pari First Lien Collateral and application of net cash proceeds thereof to satisfaction of the DIP Obligations and the Pari First Lien Obligations, and (z) subject to the Prepetition ABL Intercreditor Agreement, taking any other actions or exercising any other rights or remedies permitted under the DIP Orders, the DIP Documents, the Pari First Lien Debt Documents or applicable law, other than with respect to the ABL Priority Collateral (until the Prepetition ABL Obligations have been Paid in Full) in each case without further notice to or order of the court unless the Debtors, the Creditors' Committee (if

appointed), and/or any other party in interest have obtained an order of the Court preventing such action.  During the Remedies Notice Period, (i) the Debtors shall be prohibited from requesting any further draws under the DIP Facility (subject to the Carve Out) and (ii) the Debtors, the Creditors' Committee (if appointed), and/or any other party in interest shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court solely to contest whether an Event of Default has occurred and is continuing and the DIP Agent (acting at the direction of the Required DIP Lenders in accordance with the terms of this InterimFinal Order), the Required DIP Lenders and the Pari First Lien Secured Parties shall consent to such emergency hearing; provided that if a request for such hearing is made prior to the end of the Remedies Notice Period, then the Remedies Notice Period will be continued until the Court hears and rules with respect thereto.  For the avoidance of doubt, the DIP Agent, the DIP Lenders, and the Pari First Lien Secured Parties shall not exercise any rights or remedies while the hearing is pending.  Except as expressly provided for in the DIP Orders, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agent, the DIP Lenders, the Pari First Lien Secured Parties, or the Prepetition ABL Secured Parties.  The foregoing shall be subject to the Prepetition ABL Intercreditor Agreement.  Notwithstanding anything to the contrary herein, the DIP Agent, the DIP Lenders, the Pari First Lien Secured Parties, or the Pari First Lien Agents may only enter upon a leased premises of the Debtors following an Event of Default and expiration of the Remedies Notice Period in accordance with: (a) any agreement in writing between the DIP Agent, the DIP Lenders, the Pari First Lien Secured Parties, or the Pari First Lien Agents and any applicable landlord; (b) pre-existing rights of the DIP Agent, the DIP Lenders, the Pari First Lien Secured Parties, or the Pari First Lien Agents under

applicable law; (c) consent of the applicable landlord; or (d) further order of this Court following notice and a hearing; *provided*, *however*, that counterparties to unexpired leases reserve any and all rights pursuant to section 365(d)(3) of the Bankruptcy Code and similar laws.

(f)       No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of ~~this~~the Interim Order, this Final Order, or the DIP Documents shall be limited, modified or impaired in any way by:  (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

14.       *ABL Cash Collateral Termination Events and Modification of the Automatic Stay*. Immediately upon the occurrence of an ABL Cash Collateral Termination Event (as defined below), the Automatic Stay is hereby modified to the extent necessary to permit the Prepetition ABL Agent to take any or all of the following actions, at the same time or different times, in each case without further order or application of the Court, but subject to the terms of this ~~Interim~~Final Order, including, without limitation, the Carve Out and the ABL Remedies Notice Period (as defined herein):  (i) deliver a notice of an ABL Cash Collateral Termination Event to the Debtors; (ii) declare all applicable Prepetition ABL Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors; (iii) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral that constitutes ABL Priority Collateral; *provided* that, such declaration shall be effective five (5) Business Days following delivery of an ABL Termination Declaration (as defined below); and (iv) at any time going forward by written email notice (the "Designation Notice") to

counsel of the Debtors designating some or all of the Debtors' non-Closing Stores (as defined in the Store Closing Motion) to be closed and the assets therein sold in accordance with the Sale Guidelines (as defined in the Store Closing Motion) (such designated Stores and Distribution Centers, the "Designated Stores"), at which time, after the later of (A) the expiration of the ABL Remedies Notice Period and (B) the date of delivery of the applicable Designation Notice, the Agent (as defined in the Store Closing Motion) shall have initiated "Sales" (as defined in the Store Closing Motion) at such Designated Stores; (any such declaration of the foregoing (i) through (iv), an "ABL Termination Declaration" and the date of such ABL Termination Declaration, the "ABL Termination Declaration Date", and together with the DIP Termination Declaration Date, the "Termination Declaration Date").  The ABL Termination Declaration shall be given by electronic mail (or other electronic means) to the Debtors (and their lead restructuring counsel), counsel to a Creditors' Committee, to the U.S. Trustee, counsel to each of the Pari First Lien Agents, counsel to the Ad Hoc Group, and counsel to the DIP Agent.  The Automatic Stay otherwise applicable to the Prepetition ABL Agent and the Prepetition ABL Secured Parties shall be modified so that, five (5) business days after the date an ABL Termination Declaration is delivered (the "ABL Remedies Notice Period"):  (A) the Prepetition ABL Agent shall be entitled to exercise its rights and remedies in respect to the ABL Priority Collateral in accordance with the respective Prepetition ABL Credit Documents and the DIP Orders and shall be permitted to satisfy the relevant Prepetition ABL Obligations, the Prepetition ABL 507(b) Claim and Prepetition ABL Liens.  Following expiration of the ABL Remedies Notice Period, the Automatic Stay imposed under section 362(a) of the Bankruptcy Code shall automatically be terminated with respect to the Prepetition ABL Secured Parties, unless (a) the Prepetition ABL Agent elects otherwise in a written notice to the Debtors (email from counsel being sufficient), or (b) the Court has determined

that an ABL Cash Collateral Termination Event has not occurred and/or is not continuing, or (c) the Court orders otherwise.  Following expiration of the ABL Remedies Notice Period and termination of the Automatic Stay, the Prepetition ABL Agent and the Prepetition ABL Secured Parties shall, subject to the Prepetition ABL Intercreditor Agreement, be permitted to proceed to protect, enforce, and exercise all other rights and remedies provided for in the Prepetition ABL Credit Documents, and under applicable law, including, but not limited to, by (w) bringing any action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in any such Prepetition ABL Credit Document or any instrument pursuant to which such Prepetition ABL Obligations are evidenced, (x) subject to the rights of the DIP Secured Parties and the Pari First Lien Secured Parties and the Prepetition ABL Intercreditor Agreement, foreclosing on all of or any portion of the Prepetition ABL Collateral including freezing any Cash Collateral that constitutes ABL Priority Collateral held in the Debtors' accounts, (y) immediately setting off any and all amounts in the Controlled Accounts, Collateral Agent Account, ABL True Up Account or any other accounts maintained by the Debtors (to the extent such funds in such account constitute ABL Priority Collateral) against the Prepetition ABL Obligations, or otherwise enforcing any and all rights against any Prepetition ABL Priority Collateral in the possession of the Prepetition ABL Agent, or otherwise, including, without limitation, disposition of the Prepetition ABL Priority Collateral and application of net cash proceeds thereof to satisfaction of the Prepetition ABL Obligations, and (z) taking any other actions or exercising any other rights or remedies permitted under the DIP Orders, the Prepetition ABL Credit Documents, or applicable law, in each case, without further notice to or order of the Court unless the Debtors, the Creditors' Committee (if appointed), and/or any other party in interest have obtained an order of the Court preventing such action.  During the ABL Remedies

Notice Period, (A) the Debtors, the Creditors' Committee (if appointed), and/or any other party in interest shall be entitled to seek an emergency hearing within the ABL Remedies Notice Period with the Court solely to contest whether ABL Cash Collateral Termination Event has occurred and is continuing and the Prepetition ABL Agent and the Required Prepetition ABL Lenders shall consent to such emergency hearing; *provided* that if a request for such hearing is made prior to the end of the ABL Remedies Notice Period, then the ABL Remedies Notice Period will be continued until the Court hears and rules with respect thereto and (B) the Debtors shall be authorized to use Cash Collateral constituting ABL Priority Collateral solely to the extent necessary to avoid immediate irreparable harm.  For the avoidance of doubt, the Prepetition ABL Agent and the Prepetition ABL Secured Parties shall not exercise any rights or remedies while such hearing is pending.  Except as expressly provided for in the DIP Orders, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Prepetition ABL Agent or the Prepetition ABL Secured Parties.  This paragraph 14 shall be subject to the Prepetition ABL Intercreditor Agreement.  The below events each shall constitute an "ABL Cash Collateral Termination Event"), unless waived by the Prepetition ABL Agent and the requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement:

(i)      The termination of the DIP Commitments, other than in connection with a draw of New Money Commitments or a mandatory prepayment of the DIP Loans that the Required DIP Lenders determine to address through a reduction in DIP Commitments;

(ii)      The DIP Lenders' failure to fund (1) the Initial Draw within five (5) calendar days of the Petition Date, or (2) each additional projected draw of loans under the DIP Facility as and when (and in at least the amount) set forth in the Initial Approved Budget (or, as

applicable, any other Approved Budget to which the Prepetition ABL Agent has consented to in writing in its reasonable discretion); *provided* that each additional draw subject to (2) above may be extended by five (5) Business Days if during such period (A) the Borrowers satisfy the conditions precedent to borrow additional Tranche A DIP Loans and (y) the Debtors' unrestricted cash does not fall below $45 million as a result of such failure to fund;

(iii)    The DIP Credit Agreement shall be modified in any manner (by amendment or otherwise) which limits or restricts in any material respect the requirement that any unfunded amounts of all DIP Commitments be funded no later than one (1) Business Day prior to the date that an Acceptable Plan is effective (as provided in Section 2.3(a) of the DIP Credit Agreement as in effect on the date hereof);

(iv)    The Debtors' use of the Cash Collateral constituting ABL Priority Collateral in any manner that is not in accordance with the Approved Budget or that is otherwise prohibited by the DIP Orders, unless the Required DIP Lenders have waived or modified the Approved Budget and/or the Prohibited Variances contained therein;

(v)    The delivery of a DIP Termination Declaration by the DIP Agent;

(vi)    The termination of the RSA for any reason other than the occurrence of the Plan Effective Date (as defined in the RSA);

(vii)    The filing of any chapter 11 plan that does not result in the Payment in Full of the Prepetition ABL Obligations on the effective date of such plan, unless the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement has consented in writing to the filing of such a plan prior to the date of filing;

(viii)    The Court's entry of an order (i) terminating or modifying the exclusive right of the Debtors to file a plan under section 1121 of the Bankruptcy Code,

(ii) appointing a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3)–(4) of the Bankruptcy Code (but not including the appointment of a fee examiner to assist in reviewing applications for compensation by professionals), (iii) dismissing any of the Debtors' chapter 11 cases, or (iv) converting any of the Debtors' chapter 11 cases to a case under chapter 7 of the Bankruptcy Code;

(ix)    The Debtors' failure to make any payment of interest, fees or expenses owed to the Prepetition ABL Agent on its own behalf or on behalf of the Prepetition ABL Secured Parties pursuant to this ~~Interim~~Final Order within two (2) Business Day after such payment becomes due (for the avoidance of doubt, excluding ABL Adequate Protection Fees and Expenses);

(x)    The Debtors' failure to fund the ABL True Up Account in accordance with the terms of this ~~Interim~~Final Order within two (2) Business Days of a True Up Event;

(xi)    The Debtors' failure to deliver any Borrowing Base Certificate within one (1) Business Day~~s~~ after the date which such Borrowing Base Certificate is required to be delivered under this ~~Interim~~Final Order;

(xii)    The filing by any Debtor of a motion or pleading to stay, vacate, reverse, amend or modify this ~~Interim~~Final Order, or the stay, reversal, vacation, amendment, or modification of this ~~Interim~~Final Order, each of the foregoing in a manner materially adverse to the Prepetition ABL Secured Parties without the prior written consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement;

(xiii)    The Debtors' failure to timely comply with the ABL Milestones set forth on **Exhibit 2** hereto;

(xiv)   The closure of any stores other than the store closures authorized at the outset of these chapter 11 cases pursuant to the order approving the Store Closing Motion,[89] as may be supplemented from time to time solely with the prior written consent of the Prepetition ABL Agent (collectively, the "Initial Store Closures" or otherwise with the prior written consent of the Prepetition ABL Agent, the "Permitted Store Closures");

(xv)   Any sale of ABL Priority Collateral (other than with respect to the Permitted Store Closings and sales of inventory in the ordinary course of business) without the prior written consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement;

(xvi)   Any Debtor attempts to invalidate or reduce the Prepetition ABL Secured Obligations, other than by payment thereof;

(xvii)   The Prepetition ABL Liens, the ABL Adequate Protection Liens, or the ABL 507(b) Claims cease to be valid, perfected and enforceable in all respects;

(xviii)   The Debtors create, incur, or suffer to exist any claim or lien on ABL Priority Collateral that is *pari passu* with or senior to the ABL Adequate Protection Liens or the ABL 507(b) Claims, other than the Carve Out, while any portion of the Prepetition ABL Obligations or the payment obligations set forth in paragraphs 20(f) and 20(g) of this ~~Interim~~Final Order (the "ABL Adequate Protection Payments") remains outstanding, or the Court grants any application by any party seeking payment of any claim on a superpriority administrative claim basis with respect to the ABL Priority Collateral *pari passu* with or senior to the ABL 507(b)

---

[89]   "Store Closing Motion" means the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, (III) Modifying Customer Programs at the Closing Stores, and (IV) Granting Related Relief* [Docket No. 15].

