**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AT HOME GROUP INC., *et al.*,[1] | ) | Case No. 25-11120 (JKS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Ref. Docket Nos. 250, 392, 509 & 532** |
|  | ) |  |

**NOTICE OF FILING OF BLACKLINE OF DISCLOSURE STATEMENT RELATING
TO THE JOINT PLAN OF REORGANIZATION OF AT HOME GROUP INC. AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that, on July 7, 2025, the above-captioned debtors and debtors

in possession (the "Debtors") filed the *Disclosure Statement Relating to the Joint Plan of*

*Reorganization of At Home Group Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the*

*Bankruptcy Code* [D.I. 250].

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are: At Home Group Inc. (9563); Ambience Parent, Inc. (6231); Ambience Intermediate, Inc. (0692); At Home Holding II Inc. (9755); At Home Holding III Inc. (9930); At Home Companies LLC (6921); At Home Stores LLC (4961); At Home RMS Inc. (5235); At Home Gift Card LLC (0357); At Home Procurement Inc. (1777); At Home Properties LLC (2759); At Home Assembly Park Drive Condominium Association (N/A); 1600 East Plano Parkway, LLC (4757); 1944 South Greenfield Road LLC (4377); 2301 Earl Rudder Frwy S LLC (N/A); 3551 S 27th Street LLC (9350); 300 Tanger Outlet Blvd LLC (N/A); 3002 Firewheel Parkway LLC (2759); 2016 Grand Cypress Dr LLC (N/A); 8651 Airport Freeway LLC (0523); Transverse II Development LLC (8595); Rhombus Dev, LLC (4783); 1000 Turtle Creek Drive LLC (9177); 19000 Limestone Commercial Dr, LLC (3711); 4801 183A Toll Road, LLC (3909); 7050 Watts Rd LLC (N/A); 4700 Green Road LLC (9049); 361 Newnan Crossing Bypass LLC (N/A); 4304 West Loop 289 LLC (4302); 10460 SW Fellowship Way LLC (N/A); 1720 N Hardin Blvd LLC (N/A); Compass Creek Parkway LLC (N/A); 10800 Assembly Park Dr LLC (6145); Nodal Acquisitions, LLC (N/A); 15255 N Northsight Blvd LLC (N/A); 3015 W 86th St LLC (N/A); 9570 Fields Ertel Road LLC (N/A); 1376 E. 70th Street LLC (9942); 11501 Bluegrass Parkway LLC (3626); 12990 West Center Road LLC (9396); 334 Chicago Drive, LLC (2864); and 4200 Ambassador Caffery Pkwy LLC (5119). The location of the Debtors' service address for purposes of these chapter 11 cases is: 9000 Cypress Waters Blvd, Coppell, Texas 75019.

**PLEASE TAKE FURTHER NOTICE** that on July 29, 2025, the Debtors filed the *Disclosure Statement Relating to the Joint Plan of Reorganization of At Home Group Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 392].

**PLEASE TAKE FURTHER NOTICE** that on August 11, 2025, the Debtors filed the *Disclosure Statement Relating to the Joint Plan of Reorganization of At Home Group Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 509] (the "Revised Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that, contemporaneously herewith, the Debtors filed a revised version of the Revised Disclosure Statement [D.I. 532] (the "Further Revised Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that, for the convenience of the Court and parties in interest, a blackline comparing the Further Revised Disclosure Statement to the Revised Disclosure Statement is attached hereto as **Exhibit 1**.

**PLEASE TAKE FURTHER NOTICE** that the Further Revised Disclosure Statement remains subject to ongoing review, and the rights of the Debtors and all parties in interest are reserved.  For the avoidance of doubt, the Debtors reserve their rights to further amend, supplement, or modify the Further Revised Disclosure Statement.

*[Remainder of page intentionally left blank]*

Dated:  August 16, 2025
Wilmington, Delaware

/s/ Timothy R. Powell

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (DE Bar No. 2847)
Joseph M. Mulvihill (DE Bar No. 6061)
Timothy R. Powell (DE Bar No. 6894)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253
Email:          rbrady@ycst.com
                jmulvihill@ycst.com
                tpowell@ycst.com

*Co-Counsel for the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Elizabeth H. Jones (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          nicole.greenblatt@kirkland.com
                matthew.fagen@kirkland.com
                elizabeth.jones@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

## EXHIBIT 1

**Blackline**

> **THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AT HOME GROUP INC., *et al.*,[1] | ) | Case No. 25-11120 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DISCLOSURE STATEMENT RELATING TO THE JOINT PLAN OF REORGANIZATION OF AT HOME GROUP INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**        **KIRKLAND & ELLIS LLP**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are: At Home Group Inc. (9563); Ambience Parent, Inc. (6231); Ambience Intermediate, Inc. (0692); At Home Holding II Inc. (9755); At Home Holding III Inc. (9930); At Home Companies LLC (6921); At Home Stores LLC (4961); At Home RMS Inc. (5235); At Home Gift Card LLC (0357); At Home Procurement Inc. (1777); At Home Properties LLC (2759); At Home Assembly Park Drive Condominium Association (N/A); 1600 East Plano Parkway, LLC (4757); 1944 South Greenfield Road LLC (4377); 2301 Earl Rudder Frwy S LLC (N/A); 3551 S 27th Street LLC (9350); 300 Tanger Outlet Blvd LLC (N/A); 3002 Firewheel Parkway LLC (2759); 2016 Grand Cypress Dr LLC (N/A); 8651 Airport Freeway LLC (0523); Transverse II Development LLC (8595); Rhombus Dev, LLC (4783); 1000 Turtle Creek Drive LLC (9177); 19000 Limestone Commercial Dr, LLC (3711); 4801 183A Toll Road, LLC (3909); 7050 Watts Rd LLC (N/A); 4700 Green Road LLC (9049); 361 Newnan Crossing Bypass LLC (N/A); 4304 West Loop 289 LLC (4302); 10460 SW Fellowship Way LLC (N/A); 1720 N Hardin Blvd LLC (N/A); Compass Creek Parkway LLC (N/A); 10800 Assembly Park Dr LLC (6145); Nodal Acquisitions, LLC (N/A); 15255 N Northsight Blvd LLC (N/A); 3015 W 86th St LLC (N/A); 9570 Fields Ertel Road LLC (N/A); 1376 E. 70th Street LLC (9942); 11501 Bluegrass Parkway LLC (3626); 12990 West Center Road LLC (9396); 334 Chicago Drive, LLC (2864); and 4200 Ambassador Caffery Pkwy LLC (5119). The location of the Debtors' service address for purposes of these chapter 11 cases is: 9000 Cypress Waters Blvd, Coppell, Texas 75019.

Robert S. Brady (DE Bar No. 2847)
Joseph M. Mulvihill (DE Bar No. 6061)
Timothy R. Powell (DE Bar No. 6894)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:       (302) 571-1253
Email:            rbrady@ycst.com
                  jmulvihill @ycst.com
                  tpowell@ycst.com

**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Elizabeth H. Jones (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:            nicole.greenblatt@kirkland.com
                  matthew.fagen@kirkland.com
                  elizabeth.jones@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*        *Co-Counsel for the Debtors and Debtors in Possession*

Dated:  August 1~~1~~6, 2025

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

SOLICITATION OF VOTES ON THE *JOINT PLAN OF REORGANIZATION OF AT HOME GROUP INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* FROM THE HOLDERS OF OUTSTANDING:

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|:---:|:---:|
| CLASS 4 | CAYMAN NOTES CLAIMS |
| CLASS 5 | INTERCOMPANY NOTE CLAIMS |
| CLASS 6 | TERM LOAN CLAIMS |
| CLASS 7 | SENIOR SECURED NOTES CLAIMS |
| CLASS 8 | EXCHANGE NOTES CLAIMS |
| CLASS 9 | GENERAL UNSECURED CLAIMS |

IF YOU ARE IN CLASS 4, CLASS 5, CLASS 6, CLASS 7, CLASS 8, OR CLASS 9, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.

**DELIVERY OF BALLOTS**

**CLASS 4, CLASS 5, CLASS 6, CLASS 7, CLASS 8, AND CLASS 9 BALLOTS MAY BE RETURNED BY THE FOLLOWING METHODS:**

**BY REGULAR MAIL, OVERNIGHT MAIL, OR HAND DELIVERY AT:**

**AT HOME GROUP INC.,** *ET AL.* **BALLOT PROCESSING C/O OMNI AGENT SOLUTIONS, INC. 5955 DE SOTO AVE., SUITE 100 WOODLAND HILLS, CA 91367**

**BY ELECTRONIC ONLINE SUBMISSION VIA OMNI'S ONLINE PORTAL**

PLEASE VISIT HTTPS://OMNIAGENTSOLUTIONS.COM/ATHOME-BALLOTS AND CLICK ON THE "BALLOTING" SECTION OF THE WEBSITE AND FOLLOW THE DIRECTIONS TO SUBMIT YOUR BALLOT. IF YOU CHOOSE TO SUBMIT YOUR BALLOT VIA OMNI'S E-BALLOT SYSTEM, YOU SHOULD NOT ALSO RETURN A HARD COPY OF YOUR BALLOT.

PLEASE CHOOSE ONLY ONE METHOD TO RETURN YOUR BALLOT TO OMNI AGENT SOLUTIONS, INC. ("OMNI" OR THE "CLAIMS AND NOTICING AGENT").

FOR HOLDERS OF CAYMAN NOTES CLAIMS, SENIOR SECURED NOTES CLAIMS, AND EXCHANGE NOTES CLAIMS:

IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE. PLEASE ALLOW SUFFICIENT TIME FOR YOUR BALLOT TO BE INCLUDED ON A MASTER BALLOT COMPLETED BY YOUR NOMINEE. THE MASTER BALLOT MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT ON OR BEFORE THE VOTING DEADLINE.

IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO OMNI, PLEASE COMPLETE THE BALLOT AND RETURN IT PROMPTLY IN THE ENVELOPE PROVIDED SO THAT IT IS ACTUALLY RECEIVED BY OMNI BY THE VOTING DEADLINE.

TO VOTE ON THE PLAN, CLASS 4, CLASS 5, CLASS 6, CLASS 7, CLASS 8, AND CLASS 9 BALLOTS MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT BY THE VOTING DEADLINE, WHICH IS 4:00 P.M. (PREVAILING EASTERN TIME) ON [SEPTEMBER 16~~8~~], 2025, AS DIRECTED ON YOUR BALLOT.

**IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN:**

**YOU CAN CONTACT THE CLAIMS AND NOTICING AGENT BY E-MAIL AT: ATHOMEINQUIRIES@OMNIAGNT.COM (REFERENCING "AT HOME GROUP INC. – SOLICITATION INQUIRY" IN THE SUBJECT LINE).**

**YOU CAN ALSO CONTACT THE CLAIMS AND NOTICING AGENT BY PHONE TOLL-FREE AT 1 (888) 818-9346 (TOLL FREE/DOMESTIC) OR +1 (747) 293-0014 (INTERNATIONAL).**

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, AND INCLUDING ALL EXHIBITS AND SUPPLEMENTS HERETO, THE "<u>DISCLOSURE STATEMENT</u>") TO CERTAIN HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT PLAN OF REORGANIZATION OF AT HOME GROUP INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, AND INCLUDING ALL EXHIBITS AND SUPPLEMENTS THERETO, THE "<u>PLAN</u>").[2]  A COPY OF THE PLAN IS ATTACHED HERETO AS <u>EXHIBIT A</u> AND IS INCORPORATED HEREIN BY REFERENCE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO SUCH RIGHTS SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE VIII</u> HEREIN, AND RELATED DOCUMENTS.  IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (WHEN AND IF APPROVED) DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS REGARDING THE DEBTORS' FORTHCOMING CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, THE RSA, OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN, THE RSA, OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR

---

[2]    Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan or the RSA, as applicable.  **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan shall govern**.

WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AS OF THE DATE HEREOF OR SPECIFIED THEREIN. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AND THEIR FUTURE RESULTS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER BY THE DEBTORS OR ANY OTHER PARTY. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE OR DISTRIBUTE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT, IN EACH CASE, FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RSA.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT AND DO NOT TAKE RESPONSIBILITY FOR, OR PROVIDE ANY ASSURANCE AS TO THE RELIABILITY OF, ANY OTHER INFORMATION THAT OTHERS MAY GIVE YOU. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING

THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING <u>ARTICLE VIII</u> HEREIN, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO ACCEPT OR REJECT THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

<u>SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS</u>

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

## FORWARD-LOOKING STATEMENTS

**THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT, INCLUDING INFORMATION CONCERNING THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF CLAIMS, AMONG OTHER THINGS, THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF UNITED STATES FEDERAL SECURITIES LAWS. FORWARD-LOOKING STATEMENTS INCLUDE ANY STATEMENT THAT DOES NOT DIRECTLY RELATE TO ANY HISTORICAL OR CURRENT FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "ANTICIPATE," "ARE CONFIDENT," "ASSUME," "BELIEVE," "CONTINUE," "COULD," "ESTIMATE," "EXPECT," "INTEND," "MAY," "MIGHT," "OUTLOOK," "PLAN," "POTENTIAL," "PREDICT," "SEEK," "SHOULD," "TREND," OR "WILL," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY REGARDING FUTURE EVENTS OR CONDITIONS. FORWARD-LOOKING STATEMENTS ARE BASED ON THE DEBTORS' CURRENT EXPECTATIONS AND ASSUMPTIONS, WHICH MAY NOT PROVE TO BE ACCURATE. THESE STATEMENTS ARE NOT GUARANTEES AND ARE SUBJECT TO RISKS, UNCERTAINTIES AND CHANGES IN CIRCUMSTANCES THAT ARE DIFFICULT TO PREDICT, AND SIGNIFICANT CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. MANY FACTORS COULD CAUSE THE DEBTORS' ACTUAL RESULTS TO DIFFER MATERIALLY AND ADVERSELY FROM ANY OF THESE FORWARD-LOOKING STATEMENTS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, INCLUDING THE FOLLOWING, TO BE FORWARD-LOOKING STATEMENTS:**

- THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN;

- THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE ALTERNATIVE TRANSACTIONS IF THE PLAN IS NOT CONFIRMED;

- THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES;

- THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES;

- THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES;

- THE EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- THE DEBTORS' EXPOSURE TO LITIGATION;

- THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER;

- TAXATION APPLICABLE TO THE DEBTORS AND ADVERSE TAX CHANGES;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY TO SATISFY LIQUIDITY NEEDS DURING THE CHAPTER 11 CASES;

- GENERAL ECONOMIC, BUSINESS, AND BUSINESS CONDITIONS;

- THE DEBTORS' INABILITY TO MAINTAIN RELATIONSHIPS WITH EMPLOYEES AND OTHER THIRD PARTIES AS A RESULT OF THESE CHAPTER 11 CASES OR OTHER FAILURE OF SUCH PARTIES TO COMPLY WITH THEIR CONTRACTUAL OBLIGATIONS;

- INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;

- CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;

- LIMITED ACCESS TO CAPITAL RESOURCES;

- OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES AND INTERNATIONALLY, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;

- FLUCTUATIONS IN OPERATING COSTS;

- PLANS, OBJECTIVES, AND EXPECTATIONS;

- FLUCTUATIONS IN TARIFFS, INTEREST RATES, AND CURRENCY VALUES; AND

- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' OR COMPANY'S FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' OR COMPANY'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; OBJECTIONS TO THE PLAN AND THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; RISKS ASSOCIATED WITH THIRD-PARTY MOTIONS IN THE CHAPTER 11 CASES; BANKRUPTCY COURT RULINGS IN THE CHAPTER 11 CASES AND THE OUTCOME OF THE CHAPTER 11 CASES IN GENERAL; OTHER LITIGATION AND INHERENT RISKS INVOLVED IN A BANKRUPTCY PROCESS; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE AND ADDRESS THEIR DEBT SERVICE OBLIGATIONS; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' BUSINESS, FINANCIAL CONDITION, LIQUIDITY AND RESULTS OF OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11**

CASES, INCLUDING INCREASED LEGAL AND OTHER PROFESSIONAL COSTS NECESSARY TO EXECUTE THE DEBTORS' REORGANIZATION; THE LENGTH OF TIME THAT THE COMPANY WILL OPERATE UNDER CHAPTER 11 PROTECTION AND THE CONTINUED AVAILABILITY OF OPERATING CAPITAL DURING THE PENDENCY OF THE CHAPTER 11 CASES; THE COMPANY'S ABILITY TO COMPLY WITH THE RESTRICTIONS IMPOSED BY THE COVENANTS, TERMS AND CONDITIONS OF ITS FINANCING ARRANGEMENTS; EMPLOYEE ATTRITION AND THE COMPANY'S ABILITY TO RETAIN KEY EXECUTIVE MANAGEMENT AND OTHER PERSONNEL DUE TO THE DISTRACTIONS AND UNCERTAINTIES RESULTING FROM THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES AND THE COMPANY'S ABILITY TO MAINTAIN RELATIONSHIPS WITH SUPPLIERS, CUSTOMERS, EMPLOYEES AND OTHER THIRD PARTIES AND REGULATORY AUTHORITIES AS A RESULT OF THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; PANDEMICS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESS. THESE FACTORS SHOULD NOT BE CONSTRUED AS EXHAUSTIVE AND SHOULD BE READ IN CONJUNCTION WITH THE ADDITIONAL INFORMATION AND DISCUSSION OF OTHER RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT. THE DEBTORS UNDERTAKE NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS INCLUDED IN THIS DISCLOSURE STATEMENT AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF CLAIMS AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE. WE UNDERTAKE NO OBLIGATION TO UPDATE OR REVISE THE FORWARD LOOKING STATEMENTS INCLUDED IN THIS DISCLOSURE STATEMENT, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ..................................................................................... 1

II.  PRELIMINARY STATEMENT. ................................................................. 1

III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT
     AND THE PLAN .................................................................................... 4

     A.  What is chapter 11? ........................................................................ 4
     B.  What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ........ 4
     C.  Why are the Debtors sending me this Disclosure Statement? ....................... 5
     D.  Am I entitled to vote on the Plan? ..................................................... 5
     E.  What will I receive from the Debtors if the Plan is consummated? ................. 6
     F.  What will I receive from the Debtors if I hold an Allowed Administrative Claim,
         Priority Tax Claim, Superpriority DIP Claim, or Professional Fee Claim? ......... 11
     G.  If the Plan provides that I get a distribution, do I get it upon Confirmation or
         when the Plan goes effective, and what is meant by "Confirmation," "Effective
         Date," and "Consummation?" ........................................................... 14
     H.  What are the sources of Cash and other consideration required to fund the Plan? ... 14
     I.  How does the Plan treat Executory Contracts and Unexpired Leases? ............. 14
     J.  Are any regulatory approvals required to consummate the Plan? .................. 15
     K.  Are there risks to owning the Reorganized Equity upon the Debtors' emergence
         from chapter 11? ........................................................................... 15
     L.  Is there potential litigation related to the Plan? ..................................... 15
     M.  What happens to my recovery if the Plan is not confirmed or does not go
         effective? ................................................................................... 15
     N.  What is the Management Incentive Plan and how will it affect the distribution
         I receive under the Plan? ................................................................ 16
     O.  Does the Plan preserve Causes of Action? ........................................... 16
     P.  Will there be releases, exculpation, and injunction granted to parties in interest
         as part of the Plan? ....................................................................... 17
     Q.  Do I have to grant the releases under the Plan? ................................... 24 5
     R.  What are the consequences of not opting in to the releases provided by the Plan? ... 25
     S.  What are the consequences of opting in to the releases provided by the Plan? ...... 25
     T.  Does the Bankruptcy Code protect against discriminatory treatment? ........... 26
     U.  Will the Company retain documents after any Effective Date? ................... 26
     V.  What is the effect of Reimbursement or Contribution? ............................ 26
     W.  What is the deadline to vote on the Plan? ............................................ 26
     X.  How do I vote for or against the Plan? ................................................ 26
     Y.  Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the
         Confirmation hearing set to occur? .................................................. 26 7
     Z.  What is the purpose of the Confirmation Hearing? .................................. 27
     AA. What is the effect of the Plan on the Debtors' ongoing business? ............... 27 8
     BB. Will any party have significant influence over the corporate governance and
         operations of the Reorganized Debtors? .............................................. 28
     CC. Who do I contact if I have additional questions with respect to this Disclosure
         Statement or the Plan? .................................................................... 28
     DD. Who Supports the Plan? .................................................................. 28 9
     EE. Do the Debtors recommend voting in favor of the Plan? ........................... 28 9

| | | |
|---|---|---|
| IV. | **OVERVIEW OF THE PLAN.** | **29** |
| V. | **CORPORATE HISTORY AND BUSINESS OPERATIONS** | **40~~3~~** |
| | A. Corporate History | 40~~3~~ |
| | B. Business Operations | 41~~4~~ |
| | C. At Home's Prepetition Capital Structure | 43~~6~~ |
| VI. | **EVENTS LEADING TO THESE CHAPTER 11 FILINGS** | **45~~7~~** |
| | A. Business Challenges | 45~~7~~ |
| | B. The Company's Prepetition Initiatives | 48~~50~~ |
| VII. | **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** | **54~~3~~** |
| | A. First and Second Day Relief | 54~~3~~ |
| | B. Appointment of the Committee | 55~~8~~ |
| | C. Retention of Professionals | 56~~8~~ |
| | D. Bar Dates | ~~57~~60 |
| | E. The Disinterested Directors' Investigation | ~~58~~60 |
| VIII. | **RISK FACTORS** | **~~59~~62** |
| | A. Bankruptcy Law Considerations | 60~~3~~ |
| | B. Risks Related to Recoveries Under the Plan | 65~~8~~ |
| | C. Risks Related to the Debtors' and the Reorganized Debtors' Business | 66~~9~~ |
| | D. Risks Related to the Offer and Issuance of Securities Under the Plan | 70~~3~~ |
| IX. | **SOLICITATION AND VOTING PROCEDURES** | **72~~5~~** |
| | A. Holders of Claims Entitled to Vote on the Plan | 72~~5~~ |
| | B. Voting Record Date. | 72~~5~~ |
| | C. Voting Deadline | 72~~5~~ |
| | D. Ballots Not Counted | 73~~6~~ |
| X. | **CONFIRMATION OF THE PLAN** | **73~~6~~** |
| | A. Requirements for Confirmation of the Plan | 73~~6~~ |
| | B. Best Interests of Creditors/Liquidation Analysis. | 73~~6~~ |
| | C. Feasibility. | 74~~7~~ |
| | D. Acceptance by Impaired Classes | 74~~7~~ |
| | E. Confirmation Without Acceptance by All Impaired Classes | 75~~8~~ |
| | F. Valuation Analysis. | 76~~9~~ |
| XI. | **CERTAIN SECURITIES LAW MATTERS** | **76~~9~~** |
| | A. Reorganized Equity | 76~~9~~ |
| | B. Exemption from Registration Requirements; Issuance of Reorganized Equity Under the Plan | 76~~9~~ |
| | C. Resales of Reorganized Equity; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code | ~~77~~80 |

**XII.**    **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.** ...........................................................................................................803

    A.      Introduction .........................................................................................................803

    B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors .......................................................................................825

    C.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Claims ..................................................................................................................869

    D.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Claims .............................................................................................................891

    E.      Information Reporting and Back-Up Withholding ..............................................936

**XIII.**    **RECOMMENDATION** ................................................................................................946

**EXHIBITS**[3]

EXHIBIT A      Plan of Reorganization

EXHIBIT B      Financial Projections

EXHIBIT C      Valuation Analysis

EXHIBIT D      Liquidation Analysis

EXHIBIT E      Restructuring Support Agreement

---

[3]    Each Exhibit is incorporated herein by reference.

