*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AT HOME GROUP INC., *et al.*,[1] | ) | Case No. 25-11120 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## JOINT PLAN OF REORGANIZATION OF AT HOME GROUP INC.
## AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

---

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (DE Bar No. 2847)
Joseph M. Mulvihill (DE Bar No. 6061)
Timothy R. Powell (DE Bar No. 6894)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:    rbrady@ycst.com
    jmulvihill@ycst.com
    tpowell@ycst.com

*Co-Counsel for the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Elizabeth H. Jones (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    nicole.greenblatt@kirkland.com
    matthew.fagen@kirkland.com
    elizabeth.jones@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

Dated:  August 19, 2025

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are:  At Home Group Inc. (9563); Ambience Parent, Inc. (6231); Ambience Intermediate, Inc. (0692); At Home Holding II Inc. (9755); At Home Holding III Inc. (9930); At Home Companies LLC (6921); At Home Stores LLC (4961); At Home RMS Inc. (5235); At Home Gift Card LLC (0357); At Home Procurement Inc. (1777); At Home Properties LLC (2759); At Home Assembly Park Drive Condominium Association (N/A); 1600 East Plano Parkway, LLC (4757); 1944 South Greenfield Road LLC (4377); 2301 Earl Rudder Frwy S LLC (N/A); 3551 S 27th Street LLC (9350); 300 Tanger Outlet Blvd LLC (N/A); 3002 Firewheel Parkway LLC (2759); 2016 Grand Cypress Dr LLC (N/A); 8651 Airport Freeway LLC (0523); Transverse II Development LLC (8595); Rhombus Dev, LLC (4783); 1000 Turtle Creek Drive LLC (9177); 19000 Limestone Commercial Dr, LLC (3711); 4801 183A Toll Road, LLC (3909); 7050 Watts Rd LLC (N/A); 4700 Green Road LLC (9049); 361 Newnan Crossing Bypass LLC (N/A); 4304 West Loop 289 LLC (4302); 10460 SW Fellowship Way LLC (N/A); 1720 N Hardin Blvd LLC (N/A); Compass Creek Parkway LLC (N/A); 10800 Assembly Park Dr LLC (6145); Nodal Acquisitions, LLC (N/A); 15255 N Northsight Blvd LLC (N/A); 3015 W 86th St LLC (N/A); 9570 Fields Ertel Road LLC (N/A); 1376 E. 70th Street LLC (9942); 11501 Bluegrass Parkway LLC (3626); 12990 West Center Road LLC (9396); 334 Chicago Drive, LLC (2864); and 4200 Ambassador Caffery Pkwy LLC (5119).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  9000 Cypress Waters Blvd, Coppell, Texas 75019.

## TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
   GOVERNING LAW ...................................................................................................1
 A.  Defined Terms. ......................................................................................................1
 B.  Rules of Interpretation. ........................................................................................16
 C.  Computation of Time. ..........................................................................................17
 D.  Governing Law. ....................................................................................................17
 E.  Reference to Monetary Figures. ..........................................................................17
 F.  Reference to the Debtors or the Reorganized Debtors. ......................................17
 G.  Controlling Document. .........................................................................................18
 H.  Nonconsolidated Plan. .........................................................................................18
 I.  Consultation, Notice, Information, and Consent Rights.....................................18

ARTICLE II. ADMINISTRATIVE CLAIMS, SUPERPRIORITY DIP CLAIMS, PRIORITY CLAIMS,
   AND RESTRUCTURING EXPENSES ..................................................................18
 A.  Administrative Claims. ........................................................................................18
 B.  Priority Tax Claims. .............................................................................................19
 C.  Superpriority DIP Claims.....................................................................................19
 D.  Professional Fee Claims. ......................................................................................20
 E.  Payment of United States Trustee Quarterly Fees. .............................................21
 F.  Payment of Restructuring Expenses. ...................................................................21
 G.  Payment of the Senior Unsecured Notes Trustee Expenses. ...............................21

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................21
 A.  Classification of Claims and Interests. ................................................................21
 B.  Treatment of Claims and Interests. .....................................................................22
 C.  Special Provision Governing Unimpaired Claims. .............................................27
 D.  Elimination of Vacant Classes. ...........................................................................27
 E.  Voting Classes, Presumed Acceptance by Non-Voting Classes. ........................27
 F.  Intercompany Interests. ........................................................................................28
 G.  Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................28
 H.  Controversy Concerning Impairment....................................................................28
 I.  Subordinated Claims and Interests. .....................................................................28
 J.  Distributions of Reorganized Equity....................................................................28

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN............................................28
 A.  General Settlement of Claims and Interests. .......................................................28
 B.  Restructuring Transactions...................................................................................29
 C.  The Reorganized Debtors.....................................................................................29
 D.  Sources of Consideration for Plan Distributions. ...............................................30
 E.  Corporate Existence. ............................................................................................31
 F.  Vesting of Assets in the Reorganized Debtors. ...................................................32
 G.  Cancellation of Existing Securities, Agreements, and Interests...........................32
 H.  Unsecured Claims Distribution Trust. .................................................................33
 I.  Corporate Action...................................................................................................34
 J.  New Organizational Documents. .........................................................................34
 K.  Directors and Officers of the Reorganized Debtors. ...........................................35
 L.  Effectuating Documents; Further Transactions....................................................35
 M.  Certain Securities Law Matters. ..........................................................................35
 N.  Section 1146 Exemption. .....................................................................................36
 O.  Private Company. .................................................................................................37
 P.  Director and Officer Liability Insurance. ............................................................37
 Q.  Management Incentive Plan..................................................................................37
 R.  Employment Obligations. .....................................................................................37

S.      Preservation of Causes of Action. .............................................................................37
T.      Tax Returns. .................................................................................................................38
U.     Statutory Committee and Cessation of Fee and Expense Payment. ...........................38
V.      Cashless Transactions. ................................................................................................39
W.    Release of Ordinary Course Avoidance Actions .......................................................39

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............................39
A.      Assumption of Executory Contracts and Unexpired Leases. .....................................39
B.      Indemnification Obligations. ......................................................................................40
C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. .................40
D.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ..............41
E.      Insurance Policies. ......................................................................................................42
F.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ..........42
G.      Employee Compensation and Benefits. .....................................................................42
H.     Modifications, Amendments, Supplements, Restatements, or Other Agreements. ........43
I.      Reservation of Rights. ................................................................................................43
J.      Nonoccurence of Effective Date. ...............................................................................43
K.     Contracts and Leases Entered Into After the Petition Date. ......................................43

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...............................................................43
A.      Timing and Calculation of Amounts to Be Distributed. ............................................43
B.      Disbursing Agent. .......................................................................................................44
C.      Rights and Powers of Disbursing Agent. ...................................................................44
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ...............45
E.      Surrender and Cancelled Instruments or Securities. ..................................................46
F.      Manner of Payment. ....................................................................................................46
G.      Compliance with Tax Requirements. ..........................................................................47
H.     Allocations. .................................................................................................................47
I.      No Postpetition Interest on Claims. ...........................................................................47
J.      Foreign Currency Exchange Rate. ..............................................................................47
K.     Setoffs. ........................................................................................................................47
L.      Claims Paid or Payable by Third Parties. ..................................................................48

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ..................................................................................................................48
A.      Disputed Claims Process. ...........................................................................................48
B.      Allowance of Claims. .................................................................................................49
C.      Claims Administration Responsibilities. ....................................................................49
D.      Estimation of Claims. .................................................................................................49
E.      Adjustment to Claims without Objection. ..................................................................50
F.      Time to File Objections to Claims. .............................................................................50
G.      Disallowance of Claims. .............................................................................................50
H.     No Distributions Pending Allowance. ........................................................................50
I.      Distributions After Allowance. ..................................................................................50
J.      Single Satisfaction of Claims. ....................................................................................51

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........................51
A.      Discharge of Claims and Termination of Interests. ....................................................51
**B.      Release of Liens.** ........................................................................................................51
**C.      Releases by the Debtors.** ...........................................................................................52
**D.      Releases by Holders of Claims and Interests.** ...........................................................53
**E.      Exculpation.** ...............................................................................................................54
**F.      Injunction.** ..................................................................................................................55
G.      Protections Against Discriminatory Treatment. .........................................................55
H.     Document Retention. ..................................................................................................55
I.      Reimbursement or Contribution. ................................................................................56

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN ........................................56
    A.    Conditions Precedent to the Effective Date. ...................................................56
    B.    Waiver of Conditions. .......................................................................................57
    C.    Effect of Failure of Conditions. .......................................................................57
    D.    Substantial Consummation. ...............................................................................57

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN .........................58
    A.    Modification and Amendments. .........................................................................58
    B.    Effect of Confirmation on Modifications. .........................................................58
    C.    Revocation or Withdrawal of Plan. ...................................................................58

ARTICLE XI. RETENTION OF JURISDICTION .................................................................................58

ARTICLE XII. MISCELLANEOUS PROVISIONS ...............................................................................60
    A.    Immediate Binding Effect. .................................................................................60
    B.    Additional Documents. ......................................................................................60
    C.    Reservation of Rights. .......................................................................................61
    D.    Successors and Assigns. ....................................................................................61
    E.    Notices. ..............................................................................................................61
    F.    Enforcement of Confirmation Order. ................................................................63
    G.    Term of Injunctions or Stays. ...........................................................................63
    H.    Entire Agreement. .............................................................................................63
    I.    Exhibits. .............................................................................................................63
    J.    Nonseverability of Plan Provisions. .................................................................63
    K.    Votes Solicited in Good Faith. ..........................................................................64
    L.    Closing of Chapter 11 Cases. ............................................................................64
    M.    Waiver or Estoppel. ...........................................................................................64
    N.    Creditor Default. ...............................................................................................64
    O.    Removal or Abandonment of Third Parties' Property. .....................................64

**INTRODUCTION**

At Home Group Inc. and the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") propose this joint chapter 11 plan of reorganization (including all exhibits, supplements (including the Plan Supplement), appendices, and schedules, as amended, supplemented, or otherwise modified from time to time in accordance with its terms and the RSA (as defined below), this "<u>Plan</u>") for the resolution of the outstanding Claims against and Interests in the Debtors. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in <u>Article I.A</u> of this Plan. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor, and the classification of Claims and Interests set forth in <u>Article III</u> of this Plan shall apply separately to each of the Debtors. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters. Each Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code. This Plan does not contemplate substantive consolidation of any of the Debtors.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS PLAN IN FULL.

THE ISSUANCE OF ANY SECURITIES REFERRED TO IN THIS PLAN SHALL NOT CONSTITUTE AN INVITATION OR OFFER TO SELL, OR THE SOLICITATION OF ANY INVITATION OR OFFER TO BUY, ANY SECURITIES IN CONTRAVENTION OF APPLICABLE LAW IN ANY JURISDICTION. NO ACTION HAS BEEN TAKEN, NOR WILL BE TAKEN IN ANY JURISDICTION THAT WOULD PERMIT A PUBLIC OFFERING OF ANY SECURITIES REFERRED TO IN THIS PLAN (OTHER THAN SECURITIES ISSUED PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE IN A DEEMED PUBLIC OFFERING) IN ANY JURISDICTION WHERE SUCH ACTION FOR THAT PURPOSE IS REQUIRED.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*ABL Agent*" means Bank of America, National Association, or any assigns or successors thereto, in its capacity as collateral agent and administrative agent under the ABL Credit Agreement.

2.      "*ABL Credit Agreement*" means that certain asset-based revolving credit agreement dated as of July 23, 2021, by and among, *inter alios*, At Home Group Inc., the lenders party thereto in their capacities as lenders thereunder, letter of credit issuers in their capacities as letter of credit issuers thereunder, and Bank of America, National Association, as administrative agent and collateral agent, and the other agents and other parties thereto (as amended, supplemented, or otherwise modified from time to time).

3.      "*ABL Facility*" means the $675 million asset-backed facility issued under the ABL Credit Agreement.

4.      "*ABL Facility Claims*" means any Claim against any of the Debtors on account of the ABL Facility, including any letters of credit issued and outstanding and any cash management obligations or hedging obligations outstanding, if any, under the ABL Facility.

5.      "*ABL Lenders*" means the lenders and issuing banks party to the ABL Credit Agreement.

6.      "*ABL Loans*" means the revolving credit loans due under the ABL Facility.

7.    "*ABL Obligations*" means, at any time, all indebtedness and other obligations owing under the ABL Facility at such time and any outstanding adequate protection payments for Prepetition ABL Obligations (as such term is defined in the DIP Orders).

8.    "*ABL Secured Parties*" means, collectively, the ABL Agent, the ABL Lenders, and the other "Secured Parties" as defined in the ABL Credit Agreement.

9.    "*Ad Hoc Group*" means that certain ad hoc group of Consenting Term Loan Lenders and Consenting Noteholders as identified on the *Verified Statement of the Ad Hoc Group of At Home Prepetition Secured Creditors Pursuant to Bankruptcy Rule 2019* [Docket No. 302].

10.    "*Administrative Claim*" means a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors; (b) the Allowed Professional Fee Claims; (c) any Claims arising from that certain Letter of Credit issued by Bank of America, N.A. on July 2, 2025; and (d) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

11.    "*Administrative Claims Bar Date*" means the applicable deadline for Filing requests for payment of all Administrative Claims except as otherwise provided for in this Plan, which shall be (a) 30 days after the Effective Date for Administrative Claims other than Professional Fee Claims and (b) 60 days after the Effective Date for Professional Fee Claims.

12.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Entity that is not a Debtor, the term "Affiliate" shall apply to such Entity as if the Entity were a Debtor.

13.    "*Agent*" means any administrative agent, collateral agent, or similar Entity under the Term Loan Facility, the ABL Facility, and the DIP Facility, including any assigns or successors thereto.

14.    "*Agents/Trustees*" means, collectively, each of the Agents and Trustees.

15.    "*Allowed*" means, except as otherwise provided herein:  (a) a Claim that is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim a Proof of Claim is not required under this Plan, the Bankruptcy Code, or a Final Order, including the DIP Orders); *provided* that no objection to the allowance thereof is interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or a timely objection is interposed and the Claim has been Allowed by a Final Order; (b) a Claim that is scheduled by the Debtors as neither contingent, unliquidated, nor Disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed or stipulated to pursuant to this Plan or a Final Order, including the DIP Orders; *provided* that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or, if such an objection is so interposed, such Claim shall have been Allowed by a Final Order . For the avoidance of doubt, any Claim that is hereafter scheduled by the Debtors as contingent, unliquidated, or Disputed, and for which no contrary or superseding Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Unless expressly waived by this Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtors or Reorganized Debtors, as applicable.  For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

16.    "*Assigned Preference Actions*" means Preference Actions against Persons that are not (i) Ordinary Course Non-Insider Counterparties or (ii) Released Parties, which shall be retained by the Debtors and assigned to the Unsecured Claims Distribution Trust pursuant to this Plan.  For the avoidance of doubt, Assigned Preference Actions shall not include any Causes of Action that are settled, released, or exculpated under this Plan.  The Assigned Preference Actions shall be listed in the Schedule of Retained Causes of Action included in the Plan Supplement.

17.    "*At Home*" means Ambience Parent, Inc., a company incorporated under the Laws of Delaware.

18.    "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common Law, including fraudulent transfer Laws and Preference Actions.

19.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

20.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware presiding over the Chapter 11 Cases, or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the District of Delaware.

21.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time and applicable to the Chapter 11 Cases.

22.    "*Business Day*" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks in the State of Texas or the State of New York are closed for business as a result of a federal, state, or local holiday.

23.    "*Cash*" means the legal tender of the United States of America or the equivalents thereof, including bank deposits and checks.

24.    "*Cash Collateral*" has the meaning ascribed to it in section 363(a) of the Bankruptcy Code.