Claims, other than the Carve Out, without the prior written consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement;

(xix)    The filing by any Debtor of any motion, pleading, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of the Prepetition ABL Liens securing the Prepetition ABL Obligations or asserting any other cause of action against and/or with respect to the Prepetition ABL Obligations, any Prepetition ABL Secured Party's claim in respect of such Prepetition ABL Obligations, or the Prepetition ABL Collateral securing such Prepetition ABL Obligations (or the Debtors' support of any such motion, pleading, application, or adversary proceeding commenced by any third party);

(xx)    The filing by any Debtor of any application, motion or borrowing request seeking to: incur, without the prior written consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement, any indebtedness from any party secured by a lien on, or, otherwise having a claim against or recourse to, as the case may be, the Debtors, the Prepetition Collateral or the DIP Collateral, unless, with respect to the ABL Priority Collateral, such liens or claims are junior and subordinated in all respects to the Prepetition ABL Liens, the Prepetition ABL Obligations, the ABL Adequate Protection Liens, and the ABL 507(b) Claims (or the Debtors' support of any such motion, pleading, application, or adversary proceeding commenced by any third party);

(xxi)    The filing by any Debtor of a motion or pleading seeking an order, or the entry of an order by the Court or any other court of competent jurisdiction (i) approving claims for recovery of amounts with respect to ABL Priority Collateral under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation or the disposition of the ABL Priority Collateral; (ii) avoiding or requiring repayment of any portion of the ABL

Adequate Protection Payments made by or on behalf of the Debtors hereunder; or (iii) seeking use of Cash Collateral that is ABL Priority Collateral other than as set forth herein without the consent of the Prepetition ABL Agent and requisite Prepetition ABL Lenders under the Prepetition ABL Credit Agreement (or the Debtors′ support of any such motion, pleading, application or adversary proceeding commenced by any third party); and

(xxii) The Debtor's failure to timely satisfy any Milestones as (defined in the DIP Credit Agreement as in effect on the date hereof) as and when required unless extended by the Required DIP Lenders in accordance with the DIP Documents or otherwise ordered by the Court; *provided* that in the event the DIP Milestones in respect of the (x) final hearing to approve the DIP Facility or (y) the filing of the Plan and Disclosure Statement are extended by the DIP Lenders by more than ten (10) business days from the date set forth in the DIP Credit Agreement on the Closing Date, then an ABL Cash Collateral Termination Date shall occur if such DIP Milestone, with respect to (x) or (y) has not been satisfied within (10) business days from the date set forth in the DIP Credit Agreement on the Closing Date.

15.    *Limitation on Charging Expenses Against Collateral*. ~~Subject to entry of the Final Order granting such relief, e~~Except to the extent of the Carve Out (other than with respect to ABL Priority Collateral), no costs or expenses of administration of the chapter 11 cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or Prepetition Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or Prepetition Agent, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, the DIP Secured Parties, Prepetition

Agents, any Prepetition Secured Party, and nothing contained in this ~~Interim~~Final Order shall be deemed to be a consent by the DIP Agent, the other DIP Secured Parties, each Prepetition Agent or the other Prepetition Secured Parties to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

16.      *No Marshaling*.  ~~Subject to entry of the Final Order granting such relief~~Except as expressly set forth herein, in no event shall the DIP Agent, the other DIP Secured Parties, any Prepetition Agent or the other Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Secured Obligation, or the Prepetition Collateral.  Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to each Prepetition Agent or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any Prepetition Collateral.

17.      *Payments Free and Clear*.  Any and all payments or proceeds applied to pay or, remitted for payment of, DIP Obligations or Adequate Protection Obligations pursuant or in accordance with the provisions of the Interim Order, this Final Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by through or on behalf of the Debtors; *provided* that (1) in the case of any such payments made with proceeds of ABL Priority Collateral (other than payment of reasonable and documented out-of-pocket postpetition costs and expenses pursuant to or in accordance with the provisions of this ~~Interim~~Final Order) such payments shall be subject to the Prepetition ABL Intercreditor Agreement and (2) no such payments shall be made with proceeds of ABL Priority

70

Collateral without the consent of the Prepetition ABL Agent after the occurrence of an ABL Cash Collateral Termination Event and any such payment so received shall be subject to the Prepetition ABL Intercreditor Agreement.

18.    *Use of Cash Collateral; Approved Budget*.

(a)    The Debtors are hereby authorized, subject to the terms and conditions of this ~~Interim~~Final Order, to use all Cash Collateral in accordance with the DIP Documents, ~~this~~the Interim Order, this Final Order, and Approved Budget (subject to permitted variances under the DIP Documents); *provided* that (i) the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth, (ii) except on the terms and conditions of this ~~Interim~~Final Order and the DIP Documents, including with respect to the Carve Out, the Debtors shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court, and (iii) nothing herein shall impede the Debtors' ability and entitlement to fund the Carve Out as provided in paragraph 6 hereof.

(b)    Commencing on the second Friday after the Closing Date, and on each Friday thereafter (or the next business day if such Friday is not a business day), the Debtors shall deliver to the DIP Agent (and the Creditors' Committee) a variance report for the immediately preceding Variance Period[910] comparing the actual cash receipts and cash disbursements of the Debtors, during such Variance Period, on a line-item basis, from the values set forth in the Approved Budget (each, a "Budget Variance Report") with an explanation of each Prohibited Variance (as defined below) and each Prohibited Professional Fee Variance (as defined below), if any, accompanied by an officer's certificate attesting to the truth and accuracy in all material

---

[910]    "Variance Period" shall mean each rolling cumulative four-week period; provided that with respect to any Variance Period that would commence prior to the Closing Date, such Variance Period shall only include the period of time from and after the Closing Date.

respects of such Budget Variance Report.  The Borrower and each other Credit Party shall not permit (i) (1) (x) actual "Total Receipts" for the initial Variance Period (which, for avoidance of doubt shall end on the second Friday after the Closing Date (the "Initial Variance Period")) to be less than 82.5% of forecasted "Total Receipts" set forth in the Approved Budget for such Variance Period and (y) actual "Total Operating Disbursements" to be more than 117.5% of forecasted "Total Operating Disbursements" set forth in the Approved Budget for the Initial Variance Period and (2) (x) actual "Total Receipts" for the each Variance Period after the Initial Variance Period to be less than 87.5% of forecasted "Total Receipts" set forth in the Approved Budget for such Variance Period and (y) actual "Total Operating Disbursements" to be more than 112.5% of forecasted "Total Operating Disbursements" set forth in the Approved Budget for the each Variance Period after the Initial Variance Period (any such variance, a "Prohibited Variance"); *provided* that, for the avoidance of doubt, "Total Operating Disbursements" shall exclude Restructuring Professional Fees[1011] and fees payable to Hilco Real Estate, LLC ("Hilco") and any advisor to the Lenders; and (ii) actual "Total Pro Fee Cash Payments"[1112] since the Closing Date to the date of such Budget Variance Report to be more than 110% of forecasted "Total Pro Fee Cash Payments" set forth in the Initial Approved Budget through the date of such Budget Variance Report (any such variance, a "Prohibited Professional Fee Variance," *provided* that neither the Approved Budget nor any Prohibited Professional Fee Variance will operate as a cap on any

---

[1011]  "Restructuring Professional Fees" shall mean the Debtors' projected or actual (as the case may be) disbursements in respect of restructuring professional fees (including, without limitation, payments made to the secured parties on account of professional fees and professional fee payments to other creditors or creditor groups) during the applicable Variance Period.

[1112]  "Total Pro Fee Cash Payments" shall mean the aggregate payments made to all professionals included in the line item having same name in the Initial Approved Budget; *provided* that any payments made to (w) Hilco, (x) any advisor to the DIP Lenders, (y) any advisor to the Prepetition ABL Agent, and (z) any professionals retained by the Debtors pursuant to the OCP Motion, in each case, shall not be included in Total Professional Fee Cash Payment.

professional fees incurred by the Debtor Professionals or the Committee Professionals).  Until replaced by an updated Approved Budget, the prior Approved Budget shall remain in effect.

19. *Disposition of DIP Collateral*.  The DIP Loan Parties shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, without the prior written consent of the DIP Agent and the Required DIP Lenders (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent or the Required DIP Lenders, or an order of this Court), except:  (i) for sales of the Debtors' inventory in the ordinary course of business as permitted by the DIP Documents; (ii) prior to the occurrence of an ABL Cash Collateral Termination Event, sales, transfers, or dispositions of the ABL Priority Collateral, which have been consented to by the Prepetition ABL Agent (and, at any time prior to a Cash Collateral Termination Event, the Required DIP Lenders) and after the occurrence of an ABL Cash Collateral Termination Event, sales, transfers, or dispositions of the ABL Priority Collateral, which have been consented to by the Prepetition ABL Agent; (iii) as otherwise not prohibited by the DIP Documents and this ~~Interim~~Final Order; (iv) as otherwise permitted by an order of the Court and consented to by the Required DIP Lenders; or (v) included in the Approved Budget (subject to permitted variances under the DIP Documents).  If the Required DIP Lenders consent to a transfer of DIP Collateral free and clear of the DIP Liens, then (i) such DIP Collateral shall also be transferred free and clear of all Adequate Protection Liens (other than the ABL Adequate Protection Liens with respect to ABL Priority Collateral) and (ii) to the extent the DIP Liens attach to the proceeds of such transfer, such released Adequate Protection Liens shall also attach to such proceeds in accordance with the priorities set forth herein and reflected in **Exhibit 1.**

20. *Adequate Protection of Prepetition Secured Parties*.  Pursuant to sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, the Prepetition Secured Parties are entitled to

adequate protection of their respective interests in the Prepetition Collateral (including Cash Collateral) (the "Adequate Protection Rights").  In consideration of the foregoing, each Prepetition Agent, as applicable, and for the benefit of the applicable Prepetition Secured Parties, was granted pursuant to the Interim Order (which is hereby grantified and continuing with this Final Order) the following as Adequate Protection on account of their Adequate Protection Rights, and as an inducement to the Prepetition Secured Parties to consent to the priming of the Prepetition Liens and use of the Prepetition Collateral (including Cash Collateral) as set forth in this InterimFinal Order (collectively, the "Adequate Protection Obligations"):

(a)    *Pari First Lien Adequate Protection Liens*.  Each of the Pari First Lien Agents, for itself and for the benefit of its applicable Pari First Lien Secured Parties, is hereby granted (effective and perfected upon the date of thisthe Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) on account of its Adequate Protection Rights, for the aggregate diminution in the value of its respective interests in the Prepetition Collateral (including Cash Collateral), if any, from and after the Petition Date for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, including Cash Collateral, the priming of the Prepetition Liens by the DIP Priming Liens pursuant to the DIP Documents, and this InterimFinal Order, the payment of any amounts under the Carve Out or pursuant to this InterimFinal Order or any other order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the Automatic Stay (the "Diminution in Value"), a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (but inexcluding, without limitation, subject to entry of the Final Order granting such relief, the Avoidance Proceeds and the proceeds of commercial tort claims) (the "Pari First

Lien Adequate Protection Liens"), in accordance with the priorities set forth herein and reflected in **Exhibit 1** attached hereto and subject and subordinate to (i) Prepetition Permitted Senior Liens, (ii) the Carve Out, (iii) the DIP Liens, and (iv) and in the case of ABL Priority Collateral, (x) the Prepetition ABL Liens and (y) the ABL Adequate Protection Liens (as defined below).; *provided that* each of the Pari First Lien Agents, for itself and for the benefit of its applicable Pari First Lien Secured Parties, shall exercise commercially reasonable efforts to collect from the proceeds of the other assets of the Debtors (or their estates) first before turning to any Avoidance Proceeds or the proceeds of commercial tort claims.