## I.      INTRODUCTION.

At Home Group Inc. and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "At Home" or the "Company"), are pursuing proposed restructuring transactions (the "Restructuring Transactions") pursuant to the terms and conditions set forth in that certain Restructuring Support Agreement by and among the Company and the Consenting Stakeholders (as may be amended, supplemented, or otherwise modified from time to time, and including all schedules, exhibits, and annexes thereto, the "RSA"), a copy of which is attached hereto as **Exhibit E**.  The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes to accept or reject the Plan.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS, THE COMMITTEE, AND THE CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RSA BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  ACCORDINGLY, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.     PRELIMINARY STATEMENT.

At Home is a home décor and furnishings brand that offers its customers a broad assortment of everyday and seasonal products for any room in the home.  At Home's merchandise is sold to its millions of customers through its approximately 260 large format retail locations across 40 states and the Company's e-commerce website.  The Company employs over 7,000 employees throughout the nation and with its deep-rooted expertise in design, product development, sourcing, and merchandising strategies, has solidified its position as a leading destination for home décor and furnishings with potential to continue growing its market share.

Over the past few years, At Home has experienced a series of unprecedented challenges.  As the COVID-19 pandemic subsided, the Company, like many retailers, dealt with a number of financial and operational headwinds in 2022, including:  (a) inflationary cost pressures driven primarily by dramatically elevated industry-wide freight rates; (b) softening demand in the home décor market following a surge in demand during the pandemic; and (c) shifting consumer preferences away from brick-and-mortar locations and towards online shopping.  Accordingly, in May 2023, At Home completed a $200 million new money capital raise and unsecured senior notes exchange.  Despite this infusion of new cash, unprecedented global impacts continued to frustrate the Company's existing business plan.  In response, the Company took a number of proactive steps, including implementing cost and liquidity management initiatives, recruiting a new senior management team, and recalibrating At Home's operational focus.

With new management in place, in early 2025, the Company recognized its acute need to improve liquidity.  In January 2025, At Home initiated discussions with the ABL Agent who raised concerns with the Company's existing liquidity constraints and likely inability to address its upcoming maturities under the ABL Credit Agreement.  In addition, the Company retained AlixPartners, LLP, ("AlixPartners"), PJT Partners LP, ("PJT"), and Kirkland & Ellis LLP ("Kirkland") as advisors, appointed two disinterested directors to the boards of directors of certain Debtors (collectively, the

"Parent Boards"),[4] and formed a special committee (the "Special Committee") to evaluate strategic alternatives. In late February and March 2025, the Company, with the assistance of its advisors, began exploring financing options and soliciting proposals from existing and new investors. In March 2025, the Company commenced negotiations with an ad hoc group initially comprised of Redwood Capital Management, LLC, Farallon Capital Advisors, L.L.C., and Anchorage Capital Advisors, L.P. (together with all subsequent members joining the ad hoc group, the "Ad Hoc Group") on a possible comprehensive restructuring that would deleverage the Company and raise a new money investment.

In the midst of the Company's attempts to address its liquidity situation and during the early stages of the management team's transformation strategy, tariffs began to adversely impact the retail industry. At Home, a company that relies heavily on foreign suppliers, was—and remains—significantly impacted by new tariff policies, which intensified the financial pressure on the Company and accelerated the need for a comprehensive solution. As such, the Company determined that the best path forward to address its liquidity position and maximize value for all stakeholders was to continue to engage with the Ad Hoc Group on a comprehensive restructuring of the Company.

In the months leading up to the Petition Date, the Company engaged in good faith arm's-length negotiations that included extensive diligence and meetings with the Ad Hoc Group. As a result of those negotiations, on June 16, 2025, the Debtors entered into an RSA with the Ad Hoc Group and other lenders and noteholders that collectively hold approximately 96% of the Company's first lien debt,[5] pursuant to which the Debtors are effectuating the Restructuring Transactions through "prearranged" Chapter 11 Cases. The key terms of the RSA, which are incorporated into the Plan, include:

- the Debtors' entry into financing arrangements to provide funding throughout the duration of these Chapter 11 Cases in the form of (a) a priming superpriority senior secured debtor-in-possession financing multi-draw term loan (the "DIP Facility") comprised of a $200 million new money commitment and a $400 million roll-up of the Pari First Lien Obligations (as defined in the DIP Orders) and (b) the consensual use of cash collateral;

- the conversion of Allowed Superpriority DIP Claims into 98% of the Reorganized Common Stock upon emergence from the Chapter 11 Cases subject to dilution by the MIP Shares;

- each Holder of an ABL Facility Claim receiving payment in full;

- each Holder of an Allowed Secured Claim arising out of its Allowed First Lien Claim receiving its Pro Rata Share of the First Lien Equity Distribution comprised of all remaining Reorganized Common Stock after giving effect to the DIP Equity Conversion (subject to dilution by the MIP Shares);

- each Holder of an Allowed General Unsecured Claim receiving its pro rata share of the ~~GUC Recovery Pool~~Unsecured Claims Distribution Trust Beneficial Interests;

---

[4]    The Parent Boards include the boards of: Ambience Parent, Inc.; Ambience Intermediate, Inc.; At Home Group Inc.; At Home Holding II Inc.; and At Home Holding III Inc.

[5]    In May 2025, the Ad Hoc Group expanded to include three additional parties, Silver Rock Financial and its relying advisors (together, "Silver Rock") Aryeh Capital Management Ltd., and Glendon Capital Management L.P.

- the cancellation of Existing Equity Interests;

- funding for plan distributions in the form of a new, exit asset-based loan facility to be entered into by the Reorganized Debtors on the Effective Date; and

- the adoption of the Management Incentive Plan by the New Board within 90 days of the Effective Date, which will provide up to 10% of the Reorganized Equity for management and the New Board.

On June 16, 2025 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to consummate the Restructuring Transactions contemplated in the RSA.  At a hearing held on June 17, 2025, the Bankruptcy Court granted all the relief the Debtors requested in their First Day Motions on an interim or final basis, including approving the DIP Facility on an interim basis and authorizing the Debtors to continue using their cash management system, pay the prepetition wages and salaries of their employees, maintain and administer their customer programs, maintain insurance, pay the prepetition claims of critical vendors, and provide adequate assurance for future utility services.

Since the Petition Date, the RSA and Restructuring Transactions have continued to gain support. As of the date of the filing of this Disclosure Statement, holders of approximately 100% of the Company's first lien debt and holders of approximately 89% of the Company's Senior Unsecured Notes Obligations (as defined in the Plan) are party to the RSA.

The RSA and Plan are structured to support At Home's ongoing commitment to its customers, business partners, and stakeholders while strengthening the business as a going-concern.  With the support of their lenders and other key stakeholders, the Debtors seek authority to move through the chapter 11 process efficiently to minimize disruption to the business and the accrual of administrative expenses.  The RSA includes certain milestones to expedite these Chapter 11 Cases, including:

- the Bankruptcy Court shall enter the Final DIP Order no later than 35 days after the Petition Date;

- the Bankruptcy Court shall enter the Disclosure Statement Order no later than 38 days after the filing of the Plan and Disclosure Statement;

- the Bankruptcy Court shall enter the Confirmation Order no later than 60 days after the entry of the Disclosure Statement Order; and

- the confirmed Plan shall become effective no later than 14 days after the entry of the Confirmation Order.

The Plan includes customary debtor and third-party releases.  The Disinterested Directors, with the assistance of Young Conaway, conducted an independent investigation to assess the merits and potential value of any potential claims and Causes of Action held by the Company against any Related Party or otherwise related to any conflicts matter, as further explained in **Article VII.E** of this Disclosure Statement.  Based on the results of the Investigation, the Debtors believe the Plan, and the transactions, settlements, and compromises embodied therein, are the best alternative available to the Estates.  The releases, exculpation, and injunction are an integral component of the Plan, which provides significant distributions of value to administrative, priority, secured, and unsecured creditors.  Unless otherwise

explicitly released under the Plan or separate order of the Bankruptcy Court, all other unencumbered assets, including Estates Claims and Causes of Action, are being preserved by the Plan.

The Debtors, with broad support across their capital structure, strongly believe that the deleveraging and liquidity-enhancing Restructuring Transactions contemplated by the RSA and the Plan are in the best interest of the Debtors' Estates and represent the best available alternative to the Company at this time. In particular, the Plan provides a more favorable alternative to the Debtors' creditors than a potential liquidation of the Debtors' estates. If the Debtors' business were liquidated in a chapter 7 process, for example, creditors likely would receive lower recoveries because the value-maximizing Restructuring Transactions may not be consummated and the Debtors' Estates would necessarily bear additional costs associated with transitioning to chapter 7, retaining a chapter 7 trustee, counsel, and advisors, and administering a chapter 7 process. Given the Debtors' core strengths and strong customer relationships, the Debtors are confident that they can implement the Restructuring Transactions contemplated by the Plan and the RSA to ensure the Debtors' long-term viability. Ultimately, confirmation of the Plan will enable At Home to eliminate approximately $1.620 billion of the Company's existing $1.998 billion in debt and emerge from chapter 11 in a better position than ever to remain a leading destination in the home décor and furnishings market.

> **FOR THESE REASONS, THE DEBTORS STRONGLY RECOMMEND THAT HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN.

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly-situated equity holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" until a chapter 11 plan is consummated.

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.   What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?

As described in **Article VI** of this Disclosure Statement, as well as in the *Declaration of Jeremy Aguilar, Chief Financial Officer of At Home Group Inc. and Certain of its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 4] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to proposals for a new "first-in last-out" facility and a standalone financing, to provide stability and requisite capital to their business enterprise.

**C.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires that the Debtors prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such Disclosure Statement with all Holders of Claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**D.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ABL Facility Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | Cayman Notes Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Note Claims | Impaired | Entitled to Vote |
| Class 6 | Term Loan Claims | Impaired | Entitled to Vote |
| Class 7 | Senior Secured Notes Claims | Impaired | Entitled to Vote |
| Class 8 | Exchange Notes Claims | Impaired | Entitled to Vote |
| Class 9 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 10 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 11 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 12 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 13 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth above in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth therein shall apply separately to each of the Debtors (except for the Class 12 Existing Equity Interests, which shall apply only to Ambience Parent, Inc.). All of the potential Classes for the Debtors are set forth in the Plan. Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

### E.    What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan. Any estimates of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court, or otherwise. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

As discussed further herein, the RSA provides for repayment of each Allowed Superiority DIP Claim in full with Reorganized Equity in the amount of its pro rata share of the DIP Equity Conversion (subject to dilution on account of the MIP Shares). All remaining Reorganized Equity after giving effect to the DIP Equity Conversion, shall be valued at the midpoint provided in the Valuation Analysis, distributed pro rata to holders of Allowed First Lien Claims on account of their Allowed Secured Claims in respect thereof, and was used to calculate the projected recoveries set forth below with respect to the Allowed Secured Claims arising out of the Allowed First Lien Claims.[6] As discussed further in Article III.B of the Plan, Holders of an Allowed First Lien Claim, shall have a First Lien Deficiency Claim for the amount remaining after accounting for the recovery on account of the Allowed Secured Claim arising out of their Allowed First Lien Claim, and shall be entitled to vote such Claim, but shall not receive a distribution on behalf of such First Lien Deficiency Claim.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[7]**

---

[6]    For the avoidance of doubt, estimated recovery percentages under the Plan for Class 4 Cayman Notes Claims, Class 5 Intercompany Note Claims, Class 6 Term Loan Claims, Class 7 Senior Secured Notes Claims, and Class 8 Exchange Note Claims have been estimated at 100% of the Allowed Secured Claim in the form of Reorganized Equity using the midpoint value provided in the Valuation Analysis such that such Claims are impaired on account of receiving Reorganized Equity in lieu of Cash.

[7]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

| SUMMARY OF ESTIMATED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated % Recovery under the Plan |
| Class 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, on the Effective Date or as soon as reasonably practicable thereafter, shall receive either: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) delivery of the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $12,499,677.00 | 100% |
| Class 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, on the Effective Date, each Holder of such Allowed Other Priority Claim shall receive treatment in a manner consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Subject to reconciliation | N/A |
| Class 3 | ABL Facility Claims | Except to the extent that a Holder of an Allowed ABL Facility Claim agrees to less favorable treatment of its Allowed ABL Facility Claim, on the Effective Date, each Holder of an Allowed ABL Facility Claim will receive, in full and final satisfaction, settlement, release, and discharge of such Allowed ABL Facility Claim, payment in full in Cash with the proceeds of the Exit ABL Facility, including termination and/or cash collateralization of any outstanding letters of credit, cash management obligations, or hedging obligations. | $377,925,499.82 | 100% |
| Class 4 | Cayman Notes Claims | Except to the extent that a Holder of an Allowed Cayman Notes Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Cayman Notes Claim shall receive (i) such Holder's Pro Rata Share of the First Lien Equity Distribution and (ii) such Holder's Pro Rata Share of all Class 5 Intercompany Note Claims recoveries distributed to the Trustee in respect of the Cayman Notes in accordance with Article III.B.5(c) of the Plan. | $8,152.58 | 100% |

| SUMMARY OF ESTIMATED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated % Recovery under the Plan |
| Class 5 | Intercompany Note Claims | Except to the extent that a Holder of an Allowed Intercompany Note Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Intercompany Note Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution; *provided* that such Holder's recovery under the Plan shall be payable to the indenture trustee and collateral agent for the Cayman Notes for distribution to the Holders of the Allowed Cayman Notes Claims in accordance with the documents governing the Cayman Notes only until such Cayman Notes are repaid in full. | $8,152.58 | 100% |
| Class 6 | Term Loan Claims | Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each holder of an Allowed Secured Claim arising out of its Term Loan Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution. | $2,623,466.27 | 100% |
| Class 7 | Senior Secured Notes Claims | Except to the extent that a Holder of an Allowed Senior Secured Notes Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Senior Secured Notes Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution. | $1,866,102.51 | 100% |
| Class 8 | Exchange Notes Claims | Except to the extent that a holder of an Allowed Exchange Notes Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Exchange Notes Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution. | $2,994,126.05 | 100% |

| | | SUMMARY OF ESTIMATED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated % Recovery under the Plan |
| Class 9 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment of its Allowed General Unsecured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim, on the Effective Date, each Holder of any Allowed General Unsecured Claim (other than any Holder of any First Lien Deficiency Claim) shall receive its Pro Rata Share of the ~~GUC Recovery Pool; *provided* that the recovery under the Plan of such Holder of an Allowed General Unsecured Claim that is also an Intercompany Note Claim shall be payable to the indenture trustee and collateral agent for the Cayman Notes for distribution to the Holders of the Allowed Cayman Notes Claims in accordance with the documents governing the Cayman Notes only until such Cayman Notes are repaid in full~~Unsecured Claims Distribution Trust Beneficial Interests. For the avoidance of doubt, Holders of First Lien Deficiency Claims shall not receive any Unsecured Claims Distribution Trust Beneficial Interests or any recovery from the Unsecured Claims Distribution Trust or the Unsecured Claims Distribution Trust Net Assets on account of such First Lien Deficiency Claim. | $1,~~390~~4,000,000.00 [8] | ~~0.11~~2% [9] |
| Class 10 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be (i) reinstated, or (ii) set off, settled, discharged, contributed, cancelled, released, and extinguished without any distribution on account of such Intercompany Claim, in each case, at the Reorganized Debtors' election with the consent of the Required Consenting Stakeholders. | **Subject to reconciliation** | **None** |

---

[8] The projected allowed amount of General Unsecured Claims is based on the Debtors' books and records as of the date hereof, and all General Unsecured Claims are subject to reconciliation. For the avoidance of doubt, the projected amount of General Unsecured Claims excludes any Claims listed in the Debtors' schedules and statements as contingent, unliquidated, or disputed. Any Claim that is not: (a) paid in full prior to the Effective Date; (b) an Administrative Claim; (c) a Priority Tax Claim; (d) a Superpriority DIP Claim; (e) an Other Priority Claim; (f) an Intercompany Claim; and (g) a Section 510(b) Claim shall be General Unsecured Claims. For the avoidance of doubt, (i) Senior Unsecured Notes Claims, (ii) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, (iii) Unsecured Claims resulting from litigation against one or more of the Debtors, and (iv) the First Lien Deficiency Claims, in each case shall be General Unsecured Claims. The projected allowed amount of General Unsecured Claims excludes the $1,196,000,000.00 in First Lien Deficiency Claims because the Holders of such First Lien Deficiency Claims have agreed to waive their right to recover on account of such claims.

[9] The estimated percentage of recovery to Holders of General Unsecured Claims is calculated based on $~~13.5~~9 million as provided in the ~~GUC Recovery Pool~~Unsecured Claims Distribution Trust but does not account for any differences that may be calculated by subtracting the (x) the amount of the Allowed fees and expenses of the Committee and its Professionals from (y) the amount set forth for such fees and expenses in the Approved Budget (as defined in the DIP Orders). As such, the estimated percentage of recovery to Holders of General Unsecured Claims is subject to change.

| SUMMARY OF ESTIMATED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated % Recovery under the Plan |
| Class 11 | Intercompany Interests | On the Effective Date, all Intercompany Interests shall be (a) reinstated, or (b) set off, settled, discharged, contributed, cancelled, released, and extinguished and without any distribution on account of such Intercompany Interests, in each case, at the Reorganized Debtors' election with the consent of the Required Consenting Stakeholders. | **N/A** | **None** |
| Class 12 | Existing Equity Interests | On the Effective Date, all Existing Equity Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect. Holders of Existing Equity Interests shall receive no recovery or distribution on account thereof and each Holder of an Existing Equity Interest shall not receive or retain any distribution, property, or other value on account of such Existing Equity Interest. | **N/A** | **None** |
| Class 13 | Section 510(b) Claims | On the Effective Date, all Section 510(b) Claims shall be cancelled, released, extinguished, and discharged and will be of no further force or effect. Holders of Section 510(b) Claims shall receive no recovery or distribution on account thereof and each Holder of a Section 510(b) Claim shall not receive or retain any distribution, property, or other value on account of such Section 510(b) Claim. | **N/A** | **None** |



F.    **What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, Superpriority DIP Claim, or Professional Fee Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, Superpriority DIP Claims, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    **Administrative Claims.**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Superpriority DIP Claims, if applicable, Professional Fee Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code) that has not been paid in full prior to the Effective Date, will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by

the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Plan, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors by the applicable Administrative Claims Bar Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or the Reorganized Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Notwithstanding anything else herein, the Allowed Superpriority DIP Claims shall not be subject to the Administrative Claims Bar Date.

### 2.    Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter).

### 3.    Superpriority DIP Claims.

All Superpriority DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility in accordance with the terms and in the amounts specified under the DIP Orders and the DIP Documents on such date, (ii) all interest accrued and unpaid thereon to the date of payment, and (iii) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Documents and the DIP Orders.

Except to the extent that a Holder of an Allowed Superpriority DIP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Superpriority DIP Claim, each Holder of an Allowed Superpriority DIP Claim, including the DIP Agent, shall receive either (i) payment in full in Cash of its Allowed Superpriority DIP Claim in accordance with the terms and in the amounts specified under the DIP Orders and the DIP Documents, (ii) its pro rata share of the DIP Equity Conversion (subject to dilution on account of the MIP Shares), or (iii) such other treatment as to which the Debtors and the Holders of the Allowed Superpriority DIP Claims will have agreed upon in writing. For the avoidance of doubt, all accrued and unpaid fees, expenses, and non-contingent indemnification obligations (if any) payable under the DIP Documents and the DIP Orders (including applicable Restructuring Expenses) constituting Superpriority DIP Claims shall be paid in full in Cash on the Effective Date, unless otherwise expressly provided under the applicable DIP Documents. The Debtors intend to repay the Allowed Superiority DIP Claims in full with Reorganized Equity in the amount of its pro rata share of the DIP Equity Conversion (subject to dilution on account of the MIP Shares). Holders of Allowed Superpriority DIP Claims that receive Reorganized Equity pursuant to the DIP Equity Conversion shall be permitted to direct distributions of their Reorganized Equity to designees with the consent of the Required Consenting Stakeholders.

Following such satisfaction of the Allowed Superpriority DIP Claims, the DIP Facility, the DIP Documents, and all related loan documents shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case, without further action by the DIP Agent or the DIP Lenders and without further order of the Bankruptcy Court, and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the Superpriority DIP Claims shall be automatically discharged and released, in each case, without further action by the DIP Agent or the DIP Lenders.  At the expense of the Debtors or Reorganized Debtors, the DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

4.      **Professional Fee Claims**.

(a)      **Final Fee Applications and Payment of Professional Fee Claims**.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 60 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

(b)      **Professional Fee Escrow Account**.

No later than the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount including any cash from the Funded Reserve Account (as defined in the DIP Orders).  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors, as applicable.  The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account.  When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      **Professional Fee Amount**.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors or the Committee before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than three Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount

13

of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional; *provided, however,* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.

>    **(d)    Post-Confirmation Fees and Expenses**.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. A good faith estimate of the fees owed to Professionals incurred following the Confirmation Date shall be included in the Professional Fee Escrow Account and paid in the ordinary course of business; *provided, however*, that such estimate shall not be deemed to limit the amount of fees and expenses actually incurred by such Professionals.

>    **G.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived before the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. The "Effective Date" is the date on which (a) all conditions precedent set forth in Article IX of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan and (b) the Plan is declared effective by the Debtors. "Consummation" of the Plan refers to the occurrence of the Effective Date. The conditions precedent to the Effective Date are described in Article IX of the Plan.

>    **H.    What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) the Debtors' Cash on hand as of the Effective Date; (2) the ~~proceeds of the Exit ABL Facility~~Reorganized Equity; and (3) the ~~Reorganized Equity~~proceeds from the Exit ABL Facility. The Unsecured Claims Distribution Trust shall fund its distributions, as contemplated by the Plan and the Unsecured Claims Distribution Trust Agreement, solely from the Unsecured Claims Distribution Trust Net Assets. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the Reorganized Equity, will be exempt from registration under the Securities Act, as described more fully in Article IV.M of the Plan.

I.      **How does the Plan treat Executory Contracts and Unexpired Leases?**

On the Effective Date, except as otherwise provided in the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code, each Executory Contract or Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically assumed *unless* such Executory Contract or Unexpired Lease:  (i) is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases, (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject Filed on or before the Effective Date; or (iv) is an insurance policy (which shall be treated in accordance with Article V.E of the Plan); *provided* that the assumption, assumption and assignment, or rejection of all Executory Contracts and Unexpired Leases shall be subject to the consent of the Required Consenting Stakeholders (not to be unreasonably withheld, conditioned, or delayed).  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all assumptions, assumptions and assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided for in the Plan, the Plan Supplement, and the Confirmation Order, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Except as otherwise specifically set forth in the Plan, assumptions or rejections of Executory Contracts or Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including 45 days after the Effective Date; *provided* that such alteration, amendment, modification, or supplement shall be subject to the consent rights set forth herein.

J.      **Are any regulatory approvals required to consummate the Plan?**

At this time, there are no known regulatory approvals that are required to consummate the Plan.  To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

K.      **Are there risks to owning the Reorganized Equity upon the Debtors' emergence from chapter 11?**

Yes.  *See* **Article VIII** of this Disclosure Statement, entitled "Risk Factors," for a discussion of such risks.

**L.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation. *See* **Article VIII.C.6** of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* **Article X.E** of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

**M.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their business efficiently, and distributions to Holders of Allowed Claims may be delayed. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended Chapter 11 Case, or of a liquidation scenario, see **Article VIII.B** of this Disclosure Statement, and the Liquidation Analysis attached hereto as **Exhibit D**.

**N.      [What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

On or within 90 days of the Effective Date, the New Board shall adopt the Management Incentive Plan, which will provide up to 10% of the Reorganized Equity (on a fully diluted and fully distributed basis) for management and the New Board of the Reorganized Debtors, which may be granted in any form acceptable to the New Board, including without limitation, in the form of options, restricted stock, restricted stock units, stock appreciations rights, or any combination thereof.]