25.    "*Causes of Action*" means, including, without limitation, any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, direct or indirect, choate or inchoate, disputed or undisputed, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, under the Bankruptcy Code or applicable nonbankruptcy law, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) any and all claims based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal Law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any and all rights to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate or disallow Claims or Interests; (d) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

26.    "*Cayman Notes*" means the $200 million aggregate principal amount of outstanding 11.50% senior secured notes due 2028 under the Cayman Notes Indenture.

27.    "*Cayman Notes Claims*" means all claims against any of the Debtors arising under, derived from, based on, or related to the Cayman Notes Obligations.

28.    "*Cayman Notes Indenture*" means that certain indenture, dated as of May 12, 2023, among At Home Cayman, as issuer, the guarantors party thereto, and Wilmington Trust, National Association, as trustee and notes collateral agent (as amended, supplemented, or otherwise modified from time to time).

29.    "*Cayman Notes Obligations*" has the meaning assigned to the term "Obligations" in the Cayman Notes Indenture.

30.    "*CEO*" means the Chief Executive Officer of the Reorganized Debtors as of the Effective Date.

31.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, and (b) when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

32.    "*Claim*" means any "claim," as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

33.    "*Claims and Noticing Agent*" means Omni Agent Solutions, Inc., solely in its capacity as notice, claims, and solicitation agent for the Debtors in the Chapter 11 Cases.

34.    "*Claims Bar Date*" means the applicable bar date by which Proofs of Claim, if applicable, must be Filed, as established by:  (a) a Final Order of the Bankruptcy Court, including any Final Order establishing a deadline to File Proofs of Claim; or (b) this Plan; *provided* that if there is a conflict relating to the bar date for a particular Claim, this Plan shall control.

35.    "*Claims Register*" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent or the clerk of the Bankruptcy Court.

36.    "*Class*" means a class of Claims or Interests as set forth in <u>Article III</u> of this Plan pursuant to section 1122(a) of the Bankruptcy Code.

37.    "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

38.    "*Committee*" means the official committee of unsecured creditors of the Debtors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on June 27, 2025 [Docket No. 197], the membership of which may be reconstituted from time to time, including as provided in amended notices of appointment filed by the U.S. Trustee (including Docket Nos. 306, 320 and 335).

39.    "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, wages, compensation, and benefit plans and policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs, and payments, life and accidental death and dismemberment insurance plans and programs, for all employees of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and managers, in each case existing with the Debtors as of immediately prior to the Effective Date.

40.    "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

41.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

42.    "*Confirmation Hearing*" means the hearing(s) held by the Bankruptcy Court to consider Confirmation of this Plan, pursuant to Bankruptcy Rule 3020(b)(3) and section 1128 of the Bankruptcy Code, as applicable, as such hearing(s) may be adjourned or continued from time to time.

43.    "*Confirmation Order*" means the order entered by the Bankruptcy Court confirming this Plan, pursuant to section 1129 of the Bankruptcy Code.

44.    "*Consenting Cayman Noteholders*" means the holders (or beneficial holders) of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold, Cayman Notes Claims that executed and delivered counterpart signature pages to the RSA, a joinder, or a transfer agreement to counsel to the Debtors.

45.    "*Consenting Exchange Noteholders*" means holders (or beneficial holders) of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold, Exchange Notes Claims that have executed and delivered counterpart signature pages to the RSA, a joinder, or a transfer agreement to counsel to the Debtors.

46.    "*Consenting Noteholders*" means, collectively, the Consenting Exchange Noteholders, the Consenting Cayman Noteholders, and the Consenting Senior Secured Noteholders.

47.    "*Consenting Senior Secured Noteholders*" means holders (or beneficial holders) of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold, Senior Secured Notes Claims that have executed and delivered counterpart signature pages to the RSA, a joinder, or a transfer agreement to counsel to the Debtors.

48.    "*Consenting Sponsor*" means Hellman & Friedman LLC, on behalf of itself and each of its affiliated investment funds or investment vehicles managed or advised by it, and its affiliates that directly or indirectly hold Interests in the Debtors.

49.    "*Consenting Stakeholders*" means, collectively, the Consenting Term Loan Lenders and the Consenting Noteholders.

50.    "*Consenting Term Loan Lenders*" means holders of Term Loan Claims that have executed and delivered counterpart signature pages to the RSA, a joinder, or a transfer agreement to counsel to the Debtors.

51.    "*Consummation*" means the occurrence of the Effective Date as to the applicable Debtor.

52.    "*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults and other non-monetary defaults to the extent required by section 365 of the Bankruptcy Code, under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors or assumed and assigned by the Debtors, as applicable, pursuant to sections 365 or 1123(a) of the Bankruptcy Code.

53.    "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy" or run-off endorsement) that have been issued at any time to any of the Debtors providing current or former directors', managers', officers', and/or employees' liability coverage, and all agreements, documents, or instruments relating thereto.

54.    "*Debtor Release*" means the release set forth in <u>Article VIII.C</u> of this Plan.

55.    "*Debtors*" has the meaning set forth in the preamble.

56.    "*Dechert*" means Dechert LLP, as counsel to the Ad Hoc Group.

57.    "*Definitive Documents*" means the following and includes any exhibits, schedules, amendments, modifications, or supplements thereto:  (a) the First Day Pleadings; (b) the DIP Documents, including the DIP Credit Agreement and the DIP Orders; (c) this Plan; (d) the Disclosure Statement; (e) the Disclosure Statement Order; (f) the Confirmation Order; (g) the Exit ABL Facility Documents, including the Exit ABL Facility Credit Agreement; (h) the

Plan Supplement (including any Restructuring Transaction Memorandum); and (i) the New Organizational Documents.

58.    "*DIP Agent*" means GLAS USA LLC, or any assigns or successors thereto, in its capacity as administrative agent and collateral agent under the DIP Facility.

59.    "*DIP Commitments*" has the meaning ascribed to it in the DIP Orders.

60.    "*DIP Credit Agreement*" means that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of June 18, 2025, by and among certain of the Debtors, the DIP Agent, and the DIP Lenders setting forth the terms and conditions of the DIP Facility (as amended, supplemented, or otherwise modified from time to time).

61.    "*DIP Documents*" means, collectively, the documentation governing the DIP Facility, including the DIP Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the DIP Orders, and the DIP Motion (including any amendments, restatements, supplements, or modifications of any of the foregoing as may be approved by the DIP Lenders satisfying such consent threshold as is required to effect such amendments, restatements, supplements, or modifications as specified herein or in the DIP Credit Agreement).

62.    "*DIP Equity Conversion*" means the conversion of the Superpriority DIP Claims into 98% of the Reorganized Common Stock upon the Effective Date subject to dilution by the MIP Shares.

63.    "*DIP Facility*" means the superpriority, senior secured, debtor in possession term loan facility in an aggregate principal amount of $600 million, plus any fees and interest that have been paid in kind, provided to the Debtors under the DIP Documents.

64.    "*DIP Lenders*" means the lenders party from time to time to the DIP Credit Agreement.

65.    "*DIP Motion*" means the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 16].

66.    "*DIP Obligations*" has the meaning ascribed to "Obligations" in the DIP Credit Agreement.

67.    "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

68.    "*DIP Secured Parties*" means, collectively, the DIP Agent and the DIP Lenders.

69.    "*Disbursing Agent*" means, with respect to all distributions to be made under this Plan, the Debtors, the Reorganized Debtors, or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with this Plan, which Entity may include the Claims and Noticing Agent, the Agents/Trustees, and the Unsecured Claims Distribution Trustee, as applicable.

70.    "*Disclosure Statement*" means the *Disclosure Statement for the Joint Plan of Reorganization of At Home Group Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (including all exhibits, supplements, appendices, and schedules, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time) filed contemporaneously herewith.

71.    "*Disclosure Statement Order*" means the order of the Bankruptcy Court approving the Disclosure Statement and setting forth the procedures for solicitation of votes on this Plan.

72.    "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest (or portion thereof):  (a) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment; (b) that is not Allowed; and (c) that is not disallowed by this Plan, the Bankruptcy Code, or a Final Order, as applicable.

73.    "*Distribution Record Date*" means, other than with respect to Securities of the Debtors deposited with DTC, the date for determining which Holders of Allowed Claims are eligible to receive distributions hereunder, which shall be the Confirmation Date, or such other date as is announced by the Debtors with the consent of the Required Consenting Stakeholders or designated in a Final Order.  For the avoidance of doubt, the Distribution Record Date shall not apply to any Securities of the Debtors deposited with the DTC, and the Holders of such Securities shall receive a distribution in accordance with this Plan and, as applicable, the customary procedures of DTC.

74.    "*DTC*" means The Depository Trust Company or its nominees (or any successors thereto, in each case).

75.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of this Plan have been satisfied or waived in accordance with Article IX.B of this Plan; and (c) this Plan is declared effective by the Debtors.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

76.    "*Employment Agreement*" means any new and/or existing employment agreement or letter, indemnification agreement, severance agreement, or other agreement entered into with the Debtors' current and former officers and other employees by the Reorganized Debtors.

77.    "*Entity*" has the meaning ascribed to it in section 101(15) of the Bankruptcy Code.

78.    "*Equity Security*" has the meaning set forth in section 101(16) of the Bankruptcy Code.

79.    "*Estate*" means, as to each Debtor, the estate created for the Debtors in their Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

80.    "*Exchange Act*" means the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78a *et seq*, or any similar federal, state, or local Law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

81.    "*Exchange Notes*" means the $483 million aggregate principal amount of outstanding 7.125%/8.625% Cash/PIK toggle Senior Secured Notes due 2028, issued under the Exchange Notes Indenture.

82.    "*Exchange Notes Claims*" means all claims against any of the Debtors arising under, derived from, based on, or related to the Exchange Notes Obligations.

83.    "*Exchange Notes Indenture*" means that certain indenture, dated as of May 12, 2023, among At Home Group Inc., as issuer, the guarantors party thereto, and Wilmington Trust, National Association, as trustee and notes collateral agent (as amended, supplemented, or otherwise modified from time to time).

84.    "*Exchange Notes Obligations*" has the meaning assigned to the term "Obligations" in the Exchange Notes Indenture.

85.    "*Exculpated Partie*s" means, collectively, and in each case solely in its capacity as such (and to the extent permitted by Law): (a) each of the Debtors; (b) the Reorganized Debtors; (c) with respect to the Debtors, each of their respective former and current directors, managers, officers, attorneys, financial advisors, consultants, or other professionals or advisors that served in such capacity between the Petition Date and Effective Date; (d) the Professionals retained during the Chapter 11 Cases; and (e) the Committee and each of its present and former members, solely in their capacity as members of the Committee.

86.    "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

87.    "*Existing Equity Interests*" means the existing equity Interests of At Home.

88.    "*Exit ABL Facility*" means that certain new, asset-backed loan facility to be entered into by the Reorganized Debtors on the Effective Date in accordance with the Exit ABL Facility Documents.

89.    "*Exit ABL Facility Agent*" means the agent under the Exit ABL Facility.

90.    "*Exit ABL Facility Credit Agreement*" means the credit agreement governing the Exit ABL Facility.

91.    "*Exit ABL Facility Documents*" means the Exit ABL Facility Credit Agreement and any other documentation necessary or appropriate to effectuate the incurrence of the Exit ABL Facility.

92.    "*Exit ABL Facility Lenders*" means those lenders from time-to-time party to the Exit ABL Facility Documents, solely in their capacity as such.

93.    "*Exit ABL Loans*" means, as applicable, the loans provided under the Exit ABL Facility on the terms and conditions set forth in the Exit ABL Facility Documents.

94.    "*Federal Judgment Rate*" means the federal judgment rate specified by 28 U.S.C. § 1961 in effect as of the Petition Date.

95.    "*File*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

96.    "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 344] entered by the Bankruptcy Court.

97.    "*Final Order*" means, including, without limitation, any order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought, or if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

98.    "*First Day Declaration*" means the *Declaration of Jeremy Aguilar, Chief Financial Officer of At Home Group Inc. and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 4].

99.    "*First Day Pleadings*" means the pleadings and related documentation requesting certain emergency, interim, and/or final relief, or supporting the request for such relief, to be filed on or around the Petition Date and to be heard at the "first day" hearing.

100.    "*First Lien Claims*" means, collectively, the Cayman Notes Claims, the Intercompany Note Claims, the Term Loan Claims, the Senior Secured Notes Claims, and the Exchange Notes Claims.

101.    "*First Lien Debt*" means, collectively, the Exchange Notes, the Cayman Notes, the Intercompany Note, the Term Loans, and the Senior Secured Notes.

102.    "*First Lien Deficiency Claims*" means any unsecured deficiency Claim in respect of the First Lien Debt which for the purposes of this Plan shall be deemed Allowed in an amount equal to $1,196,503,659.24.

103.    "*First Lien Equity Distribution*" means 100% of Reorganized Common Stock subject to dilution by the DIP Equity Conversion and the MIP Shares.

104.    "*First Lien Obligations*" means, collectively, the Term Loan Obligations, the Senior Secured Notes Obligations, the Exchange Notes Obligations, the Cayman Notes Obligations and the Intercompany Note Obligations.

105.    "*General Unsecured Claim*" means any Unsecured Claim that is not:  (a) paid in full prior to the Effective Date; (b) an Administrative Claim; (c) a Priority Tax Claim; (d) a Superpriority DIP Claim; (e) an Other Priority Claim; (f) an Intercompany Claim; and (g) a Section 510(b) Claim.  For the avoidance of doubt, (i) Senior Unsecured Notes Claims, (ii) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, (iii) Unsecured Claims resulting from litigation against one or more of the Debtors, and (iv) the First Lien Deficiency Claims, in each case shall be General Unsecured Claims.

106.    "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

107.    "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

108.    "*Holder*" means an Entity that is the record owner of a Claim against or Interest in any of the Debtors, as applicable.

109.    "*Impaired*" means, when used in reference to a Claim or Interest, a Claim or Interest that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

110.    "*Insider*" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

111.    "*Intercompany Claim*" means any Claim held by a Debtor or Affiliate of a Debtor against another Debtor or Affiliate of a Debtor.  For the avoidance of doubt, the Intercompany Note Claim is not an Intercompany Claim.

112.    "*Intercompany Interest*" means any Interest in one Debtor held by another Debtor.

113.    "*Intercompany Note*" means that certain intercompany note, dated as of May 12, 2023, among At Home Group Inc., At Home Cayman, the guarantors party thereto from time to time, and Acquiom Agency Services LLC (as successor to Delaware Trust Company), as administrative agent and intercompany note collateral agent (as amended, restated, supplemented, or otherwise modified from time to time), providing for the issuance to At Home Cayman of a $200 million intercompany note which matures on May 12, 2028.

114.    "*Intercompany Note Claim*" means all claims against any of the Debtors arising under, derived from, based on, or related to the Intercompany Note Obligations.

115.    "*Intercompany Note Obligations*" has the meaning assigned to the term "Obligations" in the Intercompany Note.

116.    "*Interest*" means the common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, or other Securities or agreements to acquire the common stock (including convertible debt), preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement).

117.    "*Interim DIP Order*" means the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 98] entered by the Bankruptcy Court.

118.    "*IRS*" means the United States Internal Revenue Service.

119.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

120.    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

121.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

122.    "*Management Incentive Plan*" means a management incentive plan providing for the issuance of up to 10% of the Reorganized Equity (on a fully diluted and fully distributed basis) for management and the New Board, which may be granted in any form acceptable to the New Board, including without limitation, in the form of options, restricted stock, restricted stock units, warrants, stock appreciations rights, or any combination thereof, and which will be approved by the New Board on or within 90 days of the Effective Date.

123.    "*MIP Shares*" means a pool of a to be determined percentage of Reorganized Equity (of up to 10%), reserved for issuance under the Management Incentive Plan.