      (b)      *Pari First Lien Section 507(b) Claim*.  Each of the Pari First Lien Agents, for itself and for the benefit of its applicable Pari First Lien Secured Parties, is hereby granted, subject and subordinate to the Carve Out, an allowed superpriority administrative expense claim on account of such Pari First Lien Secured Parties' Adequate Protection Rights for the Diminution of Value as provided for in section 507(b) of the Bankruptcy Code (the "Pari First Lien 507(b) Claim"), which Pari First Lien 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof in accordance with the priorities set forth herein (including, without limitation, ~~subject to entry of the Final Order granting such relief,~~ the Avoidance Proceeds~~)~~ and proceeds of commercial tort claims)); *provided that* each of the Pari First Lien Agents, for itself and for the benefit of its applicable Pari First Lien Secured Parties, shall exercise commercially reasonable efforts to collect from the proceeds of the other assets of the Debtors (or their estates) first before turning to any Avoidance Proceeds or the proceeds of commercial tort claims.  The Pari First Lien 507(b) Claims shall be subject and subordinate only to (1) the Carve Out, (2) the DIP Superpriority Claims, and (3) solely with respect to the ABL Priority Collateral, the Prepetition ABL Obligations and the Prepetition ABL 507(b) Claim.

(c)      *ABL Adequate Protection Liens*.  The Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders is hereby granted (effective and perfected upon the date of ~~this~~the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), on account of its Adequate Protection Rights for the Diminution of Value a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (but inexcluding~~, without limitation, subject to entry of the Final Order granting such relief, the~~ Avoidance Proceeds and the proceeds of commercial tort claims) (the "ABL Adequate Protection Liens" and, together with the Pari First Lien Adequate Protection Liens, the "Adequate Protection Liens"), in accordance with the priorities set forth in **Exhibit 1** attached hereto, and in the case of the ABL Priority Collateral, senior to all liens other than any applicable Prepetition ABL Permitted Senior Liens, but in the case of DIP Priority Collateral subject and subordinate to (i) the Prepetition Permitted Senior Liens, (ii) the Carve Out, (iii) the DIP Liens, (iv) the Pari First Liens, and (v) the Pari First Lien Adequate Protection Liens~~.~~); *provided that* the Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders, shall exercise commercially reasonable efforts to collect from the proceeds of the other assets of the Debtors (or their estates) first before turning to any Avoidance Proceeds or the proceeds of commercial tort claims.

(d)      *Prepetition ABL Secured Parties' Section 507(b) Claim*.  The Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders, is hereby granted, subject and subordinate to the Carve Out, an allowed superpriority administrative expense claim on account of such Prepetition ABL Secured Parties' Adequate Protection Rights for Diminution of Value as provided for in section 507(b) of the Bankruptcy Code (the "Prepetition ABL 507(b) Claim" and, together with the Pari First Lien 507(b) Claims, the "Adequate Protection 507(b)

Claims"), which Prepetition ABL 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof in accordance with the priorities set forth herein (including, without limitation, ~~subject to entry of the Final Order granting such relief,~~ the Avoidance Proceeds~~)~~ and proceeds of commercial tort claims); *provided that* the Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders, shall exercise commercially reasonable efforts to collect from the proceeds of the other assets of the Debtors (or their estates) first before turning to any Avoidance Proceeds or the proceeds of commercial tort claims. With respect to the ABL Priority Collateral, the Prepetition ABL 507(b) Claim shall be senior to all other claims of any kind. With respect to the DIP Priority Collateral, the Prepetition ABL 507(b) Claim shall be subject and subordinate only to the Carve Out, the DIP Superpriority Claims, the Pari First Lien 507(b) Claims, the Prepetition Permitted Senior Liens, and the prepetition claims of the Pari First Lien Secured Parties.

(e)      *Pari First Lien Secured Parties Adequate Protection Fees and Expenses*. As further adequate protection, subject to the Carve Out as set forth in ~~this~~the Interim Order and the Final Order, the DIP Loan Parties shall provide current cash payments of all reasonable and documented out-of-pocket prepetition and postpetition fees and expenses of: (A) Dechert LLP, legal counsel to the Ad Hoc Group and the DIP Lenders, (B) Evercore Inc., as financial advisor to the Ad Hoc Group and the DIP Lenders, (C) Potter Anderson & Corroon LLP, as local counsel to the Ad Hoc Group and the DIP Lenders, (D) the Pari First Lien Agents and two law firms, one as lead counsel and one as local counsel, to each of the Pari First Lien Agents, (E) Maples and Calder (Cayman) LLP, and, in each case, with respect to the preceding clauses (A) to (E), relating in any way to the provision of legal and financial services related to the DIP Credit Agreement, the Prepetition Secured Obligations, the Debtors, or the chapter 11 cases, and, with respect to any

financial advisors, applicable engagement letters, fee letters, or similar arrangements (such fees and expenses, the "Pari First Lien Adequate Protection Fees and Expenses").  The Pari First Lien Adequate Protection Fees and Expenses shall be subject to the review procedures set forth in paragraph 27 of this ~~Interim~~Final Order.

(f)    *Prepetition ABL Secured Parties' Adequate Protection Fees and Expenses*. As further adequate protection, subject to the Carve Out, the DIP Loan Parties shall provide current cash payments of all reasonable and documented out-of-pocket prepetition and postpetition fees and expenses of, (x) prior to the occurrence of a ABL Cash Collateral Termination Event: (i) Choate, Hall, & Stewart LLP, (ii) Reed Smith LLP, (iii) Berkeley Research Group, LLC, and (iv) Gordon Brothers Asset Advisors, LLC ("GB") and (y) after the occurrence of an ABL Cash Collateral Termination Event, the reasonable and documented out-of-pocket postpetition fees and expenses of the advisors set forth in items (i) through (iv) above, *plus*, at the election of the Prepetition ABL Agent, the reasonable and documented out-of-pocket expenses of an investment banking advisor selected by the ABL Agent (the "ABL Adequate Protection Fees and Expenses" and, together with the Pari First Lien Adequate Protection Fees and Expenses, the "Adequate Protection Fees and Expenses").  The ABL Adequate Protection Fees and Expenses shall be subject to the review procedures set forth in paragraph 27 of this ~~Interim~~Final Order.

(g)    *ABL Postpetition Interest Payments*.  From entry of the Interim Order and continuing after entry of this ~~Interim~~Final Order, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, shall receive current cash payments during the chapter 11 cases of all accrued interest and fees (including Letter of Credit Fees and Fronting Fees) on the Prepetition ABL Obligations under the Prepetition ABL Credit Agreement as such interest and fees become due and payable and as set forth in the following sentence, at the applicable contractual non-default rate

thereunder and in the amounts specified in the Prepetition ABL Credit Agreement, and with default

rate interest with respect to the foregoing to accrue and become payable upon the occurrence of an

ABL Cash Collateral Termination Event.  The interest and fee payment date shall be paid on the

same cadence and in a manner consistent with the prepetition ABL Credit Agreement; *provided* that

~~the Debtors' or,~~ in accordance with paragraph 30, any party in interest's rights are fully reserved to

seek a determination ~~(i)~~ that adequate protection payments (as set forth in this paragraph 20(g))

should be recharacterized under section 506(b) of the Bankruptcy Code as payment on account of the

secured portion of the Prepetition ABL Obligations as of the Petition Date ~~and (ii) with respect to the~~

~~accrual and amount of default interest~~.

      (h)    *ABL ABR Rollover*.  Notwithstanding anything to the contrary herein or in

the Prepetition ABL Credit Agreement, upon the termination of any applicable Interest Period (as

defined in the Prepetition ABL Credit Agreement), each Term SOFR Loan (as defined in the

Prepetition ABL Credit Agreement) shall automatically convert to and be deemed to be an ABR

Loan (as defined in the Prepetition ABL Credit Agreement) for all purposed under the Prepetition

ABL Credit Agreement; provided that no break funding payments shall be payable in connection

therewith.

      (i)    *ABL Cash Collateral Borrowing Base*.  The definition of "Borrowing Base"

used in the determination of any True Up Event or Borrowing Base Shortfall (each as defined

below) shall be the "Borrowing Base" as defined in, and calculated and otherwise determined in

accordance with, the Prepetition ABL Credit Agreement on the date hereof and initially set forth in

the most recent Borrowing Base Certificate (as defined in the Prepetition ABL Credit Agreement)

delivered prior to the Petition Date and thereafter in the most recent Borrowing Base Certificate

delivered prior to any such date of determination, but modified as provided below herein (the

"Cash Collateral Borrowing Base"), *provided* that (x) notwithstanding anything to the contrary in the Prepetition ABL Credit Agreement, the Cash Collateral Borrowing Base shall not otherwise reflect any new or increased reserves or any modifications of eligibility criteria or advance rates (other than (i) increases in reserves resulting from mathematical calculations; (ii) the Store Closing Reserves (as defined herein); (iii) the Lease Reserves (as defined herein); and (iv) reserves that are not "Discretionary Reserves" as defined in the ABL Forbearance Agreement;~~12~~13 *provided* that any such reserves may not be implemented as a result of recommendation of any "Monthly Desktop Appraisal") (for the avoidance of doubt, subject to increase on account of seasonal advance rates in accordance with the Prepetition ABL Credit Agreement) set forth in the Prepetition ABL Credit Agreement, (y) the Cash Collateral Borrowing Base will be calculated using any updated Borrowing Base Certificates (as defined in the Prepetition ABL Credit Agreement) as and when required to be delivered pursuant to paragraph 20(k) below, and (z) the Cash Collateral Borrowing Base shall be increased (on a dollar-for-dollar basis) by the amount of cash then held in the ABL True Up Account (as defined herein).