**O.      Does the Plan preserve Causes of Action?**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' or Unsecured Claims Distribution Trust's, as applicable, rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than the Causes of Action released or exculpated herein by the Debtors pursuant to the releases and exculpations contained in the Plan, including in ~~Article VIII~~Article VIII of the Plan, which shall be deemed released and waived by the Debtors ~~and~~, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, as of the Effective Date. The Schedule of Retained Causes of Action shall specify which Assigned Preference Actions shall be deemed transferred to the Unsecured Claims Distribution Trust on the Effective Date.

The Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Unsecured Claims Distribution Trustee, as applicable. **No Entity may rely on the**

absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors ~~or,~~ the Reorganized Debtors, **or the Unsecured Claims Distribution Trust,** as applicable, will not pursue any and all available retained Causes of Action against it.   The Debtors ~~and,~~ the Reorganized Debtors, **and the Unsecured Claims Distribution Trust,** as applicable, expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity, except as otherwise expressly provided in the Plan.   The Reorganized Debtors and the Unsecured Claims Distribution Trustee, as applicable, may settle any such retained Cause of Action without further notice to or action, order, or approval of the Bankruptcy Court.   Unless any retained Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, expressly reserve all retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.   In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor or the Unsecured Claims Distribution Trust, as applicable, except as otherwise expressly provided in the Plan.   The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such retained Causes of Action.   The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.   For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.~~RS~~ of the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party that is subject to release or exculpation under the terms of the Plan.


**P.    Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtor Release, Third-Party Release, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the parties to the RSA in obtaining their support for the Restructuring Transactions pursuant to the terms of the RSA.

"*Exculpated Parties*" means, collectively, and in each case solely in its capacity as such (and to the extent permitted by Law): (a) each of the Debtors; (b) the Reorganized Debtors; (c) with respect to the Debtors, each of their respective ~~current and~~ former and current directors, managers, officers, attorneys, financial advisors, consultants, or other professionals or advisors that served in such capacity between the Petition Date and Effective Date; ~~and~~ (d) the Professionals retained ~~by the Debtors~~ during the Chapter 11 Cases; and (e) the Committee and each of its present and former members, solely in their capacity as members of the Committee.

"*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Ad Hoc Group and each Consenting Stakeholder; (d) the DIP Lenders; (e) the ABL Secured Parties; (f) the DIP Agent; (g) the Agents/Trustees; (h) the Consenting Sponsor; (i) At Home Cayman; (j) At Home Cayman Holdings; (k) eachthe Committee, each of its current and former members (solely in their capacity as such), and its Professionals; (l) the Senior Unsecured Notes Trustee and counsel thereto; (m) each current and former Affiliate of each Entity in clause (a) through the preceding clause (jl); and (ln) each Related Party of each Entity in clauses (a) through the preceding clause (jl); *provided* that, in each case, an Entity in clauses (c) through (hl) shall not be a Released Party if it:  (x) was provided with an opportunity to opt in to the releases described in Article VIII.D of the Plan by returning an "opt in" form and did not do so; or (y) timely objects to the releases contained in Article VIII.D of the Plan and such objection is not resolved before Confirmation.

"*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Ad Hoc Group and each Consenting Stakeholder; (d) the DIP Lenders; (e) the ABL Secured Parties; (f) the DIP Agent; (g) the Agents/Trustees; (h) the Consenting Sponsor; (i) the Committee and counsel thereto; (j) the Senior Unsecured Notes Trustee and counsel thereto; (k) all Holders of Claims that vote to accept the Plan and that affirmatively opt into the releases provided for in the Plan; (jl) all Holders of Claims that are deemed to accept the Plan and that affirmatively opt into the releases provided for in the Plan; (km) all Holders of Claims that abstain from voting on the Plan and that affirmatively opt into the releases provided for in the Plan; (ln) all Holders of Claims that vote to reject the Plan and that affirmatively opt into the releases provided for in the Plan; (mo) all Holders of Interests that affirmatively opt into the releases provided for in the Plan; (np) each current and former Affiliate of each Entity in clause (a) through the preceding clause (mo); and (oq) each Related Party of each Entity in clauses (a) through the preceding clause (no) for which such Entity is legally entitled to bind such Related Party to the releases contained herein under applicable law; *provided* that, in each case, an Entity in clauses (jk) through (mo) shall not be a Releasing Party if it:  (x) was provided with an opportunity to opt in to the releases described in Article VIII.D of the Plan by returning an "opt in" form and did not do so; or (y) timely objects to the releases contained in Article VIII.D of the Plan and such objection is not resolved before Confirmation.

"*Related Party*" means, collectively, with respect to any Person or Entity, each of, and in each case in its capacity as such, such Person's or such Entity's current and former directors, managers, officers, observers, committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, secondees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the DIP Facility, the Plan, and multiple other interrelated key transactions which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Moreover, each of the Exculpated Parties serves or served as a fiduciary of the Debtors' Estates during the pendency of the Chapter 11 Cases.  Accordingly, the Released Parties warrant the benefit of the Debtor Release and the Third-Party Release, and the Exculpated Parties warrant the benefit of the exculpation provisions under the Plan.

Section 1123(b)(3)(A) of the Bankruptcy Code states that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[10]  Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[11]  Article VIII.C of the Plan sets forth the Debtor Release.[12]  The Debtor Release meets the applicable standard because it is a valid exercise of the Debtors' business judgement, is fair, reasonable, and in the best interests of the Debtors' Estates, the product of extensive arm's-length negotiations, and was critical to obtaining support for the Plan.  The Disinterested Directors also conducted the Investigation to assess the merits and potential value of any potential claims and Causes of Action held by the Debtors, after which the Disinterested Directors determined that the Debtor Release is appropriate, as further described in Article VII.E of this Disclosure Statement.

***First***, each Released Party has made a substantial contribution to the Debtors' Estates.  The Released Parties played an integral role in the formulation of the Plan and contributed to the Plan not only by expending significant time and resources analyzing and negotiating the terms thereof, but also in giving up material economic interests to ensure the success of the Debtors' Chapter 11 Cases with consent to the Debtors' use of cash collateral and the funding of the DIP Facility.  These measures have improved liquidity throughout these Chapter 11 Cases thus far and will continue to provide flexibility to the Debtors.  In addition, the Debtor Release was a material inducement for the Consenting Stakeholders to support the Debtors' restructuring as set forth in the RSA.  Finally, the Debtors' directors, officers, professionals, and other agents have been instrumental in negotiating, formulating, and implementing the Restructuring Transactions contemplated by the Plan.

***Second***, the Debtor Release is essential to the Debtors' reorganization because it constitutes an integral term of the Plan.  Indeed, absent the Debtor Release, it is highly unlikely the Debtors would have been able to build the extraordinary level of consensus with respect to the RSA and the Restructuring Transactions.  Importantly, the Debtor Release is the product of arm's-length negotiations between the Debtors and their key stakeholders and is limited in scope.  Such releases do not release any entity other than a Released Party from any Claims or Causes of Action expressly set forth and preserved by the Plan.  In consideration for the Debtor Release, the Debtors and their Estates will receive mutual releases from

---

[10]  *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004)*.*  Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "is above the lowest point in the range of reasonableness." *Id.* at 330 (internal citation omitted); *see also In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (internal citation omitted); *see Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (internal citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be within reasonable range of litigation possibilities) (internal citation omitted).

[11]  *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (internal citation omitted); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citation omitted).

[12]  Article I.A.14~~3~~6 of the Plan defines "Released Party" ~~means~~as, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the Ad Hoc Group and each Consenting Stakeholder; (d) the DIP Lenders; (e) the ABL Secured Parties; (f) the DIP Agent; (g) the Agents/Trustees; (h) the Consenting Sponsor; (i) At Home Cayman; (j) At Home Cayman Holdings; (k) ~~each~~the Committee, each of its current and former members (solely in their capacity as such), and its Professionals; (l) the Senior Unsecured Notes Trustee and counsel thereto; (m) each current and former Affiliate of each Entity in clause (a) through the preceding clause (~~j~~l); and (~~l~~n) each Related Party of each Entity in clauses (a) through the preceding clause (~~j~~l); *provided* that, in each case, an Entity in clauses (c) through (~~h~~l) shall not be a Released Party if it:  (x) was provided with an opportunity to opt in to the releases described in Article VIII.D of the Plan by returning an "opt in" form and did not do so; or (y) timely objects to the releases contained in Article VIII.D of the Plan and such objection is not resolved before Confirmation.

potential Claims and Causes of Action of each of the Releasing Parties in addition to the significant benefits provided to the Debtors through this chapter 11 process. Thus, the inclusion of the Debtor Release is worthwhile and inures to the benefit of all the Debtors' stakeholders.

*Third*, an identity of interest exists between the Debtors and the parties to be released. Each Released Party, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and having the Debtors' businesses reorganized. For example, the Debtors owe indemnification obligations to its officers and directors. Like the Debtors, the Released Parties seek to confirm the Plan and implement the Restructuring Transactions.

Based on the foregoing, the Debtors believe that the releases, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

## 1.    Discharge of Claims and Termination of Interests.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan or the Confirmation Order, including the Plan Supplement and Definitive Documents, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action (including any Causes of Action or Claims based on theories or allegations of successor liability) that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors or their non-Debtor Affiliates with respect to any Claim or Interest existing immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Reinstated Claims) and Interests (other than any Intercompany Interests that are Reinstated), subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan.

## 2.    Release of Liens.

**Except as otherwise provided in the Exit ABL Facility Documents, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created**

pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a secured claim or any related claim that may be asserted against a non-Debtor Affiliate, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any non-Debtor Affiliate shall be fully released and discharged, and all of the right, benefit, title, and interest of any Holder (and the applicable Agents of such Holder, including the Agents/Trustees) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns.  Any Holder of such secured claim or claim against a non-Debtor Affiliate (and the applicable agents for such Holder, including the Agents/Trustees) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor or non-Debtor Affiliate (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder, including the Agents/Trustees) and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, at the sole cost and expense of the Reorganized Debtors, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

3.    **Releases by the Debtors**.

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Released Party is deemed, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of each and all of the Debtors, their Estates, and the Reorganized Debtors in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, and the Reorganized Debtors, whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein-after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or

collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the Restructuring Transactions, the Chapter 11 Cases, the Debtors' in- or out- of- court restructuring efforts, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the RSA, the DIP Facility, the DIP Documents, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Plan Supplement or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, the Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Consummation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement under the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided, however*, that, nothing in Article VIII.C of the Plan shall be construed to release the Released Parties from any criminal act or intentional fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contribution to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims and Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for a hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtor, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

4.    **Releases by Holders of Claims and Interests**.

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Releasing Party is deemed to have, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and

discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, and their Estates (as applicable) whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the purchase, sale, or recission of any Security of the Debtors or the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, business or contractual arrangements between any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the RSA, the DIP Facility, the DIP Documents, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, the Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (iv) a good faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for a hearing; and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

Without limiting the foregoing, from and after the Effective Date, any Entity that votes to accept the Plan or that is given the opportunity to opt into the releases contained in the Plan and exercises such opportunity to opt into the releases may not assert any claim, Claim, or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors.  From and after the Effective Date, any such Entity may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

5.    Exculpation.

Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Claim or Cause of Action arising between the Petition Date and Effective Date prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the negotiation and pursuit of the RSA, the Definitive Document, the Plan Supplement, the Exit ABL Facility Documents, or the filing of the Chapter 11 Cases, the participation in the DIP Facility, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of Securities thereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.

The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

6.     **Injunction**.

**Except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, settled, or are subject to exculpation under the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests; (iv) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities, in each case, on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests released, discharged, subject to exculpation, or settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.**

**No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action released, discharged, settled, or that is subject to exculpation pursuant to the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.**

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**Q.     Do I have to grant the releases under the Plan?**

*If you vote to accept the Plan, you must grant the releases under the Plan.*

You will not be considered a "Releasing Party" if you were provided with an opportunity to opt in to the releases described in Article VIII.D of the Plan by returning an "opt in" form ~~or voting in favor of the Plan~~ and did not do so.

**R.    What are the consequences of not opting in to the releases provided by the Plan?**

If a Holder of a Claim or Interest does not opt in to the Third-Party Releases, such Holder will preserve any direct Causes of Action that it may have against the Released Parties other than any direct Causes of Action against the Debtors and/or the Reorganized Debtors that are discharged under Article VIII of the Plan. Additionally, any third party that is a Releasing Party will preserve all Causes of Action against such Holder.

Upon the Effective Date, the Reorganized Debtors will also be vested with the authority to commence, litigate, and settle any and all retained Causes of Action. If you are contemplated to be a Released Party and have the opportunity to opt in to the Third-Party Release, by not ~~voting to accept the Plan or by not~~ opting in to providing the Third-Party Release~~s~~ under the Plan, such Holder will no longer be considered a Released Party and will forgo the opportunity to receive the Debtor Release under the Plan. These parties include:  (a) the Ad Hoc Group and each Consenting Stakeholder; (b) the DIP Lenders; (c) the ABL Secured Parties; (d) the DIP Agent; (e) the Agents/Trustees; ~~and~~ (f) the Consenting Sponsor; (g) the Committee, each of its current and former members (solely in their capacity as such), and its Professionals; and (h) the Senior Unsecured Notes Trustee and counsel thereto. As a result, after the Effective Date, the Reorganized Debtors may pursue any Causes of Action held by the Debtors that are preserved under the Plan against a party that is contemplated to be a Released Party but does not opt in to the Third-Party Releases.

**S.    What are the consequences of opting in to the releases provided by the Plan?**

Each Holder of a Claim that elects to opt in to the releases will become a Releasing Party under the Plan, and for certain parties, will also be a Released Party. For the Holders of Claims that become Released Parties under the Plan by ~~voting to accept the Plan or by~~ electing to opt in to the Third-Party Release~~s~~, such Holder will receive, subject to the terms and conditions of Article VIII.C of the Plan, a conclusive, absolute, unconditional, irrevocable, and permanent release from the Debtors of any claims and Causes of Action the Debtors may have against such Holder and will in turn grant each Released Party, subject to the terms and conditions of Article VIII.D of the Plan, a conclusive, absolute, unconditional, irrevocable, and permanent release of any claims and causes of actions it may have against such Released Party. Notwithstanding the Debtor Release, the ~~Third-Party~~Third-Party Release, or anything else contained in the Plan to the contrary, such Holder shall not be released from (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.

All Holders of Claims or Interests that:  (a) vote to accept the Plan and that affirmatively opt into the releases provided for in the Plan; (b) are deemed to accept the Plan and affirmatively opt into the releases provided for in the Plan; (c) abstain from voting on the Plan and affirmatively opt into the releases provided for in the Plan; (d) vote to reject the Plan and affirmatively opt into the releases provided for in the Plan; and (e) affirmatively opt into the releases provided for in the Plan will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all claims and causes of action against the Released Parties, including the Debtors. For the avoidance of doubt, Holders Claims or Interests that ~~vote to accept the Plan and/or~~ opt in to the Third-Party Release~~s~~ will not be Released Parties unless they are included in one of the following

groups:  (a) the Ad Hoc Group and each Consenting Stakeholder; (b) the DIP Lenders; (c) the ABL Secured Parties; (d) the DIP Agent; (e) the Agents/Trustees; and (f) the Consenting Sponsor; (g) the Committee, each of its current and former members (solely in their capacity as such), and its Professionals; and (h) the Senior Unsecured Notes Trustee and counsel thereto.

### T.    Does the Bankruptcy Code protect against discriminatory treatment?

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### U.    Will the Company retain documents after any Effective Date?

On and after the Effective Date, subject to Article IV.H of the Plan, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

### V.    What is the effect of Reimbursement or Contribution?

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

### W.    What is the deadline to vote on the Plan?

The voting deadline with respect to the Plan (the "Voting Deadline") is [September 168], 2025, at 4:00 p.m. (prevailing Eastern Time).

### X.    How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan (the "Ballots").  For your vote to be counted, your Ballot must be properly completed, executed, and delivered as directed, so that the Ballot containing your vote is **actually received** by the Claims and Noticing Agent **on or before the Voting Deadline, *i.e.*, [September 168], 2025 at 4:00 p.m., prevailing Eastern Time**.  **Delivery of a Ballot to the Claims and Noticing Agent by any means other than as expressly approved by the Disclosure Statement Order or as set forth in the Solicitation and Voting Procedures or the Ballots will not be counted.**

**Y.    Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation hearing set to occur?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan (the "Confirmation Hearing") and recognizes that any party in interest may object to Confirmation of the Plan.

Through the order approving the Disclosure Statement Motion, the ~~Debtors request that the~~ Bankruptcy Court has scheduled the Confirmation Hearing for [September ~~29~~]30, 2025~~, subject to the Bankruptcy Court's availability~~.  The Confirmation Hearing may be adjourned from time to time without further notice.

~~The Debtors have also requested that~~Pursuant to the order approving the Disclosure Statement Motion, objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [September 1~~6~~8], 2025, at 4:00 p.m., prevailing Eastern Time (the "Plan Objection Deadline").

In addition to serving the notice of the Confirmation Hearing to parties in interest in accordance with the order approving the Disclosure Statement Motion, the Debtors will also publish the notice of the Confirmation Hearing, which will contain the Voting Deadline, the Plan Objection Deadline, and the date and time of the Confirmation Hearing, in *The New York Times* (U.S. national edition) or any such other local publications that the Debtors deem appropriate.

**Z.    What is the purpose of the Confirmation Hearing?**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan.  For a more detailed discussion of the Confirmation Hearing, see **Article X** of this Disclosure Statement.

After the Plan has been confirmed, subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

Subject to certain limited exceptions, the Confirmation Order resolves any debt of the Debtors that arose before the Confirmation of the Plan and provides for the treatment of such debt in accordance with the terms of the confirmed Plan.

**AA.    What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date of the Plan means that the Debtors will ***not*** be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is

the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan; and (c) the Plan is declared effective by the Debtors.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their business and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### BB.    Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of each of the Debtors shall expire, such current members shall be deemed to have resigned, and the members of the board of directors or other Governing Body for the initial term of the New Board and the other Governing Bodies shall be appointed in accordance with the New Organizational Documents. The New Board will consist of seven directors and include:  (a) the CEO; and (b) six directors selected as follows, in each case, in consultation with the CEO, (i) four directors selected by Redwood Capital Management, LLC, (ii) one director selected by Anchorage Capital Advisors, L.P., and (iii) one director selected by Farallon Capital Advisors, L.L.C.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing. Each such member and each officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

The Reorganized Debtors will be a private company and the New Organizational Documents will include certain rights and obligations for holders of the Reorganized Common Stock.  The New Organizational Documents will be included in the Plan Supplement and creditors receiving Reorganized Common Stock under the Plan should review the Plan Supplement when filed for a full description of these rights and obligations.

### CC.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims and Noticing Agent, Omni, by calling 1 (888) 818-9346 (Toll free from US / Canada) OR +1 (747) 293-0014 (International), or e-mailing AtHomeInquiries@OmniAgnt.com with "At Home" in the subject line.  Copies of the Plan, this Disclosure Statement, and any other publicly-filed documents in the Chapter 11 Cases are available free of charge, as applicable, by:  (a) visiting the Debtors' restructuring website at https://cases.omniagentsolutions.com/athome; (b) email using AtHomeInquiries@OmniAgnt.com (with "At Home" in the subject line); or (c) calling the Claims and Noticing Agent at the number(s) listed above.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases by visiting the Bankruptcy Court's website at https://www.deb.uscourts.gov or the clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, where they are available for review between the hours 8:00 a.m. to 4:00 p.m., prevailing Eastern Time.

### DD.    Who Supports the Plan?

The Plan is supported by the Debtors, the Committee, and the Consenting Stakeholders, including the Consenting Noteholders, the Consenting Term Loan Lenders, and the Consenting Sponsor,

that have executed the RSA. The Consenting Stakeholders include (a) holders of approximately (i) 99.9% of the obligations under the Cayman Notes, (ii) 99.6% of the obligations under the Senior Secured Notes, (iii) 100% of the obligations under the Exchange Notes, (iv) 98.9% of the obligations under the Term Loans, and (v) 88.6% of the obligations under the Senior Unsecured Notes; and (b) the Consenting Sponsor. The committee letter in support of the Plan (the "Committee Letter") will be included in the Solicitation and Voting Package, the form of which is appended to the order approving the Disclosure Statement Motion as Exhibit 12.

**EE.    Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Restructuring Transactions provide for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative. The Debtors believe that the Restructuring Transactions, which contemplate a significant deleveraging of the Debtors' balance sheet and will allow them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under and pursuant the Plan.

## IV.    OVERVIEW OF THE PLAN.

The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and Allowed Interests and generally to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code and applicable law. The Debtors believe that this objective is best served by consummating the Restructuring Transactions and are authorized in all respects to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including, as applicable: (i) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, formation, organization, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement, and the RSA; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement, and the RSA and having other terms to which the applicable Entities may agree; (iii) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state Law, including any applicable New Organizational Documents; (iv) the issuance and distribution of the Reorganized Equity as set forth in the Plan; (v) with respect to the Reorganized Debtors, the implementation of the Management Incentive Plan and the approval of the issuance of the MIP Shares; (vi) the consummation of the Exit ABL Facility, including the execution, delivery, and filing of all Exit ABL Facility Documents; (vii) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Transactions Memorandum; and (viii) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with the Plan.

In general, the Plan is divided into several key sections, all of which may be reviewed in detail in the Plan attached hereto as **Exhibit A**.

| Article | Summary |
|---------|---------|
| I.A | This section contains the definitions of various capitalized terms that are used throughout the Plan. The defined terms are an essential part of the Plan. Creditors should |

| | |
|---|---|
| | cross-reference capitalized terms used in the Plan to the definitions provided in this section to understand what is being described throughout the Plan. |
| II | This section describes the Administrative Claims, the Superiority DIP Claims, Professional Fee Claims, and Priority Tax Claims that have not been classified and are excluded from the Classes of Claims set forth in **Article III** of this Disclosure Statement. |
| III.B | This section describes the treatment to be given to Holders of Claims against the Debtors and Interests in the Debtors. Claims and Interests are separated into different Classes and provided treatment based on their relative legal rights against the Debtors. Article III of the Plan sets forth the distributions that the Debtors are proposing to provide to their various stakeholders.<br><br>The projected recoveries to Holders of Claims and Interests under the Plan are set forth in **Article III.E** of this Disclosure Statement. |
| IV | This Article describes the means by which the transactions contemplated in the Plan will be implemented. |
| V | This Article describes the process by which the Debtors may reject, assume, and assume and assign executory contracts and unexpired leases. |
| VI | This Article has certain provisions regarding distributions to be made under the Plan. |
| VII | This Article contains the procedures for the allowance of claims and resolving, among other things, Disputed Claims. |
| VIII | This section has certain releases, exculpation, and injunction provisions. These provisions of the Plan are restated in **Article III.P** of this Disclosure Statement. |
| IX | This section has certain conditions that must be satisfied or waived before the Plan can become effective and distributions can be made. An explanation of "Confirmation," "Effective Date," and "Consummation" is set forth in **Article III.G** of this Disclosure Statement. |

This summary of the structure and means for implementation of the Plan and the documents referred to herein is qualified in its entirety by reference to the Plan. Such summaries do not purport to be precise or complete statements of all terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

### 1. General Settlement of Claims and Interests.

To the greatest extent permissible under the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. To the greatest extent permissible under the Bankruptcy Code, the Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims against and Interests in the Debtors. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final.

2.        **Restructuring Transactions**.