124.    "*New Board*" means the new board of directors of the Reorganized Debtors, which shall be selected in accordance with Article IV.J. of this Plan.

125.    "*New Organizational Documents*" means documentation establishing the corporate governance for the Reorganized Debtors, including charters, bylaws, operating agreements, or other organization documents, which (a) shall be consistent with the Restructuring Term Sheet, the RSA, and section 1123(a)(6) of the Bankruptcy Code, (b) shall have terms acceptable to the Required Consenting Stakeholders, and (c) shall include provisions consistent with those set forth in Annex C of the Restructuring Term Sheet which shall be subject to the consent rights set forth therein.

126.    "*Ordinary Course Non-Insider Counterparties*" means (i) Persons party to at least one Executory Contract or Unexpired Lease of a kind entered into in the ordinary course of the Debtors' business and assumed by the Debtors pursuant to the Plan, (ii) Persons that have entered into an agreement with the Debtors of a kind entered into in the ordinary course of the Debtors' business after the Petition Date and which has not been terminated as of the Effective Date of the Plan, and (iii) Persons that have entered into an agreement with the Debtors of a kind entered into in the ordinary course of the Debtors' business after the Effective Date which agreement designates such Person as an Ordinary Course Non-Insider Counterparty.

127.    "*Ordinary Course Professional*" means an Entity (other than a Professional) retained or compensated by the Debtors in accordance with the Ordinary Course Professionals Order.

128.    "*Ordinary Course Professionals Order*" means the *Order (I) Authorizing the Debtors' to Retain and Compensation Professionals Utilized in the Ordinary Course of Business, (II) Establishing Procedures for Designating Such Professionals, (III) Waiving Certain Information Requirements of Local Rule 2106-1 and*

*(IV) Granting Related Relief* [Docket No. 273] (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof).

129.    "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

130.    "*Other Secured Claim*" means any Secured Claim other than the Superpriority DIP Claims, the ABL Facility Claims, the Intercompany Note Claim, the Cayman Notes Claims, the Term Loan Claims, the Senior Secured Notes Claims, or the Exchange Notes Claims.

131.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

132.    "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

133.    "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims or other eligible Entities under and in accordance with this Plan.

134.    "*Plan Supplement*" means collectively, the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules), including the following, as applicable: (a) the Schedule of Rejected Executory Contracts and Unexpired Leases; (b) the Schedule of Assumed Executory Contracts and Unexpired Leases; (c) the Schedule of Retained Causes of Action, which shall also identify the Assigned Preference Actions; (d) the Restructuring Transactions Memorandum; (e) the identity of the members of the New Board (if known at the time of Filing); (f) the New Organizational Documents; (g) the Exit ABL Facility Documents; (h) the Unsecured Claims Distribution Trust Agreement; and (i) the identity of the Unsecured Claims Distribution Trustee.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement in accordance with this Plan and the RSA on or before the Effective Date.  The Plan Supplement shall be deemed incorporated into and part of this Plan as if set forth herein in full; *provided*, *however*, that in the event of a conflict between this Plan and the Plan Supplement, the Plan Supplement shall control in accordance with Article I.G.

135.    "*Preference Action*" means any and all causes of action that any of the Debtors, the Reorganized Debtors, or the Estates have asserted or may assert under section 547of the Bankruptcy Code.

136.    "*Prepetition Finance Documents*" means the documentation governing the ABL Facility, the First Lien Debt, and the Senior Unsecured Notes.

137.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

138.    "*Pro Rata Share*" means, (a) with respect to each Cayman Notes Claim, Intercompany Note Claim, Term Loan Claim, Senior Secured Notes Claim, and Exchange Notes Claim, the proportion that such Claim bears to all Allowed First Lien Claims and (b) with respect to any other class of Claims or Interests (including the Senior Unsecured Notes Claims), the proportion that such Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that same Class.

139.    "*Professional*" means an Entity (other than an Ordinary Course Professional):  (a) employed, or proposed to be employed by the Debtors or by the Committee prior to the Confirmation Date, in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

140.    "*Professional Fee Amount*" means the reasonable estimate of the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services to the

Debtors or the Committee prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.D of this Plan.

141.    "*Professional Fee Claim*" means any Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred on or after the Petition Date by such Professional through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

142.    "*Professional Fee Escrow Account*" means an account funded by the Debtors with Cash as soon as practicable after Confirmation and not later than the Effective Date in an amount equal to the Professional Fee Amount.

143.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

144.    "*Quarterly Fees*" means all fees payable pursuant to section 1930 of the Judicial Code, together with the statutory rate of interest set forth in section 3717 of title 31 of the United States Code, to the extent applicable.

145.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to a Claim or an Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

146.    "*Related Party*" means, collectively, with respect to any Person or Entity, each of, and in each case in its capacity as such, such Person's or such Entity's current and former directors, managers, officers, observers, committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, secondees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

147.    "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Ad Hoc Group and each Consenting Stakeholder; (d) the DIP Lenders; (e) the ABL Secured Parties; (f) the DIP Agent; (g) the Agents/Trustees; (h) the Consenting Sponsor; (i) At Home Cayman; (j) At Home Cayman Holdings; (k) the Committee, each of its current and former members (solely in their capacity as such), and its Professionals; (l) the Senior Unsecured Notes Trustee and counsel thereto; (m) each current and former Affiliate of each Entity in clause (a) through the preceding clause (l); and (n) each Related Party of each Entity in clauses (a) through the preceding clause (l); *provided* that, in each case, an Entity in clauses (c) through (l) shall not be a Released Party if it:  (x) was provided with an opportunity to opt in to the releases described in Article VIII.D of this Plan by returning an "opt in" form and did not do so; or (y) timely objects to the releases contained in Article VIII.D of this Plan and such objection is not resolved before Confirmation.

148.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Ad Hoc Group and each Consenting Stakeholder; (d) the DIP Lenders; (e) the ABL Secured Parties; (f) the DIP Agent; (g) the Agents/Trustees; (h) the Consenting Sponsor; (i) the Committee; (j) the Senior Unsecured Notes Trustee; (k) all Holders of Claims that vote to accept this Plan and that affirmatively opt into the releases provided for in this Plan; (l) all Holders of Claims that are deemed to accept this Plan and that affirmatively opt into the releases provided for in this Plan; (m) all Holders of Claims that abstain from voting on this Plan and that affirmatively opt into the releases provided for in this Plan; (n) all Holders of Claims that vote to reject this Plan and that affirmatively opt into the releases provided for in this Plan; (o) all Holders of Interests that affirmatively opt into the releases provided for in this Plan; (p) each current and former Affiliate of each Entity in clause (a) through the preceding clause (o); and (q) each Related Party of each Entity in clauses (a) through the preceding clause (o) for which such Entity is legally entitled to bind such Related Party to the releases contained herein under applicable law; *provided* that, in each case, an Entity in clauses (k) through (o) shall not be a Releasing Party if it:  (x) was provided with an opportunity to opt in to the releases described in Article VIII.D of this Plan by returning an "opt in" form and

did not do so; or (y) timely objects to the releases contained in Article VIII.D of this Plan and such objection is not resolved before Confirmation.

149.    "*Reorganized Common Stock*" means the common stock of reorganized At Home.

150.    "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under this Plan, on and after the Effective Date, or any successors or assigns thereto including by transfer, merger, consolidation, or otherwise, and including any new Entity established in connection with the implementation of the Restructuring Transactions, and which shall include, without limitation, any newly created parent holding company, if any, as applicable, pursuant to this Plan.

151.    "*Reorganized Equity*" means the common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, or profits interests of any Reorganized Debtor, and options, warrants, rights, or other Securities or agreements to acquire the common stock (including convertible debt), preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Reorganized Debtor (whether or not arising under or in connection with any employment agreement) including Reorganized Common Stock.

152.    "*Required Consenting Stakeholders*" means, as of the relevant date, Consenting Stakeholders holding at least 50.01% of the Voting Amounts held by all Consenting Stakeholders party to the RSA as of such date as confirmed in writing by Dechert (email being sufficient).

153.    "*Restructuring Expenses*" means the reasonable and documented fees and expenses accrued from the inception of their respective engagements related to the implementation of the Restructuring Transactions and not previously paid by, or on behalf of, the Debtors of:  (i) any professional retained by the Ad Hoc Group; and (ii) each of the Trustees and Agents, including each of their respective legal counsel, in respect of the First Lien Claims, the DIP Facility, and the ABL Loans.

154.    "*Restructuring Term Sheet*" means the term sheet attached to the RSA as Exhibit B.

155.    "*Restructuring Transactions*" means the transactions described in Article IV of this Plan and the Restructuring Transactions Memorandum.

156.    "*Restructuring Transactions Memorandum*" means the description of the steps acceptable to the required Consenting Stakeholders and the Consenting Sponsor (in accordance with the terms of the RSA) to be carried out to effectuate the Restructuring Transactions in accordance with this Plan and the RSA, and as set forth in the Plan Supplement, and otherwise in a manner consistent with the Definitive Documents.

157.    "*RSA*" means that certain Restructuring Support Agreement, dated as of June 16, 2025, by and among the Debtors, the Consenting Stakeholders, and the Consenting Sponsor, including all exhibits, schedules, and other attachments thereto, as may be amended, modified, or supplemented from time to time, in accordance with its terms, attached to the First Day Declaration as Exhibit B.

158.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any amendments, supplements, or modifications thereto) of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or the Reorganized Debtors with the consent of the Required Consenting Stakeholders, as applicable, in accordance with this Plan.  For the avoidance of doubt, the schedule shall be included in the Plan Supplement.

159.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments, supplements, or modifications thereto) of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or the Reorganized Debtors with the consent of the Required Consenting Stakeholders, as applicable, in accordance with this Plan.  For the avoidance of doubt, the schedule shall be included in the Plan Supplement.

160.    "*Schedule of Retained Causes of Action*" means the schedule of Causes of Action of the Debtors that shall vest in the Reorganized Debtors on the Effective Date, that are not settled, released, waived, exculpated, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall specify which of such Causes of Action shall be retained by the Reorganized Debtors and which Causes of Action shall be assigned to the Unsecured Claims Distribution Trust as Assigned Preference Actions under this Plan.

161.    "*Schedules*" means, collectively, the schedules of assets and liabilities, statements of financial affairs, lists of Holders of Claims and Interests, and all amendments or supplements thereto to be Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

162.    "*SEC*" means the United States Securities and Exchange Commission.

163.    "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

164.    "*Secured Claim*" means a Claim that is:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to this Plan, or separate order of the Bankruptcy Court, as a secured claim.

165.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

166.    "*Security*" or "*Securities*" has the meaning ascribed to it in section 2(a)(1) of the Securities Act.

167.    "*Senior Secured Notes*" means the 4.875% Senior Secured Notes due 2028 issued pursuant to the Senior Secured Notes Indenture.

168.    "*Senior Secured Notes Claims*" means all Claims against any of the Debtors arising under, derived from, based on, or related to the Senior Secured Notes Obligations.

169.    "*Senior Secured Notes Indenture*" that certain indenture, dated as of July 12, 2021, by and among At Home Group Inc., as issuer, and Computershare Trust Company (as successor to U.S. Bank Trust Company, National Association), as trustee and notes collateral agent (as amended, restated, supplemented, or otherwise modified from time to time).

170.    "*Senior Secured Notes Obligations*" has the meaning assigned to the term "Obligations" in the Senior Secured Notes Indenture.

171.    "*Senior Unsecured Notes*" means the 7.125% Senior Unsecured Notes due 2029, issued under the Senior Unsecured Notes Indenture.

172.    "*Senior Unsecured Notes Claims*" means all claims against any of the Debtors arising under, derived from, based on, or related to the Senior Unsecured Notes Obligations.

173.    "*Senior Unsecured Notes Indenture*" means that certain indenture, dated as of July 12, 2021, between At Home Group Inc., the guarantors party thereto from time to time, and CSC Delaware Trust Company (as successor to U.S. Bank Trust Company, National Association), as trustee (as amended, supplemented, or otherwise modified from time to time).

174.    "*Senior Unsecured Notes Obligations*" has the meaning assigned to the term "Obligations" in the Senior Unsecured Notes Indenture.

175.    "*Senior Unsecured Notes Trustee*" means CSC Delaware Trust Company, in its capacity as indenture trustee under the Senior Unsecured Notes Indenture, including any successor thereto.

176.    "*Senior Unsecured Notes Trustee Expenses*" means the reasonable and documented fees and expenses of the Senior Unsecured Notes Trustee not previously paid by, or on behalf of, the Debtors; *provided* that such amount shall not exceed $365,000.00 in total.

177.    "*Superpriority DIP Claims*" means Claims against any of the Debtors arising under, derived from, based on, or related to the DIP Obligations.

178.    "*Tariff Event*" has the meaning ascribed to it in the DIP Credit Agreement.

179.    "*Term Loan Facility*" means the approximately $579 million prepetition term loan facility issued under the Term Loan Credit Agreement.

180.    "*Term Loans*" means the term loans due under the Term Loan Credit Agreement.

181.    "*Term Loan Claims*" means all Claims against any of the Debtors arising under, derived from, based on, or related to the Term Loan Facility.

182.    "*Term Loan Credit Agreement*" means that certain term loan credit agreement between, *inter alios*, At Home Group Inc., as borrower, the lenders party thereto, and Wilmington Trust, National Association (as successor to Bank of America, N.A.), as administrative agent and collateral agent, dated as of July 23, 2021.

183.    "*Term Loan Obligations*" has the meaning assigned to the term "Obligations" in the Term Loan Credit Agreement.

184.    "*Third-Party Release*" means the release set forth in Article VIII.D of this Plan.

185.    "*Trustee*" means any indenture trustee, collateral trustee, administrative agent, or other trustee or similar entity under the Cayman Notes, the Senior Secured Notes, the Exchange Notes, the Intercompany Note, and the Senior Unsecured Notes.

186.    "*Unclaimed Distribution*" means any distribution under this Plan on account of an Allowed Claim to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check within 90 calendar days of receipt; (b) given notice to the Reorganized Debtors or the Unsecured Claims Distribution Trustee, as applicable, of an intent to accept a particular distribution within 90 calendar days of receipt; (c) responded to the Debtors' or Reorganized Debtors' or Unsecured Claims Distribution Trustee's requests for information necessary to facilitate a particular distribution prior to the deadline included in such request for information; or (d) timely taken any other action necessary to facilitate such distribution.

187.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

188.    "*Unexpired Lease*" means a lease of non-residential, real property to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

189.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

190.    "*Unsecured Claim*" means any Claim that is not a Secured Claim.

191.    "*Unsecured Claims Distribution Trust*" means the trust or other similar legal entity established for the benefit of the Unsecured Claims Distribution Trust Beneficiaries on the Effective Date in accordance with this Plan and pursuant to the Unsecured Claims Distribution Trust Agreement.

192.    "*Unsecured Claims Distribution Trust Agreement*" means that certain trust agreement governing the Unsecured Claims Distribution Trust, the form of which shall be included in the Plan Supplement.

193.    "*Unsecured Claims Distribution Trust Assets*" means, collectively, (a) all of the Debtors' right, title, and interest in the Assigned Preference Actions set forth on the Schedule of Retained Causes of Action, including the proceeds thereof, and (b) $3.9 million in Cash *plus* the difference (which may be a positive or negative number) calculated by subtracting (x) the amount of the Allowed fees and expenses of the Committee and its Professionals from (y) the amount set forth for such fees and expenses in the Approved Budget (as defined in the DIP Orders).

194.    "*Unsecured Claims Distribution Trust Beneficiaries*" means, collectively, the Holders of Allowed General Unsecured Claims; provided, however, for the avoidance of doubt, the Holders of any First Lien Deficiency Claims shall not be Unsecured Claims Distribution Trust Beneficiaries.