(j)    ~~(a)~~ *ABL Adequate Protection Information Rights*.  The Debtors shall provide to the Prepetition ABL Agent (and the Creditors' Committee) at the same time as such reporting is provided to the DIP Lenders and/or the DIP Agent all reporting required to be provided to the DIP Lenders or DIP Agent under the DIP Documents.  At the reasonable request of the Prepetition ABL Agent, the Debtors shall cause Hilco to provide the Prepetition ABL Agent with updates and information relating to store closing sales (including performance of such store closing sales), all as reasonably requested by the Prepetition ABL Agent.  Additionally, at the request of the

---

~~12~~13    "ABL Forbearance Agreement" means that Forbearance Agreement and Second Amendment to ABL Credit Agreement dated May 23, 2025 among the At Home Group Inc. and the other Debtors party thereto, the Prepetition ABL Agent, and the Prepetition ABL Lenders party thereto.

Prepetition ABL Agent, the Debtors shall hold weekly lender update calls with the Prepetition ABL Agent and the Prepetition ABL Lenders to discuss, among other things, status of milestones, RSA, financial performance of the Debtors and liquidity projections and budget updates. The Debtors shall provide the Prepetition ABL Agent (and the Creditors' Committee) with all other reporting required under each of the Prepetition ABL Credit Documents when due in accordance with its terms.

(k)    (b) *Borrowing Base Reporting.* On the fourth business day of each week, the Debtors shall deliver to the Prepetition ABL Agent, with copies to the DIP Agent and the Creditors' Committee, a Borrowing Base Certificate, with all the information required to be provided in connection therewith, in each case in the format customarily delivered with each Borrowing Base Certificate delivered prior to the Petition Date, setting forth the Cash Collateral Borrowing Base (i) calculated as of the last day of the immediately preceding calendar week (with weeks, for purpose of the Borrowing Base Certificate, beginning on Sunday and ending on Saturday); (ii) calculated as of the last business day of the immediately preceding fiscal month, twenty calendar days (or, if such day is not a business day, the next business day) following the end of each fiscal month which monthly Borrowing Base Certificates shall reconcile all weekly inventory roll forwards, and (iii) including such Borrowing Base information as necessary for the calculation of reserves; *provided*, *however*, that with respect to the weekly Borrowing Base Certificates required to be delivered under clause (i) above, only the Weekly Back-Up Information[1314] shall be required to be rolled forward on a weekly basis, and each other component that does not constitute Weekly Back Up-Information may be rolled forward on a monthly basis;

---

[1314] "Weekly Back-Up Information" means the following Borrowing Base components (in each case, consistent with the Debtors' past practice under the Prepetition ABL Credit Agreement): eligible credit card accounts, eligible trade accounts, eligible inventory, eligible in-transit inventory and qualified cash.

*provided further*, that the Debtors shall use commercially reasonable efforts to roll forward each input on a weekly basis to the extent practicable.

(l)        (e) *Appraisals*.  Notwithstanding anything to the contrary in the Prepetition ABL Credit Agreement, the Prepetition ABL Agent will not be entitled to request access for and/or request any new inspections, appraisals, and field examinations (including, without limitation, with respect to Prepetition ABL Priority Collateral); *provided* that the Borrower will, and will cause each of the other DIP Loan Parties to, at the prior written request of the Prepetition ABL Agent from time to time, and at the expense of the Debtors, cooperate with the Prepetition ABL Agent (including any appraisers retained by the Prepetition ABL Agent) to (i) permit to be conducted monthly "desktop" Collateral appraisals, including reviews of inventory levels (the foregoing, collectively, "Monthly Desktop Appraisals") (and shall promptly deliver all data and other information necessary for the Prepetition ABL Agent (or any appraisers retained by the Prepetition ABL Agent) to complete the Monthly Desktop Appraisals on or before five (5) business days after the most recent fiscal month then ending (commencing with the fiscal month ending June 30, 2025); and (ii) deliver any information reasonably requested in writing by the Prepetition ABL Agent or its representatives in connection with such appraisals, collateral audits or valuations of the Collateral (subject to the same exclusions set forth in the penultimate sentence of Section 9.2(a) of the Prepetition ABL Credit Agreement).  In the discretion of the Prepetition ABL Agent, the Appraised Liquidation Values set forth in the most recent Monthly Desktop Appraisal shall be used for purposes of calculating the Cash Collateral Borrowing Base as described in paragraph 20(i) above.  Solely to the extent that any field examination is conducted in accordance with this paragraph 20(l), the Prepetition ABL Agent, at the expense of the Debtors, may retain a field examiner to determine the amount of the Landed Cost Reserve and the Debtors shall cooperate with and provide all information reasonably requested by the

Prepetition ABL Agent or the field examiner to determine the amount of the Landed Cost Reserve. Notwithstanding the foregoing, the Prepetition ABL Agent shall be permitted to request access for and/or request any new inspections, appraisals, and field examinations from time to time, at the Prepetition ABL Agent's own expense, for valuation purposes only, which (i) do not impact the calculation of the Cash Collateral Borrowing Base and (ii) do not unreasonably interfere with the ordinary course activities and operations of the Debtors as in effect at such time.

(m) (d) *Store Closing Reserve*.  The Prepetition ABL Agent may implement a reserve against the Cash Collateral Borrowing Base with respect to the remaining inventory located at any store that has commenced a "store closing sale" (a "Closing Store") in an amount to reflect the then prevailing discount with respect to such remaining inventory, which reserve shall be implemented (without duplication of any other reserves implemented under the Prepetition ABL Credit Agreement) commencing as of the final four (4) weeks of such store closing sale (such last four week period to be as determined in accordance either with the applicable pre-store closing sales curve forecast prepared by the Debtors in consultation with the Agent (as defined in the Store Closing Motion) or the final four weeks of the applicable store closing timeline) (the "End of Sale Term") in the following amounts:  (x) 5% of the value (as set forth in the Debtors' books and records) of inventory located in each such Closing Store during the first two weeks of such End of Sale Term and (y) 10% of the value (as set forth in the Debtors' books and records) of inventory located in each such Closing Store during the remaining End of Sale Term (the foregoing, the "Store Closing Reserve").  Store Closing Reserves shall not include amounts in the ABL Reserves to the extent that the ABL Reserves address the same matter or circumstance.

(n) (a) *Lease Reserve*.  The Prepetition ABL Agent shall have the right to implement a Reserve to the extent (i) a lease has not yet been assumed; and (ii) liquidation sales

have not commenced at such location by September 16, 2025 ("Lease Reserve").  Such Lease Reserve shall be determined in good faith by the Prepetition ABL Agent (in consultation with GB) as appropriate to reflect any decrease in the Appraised Liquidation Value for such inventory at such location assuming it were required to be fully liquidated by the termination of the lease assumption/rejection period.

(o)        (b) *ABL True Up*.  If the Debtor delivers a Borrowing Base Certificate (as defined in the Prepetition ABL Credit Agreement and consistent with the terms hereof) to the DIP Agent and Prepetition ABL Agent that provides a Borrowing Base (as defined in the Prepetition ABL Credit Agreement) that is less than the sum of (i) the aggregate principal amount of Prepetition ABL Revolving Credit Loans at such time, (ii) the face amount of letters of credit outstanding under the Prepetition ABL Credit Facility at such time and (iii) the Minimum Availability Threshold (as defined in the Prepetition ABL Credit Agreement, but without regard to the "Total Revolving Credit Commitment" thereunder) (a "True Up Event," and the amount of such shortfall, the "Borrowing Base Shortfall"), the Debtors shall, by the end of the second business day thereafter, deposit cash in an amount equal to the Borrowing Base Shortfall (the "ABL True Up") into a controlled segregated reserve account maintained by the Prepetition ABL Agent (the "ABL True Up Account"), with all funds held in the ABL True Up Account deemed ABL Priority Collateral and subject to all liens on ABL Priority Collateral in the same priority set forth in **Exhibit 1** attached hereto, *provided* that the Borrowing Base shall be adjusted on a dollar-for-dollar basis by the amount of cash then held in the ABL True Up Account, which shall be reflected in each Borrowing Base Certificate.  The Debtors may withdraw cash from the ABL True Up Account at any time by delivering an updated Borrowing Base Certificate to the DIP Agent and the Prepetition ABL Agent along with an officer's certificate certifying that following such withdrawal no True Up Event shall be in effect.

(p)   (c) *Cash Dominion*.  From and after the date of the entry of this InterimFinal Order, all collections and proceeds of any ABL Priority Collateral and all Cash Collateral that does not constitute identifiable DIP Priority Collateral that shall at any time come into the possession, custody, or control of any Debtor, shall (x) be promptly deposited in one or more Controlled Accounts (or to the extent different, the same accounts in which such collections and proceeds of the ABL Priority Collateral were deposited under the Prepetition ABL Credit Agreement; *provided* that all such accounts shall be swept on a daily basis to a Controlled Account ("ZBA Accounts")) and (y) amounts in such Controlled Accounts shall be remitted daily to the Collateral Agent Account (as defined under the ABL Credit Agreement), which shall be subject to the sole dominion and control of the Prepetition ABL Agent; *provided* that, prior to the occurrence of an ABL Cash Collateral Termination Event, amounts in such Controlled Accounts and ZBA Accounts (other than the ABL True Up Account) shall be available to the Debtors to be used, first, in the event of a True Up Event, to cover any Borrowing Base Shortfall, and thereafter, in accordance with the Approved Budget (subject to permitted variances under the DIP Documents). Following the Debtors submission to the Prepetition ABL Agent of a notice to use Cash Collateral (a "Cash Collateral Draw Notice"), the Prepetition ABL Agent shall disburse funds from any Controlled Account (or the Collateral Agent Account (but for the avoidance of doubt, not the ABL True Up Account) to the Debtors' operating accounts as appropriate to fund the amounts specified in the Cash Collateral Draw Notice; *provided* that the Prepetition ABL Agent shall not be required to disburse such funds if an ABL Cash Collateral Termination Event has occurred (subject to the requirement of paragraph 14).

21.     *Maintenance of Collateral*.  The DIP Loan Parties shall continue to maintain and insure the Prepetition Collateral and DIP Collateral in amounts and for the risks, and by the entities, as required under the Prepetition Credit Documents and the DIP Documents.

22.     *No Further Consent*.  The Pari First Lien Secured Parties' consent or are deemed to consent, as applicable, to the priming of the Pari First Liens and the Pari First Lien Adequate Protection Liens by DIP Priming Liens and DIP Priming Second Liens and to the Debtors' use of Pari First Lien Collateral including Cash Collateral is limited solely to the DIP Financing authorized by this ~~Interim~~Final Order.  Nothing in ~~this~~the Interim Order, this Final Order, or the DIP Documents shall (x) be construed as the affirmative consent by any of the Pari First Lien Secured Parties for the use of Cash Collateral other than on the terms set forth in this ~~Interim~~Final Order and in the context of the DIP Financing authorized by this ~~Interim~~Final Order to the extent such consent has been or is deemed to have been given, (y) be construed as a consent by any Pari First Lien Secured Parties to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) other than as contemplated by the DIP Financing authorized by this ~~Interim~~Final Order, or (z) prejudice, limit or otherwise impair the rights of any of the Pari First Lien Secured Parties to seek new, different or additional adequate protection, or assert any rights of any of the Pari First Lien Secured Parties.

23.     *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties; *provided* that any of the Prepetition Secured Parties (subject to any applicable contractual limitations on such

rights) may request further or different adequate protection and the DIP Loan Parties or any other party in interest may contest any such request.

24.    *Perfection of DIP Liens and Adequate Protection Liens*.