On or before the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions and are authorized in all respects to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including, as applicable:  (i) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, formation, organization, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement, and the RSA and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement, and the RSA and having other terms to which the applicable Entities may agree; (iii) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state Law, including any applicable New Organizational Documents; (iv) the issuance and distribution of the Reorganized Equity as set forth in the Plan; (v)  with respect to the Reorganized Debtors, the implementation of the Management Incentive Plan and the approval of the issuance of the MIP Shares; (vi) the consummation of the Exit ABL Facility, including the execution, delivery, and filing of all Exit ABL Facility Documents; (vii) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Transactions Memorandum; and (viii) the establishment and funding of the Unsecured Claims Distribution Trust in accordance with the Plan and the Unsecured Claims Distribution Trust Agreement; and (ix) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with the Plan.

Subject to the consent of the Required Consenting Stakeholders, the Debtors may, but shall not be required to, create one or more additional companies, including a new parent holding company, or covert At Home into a limited liability company, in each case, as necessary, to effect the Restructuring Transactions.  For the avoidance of doubt, the Reorganized Common Stock shall include the Reorganized Equity of the parent holding company of the Reorganized Debtors and may be issued in the form of limited liability company units, to the extent applicable.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 105, 363, 1123, and 1141 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.  The Confirmation Order shall authorize the Debtors, the Reorganized Debtors, and the Consenting Stakeholders, as applicable, to undertake the Restructuring Transactions contemplated by the Plan, the RSA, and the other Definitive Documents.

3.        **The Reorganized Debtors**.

On the Effective Date, the New Board shall be established, and each Reorganized Debtor shall adopt its New Organizational Documents, which shall include provisions consistent with Annex C attached to the Restructuring Term Sheet.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan consistent with the consent rights set forth in the RSA.  Cash payments to be made pursuant to the Plan will be made by the Debtors or the Reorganized Debtors, as applicable.  The Debtors and Reorganized Debtors will be entitled to transfer funds between and among

themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth herein or as otherwise provided for in the Restructuring Transactions Memorandum, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement, the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court, to raise additional capital, including issuing additional Reorganized Equity and obtaining additional financing, subject to, the terms of the New Organizational Documents, as the New Board deems appropriate.

### 4.    Sources of Consideration for Plan Distributions.

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan, including the conveyance and funding of the Unsecured Claims Distribution Trust Assets, as applicable, with: (i) the Debtors' Cash on hand as of the Effective Date; (ii) the Reorganized Equity; and (iii) the proceeds from the Exit ABL Facility; and (iii) the Reorganized Equity. The Unsecured Claims Distribution Trust shall fund its distributions, as contemplated by the Plan and the Unsecured Claims Distribution Trust Agreement, solely from the Unsecured Claims Distribution Trust Net Assets. Each distribution and issuance referred to in Article V of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the Reorganized Equity, will be exempt from registration under the Securities Act, as described more fully in Article IV.M of the Plan.

#### (a)    Use of Cash.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand and proceeds of the DIP Facility and the Exit ABL Facility, as applicable, to fund distributions to certain Holders of Allowed Claims, consistent with the terms of the Plan.

#### (b)    Issuance of Reorganized Equity.

The Reorganized Debtors shall be authorized to issue the Reorganized Equity (including the MIP Shares) pursuant to the New Organizational Documents. The issuance of the Reorganized Equity shall be authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors. On the Effective Date, the Reorganized Equity shall be issued and distributed as provided for in the Restructuring Transactions Memorandum pursuant to, and in accordance with, the Plan. Holders of Superpriority DIP Claims and Holders of First Lien Claims entitled to receive Reorganized Equity pursuant to the Plan shall be permitted to direct distributions of their Reorganized Equity to designees with the consent of the Required Consenting Stakeholders.

All of the shares (or comparable units) of Reorganized Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable and shall be issued in book-entry form. Each distribution and issuance of Reorganized Equity shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of Reorganized Equity shall be deemed as its agreement to the New

33

Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, without the need for execution by any party thereto other than the applicable Reorganized Debtor(s). The Reorganized Equity will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not be required to meet the eligibility requirements of DTC. Additional information relating to the applicability of the securities Laws is available in Article IV.L of the Plan.

The forms of the New Organizational Documents shall be included in the Plan Supplement filed ahead of the deadline to object to confirmation of the Plan.

**(c)** **Exit ABL Facility**.

On the Effective Date, the Reorganized Debtors shall enter into the Exit ABL Facility, pursuant to the Exit ABL Facility Documents. Confirmation of the Plan shall constitute (a) approval of the Exit ABL Facility and the Exit ABL Facility Documents; and (b) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the Exit ABL Facility (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), in each case, without any further notice to or order of the Bankruptcy Court.

[In the event the Exit ABL Facility is entered into with the ABL Lenders, the ABL Loans shallmay be refinanced by means of a cashless settlement, whereby such ABL Loans shall be converted on a dollar-for-dollar basis into the Exit ABL Loans in accordance with the Exit ABL Facility Documents, and all collateral that secures the ABL Obligations under the ABL Credit Agreement shall be reaffirmed and ratified, and shall automatically secure all obligations under the Exit ABL Facility Documents.]

As of the Effective Date, all of the Liens and security interests to be granted by the Debtors in accordance with the Exit ABL Facility Documents: (a) shall be deemed to be granted in good faith, for legitimate business purposes, and for reasonably equivalent value; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral specified in the Exit ABL Facility Documents; and (c) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law. To the extent provided in the Exit ABL Facility Documents, the Exit ABL Facility Agent is authorized to file with the appropriate authorities, mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The priorities of such Liens and security interests shall be as set forth in the Exit ABL Facility Documents. The Exit ABL Facility Agent shall be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. The guarantees granted under the Exit ABL Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination

for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy Law.

The material terms of the Exit ABL Facility shall be included in the Plan Supplement filed prior to the deadline to object to Confirmation of the Plan.

### 5.        Corporate Existence.

Except as otherwise provided in the Plan, the Confirmation Order, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated therein, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings, approvals, or consents required under applicable state, provincial, or federal Law).  On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.   On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 6.        Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in the Plan or the Confirmation Order (including to the extent any ABL Loan is refinanced and/or converted into the Exit ABL Facility), on the Effective Date, all property in each Debtors' Estate, all Causes of Action belonging to the Debtors or the Estates, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor or the Unsecured Claims Distribution Trust, as applicable, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances (except for Liens securing obligations under the Exit ABL Facility Documents, and Liens securing Other Secured Claims that are Reinstated pursuant to the Plan, as applicable).  On and after the Effective Date, except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.  For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound down and liquidated in connection with the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum) shall be treated as being liable on any Claim that is discharged pursuant to the Plan or the Confirmation Order.

### 7.        Cancellation of Existing Securities Agreements, and Interests.

On the Effective Date, except to the extent otherwise provided in the Plan or the Confirmation Order (including to the extent any ABL Loan is refinanced and/or converted into the Exit ABL Facility), as applicable, all notes, instruments, certificates, credit agreements, note purchase agreements,

indentures, and other documents evidencing Claims (other than those Reinstated Claims) or Existing Equity Interests, shall, be cancelled, and all obligations and liabilities, actions, suits, accounts or demands, covenants, and indemnities (both actual and contingent) thereunder, including those of any non-Debtor Affiliates thereunder, or in any way related thereto, shall be deemed satisfied in full, released, cancelled, discharged, and of no force or effect, without any need for further action or approval by the Bankruptcy Court or for a Holder to take further action, and the Agents/Trustees and their respective agents, successors and assigns, shall each be automatically and fully released and discharged of and from all duties and obligations thereunder.

Holders of or parties to such cancelled instruments, Existing Equity Interests, and other documentation will have no rights arising from or relating to such instruments, Interests, and other documentation, or the cancellation thereof, except the rights provided for or reserved pursuant to the Plan. Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI of the Plan, the Prepetition Finance Documents and the DIP Documents shall continue in effect after the Effective Date to the extent necessary to: (a) permit Holders of Claims under the Prepetition Finance Documents and the DIP Documents to receive and accept their respective distributions on account of such Claims, if any; (b) permit the Disbursing Agent or the Agents/Trustees, as applicable, to make distributions on account of the Allowed Claims under the Prepetition Finance Documents and the DIP Documents; (c) preserve any rights of the Agents/Trustees, to maintain, exercise, and enforce any applicable rights of indemnity, expense reimbursement, priority of payment, contribution, subrogation, or any other similar claim or entitlement (whether such claims accrued before or after the Effective Date), and preserve any exculpations of the Agents/Trustees, all of which shall remain fully enforceable against the Reorganized Debtors and all other applicable Persons under the Prepetition Finance Documents and the DIP Documents; (d) permit the Agents/Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including to enforce the respective obligations owed to them under the Plan and to enforce any obligations owed to their respective Holders of Claims under the Plan in accordance with the applicable Prepetition Finance Documents and the DIP Documents; and (e) permit the Agents/Trustees to perform any functions that are necessary to effectuate the foregoing; *provided, however*, that (1) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan (including clause (c) of the preceding proviso), and (2) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan. For the avoidance of doubt, the Prepetition Finance Documents and the DIP Documents shall continue in full force and effect (other than any Liens or other security interests terminated pursuant to this section) after the Effective Date with respect to any contingent or unsatisfied obligations and any other provisions that expressly survive the cancellation of the Prepetition Finance Documents and the termination of the DIP Facility in accordance with the terms of the DIP Documents.

If the record holder of any of the Senior Unsecured Notes Claims, the Cayman Notes Claims, the Intercompany Note Claims, the Senior Secured Notes Claims, or the Exchange Notes Claims is DTC or its nominee or another securities depository or custodian thereof, and such underlying Securities are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of Senior Unsecured Notes Claims, Cayman Notes Claims, Intercompany Note Claims, Senior Secured Notes Claims, or Exchange Notes Claims shall be deemed to have surrendered such Holder's Securities underlying such Senior Unsecured Notes Claims, Cayman Notes Claims, Intercompany Note Claims, Senior Secured Notes Claims, or Exchange Notes Claims upon surrender of such global security by DTC or such other securities depository or custodian thereof.

8.      **Unsecured Claims Distribution Trust**.

On or before the Effective Date, the Debtors and the Unsecured Claims Distribution Trustee shall enter into the Unsecured Claims Distribution Trust Agreement and, on the Effective Date, the Unsecured Claims Distribution Trust Assets shall vest or be deemed to be vested in the Unsecured Claims Distribution Trust irrevocably and automatically without further action by any Person or Entity, free and clear of all Claims, Liens, and Interests, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax.  Under no circumstance shall the Debtors or the Reorganized Debtors or any other party be required to contribute any additional assets to the Unsecured Claims Distribution Trust other than the Unsecured Claims Distribution Trust Assets.  After the Effective Date, neither the Debtors, Reorganized Debtors, nor any other party shall have any interest in the Unsecured Claims Distribution Trust Assets except as expressly set forth herein.  For the avoidance of doubt, the Holders of any First Lien Deficiency Claims shall not be Unsecured Claims Distribution Trust Beneficiaries and shall have no interest in the Unsecured Claims Distribution Trust.

The Debtors and the Reorganized Debtors shall make their employees and books and records reasonably available to the Unsecured Claims Distribution Trustee and any professionals retained by the Unsecured Claims Distribution Trust (at the sole cost and expense of the Unsecured Claims Distribution Trust in the case of any third party service providers reasonably needed by the Debtors or the Reorganized Debtors to provide such information, with such cost and expense to be disclosed in advance to the Unsecured Claims Distribution Trustee) to retrieve or access data reasonably necessary to investigate, review, and reconcile General Unsecured Claims and investigate, pursue, or otherwise dispose of the Assigned Preference Actions.  To the extent the Unsecured Claims Distribution Trust receives information from the Debtors or the Reorganized Debtors in connection with the General Unsecured Claims, the Unsecured Claims Distribution Trust's receipt of such documents, information, or communications shall not constitute a waiver of any privilege.  All privileges shall remain in the control of the Debtors or the Reorganized Debtors, as applicable, and the Debtors or the Reorganized Debtors, as applicable, retain the sole right to waive their own privileges.  Reasonable agreements will be made with the Unsecured Claims Distribution Trustee such that confidential information and privileges are preserved, while permitting the Unsecured Claims Distribution Trustee to use, as necessary to administer the Unsecured Claims Distribution Trust, such information and privilege; absent such agreements, either the Unsecured Claims Distribution Trustee or the Reorganized Debtors may present the issue to the Bankruptcy Court for resolution.

The Unsecured Claims Distribution Trust shall be governed by the Unsecured Claims Distribution Trust Agreement and administered by the Unsecured Claims Distribution Trustee.  The Unsecured Claims Distribution Trustee shall be chosen by the Committee, and the Unsecured Claims Distribution Trustee's identity and compensation shall be identified in the Plan Supplement.  The powers, rights, and responsibilities of the Unsecured Claims Distribution Trustee shall be specified in the Unsecured Claims Distribution Trust Agreement and shall include, without limitation, the authority and responsibility to take the actions set forth in Article IV.H of the Plan.  Among other things, the Unsecured Claims Distribution Trustee shall have the power and authority to (a) distribute and allocate the Unsecured Claims Distribution Trust Net Assets to the Unsecured Claims Distribution Trust Beneficiaries on account of such beneficiaries' Unsecured Claims Distribution Trust Beneficial Interests in accordance with the treatment set forth in the Plan for Class 9, (b) investigate, prosecute, compromise, adjust, arbitrate, sue on, abandon, dismiss, or otherwise resolve, settle, or litigate Assigned Preference Actions, and (c) enter into any contingency fee agreements or litigation funding agreements as may be necessary in the Unsecured Claims Distribution Trustee's reasonable discretion to liquidate any claims or causes of action included in the Unsecured Claims Distribution Trust Assets; *provided*, however, any such funding agreement must be on market terms and subject to Bankruptcy Court approval.  For the avoidance of doubt, the Unsecured Claims Distribution Trustee shall have the sole discretion to release

37

any Assigned Preference Action.  In the event of any conflict between the terms of the Plan and the Unsecured Claims Distribution Trust Agreement, the terms of the Plan shall govern.

From and after the Effective Date, the Unsecured Claims Distribution Trustee, on behalf of the Unsecured Claims Distribution Trust, shall, in the ordinary course of business and without the need for any approval by the Bankruptcy Court, pay the Unsecured Claims Distribution Trust Fees and Expenses solely from the Unsecured Claims Distribution Trust Assets.  The Debtors, the Reorganized Debtors, and their Affiliates (and anyone acting on their behalf) shall not be responsible for any costs, fees, or expenses of the Unsecured Claims Distribution Trust.  The Unsecured Claims Distribution Trustee and the Unsecured Claims Distribution Trust shall be discharged or dissolved, as the case may be, such time as all distributions required to be made by the Unsecured Claims Distribution Trustee under the Plan have been made, but in no event later than the fifth anniversary of the Effective Date (unless extended by order of the Bankruptcy Court).  Upon dissolution of the Unsecured Claims Distribution Trust, any remaining Unsecured Claims Distribution Net Assets shall be distributed to all Holders of Allowed General Unsecured Claims in accordance with the Plan and the Unsecured Claims Distribution Trust Agreement as appropriate.

### 9.    8. Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan (including under the Restructuring Transactions Memorandum and the other documents contained in the Plan Supplement) shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate, Governing Body, or equity holder action, including, as and if applicable:  (i) selection of the directors, including the New Board, officers, or managers for the Reorganized Debtors in accordance with the New Organizational Documents; (ii) the authorization, issuance, and distribution of the Reorganized Equity; (iii) implementation of the Restructuring Transactions; (iv) the entry into the Exit ABL Facility Documents and the execution, delivery, and filing of any documents pertaining thereto; (v) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (vi) adoption of the New Organizational Documents; (vii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (viii) the authorization and reservation of the MIP Shares; (ix) formation of the Reorganized Debtors; (x) adoption or assumption, as applicable, of the Compensation and Benefits Programs and all obligations related thereto; and (xi) formation of the Unsecured Claims Distribution Trust, issuance of the Unsecured Claims Distribution Trust Beneficial Interests, execution and delivery of the Unsecured Claims Distribution Trust Agreement, and the vesting of the Unsecured Claims Distribution Trust Assets in the Unsecured Claims Distribution Trust; and (xii) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Holders of Existing Equity Interests or Holders of Reorganized Equity, members directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable.  On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed, without any further corporate, Governing Body, or equity holder action, to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the Reorganized Equity, the Exit ABL Facility Documents, the New Organizational Documents, any other Definitive Documents, and any and all other agreements, documents, Securities,

and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article IV.H of the Plan shall be effective notwithstanding any requirements under non-bankruptcy Law.

### 10.    9. New Organizational Documents.

On or immediately prior to the Effective Date, except as otherwise provided in the Plan and subject to local Law requirements, the New Organizational Documents shall be adopted or amended as may be necessary to effectuate the transactions contemplated by the Plan.  To the extent required under the Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Organizational Documents with the secretaries of state and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate Laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document.  The New Organizational Documents will, among other things (a) authorize the issuance of the Reorganized Equity and (b) prohibit the issuance of non-voting equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the Laws of its jurisdiction of formation and the terms of such documents, and the Reorganized Debtors may file such amended certificates or articles of incorporation or other applicable formation and constituent documents as permitted by the Laws of the applicable states, provinces, or countries of incorporation or formation and the New Organizational Documents.  For the avoidance of doubt, any Holder's acceptance of the Reorganized Equity shall be deemed to constitute its agreement to be bound by the New Organizational Documents without the need for execution by any party other than the Reorganized Debtors.

From and after the Effective Date, all Holders of Reorganized Equity shall be subject to the terms and conditions of the New Organizational Documents.  On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Organizational Documents to each Holder of Reorganized Equity, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Holders of Reorganized Equity shall be deemed to have executed the New Organizational Documents and be parties thereto, without the need to deliver signature pages thereto.

The forms of the New Organizational Documents shall be included in the Plan Supplement filed ahead of the deadline to object to confirmation of the Plan.

### 11.    10. Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of each of the Debtors shall expire, such current members shall be deemed to have resigned, and the members of the board of directors or other Governing Body for the initial term of the New Board and the other Governing Bodies shall be appointed in accordance with the New Organizational Documents.  The New Board will consist of seven directors and include:  (a) the CEO; and (b) six directors selected as follows, in each case, in consultation with the CEO: (i) four directors selected by Redwood Capital Management, LLC, (ii) one director selected by Anchorage Capital Advisors, L.P., and (iii) one director selected by Farallon Capital Advisors, L.L.C.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and each officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

**12.    11. Effectuating Documents; Further Transactions**.

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Exit ABL Facility Documents entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**13.    12. Certain Securities Law Matters**.

Any Reorganized Equity issued under the Plan will be issued (a) to the fullest extent permitted and applicable, without registration under the Securities Act or similar federal, state or local laws in reliance on the exemption set forth in section 1145 of the Bankruptcy Code or (b) to the extent section 1145 is not permitted or applicable, pursuant to other applicable exemptions under the Securities Act. For the avoidance of doubt, the MIP Shares will not be issued in reliance on section 1145 of the Bankruptcy Code.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the Reorganized Equity in reliance on the exemption set forth in section 1145 of the Bankruptcy Code shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

Such shares of Reorganized Equity issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code (a) will not be "restricted securities" as defined in rule 144(a)(3) under the Securities Act, and (b) will be freely tradable and transferable in the United States by each recipient thereof that (i) is an entity that is not an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code, (ii) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (iii) has not been such an "affiliate" within 90 days of the time of the transfer, and (iv) has not acquired such securities from an "affiliate" within one year of the time of transfer. Notwithstanding the foregoing, the shares of Reorganized Equity issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code will remain subject to compliance with applicable securities laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities and subject to any restrictions in the New Organizational Documents. The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

Any Reorganized Equity that cannot be issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code, including the MIP Shares, will be offered, issued, and distributed in reliance upon 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and subject to any restrictions on the transferability of such Reorganized Equity in the New Organizational Documents.

The Debtors recommend that potential recipients of securities issued under the Plan consult their own counsel concerning their ability to freely trade such securities in compliance with the federal

securities laws and any applicable "Blue Sky" laws. The Debtors make no representation concerning the ability of a person to dispose of such securities.

The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including DTC or any transfer agent for the Reorganized Equity) with respect to the treatment of the Reorganized Equity to be issued under the Plan under applicable securities laws.  DTC and any transfer agent for the Reorganized Equity shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the Reorganized Equity to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).  Notwithstanding anything to the contrary in the Plan, no Entity (including DTC and any transfer agent for the Reorganized Equity) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Reorganized Equity to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### **14.**    ~~13.~~ Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor, as applicable, or to or from any other Person) of property under the Plan or pursuant to (i) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, including the Reorganized Equity, (ii) the Restructuring Transactions, (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (iv) the making, assignment, or recording of any lease or sublease, (v) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit ABL Facility, or (vi) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### **15.**    ~~14.~~ Private Company.

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as private companies on the Effective Date and the Reorganized Equity shall not be listed on a recognized U.S. stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC or any other securities regulatory body, and (iii) shall not be required to list the Reorganized Equity on a recognized U.S. stock exchange, except in each case (if at all), as otherwise may be required pursuant to the New Organizational Documents.

16.    ~~15.~~ **Director and Officer Liability Insurance**.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions on or after the Effective Date.

17.    ~~16.~~ [**Management Incentive Plan**.

On or within 90 days of the Effective Date, the New Board shall adopt the Management Incentive Plan, which will provide up to 10% of the Reorganized Equity (on a fully diluted and fully distributed basis) for management and the New Board of the Reorganized Debtors, which may be granted in any form acceptable to the New Board, including without limitation, in the form of options, restricted stock, restricted stock units, stock appreciations rights, or any combination thereof.]

18.    ~~17.~~ [**Employment Obligations**.

On the Effective Date, the Reorganized Debtors will either assume or reject the existing agreements with the current members of the senior management team of the Debtors, or will enter into new compensation arrangements, as applicable, on the Effective Date with some or all such individuals who agree to such new arrangements, which assumption or rejection must be approved by the Required Consenting Stakeholders and which new arrangements, as applicable, must be acceptable to the Reorganized Debtors and the Required Consenting Stakeholders.]

19.    ~~18.~~ **Preservation of Causes of Action**.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' or Unsecured Claims Distribution Trust's, as applicable, rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than the Causes of Action released or exculpated herein by the Debtors pursuant to the releases and exculpations contained in the Plan, including in ~~Article VIII~~Article VIII of the Plan, which shall be deemed released and waived by the Debtors ~~and~~, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, as of the Effective Date. The Schedule of Retained

Causes of Action shall specify which Assigned Preference Actions shall be deemed transferred to the Unsecured Claims Distribution Trust on the Effective Date.

The Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Unsecured Claims Distribution Trustee, as applicable. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, will not pursue any and all available retained Causes of Action against it. The Debtors and, the Reorganized Debtors, and the Unsecured Claims Distribution Trust, as applicable, expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** The Reorganized Debtors aand the Unsecured Claims Distribution Trustee, as applicable, may settle any such retained Cause of Action without further notice to or action, order, or approval of the Bankruptcy Court. Unless any retained Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, expressly reserve all retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor or the Unsecured Claims Distribution Trust, as applicable, except as otherwise expressly provided in the Plan. The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such retained Causes of Action. The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.RS of the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party that is subject to release or exculpation under the terms of the Plan.

**20.    19. Tax Returns**.

After the Effective Date, the Reorganized Debtors shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

**21.    20. Statutory Committee and Cessation of Fee and Expense Payment**.

On the Effective Date, the Committee shall dissolve, and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; *provided*, however, that following the Effective Date, the Committee shall continue to have standing and a right to be heard solely with respect to Professional Fee Claims. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date. except with respect to fees and expenses incurred by the Committee's Professionals after the Effective Date relating to the defense and prosecution of the Committee's Professional Fee Claims; *provided*, however, that in no event shall the Reorganized Debtors be responsible for paying the Committee's Professional Fee Claims in excess of the amount set forth for such fees and expenses in the Approved Budget (as defined in the DIP Orders).