195.    "*Unsecured Claims Distribution Trust Beneficial Interests*" means the beneficial interest in the Unsecured Claims Distribution Trust granted to each Unsecured Claims Distribution Trust Beneficiary, which shall entitle each Unsecured Claims Distribution Trust Beneficiary to its Pro Rata Share of the Unsecured Claims Distribution Trust Net Assets, subject to the terms of this Plan and the Unsecured Claims Distribution Trust Agreement.

196.    "*Unsecured Claims Distribution Trust Fees and Expenses*" means all reasonable and documented fees, expenses, and costs (including any taxes imposed on or payable by the Unsecured Claims Distribution Trust or in respect of the Unsecured Claims Distribution Trust Assets) incurred by the Unsecured Claims Distribution Trust, any professionals retained by the Unsecured Claims Distribution Trust, and any additional amount determined necessary by the Unsecured Claims Distribution Trustee to adequately reserve for the operating expenses of the Unsecured Claims Distribution Trust that shall be paid out of the Unsecured Claims Distribution Trust Assets.

197.    "*Unsecured Claims Distribution Trust Net Assets*" means the Unsecured Claims Distribution Trust Assets less the Unsecured Claims Distribution Trust Fees and Expenses.

198.    "*Unsecured Claims Distribution Trustee*" means the trustee, who shall be selected by the Committee and whose identity shall be disclosed in the Plan Supplement, and who shall coordinate administration and other activities of the Unsecured Claims Distribution Trust in accordance with the Unsecured Claims Distribution Trust Agreement.

199.    "*Voting Amount*" means with respect to any Consenting Stakeholder (a) at any time while the DIP Commitments are held by such Consenting Stakeholder and remain outstanding (whether funded or unfunded), the aggregate principal amount of all DIP Commitments of such Consenting Stakeholder; and (b) at all other times, the sum of (i) the aggregate principal amount of the Exchange Notes, Senior Secured Notes, and Term Loans held by such Consenting Stakeholder, plus (ii) two times the aggregate principal amount of the Cayman Notes held by such Consenting Stakeholder.

*B.*      *Rules of Interpretation.*

For purposes of this Plan:  (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (ii) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto as provided for in the RSA; (iii) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or the Confirmation Order, as applicable; (iv) any reference to an Entity as a Holder of a

Claim or Interest includes that Entity's successors and assigns; (v) unless otherwise specified, all references herein to "Articles" are references to Articles hereof; (vi) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (vii) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (viii) subject to the provisions of any contract, charter, bylaws, limited liability company agreements, operating agreements, certificates of incorporation, or other organizational documents or shareholders' agreements, as applicable, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable Law, including the Bankruptcy Code and the Bankruptcy Rules; (ix) any immaterial effectuating provisions may be interpreted by the Debtors or Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval, of the Bankruptcy Court or any other Entity; (x) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (xi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (xii) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (xiii) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (xiv) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (xv) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (xvi) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (xvii) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; and (xviii) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective Person or Entity that have such consent, acceptance, or approval rights, including by electronic mail.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Except to the extent a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code or the Bankruptcy Rules) and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed, implemented, and enforced in accordance with, the Laws of the State of New York, without giving effect to the principles of conflict of Laws; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the Laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

*G.      Controlling Document.*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and this Plan, including the Plan Supplement, or the Disclosure Statement, the Confirmation Order shall control.

*H.      Nonconsolidated Plan.*

Although for purposes of administrative convenience and efficiency this Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, this Plan does not provide for the substantive consolidation of any of the Debtors.  Except as expressly provided herein, nothing in this Plan, the Confirmation Order, or the Disclosure Statement shall constitute or be deemed to constitute a representation that any one or all of the Debtors is subject to or liable for any Claims or Interests against or in any other Debtor.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under this Plan on account of any Allowed Claim exceed the amount of the Allowed Claim.

*I.      Consultation, Notice, Information, and Consent Rights.*

Notwithstanding anything herein to the contrary, all respective consultation, information, notice, and consent rights of set forth in the DIP Documents and the RSA, with respect to the form and substance of this Plan, all exhibits to this Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein until such time as the DIP Documents and/or the RSA, as applicable, are terminated in accordance with its terms.

Failure to reference in this Plan the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the DIP Documents or the RSA, as applicable, shall not impair such rights and obligations.

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS, SUPERPRIORITY DIP CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Superpriority DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

*A.      Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Superpriority DIP Claims, if applicable, Professional Fee Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code) that has not been paid in full prior to the Effective Date, will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such

time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in this Article II.A of this Plan, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors by the applicable Administrative Claims Bar Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.  **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or the Reorganized Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Notwithstanding anything else herein, the Allowed Superpriority DIP Claims shall not be subject to the Administrative Claims Bar Date.**

B.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter).

C.      *Superpriority DIP Claims.*

All Superpriority DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility in accordance with the terms and in the amounts specified under the DIP Orders and the DIP Documents on such date, (ii) all interest accrued and unpaid thereon to the date of payment, and (iii) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Documents and the DIP Orders.

Except to the extent that a Holder of an Allowed Superpriority DIP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Superpriority DIP Claim, each Holder of an Allowed Superpriority DIP Claim, including the DIP Agent, shall receive either (i) payment in full in Cash of its Allowed Superpriority DIP Claim in accordance with the terms and in the amounts specified under the DIP Orders and the DIP Documents, (ii) its pro rata share of the DIP Equity Conversion (subject to dilution on account of the MIP Shares), or (iii) such other treatment as to which the Debtors and the Holders of the Allowed Superpriority DIP Claims will have agreed upon in writing.  For the avoidance of doubt, all accrued and unpaid fees, expenses, and non-contingent indemnification obligations (if any) payable under the DIP Documents and the DIP Orders (including applicable Restructuring Expenses) constituting Superpriority DIP Claims shall be paid in full in Cash on the Effective Date, unless otherwise expressly provided under the applicable DIP Documents.  Holders of Superpriority DIP Claims that receive Reorganized Equity pursuant to the DIP Equity Conversion shall be permitted to direct distributions of their Reorganized Equity to designees with the consent of the Required Consenting Stakeholders.

Following such satisfaction of the Allowed Superpriority DIP Claims, the DIP Facility, the DIP Documents, and all related loan documents shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case, without further action by the DIP Agent or the DIP Lenders and without further order of the Bankruptcy Court, and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the Superpriority DIP Claims shall be automatically discharged and released, in each case, without further action by the DIP Agent or the DIP Lenders.  At the expense of the Debtors or Reorganized Debtors, the DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

D.    *Professional Fee Claims.*

    1.    Final Fee Applications and Payment of Professional Fee Claims.

    All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 60 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of this Plan.

    2.    Professional Fee Escrow Account.

    No later than the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, including any Cash from the Funded Reserve Amount (as defined in the DIP Orders). The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors, as applicable. The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

    3.    Professional Fee Amount.

    Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors or the Committee before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than three Business Days before the Effective Date; *provided, however,* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional; *provided, however,* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.

    4.    Post-Confirmation Fees and Expenses.

    Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. A good faith estimate of the fees owed to Professionals incurred following the Confirmation Date shall be included in the Professional Fee Escrow Account and paid in the ordinary course of business; *provided, however,* that such estimate shall not be deemed to limit the amount of fees and expenses actually incurred by such Professionals.

E.      *Payment of United States Trustee Quarterly Fees.*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors and the Reorganized Debtors shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, each of the Reorganized Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  Each and every one of the Debtors and the Reorganized Debtors shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Claim in the case, and shall not be treated as providing any release under this Plan.

F.      *Payment of Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases), without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, Restructuring Expenses related to implementation of this Plan and Consummation thereof, whether incurred before, on, or after the Effective Date in accordance with, if applicable, the respective engagement letter or fee letter and solely upon receipt of an invoice from any Entity requesting such Restructuring Expenses with reasonable detail (but without the need for time detail).

G.      *Payment of the Senior Unsecured Notes Trustee Expenses.*

On the Effective Date, the Debtors shall pay the Senior Unsecured Notes Trustee Expenses without the requirement for the Senior Unsecured Notes Trustee to file with the Bankruptcy Court either a retention application or a fee application, which shall not be subject to setoff, recoupment, reduction, or reallocation of any kind.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

This Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors (except for the Class 12 Existing Equity Interests, which shall apply only to Ambience Parent, Inc.).  All of the potential Classes for the Debtors are set forth herein.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ABL Facility Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | Cayman Notes Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Note Claims | Impaired | Entitled to Vote |
| Class 6 | Term Loan Claims | Impaired | Entitled to Vote |
| Class 7 | Senior Secured Notes Claims | Impaired | Entitled to Vote |
| Class 8 | Exchange Notes Claims | Impaired | Entitled to Vote |
| Class 9 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 10 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 11 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 12 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 13 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with such Claim's terms in the ordinary course of business) or as soon as reasonably practicable thereafter.  In no event shall any Holder of an Allowed Claim or Allowed Interest receive more than such Holder's Allowed amount on account of such Claim or Interest.

1.    <u>Class 1 – Other Secured Claims</u>.

(a)      *Classification*: Class 1 consists of all Allowed Other Secured Claims against any Debtor.

(b)      *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Allowed Other Secured Claim, in full and final

satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, on the Effective Date or as soon as reasonably practicable thereafter, shall receive either:

(i)        payment in full in Cash of its Allowed Other Secured Claim;

(ii)       delivery of the collateral securing its Allowed Other Secured Claim;

(iii)      Reinstatement of its Allowed Other Secured Claim; or

(iv)      such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting*: Class 1 is Unimpaired under this Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

2.    Class 2 – Other Priority Claims.

(a)     *Classification*: Class 2 consists of all Allowed Other Priority Claims against any Debtor.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, on the Effective Date, each Holder of such Allowed Other Priority Claim shall receive treatment in a manner consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)     *Voting*: Class 2 is Unimpaired under this Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

3.    Class 3 – ABL Facility Claims.

(a)     *Classification*: Class 3 consists of all Allowed ABL Facility Claims against any Debtor.

(b)     *Allowance*: All ABL Facility Claims shall be Allowed in the aggregate principal amount of approximately $377,925,500, *plus* any and all unpaid interest, fees, premiums, and all other obligations (including any letter of credit obligations), amounts, and expenses due and owing under the ABL Credit Agreement or related documents (including postpetition interest at the rate set forth in the DIP Orders) as of the Effective Date.

(c)     *Treatment*: Except to the extent that a Holder of an Allowed ABL Facility Claim agrees to less favorable treatment of its Allowed ABL Facility Claim, on the Effective Date, each Holder of an Allowed ABL Facility Claim will receive, in full and final satisfaction, settlement, release, and discharge of such Allowed ABL Facility Claim, payment in full in Cash with the proceeds of the Exit ABL Facility, including termination and/or cash collateralization of any outstanding letters of credit, cash management obligations, or hedging obligations.

(d)     *Voting*: Class 3 is Unimpaired under this Plan. Holders of Allowed ABL Facility Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

4. <u>Class 4 – Cayman Notes Claims</u>.

    (a)    *Classification*:  Class 4 consists of all Allowed Secured Claims arising out of the Cayman Notes against any Debtor.

    (b)    *Allowance*:  The Cayman Notes Claims shall be deemed Allowed in the aggregate principal amount under the Cayman Notes Indenture, *plus* accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing pursuant to the Cayman Notes Indenture.  The amount of the Allowed Secured Claim in respect of the Cayman Notes Claims shall be $8,152.

    (c)    *Treatment*:  Except to the extent that a Holder of an Allowed Cayman Notes Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Cayman Notes Claim shall receive (i) such Holder's Pro Rata Share of the First Lien Equity Distribution and (ii) such Holder's Pro Rata Share of all Class 5 Intercompany Note Claims recoveries distributed to the Trustee in respect of the Cayman Notes in accordance with <u>Article III.B.5(c)</u> of this Plan.

    (d)    *Voting*:  Class 4 is Impaired under this Plan.  Holders of Allowed Secured Claims arising out of the Cayman Notes Claims are entitled to vote to accept or reject this Plan.

5. <u>Class 5 – Intercompany Note Claims</u>.

    (a)    *Classification*:  Class 5 consists of all Allowed Secured Claims arising out of the Intercompany Note against any Debtor.

    (b)    *Allowance*: The Intercompany Note Claims shall be deemed Allowed in the aggregate principal amount under the Intercompany Note, plus accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing pursuant to the Intercompany Note.  The amount of the Allowed Secured Claim in respect of the Intercompany Note Claims shall be $8,152.

    (c)    *Treatment*:  Except to the extent that a Holder of an Allowed Intercompany Note Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Intercompany Note Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution; *provided* that such Holder's recovery under this Plan shall be payable to the indenture trustee and collateral agent for the Cayman Notes for distribution to the Holders of the Allowed Cayman Notes Claims in accordance with the documents governing the Cayman Notes only until such Cayman Notes are repaid in full.

    (d)    *Voting*:  Class 5 is Impaired under this Plan.  Holders of Allowed Secured Claims arising out of the Intercompany Note Claims are entitled to vote to accept or reject this Plan.

6. <u>Class 6 – Term Loan Claims</u>.

    (a)    *Classification*:  Class 6 consists of all Allowed Secured Claims arising out of the Term Loan Facility against any Debtor.

    (b)    *Allowance*:  The Term Loan Claims shall be deemed Allowed in the aggregate principal amount under the Term Loan Credit Agreement, *plus* accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing

pursuant to the Term Loan Credit Agreement.  The amount of the Allowed Secured Claim in respect of the Term Loan Claims shall be $2,623,466.

(c) *Treatment*:  Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each holder of an Allowed Secured Claim arising out of its Term Loan Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution.

(d) *Voting*:  Class 6 is Impaired under this Plan.  Holders of Allowed Secured Claims arising out of the Term Loan Claims are entitled to vote to accept or reject this Plan.

7. <u>Class 7 – Senior Secured Notes Claims</u>.

(a) *Classification*:  Class 7 consists of all Allowed Secured Claims arising out of the Senior Secured Notes against any Debtor.

(b) *Allowance*: The Senior Secured Notes Claims shall be deemed Allowed in the aggregate principal amount under the Senior Secured Notes Indenture, plus accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing pursuant to the Senior Secured Notes Indenture.  The amount of the Allowed Secured Claim respect of Senior Secured Notes Claims shall be $1,866,102.

(c) *Treatment*:  Except to the extent that a Holder of an Allowed Senior Secured Notes Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Senior Secured Notes Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution.

(d) *Voting*:  Class 7 is Impaired under this Plan.  Holders of Allowed Secured Claims arising out of Senior Secured Notes Claims are entitled to vote to accept or reject this Plan.

8. <u>Class 8 – Exchange Notes Claims</u>.

(a) *Classification*:  Class 8 consists of all Allowed Secured Claims arising out of the Allowed Exchange Notes against any Debtor.

(b) *Allowance*: The Exchange Notes Claims shall be deemed Allowed in the aggregate principal amount under the Exchange Notes Indenture, plus accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing pursuant to the Exchange Notes Indenture.  The amount of the Allowed Secured Claim in respect of the Exchange Notes Claims shall be $2,994,126.

(c) *Treatment*:  Except to the extent that a Holder of an Allowed Exchange Notes Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Exchange Notes Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution.

(d) *Voting*:  Class 8 is Impaired under this Plan.  Holders of Allowed Secured Claims arising out of Exchange Notes Claims are entitled to vote to accept or reject this Plan.

9. <u>Class 9 – General Unsecured Claims</u>.

    (a)    *Classification*:  Class 9 consists of all Allowed General Unsecured Claims against any Debtor.