(a)    Without in any way limiting the automatically valid effective perfection of the DIP Liens granted pursuant to paragraph 8 of this ~~Interim~~Final Order and the Adequate Protection Liens granted pursuant to paragraph 20 hereof, the DIP Agent, the other DIP Secured Parties, and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the DIP Loan Parties and the Prepetition Secured Parties (as applicable), as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of securities, or to amend or modify security documents, or enter into intercreditor agreements, or to subordinate existing liens and any other similar action or action in connection therewith in a manner not inconsistent herewith or take any other action in order to document, validate and perfect the liens and security interests granted to them hereunder the ("Perfection Actions").  Whether or not the DIP Agent, on behalf of the DIP Secured Parties, or the Prepetition Secured Parties shall take such Perfection Actions, the liens and security interests granted hereunder shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this ~~Interim~~Final Order), at the time and on the date of entry of this ~~Interim~~Final Order. Upon the request of the DIP Agent, each Prepetition Agent, each of the Prepetition Secured Parties and the DIP Loan Parties, without any further consent of any party, is authorized (in the case of the DIP Loan Parties) and directed (in the case of the Prepetition Secured Parties), and such direction is hereby deemed to constitute required direction under the applicable DIP Documents or

Prepetition Credit Documents, to execute such instruments and agreements (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens in all jurisdictions required under the DIP Credit Agreement, including all local law documentation therefor determined to be reasonably necessary by the DIP Agent; *provided*, *however*, that no action need be taken in a foreign jurisdiction that would jeopardize the validity and enforceability of the Prepetition Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of this ~~Interim~~Final Order may, in the discretion of the DIP Agent (acting at the direction of the Required DIP Lenders in accordance with the terms of this ~~Interim~~Final Order) and each Prepetition Agent (as applicable), be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are authorized and directed to accept a certified copy of this ~~Interim~~Final Order for filing and/or recording, as applicable.  The Automatic Stay shall be modified to the extent necessary to permit, but not obligate, the DIP Agent and each Prepetition Agent to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

25.    *Release*.  ~~Subject to entry of the Final Order, and in~~In consideration of and as a condition to consenting to the use of Cash Collateral and the DIP Agent and the DIP Lenders making the DIP Facility available under the DIP Credit Agreement and providing other credit and financial accommodations to the Debtors pursuant to the provisions of this ~~Interim~~Final Order and the DIP Documents (including the Carve Out provisions), each of the Debtors, the Debtors' estates, on its own behalf and on behalf of its and their respective past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and

forever discharges and acquits (x) the DIP Agent, the DIP Lenders (including, for the avoidance of doubt, the Fronting Lender), and the DIP Secured Parties, and (y) subject to expiration of the time period set forth in paragraph 30, the Pari First Lien Secured Parties, the Prepetition ABL Agent and the Prepetition ABL Secured Parties, and, in each case, each of their respective Representatives in such capacity (as defined herein) (collectively, the "Released Parties"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise (collectively, the "Released Claims"), in each case arising out of or related to (as applicable) the Pari First Lien Documents, the Prepetition ABL Credit Documents, the DIP Documents, the respective obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this ~~Interim~~Final Order; *provided* that the releases set forth in this section shall not release any claims against a Released Party or liabilities that a court of competent jurisdiction determines results from the bad faith, gross negligence, material breach, fraud, or willful misconduct of such Released Party.  For the avoidance of doubt, nothing in this release shall relieve the DIP Secured Parties or the Debtors of their Obligations under the DIP Documents.

26.    *Preservation of Rights Granted Under this ~~Interim~~Final Order*.

(a)    Other than (i) the Carve Out, (ii) and other claims and liens expressly granted or permitted by ~~this~~the Interim Order, this Final Order, or the DIP Credit Agreement, no claim or lien having a priority superior to or *pari passu* the Prepetition ABL Liens or with those granted by this ~~Interim~~Final Order to the DIP Secured Parties or the Prepetition Secured Parties shall be permitted while any of the Prepetition ABL Obligations, DIP Obligations, or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided herein or permitted under ~~this~~the Interim Order, this Final Order, or the DIP Credit Agreement, the DIP Liens, the Prepetition ABL Liens, and the Adequate Protection Liens shall not be:  (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties or the Prepetition ABL Loan Parties; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the DIP Loan Parties or the Prepetition ABL Loan Parties.

(b)    Upon notice of an Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Credit Agreement. Notwithstanding any order that may be entered dismissing any of the chapter 11 cases under section 1112 of the Bankruptcy Code or converting these chapter 11 cases to cases under chapter 7: (A) the DIP Superpriority Claims, the Adequate Protection 507(b) Claims, the DIP Liens, and

the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this ~~Interim~~Final Order until all DIP Obligations and Adequate Protection Obligations shall have been paid in full (and that such DIP Superpriority Claims, Adequate Protection Rights, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (B) the other rights granted by this ~~Interim~~Final Order, including with respect to the Carve Out, shall not be affected; and (C) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this ~~Interim~~Final Order.

(c)     If any or all of the provisions of this ~~Interim~~Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or each Prepetition Agent, as applicable, of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens, the Adequate Protection Liens, or the Carve Out. Notwithstanding any such reversal, modification, vacatur or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Obligations, or Adequate Protection Liens incurred by the DIP Loan Parties and granted to the DIP Agent, the DIP Secured Parties, each Prepetition Agent, or the other Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent and each Prepetition ABL Agent, as applicable, of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this ~~Interim~~Final Order, and the DIP Agent, the DIP Secured Parties, each Prepetition Agent, and the other Prepetition Secured Parties shall be entitled to, and are hereby granted, all the

rights, remedies, privileges and benefits arising under sections 363(m) (if applicable) and 364(e) of the Bankruptcy Code, ~~this~~the Interim Order, this Final Order, and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)    Except as expressly provided in ~~this~~the Interim Order, this Final Order, or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, the Adequate Protection Rights and all other rights and remedies of the DIP Agent, the other DIP Secured Parties, each Prepetition Agent, and the other Prepetition Secured Parties granted by the provisions of ~~this~~the Interim Order, this Final Order, and the DIP Documents and the Carve Out shall survive, and shall not be modified, impaired or discharged by:  (i) the entry of an order converting any of the chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the chapter 11 cases or terminating the joint administration of these chapter 11 cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the chapter 11 cases and, pursuant to section 1141 (d)(4) of the Bankruptcy Code, the DIP Loan Parties have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations in connection with such chapter 11 plan.  The terms and provisions of ~~this~~the Interim Order, this Final Order, and the DIP Documents shall continue in these chapter 11 cases, in any Successor Cases if these chapter 11 cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Secured Parties, each Prepetition Agent, and the other Prepetition Secured Parties granted by the provisions of

~~this~~the Interim Order, this Final Order, and the DIP Documents shall continue in full force and effect until the DIP Obligations and the Adequate Protection Rights are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated (and in the case of rights and remedies of each Prepetition Agent and the other Prepetition Secured Parties, shall remain in full force and effect thereafter~~, subject to the terms of the Interim Order~~), and the Carve Out shall continue in full force and effect.

27.    _Payment of Fees and Expenses_.  The invoices with respect to the professional fees and expenses payable under paragraphs 2, 20(e) and 20(f) of this ~~Interim~~Final Order shall not be required to comply with the U.S. Trustee guidelines, nor shall the applicable professionals be required to file fee applications with the Court with respect to any fees or expenses payable hereunder, and all invoices therefor may be in summary form only (and shall not be required to contain individual time entries, and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine), and shall, by email, be provided to counsel to the Debtors, counsel to any Creditors' Committee, and the U.S. Trustee (the "Fee Notice Parties"); _provided, however_, that such applicable professionals may be required to submit more detailed and/or unredacted invoices to the U.S. Trustee upon request by the U.S. Trustee_; provided further, however_, if no formal objection to payment of the requested fees and expenses is made in writing by any of the Fee Notice Parties within ten (10) business days after delivery of such invoices (the "Fee Objection Period"), which Fee Objection Period may be extended by agreement of the parties or order of the Court, then, upon the expiration of the Fee Objection Period, without further order of, or

application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors and, in any event, no later than five (5) business days after expiration of the Fee Objection Period; *provided*, *further*, *however*, if a formal objection is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, the undisputed portion shall promptly be paid by the Debtors, and in any event, no later than five (5) business days after expiration of the Fee Objection Period, and the disputed portion shall only be paid upon resolution of such objection by the applicable parties or by order of the Court. Notwithstanding the foregoing, the Debtors are authorized to and shall pay, upon the initial funding of the DIP Financing, the DIP Fees and Expenses and Adequate Protection Fees and Expenses incurred on or prior to such date without the need for any professional engaged by, or on behalf of, the DIP Secured Parties or the Prepetition Secured Parties to first deliver a copy of its invoice or other supporting documentation to the Fee Notice Parties (other than the Debtors). Subject to this paragraph 27, none of the DIP Fees and Expenses or Adequate Protection Fees and Expenses payments required to be made pursuant to this ~~Interim~~Final Order shall be subject to claim, counterclaim, challenge, setoff, subordination, recharacterization, defense, avoidance or disgorgement in the chapter 11 cases or any Successor Cases.

28.    *Letters of Credit*.  The Debtors are hereby authorized to maintain and to renew existing Letters of Credit (as defined in the Prepetition ABL Credit Agreement) issued under the Prepetition ABL Credit Agreement prior to the Petition Date on an uninterrupted basis, in accordance with the same practices and procedures as were in effect prior to the Petition Date and subject to availability under the Borrowing Base (excluding the requirement to certify that no default or Event of Default is continuing and the requirement to bring down representations and warranties, in each case solely to the extent such certification or bring down cannot be made as a

result of the chapter 11 cases), in each case subject to the terms of the Prepetition ABL Credit Agreement (except as set forth in the prior parenthetical), and to take all actions reasonably appropriate with respect thereto.  The Letter of Credit Issuer (as defined in the Prepetition ABL Credit Agreement) shall, upon the Debtors' request, continue to extend, renew, or otherwise modify (but not increase) any Letters of Credit in accordance with their existing terms consistent with their prior course of dealing.

29.    *Limits to Lender Liability*.  Nothing in ~~this~~the Interim Order, this Final Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties (in each case, in their capacities as such) of any liability for any claims arising from the prepetition or postpetition activities of the DIP Loan Parties in the operation of their business, or in connection with their restructuring efforts.  So long as the DIP Secured Parties comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the DIP Loan Parties.