**22.    21. Cashless Transactions**.

Notwithstanding anything to the contrary set forth in the Plan, the treatment of Claims, distributions, and other transactions contemplated in the Plan including, without limitation, the funding of the Exit ABL Facility, if any, may, at the election of the applicable participating parties, be effectuated by netting or other form of cashless implementation.

**23.    Release of Ordinary Course Avoidance Actions**.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, the Debtors, on behalf of themselves and their Estates, shall release any and all Avoidance Actions against Ordinary Course Non-Insider Counterparties (including, without limitation, vendors, landlords, and other parties) arising from transactions conducted in the ordinary course of business, *provided* such release shall only apply to counterparties that continue to do business with the Reorganized Debtors in the ordinary course following the Effective Date. For the avoidance of doubt, nothing in Article IV.W of the Plan shall be deemed to limit the Unsecured Claims Distribution Trustee's ability to settle, litigate, or otherwise address any Assigned Preference Claims under the Plan.

## V.    CORPORATE HISTORY AND BUSINESS OPERATIONS.

### A.    Corporate History.

The Company was founded in 1979 under the name Garden Ridge Pottery—later shortened to Garden Ridge—with the opening of an eclectic pottery, housewares, and craft store in Schertz, Texas. The Company quickly gained a loyal following in its Texas home market and opened a second store in the mid 1980s in Houston. In 1988, the existing owner sold the Company's two stores to investors who took the retailer public and expanded its reach beyond the borders of Texas with various new store openings, but by 2004, Garden Ridge had filed for chapter 11.

In October 2011, an investment group led by certain affiliates of AEA Investors LP and Starr Investment Holdings, LLC acquired the Company and began focusing on investing in the growth and future of the business. As a result, in December 2012, the Company hired a new management team. At the time, the Company operated 58 brick and mortar storefronts, located primarily in the Southeast United States.

The new Chief Executive Officer expanded the business in a variety of ways, including by: (a) rebranding Garden Ridge to At Home; (b) expanding the brand into a national concept; (c) curating the merchandise offering to focus on home and holiday décor and furnishings; (d) taking the Company

public; (e) relocating the Company headquarters from Houston to Dallas; (f) successfully overhauling corporate culture and employee and vendor relations; and (g) developing the Company's omnichannel capabilities and revising marketing and pricing strategies.  In June 2014, the Company announced its plans to rebrand all stores and change its name to "At Home" to better position it as a home décor and furnishings retailer with aspirations for future expansion.  On September 4, 2015, the Company filed a registration statement with the United States Securities and Exchange Commission relating to the proposed initial public offering of its common stock.  The Company was officially listed on the New York Stock Exchange in August 2016.  In the following years, management worked to strategically expand At Home's footprint across the country, opening the Company's 100th store in 2016.  Just three years later, in 2019, At Home doubled in size and celebrated the opening of its 200th store.  At the time, the Company was focused on growing its store base at a rate of approximately 10% per year with plans to increase its store base to 600 or more over the long term.

In July 2021, Hellman & Friedman, LLC acquired the Company in a take-private transaction valued at $2.8 billion, including the assumption of debt, that resulted in the Company no longer being listed on the New York Stock Exchange.  Under the terms of the merger agreement, existing At Home stockholders received $37 per share in cash.  Following the acquisition, the Company continued its expansion efforts, opening its 250th store in 2022, marking a significant milestone for At Home.

### B.    Business Operations.

The Company currently operates in approximately 260 stores across 40 states, averaging approximately 105,000 square feet per store.  The Company's unique product assortment at sharp values generates significant customer store traffic.  Approximately 70 million customers visit At Home stores across the country each year and similarly, approximately 53 million customers visit At Home's website annually.  With its broad product assortment, loyal customer base, and ability to provide a seamless and integrated customer experience across all channels, At Home is a leading destination for home décor and furnishings with the potential to continue growing its market share.

### 1.    The Company's Products.

The Company's mission is to help its customers express their personal style and create the many memories and joys of life at home.  Each At Home store offers a variety of products, which include a large assortment of everyday and seasonal home décor, ranging from home furnishings (*e.g.*, mirrors, cushions, rugs, wall art, patios, and accent furniture) to accent décor (*e.g.*, kitchen, bath, bedding, candles, garden and outdoor décor, holiday and seasonal décor and accessories, home organization, pillows, pottery, vases, artificial flowers and trees, and window treatments).  In fiscal year 2025,[13] 60% of net sales were comprised of everyday home furnishings and 40% of net sales were comprised of holiday and seasonal décor and accessories.

At Home employs an everyday low-price strategy that offers its customers the best possible pricing with limited use of significant discounts or promotions.  The Company's average price point per product is less than $20 with a typical customer spend of approximately $75 per visit.  Approximately 80% of At Home's net sales occur at full price with the balance attributable to limited special buys and selective markdowns used to clear slow-moving inventory or dated seasonal products, which is of particular importance given that the Company does not have warehousing, storage, or a reverse supply chain.  For the limited set of products that are directly comparable to products offered by other retailers, At Home seeks to offer prices below its specialty competitors and at or below its mass retail competitors.

---

[13]    The Company's fiscal year 2025 ended on January 25, 2025.

The Company's fully-integrated and centralized merchandising team is responsible for product development, inventory planning, and trend identification. At Home's differentiated merchandising strategy allows the Company to identify trends and then design and develop products with desirable aesthetics at attractive price points. Over 80% of At Home's products are unbranded, private label, or specifically designed for the Company.

      **2.**      **Sourcing and Distribution**.

At Home works closely with over 600 product partners (primarily located overseas) to manufacture high-quality products at a variety of price points, delivering exceptional value to the Company's customers. In fiscal year 2025, the Company's top ten product partners accounted for approximately 17% of total purchases. In addition to purchasing some of its products through domestic agents or trading companies, At Home's strategic sourcing function directly sources from overseas factories. In fiscal year 2025, At Home sourced approximately 90% of its products from overseas. Of the Company's total sourcing, in fiscal year 2025, approximately 45% of At Home's merchandise was purchased through trading companies and wholesalers and approximately 55% was purchased directly from foreign product partners in countries such as China, Vietnam, India, Turkey, and Mexico. At Home's product partners are critical to the Company's success and operations and the Company would be materially and adversely impacted if At Home were to encounter delays or difficulties in securing significant volumes of merchandise on a timely basis, especially during the summer months when critical inventory for Christmas and other seasonal holidays is in production or being shipped.

The vast majority of At Home's products are shipped directly to the Company's two distribution centers: a 592,000 square foot distribution center in Plano, Texas, and an 800,000 square foot distribution center in Carlisle, Pennsylvania. The Company's distribution centers serve as cross-dock facilities, storing very limited inventory on site. As such, on time receipt of an adequate volume of inventory is essential for the Company's financial performance as continuous shipments are critical to fill stores and maintain the right store inventory. At Home generally ships merchandise from its distribution centers to its stores between one and five times a week depending on the season and the sales volume of each store.

      **3.**      **Retail Channels**.

The Company sells its products directly to consumers through two primary channels: (i) traditional brick-and-mortar storefronts (a total of approximately 260 nationwide); and (ii) e commerce platforms. In 2020, at the beginning of the COVID-19 pandemic, the Company's website became transactional. In 2021, At Home improved its omnichannel capabilities by providing its customers with additional options for purchasing products, including a buy online pick-up in store option, curbside pick-up, and local delivery from a substantial majority of its store locations. In addition, in 2022, At Home launched its mobile application, making it even easier for customers to shop anywhere and any way they prefer. In fiscal year 2025, approximately 93% of sales revenue was generated in store and approximately 7% was generated through the Company's e commerce channels.

      **4.**      **Marketing Initiatives**.

At Home's marketing and advertising strategies seek to build deeper connections with the Company's core customers while also attracting new customers to the At Home brand. At Home uses a strategic mix of traditional and digital media platforms to build and expand its brand awareness and to drive traffic to the Company's stores and website. At Home implements its marketing strategies by communicating directly with current and prospective customers through various platforms, including

email, website, advertising media, social media, and influencer programs, and it is through these platforms that At Home shares new product launches, highlights key product categories, and provides customers with décor and home furnishings ideas and inspiration.  The breadth of the Company's digital assets, along with its well established and successful marketing history, has garnered strong brand recognition in the home décor and furnishings industry.

In addition to utilizing traditional marketing methods, the Company has also optimized its marketing strategies to drive performance.  The Company's insider perks loyalty program launched in August 2017 and, as of the Petition Date, had approximately 7 million active customers enrolled.  At Home's loyalty program incentivizes customer engagement and drives meaningful sales.  In fiscal year 2025, approximately 70% of sales were attributable to purchases made by insider perks loyalty members.  At Home also offers incentives to customers through an At Home credit card program that allows cardholders to take advantage of promotional financing offers on qualifying purchases, as well as loyalty rewards, and other exclusive cardholder benefits.

### 5.    At Home Employees.

As of the Petition Date, the Company employed approximately 7,170 individuals who work in its retail stores and its corporate and distribution center functions.  With respect to its in-store staffing, At Home utilizes specialized in-store merchandising and visual navigation strategies that enable the Company to employ a largely self-service model and streamline in-store staffing needs.  At Home centralizes major decisions relating to merchandising, inventory, and pricing at the corporate level, which allows its in-store teams to focus on a clean, organized, and inspiring shopping environment.  At Home's employees include personnel who are familiar with the Company's business, processes, and systems, and possess skills and experience to perform a wide variety of functions critical to the operations of the Company's retail stores, e-commerce channels, and global supply chains.  The strength of At Home's team is essential to the Company's long-term success.

### C.    At Home's Prepetition Capital Structure.

As of the Petition Date, the Debtors had approximately $1.998 billion in principal amount of debt obligations in the form of loans and bonds held by third-party creditors:

| Funded Debt | | |
| --- | --- | --- |
| **Debt Facility** | **Maturity** | **Approximate Principal Outstanding** |
| *ABL Facility* | | |
| **ABL Facility** | July 23, 2026 | $378 million |
| *Secured Debt[14]* | | |
| **Term Loan Facility** | July 24, 2028 | $579 million |
| **Senior Secured Notes** | July 15, 2028 | $300 million |
| **Cayman Notes** | May 12, 2028 | $200 million |

---

[14]    In addition to the above, At Home Group Inc. and the other obligors under the applicable instrument are borrower or guarantors of a $200 million aggregate principal amount Intercompany Note issued for the benefit of non-Debtor affiliate At Home Cayman which Intercompany Note has been pledged as collateral to secure the obligations under the Cayman Notes.

| Exchange Notes | May 12, 2028 | $483 million |
|---|---|---|
| *Unsecured Debt* | | |
| Senior Unsecured Notes | July 15, 2029 | $58 million |
| Total Funded Debt Obligations: | | $1.998 billion |

The ABL Facility, the Term Loan Facility, the Senior Secured Notes, the Cayman Notes, the Intercompany Note, and the Exchange Notes are secured by: (a) substantially all of the assets of At Home Group Inc. and the other obligors under the applicable instrument, not including certain excluded property, but including certain accounts, deposit accounts, cash and other assets therein, securities accounts, commodity accounts, inventory, and proceeds thereof; and (b) a pledge of the equity interests of At Home Group Inc. held by Ambience Intermediate, Inc. Prior to the Petition Date, the Debtors completed a perfection analysis and substantially all of the Debtors' assets are subject to liens securing the ABL Facility, the Term Loan Facility, the Senior Secured Notes, the Cayman Notes, the Intercompany Note, and the Exchange Notes.[15]

Pursuant to the DIP Orders, the approximately $579 million aggregate principal amount of Term Loans, $200 million aggregate principal amount of Cayman Notes, $483 million aggregate principal amount of Exchange Notes, and $300 million aggregate principal amount of Senior Secured Notes, in each case, together with all associated claims for accrued and unpaid interest, fees, and premiums thereon (as applicable) were "rolled up" with Tranche B DIP Loans (as defined in the DIP Orders). Upon the roll-up of any Claim associated with the Cayman Notes, Claims under the Intercompany Note were cancelled on a dollar-for-dollar basis pursuant to instructions delivered by the holders of the Cayman Notes to the Trustee in respect of the Cayman Notes and to At Home Cayman. The Tranche B DIP Loans issued under the roll-up of the aforementioned claims (and associated accrued and unpaid interest, fees, and premiums thereon) shall be subject to the DIP Equity Conversion on the Effective Date. For the avoidance of doubt, the prepetition Claims subject to the roll-up will receive no distributions under the Plan or be included in any calculation of the Pro Rata Share of distributions to be made under the Plan and any recovery on account of such Claims will be solely on account of the corresponding Tranche B DIP Loans.

## VI.    EVENTS LEADING TO THESE CHAPTER 11 FILINGS.

### A.    Business Challenges.

At the end of 2024 and the beginning of 2025, At Home faced certain liquidity constraints that resulted from post-COVID-19 macroeconomic trends, issues within the retail industry, operational challenges, pressures related to upcoming debt maturities under the ABL Facility, and an anticipated "going-concern" audit opinion. The Company's liquidity constraints were exacerbated and accelerated by the introduction of new tariff policies in 2025.

### 1.    Post-COVID-19 Macroeconomic Shocks and Industry Headwinds.

The Company has struggled from the continuing reverberations of the COVID-19 pandemic, which caused several macroeconomic impacts for retailers across the globe. For example, since 2022, the prolonged period of high interest rates and inflation has challenged the home furnishings and décor sector. The demand spike during the COVID-19 pandemic for home décor and furnishings products (due

---

[15]    The Disinterested Directors have reviewed this perfection analysis.

to increased discretionary cash, consumer focus on home improvement, and strong home sales) significantly exceeded prior levels and, given the durable goods nature of At Home's products, resulted in significant increase in demand and sales. In subsequent years, the Company has felt a softening in demand, which has been exacerbated by depressed homebuying activity due to elevated mortgage rates and record high home prices, reducing the population of new movers—a key segment of At Home's customer base. Given the fixed cost base of retail stores, slowing demand has significantly reduced the Company's profit margins.

Like many businesses in the retail space, the impacts of the post-COVID-19 landscape on the supply chain resulted in shipping challenges and the rising cost of materials, labor, and fuel, which has led to increased expenses and further reduced margins for the Company. These issues particularly impacted At Home given the Company's global sourcing and supply chain and the fact that its two distribution centers are not set up to store inventory, limiting the Company's ability to maintain appropriate levels of merchandise within its stores. At Home has been materially impacted by tumultuous shipping environments, including sudden and significantly higher costs and unpredictable delays and surcharges, because its product price tags are applied overseas and thus the Company historically has not been able to easily adjust prices in response to such volatility. Similarly, because At Home employs a long-range merchandising plan, its ability to quickly pivot to unforeseen macroeconomic issues can, at times, be limited. Moreover, At Home's significant brick-and-mortar retail footprint imposed a further drag on profitability as consumers shifted purchasing toward e-commerce channels, resulting in the loss of in-store foot traffic and sales. Operating in such a volatile retail environment contributed to At Home's liquidity challenges as it struggled to proactively adjust to decreased demand from the changes in the macroeconomic environment.

In response, the Company completed a successful liability management transaction in May 2023, which, as described above, resulted in the Company obtaining $200 million in new money. Unfortunately, certain operational issues, as further described below, and high interest rates continued to challenge the Company's ability to effectively generate necessary demand. Even as consumer spending generally improved in the latter half of 2024, consumers tended to spend their dollars on essentials (as opposed to home décor and similar products offered by At Home) due to economic uncertainty and reduced consumer confidence. At the start of 2025, in-store traffic was approximately 24% below pre-pandemic averages in 2020.

## 2. Operational Issues.

The sudden drop-off in demand for home décor products following the boom of the COVID-19 pandemic resulted in a mismatch between the Company's existing business plans and the new economic realities of decreased customer spending on home furnishings and a depressed housing market. The Company took immediate steps to reconcile this mismatch, but macroeconomic factors have continued to weigh on At Home and the significant interest burden has limited cash flow for reinvestment in the business.

*First*, the Company took action to conserve cash by significantly paring back new store openings. The Company then evaluated its previous lease strategy and contemplated new store openings to determine whether a change in the Company's existing store footprint was necessary. During this analysis, the Company concluded that stores recently opened in new geographies were underperforming due to low brand awareness, weak consumer demand, and mixed new store execution. The Company refocused its store growth strategy and execution to prevent these issues in the future, but the losses suffered during this time could not be completely recovered and given the contractual nature of the leases, these underperforming stores remain a part of At Home's portfolio.

***Second***, the Company attempted to address reduced customer spending post-COVID-19 by prioritizing a "low-price" competitive strategy and implementing new test concepts. Despite best efforts in deploying these strategies, consumer spending did not rebound as anticipated.

***Third***, the Company worked to adjust its strategy on sourcing and buying goods to address increased costs resulting from macroeconomic global shipping supply imbalances. Unfortunately, because the adjustments have long lead times, the Company continued operating under its existing strategy in the interim, which left it exposed to increased costs and tariff risk.

During this trying time, the Company experienced significant leadership turnover. In November 2023, At Home's then-Chief Executive Officer announced his retirement. The Company initiated a search for a replacement, during which time Brad Weston joined as new Chief Executive Officer in June 2024. Immediately thereafter, Brad worked to overhaul the Company's senior leadership team to elevate performance and improve At Home's outlook. While the new senior management team has made progress on both short-term initiatives and a longer-term roadmap for the business, the growing challenges described herein have limited the bottom-line improvements for At Home's initiatives.

### 3.    The ABL Facility and Going-Concern Opinion.

Given its strained liquidity situation, the Company initiated discussions with the ABL Agent in early 2025 to start renegotiating the terms of the ABL Credit Agreement as the Company likely would not have sufficient funds to meet this debt obligation by the July 2026 maturity date. As a part of these discussions, the ABL Agent requested diligence related to the Company's liquidity, runway, and capital structure and then retained Gordon Brothers Asset Advisors LLC to complete an appraisal of the net recovery value of At Home's retail inventory. In February 2025, due to the Company's existing liquidity issues and uncertainty surrounding impending tariffs, the ABL Agent indicated that the inventory appraisal may result in a reduction of the borrowing base under the ABL Facility and the implementation of discretionary reserves. In the months leading up to the Petition Date, the Company and the ABL Agent continued to engage in constructive discussions on how to best address the ABL Agent's concerns without further exasperating the Company's liquidity position.

As discussions remained ongoing with the ABL Agent, it also became clear that the Company's yearly audit, which was due May 27, 2025, likely would lead to a going-concern qualified opinion, highlighting substantial doubt about the Company's ability to continue operating for the foreseeable future. At Home understood that this going-concern audit opinion would put further strain on the Company and its financial situation and would cause the Company to default under the ABL Credit Agreement, the Term Loan Credit Agreement, the Cayman Notes Indenture, and the Intercompany Note for failure to deliver a clean audit opinion.

### 4.    Tariff Policy Changes.

Beyond macroeconomic challenges, retail industry headwinds, and internal pressures, the Company has faced significant challenges in addressing tariffs given its reliance on goods sourced from China. Despite the Company's experience with navigating tariff changes in recent years, the current tariff policy dynamic introduced a new level of uncertainty and volatility during the early stages of the new senior management team's implementation of its refined business strategy. On January 20, 2025, an executive order was signed instructing certain cabinet secretaries to develop reports on trade practices and recommendations for tariffs by April 1, 2025. Just days after signing the order, a 10% tariff on all Chinese imports was imposed, which was subsequently raised another 10%, making the cumulative new tariff 20%. On April 2, 2025, the scope of tariffs across the world was widened with a 10% universal tariff on goods from all countries plus individualized reciprocal tariffs on approximately 60 nations. On

April 5, 2025, the universal tariff took effect.  On April 9, 2025, a 90-day pause on all reciprocal tariffs, except for China, was announced.  While the government engaged with foreign trade partners on trade deals with respect to reciprocal tariffs, a trade war ensued with China.  On April 10, 2025, the government announced a 145% tariff on all Chinese goods and China subsequently implemented its own reciprocal tariff of 125%.  After just over a month of discussions between the United States and China, the government announced on May 12, 2025, that it would temporarily lower the tariff on Chinese goods to 30% and implement a 90-day pause to give the two countries more time to negotiate.  One month later, on June 11, 2025, the government announced an interim agreement with China, which set the near-term tariff on Chinese imports at 55%.

The introduction of broad-based tariffs caused significant unpredictability and disruption to the retail industry and put retailers—especially ones like At Home—in a difficult operating position.  Imported products became more costly immediately upon tariffs taking effect.  Given that At Home purchases most of its merchandise from foreign product partners, the Company was forced to consider whether to raise prices for customers or bear the extra costs itself.  Passing higher costs associated with tariffs on to customers is particularly challenging for At Home given demand elasticity in its discretionary purchase categories.  In addition, At Home's everyday low-price strategy makes it more difficult for the Company to react to these macroeconomic pressures and maintain its value positioning.  As such, the Company negotiated cost concessions from product partners where feasible coupled with reductions to purchase orders.

Uncertainty about tariffs, pricing, and supply chains became pervasive among consumers and businesses across the United States, making it hard to plan and manage inventory.  At the same time, the amount of cargo shipments coming into the U.S. declined precipitously.  The uncertainty surrounding tariffs has caused concern for At Home, which employs an early sourcing method whereby the Company sources seasonal goods such as for Halloween and Christmas from foreign product partners months in advance.  With large and frequent changes to trade policy, consumer sentiment has also declined materially over the past few months and higher prices coupled with uncertainty has resulted in customers being more cautious with their money.  In addition, on May 6, 2025, Moody's downgraded At Home's debt ratings, changing its outlook to negative from stable and reflecting At Home's downgrade due to increased costs from tariffs along with severely depressed operating income levels and upcoming debt maturities on the ABL Facility.  Already faced with a declining liquidity situation and a nascent leadership team and refined business strategy, new rounds of tariffs contributed greatly to the uncertainty of At Home's operational future and financial outlook and intensified the Company's need for a comprehensive solution.

### B.    The Company's Prepetition Initiatives.

Amid industry headwinds, operational challenges, upcoming debt maturities, and macroeconomic challenges, including ongoing changes to tariff policies, the Company implemented several initiatives in the months leading up to the Petition Date to stabilize its business and address its liquidity.

1.      **Revised Go-Forward Business Plan and Cost-Saving Initiatives**.

After his appointment in June 2024, CEO Brad Weston worked to galvanize the organization around the right business plan and initiatives with the appropriate investment strategy for healthy sales growth.  The Company's refined business plan revamped the sourcing strategy to eliminate costs by removing intermediary agents, reframed the business's focus on product value over price, and accelerated digital engagement and commerce capabilities.  As part of its refined business plan, the new senior management team also fortified the Company's supply chain and margin approach through diversification in its efforts to mitigate risk associated with supply chain and tariff volatility.

The Company's efforts also included certain cost-saving initiatives.  As a result of the Company's operating performance throughout 2024 (fiscal year 2025), the Company proactively revised its budget for the upcoming year to address its shortening liquidity runway and reduce certain operational costs.  These cost-saving initiatives were factored into the Company's budget and went into effect in 2025 (fiscal year 2026).

As liquidity continued to tighten for At Home throughout the beginning of 2025 and as discussions with the ABL Agent began, the Company quickly realized that additional cost savings were necessary.  To that end, the Company undertook a series of working capital management measures to conserve cash, including certain initiatives such as "Close the Gap," "Project G.R.O.W." (Get Rid of Waste), and "Fiscal Fitness."

2.      **Strategic Alternatives and the Retention of Advisors**.

Notwithstanding the Company's 2023 debt refinancing, at the beginning of 2025, due to persistent macroeconomic factors following the COVID-19 pandemic, the unpredictability of the tariff landscape, and the upcoming maturity of the ABL Facility, the Company determined it needed additional liquidity in the near term to fund its operations.