    (b)    *Allowance:*  The First Lien Deficiency Claims shall be Allowed in the amount of $1,196,503,659.24 and is comprised of:  (i) $1,300,612.98 of the Cayman Notes Claims; (ii) $1,300,612.98 of the Intercompany Note Claims; (iii) $418,531,599.52 of the Term Loan Claims;  (iv)  $297,706,463.49  of  the  Senior  Secured  Notes  Claims; (v) $477,664,370.27 of the Exchange Notes Claims.  The Unsecured Notes Claims will be allowed in the amount of $59,885,777.21.

    (c)    *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment of its Allowed General Unsecured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim, on the Effective Date, each Holder of any Allowed General Unsecured Claim (other than a Holder of any First Lien Deficiency Claim) shall receive its Pro Rata Share of the Unsecured Claims Distribution Trust Beneficial Interests.  For the avoidance of doubt, Holders of First Lien Deficiency Claims shall not receive any Unsecured Claims Distribution Trust Beneficial Interests or any recovery from the Unsecured Claims Distribution Trust or the Unsecured Claims Distribution Trust Net Assets on account of such First Lien Deficiency Claim.

    (d)    *Voting*:  Class 9 is Impaired under this Plan and Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject this Plan.

10. <u>Class 10 – Intercompany Claims</u>.

    (a)    *Classification:*  Class 10 consists of all Intercompany Claims.

    (b)    *Treatment:*  On the Effective Date, all Intercompany Claims shall be (i) reinstated, or (ii) set off, settled, discharged, contributed, cancelled, released, and extinguished and without any distribution on account of such Intercompany Claim, in each case, at the Reorganized Debtors' election with the consent of the Required Consenting Stakeholders.

    (c)    *Voting:*  Class 10 is Unimpaired if the Allowed Intercompany Claims are Reinstated or Impaired if the Allowed Intercompany Claims in Class 10 are set off, settled, discharged, contributed, cancelled, released, and extinguished.  Holders of Allowed Intercompany Claims in Class 10 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

11. <u>Class 11 – Intercompany Interests</u>.

    (a)    *Classification:*  Class 11 consists of all Intercompany Interests.

    (b)    *Treatment:*  On the Effective Date, all Intercompany Interests shall be (a) reinstated, or (b) set off, settled, discharged, contributed, cancelled, released, and extinguished and without any distribution on account of such Intercompany Interests, in each case, at the Reorganized Debtors' election with the consent of the Required Consenting Stakeholders.

(c)     *Voting*:  Class 11 is Unimpaired if the Allowed Intercompany Interests are Reinstated or Impaired if the Allowed Intercompany Interests are set off, settled, discharged, contributed, cancelled, released, and extinguished.  Holders of Allowed Intercompany Interests in Class 11 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

12.  Class 12 – Existing Equity Interests.

(a)     *Classification*:  Class 12 consists of all Existing Equity Interests.

(b)     *Treatment*:  On the Effective Date, all Existing Equity Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect.  Holders of Existing Equity Interests shall receive no recovery or distribution on account thereof and each Holder of an Existing Equity Interest shall not receive or retain any distribution, property, or other value on account of such Existing Equity Interest.

(c)     *Voting*:  Class 12 is Impaired under this Plan.  Holders of Existing Equity Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

13.  Class 13 – Section 510(b) Claims.

(a)     *Classification*:  Class 13 consists of all Section 510(b) Claims.

(b)     *Treatment*:  On the Effective Date, all Section 510(b) Claims shall be cancelled, released, extinguished, and discharged and will be of no further force or effect.  Holders of Section 510(b) Claims shall receive no recovery or distribution on account thereof and each Holder of a Section 510(b) Claim shall not receive or retain any distribution, property, or other value on account of such Section 510(b) Claim.

(c)     *Voting*:  Class 13 is Impaired under this Plan.  Holders of Section 510(b) Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

C.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan or the Plan Supplement shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.     *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class votes to accept or reject this Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted this Plan.

*F.      Intercompany Interests.*

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure, for the ultimate benefit of the Holders of the Reorganized Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims.  For the avoidance of doubt, unless otherwise set forth in the Restructuring Transactions Memorandum, to the extent Reinstated pursuant to this Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

*G.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to Article III.B of this Plan.  The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  Subject to the consent rights set forth in the RSA, the Debtors reserve the right to modify this Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

*H.      Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

*I.      Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

*J.      Distributions of Reorganized Equity*

Holders of First Lien Claims entitled to receive Reorganized Equity pursuant to this Plan shall be permitted to direct distributions of their Reorganized Equity to designees with the consent of the Required Consenting Stakeholders.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

*A.      General Settlement of Claims and Interests.*

To the greatest extent permissible under the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to this Plan.  To the greatest extent permissible under the Bankruptcy Code, this Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section

1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims against and Interests in the Debtors.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final.

B.      *Restructuring Transactions.*

On or before the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions and are authorized in all respects to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan that are consistent with and pursuant to the terms and conditions of this Plan, including, as applicable:  (i) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, formation, organization, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of this Plan, the Plan Supplement, and the RSA and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Plan Supplement, and the RSA and having other terms to which the applicable Entities may agree; (iii) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state Law, including any applicable New Organizational Documents; (iv) the issuance and distribution of the Reorganized Equity as set forth in this Plan; (v)  with respect to the Reorganized Debtors, the implementation of the Management Incentive Plan and the approval of the issuance of the MIP Shares; (vi) the consummation of the Exit ABL Facility, including the execution, delivery, and filing of all Exit ABL Facility Documents; (vii) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Transactions Memorandum; (viii) the establishment and funding of the Unsecured Claims Distribution Trust in accordance with this Plan and the Unsecured Claims Distribution Trust Agreement; and (ix) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with this Plan.

Subject to the consent of the Required Consenting Stakeholders, the Debtors may, but shall not be required to, create one or more additional companies, including a new parent holding company, or convert At Home into a limited liability company, in each case, as necessary, to effect the Restructuring Transactions.  For the avoidance of doubt, the Reorganized Common Stock shall include the Reorganized Equity of the parent holding company of the Reorganized Debtors and may be issued in the form of limited liability company units, if applicable.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 105, 363, 1123, and 1141 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.  The Confirmation Order shall authorize the Debtors, the Reorganized Debtors, and the Consenting Stakeholders, as applicable, to undertake the Restructuring Transactions contemplated by this Plan, the RSA, and the other Definitive Documents.

C.      *The Reorganized Debtors*.

On the Effective Date, the New Board shall be established, and each Reorganized Debtor shall adopt its New Organizational Documents, which shall include provisions consistent with Annex C attached to the Restructuring Term Sheet.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under this Plan as necessary to consummate this Plan consistent with the consent rights set forth in the RSA.  Cash payments to be made pursuant to this Plan will be made by the Debtors or the Reorganized Debtors, as applicable.  The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under this Plan.  Except as set forth herein or as otherwise provided for in the Restructuring Transactions Memorandum, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of this Plan.

From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement, the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court, to raise additional capital, including issuing additional Reorganized Equity and obtaining additional financing, subject to, the terms of the New Organizational Documents, as the New Board deems appropriate.

D.    *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under this Plan, including the conveyance and funding of the Unsecured Claims Distribution Trust Assets, as applicable, with: (i) the Debtors' Cash on hand as of the Effective Date; (ii) the Reorganized Equity; and (iii) the proceeds from the Exit ABL Facility. The Unsecured Claims Distribution Trust shall fund its distributions, as contemplated by this Plan and the Unsecured Claims Distribution Trust Agreement, solely from the Unsecured Claims Distribution Trust Net Assets. Each distribution and issuance referred to in Article VI of this Plan shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with this Plan, including the Reorganized Equity, will be exempt from registration under the Securities Act, as described more fully in Article IV.M hereof.

1.    Use of Cash.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand and proceeds of the DIP Facility and the Exit ABL Facility, as applicable, to fund distributions to certain Holders of Allowed Claims, consistent with the terms of this Plan.

2.    Issuance of Reorganized Equity.

The Reorganized Debtors shall be authorized to issue the Reorganized Equity (including the MIP Shares) pursuant to the New Organizational Documents. The issuance of the Reorganized Equity shall be authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors. On the Effective Date, the Reorganized Equity shall be issued and distributed as provided for in the Restructuring Transactions Memorandum pursuant to, and in accordance with, this Plan. Holders of Superpriority DIP Claims and holders of First Lien Claims entitled to receive Reorganized Equity pursuant to this Plan shall be permitted to direct distributions of their Reorganized Equity to designees with the consent of the Required Consenting Stakeholders.

All of the shares (or comparable units) of Reorganized Equity issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable and shall be issued in book-entry form. Each distribution and issuance of Reorganized Equity shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of Reorganized Equity shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, without the need for execution by any party thereto other than the applicable Reorganized Debtor(s). The Reorganized Equity will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not be required to meet the eligibility requirements of DTC. Additional information relating to the applicability of the securities Laws is available in Article IV. L

The forms of the New Organizational Documents shall be included in the Plan Supplement filed ahead of the deadline to object to Confirmation of this Plan.

3.    Exit ABL Facility.

On the Effective Date, the Reorganized Debtors shall enter into the Exit ABL Facility, pursuant to the Exit ABL Facility Documents. Confirmation of this Plan shall constitute (a) approval of the Exit ABL Facility and the Exit ABL Facility Documents; and (b) authorization for the Debtors and the Reorganized Debtors, as applicable, to

take any and all actions necessary or appropriate to consummate the Exit ABL Facility (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), in each case, without any further notice to or order of the Bankruptcy Court.

In the event the Exit ABL Facility is entered into with the ABL Lenders, the ABL Loans may be refinanced by means of a cashless settlement, whereby such ABL Loans shall be converted on a dollar-for-dollar basis into the Exit ABL Loans in accordance with the Exit ABL Facility Documents, and all collateral that secures the ABL Obligations under the ABL Credit Agreement shall be reaffirmed and ratified, and shall automatically secure all obligations under the Exit ABL Facility Documents.

As of the Effective Date, all of the Liens and security interests to be granted by the Debtors in accordance with the Exit ABL Facility Documents:  (a) shall be deemed to be granted in good faith, for legitimate business purposes, and for reasonably equivalent value; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral specified in the Exit ABL Facility Documents; and (c) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.  To the extent provided in the Exit ABL Facility Documents, the Exit ABL Facility Agent is authorized to file with the appropriate authorities, mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests.  The priorities of such Liens and security interests shall be as set forth in the Exit ABL Facility Documents.  The Exit ABL Facility Agent shall be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.  The guarantees granted under the Exit ABL Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy Law.

The material terms of the Exit ABL Facility shall be included in the Plan Supplement filed prior to the deadline to object to Confirmation of this Plan.

E.      *Corporate Existence.*

Except as otherwise provided in this Plan, the Confirmation Order, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated therein, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under this Plan or otherwise, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings, approvals, or consents required under applicable state, provincial, or federal Law).  On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in this Plan or the Confirmation Order, (including to the extent any ABL Loan is refinanced and/or converted into the Exit ABL Facility) on the Effective Date, all property in each Debtors' Estate, all Causes of Action belonging to the Debtors or the Estates, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor or the Unsecured Claims Distribution Trust, as applicable, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances (except for Liens securing obligations under the Exit ABL Facility Documents, and Liens securing Other Secured Claims that are Reinstated pursuant to this Plan, as applicable).  On and after the Effective Date, except as otherwise provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.  For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound down and liquidated in connection with the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum) shall be treated as being liable on any Claim that is discharged pursuant to this Plan or the Confirmation Order.

G.      *Cancellation of Existing Securities, Agreements, and Interests.*

On the Effective Date, except to the extent otherwise provided in this Plan or the Confirmation Order (including to the extent any ABL Loan is refinanced and/or converted into the Exit ABL Facility), as applicable, all notes, instruments, certificates, credit agreements, note purchase agreements, indentures, and other documents evidencing Claims (other than those Reinstated Claims) or Existing Equity Interests, shall, be cancelled, and all obligations and liabilities, actions, suits, accounts or demands, covenants, and indemnities (both actual and contingent) thereunder, including those of any non-Debtor Affiliates thereunder, or in any way related thereto, shall be deemed satisfied in full, released, cancelled, discharged, and of no force or effect, without any need for further action or approval by the Bankruptcy Court or for a Holder to take further action, and the Agents/Trustees and their respective agents, successors and assigns, shall each be automatically and fully released and discharged of and from all duties and obligations thereunder.

Holders of or parties to such cancelled instruments, Existing Equity Interests, and other documentation will have no rights arising from or relating to such instruments, Interests, and other documentation, or the cancellation thereof, except the rights provided for or reserved pursuant to this Plan.  Notwithstanding anything to the contrary herein, but subject to any applicable provisions of <u>Article VI</u> hereof, the Prepetition Finance Documents and the DIP Documents shall continue in effect after the Effective Date to the extent necessary to:  (a) permit Holders of Claims under the Prepetition Finance Documents and the DIP Documents to receive and accept their respective distributions on account of such Claims, if any; (b) permit the Disbursing Agent or the Agents/Trustees, as applicable, to make distributions on account of the Allowed Claims under the Prepetition Finance Documents and the DIP Documents; (c) preserve any rights of the Agents/Trustees, to maintain, exercise, and enforce any applicable rights of indemnity, expense reimbursement, priority of payment, contribution, subrogation, or any other similar claim or entitlement (whether such claims accrued before or after the Effective Date), and preserve any exculpations of the Agents/Trustees, all of which shall remain fully enforceable against the Reorganized Debtors and all other applicable Persons under the Prepetition Finance Documents and the DIP Documents; (d) permit the Agents/Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including to enforce the respective obligations owed to them under this Plan and to enforce any obligations owed to their respective Holders of Claims under this Plan in accordance with the applicable Prepetition Finance Documents and the DIP Documents; and (e) permit the Agents/Trustees to perform any functions that are necessary to effectuate the foregoing; *provided, however*, that (1) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in this Plan (including clause (c) of the preceding proviso), and (2) except as otherwise provided in this Plan, the terms and provisions of this Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under this Plan.  For the avoidance of doubt, the Prepetition Finance Documents and the DIP Documents shall continue in full force and effect (other than any Liens or other security interests terminated pursuant to this section) after the Effective Date with respect to any contingent or unsatisfied obligations and any other provisions that expressly survive the cancellation of the Prepetition Finance Documents and the termination of the DIP Facility in accordance with the terms of the DIP Documents.

If the record holder of any of the Senior Unsecured Notes Claims, the Cayman Notes Claims, the Intercompany Note Claims, the Senior Secured Notes Claims, or the Exchange Notes Claims is DTC or its nominee or another securities depository or custodian thereof, and such underlying Securities are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of Senior Unsecured Notes Claims, Cayman Notes Claims, Intercompany Note Claims, Senior Secured Notes Claims, or Exchange Notes Claims shall be deemed to have surrendered such Holder's Securities underlying such Senior Unsecured Notes Claims, Cayman Notes Claims, Intercompany Note Claims, Senior Secured Notes Claims, or Exchange Notes Claims upon surrender of such global security by DTC or such other securities depository or custodian thereof.

H.      *Unsecured Claims Distribution Trust.*

On or before the Effective Date, the Debtors and the Unsecured Claims Distribution Trustee shall enter into the Unsecured Claims Distribution Trust Agreement and, on the Effective Date, the Unsecured Claims Distribution Trust Assets shall vest or be deemed to be vested in the Unsecured Claims Distribution Trust irrevocably and automatically without further action by any Person or Entity, free and clear of all Claims, Liens, and Interests, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax. Under no circumstance shall the Debtors or the Reorganized Debtors or any other party be required to contribute any additional assets to the Unsecured Claims Distribution Trust other than the Unsecured Claims Distribution Trust Assets. After the Effective Date, neither the Debtors, Reorganized Debtors, nor any other party shall have any interest in the Unsecured Claims Distribution Trust Assets except as expressly set forth herein. For the avoidance of doubt, the Holders of any First Lien Deficiency Claims shall not be Unsecured Claims Distribution Trust Beneficiaries and shall have no interest in the Unsecured Claims Distribution Trust.