30.    *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions, agreements, and releases contained in ~~this~~the Interim Order and this Final Order shall be binding upon the Debtors in all circumstances and for all purposes ~~upon the expiration of the time period set forth in paragraph 32 of this Interim Order~~.  The Debtors' stipulations, admissions, agreements and releases contained in paragraph H of ~~this~~the Interim Order and this Final Order shall be

95

binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the chapter 11 cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless:  (a) such committee or any other party in interest with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), including a chapter 7 trustee or chapter 11 trustee, has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph) by no later than (i) seventy-five (75) calendar days after the entry of ~~this~~the Interim Order; and (ii) any such later date as (x) has been agreed to by the Prepetition ABL Agent with respect to the Prepetition ABL Obligations or the Prepetition ABL Liens, or (y) has been agreed to by the applicable Pari First Lien Agent (acting in accordance with its respective Pari First Lien Documents) with respect to the Pari First Lien Obligations or the Pari First Liens or (iv) has been ordered by the Court for cause upon a motion filed and served within any applicable period in clauses (i) or (ii) of this paragraph 30 (the time period established by the foregoing clauses (i)–(ii), the "Challenge Period"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligations or the Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests, or defenses (collectively, the "Challenges") against the Prepetition Secured Parties, their affiliates, and/or their respective subsidiaries, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns

thereof, in each case in their respective capacity as such (each, a "Representative" and, collectively, the "Representatives") in connection with matters related to the Prepetition Credit Documents, the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released, and barred.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then:  (1) the Debtors' stipulations, admissions, agreements and releases contained in ~~this~~the Interim Order and this Final Order shall be binding on all parties in interest; (2) the obligations of the DIP Loan Parties under the Prepetition Credit Documents, including the Prepetition Secured Obligations, shall constitute allowed claims not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise, except under the Intercreditor Agreements), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in the chapter 11 cases, and any subsequent chapter 7 case(s); (3) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual (other than pursuant to the Intercreditor Agreements), or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory

or non-statutory committees appointed or formed in the chapter 11 cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or ~~non~~ non-statutory committees appointed or formed in the chapter 11 cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Credit Documents, the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Collateral shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in ~~this~~the Interim Order and this Final Order shall nonetheless remain binding and preclusive on each other statutory or nonstatutory committee appointed or formed in the chapter 11 cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in ~~this~~the Interim Order or this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these chapter 11 cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including,

without limitation, Challenges with respect to the Prepetition Credit Documents, the Prepetition Secured Obligations, or the Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay the chapter 11 cases or confirmation of any plan of reorganization; *provided*, *however*, that any trustee appointed prior to the expiration of the Challenge Period will have the longer of (x) the remaining Challenge Period and (y) thirty (30) days from the date of such trustee's appointment to commence a Challenge. The timely filing of a motion seeking standing to file a Challenge before the termination of the Challenge Period that attaches a proposed pleading commencing such Challenge shall toll the Challenge Deadline only as to the party that timely filed such standing motion until such motion is resolved or adjudicated by the Court. Any pleadings filed in any Challenge proceeding shall set forth with specificity the basis for such Challenge (and any Challenge not so specified prior to the Challenge Deadline shall be deemed forever waived, released, and barred). The Court may fashion any appropriate remedy following a successful Challenge. The Prepetition Secured Parties agree not to object to the standing of the Creditors' Committee to raise any issues on behalf of the estates of any Debtor that is a limited liability company on the basis that the Creditors' Committee cannot have standing to raise such issues under applicable non-bankruptcy law because such Debtor entity is a limited liability company.

31.     *Limitation on Use of DIP Financing Proceeds and Collateral*. Notwithstanding any other provision of ~~this~~the Interim Order, this Final Order, or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral), or any portion of the Carve Out, may be used directly or indirectly for any of the following: (a) in connection with the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, the Pari First Lien Secured Parties, the Prepetition ABL Secured Parties or their respective predecessors-in-interest,

agents, affiliates, representatives, attorneys, or advisors, in each case in their respective capacity as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, Superpriority DIP Claims, Pari First Lien Obligations, the Pari First Liens, the Prepetition ABL Obligations, the Prepetition ABL Liens and/or the Adequate Protection Obligations and Adequate Protection Liens granted under the DIP Orders, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Pari First Lien Obligations, the Prepetition ABL Obligations and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations, the Pari First Lien Obligations or the Prepetition ABL Obligations granted under ~~this~~the Interim Order, the Final DIP Order, the DIP Documents, or the applicable Pari First Lien Debt Documents or Prepetition ABL Credit Documents, including, in the case of each of (i) and (ii), without limitation, any claims or challenges relating to the allocation of value as between encumbered or unencumbered assets of the Debtors or claims alleged for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) except for the right of the Debtors and the Creditors' Committee to contest whether an Event of Default has occurred and/or is continuing during the Remedies Notice Period or the ABL Remedies Notice Period, to prevent, hinder, or otherwise delay or interfere with the Pari First Lien Secured Parties', the Prepetition ABL Secured Parties' the DIP Agent's, or the DIP Lenders', as applicable, enforcement or realization on the Pari First Lien Obligations, Prepetition ABL Obligations Pari First Lien Collateral, Prepetition ABL Collateral DIP Obligations, DIP Collateral, the Adequate Protection Obligations and Adequate Protection Liens and the liens, claims and rights granted to such parties under this ~~Interim~~Final Order each in accordance with the DIP Documents, the applicable Pari First Lien Debt Documents,

100

the applicable Prepetition ABL Credit Documents and the DIP Orders; (c) to seek to subordinate, recharacterize, disallow, or avoid any of the DIP Obligations, Pari First Lien Obligations or the Prepetition ABL Obligations; (d) to seek to modify any of the rights and remedies granted to the Pari First Lien Secured Parties, the Prepetition ABL Secured Parties, the DIP Agents, or the DIP Lenders under this ~~Interim~~Final Order, the Pari First Lien Debt Documents, the Prepetition ABL Credit Documents or the DIP Documents, as applicable; (e) to apply to the Court for authority to approve superpriority claims or grant liens or security interests in the DIP Collateral or any portion thereof that are, in each case, senior to, or on parity with, the DIP Liens, Superpriority DIP Claims, Adequate Protection Liens and Adequate Protection 507(b) Claims granted to the Pari First Lien Secured Parties and the Prepetition ABL Secured Parties; (f) to make any payment in respect of Committee Professionals in excess of the amounts set forth in the Initial Approved Budget, or (g) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are included in the Approved Budget, approved or authorized by the Court, agreed to in writing by the Required DIP Lenders, or as expressly permitted under ~~this~~the Interim Order, this Final Order, or permitted under the DIP Documents (including the Approved Budget subject to permitted variances under the DIP Documents), in each case, unless all DIP Obligations, Pari First Lien Obligations, Prepetition ABL Obligations, Adequate Protection Obligations and claims granted to the DIP Agent, DIP Lenders, the Pari First Lien Secured Parties or the Prepetition ABL Secured Parties under this ~~Interim~~Final Order, have been refinanced or paid in full in cash or otherwise agreed to in writing by the Required DIP Lenders.  Notwithstanding the above, the Creditors' Committee may use the proceeds of the DIP Collateral to investigate but not to prosecute (A) the claims and liens of the Pari First Lien Secured Parties and the Prepetition ABL Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the

Pari First Lien Secured Parties and the Prepetition ABL Secured Parties, in each case, subject to an aggregate cap of no more than $~~7~~150,000.  Notwithstanding the above, ~~through the time period set forth in paragraph 32~~prior to the earlier of the entry of this Final Order or the completion of the Special Committee's investigation, the Special Committee may use the proceeds of the DIP Collateral to investigate but not to prosecute (A) the claims and liens of the Pari First Lien Secured Parties and (B) potential claims, counterclaims, causes of action, or defenses against the Pari First Lien Secured Parties.

~~32.  *Effect of Stipulations on the Debtors*.  Notwithstanding anything in this Interim Order to the contrary, the Debtors' stipulations, admissions, and releases contained in this Interim Order solely with respect to the Pari Frist Lien Secured Obligations and the Pari First Lien Secured Parties are subject to completion of the investigation by the Special Committee of the Parent Boards (each as defined in the First Day Declaration) and shall be automatically binding upon the Debtors in all circumstances and for all purposes upon the earlier of the (a) entry of the Final Order and (b) completion of the investigation by the Special Committee of the Parent Boards (both as defined in the First Day Declaration).~~

32.    ~~33.~~ *Indemnification*.  Without limitation to any other right to indemnification, the Prepetition Secured Parties (subject to any Challenges that may be raised prior to expiration of the time period set forth in paragraph 30) and the DIP Secured Parties shall be and hereby are indemnified (as applicable) as provided in the Prepetition Credit Documents and the DIP Documents, as applicable.

33.    ~~34.  *Interim*~~*Final Order Governs*.  In the event of any inconsistency between the provisions of this Final Order, the Interim Order, the Prepetition Credit Documents, and the DIP

Documents (including, but not limited to, with respect to the Adequate Protection Obligations), the provisions of this ~~Interim~~Final Order shall govern.

34.    ~~35.~~ *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this ~~Interim~~Final Order, including all findings herein, shall be binding upon all parties in interest in these chapter 11 cases, including, without limitation, the DIP Agent, the DIP Secured Parties, the Prepetition ABL Agent, the Prepetition ABL Secured Parties, each Pari First Lien Agent, the Pari First Lien Secured Parties, any other Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in these chapter 11 cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Secured Parties, the Prepetition ABL Agent, the Prepetition ABL Secured Parties, each Pari First Lien Agent, the Pari First Lien Secured Parties, any other Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* that the DIP Agent, the other DIP Secured Parties, each Prepetition Agent and the other Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

35.    ~~36.~~ *Limitation of Liability*.

(a)    Nothing in ~~this~~the Interim Order, this Final Order, the DIP Documents, the Prepetition Credit Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any

DIP Secured Party, any Pari First Lien Secured Party, or any Prepetition ABL Secured Party of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  The DIP Secured Parties, Pari First Lien Secured Parties, and the Prepetition ABL Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Debtors.

(b)      In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral or Prepetition Collateral (including Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to ~~this~~the Interim Order, this Final Order, the DIP Documents or Prepetition Credit Documents, none of the DIP Secured Parties or Prepetition Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code).  Furthermore, nothing in ~~this~~the Interim Order or this Final Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Agent, other DIP Secured Parties, the Prepetition ABL Agent, each Prepetition ABL Secured Party, each Pari First Lien Agent or other Pari First Lien

Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

36.    ~~37.~~ *Master Proof of Claim*.  The Prepetition Cayman Notes Trustee, Prepetition Exchange Notes Trustee, Prepetition 4.875% Notes Trustee, Prepetition Intercompany Note Agent, Prepetition Term Loan Agent, and the Prepetition ABL Agent, and/or any other Prepetition Secured Parties shall not be required to file proofs of claim in the chapter 11 cases or any Successor Case to assert claims on behalf of themselves or the Prepetition Secured Parties for payment of the Prepetition Secured Obligations arising under the Prepetition Credit Documents, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts under the Prepetition Credit Documents.  The statements of claim in respect of such indebtedness set forth in ~~this~~the Interim Order and Final Order are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status.  However, to facilitate the processing of claims, each of the Prepetition Cayman Notes Trustee, Prepetition Exchange Notes Trustee, Prepetition 4.875% Notes Trustee, Prepetition Intercompany Note Agent, Prepetition Term Loan Agent, and the Prepetition ABL Agent is hereby authorized, but not directed or required, to file in the Debtors' lead chapter 11 case *In re At Home Group Inc.,* Case No. 25-11120 (JKS), a master proof of claim on behalf of its respective Prepetition Secured Parties on account of any and all of their respective claims arising under the applicable Prepetition Credit Documents and hereunder (each, a "Master Proof of Claim") against each of the Debtors.  Upon the filing of a Master Proof of Claim by the Prepetition Cayman Notes Trustee, Prepetition Exchange Notes Trustee, Prepetition 4.875% Notes Trustee, Prepetition Intercompany Note Agent, Prepetition Term Loan Agent, and the Prepetition ABL Agent, as applicable, it shall be deemed to have filed a proof of claim in the amount set forth opposite its name

therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Prepetition Credit Documents, and the claim of each applicable Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if it had filed a separate proof of claim in each of these chapter 11 cases.  The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these chapter 11 cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements, or other documents will be provided upon written request to counsel to each Prepetition Agent, as applicable.  The DIP Agent and the other DIP Secured Parties shall similarly not be required to file proofs of claim with respect to their DIP Obligations under the DIP Documents, and the evidence presented with the DIP Motion and the record established at the ~~Interim~~Final Hearing are deemed sufficient to, and do, constitute proofs of claim with respect to their obligations, secured status, and priority.

37. ~~38.~~ *Insurance*.  To the extent that each Prepetition Agent is listed as loss payee under the Borrower's or DIP Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee under the insurance policies, (in any such case with the same priority of liens and claims thereunder relative to the priority of (x) the Prepetition Liens and Adequate Protection

Liens and (y) the DIP Liens, as set forth herein) and, except with respect to the ABL Priority Collateral prior to the indefeasible payment in full of the Prepetition ABL Obligations, shall act in that capacity and distribute any proceeds recovered or received in respect of the insurance policies, to the indefeasible payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and termination of the DIP Commitment and thereafter to the payment of the applicable Prepetition Secured Obligations, *provided* that nothing herein is intended to alter the rights, if any of a lessor under any non-residential real property lease with respect to such insurance proceeds.