Accordingly, in February 2025, the Company engaged PJT as investment banker and Kirkland as legal counsel to assist the Company in exploring financing and other strategic alternatives to address its balance sheet.[16]  Also in February 2025, the Company retained AlixPartners to assist with its 13-week cash flow forecast in connection with evaluating ways to right-size its balance sheet.  On April 2, 2025, the Company expanded AlixPartners' scope of services and officially retained AlixPartners as financial advisor.

Shortly after the Company retained advisors, PJT reached out to six third-party lenders and certain of the Company's existing lenders to solicit proposals around a new money capital raise.  Of those six third-parties, two lenders submitted proposals for a new "first-in last-out" facility and two other lenders indicated their intent to also submit financing proposals subject to certain conditions.  In parallel with those discussions, and in response to the Company's request for a standalone financing proposal, certain of the Company's existing lenders expressed an interest in engaging with the Company on a comprehensive restructuring proposal.  In March 2025, the Company and the Ad Hoc Group commenced discussions on a possible comprehensive restructuring that would deleverage the Company and raise a new money investment.

---

[16]      PJT's engagement letter was signed on April 11, 2025, but is effective as of February 11, 2025.  Kirkland's engagement letter was signed on February 14, 2025.

During this time, the Company and its advisors were also progressing constructive discussions with the ABL Agent regarding the various financing options available to the Company to avoid the risk of the ABL Agent taking actions, including implementing certain reserves, that could potentially limit the Company's go-forward options.

The Company initially believed that a capital raise in conjunction with amendments to the ABL Credit Agreement could solve its financial issues. Given additional market uncertainty associated with new tariff policies announced in the beginning of April 2025, however, the Company recognized that a comprehensive strategy aimed at addressing all of its financial issues at once (including extending the maturity under the ABL Credit Agreement, addressing its going concern issues, raising new capital, and deleveraging its balance sheet) may be a more reasonable approach. After careful and detailed consideration of the various proposals in front of them, the Parent Boards and the Special Committee determined, in an exercise of their business judgment, that the best option to maximize value for all stakeholders would be a comprehensive restructuring of the Company's capital structure. Thus, in April 2025, the Company increasingly focused its efforts on engaging with the Ad Hoc Group on the terms of a comprehensive restructuring.

### 3.    Governance Changes.

In connection with evaluating its strategic alternatives, the Company proactively evaluated its own corporate governance structure. On March 4, 2025, the Parent Boards determined that it was in the best interests of the Company and its stakeholders to appoint Jill Frizzley as a disinterested director of the Parent Boards to assist in exploring, negotiating, and entering into potential strategic value-maximizing transactions. Ms. Frizzley has over two decades of experience in the restructuring industry and extensive expertise advising companies facing liquidity constraints.

Subsequently, one of the existing independent directors of the Parent Boards resigned. Accordingly, on March 28, 2025, the Parent Boards appointed Elizabeth Abrams (together with Ms. Frizzley, the "Disinterested Directors") as an additional disinterested director with meaningful experience navigating similar distressed situations to fill that vacancy. Simultaneously, the Parent Boards formed the Special Committee, comprised of Ms. Frizzley, Ms. Abrams, and John Butcher, one of the other existing independent directors. The Parent Boards delegated exclusive decision-making authority to the Special Committee with respect to any matters in which a conflict of interest exists or is reasonably likely to exist (the "Conflict Matters") between the Company, on the one hand, and any of its Related Parties.

In May 2025, Ms. Frizzley and Ms. Abrams, as the two Disinterested Directors, initiated an independent investigation (the "Investigation") into the Conflict Matters, such as potential claims and causes of action that the Company may hold against Related Parties, as a part of the Company's preparation for these Chapter 11 Cases.[17] The Disinterested Directors constitute a majority of the Special Committee.[18] The Disinterested Directors, with the assistance of Young Conaway, reviewed the factual and legal bases for potential claims and causes of action arising from the Company's transactions to ensure that any releases to be provided under a plan of reorganization or otherwise in the Chapter 11

---

[17]    The Disinterested Directors are represented by Young Conaway Stargatt & Taylor, LLP ("Young Conaway") in connection with the investigation.

[18]    Although a member of the Special Committee, Mr. Butcher did not participate in the independent investigation into the Conflict Matters due to his tenure on the Parent Boards.

Cases are appropriate in scope and nature.  As part of the Investigation, Young Conaway requested and received documents from the Company and also conducted interviews of relevant persons.

The Investigation and its outcome are further discussed in **Article VII.E** of this Disclosure Statement.

### 4.    **Lease Savings Initiatives**.

As part of its ongoing efforts to optimize its operations, the Company engaged in a comprehensive analysis of its real estate portfolio to identify ways to restructure or exit leases with off-market lease terms or faltering financial performance.  As further described above, in the months preceding the filing of these cases, the Company, with the assistance of its advisors, developed a revised business plan strategy, which focused in part on right-sizing At Home's lease portfolio to ensure unprofitable store locations close and/or benefit from restructured lease obligations.

As part of this strategy, the Company retained Hilco Real Estate, LLC ("Hilco") on April 16, 2025, to conduct a footprint assessment and site-level evaluation to identify (a) a series of sites for immediate closure and (b) certain sites with off-market lease terms.  Subsequently, the Company, together with Hilco and AlixPartners, completed a lease rationalization analysis to incorporate into the business plan which includes but is not limited to addressing the fixed term obligations and future options of each lease and aligning such commitment with store performance and operational risk factors. The Company intends to implement the Plan during these Chapter 11 Cases to bring lease costs in line with expected revenues and sustainable margins.

On June 14, 2025, the Company also retained Hilco Merchant Services, LLC to act as the exclusive agent for the purpose of conducting a sale of certain of the Company's goods, saleable in the ordinary course located in certain of the Company's stores designated for "Store Closing," "Everything Must Go," "Everything on Sale," or similar themed sale.  These undertakings will aid the Company in pursuing its plan to right-size At Home's store footprint.

### 5.    **Forbearance Agreements**.

As negotiations with the Company's stakeholders progressed, the Ad Hoc Group agreed to enter into a forbearance agreement with the Company with respect to certain upcoming interest payments to extend the Company's liquidity runway including an approximately (a) $11.5 million interest payment due under the Cayman Notes Indenture on May 15, 2025, (b) $11.5 million interest payment due under the Intercompany Note on May 15, 2025, and (c) $4.3 million interest payment due under the Term Loan Credit Agreement on June 2, 2025.  In addition, the ABL Agent agreed to enter into a separate forbearance agreement with the Company with respect to certain anticipated events of default under the ABL Credit Agreement, including, among other things, failure to comply with the requirements to deliver a clean audit opinion, annual and quarterly financials, a budget, and related compliance certificates.

On May 23, 2025, those efforts resulted in the execution of the ABL Forbearance Agreement and the Omnibus Forbearance Agreement (collectively, the "Forbearance Agreements").  The Forbearance Agreements contained, among other things, an agreement from the consenting lenders to forbear from exercising their rights and remedies under the applicable debt documentation through June 30, 2025, as well as certain milestones and reporting obligations intended to drive parties to consensus on a transaction.

The Forbearance Agreements provided the Company with the liquidity runway needed to complete negotiation of a comprehensive restructuring and to secure needed financing thus ensuring the Company commenced the Chapter 11 Cases with sufficient financing and a clear path to emergence.

### 6.    Restructuring Support Agreement.

After extensive, arms'-length and good faith negotiations, on June 16, 2025, the Debtors, the Ad Hoc Group, other holders of the Company's first lien debt, and H&F entered into the RSA, a copy of which is attached hereto as **Exhibit E**.  The RSA provides for a comprehensive deleveraging transaction effectuated through a chapter 11 plan of reorganization and allows the Debtors to emerge as a going concern with sufficient liquidity to implement their go-forward business plan.  The RSA represents a significant achievement for At Home and is a testament to the commitment of its lenders to support a value-maximizing path forward upon emergence from these Chapter 11 Cases.  Holders of approximately 96% of the Debtors' first lien debt signed on to the RSA and pursuant to the RSA, such holders agreed to support the Debtors' proposed plan of reorganization, which will help ensure a straight-forward and efficient chapter 11 process.  The Restructuring Transactions contemplated by the RSA will eliminate approximately $1.620 billion of the Company's existing $1.998 billion in debt, and the commitments for up to $600 million of debtor-in-possession financing and the consensual use of cash collateral will support the Company's operations during the Chapter 11 Cases and ensure a smooth and timely exit from chapter 11.  On the effective date of the plan, the Reorganized Debtors will enter into an exit asset-based lending facility, which will be applied to refinance the prepetition ABL Facility.  Ultimately, the Restructuring Transactions contemplated by the RSA provides the best path forward for the Debtors to continue business as usual while allowing the Debtors to continue to consider value-maximizing alternatives.

## VII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES.

### A.    First and Second Day Relief.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors (42 entities) filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  Throughout June and July 2025, the Bankruptcy Court entered orders granting the First Day Motions on an interim or final basis, as specified below.

### 1.    The DIP Facility and Access to Cash Collateral.

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 16] (the "DIP Motion") seeking approval of entry into a debtor-in-possession financing facility in the form of a $600 million DIP Facility.  The DIP Facility is comprised of (i) new money first-out delayed draw term loans in an aggregate amount of $200 million, and (ii) a second-out roll-up facility in an aggregate principal amount of approximately $400 million representing a 2:1 roll-up of obligations under the Term Loan Facility, the Senior Secured Notes, the Exchange Notes, and the Cayman Notes.  Pursuant to the DIP Motion, the Debtors also sought the authority to use the ABL Secured Parties' cash collateral on a consensual basis.  On June 17, 2025, the Bankruptcy Court entered

the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 107] (the "Interim DIP Order").  Pursuant to the Interim DIP Order, the Bankruptcy Court authorized the Debtors' use of cash collateral on a consensual basis and authorized the Debtors to access $75 million of new money and a roll up of $150 million of certain prepetition obligations.

Following entry of the Interim DIP Order, the Debtors received several formal and informal objections from various parties including the Committee and landlords.  *See* [Docket Nos. 268, 271, 275, 279, and 283] (collectively, the "DIP Objections").  In response to the DIP Objections, the Debtors and the DIP Lenders each filed a reply in support of the DIP Motion.  *See* [Docket Nos. 310, 313].  Prior to the final DIP hearing, the Debtors, together with the DIP Lenders, worked to address the concerns raised in the DIP Objections.  These discussions resulted in a consensual resolution of the DIP Motion, and on July 18, 2025, the Bankruptcy Court entered an order approving the DIP Motion on a final basis [Docket No. 344].

## 2. **Operational Motions**.

The Bankruptcy Court entered the following orders authorizing the Debtors to facilitate their operations in the ordinary course:

- **Cash Management Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 102] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (III) Granting Related Relief [Docket No. 8] (the "Cash Management Motion") on an interim basis.  On July 14, 2025, the Bankruptcy Court entered an order approving the Cash Management Motion on a final basis [Docket No. 299].

- **Wages Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 97] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs; and (II) Granting Related Relief [Docket No. 7] (the "Wages Motion") on an interim basis.  On July 14, 2025, the Bankruptcy Court entered an order approving the Wages Motion on a final basis [Docket No. 298].

- **Vendors Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 114] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain (A) Critical Vendors, (B) Foreign Vendors, (C) 503(b)(9) Claimants, and (D) Lien Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief [Docket No. 6] (the "Vendors Motion") on an interim basis.  On July 14, 2025, the Bankruptcy Court entered an order approving the Vendors Motion on a final basis [Docket No. 297].

- **Customer Programs Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 95] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer their Customer Programs and (B) Honor Prepetition Obligations, and (II) Granting Related Relief [Docket No. 5] (the "<u>Customer Programs Motion</u>") on an interim basis.  On July 13, 2025, the Bankruptcy Court entered an order approving the Customer Programs Motion on a final basis [Docket No. 286].

- **Insurance Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 117] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance, Surety Coverage, and Letters of Credit Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, Surety Bonds, and Letters of Credit, (C) Honor and Renew Premium Financing Agreements Entered into Prepetition, Satisfy Prepetition Obligations Related Thereto, and Enter into Premium Financing Agreements, and (D) Continue to Pay Broker Fees, and (II) Granting Related Relief [Docket No. 10] (the "<u>Insurance Motion</u>") on an interim basis.  In accordance with such order, on or around July 2, 2025, Bank of America, N.A. issued a letter of credit to the Debtors with respect to a surety bond provided by Liberty Mutual Insurance Company.  On July 14, 2025, the Bankruptcy Court entered an order approving the Insurance Motion on a final basis [Docket No. 300].

- **Utilities Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 103] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (IV) Authorizing Payments to the Debtors' Utilities Administrator, and (V) Granting Related Relief [Docket No. 12] (the "<u>Utilities Motion</u>") on an interim basis.  On July 13, 2025, the Bankruptcy Court entered an order approving the Utilities Motion on a final basis [Docket No. 287].

- **Taxes Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 116] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief [Docket No. 13] (the "<u>Taxes Motion</u>") on an interim basis. On July 14, 2025, the Bankruptcy Court entered an order approving the Taxes Motion on a final basis [Docket No. 288].

- **NOL Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 118] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief [Docket No. 14] (the "<u>NOL Motion</u>") on an interim basis.  On July 11, 2025, the Bankruptcy Court entered an order approving the NOL Motion on a final basis [Docket No. 270].

### 3.       Administrative Motions.

In addition to the operational motions above, the Bankruptcy Court entered the following orders authorizing the Debtors to facilitate their administration of these Chapter 11 Cases:

- **Joint Administration Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 92] approving the Motion of Debtors for Entry of an Order (I) Directing the Joint Administration of Chapter 11 Cases and (II) Granting Related Relief [Docket No. 2] on a final basis.

- **Automatic Stay Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 111] approving the Motion of Debtors Seeking Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief [Docket No. 11] on a final basis.

- **Claims Agent Retention Application.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 119] approving the Application of Debtors for Entry of an Order (I) Authorizing and Approving the Appointment of Omni Agent Solutions, Inc. as Claims and Noticing Agent and (II) Granting Related Relief [Docket No. 3] on a final basis.

- **Creditor Matrix Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 120] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Redact Certain Confidential Information of Customers, (B) Redact Certain Personally Identifiable Information of Individuals, and (C) Serve Certain Parties in Interest by Email; (II) Approving the Form and Manner of Service of the Notice of Commencement; (III) Approving the Form and Manner of Notice to Customers; and (IV) Granting Related Relief [Docket No. 9] (the "Creditor Matrix Motion") on an interim basis. On July 11, 2025, the Bankruptcy Court entered an order approving the Creditor Matrix Motion on a final basis [Docket No. 269].

- **Schedules and Statements Extension Motion.**  On the Petition Date, the Debtors filed the Motion of Debtors for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports and (II) Granting Related Relief [Docket No. 22] (the "Schedules and Statements Extension Motion") requesting that the Bankruptcy Court extend the time for the Debtors to file schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, statements of financial affairs, and Bankruptcy Rule 2015.3 financial reports.  On July 11, 2025, the Bankruptcy Court entered an order approving the Schedules and Statements Extension Motion [Docket No. 274], which extended the schedules and statements filing deadline to August 4, 2025.  On August 4, 2025, the Debtors filed their Schedules and statements of financial affairs [Docket Nos. 431–472].

### 4.       Store and Lease Related Motions.

As discussed above and further in the First Day Declaration, a key component of the Company's prepetition and postpetition engagement revolved around a continuation and completion of the Debtors' ongoing effort to rationalize their retail store footprint.  This effort entailed, among other things, the closure of certain underperforming stores (based on a comprehensive cost-benefit analysis with the

assistance of outside advisors) with the goal of creating an efficient and profitable remaining store footprint.

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement, (II) Authorizing and Approving the Conduct of Store* Closing *Sales, with Such Sales to Be Free and Clear of all Liens, Claims, and Encumbrances, (III) Modifying Customer Programs at the Closing Stores, and (IV) Granting Related Relief* [Docket No. 16] (the "Store Closing Motion") to conduct 26 initial store closings. On June 17, 2025, the Bankruptcy Court entered an order approving the Store Closing Motion on an interim basis [Docket No. 126]. On July 15, 2025, the Debtors filed the *Notice of Removal of Closing Stores from the Store Closing List* [Docket No. 303], removing two stores from the original store closing list. On July 18, 2025, the Bankruptcy Court entered an order approving the Store Closing Motion on a final basis [Docket No. 345]. On July 24, 2025, the Debtors filed the *Notice of Filing of Additional Store Closing List* [Docket No. 369], adding six stores to the amended store closing list. On August 1, 2025, the Debtors filed *Notice of Removal of Closing Stores from the Store Closing List* [Docket No. 426], removing two stores from the amended store closing list. The Debtors have authority to file subsequent notices amending such list as necessary.

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* [Docket No. 21] (the "Assumption and Rejection Procedures Motion"), through which the Debtors sought approval of certain procedures for rejecting or assuming executory contracts and unexpired leases. On July 18, 2025, the Bankruptcy Court entered an order approving the Assumption and Rejection Procedures Motion on a final basis [Docket No. 346]. On August 6, 2025, the Debtors filed the *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 476], rejecting 22 leases. *On August 12, 2025, the Debtors filed the Second Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases [Docket No. 520], rejecting six additional leases.*

On the Petition Date, the Debtors filed the *Omnibus Motion of Debtors for Entry of an Order (I) Authorizing the (A) Rejection of Certain Unexpired Leases and (B) Abandonment of Certain Personal Property, Each Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 20] (the "Omnibus Rejection Motion") to reject six initial leases effective as of the Petition Date. On July 18, 2025, the Bankruptcy Court entered an order approving the Omnibus Rejection Motion on a final basis [Docket No. 342].

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Extending the Deadline for the Debtors to Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* [Docket No. 23] (the "365(d)(4) Extension Motion") requesting that the Bankruptcy Court extend the deadline established by section 365(d)(4) of the Bankruptcy Code for the Debtors to assume, assume and assign, or reject unexpired leases of nonresidential property to January 12, 2026. On July 14, 2025, the Bankruptcy Court entered an order approving the 365(d)(4) Extension Motion [Docket No. 301].

### B.    Appointment of the Committee.

On June 27, 2025, the U.S. Trustee filed the N*otice of Appointment of Committee of Unsecured Creditors* [Docket No. 197] appointing the Committee. The Committee is comprised of the following entities: (1) CSC Delaware Trust Company, in its capacity as successor Trustee; (2) Realty Income Corporation; (3) Brentwood Originals, Inc.; (4) Jordan Manufacturing Co., Inc.; (5) Loloi Rugs; (6) Natco Products Corp.; and (7) Oriental Weavers USA. On July 15, 2025, the U.S. Trustee filed the

*Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 306], which removed Oriental Weavers USA from the Committee and appointed CTM International Giftware Inc. in its place. On July 17, 2025, the U.S. Trustee filed the *Second Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 320], which removed CTM International Giftware Inc. from the Committee and reappointed Oriental Weavers USA in its place.  On July 18, 2025, the U.S. Trustee filed the *Third Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 335], which removed Natco Products Corp. from the Committee.

Shortly after the Committee's appointment, the Debtors began actively engaging with the Committee regarding the key components of these Chapter 11 Cases.  As discussed above in more detail, after the Committee's appointment, the Committee filed an objection to entry of an order approving the DIP Motion on a final basis which the Debtors and the Committee worked together to resolve informally.

**C.**     **Retention of Professionals**.

**1.**     **Retention of Debtor Professionals**.

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed applications requesting that the Bankruptcy Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327, 328, and 363 of the Bankruptcy Code, as applicable:

- Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP, as Attorneys for the Debtors and Debtors in Possession Effective as of June 16, 2025 [Docket No. 203] filed on June 27, 2025, to retain Kirkland & Ellis LLP and Kirkland & Ellis International LLP as lead restructuring counsel, was approved by the Bankruptcy Court on July 24, 2025 [Docket No. 371];

- Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Young Conaway Stargatt & Taylor, LLP, as Co-Counsel for the Debtors, Effective as of the Petition Date [Docket No. 199] filed on June 27, 2025, to retain Young Conaway Stargatt & Taylor, LLP as co-counsel and conflicts counsel, was approved by the Bankruptcy Court on July 24, 2025 [Docket No. 375];

- Application of Debtors for Entry of an Order Authorizing the Retention and Employment of PJT Partners LP, as Investment Banker to the Debtors and Debtors in Possession, Effective as of the Petition Date, (II) Waving Certain Information Requirements Pursuant to Local Rule 2016-1, and (III) Granting Related Relief [Docket No. 168] filed on June 23, 2025, to retain PJT Partners, LP as investment banker, was approved by the Bankruptcy Court on July 18, 2025 [Docket No. 347];

- Application of Debtors for Entry of an Order Authorizing the Employment and Retention of AlixPartners, LLP, as Financial Advisor Effective as of the Petition Date [Docket No. 204] filed on June 27, 2025, to retain AlixPartners, LLP as financial advisor, was approved by the Bankruptcy Court on July 24, 2025 [Docket No. 372];

- Application of Debtors for Entry of an Order Authorizing the Debtors to Employ and Retain Omni Agent Solutions, Inc. as Administrative Agent Effective as of the Petition Date [Docket No. 205] filed on June 27, 2025, to retain Omni Agent Solutions, Inc. as claims and noticing agent, was approved by the Bankruptcy Court on July 24, 2025 [Docket No. 374];

- Application of Debtors for Entry of an Order (I) Authorizing the Retention and Employment of Ernst & Young LLP as Tax Advisory Services Provider Effective as of the Petition Date and (II) Granting Related Relief [Docket No. 169] filed on June 23, 2025 to retain Ernst & Young LLP as tax advisory services, was approved by the Bankruptcy Court on July 18, 2025 [Docket No. 348];

- Application of Debtors for Entry of an Order (I) Authorizing the Employment and Retention of Hilco Real Estate, LLC as Real Estate Consultant and Advisor to the Debtors and Debtors in Possession, (II) Approving the Terms of Hilco's Employment, (III) Waiving Certain Timekeeping Requirements, and (IV) Granting Related Relief [Docket No. 170] filed on June 23, 2025 to retain Hilco Real Estates, LLC as real estate advisor, was approved by the Bankruptcy Court on July 18, 2025 [Docket No. 349]; and

- Application of Debtors for Entry of an Order (I) Authorizing the Retention and Employment of KPMG LLP to Provide Accounting Advisory, Valuation, Tax Provision, Tax Consulting, and Tax Compliance Services Effective as of the Petition Date; and (II) Waiving the Information Requirements of Local Rule 2016-1(D) [Docket No. 225] filed on July 1, 2025 to retain KPMG LLP to provide accounting, advisory, valuation, tax provision, tax consulting, and tax compliance services, was approved by the Bankruptcy Court on July 24, 2025 [Docket No. 373].

### 2. Retention of Ordinary Course Professionals.

On June 23, 2025, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business, (II) Establishing Procedures for Designating Such Professionals, (III) Waving Certain Information Requirements of Local Rule 2016-1, and (IV) Granting Related Relief* [Docket No. 167] (the "Ordinary Course Professionals Motion"), seeking authorization to retain and compensate certain law firms, accountants, consultants, and other non-attorney professionals utilized in the ordinary course of business. On July 11, 2025, the Bankruptcy Court entered an order approving the Ordinary Course Professionals Motion [Docket No. 273]. On July 21, 2024, the Debtors filed the *Notice of Filing of First Amended List of Ordinary Course Professionals* [Docket No. 353]. On July 23, 2025, the Debtors filed the *Notice of Filing of Second Amended List of Ordinary Course Professionals* [Docket No. 367].

### 3. Retention of Committee Professionals.

After its appointment, the Committee filed applications requesting the Bankruptcy Court's authorization to retain and employ certain advisors pursuant to sections 327, 328, and 363 of the Bankruptcy Code, as applicable, including Pachulski Stang Ziehl & Jones LLP, as proposed counsel [Docket No. 427] and FTI Consulting, Inc., as proposed financial advisor [Docket No. 428]. As of the date hereof, the Bankruptcy Court has not entered orders authorizing retention of the Committee's proposed professionals.