The Debtors and the Reorganized Debtors shall make their employees and books and records reasonably available to the Unsecured Claims Distribution Trustee and any professionals retained by the Unsecured Claims Distribution Trust (at the sole cost and expense of the Unsecured Claims Distribution Trust in the case of any third party service providers reasonably needed by the Debtors or the Reorganized Debtors to provide such information, with such cost and expense to be disclosed in advance to the Unsecured Claims Distribution Trustee) to retrieve and access data reasonably necessary to investigate, review, and reconcile General Unsecured Claims and investigate, pursue or otherwise dispose of the Assigned Preference Actions. To the extent the Unsecured Claims Distribution Trust receives information from the Debtors or the Reorganized Debtors in connection with the General Unsecured Claims, the Unsecured Claims Distribution Trust's receipt of such documents, information, or communications shall not constitute a waiver of any privilege. All privileges shall remain in the control of the Debtors or the Reorganized Debtors, as applicable, and the Debtors or the Reorganized Debtors, as applicable, retain the sole right to waive their own privileges. Reasonable agreements will be made with the Unsecured Claims Distribution Trustee such that confidential information and privileges are preserved, while permitting the Unsecured Claims Distribution Trustee to use, as necessary to administer the Unsecured Claims Distribution Trust, such information and privilege; absent such agreements, either the Unsecured Claims Distribution Trustee or the Reorganized Debtors may present the issue to the Bankruptcy Court for resolution.

The Unsecured Claims Distribution Trust shall be governed by the Unsecured Claims Distribution Trust Agreement and administered by the Unsecured Claims Distribution Trustee. The Unsecured Claims Distribution Trustee shall be chosen by the Committee, and the Unsecured Claims Distribution Trustee's identity and compensation shall be identified in the Plan Supplement. The powers, rights, and responsibilities of the Unsecured Claims Distribution Trustee shall be specified in the Unsecured Claims Distribution Trust Agreement and shall include, without limitation, the authority and responsibility to take the actions set forth in this <u>Article IV.H</u>. Among other things, the Unsecured Claims Distribution Trustee shall have the power and authority to (a) distribute and allocate the Unsecured Claims Distribution Trust Net Assets to the Unsecured Claims Distribution Trust Beneficiaries on account of such beneficiaries' Unsecured Claims Distribution Trust Beneficial Interests in accordance with the treatment set forth in this Plan for Class 9, (b) investigate, prosecute, compromise, adjust, arbitrate, sue on, abandon, dismiss, or otherwise resolve, settle, or litigate Assigned Preference Actions, and (c) enter into any contingency fee agreements or litigation funding agreements as may be necessary in the Unsecured Claims Distribution Trustee's reasonable discretion to liquidate any claims or causes of action included in the Unsecured Claims Distribution Trust Assets; *provided*, however, any such funding agreement must be on market terms and subject to Bankruptcy Court approval. For the avoidance of doubt, the Unsecured Claims Distribution Trustee shall have the sole discretion to release any

Assigned Preference Action.  In the event of any conflict between the terms of this Plan and the Unsecured Claims Distribution Trust Agreement, the terms of this Plan shall govern.

From and after the Effective Date, the Unsecured Claims Distribution Trustee, on behalf of the Unsecured Claims Distribution Trust, shall, in the ordinary course of business and without the need for any approval by the Bankruptcy Court, pay the Unsecured Claims Distribution Trust Fees and Expenses solely from the Unsecured Claims Distribution Trust Assets.  The Debtors, the Reorganized Debtors, and their Affiliates (and anyone acting on their behalf) shall not be responsible for any costs, fees, or expenses of the Unsecured Claims Distribution Trust.  The Unsecured Claims Distribution Trustee and the Unsecured Claims Distribution Trust shall be discharged or dissolved, as the case may be, such time as all distributions required to be made by the Unsecured Claims Distribution Trustee under this Plan have been made, but in no event later than the fifth anniversary of the Effective Date (unless extended by order of the Bankruptcy Court).  Upon dissolution of the Unsecured Claims Distribution Trust, any remaining Unsecured Claims Distribution Trust Net Assets shall be distributed to all Holders of Allowed General Unsecured Claims in accordance with the Plan and the Unsecured Claims Distribution Trust Agreement as appropriate.

I.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under this Plan (including under the Restructuring Transactions Memorandum and the other documents contained in the Plan Supplement) shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate, Governing Body, or equity holder action, including, as and if applicable:  (i) selection of the directors, including the New Board, officers, or managers of the Reorganized Debtors in accordance with the New Organizational Documents; (ii) the authorization, issuance and distribution of the Reorganized Equity; (iii) implementation of the Restructuring Transactions; (iv) the entry into the Exit ABL Facility Documents and the execution, delivery, and filing of any documents pertaining thereto; (v) all other actions contemplated under this Plan (whether to occur before, on, or after the Effective Date); (vi) adoption of the New Organizational Documents; (vii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (viii) the authorization and reservation of the MIP Shares; (ix) formation of the Reorganized Debtors; (x) adoption or assumption, as applicable, of the Compensation and Benefits Programs and all obligations related thereto; (xi) formation of the Unsecured Claims Distribution Trust, issuance of the Unsecured Claims Distribution Trust Beneficial Interests, execution and delivery of the Unsecured Claims Distribution Trust Agreement, and the vesting of the Unsecured Claims Distribution Trust Assets in the Unsecured Claims Distribution Trust; and (xii) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by this Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors, as applicable, in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Holders of Existing Equity Interests or Holders of Reorganized Equity, members directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable.  On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed, without any further corporate, Governing Body, or equity holder action, to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Reorganized Debtors, including the Reorganized Equity, the Exit ABL Facility Documents, the New Organizational Documents, any other Definitive Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this <u>Article IV.H</u> shall be effective notwithstanding any requirements under non-bankruptcy Law.

J.      *New Organizational Documents.*

On or immediately prior to the Effective Date, except as otherwise provided in this Plan and subject to local Law requirements, the New Organizational Documents shall be adopted or amended as may be necessary to effectuate the transactions contemplated by this Plan.  To the extent required under this Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Organizational Documents with the secretaries of state and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate Laws of the respective state, province, or country of incorporation to the extent such filing is required for each such

document.  The New Organizational Documents will, among other things (a) authorize the issuance of the Reorganized Equity and (b) prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the Laws of its jurisdiction of formation and the terms of such documents, and the Reorganized Debtors may file such amended certificates or articles of incorporation or other applicable formation and constituent documents as permitted by the Laws of the applicable states, provinces, or countries of incorporation or formation and the New Organizational Documents.  For the avoidance of doubt, any Holder's acceptance of the Reorganized Equity shall be deemed to constitute its agreement to be bound by the New Organizational Documents without the need for execution by any party other than the Reorganized Debtors.

From and after the Effective Date, all Holders of Reorganized Equity shall be subject to the terms and conditions of the New Organizational Documents.  On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Organizational Documents to each Holder of Reorganized Equity, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Holders of Reorganized Equity shall be deemed to have executed the New Organizational Documents and be parties thereto, without the need to deliver signature pages thereto.

The forms of the New Organizational Documents shall be included in the Plan Supplement filed ahead of the deadline to object to Confirmation of this Plan.

K.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of each of the Debtors shall expire, such current members shall be deemed to have resigned, and the members of the board of directors or other Governing Body for the initial term of the New Board and the other Governing Bodies shall be appointed in accordance with the New Organizational Documents.  The New Board will consist of seven directors and include:  (a) the CEO; and (b) six directors selected as follows, in each case, in consultation with the CEO, (i) four directors selected by Redwood Capital Management, LLC, (ii) one director selected by Anchorage Capital Advisors, L.P., and (iii) one director selected by Farallon Capital Advisors, L.L.C.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and each officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

L.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, the Exit ABL Facility Documents entered into, and the Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

M.      *Certain Securities Law Matters.*

Any Reorganized Equity issued under this Plan will be issued (a) to the fullest extent permitted and applicable, without registration under the Securities Act or similar federal, state or local Laws in reliance on the exemption set forth in section 1145 of the Bankruptcy Code or (b) to the extent section 1145 is not permitted or applicable, pursuant to other applicable exemptions under the Securities Act.  For the avoidance of doubt, the MIP Shares will not be issued in reliance on section 1145 of the Bankruptcy Code.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the Reorganized Equity in reliance on the exemption set forth in section 1145 of the Bankruptcy Code shall be exempt from, among

other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local Laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

Such shares of Reorganized Equity issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code (a) will not be "restricted securities" as defined in rule 144(a)(3) under the Securities Act, and (b) will be freely tradable and transferable in the United States by each recipient thereof that (i) is an entity that is not an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code, (ii) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (iii) has not been such an "affiliate" within 90 days of the time of the transfer, and (iv) has not acquired such securities from an "affiliate" within one year of the time of transfer. Notwithstanding the foregoing, the shares of Reorganized Equity issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code will remain subject to compliance with applicable securities Laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities and subject to any restrictions in the New Organizational Documents. The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities Laws shall not be a condition to the occurrence of the Effective Date.

Any Reorganized Equity that cannot be issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code, including the MIP Shares, will be offered, issued, and distributed in reliance upon 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and subject to any restrictions on the transferability of such Reorganized Equity in the New Organizational Documents.

The Debtors recommend that potential recipients of Securities issued under this Plan consult their own counsel concerning their ability to freely trade such Securities in compliance with the federal securities Laws and any applicable "Blue Sky" laws. The Debtors make no representation concerning the ability of a person to dispose of such Securities.

The Reorganized Debtors need not provide any further evidence other than this Plan or the Confirmation Order to any Entity (including DTC or any transfer agent for the Reorganized Equity) with respect to the treatment of the Reorganized Equity to be issued under this Plan under applicable securities Laws. DTC and any transfer agent for the Reorganized Equity shall be required to accept and conclusively rely upon this Plan and Confirmation Order in lieu of a legal opinion regarding whether the Reorganized Equity to be issued under this Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable). Notwithstanding anything to the contrary in this Plan, no Entity (including DTC and any transfer agent for the Reorganized Equity) may require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the Reorganized Equity to be issued under this Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

N.    Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor, as applicable, or to or from any other Person) of property under this Plan or pursuant to (i) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, including the Reorganized Equity, (ii) the Restructuring Transactions, (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (iv) the making, assignment, or recording of any lease or sublease, (v) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit ABL Facility, or (vi) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental

officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.       *Private Company.*

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private companies on the Effective Date and the Reorganized Equity shall not be listed on a recognized U.S. stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC or any other securities regulatory body, and (iii) shall not be required to list the Reorganized Equity on a recognized U.S. stock exchange, except in each case (if at all), as otherwise may be required pursuant to the New Organizational Documents.

P.       *Director and Officer Liability Insurance.*

Notwithstanding anything in this Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in this Plan, Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under this Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors, and officers remain in such positions on or after the Effective Date.

Q.       *Management Incentive Plan.*

On or within 90 days of the Effective Date, the New Board shall adopt the Management Incentive Plan, which will provide up to 10% of the Reorganized Equity (on a fully diluted and fully distributed basis) for management and the New Board of the Reorganized Debtors, which may be granted in any form acceptable to the New Board, including without limitation, in the form of options, restricted stock, restricted stock units, stock appreciations rights, or any combination thereof.

R.       *Employment Obligations.*

On the Effective Date, the Reorganized Debtors will either assume or reject the existing agreements with the current members of the senior management team of the Debtors, or will enter into new compensation arrangements, as applicable, on the Effective Date with some or all such individuals who agree to such new arrangements, which assumption or rejection must be approved by the Required Consenting Stakeholders and which new arrangements, as applicable, must be acceptable to the Reorganized Debtors and the Required Consenting Stakeholders.

S.       *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to <u>Article VIII</u> hereof, the Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and

the Reorganized Debtors' or Unsecured Claims Distribution Trust's, as applicable, rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of this Plan to the contrary, other than the Causes of Action released or exculpated herein by the Debtors pursuant to the releases and exculpations contained in this Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, as of the Effective Date.  The Schedule of Retained Causes of Action shall specify which Assigned Preference Actions shall be deemed transferred to the Unsecured Claims Distribution Trust on the Effective Date.

The Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Unsecured Claims Distribution Trustee, as applicable.  **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, will not pursue any and all available retained Causes of Action against it.  The Debtors, the Reorganized Debtors, and the Unsecured Claims Distribution Trust, as applicable, expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity, except as otherwise expressly provided in this Plan.**  The Reorganized Debtors and the Unsecured Claims Distribution Trustee, as applicable, may settle any such retained Cause of Action without further notice to or action, order, or approval of the Bankruptcy Court.  Unless any retained Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Final Order, the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, expressly reserve all retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor or the Unsecured Claims Distribution Trust, as applicable, except as otherwise expressly provided in this Plan.  The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such retained Causes of Action.  The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.R include any Claim or Cause of Action against a Released Party or Exculpated Party that is subject to release or exculpation under the terms of this Plan.

*T.*     *Tax Returns.*

After the Effective Date, the Reorganized Debtors shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

*U.*     *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, the Committee shall dissolve, and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; *provided*, however, that following the Effective Date, the Committee shall continue to have standing and a right to be heard solely with respect to Professional Fee Claims.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date except with respect to fees and expenses incurred by the Committee's Professionals after the Effective Date relating to the defense and prosecution of the Committee's Professional Fee Claims; *provided* however, that in no event shall the Reorganized Debtors be

responsible for paying the Committee's Professional Fee Claims in excess of the amount set forth for such fees and expenses in the Approved Budget (as defined in the DIP Orders).

V.      *Cashless Transactions.*

Notwithstanding anything to the contrary set forth herein, the treatment of Claims, distributions, and other transactions contemplated hereby including, without limitation, the funding of the Exit ABL Facility, if any, may, at the election of the applicable participating parties, be effectuated by netting or other form of cashless implementation.

W.      *Release of Ordinary Course Avoidance Actions*

Notwithstanding anything to the contrary in this Plan, on the Effective Date, the Debtors, on behalf of themselves and their Estates, shall release any and all Avoidance Actions against Ordinary Course Non-Insider Counterparties (including, without limitation, vendors, landlords, and other parties) arising from transactions conducted in the ordinary course of business, *provided* such release shall only apply to counterparties that continue to do business with the Reorganized Debtors in the ordinary course following the Effective Date.  For the avoidance of doubt, nothing in this Article IV.W shall be deemed to limit the Unsecured Claims Distribution Trustee's ability to settle, litigate, or otherwise address any Assigned Preference Claims under this Plan.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in this Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code, each Executory Contract or Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically assumed *unless* such Executory Contract or Unexpired Lease: (i) is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases, (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject Filed on or before the Effective Date; or (iv) is an insurance policy (which shall be treated in accordance with <u>Article V.E</u>); *provided* that the assumption, assumption and assignment, or rejection of all Executory Contracts and Unexpired Leases shall be subject to the consent of the Required Consenting Stakeholders (not to be unreasonably withheld, conditioned, or delayed).    Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all assumptions, assumptions and assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided for in this Plan, the Plan Supplement, and the Confirmation Order, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to this Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed (or assumed and assigned) Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.    Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in this Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including 45 days after the Effective Date; *provided* that such alteration, amendment, modification, or supplement shall be subject to the consent rights set forth herein.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

B.    *Indemnification Obligations.*

Subject to the Bankruptcy Court's entry of the Confirmation Order approving the releases as contemplated in this Plan, all indemnification provisions, consistent with applicable law, currently in place as of the Effective Date, including under the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise for the benefit of current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as of the Effective Date, as applicable, shall:  (a) to the extent permitted by applicable law (i) be reinstated and remain intact, irrevocable, and shall survive the Effective Date, on terms no less favorable to such current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date, and (ii) shall be assumed by the Reorganized Debtors; or (b) to the extent not permitted to be assumed by applicable law, shall be included in the New Organizational Documents of the Reorganized Debtors on terms no less favorable to such directors, officers, managers, and employees than the indemnification provisions in place prior to the Effective Date.