38.    ~~39.~~ *Credit Bidding*.  Subject to section 363(k) of the Bankruptcy Code and the lien priorities set forth herein and the rights of parties in interest under paragraph 13 and the Prepetition ABL Intercreditor Agreement, (a) the DIP Agent (acting at the direction of the Required DIP Lenders) shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral, (b) the Prepetition ABL Agent shall have the right to credit bid, in accordance with the Prepetition ABL Credit Documents, in any sale of any ABL Priority Collateral, and (c) subject to any Challenges (as defined below) that may be raised prior to expiration of the time period set forth in paragraph 30, each Prepetition Agent shall have the right, consistent with the provisions of the Prepetition Credit Documents, as applicable (and providing for the DIP Obligations to be indefeasibly repaid in full in cash and the termination of the DIP Commitments), to credit bid up to the full amount of the applicable Prepetition Secured Obligations in the sale of the applicable collateral, as applicable, in each case outside the ordinary course of business, without the need for further Court order authorizing the same and whether any such sale is effectuated through sections 363(k), 1123, or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, in each case unless the

Court for cause orders otherwise pursuant to section 363(k) of the Bankruptcy Code; *provided* that neither the DIP Obligations nor any Prepetition Secured Obligation may be credit bid without the consent of the Prepetition ABL Agent (acting in accordance with the Prepetition ABL Credit Documents) in any disposition of any ABL Priority Collateral unless such sale provides for indefeasible payment in full in cash to the Prepetition ABL Agent and the Prepetition ABL Lenders of all Prepetition ABL Obligations on the closing date of such sale. Notwithstanding anything to the contrary herein, any credit bidding of the DIP Roll-Up Obligations shall be subject to any Challenges (as defined below) that may be raised prior to expiration of the time period set forth in paragraph 30.

39. ~~40.~~ *Treatment of DIP Claims*. On the Maturity Date (as defined in the DIP Credit Agreement, and as may extended in accordance with the terms thereof), the Borrower shall pay the then unpaid and outstanding amount of the DIP Obligations pursuant to the provisions of the DIP Documents.

40. *Special Provisions Regarding Texas Taxing Authorities*. Notwithstanding any other provisions in this Final Order or any final orders pertaining to post-petition financing or the use of cash collateral in these Chapter 11 Cases, any statutory liens on account of ad valorem taxes held by the Texas Taxing Authorities[15] (the "Tax Liens") shall maintain their prepetition lien priority as

---

[15] "Texas Taxing Authorities" means all ad valorem taxing jurisdictions represented by the firms of Linebarger Goggan Blair and Sampson, LLP, Perdue Brandon Fielder Collins and Mott LLP, and McCreary Veselka Bragg and Allen, P.C. including but not limited to Bexar County, Cypress-Fairbanks Independent School District, Dallas County, Ector CAD, City of El Paso, Fort Bend County, Harris County Emergency Service District #09, Harris County Emergency Service District #13, Harris County Emergency District #47, Hidalgo County, City of Humble, Lewisville Independent School District, Lone Star College System, Montgomery County, Northwest Independent School District, Nueces County, Smith County, Tarrant County, City of Webster, Lubbock Central Appraisal District, Plano Independent School District, Frisco Independent School District, Carrollton-Farmers Branch Independent School District, City of Garland, Garland Independent School District, Tyler Independent School District, Fort Bend Independent School District, Fort Bend County Municipal Utility District #143, Fort Bend County Levee Improvement District #2, Clear Creek Independent School District, City of Houston, Woodlands Metro Center Municipal Utility District, County of Brazos, County of Comal, County of Denton, and County of Williamson, Texas.

provided by applicable nonbankruptcy law and will not be primed by nor made subordinate to any liens granted to any party hereby to the extent the Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by the Texas Taxing Authorities are fully preserved.  Further, as adequate protection for the asserted secured tax claims of the Texas Taxing Authorities (the "Tax Claims"), the Debtors shall set aside the amount of $1,591,980.00 in a segregated account from the proceeds of the sale of any of the Debtors' assets located within the jurisdiction of the applicable Texas Taxing Authority (the "Tax Reserve").  The asserted liens of the Texas Taxing Authorities shall attach to the Tax Reserve to the same extent and with the same priority as the liens they now assert against the property of the Debtors.  These funds shall be on the order of adequate protection and shall constitute neither the allowance of the Tax Claims nor a cap on the amounts the Texas Taxing Authorities may be entitled to receive.  The funds may be distributed only upon agreement between the Texas Taxing Authorities and the Debtors, or by subsequent order of the Court, duly noticed to the Texas Taxing Authorities.

41.    *Governing Order*.  Notwithstanding the relief granted in any other order by this Court, (i) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be subject to this ~~Interim~~Final Order, including compliance with the Approved Budget (subject to permitted variances under the DIP Documents) and all other terms and conditions hereof, and (ii) to the extent there is any inconsistency between the terms of such other order and this ~~Interim~~Final Order, this ~~Interim~~Final Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

42.    *Effectiveness*.  This ~~Interim~~Final Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully

enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this ~~Interim~~Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this ~~Interim~~Final Order.

43.     *Lien and Claim Priority Annex Governs*.  The relative priorities of each of the DIP Liens, the Prepetition ABL Liens, the Pari First Liens, the ABL Adequate Protection Liens, the Pari First Lien Adequate Protection Liens, the Superpriority DIP Claims, the Adequate Protection Liens, the ABL 507(b) Claims, the Pari First Lien 507(b) Claims, the Superpriority DIP Claims, and all other liens and administrative claims granted pursuant to ~~this~~the Interim Order and this Final Order shall be dictated by lien and claim priority annex set forth in **Exhibit 1**.  To the extent there is an inconsistency between this ~~Interim~~Final Order and the lien and claim priority annex set forth in **Exhibit 1**, the lien and priority annex set forth in **Exhibit 1** shall control.

44.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this ~~Interim~~Final Order.

45.     *Payments Held in Trust*.  Except as expressly permitted in this ~~Interim~~Final Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the DIP Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the applicable DIP Agent and the DIP Lenders and shall immediately turn over the

proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this ~~Interim~~Final Order.

46.    *No Third-Party Rights*.  Except as explicitly provided for herein, this ~~Interim~~Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

47.    *Necessary Action*.  The Debtors are authorized to take all actions as are necessary or appropriate to implement the terms of this ~~Interim~~Final Order.  In addition, the Automatic Stay is modified with respect to non-Debtor affiliates of the Debtors to take all actions as are necessary or appropriate for the Debtors to implement the terms of this ~~Interim~~Final Order.

48.    *Replacement Agent*.    Notwithstanding the resignation or replacement of any collateral agent or administrative agent, including the DIP Agent in either capacity, and any of the Prepetition Agents, the DIP Liens on the DIP Collateral, the Prepetition Liens on the Prepetition Collateral, and the Adequate Protection Liens shall remain continuously and properly perfected, notwithstanding the transfer of control, possession, or title of any Prepetition Collateral or DIP Collateral to a new collateral agent or administrative agent.

49.    *Stub Rent Escrow Account*.  The Debtors shall establish an escrow account or segregated account (the "Stub Rent Escrow Account") to hold an amount equal to no more than $9,300,000, for payment of allowed claims under section 503(b) of the Bankruptcy Code related to the Debtors' postpetition contractual rent obligations to their applicable landlords for the period of the Petition Date to June 30, 2025 (any such claims, the "Stub Rent Claims") (which cash shall remain part of the DIP Collateral, Prepetition Collateral and subject to the DIP Liens, Prepetition Liens and the Adequate Protection Liens until payment of the Stub Rent Claims (or release thereof) in accordance with the terms of this paragraph 49).  The Debtors shall deposit into the

Stub Rent Escrow Account:  (i) $3,000,000 by no later than the week beginning July 21, 2025, (ii) $4,300,000 by no later than week beginning September 1, 2025, and (iii) $2,000,000 by no later than the week beginning September 22, 2025.  Notwithstanding anything in this Final Order to the contrary, the DIP Liens, the Adequate Protection Liens, and the Prepetition Liens encumbering the Stub Rent Escrow Account shall be subject and subordinate to the rights of landlords to receive payment on account of all allowed Stub Rent Claims in accordance with this paragraph 49 and no lien on the amounts contained in the Stub Rent Escrow Account shall prevent use of such amounts to pay allowed Stub Rent Claims.

(a)      The Debtors shall use the amounts held in the Stub Rent Escrow Account to solely pay Stub Rent Claims in amounts that (a) are allowed under section 503(b) by a Bankruptcy Court order or (b) agreed to by the Debtors and the applicable holder of a Stub Rent Claim without further order of the Bankruptcy Court.  Subject to sub-paragraph (c) of this paragraph 49, Allowed Stub Rent Claims shall be paid on the later of (i) the date such Stub Rent Claim is allowed by Bankruptcy Court order and (ii) the Effective Date of the Plan; *provided* that the Debtors and any holder of a proposed Stub Rent Claim may agree to alternative treatment, including timing of payment, of any such holders' proposed Stub Rent Claim without further order of the Bankruptcy Court and the Debtors shall be authorized, but not directed, to release amounts from the Stub Rent Escrow Account prior to such date with the consent of the DIP Agent and the Prepetition ABL Agent to make payments on such Stub Rent Claims; *provided further* that, if any Stub Rent Claim is allowed in connection with the assumption or assumption and assignment of a lease prior to the Effective Date, then such Stub Rent Claim shall be paid at the time of assumption or assumption and assignment of the applicable lease.  The amount on deposit in the Stub Rent Escrow Account shall be subject to reduction (or release) on a weekly basis to account for any satisfaction in respect

of any portion of Stub Rent Claims benefitting from the Stub Rent Escrow Account, including in connection with any assumptions of leases, assumptions and assignments of leases, or other lease dispositions. The Stub Rent Escrow Account shall in no event have more than the then net outstanding estimated Stub Rent Claims and any amounts in excess thereof shall be released from the Stub Rent Escrow Account and returned to the Debtor for application to the DIP Obligations.

(b)     The Debtors shall fund the Stub Rent Escrow Account in accordance with this paragraph 49 and the Approved Budget, and this Order and the Approved Budget may not be amended, updated or replaced to alter the timing of the funding of the Stub Rent Escrow Account, without the consent of the Committee.

(c)     In the event a Stub Rent Claim held by a landlord that filed an objection to the DIP Motion at Docket Nos. 268, 271, 275, or 283 seeking adequate protection with respect to their leases (an "Objecting Landlord") becomes payable in accordance with subparagraph (a) of this paragraph 49 (an "Objecting Landlord Stub Rent Claim"), to satisfy the requested adequate protection with respect to such Objecting Landlord Stub Rent Claims, such claims shall be paid out of the first funds deposited into the Stub Rent Escrow Account prior to any other Stub Rent Claims other than previously paid Objecting Landlord Stub Rent Claims.  As further adequate protection for Objecting Landlords, any Objecting Landlord Stub Rent Claim held by an Objecting Landlord whose lease is rejected prior to the Effective Date shall be paid its Objecting Landlord Stub Rent Claim from the Stub Rent Escrow Account within two business days after the rejection date of the lease.

50.     49. *Retention of Jurisdiction*.  The Court shall have jurisdiction to resolve any and all disputes arising under or related to the DIP Loans, the DIP Documents, and/or the provisions of

this ~~Interim~~Final Order, and to enforce all of the conditions of the DIP Documents and this ~~Interim~~Final Order.