**D.      Bar Dates**.

On July 22, 2025, the Debtors filed the *Motion of Debtors Seeking Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II)* Establishing *Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Form and Manner of Notice Thereof* [Docket No. 355] (the "Bar Date Motion") which is set for a hearing on August 14, 2025.  On August 8, 2025, the Bankruptcy Court entered an order approving the Bar Date Motion [Docket No. 499] (the "Bar Date Order").  Pursuant to the Bar Date Order, the bar dates are as follows:

- **General Bar Date**:  September 8, 2025 at 11:59 p.m., prevailing Eastern Time;

- **Governmental Bar Date**:  December 15, 2025 at 11:59 p.m., prevailing Eastern Time;

- **Amended Schedules Bar Date**:  in the event that the Debtors amend or supplement their Schedules, the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, to such claim, and (b) 11:59 p.m., prevailing Eastern Time, on the date that is 30 days from the date on which the Debtors provide notice of the amendment to the Schedules; and

- **Rejection Damages Bar Date**:  in the event that an order authorizing the rejection of an executory contract or unexpired lease is entered, except as otherwise set forth in such order, the later of (i) the General Bar Date, (ii) 11:59 p.m., prevailing Eastern Time, on the date that is 30 days after the later of (A) entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors or (B) the effective date of a rejection of any executory contract or unexpired lease of the Debtors pursuant to operation of any Bankruptcy Court order.

**E.      The Disinterested Directors' Investigation**.

As previously discussed in **Article VI.B.3** of this Disclosure Statement, prior to the Petition Date, the Disinterested Directors initiated the Investigation, with the assistance of Young Conaway.

From May 2025 to July 7, 2025, Ms. Frizzley and Ms. Abrams, with Young Conaway's assistance, oversaw and directed the Investigation which consisted of document review, interviews with Company executives, board members, and advisors to certain of the transactions, and numerous update conferences between Young Conaway, Ms. Frizzley, and Ms. Abrams.  In connection with the Investigation, the Disinterested Directors reviewed thousands of pages of credit agreements, financial documents, and board presentation materials, in addition to interviews with management, board members, and legal and financial advisors.

The Investigation was designed to accomplish, and ultimately accomplished, the following goals:

- reviewing the factual and legal bases for potential claims;

- assessing the strengths and weaknesses of each claim to determine the proper treatment of claims in a chapter 11 plan and in connection with the DIP Facility;

- evaluating any proposed release, settlement, retention, or prosecution of claims or causes of action; and

- making determinations in connection with the release of claims or causes of action the Company might hold against Related Parties and others.

The Investigation focused particular attention on a financing transaction, referred to in the Company's first-day pleadings as the May 2023 liability management transaction, which involved a new money capital raise and Senior Unsecured Notes exchange with certain holders of the Senior Unsecured Notes. In May 2023, the Company exchanged $442 million aggregate principal amount of Senior Unsecured Notes for $412 million aggregate principal amount of new Exchange Notes. The Company also formed a new foreign entity, At Home Cayman, a restricted subsidiary of the Company, and completed a private placement of $200 million of new senior secured Cayman Notes, the net proceeds of which were then lent by At Home Cayman to At Home Group Inc. pursuant to the Intercompany Note. The document review and interviews performed in connection with the Investigation helped to confirm that the liability management transaction was not only at arm's-length but that there were effectively no other realistic financing alternatives available to the Company, a fact confirmed by the absence of interest in other potential lenders who were contacted during a follow-on 60-day go-shop period.

As a result of the May 2023 liability management transaction, the Company received a significant cash infusion on pricing terms not otherwise available. The proceeds for the transaction were applied by the Company to fund its operations and by virtue of the Company's integrated operations provided direct and indirect benefits to the Company's various subsidiaries and the business enterprise as a whole. The Investigation also considered any alternative forms of financing that the Company might have pursued or considered in the run-up to its bankruptcy filing, as well as the operational factors and macroeconomic forces that the Company was facing as it sought to right its financial ship in the early months of 2025.

Particular focus was also given to the role of the Consenting Sponsor. What emerged from that analysis was that the Consenting Sponsor did not receive management fees, did not receive director fees for its appointees to the board, and contributed considerable manpower, resources, and expertise, even at a time when it became apparent that its capital investment of more than $1 billion would ultimately need to be written off. Specifically, the Investigation's findings did not yield any potential claims against the Consenting Sponsor for reimbursement of expenses, which, if anything, suggested that the Consenting Sponsor was intentionally vigilant about not compromising the Company's liquidity for its own benefit, and was also praised by officers at the Company for the expertise and resources provided to management. The Investigation also examined the Consenting Sponsor's transaction, which was a boon to the public stockholders being cashed out at a substantial premium. The Investigation was able to confirm that none of these stockholders ever commenced legal action to enjoin the go-private merger in 2021 or received a judicial appraisal opinion of their shares. Further, no evidence emerged that, in the wake of this merger, the Company was unable to timely pay its creditors. It continued to do so.

Beyond the specifics of certain transactions, the circumstances and nature of the relationship between the Company, its secured lenders, and the unsecured bond holders was also explored to determine any other possible claims that might have arisen in the context of any transaction. That analysis similarly failed to produce evidence of any viable claims. In addition, the Disinterested Directors analyzed possible claims around salaries and benefits that were paid to Company officers and directors in the year leading up to the bankruptcy filing, but the Investigation concluded that that such

compensation was typical, market, and consistent with Company practices, particularly in the strained financial circumstances the Company was facing.

Based on the analysis presented by the Disinterested Directors, the board determined that the Company did not have any colorable or valuable claims and/or causes of action against the Company's Insiders relating to any prepetition conduct of such parties. Nonetheless, given other considerations relevant to these Chapter 11 Cases, the board determined that there is sufficient consideration for the Releases provided in the Plan.

Based on the results of the Investigation, the Debtors believe the Plan, and the transactions, settlements, and compromises embodied therein, are the best alternative available to the estates.

## VIII.    RISK FACTORS.

**Before taking any action with respect to the Plan, Holders of Claims should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement, the Plan, and the documents delivered together herewith, referred to, or incorporated by reference into this Disclosure Statement, including other documents filed with the Bankruptcy Court in the Chapter 11 Cases. The risk factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the restructuring and consummation of the Plan. Each of the risk factors discussed in this Disclosure Statement may apply equally to the Debtors and the Reorganized Debtors, as applicable and as context requires.**

### A.    Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan, but will not necessarily affect the validity of the vote of the Voting Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Voting Classes.

#### 1.    There Is a Risk of Termination of the RSA.

The RSA contains provisions that give the signatories thereto (collectively or individually, as applicable) the ability to terminate the RSA upon the occurrence of certain events or if certain conditions are not satisfied, including the Debtors' failure to use commercially reasonable efforts to achieve the Milestones set forth therein. To the extent that events giving rise to termination of the RSA occur, the RSA may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies and could result in the loss of use of DIP Facility and/or Cash Collateral by the Debtors under certain circumstances. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan. In the event that the RSA is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

#### 2.    The Debtors May Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors.

While the Debtors are permitted to evaluate restructuring alternatives under the RSA, they believe the Restructuring Transactions outlined in the RSA represent the best available means of implementing a needed comprehensive restructuring of their business. If the Restructuring Transactions

are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, commencing section 363 sales of the Debtors' assets, converting to a chapter 7 plan, and any other transaction that would maximize the value of the Debtors' Estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

### 3.    Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 4.    The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not met or waived with the consent of the Required Consenting Stakeholders, the Confirmation and Effective Date of the Plan will not take place. In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan. If the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

Specifically, the Effective Date may not occur if (i) import tariffs announced by the United States on jurisdictions material to the Debtors' business increase to a level higher than the levels that were in effect on June 16, 2025, and (ii) the Debtors' Revised Business Plan (as defined in the DIP Term Sheet attached as <u>Annex C</u> to the Restructuring Term Sheet) results in declines in Adjusted EBITDA (calculated in the same manner as calculated in the Debtors' business plan) of greater than $13,000,000

for the fiscal year 2026 or greater than $15,000,000 for the fiscal year 2027 as compared to the Debtors' business plan.

Additionally, the Effective Date may not occur if the Debtors shall have not previously entered into new leases or modifications or amendments to existing leases (or rejected existing leases) with the combined aggregate effect of reducing rental costs (through reductions in base rent or otherwise) by an amount and on terms acceptable to the Debtors and the Required Consenting Stakeholders.

### 5.      The Debtors Could Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  If sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims or Interests as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 6.      The Debtors Might Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them or Interests would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the RSA and subject to the consent of the Required Consenting Stakeholders, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

7. **The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes**.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "~i~Insider~²~" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

8. **Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation**.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' products, and increasing expenses. *See* **Article VIII.C** of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Business." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan to achieve the Debtors' stated goals.

9. **The Chapter 11 Cases Could Be Converted to Cases under Chapter 7 of the Bankruptcy Code**.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

10.    **One or More of the Chapter 11 Cases May Be Dismissed**.

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial Consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases.  In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Plan.

11.    **The Debtors May Object to the Amount or Classification of a Claim**.

Except as otherwise provided in the Plan or in prior orders entered by the Bankruptcy Court in the Chapter 11 Cases (including the DIP Orders), the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the RSA.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

12.    **The Total Amount of Allowed Administrative and Priority Claims May be Higher than Anticipated by the Debtors**.

The Debtors anticipate that they will have sufficient Cash, including from proceeds of the DIP Facility, to pay all Allowed Administrative Claims pursuant to the Plan.  Nevertheless, the amount of Cash the Debtors ultimately retain prior to and following the Effective Date may be lower than anticipated.  Additionally, Allowed Administrative Claims, Professional Fee Claims, and Priority Tax Claims may be higher than anticipated.  Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims, Superpriority DIP Claims, Professional Fee Claims, and Priority Tax Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization. In that instance, the Effective Date and prerequisite terms could be delayed and/or modified.

13.    **Risk of Non-Occurrence of the Effective Date**.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or met, the Effective Date will not take place.

14.    **Contingencies Could Affect Distributions to Holders of Allowed Claims**.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of re-vote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.

Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 15.    Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of Liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization.  The Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions, including by agreeing to reductions in the amounts of their Claims against the Debtors' Estates and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the RSA and Plan and the significant deleveraging and financial benefits that they embody.

### 16.    The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Its Confirmation.

The Debtors reserve the right, prior to the Confirmation or substantial Consummation thereof, subject to the provisions of Section 1127 of the Bankruptcy Code, applicable law, and the RSA, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (i) all Classes of adversely affected creditors and interest Holders accept the modification in writing or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification was de minimis or purely technical or otherwise did not adversely change the treatment of Holders accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

### 17.    The RSA and the DIP Credit Agreement Contain Significant Conditions and Milestones That May Be Difficult to Satisfy.

There are certain material conditions that must be satisfied under the RSA and DIP Credit Agreement, including the timely satisfaction of milestones in the Chapter 11 Cases.  The ability to timely complete such milestones is subject to risks and uncertainties, many of which are beyond the Debtors' control.  As discussed further in the RSA, a copy of which is attached hereto as **Exhibit E**, failure to meet any of the milestones without the written consent of the Required Consenting Lenders (as defined in the RSA) shall amount to a breach of the RSA subject to customary cure provisions, including, but not limited to, termination of the RSA.  Likewise, failure to meet any of the milestones under the DIP Credit Agreement without the written consent of the Required DIP Lenders, shall amount to an event of default

under the DIP Credit Agreement subject to customary cure provisions, including, but not limited to, termination, reduction, or restriction of any further DIP Loan Commitment (as defined in the RSA).

**B.**     **Risks Related to Recoveries Under the Plan.**

**1.**     **Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary.**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, contains estimates and assumptions that might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed. Among other things, estimates will fluctuate based on general economic and business conditions, capital market conditions, and industry-specific and Company-specific factors (including the ability of the Reorganized Debtors to achieve strategic goals, objectives, and targets over applicable periods).

**2.**     **The Reorganized Equity Is Subject to Dilution.**

The ownership percentage represented by the Reorganized Equity distributed to Holders of First Lien Claims on the Effective Date under the Plan will be subject to dilution by the DIP Equity Conversion and the Management Incentive Plan.

**3.**     **The Debtors Might Be Controlled by Significant Holders.**

Assuming that the Effective Date occurs, the Holders of Superpriority DIP Claims and First Lien Claims will receive distributions representing all of the outstanding shares of the Reorganized Equity. In addition, the New Organizational Documents will provide certain of these Holders with specifically enumerated rights. Such holders acting individually or as a group will be in a position to control the outcome of many actions requiring shareholder approval, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors. Such Holders may have interests that differ from those of the other Holders of shares of Reorganized Equity and may vote in a manner adverse to the interests of such other Holders. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of the Reorganized Equity.

**4.**     **Estimated Valuations of the Debtors and the Reorganized Equity, and Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent Potential Market Values.**

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the market value of the Debtors' securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

5.      **The Terms of the New Organizational Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court**.

The terms of the New Organizational Documents are subject to change based on negotiations between the Debtors and the Consenting Stakeholders but will be included in the Plan Supplement. Holders of Claims that are not the Consenting Stakeholders will not participate in these negotiations and the results of such negotiations may affect the rights of equity holders in the Reorganized Debtors following the Effective Date.

6.      **The Terms of the Exit ABL Facility Documents Are Not Yet Known**.

The terms of the Exit ABL Facility Documents are not yet known and subject to development and negotiations but will be included in the Plan Supplement. Holders of Claims that are not the Consenting Stakeholders will not participate in these negotiations and the results of such negotiations may affect the rights of equity holders in the Reorganized Debtors following the Effective Date.

7.      **Certain Tax Implications of the Plan**.

Holders of Allowed Claims should carefully review **Article XII** of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the U.S. federal income tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

C.      **Risks Related to the Debtors' and the Reorganized Debtors' Business**.

1.      **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors

cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 2. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business.

While the Debtors intend the chapter 11 process to be short, the Debtors' future results will be dependent upon the successful Confirmation and Consummation of the Plan. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. If the Debtors are unable to obtain final approval of debtor-in-possession financing on favorable terms or at all, or if the Debtors are unable to fully draw on the availability under the DIP Facility, the chances of successfully reorganizing the Debtors' business may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 3. Financial Results May Be Volatile and May Not Reflect Historical Trends.

The Financial Projections attached hereto as **Exhibit B** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the Reorganized Equity and the ability of the Debtors to make necessary payments. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur. The information included in this Disclosure Statement does not necessarily conform to the information, including with respect to the Financial Projections, that would be required if the Solicitation was made pursuant to a registration statement filed with the SEC or another securities regulator.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses and Claims assessments significantly impact the

Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.  In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting may be different from historical trends.  The Financial Projections contained herein do not currently reflect the impact of "fresh start" accounting.

### 4.      The Reorganized Debtors May Not Be Able to Implement the Business Plan.

While the Debtors believe that Consummation of the Plan will put them in a strong position to implement their go-forward business plan, various factors beyond the Reorganized Debtors' control may hinder or prevent their successful implementation of the business plan.  In particular, the Reorganized Debtors' successful implementation of the business plan depends significantly on maintaining and growing their customer base.  There can be no assurance that the Reorganized Debtors will maintain and grow their customer base.  The erosion of the Reorganized Debtors' customer base may materially and adversely affect their operating results and hinder or prevent their successful implementation of the business plan.

### 5.      The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business.

The Debtors' operations are subject to various federal, state, and local laws and regulations.  The Debtors may be required to make large expenditures to comply with such regulations.  Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil, and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations, and cash flows of the Reorganized Debtors.

### 6.      The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

### 7.      The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.

The Debtors' operations are dependent on a group of key management personnel and reliable employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for management personnel and employees.  As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition.  Because of competition in the marketplace, the Debtors may be unable to find replacements and the loss of such management personnel could adversely affect the Debtors' ability to operate their business.  In addition, a loss of key personnel

or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' business and the results of operations.

**8.     The Debtors Face Significant Competition and May Lose Market Share to Their Competitors**.

The market for home décor and furnishings products is competitive and characterized by rapid changes in customer preferences, industry standards, and frequent introductions of new products.  As customer preferences evolve, and as new products are introduced, if the Debtors are unable to anticipate or effectively react to competitive challenges, the Debtors' competitive position could weaken, and they could experience a decline in revenue or growth rate that could materially and adversely affect their business and results of operations.

**9.     The Debtors Could Fail to Retain or Attract Customers, Which Would Adversely Affect the Debtors' Business and Financial Results**.

The Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base, in terms of customers continuing to purchase products.  Existing customers may purchase fewer of the Debtors' products and new customers may avoid purchasing products from the Debtors, which could have a material adverse effect on the Debtors' business and results of operations. In such cases, there can be no assurance that the Debtors will be able to retain their current customers.

A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products, content, and merchandise, the level of customer spending for home furnishings and décor, the quality of the Debtors' customer service, and the Debtors' ability to update their products desired by customers.  Further, the industry in which the Debtors operate is highly competitive and the Debtors may not be able to compete effectively.  The Debtors' revenue comes from the sale of the Debtors' products, as well as merchandise and related offerings.  It is impossible to predict with perfect accuracy what market demand for such offerings will be.  Further, the Debtors' business is highly tied to discretionary consumer spending habits, and interest rates, tariffs, employment, and general economic conditions may impact customers' finances and therefore willingness to spend on the Debtors' products.

**10.     The Cyclical Nature of the Home Décor and Furnishings Industry May Lead to Volatility**.

The Debtors business is highly cyclical.  With respect to seasonality, the summer and holiday season are generally the Debtors' busiest seasons with substantially less sales volume and revenue during the rest of the year.  Additionally, the Debtors' business operations are volatile and highly susceptible to a downturn in market conditions.

11. **Deteriorations in Business Relationships May Impact the Ability to Source Parts**.

The Debtors' success depends in part on their ability to source various goods and supplies necessary to sell the Debtors' products. These products and the materials for these products are sourced from a broad range of suppliers. As a result, the Debtors' business depends on maintaining productive business relationships with their global and dispersed network of third-party suppliers. The Debtors' operations could be disrupted if such business relationships decline, for whatever reason, or if such suppliers go out of business or are unable to provide parts to the Debtors as they have on a historical basis. There is a risk that economic conditions could lead to financial, operational, production, labor, regulatory, or quality assurance difficulties that could result in a reduction or interruption in the Debtors' goods and supplies.

D. **Risks Related to the Offer and Issuance of Securities Under the Plan**.

1. **The Debtors Do Not Intend to Register the Offer or Sale of Reorganized Equity and Holders of the Reorganized Equity May Be Restricted in Their Ability to Transfer or Sell Their Securities**.

The Reorganized Equity will not be registered under the Securities Act or any state securities laws and, subject to the discussion below and the discussion in Article XI of this Disclosure Statement entitled "Certain Securities Laws Matters," unless so registered, may not be re-offered or re-sold except pursuant to an exemption from the registration requirements of the Securities Act and applicable state securities laws. In addition, the Reorganized Debtors do not expect to be subject to the reporting requirements promulgated under U.S. federal securities Law, and Holders of the Reorganized Equity will not be entitled to any information except as expressly required in the applicable New Organizational Documents.

If shares of Reorganized Equity issued under the Plan are issued pursuant to section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; provided, however, shares of such securities will not be freely tradeable if, at the time of transfer, the Holder is an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer. Such affiliate Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. Resales by Holders who receive Reorganized Equity pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

Any Reorganized Equity that cannot be issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code, including the MIP Shares, will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and subject to any restrictions on the transferability of such Reorganized Equity Interests in the New Organizational Documents.

Recipients of the Reorganized Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws for resales of Reorganized Equity.

*See* **Article XI** of this Disclosure Statement, entitled "Certain Securities Law Matters," for additional details.

> **2.      The New Organizational Documents May Contain Restrictions on Transfer of the Reorganized Equity**.

The New Organizational Documents will contain contractual restriction on holders' ability to transfer the Reorganized Equity.  In addition, to the extent the Reorganized Equity is issued pursuant to Section 4(a)(2) under the Securities Act (or another exemption from registration), such securities will be deemed "restricted securities" (as defined under the Securities Act and the rules promulgated thereunder).  Such securities may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act.  In addition, the Reorganized Equity is not expected to be registered under any local or state securities Laws.  The Debtors make no representation regarding the right of any holder of Reorganized Equity Interest to freely transfer or resell the Reorganized Equity.  Resale restrictions and other restrictions on transfer are discussed in more detail in **Article XI** of this Disclosure Statement, entitled "Certain Securities Law Matters."  Further, the New Organizational Documents may also impose certain restrictions on transfer of the new Interests.

> **3.      A Liquid Trading Market for the Shares of Reorganized Equity May Not Develop**.

The Debtors do not expect to list the Reorganized Equity on a national securities exchange, and even if they make such an application in the future, the Debtors make no assurance that they will be able to obtain this listing or, even if the Debtors do, that liquid trading markets for shares of Reorganized Equity will develop.  The liquidity of any market for Reorganized Equity will depend upon, among other things, the number of Holders of shares of Reorganized Equity, the Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the Reorganized Equity will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell shares of Reorganized Equity may be substantially limited, and the price for shares of the Reorganized Equity may decline or may be considered unfavorable.  You may be required to bear the financial risk of your ownership of the Reorganized Equity indefinitely.

In addition, the Reorganized Debtors do not expect to apply to be subject to the reporting requirements of the Securities Act, and Holders of the Reorganized Equity will not be entitled to any information except as expressly required by the New Organizational Documents.  As a result, the information which the Debtors are required to provide in order to issue the Reorganized Equity may be less than the Debtors would be required to provide if the Reorganized Equity were registered.  Among other things, the Debtors may not be required to provide:  (a) separate financial information for any subsidiary; (b) select annual audited financial data; (c) selected quarterly financial data; (d) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers.  This lack of

information could impair your ability to evaluate your ownership and the marketability of the Reorganized Equity.

## IX.   SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement is being distributed to Holders of Class 4, Class 5, Class 6, Class 7, Class 8, and Class 9 in connection with the solicitation of votes to accept or reject the Plan.  This Disclosure Statement is accompanied by the Ballot, a ballot to be used for voting on the Plan.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS**
> **SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
> PLEASE REFER TO THE DISCLOSURE STATEMENT MOTION FOR A MORE COMPREHENSIVE
> DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.   Holders of Claims Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in **Article III.D** of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim) under the Plan.

The Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 4, Class 5, Class 6, Class 7, Class 8, and Class 9 (collectively, the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, if the Plan is confirmed and consummated, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

Holders of Claims and Interests in Voting Classes will receive a solicitation package (the "Solicitation Package") that contains the following materials (each as defined in the Disclosure Statement Motion):  (a) the Disclosure Statement Order; (b) a Ballot; (c) the Cover Letter; and (d) the Confirmation Hearing Notice.

The Debtors are *not* soliciting votes on the Plan from Holders of Claims or Interests in Class 1, Class 2, Class 3, Class 10, Class 11, Class 12, or Class 13 (the "Non-Voting Classes").  Holders of Claims and Interests in the Non-Voting Classes will receive the Notice of Non-Voting Status and Opt-In Forms, as applicable (each as defined in the Disclosure Statement Motion).

### B.   Voting Record Date.

**The Voting Record Date is [August 15], 2025** (the "Voting Record Date").  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan, and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.   Voting Deadline.

**The Voting Deadline is [September 168], 2025, at 4:00 p.m. (prevailing Eastern Time).**  All Holders of Claims who are entitled to vote on the Plan must complete, execute, and return their applicable Ballot(s) in accordance with the instructions on the Ballots so that such Ballot(s) are actually

received by the Claims and Noticing Agent on or before the Voting Deadline in order for such Holder's vote to be counted.