For the avoidance of doubt, nothing herein shall expand any of the Debtors' indemnification obligations in place as of the Petition Date or constitute a finding or conclusion that any party that may seek indemnification is entitled to indemnification under the terms of such indemnification provisions or is intended to effectuate the survival of any indemnification obligations for any party other than the current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as of the Effective Date.

C.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim based on the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court and served on the Debtors or, after the Effective Date, the Reorganized Debtors, as applicable, no later than 30 days after the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation order) approving such rejection, and (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease.  The notice of the Plan Supplement shall be deemed appropriate notice of rejection when served on applicable parties.

**Any Claim arising from the rejection of an Executory Contract or Unexpired Lease with respect to which a Proof of Claim is not Filed with the Bankruptcy Court within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, the Unsecured Claims Distribution Trust, or their property without the need for any objection by the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim**

**arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged and shall be subject to the permanent injunction set forth in Article VIII.F of this Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim as set forth in Article III.B of this Plan and may be objected to in accordance with the provisions of Article VII of this Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules. For the avoidance of doubt, nothing provided herein shall extend or modify any previously established deadline to File a claim arising from the rejection of an Executory Contract or Unexpired Lease previously rejected by the Debtors.

D.       *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter in the ordinary course of business. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to a proposed assumption, including pursuant to this Plan, or related Cure amount must be Filed, served, and actually received by counsel to the Debtors and the U.S. Trustee no later than the deadline to object to Confirmation of this Plan or any other deadline that may be set by the Bankruptcy Court. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, as applicable, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors, as applicable, of the applicable Cure costs; *provided, however,* that nothing herein shall prevent the Reorganized Debtors from paying any Cure costs despite the failure of the relevant counterparty to File such request for payment of such Cure costs. The Reorganized Debtors also may settle any Cure costs without any further notice to or action, order, or approval of the Bankruptcy Court. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or such other setting as requested by the Debtors for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure costs shall occur as soon as reasonably practicable after (i) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (ii) as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors and the Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute. If a Cure Claim, as ruled by the Bankruptcy Court, is more than what was proposed by the Debtors, the Debtors and the Reorganized Debtors reserve the right to reject such Executory Contract or Unexpired Lease. The Debtors shall include a non-exhaustive Schedule of Assumed Executory Contracts and Unexpired Leases that will include proposed Cure costs in the Plan Supplement.

Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise and payment of any applicable Cure cost pursuant to this Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

E.     *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under this Plan.  Unless otherwise provided in this Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (ii) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors and all obligations of the Debtors under such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall continue as obligations of the Reorganized Debtors.

F.     *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases including, for the avoidance of doubt, rights to indemnification or contribution in respect of product liability or claims arising under any rejected Executory Contract or rejected Unexpired Lease.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

G.     *Employee Compensation and Benefits.*

1.     Compensation and Benefits Programs.

Except as otherwise set forth herein, on the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall assume all Employment Agreements, which shall thereafter be assigned to the Reorganized Debtors. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Subject to the provisions of this Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under this Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:  (a) all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Interests, Existing Equity Interests, or Reorganized Equity, which shall not constitute or be deemed to constitute Executory Contracts and shall be deemed terminated on the Effective Date; (b) Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court; and (c) Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

A counterparty to a Compensation and Benefits Program assumed pursuant to this Plan shall have the same rights under such Compensation and Benefits Program as such counterparty had thereunder immediately prior to such assumption (unless otherwise agreed by such counterparty and the applicable Reorganized Debtor(s)).

2.     Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under:  (a) all applicable workers' compensation Laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance.  All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable Law, including non-bankruptcy Law with respect to any such contracts, agreements, policies, programs, and plans; *provided, further,* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable non-bankruptcy Law.

*H.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Final Order of the Bankruptcy Court to the contrary.

*I.      Reservation of Rights.*

Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under this Plan.

*J.      Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

*K.      Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtor liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A.      Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in this Plan, on the Effective Date, or as soon as reasonably practicable thereafter (or, if a Claim or Interest is not an Allowed Claim on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class. Specifically with respect to Holders of Allowed General Unsecured Claims (but, for the avoidance of doubt, excluding any Holders of First Lien Deficiency Claims), each such Holder shall receive, upon completion of the Claims reconciliation process, its Pro Rata Share of Unsecured Claims Distribution Trust Beneficial Interests in accordance with Article III.B.9 of this Plan and the Unsecured Claims Distribution Trust Agreement. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in this Plan, Holders of Allowed Claims

or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. For the avoidance of doubt, distributions on account of General Unsecured Claims shall be governed by the Unsecured Claims Distribution Trust Agreement.

Notwithstanding the foregoing, (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Allowed Priority Tax Claims shall be paid in accordance with <u>Article II.B</u> of this Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy Law or in the ordinary course of business.

B.      *Disbursing Agent.*

All distributions under this Plan shall be made by the Disbursing Agent or the Unsecured Claims Distribution Trustee, acting on behalf of the Unsecured Claims Distribution Trust, as applicable, on the Effective Date or at such other time as provided for in this Plan. The Disbursing Agent and the Unsecured Claims Distribution Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent or the Unsecured Claims Distribution Trustee is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors or the Unsecured Claims Distribution Trustee, respectively. For the avoidance of doubt, the Unsecured Claims Distribution Trustee may, in its sole discretion, retain or employ a disbursing agent, which may be the Disbursing Agent, in accordance with the Unsecured Claims Distribution Trust Agreement.

All Plan distributions to any Disbursing Agent on behalf of the Holders of Claims listed on the Claims Register (or the designees of such Holders, as applicable) shall be deemed completed by the Debtors when received by such Disbursing Agent. Distributions under this Plan shall be made to any such Holders (or the designees of such Holders, as applicable) by the applicable Disbursing Agent.

Notwithstanding any provision in this Plan to the contrary, the Trustees, acting in their respective capacity as a Disbursing Agent, may, to the extent applicable, transfer or direct the transfer of distributions to be made via DTC directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under this Plan with the respective Holders of such Claims to the extent consistent with the customary practices of DTC. Notwithstanding anything to the contrary herein, such distributions shall be subject in all respects to any rights of the Trustees to assert a charging lien against such distributions. To the extent any distributions are to be made through DTC, such distributions shall be made eligible for distribution through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Trustees be responsible for making or required to make any such distributions under this Plan if such distributions are not eligible to be distributed through the facilities of DTC.

C.      *Rights and Powers of Disbursing Agent.*

1.      <u>Powers of the Disbursing Agent.</u>

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.   Fees of Disbursing Agent and Expenses Incurred on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.  Notwithstanding anything herein to the contrary, each potential recipient of the Reorganized Equity pursuant to this Plan shall be required to deliver information sufficient, in the reasonable determination of the Disbursing Agent (with the consent of the Required Consenting Stakeholders), to permit the issuance of the Reorganized Equity in book-entry form in accordance with the New Organizational Documents on the Effective Date, in each case, by no later than the Distribution Record Date or by such alter date agreed to by the Debtors with the consent of the Required Consenting Stakeholders.

D.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.   Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date (or the designees of such Holders, as applicable).

2.   Delivery of Distributions in General.

Except as otherwise provided herein or in the Plan Supplement, the Disbursing Agent or the Unsecured Claims Distribution Trustee, as applicable, shall make distributions to Holders of Allowed Claims, as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate: (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors, the Disbursing Agent, or the Unsecured Claims Distribution Trustee, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

For the avoidance of doubt, the Distribution Record Date shall not apply to Securities held through DTC, which shall receive distributions in accordance with the applicable procedures of DTC.

3.   Minimum Distribution; No Fractional Distributions.

In the discretion of the Reorganized Debtors or the Unsecured Claims Distribution Trustee, as applicable, (x) no cash payments of less than $250 and (y) no distribution and issuance of Reorganized Equity to any single Holder of Allowed Claims whose aggregate sum of Reorganized Equity to be distributed to such holder would be worth less than $250 value shall be made, in each case, to a Holder of an Allowed Claim (taken together with such Holder's affiliates for the purposes of the foregoing calculations) on account of such Allowed Claim.  No fractional shares of Reorganized Equity shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to this Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of Reorganized Equity that is not a whole number, the actual distribution of shares of Reorganized Equity shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of Reorganized Equity to be distributed under this Plan shall be adjusted as necessary to account for the foregoing rounding.

4.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Interests (as applicable) is returned as undeliverable, no distribution to such Holder (or its designees, as applicable) shall be made unless and until the

Disbursing Agent or the Unsecured Claims Distribution Trustee, as applicable, is notified in writing of such Holder's (or its designee, as applicable) then-current address or other necessary information for delivery (including all signatures, certificates, and other documents that are required of the Holder to receive such distribution), at which time such distribution shall be made to such Holder (or its designee, as applicable) on the next distribution date without interest. Undeliverable distributions shall remain in the possession of the Reorganized Debtors, or the Unsecured Claims Distribution Trust (in the case of distributions from the Unsecured Claims Distribution Trust Net Assets), as applicable, until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to this Article VI.D.4, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

Any distribution under this Plan that is an Unclaimed Distribution or remains undeliverable (including due to such Holder not delivering all signatures, certificates, and other documents that are required of the Holder to receive such distribution) for a period of 90 days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution or undeliverable distribution shall revest in the applicable Reorganized Debtor automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property Laws to the contrary) and, to the extent such Unclaimed Distribution is comprised of Reorganized Equity, such Reorganized Equity shall be cancelled unless determined otherwise by the New Board. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary. The Disbursing Agent shall adjust the distributions of Reorganized Equity to reflect any such cancellation.

Subject to Article III herein, any distribution under this Plan on account of a Class 9 General Unsecured Claim that constitutes an Unclaimed Distribution or remains undeliverable for a period of 90 days after distribution shall not revest in the applicable Reorganized Debtor, and instead shall revest in the Unsecured Claims Distribution Trust and be distributed for the benefit of other Unsecured Claims Distribution Trust Beneficiaries in accordance with Article III of this Plan. For the avoidance of doubt, treatment of undeliverable distributions on account of General Unsecured Claims shall be governed by the Unsecured Claims Distribution Trust Agreement.

E.      *Surrender and Cancelled Instruments or Securities.*

On the Effective Date, or as soon as reasonably practicable thereafter, each Holder (and the applicable Agents for such Holder, including the Agents/Trustees) of a certificate or instrument evidencing a Claim or an Equity Interest that has been cancelled in accordance with Article IV.G hereof, shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and any non-Debtor Affiliates, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties (other than the non-Debtor Affiliates) in respect of one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for the purposes of allowing Holders to receive distributions under this Plan, charging Liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary in this Plan, the foregoing shall not apply to certificates or instruments evidencing Claims that are Unimpaired under this Plan.

F.      *Manner of Payment.*

Except as otherwise provided in this Plan, or any agreement, instrument, or other document incorporated herein, all distributions of the Reorganized Equity to the Holders of the applicable Allowed Claims (or its designees, as applicable), in each case if any, under this Plan shall be made by the Disbursing Agent on behalf of the Debtors or the Reorganized Debtors, as applicable.

All distributions of Cash to the Holders of the applicable Allowed Claims, in each case if any, under this Plan shall be made by the Disbursing Agent or the Unsecured Claims Distribution Trustee, as applicable, on behalf of the applicable Debtor or Reorganized Debtor, as applicable.

At the option of the Disbursing Agent or the Unsecured Claims Distribution Trustee, as applicable, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

G.      *Compliance with Tax Requirements.*

In connection with this Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Disbursing Agent, the Unsecured Claims Distribution Trust, and any applicable withholding or reporting agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and the Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances. A General Unsecured Claim may be deemed disallowed in the event no written response is received to a request for tax identification information by the Unsecured Claims Distribution Trust upon not less than 90 days' notice.

H.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in this Plan, the DIP Orders, or the Confirmation Order, or required by the Bankruptcy Code or applicable non-bankruptcy Law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

J.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than United States dollars shall be automatically deemed converted to the equivalent United States dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Petition Date.

K.      *Setoffs.*

Except as expressly provided in this Plan, each Reorganized Debtor or the Unsecured Claims Distribution Trustee, as applicable, may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all Claims, rights, and Causes of Action that such Reorganized Debtor or the Unsecured Claims Distribution Trustee, as applicable, may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (i) agreed in amount among the relevant Reorganized Debtor(s) or the Unsecured Claims Distribution Trustee, as applicable, and the Holder of the Allowed Claim or (ii) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor or the Unsecured Claims Distribution Trustee, as applicable, of any and all Claims, rights, and Causes of Action that such Reorganized Debtor or its successor or the Unsecured Claims

Distribution Trustee, as applicable, may possess against the applicable Holder.  In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors or the Unsecured Claims Distribution Trustee, as applicable, in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

L.      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties.

The Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trustee, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or the Unsecured Claims Distribution Trust, as applicable.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or the Unsecured Claims Distribution Trust, as applicable, on account of such Claim, such Holder shall, within five Business Days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor or the Unsecured Claims Distribution Trust (in the case of distributions from the Unsecured Claims Distribution Trust Net Assets), to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor or the Unsecured Claims Distribution Trust (in the case of distribution from the Unsecured Claims Distribution Trust Net Assets) annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the five Business Day grace period specified above until the amount is fully repaid.

2.      Claims Payable by Third Parties.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy or is found liable for satisfying in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything to the contrary contained herein (including Article III of this Plan), nothing contained in this Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Disputed Claims Process.*

Except as otherwise provided in a Final Order (including the DIP Orders), the Debtors (subject to the consent of the Required Consenting Stakeholders), the Reorganized Debtors, or the Unsecured Claims Distribution Trustee, as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file,

settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan. **Except as otherwise provided herein, all Proofs of Claim Filed after the earlier of: (a) the Effective Date; or (b) the Claims Bar Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor, any Reorganized Debtor, and/or the Unsecured Claims Distribution Trust, as applicable, without the need for any objection by the Debtor, the Reorganized Debtors, or the Unsecured Claims Distribution Trustee, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors or the Unsecured Claims Distribution Trust (solely with respect to General Unsecured Claims) shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be Allowed under applicable non-bankruptcy Law. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim unless and until such Claim or Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed on or prior to the applicable Claims Bar Date, or that is not or has not been Allowed by this Plan or a Final Order is not considered Allowed and shall be disallowed and expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in this Plan, after the Effective Date, the Reorganized Debtors or the Unsecured Claims Distribution Trustee (solely with respect to General Unsecured Claims), as applicable, shall have the sole authority: (i) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (ii) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor, or the Unsecured Claims Distribution Trust, as applicable, shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to this Plan.

Notwithstanding the foregoing, the Debtors, the Reorganized Debtors, and the Unsecured Claims Distribution Trust (solely with respect to General Unsecured Claims), as applicable, shall be entitled to dispute and/or otherwise object to any Claim in accordance with applicable non-bankruptcy Law.

To the extent a Claim is Filed against the Debtors that asserts Claims in more than one Class or asserting multiple priorities, the Reorganized Debtors and the Unsecured Claims Distribution Trust shall cooperate in good faith on an efficient method to address, object to, or otherwise administer such Claim. The Reorganized Debtors will not seek to reclassify any Claim as a General Unsecured Claim without either the consent of the Unsecured Claims Distribution Trustee (which consent shall not be unreasonably withheld) or an order of the Bankruptcy Court.

D.      *Estimation of Claims.*

Before or after the Effective Date, the Debtors (with the consent of the Required Consenting Stakeholders), the Reorganized Debtors, or the Unsecured Claims Distribution Trustee, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to

such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the appeal relating to such objection.  Notwithstanding any provision otherwise in this Plan, a Disputed Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under this Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to the allowance of, or any ultimate distribution on, such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 14 days after the date on which such Disputed Claim is estimated.