50. *Final Hearing*. The Final Hearing is scheduled for July 14, 2025 at 1:00 p.m. (prevailing Eastern Time) before this Court.

51. *Objections*. Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Debtors, At Home Group Inc., 9000 Cypress Waters Blvd, Coppell, Texas 75019, Attn.: Meredith Hampton; (d) proposed counsel to the Debtors, (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Nicole L. Greenblatt, P.C. (nicole.greenblatt@kirkland.com); Matthew C. Fagen, P.C. (matthew.fagen@kirkland.com); Elizabeth H. Jones (elizabeth.jones@kirkland.com); and Jimmy Ryan (jimmy.ryan@kirkland.com); and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn.: Robert S. Brady (rbrady@ycst.com); Edwin J. Harron (eharron@ycst.com); and Joseph M. Mulvihill (jmulvihill@ycst.com); (e) counsel to the DIP Agent, Moses & Singer LLP, 405 Lexington Ave, New York, New York 10174, Attn.: Andrew Oliver (aoliver@mosessinger.com) and Kent Kolbig (kkolbig@mosessinger.com); (f) counsel to the Ad Hoc Group and the DIP Lenders, Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York, NY 10036, Attn.: Stephen Zide (stephen.zide@dechert.com) and Eric Hilmo (eric.hilmo@dechert.com), and Potter Anderson & Corroon LLP, 1313 North Market Street, Wilmington, Delaware 19801, Attn: M. Blake Cleary (bcleary@potteranderson.com) and Brett M. Haywood (bcleary@potteranderson.com); (g) counsel to the Prepetition ABL Agent, (i) Choate, Hall and

Stewart LLP, 2 International Place, Boston, MA 02110, Attn.: Kevin J. Simard (ksimard@choate.com), Mark D. Silva (msilva@choate.com), and M. Hampton Foushee (hfoushee@choate.com), and (ii) Reed Smith LLP, 1201 N Market St # 1500, Wilmington, DE 19801, Attn.: Kurt F. Gwynne (kgwynne@reedsmith.com) and Jason D. Angelo (jangelo@reedsmith.com); (h) the Creditors' Committee (if appointed) and its legal counsel, and (i) any other party that has filed a request for notices with this Court pursuant to Bankruptcy Rule 2002, with a copy to the Court's chamber, in each case to allow actual receipt by the foregoing no later than July 3, 2025 at 4:00 p.m., prevailing Eastern Time and otherwise in conformity with the Court's order establishing notice and case management procedures.

51.    *Interim Order.* Except as specifically amended or otherwise modified hereby, all of the provisions of the Interim Order and any actions taken by the Debtors, the DIP Secured Parties, or the Prepetition Secured Parties in accordance therewith shall remain in effect and are hereby ratified by this Final Order.

52.    The *Notice of Entry of Final Order.* Pursuant to the Local Rules, the Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing)Final Order to the parties having been given notice of the InterimFinal Hearing and to any party that has filed a request for notices with this Court in accordance with Local Rule 9013-1(m).

Dated:  Wilmington, Delaware
           June 17July ___, 2025

_____
Hon. J. Kate Stickles
United States Bankruptcy Judge

115

*[Different first page link-to-previous setting changed from on in original to off in modified.]*

**Exhibit 1**

| Priority | DIP Collateral that constitutes ABL Priority Collateral[1416] | DIP Collateral that constitutes DIP Priority Collateral | Liens on Unencumbered Property | Claims with respect to ABL Priority Collateral | Claims with respect to the DIP Priority Collateral | Claims with respect to Unencumbered Property |
|---|---|---|---|---|---|---|
| ***First*** | Prepetition Permitted Senior Liens | Carve Out and Prepetition Permitted Senior Liens | Carve Out | Carve Out | Carve Out | Carve Out |
| ***Second*** | ABL Adequate Protection Liens | DIP Liens | DIP Liens* | ABL 507(b) Claims | Superpriority DIP Claims | Superpriority DIP Claims |
| ***Third*** | Prepetition ABL Liens | Pari First Lien Adequate Protection Liens | Pari First Lien Adequate Protection Liens* | Superpriority DIP Claims | Pari First Lien 507(b) Claims | Pari First Lien 507(b) Claims |

---

[1416]    Notwithstanding anything to the contrary contained herein, prior to the date on which a Carve Out Trigger Notice is given, cash collateral consisting of ABL Priority may be utilized to fund amounts in accordance with paragraph 6(c) (Carve Out Reserves) of this ~~Interim~~Final Order.

\*    (a) DIP Liens securing the DIP Roll-Up Obligations and (b) Adequate Protection Liens, in each case, shall not encumber Avoidance Proceeds and proceeds of commercial tort claims.

| | | | | | | |
|---|---|---|---|---|---|---|
| ***Fourth*** | Carve Out | Pari First Liens | ABL Adequate Protection Liens* | Pari First Lien 507(b) Claims | ABL 507(b) Claims | ABL 507(b) Claims |
| ***Fifth*** | DIP Liens | ABL Adequate Protection Liens | | | | |
| ***Sixth*** | Pari First Lien Adequate Protection Liens | Prepetition ABL Liens | | | | |
| ***Seventh*** | Pari First Liens | | | | | |

**EXHIBIT 2**

**ABL MILESTONES**

1.      On or prior to the Petition Date, the Debtors' board shall have approved a restructuring support agreement (the "RSA") that contemplates the filing of an Acceptable Plan and sets forth the key terms of such Acceptable Plan;

    2.  On or prior to thirty-five (35) days after the Petition Date, Court shall have approved the Debtors' motion seeking extension of the lease assumption/rejection deadline to 210 days from the Petition Date pursuant to Section 365(d)(4) of the Bankruptcy Code; and

3.      An order (the "Confirmation Order") confirming an Acceptable Plan, shall be entered in the Bankruptcy Cases by no later than one hundred twenty (120) days after the Petition Date or such later date agreed in writing by the Prepetition ABL Agent in its sole discretion.

"Acceptable Plan" means a chapter 11 plan, which plan shall provide for payment in full of the Prepetition ABL Obligations upon the effective date of such plan.

## **Exhibit 3**

**Approved Budget**

*$ in thousands*

| | Week 24 | Week 25 | Week 26 | Week 27 | Week 28 | Week 29 | Week 30 | Week 31 | Week 32 | Week 33 | Week 34 | Week 35 | Week 36 | Weeks 24-36 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Beginning Date* | 7/6/2025 | 7/13/2025 | 7/20/2025 | 7/27/2025 | 8/3/2025 | 8/10/2025 | 8/17/2025 | 8/24/2025 | 8/31/2025 | 9/7/2025 | 9/14/2025 | 9/21/2025 | 9/28/2025 | 7/6/2025 |
| *End Date* | 7/12/2025 | 7/19/2025 | 7/26/2025 | 8/2/2025 | 8/9/2025 | 8/16/2025 | 8/23/2025 | 8/30/2025 | 9/6/2025 | 9/13/2025 | 9/20/2025 | 9/27/2025 | 10/4/2025 | 10/4/2025 |
| | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* |
| **Operating Receipts** | | | | | | | | | | | | | | |
| **Total Receipts** | **35,906** | **27,813** | **32,984** | **34,616** | **35,582** | **37,063** | **38,627** | **36,535** | **35,545** | **35,182** | **34,445** | **33,958** | **32,211** | **450,468** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Accounts Payable & Freight[1] | 15,710 | 21,795 | 21,542 | 30,866 | 22,782 | 14,817 | 18,279 | 28,282 | 15,490 | 18,387 | 14,540 | 14,404 | 22,716 | 259,611 |
| Payroll | 9,278 | 1,077 | 9,055 | 1,077 | 9,392 | 1,366 | 11,235 | 1,378 | 17,533 | 1,288 | 9,880 | 1,369 | 9,667 | 83,595 |
| Landlord[2] | - | - | - | 14,980 | 9,903 | - | - | - | 24,569 | - | - | - | 23,451 | 72,903 |
| Tariffs, Taxes & Other | 1,003 | 12,688 | 9,073 | 1,416 | 1,048 | 2,688 | 16,147 | 1,130 | 1,396 | 1,031 | 24,887 | 1,321 | 1,128 | 74,957 |
| **Total Operating Disbursements** | **25,991** | **35,560** | **39,669** | **48,340** | **43,125** | **18,870** | **45,662** | **30,790** | **58,988** | **20,706** | **49,307** | **17,094** | **56,963** | **491,065** |
| **Total Net Operating Cash Flow** | **9,915** | **(7,747)** | **(6,685)** | **(13,724)** | **(7,543)** | **18,193** | **(7,035)** | **5,745** | **(23,442)** | **14,476** | **(14,862)** | **16,864** | **(24,751)** | **(40,598)** |
| **Financing** | | | | | | | | | | | | | | |
| ABL Borrowings / (Payments) | (10,417) | (4,670) | (2,825) | (2,646) | 5,731 | (925) | (1,670) | 396 | (1,599) | 935 | 584 | 2,706 | 1,984 | (12,417) |
| DD DIP Loan | - | 50,000 | - | - | - | - | - | - | 25,000 | - | 25,000 | - | 25,000 | 125,000 |
| Interest and Bank Fees | - | (2,494) | (33) | (40) | - | - | (2,547) | (40) | - | - | (2,547) | (40) | - | (7,741) |
| **Total Finance Cash Flow** | **(10,417)** | **42,837** | **(2,859)** | **(2,686)** | **5,731** | **(925)** | **(4,217)** | **356** | **23,401** | **935** | **23,036** | **2,666** | **26,984** | **104,841** |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| Restructuring Professional Fees[3] | 3,765 | 2,025 | 2,445 | 1,495 | 3,765 | 1,385 | 1,210 | 1,110 | 1,395 | 4,820 | 995 | 995 | 9,410 | 34,815 |
| Estimated Stub Rent Reserve[4] | - | - | 3,000 | - | - | - | - | - | 4,300 | - | - | 2,000 | - | 9,300 |
| Other BK Costs[5] | - | 2,000 | - | - | - | - | - | - | - | - | - | - | 10,200 | 12,200 |
| **Total Non-Operating Disbursements** | **3,765** | **4,025** | **5,445** | **1,495** | **3,765** | **1,385** | **1,210** | **1,110** | **5,695** | **4,820** | **995** | **2,995** | **19,610** | **56,315** |
| **Total Net Cash Flow** | **(4,267)** | **31,065** | **(14,989)** | **(17,905)** | **(5,578)** | **15,883** | **(12,462)** | **4,990** | **(5,736)** | **10,592** | **7,179** | **16,535** | **(17,378)** | **7,929** |
| Beginning Bank Balance | 57,024 | 52,757 | 83,822 | 68,833 | 50,927 | 45,350 | 61,232 | 48,770 | 53,761 | 48,025 | 58,616 | 65,795 | 82,331 | 57,024 |
| ***Ending Bank Balance*** | ***52,757*** | ***83,822*** | ***68,833*** | ***50,927*** | ***45,350*** | ***61,232*** | ***48,770*** | ***53,761*** | ***48,025*** | ***58,616*** | ***65,795*** | ***82,331*** | ***64,953*** | ***64,953*** |

[1] Accounts Payable & Freight consist of Merchandise Vendors, Generating Operating Expenses, and Inbound/Outbound Transportation
[2] Landlord Line Item includes all rent and monthly escrows for all CAM, Insurance, Taxes, and Other contractual LL reimbursements
[3] Restructuring Professional Fees includes Debtor, ABL, DIP, and UCC advisors
[4] Estimated amount of stub rent claims to be paid under the plan subject to ongoing review and reconciliation
[5] Other BK costs include Utility Adequate Assurance, Cure Costs, and Other expenses