> **D.** **Ballots Not Counted**.

**No Ballot will be counted toward Confirmation of the Plan if, among other things**:  (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (ii) it was transmitted by means other than as specifically set forth in the Ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was sent to any person or entity other than the Claims and Noticing Agent; (v) it is unsigned; (vi) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to your Ballot for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE THAT IS OTHERWISE IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN ARTICLE IX OF THIS DISCLOSURE STATEMENT OR THE DIRECTIONS AND REQUIREMENTS SET FORTH IN YOUR BALLOT WILL NOT BE COUNTED WITH RESPECT TO VOTING ON THE PLAN WITHOUT THE CONSENT OF THE COMPANY.**

**X.** **CONFIRMATION OF THE PLAN**.

> **A.** **Requirements for Confirmation of the Plan**.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (a) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (b) the Plan is feasible; and (c) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for Confirmation; (ii) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for Confirmation; and (iii) the Plan has been proposed in good faith.

> **B.** **Best Interests of Creditors/Liquidation Analysis**.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors and reliance upon the valuation methodologies utilized by the Debtors' advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and

their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' business may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their business, which is reflected in the Reorganized Equity to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

C.    **Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows. Creditors and other interested parties should review Article VIII of this Disclosure Statement entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit B** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

The Financial Projections are subject to ongoing analysis and subject to change based on new information that may arise between approval of this Disclosure Statement and the Confirmation Hearing. If applicable, the Debtors will file revised Financial Projections in advance of the Confirmation Hearing in support of the feasibility of the Plan.

D.    **Acceptance by Impaired Classes**.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[19]

---

[19] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that vote on the Plan actually cast their Ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the allowed interests in such Class that vote on the Plan actually cast their Ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests that are eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.    Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100

percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.    Valuation Analysis.

The Plan provides for the distribution of the Reorganized Equity to certain Holders of Claims upon Consummation of the Restructuring Transactions contemplated by the Plan. Accordingly, PJT the Company's investment banker, performed an analysis of the estimated implied equity value of the Debtors as of an assumed Effective Date (the "Valuation Analysis") at the Debtors' request. Based on the Valuation Analysis, which is attached hereto as **Exhibit C**, the enterprise value of the Reorganized Debtors will be approximately $500 million to approximately $800 million, with an estimated midpoint of approximately $650 million.

The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken, should be read in conjunction with **Article VIII** of this Disclosure Statement entitled "Risk Factors." PJT makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

## XI.    CERTAIN SECURITIES LAW MATTERS.

### A.    Reorganized Equity.

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of Reorganized Equity to certain Holders of Claims against the Debtors. The Debtors believe that the class of Reorganized Equity will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue-Sky Law. Any Reorganized Equity issued under the Plan will be issued (a) to the fullest extent permitted and applicable, without registration under the Securities Act or similar federal, state, or local laws in reliance on the exemption set forth in section 1145 of the Bankruptcy Code or (b) to the extent section 1145 is not permitted or applicable, pursuant to other exemptions under the Securities Act.

The following discussion of the issuance and transferability of the Reorganized Equity relates solely to matters arising under U.S. federal and state securities laws. The rights of holders of Reorganized Equity, including the right to transfer Reorganized Equity, will also be subject to any restrictions in the New Organizational Documents to the extent applicable. Recipients of the Reorganized Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws.

**B.      Exemption from Registration Requirements; Issuance of Reorganized Equity Under the Plan**.

The Debtors believe that the issuance of the Reorganized Equity (other than the MIP Shares) will be exempt from federal registration requirements under section 1145 of the Bankruptcy Code, except in certain limited circumstances as explained in more detail in this Disclosure Statement and/or the Plan. For the avoidance of doubt, any securities that may not be issued to persons pursuant to section 1145 of the Bankruptcy Code are expected to be issued in reliance upon the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

Section 1145 of the Bankruptcy Code provides, among other things, that Section 5 of the Securities Act and any other applicable U.S. state or local law requirements for the registration of issuance of a security do not apply to the offering, issuance, distribution, or sale of stock, options, warrants or other securities by a debtor if (1) the offer or sale occurs under a plan of reorganization of the debtor, (2) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor or an affiliate thereof participating in the plan of reorganization, and (3) the securities are (i) issued in exchange for a claim against, interest in, or claim for an administrative expense against a debtor or an affiliate thereof participating in the plan of reorganization, or (ii) issued principally in such exchange and partly for cash or property. The Debtors believe that all shares of Reorganized Equity (other than the MIP Shares) issued after the Petition Date in exchange for the Claims described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

The MIP Shares will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial offer, issuance, and distribution of any Reorganized Equity. Recipients of the Reorganized Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws.  As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

**C.      Resales of Reorganized Equity; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code**.

**1.      Resales of Reorganized Equity Issued Pursuant to Section 1145**.

The Reorganized Equity (other than the MIP Shares) to the extent offered, issued and distributed pursuant to section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or state or local securities laws, if any, applicable at the time of any future transfer of such securities or instruments.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10 percent or more of a class of voting securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the Reorganized Equity pursuant to the Plan by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of such Reorganized Equity who are deemed to be "underwriters" may be entitled to resell their Reorganized Equity pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of "control" securities received by such Person if the requirements for sales of such control securities under Rule 144 have been met, including that current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the Reorganized Equity would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such Reorganized Equity and, in turn, whether any Person may freely trade such Reorganized Equity under the federal securities laws. The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, Rule 144 will not be available for resales of such Reorganized Equity by Persons deemed to be underwriters or otherwise.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS AND THE HIGHLY FACT SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF**

THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATIONS CONCERNING THE ABILITY OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN.  ACCORDINGLY, POTENTIAL RECIPIENTS OF REORGANIZED EQUITY ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

2.    Resales of Reorganized Equity Issued Pursuant to Section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, and/or Regulation S under the Securities Act.

To the extent the exemption set forth in section 1145(a) of the Bankruptcy Code is unavailable, Reorganized Equity will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable state securities laws.

Generally, Rule 144 of the Securities Act provides a limited safe harbor for the public resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period.  An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such Reorganized Equity by affiliates of the Debtors.  Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

In addition, in connection with resales of any Reorganized Equity offered, issued and distributed pursuant to Regulation S under the Securities Act:  (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period (six months for a reporting issuer), may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

All Reorganized Equity issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will bear a restrictive legend.  Each certificate or book-entry interest

representing, or issued in exchange for or upon the transfer, sale or assignment of, any Reorganized Equity issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, shall be stamped or otherwise imprinted with a legend in substantially the following form:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION."**

The Reorganized Debtors will reserve the right to require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the Reorganized Equity issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration. The Reorganized Debtors will also reserve the right to stop the transfer of any such Reorganized Equity if such transfer (x) is not effected in compliance with Rule 144 or in compliance with another applicable exemption from registration (including section 1145 of the Bankruptcy Code) or (y) would otherwise make the Debtors subject to the periodic reporting requirements under the Exchange Act.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this Disclosure Statement, including, for the avoidance of doubt, whether the Reorganized Equity is exempt from the registration requirements of section 5 of the Securities Act.

In addition to the foregoing restrictions, the Reorganized Equity will also be subject to any applicable transfer restrictions contained in the New Organizational Documents.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF REORGANIZED EQUITY MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

XII.    **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.**

A.    **Introduction**.

The following discussion is a summary of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims. This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS, as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors, the Reorganized Debtors, or certain Holders of Claims in light of their individual circumstances. This discussion does not address tax issues with respect to Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, brokers, mutual funds, governmental authorities or agencies, pass-through entities (including subchapter S corporations), beneficial owners of pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. Holders who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction). This summary does not address any aspect of state, local, estate, gift, or non-U.S. taxation or U.S. federal non-income tax considerations (including estate or gift tax or the Medicare tax imposed on certain net investment income). This summary assumes that a Holder of a Claim holds only Claims in a single Class and holds such Claims as "capital assets" within the meaning of section 1221 of the IRC (generally, property held for investment). This summary also assumes that the various debt and other arrangements to which the Debtors and the Reorganized Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, none of the Allowed Claims is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for U.S. federal income tax purposes, that the Claims constitute Interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC, and that the Reorganized Equity will be treated as stock of a corporation for U.S. federal income tax purposes. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders of Allowed Claims (a) that hold 10 percent or more of the equity of the Debtors or that will hold 10 percent or more of the equity of the Reorganized Debtors after receiving the distributions contemplated by the Plan or (b) (i) whose Claims are Unimpaired or otherwise entitled to

payment in full in Cash under the Plan, (ii) that are deemed to reject the Plan, or (iii) that are otherwise not entitled to vote to accept or reject the Plan.  This summary also does not address the U.S. federal income tax consequences to Holders that are not Holders of Class 4, Class 5, Class 6, Class 7, Class 8, or Class 9 Claims.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that for U.S. federal income tax purposes is: (a) an individual that is a citizen or resident of the United States; (b) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or such beneficial owner) and the activities of the partner (or such beneficial owner) and the partnership (or other pass-through entity).  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors**.

**1.      Characterization of the Restructuring Transactions**.

The Debtors expect that the Restructuring Transactions will be structured in one of two ways:  (a) as a taxable sale of all or substantially all of the assets and/or stock of any Debtor (a "Taxable Transaction"); or (b) as a recapitalization of the existing Debtors (a "Recapitalization Transaction").  The Debtors have not yet determined whether the Restructuring Transactions will be consummated as a Taxable Transaction or a Recapitalization Transaction.  Such decision will depend on, among other things, finalizing certain modeling and analytical determinations.

In a Taxable Transaction, the Debtors are expected to realize gain or loss in an amount equal to the difference between the fair market value of the assets or stock transferred (or deemed transferred) and the Debtors' tax basis in such assets or stock.  Any such realized gain generally will be reduced by the amount of tax attributes available for use by the Debtors (if any), and any remaining gain will be recognized by the Debtors and result in a Cash tax obligation.  If a Reorganized Debtor purchases (or is deemed to purchase) assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized

Debtor is expected to take a fair market value basis in the transferred assets or stock. However, if a Taxable Transaction involves a purchase of stock, the Debtor whose stock is transferred will generally retain its basis in its assets, unless the Debtors and/or Reorganized Debtors timely make certain elections provided for under the IRC to treat such stock purchase as the purchase of the Debtors' assets or unless the application of certain complex "loss duplication" rules results in a reduction in the tax basis of such assets. In a Taxable Transaction that does not involve a purchase of stock, the Reorganized Debtors generally will not succeed to any of the Debtors' existing tax attributes.

The Debtors will be subject to the rules discussed below with respect to cancellation of indebtedness income ("COD Income") and, other than in a Taxable Transaction that does not involve a transfer of stock, the limitations on net operating losses ("NOLs"), deferred deductions under section 163(j) of the IRC ("163(j) Deductions") and other tax attributes.

## 2.    Cancellation of Debt and Reduction of Tax Attributes.

As a result of the Restructuring Transactions, the Debtors are expected to recognize a substantial amount of COD Income. In such case, the U.S. tax attributes of the Debtors may, depending on certain factors, be reduced by the amount of such COD Income excluded from U.S. federal taxable income under section 108 of the IRC.

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (i) the amount of any Cash, (ii) the issue price of any new indebtedness issued by the debtor, and (iii) the fair market value of the Reorganized Equity and any other consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange. Unless an exception or exclusion applies, COD Income constitutes U.S. federal taxable income like any other item of taxable income.

Under section 108 of the IRC, however, a taxpayer will not be required to include any amount of COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. Such reduction in tax attributes occurs only after the taxable income (or loss) for the year in which the debt exchange occurs has been determined. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtors remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. Deductions deferred under section 163(j) of the IRC are not subject to reduction under these rules. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC (which can include a reduction in the basis of a partnership interest, but only if the "inside" basis of assets in the partnership are also reduced), though it has not been determined whether the Debtors will make this election. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The aggregate tax basis of the Debtors in their assets is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that the relevant entity will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor"). Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax

principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The exact amount of any COD Income (if any) that will be realized by the Debtors will not be determinable until the Consummation of the Plan because the amount of COD Income will depend, in part, on the fair market value of the Reorganized Equity and any other consideration given in satisfaction of any Allowed Claims, none of which can be determined until after the Plan is consummated. Accordingly, the Debtors are currently unable to determine the precise effect that the COD Income exclusion rules will have on the Debtors and their U.S. federal income tax attributes.

As noted above, as a general matter, in a Taxable Transaction that does not involve the transfer of the stock of a Debtor, the attribute reduction rules discussed above will be inapplicable, and the Reorganized Debtors (a) will take a fair market value basis in the assets of the Debtors without any reduction from excluded COD Income and (b) will not otherwise inherit any of the Debtors' tax attributes.

### 3. Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes.

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

### (a) General Section 382 and 383 Annual Limitation.

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, net unrealized built-in losses ("NUBILs"), deductions deferred under section 163(j) of the IRC, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a NUBIL at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original NUBIL) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of Reorganized Equity pursuant to a Restructuring Transaction will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC (described below) applies.

As noted above, as a general matter, in a Taxable Transaction that does not involve the transfer of the stock of a Debtor, the rules under section 382 of the IRC discussed above and below will be inapplicable to the Reorganized Debtors.

**(b)      General Section 382 Annual Limitation**.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 3.71 percent for changes that occur in July 2025).  The 382 Limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change (the "Recognition Period") or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  If a loss corporation has a NUBIL immediately prior to the ownership change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of post-change losses and deductions that could be used by the loss corporation during the Recognition Period.  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

Notwithstanding the rules described above, unless the special 382(l)(5) Exception (described below) applies, if the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (other than any increases due to recognized built-in gains).  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

**(c)      Special Bankruptcy Exceptions**.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding.  An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.  If the Reorganized Debtors were to undergo another "ownership change" after the expiration of this two-year period, the resulting 382 Limitation would be determined under the regular rules for ownership changes under sections 382 and 383 of the IRC.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the 382 Limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately

before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the ownership change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  Rather, the resulting limitation would be determined under the regular rules for ownership changes under sections 382 and 383 of the IRC.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application so that the 382(l)(6) Exception applies.  Whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if a subsequent "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

**C.**     **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Claims**.

~~**1. U.S. Federal Income Tax Consequences to U.S. Holders of the Consummation of the Restructuring Transactions: Treatment of Class 4, Class 5, Class 6, Class 7, or Class 8 Claims as a Security**~~

~~The U.S. federal income tax consequences to a U.S. Holder of Class 4, Class 5, Class 6, Class 7, or Class 8 Claims in a Recapitalization Transaction will depend, in part, on whether for U.S. federal income tax purposes the (a) Claim surrendered by such U.S. Holder constitutes a "security" of a Debtor and (b) the Reorganized Equity received by such U.S. Holder constitutes a stock or a "security" issued by the same entity against which the Claim is asserted (or, an entity that is a "party to a reorganization" with such entity).  Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security."  Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  While not free from doubt, the Debtors will, to the extent they are required to take a position, take the position that the Class 4, Class 5, Class 6, Class 7, or Class 8 Claims do not constitute "securities" of the entity that will issue the Reorganized Equity.  The remainder of this discussion assumes such treatment is correct, and accordingly, that the exchanges pursuant to the Plan should not be treated as made pursuant to a "reorganization" within the meaning of section 368 of the IRC.~~

~~Due to the inherently factual nature of the determination of whether a debt instrument constitutes "securities," U.S. Holders of Class 4, Class 5, Class 6, Class 7, or Class 8 Claims are urged to consult their tax advisors regarding these issues.~~

**1.**    ~~2.~~ **Consequences to U.S. Holders of Class 4, Class 5, Class 6, Class 7, or Class 8 Claims; General**.

Pursuant to the Plan and as described above, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, (i) each Holder of a Class 4, Class 5, Class 6, Class 7, or Class 8 Claim will receive its Pro Rata share of the First Lien Equity Distribution on the Effective Date.

**2.**    ~~3.~~ **Consequences to Holders of Class 9 Claims of the Restructuring Transactions; General**.

Pursuant to the Plan and as described above, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each Holder of a Class 9 Claim will receive its pro rata share of the ~~GUC Recovery Pool~~Unsecured Claims Distribution Trust Beneficial Interests on the Effective Date.  For the avoidance of doubt, Holders of Class 9 First Lien Deficiency Claims shall not receive a distribution on account of such claims.

**3.**    ~~4.~~ **Consequences to Holders of Claims of the Restructuring Transactions**.

Regardless of whether the Restructuring Transactions are structured as a Taxable Transaction or a Recapitalization Transaction, the exchange of any Claims by a U.S. Holder is expected to be treated as a taxable exchange pursuant to section 1001 of the IRC.  In that case, a U.S. Holder of a Claim is expected to recognize gain or loss equal to (a) the fair market value of the Reorganized Equity or other consideration received as of the date such Interest is distributed less (b) the U.S. Holder's adjusted tax basis in its Claim.  The adjusted tax basis of a U.S. Holder's Claims generally will equal such U.S. Holder's actual or deemed purchase price for such Claims, reduced in the event that such U.S. Holder claimed a bad debt deduction with respect to such Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest."  Any gain or loss recognized by a U.S. Holder from the exchange will generally be capital gain or loss, except to the extent described below under "Market Discount."  If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year.  Non-corporate taxpayers are generally subject to a reduced U.S. federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.  A U.S. Holder should obtain a tax basis in any Interest received equal to the fair market value of the Interest as of the date such Interest is distributed to such U.S. Holder.  The holding period for any such Interest should begin on the day following the receipt of such Interest.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

**4.**    ~~5.~~ **Accrued Interest**.

To the extent that the fair market value of the consideration received by a U.S. Holder on an exchange of its Allowed Claim under the Plan are attributable to accrued but unpaid interest on such Allowed Claim, the receipt of such amount generally should be taxable to the U.S. Holder as ordinary interest income (to the extent such amount was not previously included in the gross income of such U.S. Holder).  Conversely, a U.S. Holder of an Allowed Claim may be able to deduct a loss to the extent that any accrued interest on such debt instruments constituting such Allowed Claim was previously included

in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder of an Allowed Claim under the Plan is not sufficient to fully satisfy all principal and interest on its Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration distributed to U.S. Holders will be allocated first to the principal amount of the Allowed Claim, with any excess allocated to accrued but unpaid interest, if any, on such U.S. Holder's Allowed Claims.  Certain legislative history indicates that an allocation of consideration between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated first to principal, rather than interest.  Certain Treasury Regulations, however, allocate payments first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  ***U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the proper allocation of the consideration received under the Plan***.

**5.**    ~~6.~~ **Market Discount**.

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Claim, who exchanges such Allowed Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such exchanged Allowed Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, by at least a *de minimis* amount (equal 1/4 of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the remaining number of complete years to maturity).

Any gain allocated to a U.S. Holder in connection the taxable disposition of an Allowed Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent that a U.S. Holder exchanges any Allowed Claim that was acquired with market discount in a tax-free transaction for other property, any market discount that accrued on such Allowed Claim (*i.e.*, up to the time of the exchange), but was not recognized by such U.S. Holder, is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property will be treated as ordinary income to the extent of such accrued, but not recognized, market discount.  ***U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Allowed Claim***.

**6.**    ~~7.~~ **Limitations on Capital Losses**.

A U.S. Holder who recognizes capital losses as a result of the exchanges under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 annually ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income

for an unlimited number of years. For corporate holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

    **7.** ~~8.~~ **U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Reorganized Equity**.

    **(a)**      **Dividends on Reorganized Equity**.

Any distributions made on account of the Reorganized Equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. "Qualified dividend income" allocable to an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the Reorganized Equity. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as the Reorganized Debtors have sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

    **(b)**      **Sale, Redemption, or Repurchase of Reorganized Equity**.

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the Reorganized Equity. Such capital gain generally will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has a holding period in the Reorganized Equity of more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above. Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the Reorganized Equity as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claims or recognized an ordinary loss on the exchange of its Claims for Reorganized Equity.

    **D.**      **Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Claims**.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions as contemplated by the Plan and as described above, and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of Claims. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the

consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the Reorganized Equity.

### 1.   U.S. Federal Income Tax Consequences to Non-U.S. Holders of the Restructuring Transactions.

Whether a Non-U.S. Holder realizes gain or loss on the exchange of any Allowed Claims and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders holding the same class of Claims.  Any gain realized by a Non-U.S. Holder of an Allowed Claim on the exchange of its Allowed Claims (other than any gain attributable to accrued but untaxed interest (or original issue discount, if any), which will be taxable in the same manner as described below in "Accrued Interest") generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.   Accrued Interest.

Subject to the discussion of backup withholding and FATCA below, payments to a Non-U.S. Holder that is attributable to accrued but untaxed interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID, if any) with respect to Allowed Claims that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, *provided* that:

- the Non-U.S. Holder does not own, actually or constructively, a 10 percent or greater interest in the Debtors within the meaning of section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to Debtors, actually or constructively through the ownership rules under section 864(d)(4) of the IRC;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives the Debtors an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest income allocable to a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.  As described above in more detail under the heading "Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders - Accrued Interest," under the Plan, the aggregate consideration to be distributed in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest on such Allowed Claims, if any.

If interest income allocable to a Non-U.S. Holder is effectively connected with a trade or business in the United States ("ECI") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply, *provided* the appropriate statement is provided to Debtors) unless an applicable income tax treaty provides otherwise.  To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  If a Non-U.S. Holder is eligible for the benefits of any applicable income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the applicable income tax treaty if the Non-U.S. Holder claims the benefit of the applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional branch profits tax at a 30 percent rate, or, if applicable, a lower applicable income tax treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically.   Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

3.      **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Reorganized Equity**.

(a)      **Dividends on Reorganized Equity**.

Any distributions made with respect to Reorganized Equity (other than certain distributions of stock of the Reorganized Debtors) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces such Non-U.S. Holder's basis in such Reorganized Equity and then, generally, capital gain).  Except as described below, dividends paid with respect to Reorganized Equity that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an applicable income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or suitable substitute or successor form or such other form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to Reorganized Equity that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the Reorganized Debtors are considered "U.S. real property holding corporations" ("USRPHC"), distributions to a Non-U.S. Holder will generally be subject to withholding by such Reorganized Debtor at a rate of 15 percent to the extent they are not treated as dividends for U.S. federal income tax purposes.  In the event the Reorganized Equity is regularly traded on an established securities market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of interests that includes Reorganized Equity during a specified testing period.  Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations.  The Debtors have not determined if they are, or whether the Reorganized Debtors will be, USRPHCs.

(b)      **Sale, Redemption, or Repurchase of Reorganized Equity**.

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of Reorganized Equity unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- the issuer of such Reorganized Equity is or has been during a specified testing period a USRPHC.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of the Reorganized Equity. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, a Non-U.S. Holder of Reorganized Equity generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of the Reorganized Equity under the Foreign Investment in Real Property Tax Act and the Treasury Regulations thereunder. Taxable gain from a disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and the Non-U.S. Holder's adjusted tax basis in such interest) would be treated as effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business. A Non- U.S. Holder would also be subject to withholding tax equal to 15 percent of the amount realized on the disposition and generally required to file a U.S. federal income tax return. The amount of any such withholding may be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund if the Non-U.S. Holder properly and timely files a tax return with the IRS. In the event the Reorganized Equity is regularly traded on an established securities market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of interests that includes Reorganized Equity during a specified testing period. Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations.

### 4.    FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that would have applied to payments of gross proceeds from the sale or other disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest have been effectively suspended under proposed Treasury Regulations, which can

be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF REORGANIZED EQUITY.**

E. **Information Reporting and Back-Up Withholding**.

The Debtors, the Reorganized Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless such Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that such number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, TERRITORIAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIII.    RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  August 16, 2025

AT HOME GROUP INC.
on behalf of itself and all other Debtors

By:  _/s/ Jeremy Aguilar_
      Name:  Jeremy Aguilar
      Title:  Authorized Signatory