E.      *Adjustment to Claims without Objection.*

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to this Plan) on the Claims Register by the Reorganized Debtors, the Claims and Noticing Agent, and/or the Unsecured Claims Distribution Trust (with respect to General Unsecured Claims), as applicable, without the Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Bankruptcy Court upon a motion by the Debtors or the Reorganized Debtors, as applicable, *provided* that the deadline to object to Claims shall automatically be extended pending the Bankruptcy Court's ruling on such motion.

G.      *Disallowance of Claims.*

All Claims of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors, as applicable, allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed pursuant to section 502(d) of the Bankruptcy Code if:  (i) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (ii) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

H.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of this Plan, if any portion of a Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

I.      *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan, and as applicable, the Unsecured Claims Distribution Trust Agreement.  On or as soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent or the Unsecured Claims Distribution Trustee, as applicable, shall provide to the Holder of such Claim the distribution

(if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy Law.

J.      *Single Satisfaction of Claims.*

Holders of Allowed Claims may assert such Claims against the Debtor(s) obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the applicable Debtor(s) based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under this Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan or the Confirmation Order, including the Plan Supplement and Definitive Documents, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action (including any Causes of Action or Claims based on theories or allegations of successor liability) that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted this Plan. Except as otherwise provided herein, any default by the Debtors or their non-Debtor Affiliates with respect to any Claim or Interest existing immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Reinstated Claims) and Interests (other than any Intercompany Interests that are Reinstated), subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan.

B.      **Release of Liens.**

**Except as otherwise provided in the Exit ABL Facility Documents, this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a secured claim or any related claim that may be asserted against a non-Debtor Affiliate, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any non-Debtor Affiliate shall be fully released and discharged, and all of the right, benefit, title, and interest of any Holder (and the applicable Agents of such Holder, including the Agents/Trustees) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns. Any Holder of such secured claim or claim against a non-Debtor Affiliate (and the applicable agents for such Holder, including the Agents/Trustees) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or**

**other property of any Debtor or non-Debtor Affiliate (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder, including the Agents/Trustees) and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, at the sole cost and expense of the Reorganized Debtors, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

*C.*      *Releases by the Debtors.*

**Except as otherwise specifically provided in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Released Party is deemed, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of each and all of the Debtors, their Estates, and the Reorganized Debtors in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, and the Reorganized Debtors, whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein-after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the Restructuring Transactions, the Chapter 11 Cases, the Debtors' in- or out- of- court restructuring efforts, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the RSA, the DIP Facility, the DIP Documents, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, this Plan, the Plan Supplement or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, this Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement under the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided*, *however*, that, nothing in this <u>Article VIII.C</u> shall be construed to release the Released Parties from any criminal act or intentional fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order.**

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under this Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contribution to facilitating the Restructuring Transactions and implementing this Plan; (ii) a good faith settlement and compromise of the Claims and Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for a hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtor, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.      *Releases by Holders of Claims and Interests.*

Except as otherwise specifically provided in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Releasing Party is deemed to have, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, and their Estates (as applicable) whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the purchase, sale, or recission of any Security of the Debtors or the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the RSA, the DIP Facility, the DIP Documents, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, this Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, this Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under this Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the Confirmation of this Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing this Plan; (iv) a good faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for a hearing; and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

Without limiting the foregoing, from and after the Effective Date, any Entity that votes to accept this Plan or that is given the opportunity to opt into the releases contained in this Plan and exercises such opportunity to opt into the releases may not assert any claim, Claim, or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors. From and after the Effective Date, any such Entity may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in this Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in this Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in this Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

E.      *Exculpation.*

Except as otherwise expressly provided in this Plan or the Confirmation Order, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Claim or Cause of Action arising between the Petition Date and the Effective Date prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, this Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the filing of the Chapter 11 Cases, the negotiation and pursuit of the RSA, the Definitive Document, the Plan Supplement, the Exit ABL Facility Documents, or the filing of the Chapter 11 Cases, the participation in the DIP Facility, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to this Plan and, therefore, are not, and on account of such distributions will not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.

The Exculpated Parties have, and upon consummation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

F.      *Injunction.*

Except as otherwise specifically provided in this Plan or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, settled, or are subject to exculpation under this Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Causes of Action, Claims or Interests; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Causes of Action, Claims or Interests; (iv) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities, in each case, on account of or in connection with or with respect to any such Causes of Action, Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims or Interests released, discharged, subject to exculpation, or settled pursuant to this Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan.  Each Holder of an Allowed Claim by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action released, discharged, settled, or that is subject to exculpation pursuant to this Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, subject to Article IV.H hereof, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (i) such Claim has been adjudicated as non-contingent or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN**

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      the Bankruptcy Court shall have entered the Confirmation Order and such order shall be (a) in form and substance materially consistent with the RSA (subject to all consent rights therein), (b) acceptable to the Debtors and Required Consenting Stakeholders, and (c) a Final Order (or such requirement shall be waived by the Required Consenting Stakeholders);

2.      each document or agreement constituting the applicable Definitive Documents shall (a) have been executed and/or effectuated and remain in full force and effect, (b) be in form and substance reasonably acceptable or acceptable (as applicable) to the Debtors, the Required Consenting Stakeholders, and the Consenting Sponsor (in accordance with the terms of the RSA) and (c) be materially consistent with the RSA, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

3.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring Transactions and this Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

4.      all governmental and third-party approvals and consents that may be necessary in connection with the Restructuring Transactions shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on the Restructuring Transactions;

5.      no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing, or prohibiting the consummation of any of the Restructuring Transactions;

6.      the RSA shall be in full force and effect, no termination event or event that would give rise to a termination event under the RSA upon the expiration of the applicable grace period shall have occurred, and the RSA shall not have been validly terminated prior to the Effective Date;

7.      the steps to cancel the Existing Interests and, subject to the consent of the Required Consenting Stakeholders, not unreasonably withheld, any Intercompany Interests and/or Intercompany Claims shall be completed in accordance with the Restructuring Transactions Memorandum;

8.      the Reorganized Equity shall have been issued by the Reorganized Debtors in accordance with the Restructuring Transactions Memorandum which will be reasonably acceptable to the Debtors and Required Consenting Stakeholders;

9.    the Reorganized Debtors shall have entered into the Exit ABL Facility on terms reasonably acceptable to the Debtors and the Required Consenting Stakeholders;

10. the Unsecured Claims Distribution Trust Agreement shall have been executed and the Unsecured Claims Distribution Trust Assets shall have vested or be deemed to have vested in the Unsecured Claims Distribution Trust;

11.    the Debtors shall have previously entered into new leases or modifications or amendments to existing leases (or rejected existing leases) with the combined aggregate effect of reducing rental costs (through reductions in base rent or otherwise) by an amount and on terms acceptable to the Debtors and the Required Consenting Stakeholders;

12.    no Tariff Event shall have occurred;

13.    on the Effective Date, after giving effect to any distributions or other payments to be made pursuant to this Plan (including the funding of any applicable reserves or payments of Administrative Claims) on or as soon as practicable after the Effective Date, the Reorganized Debtors shall have access to liquidity on terms reasonably acceptable to the Required Consenting Stakeholders;

14.    the releases and exculpation materially consistent with the terms of this Plan shall have gone into full force and effect; and

15.    (a) all of the reasonable and documented fees and expenses payable to the Ad Hoc Group, the DIP Secured Parties, the ABL Secured Parties and the Pari First Lien Secured Parties (as defined in the DIP Orders) under the RSA and the DIP Documents shall have been paid in full; and (b) all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account.

B.    *Waiver of Conditions.*

The conditions to the Effective Date set forth in this Article IX may be waived in whole or in part at any time by the Debtors only with the prior written consent (email shall suffice) of the Required Consenting Stakeholders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.

C.    *Effect of Failure of Conditions.*

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in the RSA, this Plan, or the Disclosure Statement shall: (i) constitute a waiver or release by the Debtors or any Holder of Claims or Interests of any Claim or Interest; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

D.    *Substantial Consummation.*

"Substantial Consummation" of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the RSA and the consent rights set forth therein, the Debtors reserve the right to modify this Plan with the consent of the Required Consenting Stakeholders, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in this Plan and the RSA, and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, to alter, amend, or modify this Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the RSA and with the consent of the Required Consenting Stakeholders, the Debtors reserve the right to revoke or withdraw this Plan, including the right to revoke or withdraw this Plan for any or all of the Debtors, prior to the Confirmation Date and to File subsequent plans of reorganization.  In such event, the Classes pertaining to such Debtor(s) shall be removed from this Plan, and this Plan shall omit any treatment of the assets and liabilities of such Debtor(s).  The removal of any Debtor from this Plan shall not affect this Plan with respect to any other Debtor.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then: (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain, and including the Allowance or disallowance, of all or any portion of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (iii) nothing contained in this Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of such Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

3.          resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease to the maximum extent permitted under applicable law; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed, assumed and assigned, or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.          grant any consensual request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

5.          ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

6.          adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.          adjudicate, decide, or resolve any and all matters related to sections 1141and 1145 of the Bankruptcy Code;

8.          enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

9.          enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.         resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

11.         issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan;

12.         resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, discharges, exculpations, and other provisions contained in this Plan, including under Article VIII hereof, whether arising prior to or after the Effective Date, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

13.         resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

14.         hear and determine all disputes relating to or arising out of the administration of the Unsecured Claims Distribution Trust;

15.         enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.         determine any other matters that may arise in connection with or relate to this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan, the Plan Supplement, or the Disclosure Statement;

17.        enter an order concluding or closing the Chapter 11 Cases;

18.        adjudicate any and all disputes arising from or relating to distributions under this Plan or any transactions contemplated herein;

19.        consider any modifications of this Plan, to Cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.        determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

21.        hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

22.        hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.        hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

24.        enforce all orders previously entered by the Bankruptcy Court; and

25.        hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article IXI to the contrary, the New Organizational Documents and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.        *Immediate Binding Effect.*

Subject to Article IX.A hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or Interest has voted on this Plan.

B.        *Additional Documents.*

Subject to and in accordance with the RSA, on or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan.  The Debtors, the Reorganized Debtors, and the Unsecured Claims Distribution Trust, as applicable, and all Holders of Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

C.      *Reservation of Rights.*

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

D.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of such Entity.

E.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.   if to the Debtors, to:

        At Home Group Inc.
        Meredith Hampton, General Counsel

        with copies to:

        Kirkland & Ellis LLP
        601 Lexington Avenue
        New York, NY 10022
        Attention: Nicole Greenblatt, P.C.
                Matthew Fagen, P.C.
                Elizabeth Jones
        E-mail:   nicole.greenblatt@kirkland.com
                matthew.fagen@kirkland.com
                elizabeth.jones@kirkland.com

        -and-

        Young Conaway Stargatt & Taylor, LLP
        1000 North King Street
        Wilmington, DE 19801
        Attention: Robert S. Brady
                Joseph M. Mulvihill
                Timothy R. Powell
        E-mail:    rbrady@ycst.com
                jmulvihill@ycst.com
                tpowell@ycst.com

2.   <u>if to the Ad Hoc Group, to</u>:

     Dechert LLP
     1095 Avenue of the Americas
     New York, NY 10036
     Attention: Stephen Zide
              Eric Hilmo
     E-mail:   Stephen.Zide@dechert.com
              Eric.Hilmo@dechert.com

3.   <u>if to the Consenting Sponsor, to</u>:

     Fried, Frank, Harris, Shriver & Jacobson LLP
     One New York Plaza
     New York, New York 10004
     Attention: Rachel Strickland
              Erin Ryan
     E-mail:   Rachel.Strickland@friedfrank.com
              Erin.Ryan@friedfrank.com

4.   <u>If to the ABL Lenders, to</u>:

     Choate, Hall & Stewart LLP
     Two International Place
     Boston, Massachusetts 02110
     Attention: Kevin J. Simard
              Mark D. Silva
     E-mail:   ksimard@choate.com
              msilva@choate.com
     -and-

     Reed Smith LLP
     1201 North Market Street, Suite 1500
     Wilmington, DE 19801
     Attention: Kurt F. Gwynne
     E-mail:   kgwynne@reedsmith.com

5.   <u>If to the U.S. Trustee, to</u>:

     Office of the United States Trustee for the District of Delaware
     844 King Street, Suite 2207, Lockbox 35
     Wilmington, DE 19801
     Attention: Jon Lipshie
              Megan Seliber
     E-mail:   jon.lipshie@usdoj.gov
              megan.seliber@usdoj.gov

6.   <u>If to the Committee, to</u>:

     Pachulski, Stang, Ziehl & Jones LLP
     1700 Broadway, 36th Floor
     New York, NY 10019
     Attention:  Robert J. Feinstein
              Judith Elkin
              Shirley S. Cho

Email:    rfeinstein@pszjlaw.com
          jelkin@pszjlaw.com
          scho@pszjlaw.com

After the Effective Date, the Reorganized Debtors have authority to notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.    *Enforcement of Confirmation Order.*

On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to enforce the terms of the Confirmation Order and this Plan (which shall include, for the avoidance of doubt, the Plan Supplement).

G.    *Term of Injunctions or Stays.*

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect from and after the Effective Date in accordance with their terms.

H.    *Entire Agreement.*

Except as otherwise indicated, this Plan (including the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

I.    *Exhibits.*

All exhibits and documents included in the Plan Supplement are an integral part of this Plan and are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://omniagentsolutions.com/AtHome or the Bankruptcy Court's website at https://www.deb.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the Plan Supplement exhibit or document shall control.

J.    *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to this Plan and may not be deleted or modified without the Debtors' or the Reorganized Debtors' consent, as applicable; and (iii) nonseverable and mutually dependent.

K.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan and any previous plan, and, therefore, no such parties nor individuals or the Reorganized Debtors will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and any previous plan.

L.      *Closing of Chapter 11 Cases.*

For the avoidance of doubt, upon the occurrence of the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall be permitted, subject to the Filing of any appropriate motion by the Reorganized Debtors and reasonable consultation in advance with the Unsecured Claims Distribution Trustee, to close all of the Chapter 11 Cases except one, and all contested matters relating to any of the Debtors, including objections to Claims and any adversary proceedings, shall be administered and heard in such remaining Chapter 11 Case, irrespective of whether such Claim(s) were Filed or such adversary proceedings was commenced against a Debtor whose Chapter 11 Case was closed.

M.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

N.      *Creditor Default.*

An act or omission by a Holder of a Claim or Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan.  Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default.  Upon the finding of such a default by a Holder of a Claim or Interest, the Bankruptcy Court may:  (a) designate a party to appear, sign, and/or accept the documents required under this Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce this Plan by order of specific performance; (c) award a judgment against such defaulting Holder of a Claim or Interest in favor of the Reorganized Debtors in an amount, including interest, if applicable, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of this Plan.

O.      *Removal or Abandonment of Third Parties' Property.*

Nothing in this Plan shall impose upon the Reorganized Debtors any obligation to store or protect any third party's property, all of which property will be deemed abandoned and surrendered to the Reorganized Debtors if such property has not been removed (by its owner in a commercially reasonable manner, and with insurance to cover any damage from such removal) from any real property owned or leased by the Reorganized Debtors within 45 days after Confirmation of this Plan.  Following the abandonment and surrender of any such property, the Reorganized Debtors may sell, transfer, assign, scrap, abandon, or otherwise dispose of such property and retain any proceeds resulting therefrom.

*[Remainder of page intentionally left blank.]*

Dated:  August 19, 2025

AT HOME GROUP INC.
on behalf of itself and all other Debtors

By: */s/  Jeremy Aguilar*
    Name:  Jeremy Aguilar
    Title:  Authorized Signatory