*Solicitation Version*

---

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AT HOME GROUP INC., *et al.*,[1] | ) | Case No. 25-11120 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT RELATING TO THE JOINT PLAN**
**OF REORGANIZATION OF AT HOME GROUP INC. AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (DE Bar No. 2847)
Joseph M. Mulvihill (DE Bar No. 6061)
Timothy R. Powell (DE Bar No. 6894)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:   (302) 571-6600
Facsimile:   (302) 571-1253
Email:      rbrady@ycst.com
           jmulvihill @ycst.com
           tpowell@ycst.com

*Co-Counsel for the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Elizabeth H. Jones (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:      nicole.greenblatt@kirkland.com
           matthew.fagen@kirkland.com
           elizabeth.jones@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

Dated: August 19, 2025

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are:  At Home Group Inc. (9563); Ambience Parent, Inc. (6231); Ambience Intermediate, Inc. (0692); At Home Holding II Inc. (9755); At Home Holding III Inc. (9930); At Home Companies LLC (6921); At Home Stores LLC (4961); At Home RMS Inc. (5235); At Home Gift Card LLC (0357); At Home Procurement Inc. (1777); At Home Properties LLC (2759); At Home Assembly Park Drive Condominium Association (N/A); 1600 East Plano Parkway, LLC (4757); 1944 South Greenfield Road LLC (4377); 2301 Earl Rudder Frwy S LLC (N/A); 3551 S 27th Street LLC (9350); 300 Tanger Outlet Blvd LLC (N/A); 3002 Firewheel Parkway LLC (2759); 2016 Grand Cypress Dr LLC (N/A); 8651 Airport Freeway LLC (0523); Transverse II Development LLC (8595); Rhombus Dev, LLC (4783); 1000 Turtle Creek Drive LLC (9177); 19000 Limestone Commercial Dr, LLC (3711); 4801 183A Toll Road, LLC (3909); 7050 Watts Rd LLC (N/A); 4700 Green Road LLC (9049); 361 Newnan Crossing Bypass LLC (N/A); 4304 West Loop 289 LLC (4302); 10460 SW Fellowship Way LLC (N/A); 1720 N Hardin Blvd LLC (N/A); Compass Creek Parkway LLC (N/A); 10800 Assembly Park Dr LLC (6145); Nodal Acquisitions, LLC (N/A); 15255 N Northsight Blvd LLC (N/A); 3015 W 86th St LLC (N/A); 9570 Fields Ertel Road LLC (N/A); 1376 E. 70th Street LLC (9942); 11501 Bluegrass Parkway LLC (3626); 12990 West Center Road LLC (9396); 334 Chicago Drive, LLC (2864); and 4200 Ambassador Caffery Pkwy LLC (5119).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  9000 Cypress Waters Blvd, Coppell, Texas 75019.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

SOLICITATION OF VOTES ON THE *JOINT PLAN OF REORGANIZATION OF AT HOME GROUP INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* FROM THE HOLDERS OF OUTSTANDING:

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| CLASS 4 | CAYMAN NOTES CLAIMS |
| CLASS 5 | INTERCOMPANY NOTE CLAIMS |
| CLASS 6 | TERM LOAN CLAIMS |
| CLASS 7 | SENIOR SECURED NOTES CLAIMS |
| CLASS 8 | EXCHANGE NOTES CLAIMS |
| CLASS 9 | GENERAL UNSECURED CLAIMS |

IF YOU ARE IN CLASS 4, CLASS 5, CLASS 6, CLASS 7, CLASS 8, OR CLASS 9, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.

**DELIVERY OF BALLOTS**

**CLASS 4, CLASS 5, CLASS 6, CLASS 7, CLASS 8, AND CLASS 9 BALLOTS MAY BE RETURNED BY THE FOLLOWING METHODS:**

**BY REGULAR MAIL, OVERNIGHT MAIL, OR HAND DELIVERY AT:**

**AT HOME GROUP INC.,** *ET AL.* **BALLOT PROCESSING**
**C/O OMNI AGENT SOLUTIONS, INC.**
**5955 DE SOTO AVE., SUITE 100**
**WOODLAND HILLS, CA 91367**

**BY ELECTRONIC ONLINE SUBMISSION VIA OMNI'S ONLINE PORTAL**

**PLEASE VISIT HTTPS://OMNIAGENTSOLUTIONS.COM/ATHOME-BALLOTS AND CLICK ON THE "BALLOTING" SECTION OF THE WEBSITE AND FOLLOW THE DIRECTIONS TO SUBMIT YOUR BALLOT. IF YOU CHOOSE TO SUBMIT YOUR BALLOT VIA OMNI'S E-BALLOT SYSTEM, YOU SHOULD NOT ALSO RETURN A HARD COPY OF YOUR BALLOT.**

**PLEASE CHOOSE ONLY ONE METHOD TO RETURN YOUR BALLOT TO OMNI AGENT SOLUTIONS, INC. ("OMNI" OR THE "CLAIMS AND NOTICING AGENT").**

**FOR HOLDERS OF CAYMAN NOTES CLAIMS, SENIOR SECURED NOTES CLAIMS, AND EXCHANGE NOTES CLAIMS:**

**IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE. PLEASE ALLOW SUFFICIENT TIME FOR YOUR BALLOT TO BE INCLUDED ON A MASTER BALLOT COMPLETED BY YOUR NOMINEE. THE MASTER BALLOT MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT ON OR BEFORE THE VOTING DEADLINE.**

**IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO OMNI, PLEASE COMPLETE THE BALLOT AND RETURN IT PROMPTLY IN THE ENVELOPE PROVIDED SO THAT IT IS ACTUALLY RECEIVED BY OMNI BY THE VOTING DEADLINE.**

**TO VOTE ON THE PLAN, CLASS 4, CLASS 5, CLASS 6, CLASS 7, CLASS 8, AND CLASS 9 BALLOTS MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT BY THE VOTING DEADLINE, WHICH IS 4:00 P.M. (PREVAILING EASTERN TIME) ON SEPTEMBER 18, 2025, AS DIRECTED ON YOUR BALLOT.**

**IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR
VOTING ON THE PLAN:**

YOU CAN CONTACT THE CLAIMS AND NOTICING AGENT BY E-MAIL AT: <u>ATHOMEINQUIRIES@OMNIAGNT.COM</u> (REFERENCING "<u>AT HOME GROUP INC. – SOLICITATION INQUIRY</u>" IN THE SUBJECT LINE).

YOU CAN ALSO CONTACT THE CLAIMS AND NOTICING AGENT BY PHONE TOLL-FREE AT 1 (888) 818-9346 (TOLL FREE/DOMESTIC) OR +1 (747) 293-0014 (INTERNATIONAL).

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, AND INCLUDING ALL EXHIBITS AND SUPPLEMENTS HERETO, THE "DISCLOSURE STATEMENT") TO CERTAIN HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT PLAN OF REORGANIZATION OF AT HOME GROUP INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, AND INCLUDING ALL EXHIBITS AND SUPPLEMENTS THERETO, THE "PLAN").[2]  A COPY OF THE PLAN IS ATTACHED HERETO AS EXHIBIT A AND IS INCORPORATED HEREIN BY REFERENCE.   NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO SUCH RIGHTS SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN, AND RELATED DOCUMENTS.  IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (WHEN AND IF APPROVED) DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS REGARDING THE DEBTORS' FORTHCOMING CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, THE RSA, OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN, THE RSA, OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

---

[2]    Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan or the RSA, as applicable.  **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan shall govern**.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AS OF THE DATE HEREOF OR SPECIFIED THEREIN. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AND THEIR FUTURE RESULTS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER BY THE DEBTORS OR ANY OTHER PARTY. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE OR DISTRIBUTE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT, IN EACH CASE, FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RSA.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT AND DO NOT TAKE RESPONSIBILITY FOR, OR PROVIDE ANY ASSURANCE AS TO THE RELIABILITY OF, ANY OTHER INFORMATION THAT OTHERS MAY GIVE YOU. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE VIII HEREIN, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO ACCEPT OR REJECT THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

FORWARD-LOOKING STATEMENTS

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT, INCLUDING INFORMATION CONCERNING THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF CLAIMS, AMONG OTHER THINGS, THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF UNITED STATES FEDERAL SECURITIES LAWS. FORWARD-LOOKING STATEMENTS INCLUDE ANY STATEMENT THAT DOES NOT DIRECTLY RELATE TO ANY HISTORICAL OR

**CURRENT FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "ANTICIPATE," "ARE CONFIDENT," "ASSUME," "BELIEVE," "CONTINUE," "COULD," "ESTIMATE," "EXPECT," "INTEND," "MAY," "MIGHT," "OUTLOOK," "PLAN," "POTENTIAL," "PREDICT," "SEEK," "SHOULD," "TREND," OR "WILL," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY REGARDING FUTURE EVENTS OR CONDITIONS. FORWARD-LOOKING STATEMENTS ARE BASED ON THE DEBTORS' CURRENT EXPECTATIONS AND ASSUMPTIONS, WHICH MAY NOT PROVE TO BE ACCURATE. THESE STATEMENTS ARE NOT GUARANTEES AND ARE SUBJECT TO RISKS, UNCERTAINTIES AND CHANGES IN CIRCUMSTANCES THAT ARE DIFFICULT TO PREDICT, AND SIGNIFICANT CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. MANY FACTORS COULD CAUSE THE DEBTORS' ACTUAL RESULTS TO DIFFER MATERIALLY AND ADVERSELY FROM ANY OF THESE FORWARD-LOOKING STATEMENTS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, INCLUDING THE FOLLOWING, TO BE FORWARD-LOOKING STATEMENTS:**

- THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN;

- THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE ALTERNATIVE TRANSACTIONS IF THE PLAN IS NOT CONFIRMED;

- THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES;

- THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES;

- THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES;

- THE EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- THE DEBTORS' EXPOSURE TO LITIGATION;

- THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER;

- TAXATION APPLICABLE TO THE DEBTORS AND ADVERSE TAX CHANGES;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY TO SATISFY LIQUIDITY NEEDS DURING THE CHAPTER 11 CASES;

- GENERAL ECONOMIC, BUSINESS, AND BUSINESS CONDITIONS;

- THE DEBTORS' INABILITY TO MAINTAIN RELATIONSHIPS WITH EMPLOYEES AND OTHER THIRD PARTIES AS A RESULT OF THESE CHAPTER 11 CASES OR OTHER FAILURE OF SUCH PARTIES TO COMPLY WITH THEIR CONTRACTUAL OBLIGATIONS;

- INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;

- CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;

- LIMITED ACCESS TO CAPITAL RESOURCES;

- OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES AND INTERNATIONALLY, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;

- FLUCTUATIONS IN OPERATING COSTS;

- PLANS, OBJECTIVES, AND EXPECTATIONS;

- FLUCTUATIONS IN TARIFFS, INTEREST RATES, AND CURRENCY VALUES; AND

- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' OR COMPANY'S FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' OR COMPANY'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; OBJECTIONS TO THE PLAN AND THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; RISKS ASSOCIATED WITH THIRD-PARTY MOTIONS IN THE CHAPTER 11 CASES; BANKRUPTCY COURT RULINGS IN THE CHAPTER 11 CASES AND THE OUTCOME OF THE CHAPTER 11 CASES IN GENERAL; OTHER LITIGATION AND INHERENT RISKS INVOLVED IN A BANKRUPTCY PROCESS; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE AND ADDRESS THEIR DEBT SERVICE OBLIGATIONS; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' BUSINESS, FINANCIAL CONDITION, LIQUIDITY AND RESULTS OF OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES, INCLUDING INCREASED LEGAL AND OTHER PROFESSIONAL COSTS NECESSARY TO EXECUTE THE DEBTORS' REORGANIZATION; THE LENGTH OF TIME THAT THE COMPANY WILL OPERATE UNDER CHAPTER 11 PROTECTION AND THE CONTINUED AVAILABILITY OF OPERATING CAPITAL DURING THE PENDENCY OF THE CHAPTER 11 CASES; THE COMPANY'S ABILITY TO COMPLY WITH THE RESTRICTIONS IMPOSED BY THE COVENANTS, TERMS AND CONDITIONS OF ITS FINANCING ARRANGEMENTS; EMPLOYEE ATTRITION AND THE COMPANY'S ABILITY TO RETAIN KEY EXECUTIVE MANAGEMENT AND OTHER PERSONNEL DUE TO THE DISTRACTIONS AND UNCERTAINTIES RESULTING FROM THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES AND THE COMPANY'S ABILITY TO MAINTAIN RELATIONSHIPS WITH SUPPLIERS, CUSTOMERS, EMPLOYEES AND OTHER THIRD**

PARTIES AND REGULATORY AUTHORITIES AS A RESULT OF THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; PANDEMICS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESS. THESE FACTORS SHOULD NOT BE CONSTRUED AS EXHAUSTIVE AND SHOULD BE READ IN CONJUNCTION WITH THE ADDITIONAL INFORMATION AND DISCUSSION OF OTHER RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT. THE DEBTORS UNDERTAKE NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS INCLUDED IN THIS DISCLOSURE STATEMENT AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF CLAIMS AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE. WE UNDERTAKE NO OBLIGATION TO UPDATE OR REVISE THE FORWARD LOOKING STATEMENTS INCLUDED IN THIS DISCLOSURE STATEMENT, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

# TABLE OF CONTENTS

Page

I.     **INTRODUCTION** ............................................................................................... 1

II.    **PRELIMINARY STATEMENT.** ....................................................................... 1

III.   **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN** ............................................................................ 4

    A.     What is chapter 11? ........................................................................................ 4

    B.     What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ............... 4

    C.     Why are the Debtors sending me this Disclosure Statement? ........................... 5

    D.     Am I entitled to vote on the Plan? ................................................................. 5

    E.     What will I receive from the Debtors if the Plan is consummated? .................. 6

    F.     What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, Superpriority DIP Claim, or Professional Fee Claim? ..................... 11

    G.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" .............................................................................. 14

    H.     What are the sources of Cash and other consideration required to fund the Plan? ........... 14

    I.     How does the Plan treat Executory Contracts and Unexpired Leases? ........... 14

    J.     Are any regulatory approvals required to consummate the Plan? .................. 15

    K.     Are there risks to owning the Reorganized Equity upon the Debtors' emergence from chapter 11? ......................................................................................... 15

    L.     Is there potential litigation related to the Plan? ............................................ 15

    M.    What happens to my recovery if the Plan is not confirmed or does not go effective? ......................................................................................................... 15

    N.     What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan? ............................................................................... 16

    O.     Does the Plan preserve Causes of Action? ................................................... 16

    P.     Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan? ......................................................................................... 17

    Q.     Do I have to grant the releases under the Plan? ............................................ 25

    R.     What are the consequences of not opting in to the releases provided by the Plan? .......... 25

    S.     What are the consequences of opting in to the releases provided by the Plan? .............. 25

    T.     Does the Bankruptcy Code protect against discriminatory treatment? ........... 26

    U.     Will the Company retain documents after any Effective Date? ..................... 26

    V.     What is the effect of Reimbursement or Contribution? ................................. 26

    W.    What is the deadline to vote on the Plan? ..................................................... 26

    X.     How do I vote for or against the Plan? .......................................................... 26

    Y.     Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation hearing set to occur? ............................................................... 27

    Z.     What is the purpose of the Confirmation Hearing? ....................................... 27

    AA.   What is the effect of the Plan on the Debtors' ongoing business? .................. 27

    BB.   Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors? ....................................................... 28

    CC.   Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ................................................................................. 28

    DD.   Who Supports the Plan? ................................................................................ 28

    EE.   Do the Debtors recommend voting in favor of the Plan? .............................. 29

ix

| IV. | OVERVIEW OF THE PLAN. | 29 |
|---|---|---|
| **V.** | **CORPORATE HISTORY AND BUSINESS OPERATIONS** | **43** |
| | A. Corporate History | 43 |
| | B. Business Operations | 44 |
| | C. At Home's Prepetition Capital Structure | 46 |
| **VI.** | **EVENTS LEADING TO THESE CHAPTER 11 FILINGS** | **47** |
| | A. Business Challenges | 47 |
| | B. The Company's Prepetition Initiatives | 50 |
| **VII.** | **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** | **53** |
| | A. First and Second Day Relief | 53 |
| | B. Appointment of the Committee | 58 |
| | C. Retention of Professionals | 58 |
| | D. Bar Dates | 60 |
| | E. The Disinterested Directors' Investigation | 60 |
| **VIII.** | **RISK FACTORS** | **62** |
| | A. Bankruptcy Law Considerations | 63 |
| | B. Risks Related to Recoveries Under the Plan | 68 |
| | C. Risks Related to the Debtors' and the Reorganized Debtors' Business | 69 |
| | D. Risks Related to the Offer and Issuance of Securities Under the Plan | 73 |
| **IX.** | **SOLICITATION AND VOTING PROCEDURES** | **75** |
| | A. Holders of Claims Entitled to Vote on the Plan | 75 |
| | B. Voting Record Date. | 75 |
| | C. Voting Deadline | 75 |
| | D. Ballots Not Counted | 76 |
| **X.** | **CONFIRMATION OF THE PLAN** | **76** |
| | A. Requirements for Confirmation of the Plan | 76 |
| | B. Best Interests of Creditors/Liquidation Analysis. | 76 |
| | C. Feasibility | 77 |
| | D. Acceptance by Impaired Classes | 77 |
| | E. Confirmation Without Acceptance by All Impaired Classes | 78 |
| | F. Valuation Analysis | 79 |
| **XI.** | **CERTAIN SECURITIES LAW MATTERS** | **79** |
| | A. Reorganized Equity | 79 |
| | B. Exemption from Registration Requirements; Issuance of Reorganized Equity Under the Plan | 79 |
| | C. Resales of Reorganized Equity; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code | 80 |

**XII.**   **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.** ...................................................................................................................... **83**

    A.    Introduction ................................................................................................................ 83

    B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors .......................................................................................... 85

    C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Claims ....................................................................................................................... 89

    D.    Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Claims ................................................................................................................... 91

    E.    Information Reporting and Back-Up Withholding ........................................................ 96

**XIII.**  **RECOMMENDATION** ..................................................................................................... **96**

## EXHIBITS[3]

EXHIBIT A     Plan of Reorganization

EXHIBIT B     Financial Projections

EXHIBIT C     Valuation Analysis

EXHIBIT D     Liquidation Analysis

EXHIBIT E     Restructuring Support Agreement

---

[3]     Each Exhibit is incorporated herein by reference.

I.      **INTRODUCTION**.

At Home Group Inc. and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>" and, together with their non-Debtor affiliates, "<u>At Home</u>" or the "<u>Company</u>"), are pursuing proposed restructuring transactions (the "<u>Restructuring Transactions</u>") pursuant to the terms and conditions set forth in that certain Restructuring Support Agreement by and among the Company and the Consenting Stakeholders (as may be amended, supplemented, or otherwise modified from time to time, and including all schedules, exhibits, and annexes thereto, the "<u>RSA</u>"), a copy of which is attached hereto as **Exhibit E**.  The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes to accept or reject the Plan.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS, THE COMMITTEE, AND THE CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RSA BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  ACCORDINGLY, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

II.     **PRELIMINARY STATEMENT.**

At Home is a home décor and furnishings brand that offers its customers a broad assortment of everyday and seasonal products for any room in the home.  At Home's merchandise is sold to its millions of customers through its approximately 260 large format retail locations across 40 states and the Company's e-commerce website.  The Company employs over 7,000 employees throughout the nation and with its deep-rooted expertise in design, product development, sourcing, and merchandising strategies, has solidified its position as a leading destination for home décor and furnishings with potential to continue growing its market share.

Over the past few years, At Home has experienced a series of unprecedented challenges.  As the COVID-19 pandemic subsided, the Company, like many retailers, dealt with a number of financial and operational headwinds in 2022, including:  (a) inflationary cost pressures driven primarily by dramatically elevated industry-wide freight rates; (b) softening demand in the home décor market following a surge in demand during the pandemic; and (c) shifting consumer preferences away from brick-and-mortar locations and towards online shopping.  Accordingly, in May 2023, At Home completed a $200 million new money capital raise and unsecured senior notes exchange.  Despite this infusion of new cash, unprecedented global impacts continued to frustrate the Company's existing business plan.  In response, the Company took a number of proactive steps, including implementing cost and liquidity management initiatives, recruiting a new senior management team, and recalibrating At Home's operational focus.

With new management in place, in early 2025, the Company recognized its acute need to improve liquidity.  In January 2025, At Home initiated discussions with the ABL Agent who raised concerns with the Company's existing liquidity constraints and likely inability to address its upcoming maturities under the ABL Credit Agreement.  In addition, the Company retained AlixPartners, LLP, ("<u>AlixPartners</u>"), PJT Partners LP, ("<u>PJT</u>"), and Kirkland & Ellis LLP ("<u>Kirkland</u>") as advisors, appointed two disinterested

directors to the boards of directors of certain Debtors (collectively, the "Parent Boards"),[4] and formed a special committee (the "Special Committee") to evaluate strategic alternatives.  In late February and March 2025, the Company, with the assistance of its advisors, began exploring financing options and soliciting proposals from existing and new investors.  In March 2025, the Company commenced negotiations with an ad hoc group initially comprised of Redwood Capital Management, LLC, Farallon Capital Advisors, L.L.C., and Anchorage Capital Advisors, L.P. (together with all subsequent members joining the ad hoc group, the "Ad Hoc Group") on a possible comprehensive restructuring that would deleverage the Company and raise a new money investment.

In the midst of the Company's attempts to address its liquidity situation and during the early stages of the management team's transformation strategy, tariffs began to adversely impact the retail industry.  At Home, a company that relies heavily on foreign suppliers, was—and remains—significantly impacted by new tariff policies, which intensified the financial pressure on the Company and accelerated the need for a comprehensive solution.  As such, the Company determined that the best path forward to address its liquidity position and maximize value for all stakeholders was to continue to engage with the Ad Hoc Group on a comprehensive restructuring of the Company.

In the months leading up to the Petition Date, the Company engaged in good faith arm's-length negotiations that included extensive diligence and meetings with the Ad Hoc Group.  As a result of those negotiations, on June 16, 2025, the Debtors entered into an RSA with the Ad Hoc Group and other lenders and noteholders that collectively hold approximately 96% of the Company's first lien debt,[5] pursuant to which the Debtors are effectuating the Restructuring Transactions through "prearranged" Chapter 11 Cases. The key terms of the RSA, which are incorporated into the Plan, include:

- the Debtors' entry into financing arrangements to provide funding throughout the duration of these Chapter 11 Cases in the form of (a) a priming superpriority senior secured debtor-in-possession financing multi-draw term loan (the "DIP Facility") comprised of a $200 million new money commitment and a $400 million roll-up of the Pari First Lien Obligations (as defined in the DIP Orders) and (b) the consensual use of cash collateral;

- the conversion of Allowed Superpriority DIP Claims into 98% of the Reorganized Common Stock upon emergence from the Chapter 11 Cases subject to dilution by the MIP Shares;

- each Holder of an ABL Facility Claim receiving payment in full;

- each Holder of an Allowed Secured Claim arising out of its Allowed First Lien Claim receiving its Pro Rata Share of the First Lien Equity Distribution comprised of all remaining Reorganized Common Stock after giving effect to the DIP Equity Conversion (subject to dilution by the MIP Shares);

- each Holder of an Allowed General Unsecured Claim receiving its pro rata share of the Unsecured Claims Distribution Trust Beneficial Interests;

---

[4]    The Parent Boards include the boards of:  Ambience Parent, Inc.; Ambience Intermediate, Inc.; At Home Group Inc.; At Home Holding II Inc.; and At Home Holding III Inc.

[5]    In May 2025, the Ad Hoc Group expanded to include three additional parties, Silver Rock Financial and its relying advisors (together, "Silver Rock") Aryeh Capital Management Ltd., and Glendon Capital Management L.P.

- the cancellation of Existing Equity Interests;

- funding for plan distributions in the form of a new, exit asset-based loan facility to be entered into by the Reorganized Debtors on the Effective Date; and

- the adoption of the Management Incentive Plan by the New Board within 90 days of the Effective Date, which will provide up to 10% of the Reorganized Equity for management and the New Board.

On June 16, 2025 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to consummate the Restructuring Transactions contemplated in the RSA. At a hearing held on June 17, 2025, the Bankruptcy Court granted all the relief the Debtors requested in their First Day Motions on an interim or final basis, including approving the DIP Facility on an interim basis and authorizing the Debtors to continue using their cash management system, pay the prepetition wages and salaries of their employees, maintain and administer their customer programs, maintain insurance, pay the prepetition claims of critical vendors, and provide adequate assurance for future utility services.

Since the Petition Date, the RSA and Restructuring Transactions have continued to gain support. As of the date of the filing of this Disclosure Statement, holders of approximately 100% of the Company's first lien debt and holders of approximately 89% of the Company's Senior Unsecured Notes Obligations (as defined in the Plan) are party to the RSA.

The RSA and Plan are structured to support At Home's ongoing commitment to its customers, business partners, and stakeholders while strengthening the business as a going-concern. With the support of their lenders and other key stakeholders, the Debtors seek authority to move through the chapter 11 process efficiently to minimize disruption to the business and the accrual of administrative expenses. The RSA includes certain milestones to expedite these Chapter 11 Cases, including:

- the Bankruptcy Court shall enter the Final DIP Order no later than 35 days after the Petition Date;

- the Bankruptcy Court shall enter the Disclosure Statement Order no later than 38 days after the filing of the Plan and Disclosure Statement;

- the Bankruptcy Court shall enter the Confirmation Order no later than 60 days after the entry of the Disclosure Statement Order; and

- the confirmed Plan shall become effective no later than 14 days after the entry of the Confirmation Order.

The Plan includes customary debtor and third-party releases. The Disinterested Directors, with the assistance of Young Conaway, conducted an independent investigation to assess the merits and potential value of any potential claims and Causes of Action held by the Company against any Related Party or otherwise related to any conflicts matter, as further explained in **Article VII.E** of this Disclosure Statement. Based on the results of the Investigation, the Debtors believe the Plan, and the transactions, settlements, and compromises embodied therein, are the best alternative available to the Estates. The releases, exculpation, and injunction are an integral component of the Plan, which provides significant distributions of value to administrative, priority, secured, and unsecured creditors. Unless otherwise explicitly released

under the Plan or separate order of the Bankruptcy Court, all other unencumbered assets, including Estates Claims and Causes of Action, are being preserved by the Plan.

The Debtors, with broad support across their capital structure, strongly believe that the deleveraging and liquidity-enhancing Restructuring Transactions contemplated by the RSA and the Plan are in the best interest of the Debtors' Estates and represent the best available alternative to the Company at this time. In particular, the Plan provides a more favorable alternative to the Debtors' creditors than a potential liquidation of the Debtors' estates. If the Debtors' business were liquidated in a chapter 7 process, for example, creditors likely would receive lower recoveries because the value-maximizing Restructuring Transactions may not be consummated and the Debtors' Estates would necessarily bear additional costs associated with transitioning to chapter 7, retaining a chapter 7 trustee, counsel, and advisors, and administering a chapter 7 process. Given the Debtors' core strengths and strong customer relationships, the Debtors are confident that they can implement the Restructuring Transactions contemplated by the Plan and the RSA to ensure the Debtors' long-term viability. Ultimately, confirmation of the Plan will enable At Home to eliminate approximately $1.620 billion of the Company's existing $1.998 billion in debt and emerge from chapter 11 in a better position than ever to remain a leading destination in the home décor and furnishings market.

> **FOR THESE REASONS, THE DEBTORS STRONGLY RECOMMEND THAT HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN <u>VOTE TO ACCEPT</u> THE PLAN**.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN.

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly-situated equity holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" until a chapter 11 plan is consummated.

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?

As described in **Article VI** of this Disclosure Statement, as well as in the *Declaration of Jeremy Aguilar, Chief Financial Officer of At Home Group Inc. and Certain of its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 4] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to proposals for a new "first-in last-out" facility and a standalone financing, to provide stability and requisite capital to their business enterprise.

## C.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires that the Debtors prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such Disclosure Statement with all Holders of Claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

## D.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ABL Facility Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | Cayman Notes Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Note Claims | Impaired | Entitled to Vote |
| Class 6 | Term Loan Claims | Impaired | Entitled to Vote |
| Class 7 | Senior Secured Notes Claims | Impaired | Entitled to Vote |
| Class 8 | Exchange Notes Claims | Impaired | Entitled to Vote |
| Class 9 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 10 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 11 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 12 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 13 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth above in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth therein shall apply separately to each of the Debtors (except for the Class 12 Existing Equity Interests, which shall apply only to Ambience Parent, Inc.). All of the potential Classes for the Debtors are set forth in the Plan. Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

### E.    What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan. Any estimates of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court, or otherwise. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

As discussed further herein, the RSA provides for repayment of each Allowed Superiority DIP Claim in full with Reorganized Equity in the amount of its pro rata share of the DIP Equity Conversion (subject to dilution on account of the MIP Shares). All remaining Reorganized Equity after giving effect to the DIP Equity Conversion, shall be valued at the midpoint provided in the Valuation Analysis, distributed pro rata to holders of Allowed First Lien Claims on account of their Allowed Secured Claims in respect thereof, and was used to calculate the projected recoveries set forth below with respect to the Allowed Secured Claims arising out of the Allowed First Lien Claims.[6] As discussed further in Article III.B of the Plan, Holders of an Allowed First Lien Claim, shall have a First Lien Deficiency Claim for the amount remaining after accounting for the recovery on account of the Allowed Secured Claim arising out of their Allowed First Lien Claim, and shall be entitled to vote such Claim, but shall not receive a distribution on behalf of such First Lien Deficiency Claim.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[7]**

| SUMMARY OF ESTIMATED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated % Recovery under the Plan |
| Class 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and | $12,499,677.00 | 100% |

---

[6]    For the avoidance of doubt, estimated recovery percentages under the Plan for Class 4 Cayman Notes Claims, Class 5 Intercompany Note Claims, Class 6 Term Loan Claims, Class 7 Senior Secured Notes Claims, and Class 8 Exchange Note Claims have been estimated at 100% of the Allowed Secured Claim in the form of Reorganized Equity using the midpoint value provided in the Valuation Analysis such that such Claims are impaired on account of receiving Reorganized Equity in lieu of Cash.

[7]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

| | | SUMMARY OF ESTIMATED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated % Recovery under the Plan |
| | | discharge of each Allowed Other Secured Claim, on the Effective Date or as soon as reasonably practicable thereafter, shall receive either:<br><br>(i) payment in full in Cash of its Allowed Other Secured Claim;<br><br>(ii) delivery of the collateral securing its Allowed Other Secured Claim;<br><br>(iii) Reinstatement of its Allowed Other Secured Claim; or<br><br>(iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | | |
| Class 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, on the Effective Date, each Holder of such Allowed Other Priority Claim shall receive treatment in a manner consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | **Subject to reconciliation** | **N/A** |
| Class 3 | ABL Facility Claims | Except to the extent that a Holder of an Allowed ABL Facility Claim agrees to less favorable treatment of its Allowed ABL Facility Claim, on the Effective Date, each Holder of an Allowed ABL Facility Claim will receive, in full and final satisfaction, settlement, release, and discharge of such Allowed ABL Facility Claim, payment in full in Cash with the proceeds of the Exit ABL Facility, including termination and/or cash collateralization of any outstanding letters of credit, cash management obligations, or hedging obligations. | **$377,925,499.82** | **100%** |
| Class 4 | Cayman Notes Claims | Except to the extent that a Holder of an Allowed Cayman Notes Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Cayman Notes Claim shall receive (i) such Holder's Pro Rata Share of the First Lien Equity Distribution and (ii) such Holder's Pro Rata Share of all Class 5 Intercompany Note Claims recoveries distributed to the Trustee in respect of the Cayman Notes in accordance with Article III.B.5(c) of the Plan. | **$8,152.58** | **100%** |

| | | SUMMARY OF ESTIMATED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated % Recovery under the Plan |
| Class 5 | Intercompany Note Claims | Except to the extent that a Holder of an Allowed Intercompany Note Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Intercompany Note Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution; *provided* that such Holder's recovery under the Plan shall be payable to the indenture trustee and collateral agent for the Cayman Notes for distribution to the Holders of the Allowed Cayman Notes Claims in accordance with the documents governing the Cayman Notes only until such Cayman Notes are repaid in full. | $8,152.58 | 100% |
| Class 6 | Term Loan Claims | Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each holder of an Allowed Secured Claim arising out of its Term Loan Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution. | $2,623,466.27 | 100% |
| Class 7 | Senior Secured Notes Claims | Except to the extent that a Holder of an Allowed Senior Secured Notes Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Senior Secured Notes Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution. | $1,866,102.51 | 100% |
| Class 8 | Exchange Notes Claims | Except to the extent that a holder of an Allowed Exchange Notes Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Exchange Notes Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution. | $2,994,126.05 | 100% |

| | | SUMMARY OF ESTIMATED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated % Recovery under the Plan |
| Class 9 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment of its Allowed General Unsecured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim, on the Effective Date, each Holder of any Allowed General Unsecured Claim (other than any Holder of any First Lien Deficiency Claim) shall receive its Pro Rata Share of the Unsecured Claims Distribution Trust Beneficial Interests. For the avoidance of doubt, Holders of First Lien Deficiency Claims shall not receive any Unsecured Claims Distribution Trust Beneficial Interests or any recovery from the Unsecured Claims Distribution Trust or the Unsecured Claims Distribution Trust Net Assets on account of such First Lien Deficiency Claim. | $194,000,000.00[8] | ~2%[9] |
| Class 10 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be (i) reinstated, or (ii) set off, settled, discharged, contributed, cancelled, released, and extinguished and without any distribution on account of such Intercompany Claim, in each case, at the Reorganized Debtors' election with the consent of the Required Consenting Stakeholders. | **Subject to reconciliation** | **None** |
| Class 11 | Intercompany Interests | On the Effective Date, all Intercompany Interests shall be (a) reinstated, or (b) set off, settled, discharged, contributed, cancelled, released, and extinguished and without any distribution on account of such Intercompany Interests, in each case, at the Reorganized Debtors' election with the consent of the Required Consenting Stakeholders. | **N/A** | **None** |

---

[8] The projected allowed amount of General Unsecured Claims is based on the Debtors' books and records as of the date hereof, and all General Unsecured Claims are subject to reconciliation. For the avoidance of doubt, the projected amount of General Unsecured Claims excludes any Claims listed in the Debtors' schedules and statements as contingent, unliquidated, or disputed. Any Claim that is not: (a) paid in full prior to the Effective Date; (b) an Administrative Claim; (c) a Priority Tax Claim; (d) a Superpriority DIP Claim; (e) an Other Priority Claim; (f) an Intercompany Claim; and (g) a Section 510(b) Claim shall be General Unsecured Claims. For the avoidance of doubt, (i) Senior Unsecured Notes Claims, (ii) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, (iii) Unsecured Claims resulting from litigation against one or more of the Debtors, and (iv) the First Lien Deficiency Claims, in each case shall be General Unsecured Claims. The projected allowed amount of General Unsecured Claims excludes the $1,196,000,000.00 in First Lien Deficiency Claims because the Holders of such First Lien Deficiency Claims have agreed to waive their right to recover on account of such claims.

[9] The estimated percentage of recovery to Holders of General Unsecured Claims is calculated based on $3.9 million as provided in the Unsecured Claims Distribution Trust but does not account for any differences that may be calculated by subtracting the (x) the amount of the Allowed fees and expenses of the Committee and its Professionals from (y) the amount set forth for such fees and expenses in the Approved Budget (as defined in the DIP Orders). As such, the estimated percentage of recovery to Holders of General Unsecured Claims is subject to change.

| SUMMARY OF ESTIMATED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated % Recovery under the Plan |
| Class 12 | Existing Equity Interests | On the Effective Date, all Existing Equity Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect. Holders of Existing Equity Interests shall receive no recovery or distribution on account thereof and each Holder of an Existing Equity Interest shall not receive or retain any distribution, property, or other value on account of such Existing Equity Interest. | N/A | None |
| Class 13 | Section 510(b) Claims | On the Effective Date, all Section 510(b) Claims shall be cancelled, released, extinguished, and discharged and will be of no further force or effect. Holders of Section 510(b) Claims shall receive no recovery or distribution on account thereof and each Holder of a Section 510(b) Claim shall not receive or retain any distribution, property, or other value on account of such Section 510(b) Claim. | N/A | None |



F.     **What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, Superpriority DIP Claim, or Professional Fee Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, Superpriority DIP Claims, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.     **Administrative Claims.**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Superpriority DIP Claims, if applicable, Professional Fee Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code) that has not been paid in full prior to the Effective Date, will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Plan, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors by the applicable Administrative Claims Bar Date.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or the Reorganized Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Notwithstanding anything else herein, the Allowed Superpriority DIP Claims shall not be subject to the Administrative Claims Bar Date.

2.     **Priority Tax Claims**.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter).

3.        **Superpriority DIP Claims**.

All Superpriority DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility in accordance with the terms and in the amounts specified under the DIP Orders and the DIP Documents on such date, (ii) all interest accrued and unpaid thereon to the date of payment, and (iii) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Documents and the DIP Orders.

Except to the extent that a Holder of an Allowed Superpriority DIP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Superpriority DIP Claim, each Holder of an Allowed Superpriority DIP Claim, including the DIP Agent, shall receive either (i) payment in full in Cash of its Allowed Superpriority DIP Claim in accordance with the terms and in the amounts specified under the DIP Orders and the DIP Documents, (ii) its pro rata share of the DIP Equity Conversion (subject to dilution on account of the MIP Shares), or (iii) such other treatment as to which the Debtors and the Holders of the Allowed Superpriority DIP Claims will have agreed upon in writing.  For the avoidance of doubt, all accrued and unpaid fees, expenses, and non-contingent indemnification obligations (if any) payable under the DIP Documents and the DIP Orders (including applicable Restructuring Expenses) constituting Superpriority DIP Claims shall be paid in full in Cash on the Effective Date, unless otherwise expressly provided under the applicable DIP Documents.  The Debtors intend to repay the Allowed Superiority DIP Claims in full with Reorganized Equity in the amount of its pro rata share of the DIP Equity Conversion (subject to dilution on account of the MIP Shares).  Holders of Allowed Superpriority DIP Claims that receive Reorganized Equity pursuant to the DIP Equity Conversion shall be permitted to direct distributions of their Reorganized Equity to designees with the consent of the Required Consenting Stakeholders.

Following such satisfaction of the Allowed Superpriority DIP Claims, the DIP Facility, the DIP Documents, and all related loan documents shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case, without further action by the DIP Agent or the DIP Lenders and without further order of the Bankruptcy Court, and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the Superpriority DIP Claims shall be automatically discharged and released, in each case, without further action by the DIP Agent or the DIP Lenders.  At the expense of the Debtors or Reorganized Debtors, the DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

4.        **Professional Fee Claims**.

(a)        **Final Fee Applications and Payment of Professional Fee Claims**.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 60 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the

12

Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

        **(b)**        **Professional Fee Escrow Account**.

No later than the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount including any cash from the Funded Reserve Account (as defined in the DIP Orders). The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors, as applicable. The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

        **(c)**        **Professional Fee Amount**.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors or the Committee before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than three Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional; *provided, however,* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.

        **(d)**        **Post-Confirmation Fees and Expenses**.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. A good faith estimate of the fees owed to Professionals incurred following the Confirmation Date shall be included in the Professional Fee Escrow Account and paid in the ordinary course of business; *provided, however*, that such estimate shall not be deemed to limit the amount of fees and expenses actually incurred by such Professionals.

**G.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived before the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  The "Effective Date" is the date on which (a) all conditions precedent set forth in Article IX of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan and (b) the Plan is declared effective by the Debtors.  "Consummation" of the Plan refers to the occurrence of the Effective Date.  The conditions precedent to the Effective Date are described in Article IX of the Plan.

**H.    What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with:  (1) the Debtors' Cash on hand as of the Effective Date; (2) the Reorganized Equity; and (3) the proceeds from the Exit ABL Facility.  The Unsecured Claims Distribution Trust shall fund its distributions, as contemplated by the Plan and the Unsecured Claims Distribution Trust Agreement, solely from the Unsecured Claims Distribution Trust Net Assets.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the Reorganized Equity, will be exempt from registration under the Securities Act, as described more fully in Article IV.M of the Plan.

**I.    How does the Plan treat Executory Contracts and Unexpired Leases?**

On the Effective Date, except as otherwise provided in the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code, each Executory Contract or Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically assumed *unless* such Executory Contract or Unexpired Lease:  (i) is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases, (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject Filed on or before the Effective Date; or (iv) is an insurance policy (which shall be treated in accordance with Article V.E of the Plan); *provided* that the assumption, assumption and assignment, or rejection of all Executory Contracts and Unexpired Leases shall be subject to the consent of the Required Consenting Stakeholders (not to be unreasonably withheld, conditioned, or delayed).  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all assumptions, assumptions and assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided for in the Plan, the Plan Supplement, and the Confirmation Order, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Except as otherwise specifically set forth in the Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective

Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including 45 days after the Effective Date; *provided* that such alteration, amendment, modification, or supplement shall be subject to the consent rights set forth herein.

**J.      Are any regulatory approvals required to consummate the Plan?**

At this time, there are no known regulatory approvals that are required to consummate the Plan. To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

**K.      Are there risks to owning the Reorganized Equity upon the Debtors' emergence from chapter 11?**

Yes. *See* **Article VIII** of this Disclosure Statement, entitled "Risk Factors," for a discussion of such risks.

**L.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation. *See* **Article VIII.C.6** of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* **Article X.E** of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

**M.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their business efficiently, and distributions to Holders of Allowed Claims may be delayed. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended Chapter 11 Case, or of a liquidation scenario, see **Article VIII.B** of this Disclosure Statement, and the Liquidation Analysis attached hereto as **Exhibit D**.

**N.    What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

On or within 90 days of the Effective Date, the New Board shall adopt the Management Incentive Plan, which will provide up to 10% of the Reorganized Equity (on a fully diluted and fully distributed basis) for management and the New Board of the Reorganized Debtors, which may be granted in any form acceptable to the New Board, including without limitation, in the form of options, restricted stock, restricted stock units, stock appreciations rights, or any combination thereof.

**O.    Does the Plan preserve Causes of Action?**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' or Unsecured Claims Distribution Trust's, as applicable, rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than the Causes of Action released or exculpated herein by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, as of the Effective Date.  The Schedule of Retained Causes of Action shall specify which Assigned Preference Actions shall be deemed transferred to the Unsecured Claims Distribution Trust on the Effective Date.

The Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Unsecured Claims Distribution Trustee, as applicable.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, will not pursue any and all available retained Causes of Action against it.  The Debtors, the Reorganized Debtors, and the Unsecured Claims Distribution Trust, as applicable, expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  The Reorganized Debtors and the Unsecured Claims Distribution Trustee, as applicable, may settle any such retained Cause of Action without further notice to or action, order, or approval of the Bankruptcy Court.  Unless any retained Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, expressly reserve all retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor or the Unsecured Claims Distribution Trust, as applicable, except as otherwise expressly provided in the Plan.  The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such retained Causes of Action.  The Reorganized Debtors

and the Unsecured Claims Distribution Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.S of the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party that is subject to release or exculpation under the terms of the Plan.

**P.    Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtor Release, Third-Party Release, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the parties to the RSA in obtaining their support for the Restructuring Transactions pursuant to the terms of the RSA.

"*Exculpated Parties*" means, collectively, and in each case solely in its capacity as such (and to the extent permitted by Law): (a) each of the Debtors; (b) the Reorganized Debtors; (c) with respect to the Debtors, each of their respective former and current directors, managers, officers, attorneys, financial advisors, consultants, or other professionals or advisors that served in such capacity between the Petition Date and Effective Date; (d) the Professionals retained during the Chapter 11 Cases; and (e) the Committee and each of its present and former members, solely in their capacity as members of the Committee.

"*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Ad Hoc Group and each Consenting Stakeholder; (d) the DIP Lenders; (e) the ABL Secured Parties; (f) the DIP Agent; (g) the Agents/Trustees; (h) the Consenting Sponsor; (i) At Home Cayman; (j) At Home Cayman Holdings; (k) the Committee, each of its current and former members (solely in their capacity as such), and its Professionals; (l) the Senior Unsecured Notes Trustee and counsel thereto; (m) each current and former Affiliate of each Entity in clause (a) through the preceding clause (l); and (n) each Related Party of each Entity in clauses (a) through the preceding clause (l); *provided* that, in each case, an Entity in clauses (c) through (l) shall not be a Released Party if it:  (x) was provided with an opportunity to opt in to the releases described in <u>Article VIII.D</u> of the Plan by returning an "opt in" form and did not do so; or (y) timely objects to the releases contained in <u>Article VIII.D</u> of the Plan and such objection is not resolved before Confirmation.

"*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Ad Hoc Group and each Consenting Stakeholder; (d) the DIP Lenders; (e) the ABL Secured Parties; (f) the DIP Agent; (g) the Agents/Trustees; (h) the Consenting Sponsor; (i) the Committee; (j) the Senior Unsecured Notes Trustee; (k) all Holders of Claims that vote to accept the Plan and that affirmatively opt into the releases provided for in the Plan; (l) all Holders of Claims that are deemed to accept the Plan and that affirmatively opt into the releases provided for in the Plan; (m) all Holders of Claims that abstain from voting on the Plan and that affirmatively opt into the releases provided for in the Plan; (n) all Holders of Claims that vote to reject the Plan and that affirmatively opt into the releases provided for in the Plan; (o) all Holders of Interests that affirmatively opt into the releases provided for in the Plan; (p) each current and former Affiliate of each Entity in clause (a) through the preceding clause (o); and (q) each Related Party of each Entity in clauses (a) through the preceding clause (o) for which such Entity is legally entitled to bind such Related Party to the releases contained herein under applicable law; *provided* that, in each case, an Entity in clauses (k) through (o) shall not be a Releasing Party if it:  (x) was provided with an opportunity to opt in to the releases described in Article VIII.D of the Plan by returning

an "opt in" form and did not do so; or (y) timely objects to the releases contained in Article VIII.D of the Plan and such objection is not resolved before Confirmation.

"*Related Party*" means, collectively, with respect to any Person or Entity, each of, and in each case in its capacity as such, such Person's or such Entity's current and former directors, managers, officers, observers, committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, secondees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the DIP Facility, the Plan, and multiple other interrelated key transactions which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Moreover, each of the Exculpated Parties serves or served as a fiduciary of the Debtors' Estates during the pendency of the Chapter 11 Cases. Accordingly, the Released Parties warrant the benefit of the Debtor Release and the Third-Party Release, and the Exculpated Parties warrant the benefit of the exculpation provisions under the Plan.

Section 1123(b)(3)(A) of the Bankruptcy Code states that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[10] Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[11] Article VIII.C of the Plan sets forth the Debtor Release.[12] The Debtor Release meets the applicable standard because it is a valid exercise of the Debtors' business judgement, is fair, reasonable, and in the best interests of the Debtors' Estates, the product of extensive arm's-length negotiations, and was critical to obtaining

---

[10]  *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004). Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "is above the lowest point in the range of reasonableness." *Id.* at 330 (internal citation omitted); *see also In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (internal citation omitted); *see Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (internal citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be within reasonable range of litigation possibilities) (internal citation omitted).

[11]  *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (internal citation omitted); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citation omitted).

[12]  Article I.A.146 of the Plan defines "Released Party" as, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the Ad Hoc Group and each Consenting Stakeholder; (d) the DIP Lenders; (e) the ABL Secured Parties; (f) the DIP Agent; (g) the Agents/Trustees; (h) the Consenting Sponsor; (i) At Home Cayman; (j) At Home Cayman Holdings; (k) the Committee, each of its current and former members (solely in their capacity as such), and its Professionals; (l) the Senior Unsecured Notes Trustee and counsel thereto; (m) each current and former Affiliate of each Entity in clause (a) through the preceding clause (l); and (n) each Related Party of each Entity in clauses (a) through the preceding clause (l); *provided* that, in each case, an Entity in clauses (c) through (l) shall not be a Released Party if it: (x) was provided with an opportunity to opt in to the releases described in <u>Article VIII.D</u> of the Plan by returning an "opt in" form and did not do so; or (y) timely objects to the releases contained in <u>Article VIII.D</u> of the Plan and such objection is not resolved before Confirmation.

support for the Plan.  The Disinterested Directors also conducted the Investigation to assess the merits and potential value of any potential claims and Causes of Action held by the Debtors, after which the Disinterested Directors determined that the Debtor Release is appropriate, as further described in Article VII.E of this Disclosure Statement.

*First*, each Released Party has made a substantial contribution to the Debtors' Estates.  The Released Parties played an integral role in the formulation of the Plan and contributed to the Plan not only by expending significant time and resources analyzing and negotiating the terms thereof, but also in giving up material economic interests to ensure the success of the Debtors' Chapter 11 Cases with consent to the Debtors' use of cash collateral and the funding of the DIP Facility.  These measures have improved liquidity throughout these Chapter 11 Cases thus far and will continue to provide flexibility to the Debtors.  In addition, the Debtor Release was a material inducement for the Consenting Stakeholders to support the Debtors' restructuring as set forth in the RSA.  Finally, the Debtors' directors, officers, professionals, and other agents have been instrumental in negotiating, formulating, and implementing the Restructuring Transactions contemplated by the Plan.

*Second*, the Debtor Release is essential to the Debtors' reorganization because it constitutes an integral term of the Plan.  Indeed, absent the Debtor Release, it is highly unlikely the Debtors would have been able to build the extraordinary level of consensus with respect to the RSA and the Restructuring Transactions.  Importantly, the Debtor Release is the product of arm's-length negotiations between the Debtors and their key stakeholders and is limited in scope.  Such releases do not release any entity other than a Released Party from any Claims or Causes of Action expressly set forth and preserved by the Plan.  In consideration for the Debtor Release, the Debtors and their Estates will receive mutual releases from potential Claims and Causes of Action of each of the Releasing Parties in addition to the significant benefits provided to the Debtors through this chapter 11 process.  Thus, the inclusion of the Debtor Release is worthwhile and inures to the benefit of all the Debtors' stakeholders.

*Third*, an identity of interest exists between the Debtors and the parties to be released.  Each Released Party, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and having the Debtors' businesses reorganized.  For example, the Debtors owe indemnification obligations to its officers and directors.  Like the Debtors, the Released Parties seek to confirm the Plan and implement the Restructuring Transactions.

Based on the foregoing, the Debtors believe that the releases, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

## 1.    Discharge of Claims and Termination of Interests.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan or the Confirmation Order, including the Plan Supplement and Definitive Documents, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of

whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action (including any Causes of Action or Claims based on theories or allegations of successor liability) that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their non-Debtor Affiliates with respect to any Claim or Interest existing immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Reinstated Claims) and Interests (other than any Intercompany Interests that are Reinstated), subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan.

> **2.      Release of Liens**.

> **Except as otherwise provided in the Exit ABL Facility Documents, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a secured claim or any related claim that may be asserted against a non-Debtor Affiliate, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any non-Debtor Affiliate shall be fully released and discharged, and all of the right, benefit, title, and interest of any Holder (and the applicable Agents of such Holder, including the Agents/Trustees) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns.  Any Holder of such secured claim or claim against a non-Debtor Affiliate (and the applicable agents for such Holder, including the Agents/Trustees) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor or non-Debtor Affiliate (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder, including the Agents/Trustees) and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

> **To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, at the sole cost and expense of the Reorganized Debtors, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

3.        **Releases by the Debtors**.

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Released Party is deemed, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of each and all of the Debtors, their Estates, and the Reorganized Debtors in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, and the Reorganized Debtors, whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein-after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the Restructuring Transactions, the Chapter 11 Cases, the Debtors' in- or out- of- court restructuring efforts, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the RSA, the DIP Facility, the DIP Documents, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Plan Supplement or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, the Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement under the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided, however*, that, nothing in Article VIII.C of the Plan shall be construed to release the Released Parties from any criminal act or intentional fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contribution to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims and Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for a hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtor, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

4.      **Releases by Holders of Claims and Interests**.

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Releasing Party is deemed to have, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, and their Estates (as applicable) whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the purchase, sale, or recission of any Security of the Debtors or the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, business or contractual arrangements between any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the RSA, the DIP Facility, the DIP Documents, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, the Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any

22

Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (iv) a good faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for a hearing; and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

Without limiting the foregoing, from and after the Effective Date, any Entity that votes to accept the Plan or that is given the opportunity to opt into the releases contained in the Plan and exercises such opportunity to opt into the releases may not assert any claim, Claim, or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors.  From and after the Effective Date, any such Entity may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

     5.     **Exculpation**.

Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Claim or Cause of Action arising between the Petition Date and Effective Date prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the negotiation and pursuit of the RSA, the Definitive Document, the Plan Supplement, the Exit ABL Facility Documents, or the filing of the Chapter 11 Cases, the participation in the DIP Facility, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of

Securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of Securities thereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.

The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

6.    Injunction.

Except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, settled, or are subject to exculpation under the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests; (iv) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities, in each case, on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims, or Interests released, discharged, subject to exculpation, or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action released, discharged, settled, or that is subject to exculpation pursuant to the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such

**Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.**

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**Q.      Do I have to grant the releases under the Plan?**

You will not be considered a "Releasing Party" if you were provided with an opportunity to opt in to the releases described in Article VIII.D of the Plan by returning an "opt in" form and did not do so.

**R.      What are the consequences of not opting in to the releases provided by the Plan?**

If a Holder of a Claim or Interest does not opt in to the Third-Party Releases, such Holder will preserve any direct Causes of Action that it may have against the Released Parties other than any direct Causes of Action against the Debtors and/or the Reorganized Debtors that are discharged under Article VIII of the Plan.  Additionally, any third party that is a Releasing Party will preserve all Causes of Action against such Holder.

Upon the Effective Date, the Reorganized Debtors will also be vested with the authority to commence, litigate, and settle any and all retained Causes of Action.  If you are contemplated to be a Released Party and have the opportunity to opt in to the Third-Party Release, by not opting in to providing the Third-Party Release under the Plan, such Holder will no longer be considered a Released Party and will forgo the opportunity to receive the Debtor Release under the Plan.  These parties include:  (a) the Ad Hoc Group and each Consenting Stakeholder; (b) the DIP Lenders; (c) the ABL Secured Parties; (d) the DIP Agent; (e) the Agents/Trustees; (f) the Consenting Sponsor; (g) the Committee, each of its current and former members (solely in their capacity as such), and its Professionals; and (h) the Senior Unsecured Notes Trustee and counsel thereto.  As a result, after the Effective Date, the Reorganized Debtors may pursue any Causes of Action held by the Debtors that are preserved under the Plan against a party that is contemplated to be a Released Party but does not opt in to the Third-Party Releases.

**S.      What are the consequences of opting in to the releases provided by the Plan?**

Each Holder of a Claim that elects to opt in to the releases will become a Releasing Party under the Plan, and for certain parties, will also be a Released Party.  For the Holders of Claims that become Released Parties under the Plan by electing to opt in to the Third-Party Release, such Holder will receive, subject to the terms and conditions of Article VIII.C of the Plan, a conclusive, absolute, unconditional, irrevocable, and permanent release from the Debtors of any claims and Causes of Action the Debtors may have against such Holder and will in turn grant each Released Party, subject to the terms and conditions of Article VIII.D of the Plan, a conclusive, absolute, unconditional, irrevocable, and permanent release of any claims and causes of actions it may have against such Released Party.  Notwithstanding the Debtor Release, the Third-Party Release, or anything else contained in the Plan to the contrary, such Holder shall not be released from (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.

All Holders of Claims or Interests that:  (a) vote to accept the Plan and that affirmatively opt into the releases provided for in the Plan; (b) are deemed to accept the Plan and affirmatively opt into the releases provided for in the Plan; (c) abstain from voting on the Plan and affirmatively opt into the releases provided

for in the Plan; (d) vote to reject the Plan and affirmatively opt into the releases provided for in the Plan; and (e) affirmatively opt into the releases provided for in the Plan will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all claims and causes of action against the Released Parties, including the Debtors.  For the avoidance of doubt, Holders Claims or Interests that opt in to the Third-Party Release will not be Released Parties unless they are included in one of the following groups:  (a) the Ad Hoc Group and each Consenting Stakeholder; (b) the DIP Lenders; (c) the ABL Secured Parties; (d) the DIP Agent; (e) the Agents/Trustees; (f) the Consenting Sponsor; (g) the Committee, each of its current and former members (solely in their capacity as such), and its Professionals; and (h) the Senior Unsecured Notes Trustee and counsel thereto.

### T.        Does the Bankruptcy Code protect against discriminatory treatment?

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### U.        Will the Company retain documents after any Effective Date?

On and after the Effective Date, subject to Article IV.H of the Plan, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

### V.        What is the effect of Reimbursement or Contribution?

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

### W.        What is the deadline to vote on the Plan?

The voting deadline with respect to the Plan (the "Voting Deadline") is September 18, 2025, at 4:00 p.m. (prevailing Eastern Time).

### X.        How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan (the "Ballots").  For your vote to be counted, your Ballot must be properly completed, executed, and delivered as directed, so that the Ballot containing your vote is **actually received** by the Claims and Noticing Agent **on or before the Voting Deadline, *i.e.*, September 18, 2025 at 4:00 p.m., prevailing Eastern Time**.  **Delivery of a Ballot to the Claims and Noticing Agent by any means other than as expressly approved by the Disclosure Statement Order or as set forth in the Solicitation and Voting Procedures or the Ballots will not be counted.**

**Y.     Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation hearing set to occur?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan (the "Confirmation Hearing") and recognizes that any party in interest may object to Confirmation of the Plan.

Through the order approving the Disclosure Statement Motion, the Bankruptcy Court has scheduled the Confirmation Hearing for **September 30, 2025**.  The Confirmation Hearing may be adjourned from time to time without further notice.

Pursuant to the order approving the Disclosure Statement Motion, objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than **September 18, 2025, at 4:00 p.m., prevailing Eastern Time** (the "Plan Objection Deadline").

In addition to serving the notice of the Confirmation Hearing to parties in interest in accordance with the order approving the Disclosure Statement Motion, the Debtors will also publish the notice of the Confirmation Hearing, which will contain the Voting Deadline, the Plan Objection Deadline, and the date and time of the Confirmation Hearing, in *The New York Times* (U.S. national edition) or any such other local publications that the Debtors deem appropriate.

**Z.     What is the purpose of the Confirmation Hearing?**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan. For a more detailed discussion of the Confirmation Hearing, see **Article X** of this Disclosure Statement.

After the Plan has been confirmed, subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

Subject to certain limited exceptions, the Confirmation Order resolves any debt of the Debtors that arose before the Confirmation of the Plan and provides for the treatment of such debt in accordance with the terms of the confirmed Plan.

**AA.     What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date of the Plan means that the Debtors will ***not*** be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been

satisfied or waived in accordance with Article IX.B of the Plan; and (c) the Plan is declared effective by the Debtors.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their business and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### BB.   Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of each of the Debtors shall expire, such current members shall be deemed to have resigned, and the members of the board of directors or other Governing Body for the initial term of the New Board and the other Governing Bodies shall be appointed in accordance with the New Organizational Documents.  The New Board will consist of seven directors and include:  (a) the CEO; and (b) six directors selected as follows, in each case, in consultation with the CEO, (i) four directors selected by Redwood Capital Management, LLC, (ii) one director selected by Anchorage Capital Advisors, L.P., and (iii) one director selected by Farallon Capital Advisors, L.L.C.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and each officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

The Reorganized Debtors will be a private company and the New Organizational Documents will include certain rights and obligations for holders of the Reorganized Common Stock.  The New Organizational Documents will be included in the Plan Supplement and creditors receiving Reorganized Common Stock under the Plan should review the Plan Supplement when filed for a full description of these rights and obligations.

### CC.   Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims and Noticing Agent, Omni, by calling 1 (888) 818-9346 (Toll free from US / Canada) OR +1 (747) 293-0014 (International), or e-mailing AtHomeInquiries@OmniAgnt.com with "At Home" in the subject line. Copies of the Plan, this Disclosure Statement, and any other publicly-filed documents in the Chapter 11 Cases are available free of charge, as applicable, by:  (a) visiting the Debtors' restructuring website at https://cases.omniagentsolutions.com/athome;  (b)  email  using  AtHomeInquiries@OmniAgnt.com (with "At Home" in the subject line); or (c) calling the Claims and Noticing Agent at the number(s) listed above.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases by visiting the Bankruptcy Court's website at https://www.deb.uscourts.gov or the clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, where they are available for review between the hours 8:00 a.m. to 4:00 p.m., prevailing Eastern Time.

### DD.   Who Supports the Plan?

The Plan is supported by the Debtors, the Committee, and the Consenting Stakeholders, including the Consenting Noteholders, the Consenting Term Loan Lenders, and the Consenting Sponsor, that have executed the RSA.  The Consenting Stakeholders include (a) holders of approximately (i) 99.9% of the obligations under the Cayman Notes, (ii) 99.6% of the obligations under the Senior Secured Notes, (iii) 100% of the obligations under the Exchange Notes, (iv) 98.9% of the obligations under the Term

Loans, and (v) 88.6% of the obligations under the Senior Unsecured Notes; and (b) the Consenting Sponsor. The committee letter in support of the Plan (the "Committee Letter") will be included in the Solicitation and Voting Package, the form of which is appended to the order approving the Disclosure Statement Motion as Exhibit 12.

      **EE.**    **Do the Debtors recommend voting in favor of the Plan?**

      Yes.  The Debtors believe that the Restructuring Transactions provide for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Restructuring Transactions, which contemplate a significant deleveraging of the Debtors' balance sheet and will allow them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under and pursuant the Plan.

## IV.    OVERVIEW OF THE PLAN.

      The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and Allowed Interests and generally to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code and applicable law.  The Debtors believe that this objective is best served by consummating the Restructuring Transactions and are authorized in all respects to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including, as applicable:  (i) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, formation, organization, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement, and the RSA; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement, and the RSA and having other terms to which the applicable Entities may agree; (iii) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state Law, including any applicable New Organizational Documents; (iv) the issuance and distribution of the Reorganized Equity as set forth in the Plan; (v)  with respect to the Reorganized Debtors, the implementation of the Management Incentive Plan and the approval of the issuance of the MIP Shares; (vi) the consummation of the Exit ABL Facility, including the execution, delivery, and filing of all Exit ABL Facility Documents; (vii) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Transactions Memorandum; and (viii) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with the Plan.

      In general, the Plan is divided into several key sections, all of which may be reviewed in detail in the Plan attached hereto as **Exhibit A**.

| Article | Summary |
|---|---|
| I.A | This section contains the definitions of various capitalized terms that are used throughout the Plan.  The defined terms are an essential part of the Plan.  Creditors should cross-reference capitalized terms used in the Plan to the definitions provided in this section to understand what is being described throughout the Plan. |

| II | This section describes the Administrative Claims, the Superiority DIP Claims, Professional Fee Claims, and Priority Tax Claims that have not been classified and are excluded from the Classes of Claims set forth in **Article III** of this Disclosure Statement. |
|----|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| III.B | This section describes the treatment to be given to Holders of Claims against the Debtors and Interests in the Debtors.  Claims and Interests are separated into different Classes and provided treatment based on their relative legal rights against the Debtors.  Article III of the Plan sets forth the distributions that the Debtors are proposing to provide to their various stakeholders.

The projected recoveries to Holders of Claims and Interests under the Plan are set forth in **Article III.E** of this Disclosure Statement. |
| IV | This Article describes the means by which the transactions contemplated in the Plan will be implemented. |
| V | This Article describes the process by which the Debtors may reject, assume, and assume and assign executory contracts and unexpired leases. |
| VI | This Article has certain provisions regarding distributions to be made under the Plan. |
| VII | This Article contains the procedures for the allowance of claims and resolving, among other things, Disputed Claims. |
| VIII | This section has certain releases, exculpation, and injunction provisions.  These provisions of the Plan are restated in **Article III.P** of this Disclosure Statement. |
| IX | This section has certain conditions that must be satisfied or waived before the Plan can become effective and distributions can be made.  An explanation of "Confirmation," "Effective Date," and "Consummation" is set forth in **Article III.G** of this Disclosure Statement. |

This summary of the structure and means for implementation of the Plan and the documents referred to herein is qualified in its entirety by reference to the Plan.  Such summaries do not purport to be precise or complete statements of all terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

### 1. General Settlement of Claims and Interests.

To the greatest extent permissible under the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan.  To the greatest extent permissible under the Bankruptcy Code, the Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims against and Interests in the Debtors.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final.

### 2. Restructuring Transactions.

On or before the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions and are authorized

in all respects to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including, as applicable:  (i) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, formation, organization, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement, and the RSA and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement, and the RSA and having other terms to which the applicable Entities may agree; (iii) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state Law, including any applicable New Organizational Documents; (iv) the issuance and distribution of the Reorganized Equity as set forth in the Plan; (v)  with respect to the Reorganized Debtors, the implementation of the Management Incentive Plan and the approval of the issuance of the MIP Shares; (vi) the consummation of the Exit ABL Facility, including the execution, delivery, and filing of all Exit ABL Facility Documents; (vii) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Transactions Memorandum; (viii) the establishment and funding of the Unsecured Claims Distribution Trust in accordance with the Plan and the Unsecured Claims Distribution Trust Agreement; and (ix) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with the Plan.

Subject to the consent of the Required Consenting Stakeholders, the Debtors may, but shall not be required to, create one or more additional companies, including a new parent holding company, or covert At Home into a limited liability company, in each case, as necessary, to effect the Restructuring Transactions.  For the avoidance of doubt, the Reorganized Common Stock shall include the Reorganized Equity of the parent holding company of the Reorganized Debtors and may be issued in the form of limited liability company units, to the extent applicable.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 105, 363, 1123, and 1141 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.  The Confirmation Order shall authorize the Debtors, the Reorganized Debtors, and the Consenting Stakeholders, as applicable, to undertake the Restructuring Transactions contemplated by the Plan, the RSA, and the other Definitive Documents.

### 3.    The Reorganized Debtors.

On the Effective Date, the New Board shall be established, and each Reorganized Debtor shall adopt its New Organizational Documents, which shall include provisions consistent with Annex C attached to the Restructuring Term Sheet.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan consistent with the consent rights set forth in the RSA.  Cash payments to be made pursuant to the Plan will be made by the Debtors or the Reorganized Debtors, as applicable. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under the Plan.  Except as set forth herein or as otherwise provided for in the Restructuring Transactions Memorandum, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement, the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court, to raise additional capital, including issuing additional Reorganized Equity and obtaining additional financing, subject to, the terms of the New Organizational Documents, as the New Board deems appropriate.

4.      **Sources of Consideration for Plan Distributions**.

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan, including the conveyance and funding of the Unsecured Claims Distribution Trust Assets, as applicable, with:  (i) the Debtors' Cash on hand as of the Effective Date; (ii) the Reorganized Equity; and (iii) the proceeds from the Exit ABL Facility.  The Unsecured Claims Distribution Trust shall fund its distributions, as contemplated by the Plan and the Unsecured Claims Distribution Trust Agreement, solely from the Unsecured Claims Distribution Trust Net Assets.  Each distribution and issuance referred to in Article V of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the Reorganized Equity, will be exempt from registration under the Securities Act, as described more fully in Article IV.M of the Plan.

(a)      **Use of Cash**.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand and proceeds of the DIP Facility and the Exit ABL Facility, as applicable, to fund distributions to certain Holders of Allowed Claims, consistent with the terms of the Plan.

(b)      **Issuance of Reorganized Equity**.

The Reorganized Debtors shall be authorized to issue the Reorganized Equity (including the MIP Shares) pursuant to the New Organizational Documents.  The issuance of the Reorganized Equity shall be authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors.  On the Effective Date, the Reorganized Equity shall be issued and distributed as provided for in the Restructuring Transactions Memorandum pursuant to, and in accordance with, the Plan. Holders of Superpriority DIP Claims and Holders of First Lien Claims entitled to receive Reorganized Equity pursuant to the Plan shall be permitted to direct distributions of their Reorganized Equity to designees with the consent of the Required Consenting Stakeholders.

All of the shares (or comparable units) of Reorganized Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable and shall be issued in book-entry form.  Each distribution and issuance of Reorganized Equity shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Any Entity's acceptance of Reorganized Equity shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).  The Reorganized Equity will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not be required to meet the eligibility requirements of DTC.  Additional information relating to the applicability of the securities Laws is available in Article IV.L of the Plan.

The forms of the New Organizational Documents shall be included in the Plan Supplement filed ahead of the deadline to object to confirmation of the Plan.

### (c)  Exit ABL Facility.

On the Effective Date, the Reorganized Debtors shall enter into the Exit ABL Facility, pursuant to the Exit ABL Facility Documents.  Confirmation of the Plan shall constitute (a) approval of the Exit ABL Facility and the Exit ABL Facility Documents; and (b) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the Exit ABL Facility (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), in each case, without any further notice to or order of the Bankruptcy Court.

In the event the Exit ABL Facility is entered into with the ABL Lenders, the ABL Loans may be refinanced by means of a cashless settlement, whereby such ABL Loans shall be converted on a dollar-for-dollar basis into the Exit ABL Loans in accordance with the Exit ABL Facility Documents, and all collateral that secures the ABL Obligations under the ABL Credit Agreement shall be reaffirmed and ratified, and shall automatically secure all obligations under the Exit ABL Facility Documents.

As of the Effective Date, all of the Liens and security interests to be granted by the Debtors in accordance with the Exit ABL Facility Documents:  (a) shall be deemed to be granted in good faith, for legitimate business purposes, and for reasonably equivalent value; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral specified in the Exit ABL Facility Documents; and (c) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.  To the extent provided in the Exit ABL Facility Documents, the Exit ABL Facility Agent is authorized to file with the appropriate authorities, mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests.  The priorities of such Liens and security interests shall be as set forth in the Exit ABL Facility Documents.  The Exit ABL Facility Agent shall be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.  The guarantees granted under the Exit ABL Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy Law.

The material terms of the Exit ABL Facility shall be included in the Plan Supplement filed prior to the deadline to object to Confirmation of the Plan.

5.      **Corporate Existence**.

Except as otherwise provided in the Plan, the Confirmation Order, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated therein, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings, approvals, or consents required under applicable state, provincial, or federal Law). On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

6.      **Vesting of Assets in the Reorganized Debtors**.

Except as otherwise provided in the Plan or the Confirmation Order (including to the extent any ABL Loan is refinanced and/or converted into the Exit ABL Facility), on the Effective Date, all property in each Debtors' Estate, all Causes of Action belonging to the Debtors or the Estates, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor or the Unsecured Claims Distribution Trust, as applicable, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances (except for Liens securing obligations under the Exit ABL Facility Documents, and Liens securing Other Secured Claims that are Reinstated pursuant to the Plan, as applicable). On and after the Effective Date, except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound down and liquidated in connection with the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum) shall be treated as being liable on any Claim that is discharged pursuant to the Plan or the Confirmation Order.

7.      **Cancellation of Existing Securities Agreements, and Interests**.

On the Effective Date, except to the extent otherwise provided in the Plan or the Confirmation Order (including to the extent any ABL Loan is refinanced and/or converted into the Exit ABL Facility), as applicable, all notes, instruments, certificates, credit agreements, note purchase agreements, indentures, and other documents evidencing Claims (other than those Reinstated Claims) or Existing Equity Interests, shall, be cancelled, and all obligations and liabilities, actions, suits, accounts or demands, covenants, and indemnities (both actual and contingent) thereunder, including those of any non-Debtor Affiliates thereunder, or in any way related thereto, shall be deemed satisfied in full, released, cancelled, discharged, and of no force or effect, without any need for further action or approval by the Bankruptcy Court or for a Holder to take further action, and the Agents/Trustees and their respective agents, successors and assigns, shall each be automatically and fully released and discharged of and from all duties and obligations thereunder.

Holders of or parties to such cancelled instruments, Existing Equity Interests, and other documentation will have no rights arising from or relating to such instruments, Interests, and other documentation, or the cancellation thereof, except the rights provided for or reserved pursuant to the Plan. Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI of the Plan, the Prepetition Finance Documents and the DIP Documents shall continue in effect after the Effective Date to the extent necessary to:  (a) permit Holders of Claims under the Prepetition Finance Documents and the DIP Documents to receive and accept their respective distributions on account of such Claims, if any; (b) permit the Disbursing Agent or the Agents/Trustees, as applicable, to make distributions on account of the Allowed Claims under the Prepetition Finance Documents and the DIP Documents; (c) preserve any rights of the Agents/Trustees, to maintain, exercise, and enforce any applicable rights of indemnity, expense reimbursement, priority of payment, contribution, subrogation, or any other similar claim or entitlement (whether such claims accrued before or after the Effective Date), and preserve any exculpations of the Agents/Trustees, all of which shall remain fully enforceable against the Reorganized Debtors and all other applicable Persons under the Prepetition Finance Documents and the DIP Documents; (d) permit the Agents/Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including to enforce the respective obligations owed to them under the Plan and to enforce any obligations owed to their respective Holders of Claims under the Plan in accordance with the applicable Prepetition Finance Documents and the DIP Documents; and (e) permit the Agents/Trustees to perform any functions that are necessary to effectuate the foregoing; *provided, however*, that (1) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan (including clause (c) of the preceding proviso), and (2) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan.  For the avoidance of doubt, the Prepetition Finance Documents and the DIP Documents shall continue in full force and effect (other than any Liens or other security interests terminated pursuant to this section) after the Effective Date with respect to any contingent or unsatisfied obligations and any other provisions that expressly survive the cancellation of the Prepetition Finance Documents and the termination of the DIP Facility in accordance with the terms of the DIP Documents.

If the record holder of any of the Senior Unsecured Notes Claims, the Cayman Notes Claims, the Intercompany Note Claims, the Senior Secured Notes Claims, or the Exchange Notes Claims is DTC or its nominee or another securities depository or custodian thereof, and such underlying Securities are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of Senior Unsecured Notes Claims, Cayman Notes Claims, Intercompany Note Claims, Senior Secured Notes Claims, or Exchange Notes Claims shall be deemed to have surrendered such Holder's Securities underlying such Senior Unsecured Notes Claims, Cayman Notes Claims, Intercompany Note Claims, Senior Secured Notes Claims, or Exchange Notes Claims upon surrender of such global security by DTC or such other securities depository or custodian thereof.

## 8.    Unsecured Claims Distribution Trust.

On or before the Effective Date, the Debtors and the Unsecured Claims Distribution Trustee shall enter into the Unsecured Claims Distribution Trust Agreement and, on the Effective Date, the Unsecured Claims Distribution Trust Assets shall vest or be deemed to be vested in the Unsecured Claims Distribution Trust irrevocably and automatically without further action by any Person or Entity, free and clear of all Claims, Liens, and Interests, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax.  Under no circumstance shall the Debtors or the Reorganized Debtors or any other party be required to contribute any additional assets to the Unsecured Claims Distribution Trust other than the Unsecured Claims Distribution Trust Assets.  After the Effective Date, neither the Debtors, Reorganized Debtors, nor any other party shall have any interest in the Unsecured

Claims Distribution Trust Assets except as expressly set forth herein. For the avoidance of doubt, the Holders of any First Lien Deficiency Claims shall not be Unsecured Claims Distribution Trust Beneficiaries and shall have no interest in the Unsecured Claims Distribution Trust.

The Debtors and the Reorganized Debtors shall make their employees and books and records reasonably available to the Unsecured Claims Distribution Trustee and any professionals retained by the Unsecured Claims Distribution Trust (at the sole cost and expense of the Unsecured Claims Distribution Trust in the case of any third party service providers reasonably needed by the Debtors or the Reorganized Debtors to provide such information, with such cost and expense to be disclosed in advance to the Unsecured Claims Distribution Trustee) to retrieve or access data reasonably necessary to investigate, review, and reconcile General Unsecured Claims and investigate, pursue, or otherwise dispose of the Assigned Preference Actions. To the extent the Unsecured Claims Distribution Trust receives information from the Debtors or the Reorganized Debtors in connection with the General Unsecured Claims, the Unsecured Claims Distribution Trust's receipt of such documents, information, or communications shall not constitute a waiver of any privilege. All privileges shall remain in the control of the Debtors or the Reorganized Debtors, as applicable, and the Debtors or the Reorganized Debtors, as applicable, retain the sole right to waive their own privileges. Reasonable agreements will be made with the Unsecured Claims Distribution Trustee such that confidential information and privileges are preserved, while permitting the Unsecured Claims Distribution Trustee to use, as necessary to administer the Unsecured Claims Distribution Trust, such information and privilege; absent such agreements, either the Unsecured Claims Distribution Trustee or the Reorganized Debtors may present the issue to the Bankruptcy Court for resolution.

The Unsecured Claims Distribution Trust shall be governed by the Unsecured Claims Distribution Trust Agreement and administered by the Unsecured Claims Distribution Trustee. The Unsecured Claims Distribution Trustee shall be chosen by the Committee, and the Unsecured Claims Distribution Trustee's identity and compensation shall be identified in the Plan Supplement. The powers, rights, and responsibilities of the Unsecured Claims Distribution Trustee shall be specified in the Unsecured Claims Distribution Trust Agreement and shall include, without limitation, the authority and responsibility to take the actions set forth in Article IV.H of the Plan. Among other things, the Unsecured Claims Distribution Trustee shall have the power and authority to (a) distribute and allocate the Unsecured Claims Distribution Trust Net Assets to the Unsecured Claims Distribution Trust Beneficiaries on account of such beneficiaries' Unsecured Claims Distribution Trust Beneficial Interests in accordance with the treatment set forth in the Plan for Class 9, (b) investigate, prosecute, compromise, adjust, arbitrate, sue on, abandon, dismiss, or otherwise resolve, settle, or litigate Assigned Preference Actions, and (c) enter into any contingency fee agreements or litigation funding agreements as may be necessary in the Unsecured Claims Distribution Trustee's reasonable discretion to liquidate any claims or causes of action included in the Unsecured Claims Distribution Trust Assets; *provided*, however, any such funding agreement must be on market terms and subject to Bankruptcy Court approval. For the avoidance of doubt, the Unsecured Claims Distribution Trustee shall have the sole discretion to release any Assigned Preference Action. In the event of any conflict between the terms of the Plan and the Unsecured Claims Distribution Trust Agreement, the terms of the Plan shall govern.

From and after the Effective Date, the Unsecured Claims Distribution Trustee, on behalf of the Unsecured Claims Distribution Trust, shall, in the ordinary course of business and without the need for any approval by the Bankruptcy Court, pay the Unsecured Claims Distribution Trust Fees and Expenses solely from the Unsecured Claims Distribution Trust Assets. The Debtors, the Reorganized Debtors, and their Affiliates (and anyone acting on their behalf) shall not be responsible for any costs, fees, or expenses of the Unsecured Claims Distribution Trust. The Unsecured Claims Distribution Trust and the Unsecured Claims Distribution Trust shall be discharged or dissolved, as the case may be, such time as all distributions required to be made by the Unsecured Claims Distribution Trustee under the Plan have been made, but in

no event later than the fifth anniversary of the Effective Date (unless extended by order of the Bankruptcy Court). Upon dissolution of the Unsecured Claims Distribution Trust, any remaining Unsecured Claims Distribution Net Assets shall be distributed to all Holders of Allowed General Unsecured Claims in accordance with the Plan and the Unsecured Claims Distribution Trust Agreement as appropriate.

9.     **Corporate Action**.

Upon the Effective Date, all actions contemplated under the Plan (including under the Restructuring Transactions Memorandum and the other documents contained in the Plan Supplement) shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate, Governing Body, or equity holder action, including, as and if applicable: (i) selection of the directors, including the New Board, officers, or managers for the Reorganized Debtors in accordance with the New Organizational Documents; (ii) the authorization, issuance, and distribution of the Reorganized Equity; (iii) implementation of the Restructuring Transactions; (iv) the entry into the Exit ABL Facility Documents and the execution, delivery, and filing of any documents pertaining thereto; (v) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (vi) adoption of the New Organizational Documents; (vii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (viii) the authorization and reservation of the MIP Shares; (ix) formation of the Reorganized Debtors; (x) adoption or assumption, as applicable, of the Compensation and Benefits Programs and all obligations related thereto; (xi) formation of the Unsecured Claims Distribution Trust, issuance of the Unsecured Claims Distribution Trust Beneficial Interests, execution and delivery of the Unsecured Claims Distribution Trust Agreement, and the vesting of the Unsecured Claims Distribution Trust Assets in the Unsecured Claims Distribution Trust; and (xii) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Holders of Existing Equity Interests or Holders of Reorganized Equity, members directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed, without any further corporate, Governing Body, or equity holder action, to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the Reorganized Equity, the Exit ABL Facility Documents, the New Organizational Documents, any other Definitive Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.H of the Plan shall be effective notwithstanding any requirements under non-bankruptcy Law.

10.     **New Organizational Documents**.

On or immediately prior to the Effective Date, except as otherwise provided in the Plan and subject to local Law requirements, the New Organizational Documents shall be adopted or amended as may be necessary to effectuate the transactions contemplated by the Plan. To the extent required under the Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Organizational Documents with the secretaries of state and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate Laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document. The New Organizational Documents will, among other things (a) authorize the issuance of the Reorganized Equity

and (b) prohibit the issuance of non-voting equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the Laws of its jurisdiction of formation and the terms of such documents, and the Reorganized Debtors may file such amended certificates or articles of incorporation or other applicable formation and constituent documents as permitted by the Laws of the applicable states, provinces, or countries of incorporation or formation and the New Organizational Documents.  For the avoidance of doubt, any Holder's acceptance of the Reorganized Equity shall be deemed to constitute its agreement to be bound by the New Organizational Documents without the need for execution by any party other than the Reorganized Debtors.

From and after the Effective Date, all Holders of Reorganized Equity shall be subject to the terms and conditions of the New Organizational Documents.  On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Organizational Documents to each Holder of Reorganized Equity, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Holders of Reorganized Equity shall be deemed to have executed the New Organizational Documents and be parties thereto, without the need to deliver signature pages thereto.

The forms of the New Organizational Documents shall be included in the Plan Supplement filed ahead of the deadline to object to confirmation of the Plan.

## 11.    Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of each of the Debtors shall expire, such current members shall be deemed to have resigned, and the members of the board of directors or other Governing Body for the initial term of the New Board and the other Governing Bodies shall be appointed in accordance with the New Organizational Documents.  The New Board will consist of seven directors and include:  (a) the CEO; and (b) six directors selected as follows, in each case, in consultation with the CEO:  (i) four directors selected by Redwood Capital Management, LLC, (ii) one director selected by Anchorage Capital Advisors, L.P., and (iii) one director selected by Farallon Capital Advisors, L.L.C.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and each officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

## 12.    Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Exit ABL Facility Documents entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

## 13.    Certain Securities Law Matters.

Any Reorganized Equity issued under the Plan will be issued (a) to the fullest extent permitted and applicable, without registration under the Securities Act or similar federal, state or local laws in reliance on the exemption set forth in section 1145 of the Bankruptcy Code or (b) to the extent section 1145 is not

permitted or applicable, pursuant to other applicable exemptions under the Securities Act. For the avoidance of doubt, the MIP Shares will not be issued in reliance on section 1145 of the Bankruptcy Code.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the Reorganized Equity in reliance on the exemption set forth in section 1145 of the Bankruptcy Code shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

Such shares of Reorganized Equity issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code (a) will not be "restricted securities" as defined in rule 144(a)(3) under the Securities Act, and (b) will be freely tradable and transferable in the United States by each recipient thereof that (i) is an entity that is not an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code, (ii) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (iii) has not been such an "affiliate" within 90 days of the time of the transfer, and (iv) has not acquired such securities from an "affiliate" within one year of the time of transfer. Notwithstanding the foregoing, the shares of Reorganized Equity issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code will remain subject to compliance with applicable securities laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities and subject to any restrictions in the New Organizational Documents. The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

Any Reorganized Equity that cannot be issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code, including the MIP Shares, will be offered, issued, and distributed in reliance upon 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and subject to any restrictions on the transferability of such Reorganized Equity in the New Organizational Documents.

The Debtors recommend that potential recipients of securities issued under the Plan consult their own counsel concerning their ability to freely trade such securities in compliance with the federal securities laws and any applicable "Blue Sky" laws. The Debtors make no representation concerning the ability of a person to dispose of such securities.

The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including DTC or any transfer agent for the Reorganized Equity) with respect to the treatment of the Reorganized Equity to be issued under the Plan under applicable securities laws. DTC and any transfer agent for the Reorganized Equity shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the Reorganized Equity to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable). Notwithstanding anything to the contrary in the Plan, no Entity (including DTC and any transfer agent for the Reorganized Equity) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Reorganized Equity to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

14.    **Section 1146 Exemption**.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor, as applicable, or to or from any other Person) of property under the Plan or pursuant to (i) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, including the Reorganized Equity, (ii) the Restructuring Transactions, (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (iv) the making, assignment, or recording of any lease or sublease, (v) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit ABL Facility, or (vi) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

15.    **Private Company**.

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as private companies on the Effective Date and the Reorganized Equity shall not be listed on a recognized U.S. stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC or any other securities regulatory body, and (iii) shall not be required to list the Reorganized Equity on a recognized U.S. stock exchange, except in each case (if at all), as otherwise may be required pursuant to the New Organizational Documents.

16.    **Director and Officer Liability Insurance**.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full

benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions on or after the Effective Date.

### 17.    Management Incentive Plan.

On or within 90 days of the Effective Date, the New Board shall adopt the Management Incentive Plan, which will provide up to 10% of the Reorganized Equity (on a fully diluted and fully distributed basis) for management and the New Board of the Reorganized Debtors, which may be granted in any form acceptable to the New Board, including without limitation, in the form of options, restricted stock, restricted stock units, stock appreciations rights, or any combination thereof.

### 18.    Employment Obligations.

On the Effective Date, the Reorganized Debtors will either assume or reject the existing agreements with the current members of the senior management team of the Debtors, or will enter into new compensation arrangements, as applicable, on the Effective Date with some or all such individuals who agree to such new arrangements, which assumption or rejection must be approved by the Required Consenting Stakeholders and which new arrangements, as applicable, must be acceptable to the Reorganized Debtors and the Required Consenting Stakeholders.

### 19.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' or Unsecured Claims Distribution Trust's, as applicable, rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than the Causes of Action released or exculpated herein by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, as of the Effective Date.  The Schedule of Retained Causes of Action shall specify which Assigned Preference Actions shall be deemed transferred to the Unsecured Claims Distribution Trust on the Effective Date.

The Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Unsecured Claims Distribution Trustee, as applicable.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, will not pursue any and all available retained Causes of Action against it.  The Debtors, the Reorganized Debtors, and the Unsecured Claims Distribution Trust, as applicable, expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  The Reorganized Debtors aand the Unsecured Claims Distribution Trustee, as applicable, may settle any such retained Cause of Action without further notice to or action, order, or approval of the Bankruptcy Court.  Unless any retained Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, expressly reserve all retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue

preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor or the Unsecured Claims Distribution Trust, as applicable, except as otherwise expressly provided in the Plan.  The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such retained Causes of Action.  The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.S of the Plan include any Claim or Cause of Action against a Released Party or Exculpated Party that is subject to release or exculpation under the terms of the Plan.

## 20.    Tax Returns.

After the Effective Date, the Reorganized Debtors shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

## 21.    Statutory Committee and Cessation of Fee and Expense Payment.

On the Effective Date, the Committee shall dissolve, and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; *provided*, however, that following the Effective Date, the Committee shall continue to have standing and a right to be heard solely with respect to Professional Fee Claims.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date except with respect to fees and expenses incurred by the Committee's Professionals after the Effective Date relating to the defense and prosecution of the Committee's Professional Fee Claims; *provided*, however, that in no event shall the Reorganized Debtors be responsible for paying the Committee's Professional Fee Claims in excess of the amount set forth for such fees and expenses in the Approved Budget (as defined in the DIP Orders).

## 22.    Cashless Transactions.

Notwithstanding anything to the contrary set forth in the Plan, the treatment of Claims, distributions, and other transactions contemplated in the Plan including, without limitation, the funding of the Exit ABL Facility, if any, may, at the election of the applicable participating parties, be effectuated by netting or other form of cashless implementation.

23.     **Release of Ordinary Course Avoidance Actions**.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, the Debtors, on behalf of themselves and their Estates, shall release any and all Avoidance Actions against Ordinary Course Non-Insider Counterparties (including, without limitation, vendors, landlords, and other parties) arising from transactions conducted in the ordinary course of business, *provided* such release shall only apply to counterparties that continue to do business with the Reorganized Debtors in the ordinary course following the Effective Date.  For the avoidance of doubt, nothing in Article IV.W of the Plan shall be deemed to limit the Unsecured Claims Distribution Trustee's ability to settle, litigate, or otherwise address any Assigned Preference Claims under the Plan.

## V.     CORPORATE HISTORY AND BUSINESS OPERATIONS.

### A.     Corporate History.

The Company was founded in 1979 under the name Garden Ridge Pottery—later shortened to Garden Ridge—with the opening of an eclectic pottery, housewares, and craft store in Schertz, Texas.  The Company quickly gained a loyal following in its Texas home market and opened a second store in the mid 1980s in Houston.  In 1988, the existing owner sold the Company's two stores to investors who took the retailer public and expanded its reach beyond the borders of Texas with various new store openings, but by 2004, Garden Ridge had filed for chapter 11.

In October 2011, an investment group led by certain affiliates of AEA Investors LP and Starr Investment Holdings, LLC acquired the Company and began focusing on investing in the growth and future of the business.  As a result, in December 2012, the Company hired a new management team.  At the time, the Company operated 58 brick and mortar storefronts, located primarily in the Southeast United States.

The new Chief Executive Officer expanded the business in a variety of ways, including by: (a) rebranding Garden Ridge to At Home; (b) expanding the brand into a national concept; (c) curating the merchandise offering to focus on home and holiday décor and furnishings; (d) taking the Company public; (e) relocating the Company headquarters from Houston to Dallas; (f) successfully overhauling corporate culture and employee and vendor relations; and (g) developing the Company's omnichannel capabilities and revising marketing and pricing strategies.  In June 2014, the Company announced its plans to rebrand all stores and change its name to "At Home" to better position it as a home décor and furnishings retailer with aspirations for future expansion.  On September 4, 2015, the Company filed a registration statement with the United States Securities and Exchange Commission relating to the proposed initial public offering of its common stock.  The Company was officially listed on the New York Stock Exchange in August 2016. In the following years, management worked to strategically expand At Home's footprint across the country, opening the Company's 100th store in 2016.  Just three years later, in 2019, At Home doubled in size and celebrated the opening of its 200th store.  At the time, the Company was focused on growing its store base at a rate of approximately 10% per year with plans to increase its store base to 600 or more over the long term.

In July 2021, Hellman & Friedman, LLC acquired the Company in a take-private transaction valued at $2.8 billion, including the assumption of debt, that resulted in the Company no longer being listed on the New York Stock Exchange.  Under the terms of the merger agreement, existing At Home stockholders received $37 per share in cash.  Following the acquisition, the Company continued its expansion efforts, opening its 250th store in 2022, marking a significant milestone for At Home.

B.      **Business Operations**.

The Company currently operates in approximately 260 stores across 40 states, averaging approximately 105,000 square feet per store. The Company's unique product assortment at sharp values generates significant customer store traffic. Approximately 70 million customers visit At Home stores across the country each year and similarly, approximately 53 million customers visit At Home's website annually. With its broad product assortment, loyal customer base, and ability to provide a seamless and integrated customer experience across all channels, At Home is a leading destination for home décor and furnishings with the potential to continue growing its market share.

1.      **The Company's Products**.

The Company's mission is to help its customers express their personal style and create the many memories and joys of life at home. Each At Home store offers a variety of products, which include a large assortment of everyday and seasonal home décor, ranging from home furnishings (*e.g.*, mirrors, cushions, rugs, wall art, patios, and accent furniture) to accent décor (*e.g.*, kitchen, bath, bedding, candles, garden and outdoor décor, holiday and seasonal décor and accessories, home organization, pillows, pottery, vases, artificial flowers and trees, and window treatments). In fiscal year 2025,[13] 60% of net sales were comprised of everyday home furnishings and 40% of net sales were comprised of holiday and seasonal décor and accessories.

At Home employs an everyday low-price strategy that offers its customers the best possible pricing with limited use of significant discounts or promotions. The Company's average price point per product is less than $20 with a typical customer spend of approximately $75 per visit. Approximately 80% of At Home's net sales occur at full price with the balance attributable to limited special buys and selective markdowns used to clear slow-moving inventory or dated seasonal products, which is of particular importance given that the Company does not have warehousing, storage, or a reverse supply chain. For the limited set of products that are directly comparable to products offered by other retailers, At Home seeks to offer prices below its specialty competitors and at or below its mass retail competitors.

The Company's fully-integrated and centralized merchandising team is responsible for product development, inventory planning, and trend identification. At Home's differentiated merchandising strategy allows the Company to identify trends and then design and develop products with desirable aesthetics at attractive price points. Over 80% of At Home's products are unbranded, private label, or specifically designed for the Company.

2.      **Sourcing and Distribution**.

At Home works closely with over 600 product partners (primarily located overseas) to manufacture high-quality products at a variety of price points, delivering exceptional value to the Company's customers. In fiscal year 2025, the Company's top ten product partners accounted for approximately 17% of total purchases. In addition to purchasing some of its products through domestic agents or trading companies, At Home's strategic sourcing function directly sources from overseas factories. In fiscal year 2025, At Home sourced approximately 90% of its products from overseas. Of the Company's total sourcing, in fiscal year 2025, approximately 45% of At Home's merchandise was purchased through trading companies and wholesalers and approximately 55% was purchased directly from foreign product partners in countries such as China, Vietnam, India, Turkey, and Mexico. At Home's product partners are critical to the Company's success and operations and the Company would be materially and adversely impacted if At Home were to

---

[13]      The Company's fiscal year 2025 ended on January 25, 2025.

encounter delays or difficulties in securing significant volumes of merchandise on a timely basis, especially during the summer months when critical inventory for Christmas and other seasonal holidays is in production or being shipped.

The vast majority of At Home's products are shipped directly to the Company's two distribution centers: a 592,000 square foot distribution center in Plano, Texas, and an 800,000 square foot distribution center in Carlisle, Pennsylvania. The Company's distribution centers serve as cross-dock facilities, storing very limited inventory on site. As such, on time receipt of an adequate volume of inventory is essential for the Company's financial performance as continuous shipments are critical to fill stores and maintain the right store inventory. At Home generally ships merchandise from its distribution centers to its stores between one and five times a week depending on the season and the sales volume of each store.

### 3. Retail Channels.

The Company sells its products directly to consumers through two primary channels: (i) traditional brick-and-mortar storefronts (a total of approximately 260 nationwide); and (ii) e commerce platforms. In 2020, at the beginning of the COVID-19 pandemic, the Company's website became transactional. In 2021, At Home improved its omnichannel capabilities by providing its customers with additional options for purchasing products, including a buy online pick-up in store option, curbside pick-up, and local delivery from a substantial majority of its store locations. In addition, in 2022, At Home launched its mobile application, making it even easier for customers to shop anywhere and any way they prefer. In fiscal year 2025, approximately 93% of sales revenue was generated in store and approximately 7% was generated through the Company's e commerce channels.

### 4. Marketing Initiatives.

At Home's marketing and advertising strategies seek to build deeper connections with the Company's core customers while also attracting new customers to the At Home brand. At Home uses a strategic mix of traditional and digital media platforms to build and expand its brand awareness and to drive traffic to the Company's stores and website. At Home implements its marketing strategies by communicating directly with current and prospective customers through various platforms, including email, website, advertising media, social media, and influencer programs, and it is through these platforms that At Home shares new product launches, highlights key product categories, and provides customers with décor and home furnishings ideas and inspiration. The breadth of the Company's digital assets, along with its well established and successful marketing history, has garnered strong brand recognition in the home décor and furnishings industry.

In addition to utilizing traditional marketing methods, the Company has also optimized its marketing strategies to drive performance. The Company's insider perks loyalty program launched in August 2017 and, as of the Petition Date, had approximately 7 million active customers enrolled. At Home's loyalty program incentivizes customer engagement and drives meaningful sales. In fiscal year 2025, approximately 70% of sales were attributable to purchases made by insider perks loyalty members. At Home also offers incentives to customers through an At Home credit card program that allows cardholders to take advantage of promotional financing offers on qualifying purchases, as well as loyalty rewards, and other exclusive cardholder benefits.

### 5. At Home Employees.

As of the Petition Date, the Company employed approximately 7,170 individuals who work in its retail stores and its corporate and distribution center functions. With respect to its in-store staffing, At Home utilizes specialized in-store merchandising and visual navigation strategies that enable the Company

to employ a largely self-service model and streamline in-store staffing needs.  At Home centralizes major decisions relating to merchandising, inventory, and pricing at the corporate level, which allows its in-store teams to focus on a clean, organized, and inspiring shopping environment.  At Home's employees include personnel who are familiar with the Company's business, processes, and systems, and possess skills and experience to perform a wide variety of functions critical to the operations of the Company's retail stores, e-commerce channels, and global supply chains.  The strength of At Home's team is essential to the Company's long-term success.

### C.    At Home's Prepetition Capital Structure.

As of the Petition Date, the Debtors had approximately $1.998 billion in principal amount of debt obligations in the form of loans and bonds held by third-party creditors:

| Funded Debt | | |
|---|---|---|
| **Debt Facility** | **Maturity** | **Approximate Principal Outstanding** |
| *ABL Facility* | | |
| **ABL Facility** | July 23, 2026 | $378 million |
| *Secured Debt[14]* | | |
| **Term Loan Facility** | July 24, 2028 | $579 million |
| **Senior Secured Notes** | July 15, 2028 | $300 million |
| **Cayman Notes** | May 12, 2028 | $200 million |
| **Exchange Notes** | May 12, 2028 | $483 million |
| *Unsecured Debt* | | |
| **Senior Unsecured Notes** | July 15, 2029 | $58 million |
| **Total Funded Debt Obligations:** | | **$1.998 billion** |

The ABL Facility, the Term Loan Facility, the Senior Secured Notes, the Cayman Notes, the Intercompany Note, and the Exchange Notes are secured by:  (a) substantially all of the assets of At Home Group Inc. and the other obligors under the applicable instrument, not including certain excluded property, but including certain accounts, deposit accounts, cash and other assets therein, securities accounts, commodity accounts, inventory, and proceeds thereof; and (b) a pledge of the equity interests of At Home Group Inc. held by Ambience Intermediate, Inc.  Prior to the Petition Date, the Debtors completed a perfection analysis and substantially all of the Debtors' assets are subject to liens securing the ABL Facility, the Term Loan Facility, the Senior Secured Notes, the Cayman Notes, the Intercompany Note, and the Exchange Notes.[15]

---

[14]    In addition to the above, At Home Group Inc. and the other obligors under the applicable instrument are borrower or guarantors of a $200 million aggregate principal amount Intercompany Note issued for the benefit of non-Debtor affiliate At Home Cayman which Intercompany Note has been pledged as collateral to secure the obligations under the Cayman Notes.

[15]    The Disinterested Directors have reviewed this perfection analysis.

Pursuant to the DIP Orders, the approximately $579 million aggregate principal amount of Term Loans, $200 million aggregate principal amount of Cayman Notes, $483 million aggregate principal amount of Exchange Notes, and $300 million aggregate principal amount of Senior Secured Notes, in each case, together with all associated claims for accrued and unpaid interest, fees, and premiums thereon (as applicable) were "rolled up" with Tranche B DIP Loans (as defined in the DIP Orders). Upon the roll-up of any Claim associated with the Cayman Notes, Claims under the Intercompany Note were cancelled on a dollar-for-dollar basis pursuant to instructions delivered by the holders of the Cayman Notes to the Trustee in respect of the Cayman Notes and to At Home Cayman. The Tranche B DIP Loans issued under the roll-up of the aforementioned claims (and associated accrued and unpaid interest, fees, and premiums thereon) shall be subject to the DIP Equity Conversion on the Effective Date. For the avoidance of doubt, the prepetition Claims subject to the roll-up will receive no distributions under the Plan or be included in any calculation of the Pro Rata Share of distributions to be made under the Plan and any recovery on account of such Claims will be solely on account of the corresponding Tranche B DIP Loans.

## VI.    EVENTS LEADING TO THESE CHAPTER 11 FILINGS.

### A.    Business Challenges.

At the end of 2024 and the beginning of 2025, At Home faced certain liquidity constraints that resulted from post-COVID-19 macroeconomic trends, issues within the retail industry, operational challenges, pressures related to upcoming debt maturities under the ABL Facility, and an anticipated "going-concern" audit opinion. The Company's liquidity constraints were exacerbated and accelerated by the introduction of new tariff policies in 2025.

### 1.    Post-COVID-19 Macroeconomic Shocks and Industry Headwinds.

The Company has struggled from the continuing reverberations of the COVID-19 pandemic, which caused several macroeconomic impacts for retailers across the globe. For example, since 2022, the prolonged period of high interest rates and inflation has challenged the home furnishings and décor sector. The demand spike during the COVID-19 pandemic for home décor and furnishings products (due to increased discretionary cash, consumer focus on home improvement, and strong home sales) significantly exceeded prior levels and, given the durable goods nature of At Home's products, resulted in significant increase in demand and sales. In subsequent years, the Company has felt a softening in demand, which has been exacerbated by depressed homebuying activity due to elevated mortgage rates and record high home prices, reducing the population of new movers—a key segment of At Home's customer base. Given the fixed cost base of retail stores, slowing demand has significantly reduced the Company's profit margins.

Like many businesses in the retail space, the impacts of the post-COVID-19 landscape on the supply chain resulted in shipping challenges and the rising cost of materials, labor, and fuel, which has led to increased expenses and further reduced margins for the Company. These issues particularly impacted At Home given the Company's global sourcing and supply chain and the fact that its two distribution centers are not set up to store inventory, limiting the Company's ability to maintain appropriate levels of merchandise within its stores. At Home has been materially impacted by tumultuous shipping environments, including sudden and significantly higher costs and unpredictable delays and surcharges, because its product price tags are applied overseas and thus the Company historically has not been able to easily adjust prices in response to such volatility. Similarly, because At Home employs a long-range merchandising plan, its ability to quickly pivot to unforeseen macroeconomic issues can, at times, be limited. Moreover, At Home's significant brick-and-mortar retail footprint imposed a further drag on profitability as consumers shifted purchasing toward e-commerce channels, resulting in the loss of in-store foot traffic and sales. Operating in such a volatile retail environment contributed to At Home's

liquidity challenges as it struggled to proactively adjust to decreased demand from the changes in the macroeconomic environment.

In response, the Company completed a successful liability management transaction in May 2023, which, as described above, resulted in the Company obtaining $200 million in new money. Unfortunately, certain operational issues, as further described below, and high interest rates continued to challenge the Company's ability to effectively generate necessary demand. Even as consumer spending generally improved in the latter half of 2024, consumers tended to spend their dollars on essentials (as opposed to home décor and similar products offered by At Home) due to economic uncertainty and reduced consumer confidence. At the start of 2025, in-store traffic was approximately 24% below pre-pandemic averages in 2020.

## 2.    Operational Issues.

The sudden drop-off in demand for home décor products following the boom of the COVID-19 pandemic resulted in a mismatch between the Company's existing business plans and the new economic realities of decreased customer spending on home furnishings and a depressed housing market. The Company took immediate steps to reconcile this mismatch, but macroeconomic factors have continued to weigh on At Home and the significant interest burden has limited cash flow for reinvestment in the business.

*First*, the Company took action to conserve cash by significantly paring back new store openings. The Company then evaluated its previous lease strategy and contemplated new store openings to determine whether a change in the Company's existing store footprint was necessary. During this analysis, the Company concluded that stores recently opened in new geographies were underperforming due to low brand awareness, weak consumer demand, and mixed new store execution. The Company refocused its store growth strategy and execution to prevent these issues in the future, but the losses suffered during this time could not be completely recovered and given the contractual nature of the leases, these underperforming stores remain a part of At Home's portfolio.

*Second*, the Company attempted to address reduced customer spending post-COVID-19 by prioritizing a "low-price" competitive strategy and implementing new test concepts. Despite best efforts in deploying these strategies, consumer spending did not rebound as anticipated.

*Third*, the Company worked to adjust its strategy on sourcing and buying goods to address increased costs resulting from macroeconomic global shipping supply imbalances. Unfortunately, because the adjustments have long lead times, the Company continued operating under its existing strategy in the interim, which left it exposed to increased costs and tariff risk.

During this trying time, the Company experienced significant leadership turnover. In November 2023, At Home's then-Chief Executive Officer announced his retirement. The Company initiated a search for a replacement, during which time Brad Weston joined as new Chief Executive Officer in June 2024. Immediately thereafter, Brad worked to overhaul the Company's senior leadership team to elevate performance and improve At Home's outlook. While the new senior management team has made progress on both short-term initiatives and a longer-term roadmap for the business, the growing challenges described herein have limited the bottom-line improvements for At Home's initiatives.

## 3.    The ABL Facility and Going-Concern Opinion.

Given its strained liquidity situation, the Company initiated discussions with the ABL Agent in early 2025 to start renegotiating the terms of the ABL Credit Agreement as the Company likely would not have sufficient funds to meet this debt obligation by the July 2026 maturity date. As a part of these

discussions, the ABL Agent requested diligence related to the Company's liquidity, runway, and capital structure and then retained Gordon Brothers Asset Advisors LLC to complete an appraisal of the net recovery value of At Home's retail inventory.  In February 2025, due to the Company's existing liquidity issues and uncertainty surrounding impending tariffs, the ABL Agent indicated that the inventory appraisal may result in a reduction of the borrowing base under the ABL Facility and the implementation of discretionary reserves.  In the months leading up to the Petition Date, the Company and the ABL Agent continued to engage in constructive discussions on how to best address the ABL Agent's concerns without further exasperating the Company's liquidity position.

As discussions remained ongoing with the ABL Agent, it also became clear that the Company's yearly audit, which was due May 27, 2025, likely would lead to a going-concern qualified opinion, highlighting substantial doubt about the Company's ability to continue operating for the foreseeable future. At Home understood that this going-concern audit opinion would put further strain on the Company and its financial situation and would cause the Company to default under the ABL Credit Agreement, the Term Loan Credit Agreement, the Cayman Notes Indenture, and the Intercompany Note for failure to deliver a clean audit opinion.

### 4.      Tariff Policy Changes.

Beyond macroeconomic challenges, retail industry headwinds, and internal pressures, the Company has faced significant challenges in addressing tariffs given its reliance on goods sourced from China.  Despite the Company's experience with navigating tariff changes in recent years, the current tariff policy dynamic introduced a new level of uncertainty and volatility during the early stages of the new senior management team's implementation of its refined business strategy.  On January 20, 2025, an executive order was signed instructing certain cabinet secretaries to develop reports on trade practices and recommendations for tariffs by April 1, 2025.  Just days after signing the order, a 10% tariff on all Chinese imports was imposed, which was subsequently raised another 10%, making the cumulative new tariff 20%. On April 2, 2025, the scope of tariffs across the world was widened with a 10% universal tariff on goods from all countries plus individualized reciprocal tariffs on approximately 60 nations.  On April 5, 2025, the universal tariff took effect.  On April 9, 2025, a 90-day pause on all reciprocal tariffs, except for China, was announced.  While the government engaged with foreign trade partners on trade deals with respect to reciprocal tariffs, a trade war ensued with China.  On April 10, 2025, the government announced a 145% tariff on all Chinese goods and China subsequently implemented its own reciprocal tariff of 125%.  After just over a month of discussions between the United States and China, the government announced on May 12, 2025, that it would temporarily lower the tariff on Chinese goods to 30% and implement a 90-day pause to give the two countries more time to negotiate.  One month later, on June 11, 2025, the government announced an interim agreement with China, which set the near-term tariff on Chinese imports at 55%.

The introduction of broad-based tariffs caused significant unpredictability and disruption to the retail industry and put retailers—especially ones like At Home—in a difficult operating position.  Imported products became more costly immediately upon tariffs taking effect.  Given that At Home purchases most of its merchandise from foreign product partners, the Company was forced to consider whether to raise prices for customers or bear the extra costs itself.  Passing higher costs associated with tariffs on to customers is particularly challenging for At Home given demand elasticity in its discretionary purchase categories.  In addition, At Home's everyday low-price strategy makes it more difficult for the Company to react to these macroeconomic pressures and maintain its value positioning.  As such, the Company negotiated cost concessions from product partners where feasible coupled with reductions to purchase orders.

Uncertainty about tariffs, pricing, and supply chains became pervasive among consumers and businesses across the United States, making it hard to plan and manage inventory.  At the same time, the

49

amount of cargo shipments coming into the U.S. declined precipitously. The uncertainty surrounding tariffs has caused concern for At Home, which employs an early sourcing method whereby the Company sources seasonal goods such as for Halloween and Christmas from foreign product partners months in advance. With large and frequent changes to trade policy, consumer sentiment has also declined materially over the past few months and higher prices coupled with uncertainty has resulted in customers being more cautious with their money. In addition, on May 6, 2025, Moody's downgraded At Home's debt ratings, changing its outlook to negative from stable and reflecting At Home's downgrade due to increased costs from tariffs along with severely depressed operating income levels and upcoming debt maturities on the ABL Facility. Already faced with a declining liquidity situation and a nascent leadership team and refined business strategy, new rounds of tariffs contributed greatly to the uncertainty of At Home's operational future and financial outlook and intensified the Company's need for a comprehensive solution.

### B.    The Company's Prepetition Initiatives.

Amid industry headwinds, operational challenges, upcoming debt maturities, and macroeconomic challenges, including ongoing changes to tariff policies, the Company implemented several initiatives in the months leading up to the Petition Date to stabilize its business and address its liquidity.

### 1.    Revised Go-Forward Business Plan and Cost-Saving Initiatives.

After his appointment in June 2024, CEO Brad Weston worked to galvanize the organization around the right business plan and initiatives with the appropriate investment strategy for healthy sales growth. The Company's refined business plan revamped the sourcing strategy to eliminate costs by removing intermediary agents, reframed the business's focus on product value over price, and accelerated digital engagement and commerce capabilities. As part of its refined business plan, the new senior management team also fortified the Company's supply chain and margin approach through diversification in its efforts to mitigate risk associated with supply chain and tariff volatility.

The Company's efforts also included certain cost-saving initiatives. As a result of the Company's operating performance throughout 2024 (fiscal year 2025), the Company proactively revised its budget for the upcoming year to address its shortening liquidity runway and reduce certain operational costs. These cost-saving initiatives were factored into the Company's budget and went into effect in 2025 (fiscal year 2026).

As liquidity continued to tighten for At Home throughout the beginning of 2025 and as discussions with the ABL Agent began, the Company quickly realized that additional cost savings were necessary. To that end, the Company undertook a series of working capital management measures to conserve cash, including certain initiatives such as "Close the Gap," "Project G.R.O.W." (Get Rid of Waste), and "Fiscal Fitness."

### 2.    Strategic Alternatives and the Retention of Advisors.

Notwithstanding the Company's 2023 debt refinancing, at the beginning of 2025, due to persistent macroeconomic factors following the COVID-19 pandemic, the unpredictability of the tariff landscape, and the upcoming maturity of the ABL Facility, the Company determined it needed additional liquidity in the near term to fund its operations.

Accordingly, in February 2025, the Company engaged PJT as investment banker and Kirkland as legal counsel to assist the Company in exploring financing and other strategic alternatives to address its

balance sheet.[16]  Also in February 2025, the Company retained AlixPartners to assist with its 13-week cash flow forecast in connection with evaluating ways to right-size its balance sheet.  On April 2, 2025, the Company expanded AlixPartners' scope of services and officially retained AlixPartners as financial advisor.

Shortly after the Company retained advisors, PJT reached out to six third-party lenders and certain of the Company's existing lenders to solicit proposals around a new money capital raise.  Of those six third-parties, two lenders submitted proposals for a new "first-in last-out" facility and two other lenders indicated their intent to also submit financing proposals subject to certain conditions.  In parallel with those discussions, and in response to the Company's request for a standalone financing proposal, certain of the Company's existing lenders expressed an interest in engaging with the Company on a comprehensive restructuring proposal.  In March 2025, the Company and the Ad Hoc Group commenced discussions on a possible comprehensive restructuring that would deleverage the Company and raise a new money investment.

During this time, the Company and its advisors were also progressing constructive discussions with the ABL Agent regarding the various financing options available to the Company to avoid the risk of the ABL Agent taking actions, including implementing certain reserves, that could potentially limit the Company's go-forward options.

The Company initially believed that a capital raise in conjunction with amendments to the ABL Credit Agreement could solve its financial issues.  Given additional market uncertainty associated with new tariff policies announced in the beginning of April 2025, however, the Company recognized that a comprehensive strategy aimed at addressing all of its financial issues at once (including extending the maturity under the ABL Credit Agreement, addressing its going concern issues, raising new capital, and deleveraging its balance sheet) may be a more reasonable approach.  After careful and detailed consideration of the various proposals in front of them, the Parent Boards and the Special Committee determined, in an exercise of their business judgment, that the best option to maximize value for all stakeholders would be a comprehensive restructuring of the Company's capital structure.  Thus, in April 2025, the Company increasingly focused its efforts on engaging with the Ad Hoc Group on the terms of a comprehensive restructuring.

### 3.    Governance Changes.

In connection with evaluating its strategic alternatives, the Company proactively evaluated its own corporate governance structure.  On March 4, 2025, the Parent Boards determined that it was in the best interests of the Company and its stakeholders to appoint Jill Frizzley as a disinterested director of the Parent Boards to assist in exploring, negotiating, and entering into potential strategic value-maximizing transactions.  Ms. Frizzley has over two decades of experience in the restructuring industry and extensive expertise advising companies facing liquidity constraints.

Subsequently, one of the existing independent directors of the Parent Boards resigned.  Accordingly, on March 28, 2025, the Parent Boards appointed Elizabeth Abrams (together with Ms. Frizzley, the "Disinterested Directors") as an additional disinterested director with meaningful experience navigating similar distressed situations to fill that vacancy.  Simultaneously, the Parent Boards formed the Special Committee, comprised of Ms. Frizzley, Ms. Abrams, and John Butcher, one of the other existing independent directors.  The Parent Boards delegated exclusive decision-making authority to the Special

---

[16]    PJT's engagement letter was signed on April 11, 2025, but is effective as of February 11, 2025.  Kirkland's engagement letter was signed on February 14, 2025.

Committee with respect to any matters in which a conflict of interest exists or is reasonably likely to exist (the "Conflict Matters") between the Company, on the one hand, and any of its Related Parties.

In May 2025, Ms. Frizzley and Ms. Abrams, as the two Disinterested Directors, initiated an independent investigation (the "Investigation") into the Conflict Matters, such as potential claims and causes of action that the Company may hold against Related Parties, as a part of the Company's preparation for these Chapter 11 Cases.[17] The Disinterested Directors constitute a majority of the Special Committee.[18] The Disinterested Directors, with the assistance of Young Conaway, reviewed the factual and legal bases for potential claims and causes of action arising from the Company's transactions to ensure that any releases to be provided under a plan of reorganization or otherwise in the Chapter 11 Cases are appropriate in scope and nature. As part of the Investigation, Young Conaway requested and received documents from the Company and also conducted interviews of relevant persons.

The Investigation and its outcome are further discussed in **Article VII.E** of this Disclosure Statement.

### 4.    Lease Savings Initiatives.

As part of its ongoing efforts to optimize its operations, the Company engaged in a comprehensive analysis of its real estate portfolio to identify ways to restructure or exit leases with off-market lease terms or faltering financial performance. As further described above, in the months preceding the filing of these cases, the Company, with the assistance of its advisors, developed a revised business plan strategy, which focused in part on right-sizing At Home's lease portfolio to ensure unprofitable store locations close and/or benefit from restructured lease obligations.

As part of this strategy, the Company retained Hilco Real Estate, LLC ("Hilco") on April 16, 2025, to conduct a footprint assessment and site-level evaluation to identify (a) a series of sites for immediate closure and (b) certain sites with off-market lease terms. Subsequently, the Company, together with Hilco and AlixPartners, completed a lease rationalization analysis to incorporate into the business plan which includes but is not limited to addressing the fixed term obligations and future options of each lease and aligning such commitment with store performance and operational risk factors. The Company intends to implement the Plan during these Chapter 11 Cases to bring lease costs in line with expected revenues and sustainable margins.

On June 14, 2025, the Company also retained Hilco Merchant Services, LLC to act as the exclusive agent for the purpose of conducting a sale of certain of the Company's goods, saleable in the ordinary course located in certain of the Company's stores designated for "Store Closing," "Everything Must Go," "Everything on Sale," or similar themed sale. These undertakings will aid the Company in pursuing its plan to right-size At Home's store footprint.

### 5.    Forbearance Agreements.

As negotiations with the Company's stakeholders progressed, the Ad Hoc Group agreed to enter into a forbearance agreement with the Company with respect to certain upcoming interest payments to extend the Company's liquidity runway including an approximately (a) $11.5 million interest payment due

---

[17]    The Disinterested Directors are represented by Young Conaway Stargatt & Taylor, LLP ("Young Conaway") in connection with the investigation.

[18]    Although a member of the Special Committee, Mr. Butcher did not participate in the independent investigation into the Conflict Matters due to his tenure on the Parent Boards.

under the Cayman Notes Indenture on May 15, 2025, (b) $11.5 million interest payment due under the Intercompany Note on May 15, 2025, and (c) $4.3 million interest payment due under the Term Loan Credit Agreement on June 2, 2025. In addition, the ABL Agent agreed to enter into a separate forbearance agreement with the Company with respect to certain anticipated events of default under the ABL Credit Agreement, including, among other things, failure to comply with the requirements to deliver a clean audit opinion, annual and quarterly financials, a budget, and related compliance certificates.

On May 23, 2025, those efforts resulted in the execution of the ABL Forbearance Agreement and the Omnibus Forbearance Agreement (collectively, the "Forbearance Agreements"). The Forbearance Agreements contained, among other things, an agreement from the consenting lenders to forbear from exercising their rights and remedies under the applicable debt documentation through June 30, 2025, as well as certain milestones and reporting obligations intended to drive parties to consensus on a transaction.

The Forbearance Agreements provided the Company with the liquidity runway needed to complete negotiation of a comprehensive restructuring and to secure needed financing thus ensuring the Company commenced the Chapter 11 Cases with sufficient financing and a clear path to emergence.

**6.      Restructuring Support Agreement.**

After extensive, arms'-length and good faith negotiations, on June 16, 2025, the Debtors, the Ad Hoc Group, other holders of the Company's first lien debt, and H&F entered into the RSA, a copy of which is attached hereto as **Exhibit E**. The RSA provides for a comprehensive deleveraging transaction effectuated through a chapter 11 plan of reorganization and allows the Debtors to emerge as a going concern with sufficient liquidity to implement their go-forward business plan. The RSA represents a significant achievement for At Home and is a testament to the commitment of its lenders to support a value-maximizing path forward upon emergence from these Chapter 11 Cases. Holders of approximately 96% of the Debtors' first lien debt signed on to the RSA and pursuant to the RSA, such holders agreed to support the Debtors' proposed plan of reorganization, which will help ensure a straight-forward and efficient chapter 11 process. The Restructuring Transactions contemplated by the RSA will eliminate approximately $1.620 billion of the Company's existing $1.998 billion in debt, and the commitments for up to $600 million of debtor-in-possession financing and the consensual use of cash collateral will support the Company's operations during the Chapter 11 Cases and ensure a smooth and timely exit from chapter 11. On the effective date of the plan, the Reorganized Debtors will enter into an exit asset-based lending facility, which will be applied to refinance the prepetition ABL Facility. Ultimately, the Restructuring Transactions contemplated by the RSA provides the best path forward for the Debtors to continue business as usual while allowing the Debtors to continue to consider value-maximizing alternatives.

**VII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES.**

**A.      First and Second Day Relief.**

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors (42 entities) filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. Throughout June and July 2025, the Bankruptcy Court entered orders granting the First Day Motions on an interim or final basis, as specified below.

1.       **The DIP Facility and Access to Cash Collateral.**

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 16] (the "DIP Motion") seeking approval of entry into a debtor-in-possession financing facility in the form of a $600 million DIP Facility. The DIP Facility is comprised of (i) new money first-out delayed draw term loans in an aggregate amount of $200 million, and (ii) a second-out roll-up facility in an aggregate principal amount of approximately $400 million representing a 2:1 roll-up of obligations under the Term Loan Facility, the Senior Secured Notes, the Exchange Notes, and the Cayman Notes. Pursuant to the DIP Motion, the Debtors also sought the authority to use the ABL Secured Parties' cash collateral on a consensual basis. On June 17, 2025, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 107] (the "Interim DIP Order"). Pursuant to the Interim DIP Order, the Bankruptcy Court authorized the Debtors' use of cash collateral on a consensual basis and authorized the Debtors to access $75 million of new money and a roll up of $150 million of certain prepetition obligations.

Following entry of the Interim DIP Order, the Debtors received several formal and informal objections from various parties including the Committee and landlords. *See* [Docket Nos. 268, 271, 275, 279, and 283] (collectively, the "DIP Objections"). In response to the DIP Objections, the Debtors and the DIP Lenders each filed a reply in support of the DIP Motion. *See* [Docket Nos. 310, 313]. Prior to the final DIP hearing, the Debtors, together with the DIP Lenders, worked to address the concerns raised in the DIP Objections. These discussions resulted in a consensual resolution of the DIP Motion, and on July 18, 2025, the Bankruptcy Court entered an order approving the DIP Motion on a final basis [Docket No. 344].

2.       **Operational Motions**.

The Bankruptcy Court entered the following orders authorizing the Debtors to facilitate their operations in the ordinary course:

- **Cash Management Motion.** On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 102] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (III) Granting Related Relief [Docket No. 8] (the "Cash Management Motion") on an interim basis. On July 14, 2025, the Bankruptcy Court entered an order approving the Cash Management Motion on a final basis [Docket No. 299].

- **Wages Motion.** On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 97] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs; and (II) Granting Related Relief [Docket No. 7] (the "Wages Motion") on an interim basis. On July 14, 2025, the Bankruptcy Court entered an order approving the Wages Motion on a final basis [Docket No. 298].

- **Vendors Motion.** On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 114] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain (A) Critical Vendors, (B) Foreign Vendors, (C) 503(b)(9) Claimants, and (D) Lien Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief [Docket No. 6] (the "Vendors Motion") on an interim basis. On July 14, 2025, the Bankruptcy Court entered an order approving the Vendors Motion on a final basis [Docket No. 297].

- **Customer Programs Motion.** On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 95] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer their Customer Programs and (B) Honor Prepetition Obligations, and (II) Granting Related Relief [Docket No. 5] (the "Customer Programs Motion") on an interim basis. On July 13, 2025, the Bankruptcy Court entered an order approving the Customer Programs Motion on a final basis [Docket No. 286].

- **Insurance Motion.** On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 117] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance, Surety Coverage, and Letters of Credit Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, Surety Bonds, and Letters of Credit, (C) Honor and Renew Premium Financing Agreements Entered into Prepetition, Satisfy Prepetition Obligations Related Thereto, and Enter into Premium Financing Agreements, and (D) Continue to Pay Broker Fees, and (II) Granting Related Relief [Docket No. 10] (the "Insurance Motion") on an interim basis. In accordance with such order, on or around July 2, 2025, Bank of America, N.A. issued a letter of credit to the Debtors with respect to a surety bond provided by Liberty Mutual Insurance Company. On July 14, 2025, the Bankruptcy Court entered an order approving the Insurance Motion on a final basis [Docket No. 300].

- **Utilities Motion.** On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 103] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (IV) Authorizing Payments to the Debtors' Utilities Administrator, and (V) Granting Related Relief [Docket No. 12] (the "Utilities Motion") on an interim basis. On July 13, 2025, the Bankruptcy Court entered an order approving the Utilities Motion on a final basis [Docket No. 287].

- **Taxes Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 116] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief [Docket No. 13] (the "Taxes Motion") on an interim basis.  On July 14, 2025, the Bankruptcy Court entered an order approving the Taxes Motion on a final basis [Docket No. 288].

- **NOL Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 118] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief [Docket No. 14] (the "NOL Motion") on an interim basis.  On July 11, 2025, the Bankruptcy Court entered an order approving the NOL Motion on a final basis [Docket No. 270].

  **3.**    **Administrative Motions**.

In addition to the operational motions above, the Bankruptcy Court entered the following orders authorizing the Debtors to facilitate their administration of these Chapter 11 Cases:

- **Joint Administration Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 92] approving the Motion of Debtors for Entry of an Order (I) Directing the Joint Administration of Chapter 11 Cases and (II) Granting Related Relief [Docket No. 2] on a final basis.

- **Automatic Stay Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 111] approving the Motion of Debtors Seeking Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief [Docket No. 11] on a final basis.

- **Claims Agent Retention Application.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 119] approving the Application of Debtors for Entry of an Order (I) Authorizing and Approving the Appointment of Omni Agent Solutions, Inc. as Claims and Noticing Agent and (II) Granting Related Relief [Docket No. 3] on a final basis.

- **Creditor Matrix Motion.**  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 120] approving the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Redact Certain Confidential Information of Customers, (B) Redact Certain Personally Identifiable Information of Individuals, and (C) Serve Certain Parties in Interest by Email; (II) Approving the Form and Manner of Service of the Notice of Commencement; (III) Approving the Form and Manner of Notice to Customers; and (IV) Granting Related Relief [Docket No. 9] (the "Creditor Matrix Motion") on an interim basis.  On July 11, 2025, the Bankruptcy Court entered an order approving the Creditor Matrix Motion on a final basis [Docket No. 269].

- **Schedules and Statements Extension Motion.** On the Petition Date, the Debtors filed the Motion of Debtors for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports and (II) Granting Related Relief [Docket No. 22] (the "Schedules and Statements Extension Motion") requesting that the Bankruptcy Court extend the time for the Debtors to file schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, statements of financial affairs, and Bankruptcy Rule 2015.3 financial reports. On July 11, 2025, the Bankruptcy Court entered an order approving the Schedules and Statements Extension Motion [Docket No. 274], which extended the schedules and statements filing deadline to August 4, 2025. On August 4, 2025, the Debtors filed their Schedules and statements of financial affairs [Docket Nos. 431–472].

### 4.      Store and Lease Related Motions.

As discussed above and further in the First Day Declaration, a key component of the Company's prepetition and postpetition engagement revolved around a continuation and completion of the Debtors' ongoing effort to rationalize their retail store footprint. This effort entailed, among other things, the closure of certain underperforming stores (based on a comprehensive cost-benefit analysis with the assistance of outside advisors) with the goal of creating an efficient and profitable remaining store footprint.

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to Be Free and Clear of all Liens, Claims, and Encumbrances, (III) Modifying Customer Programs at the Closing Stores, and (IV) Granting Related Relief* [Docket No. 16] (the "Store Closing Motion") to conduct 26 initial store closings. On June 17, 2025, the Bankruptcy Court entered an order approving the Store Closing Motion on an interim basis [Docket No. 126]. On July 15, 2025, the Debtors filed the *Notice of Removal of Closing Stores from the Store Closing List* [Docket No. 303], removing two stores from the original store closing list. On July 18, 2025, the Bankruptcy Court entered an order approving the Store Closing Motion on a final basis [Docket No. 345]. On July 24, 2025, the Debtors filed the *Notice of Filing of Additional Store Closing List* [Docket No. 369], adding six stores to the amended store closing list. On August 1, 2025, the Debtors filed the *Notice of Removal of Closing Stores from the Store Closing List* [Docket No. 426], removing two stores from the amended store closing list. The Debtors have authority to file subsequent notices amending such list as necessary.

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* [Docket No. 21] (the "Assumption and Rejection Procedures Motion"), through which the Debtors sought approval of certain procedures for rejecting or assuming executory contracts and unexpired leases. On July 18, 2025, the Bankruptcy Court entered an order approving the Assumption and Rejection Procedures Motion on a final basis [Docket No. 346]. On August 6, 2025, the Debtors filed the *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 476], rejecting 22 leases. On August 12, 2025, the Debtors filed the *Second Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 520], rejecting six additional leases.

On the Petition Date, the Debtors filed the *Omnibus Motion of Debtors for Entry of an Order (I) Authorizing the (A) Rejection of Certain Unexpired Leases and (B) Abandonment of Certain Personal Property, Each Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 20] (the "Omnibus Rejection Motion") to reject six initial leases effective as of the Petition Date. On

July 18, 2025, the Bankruptcy Court entered an order approving the Omnibus Rejection Motion on a final basis [Docket No. 342].

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Extending the Deadline for the Debtors to Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* [Docket No. 23] (the "365(d)(4) Extension Motion") requesting that the Bankruptcy Court extend the deadline established by section 365(d)(4) of the Bankruptcy Code for the Debtors to assume, assume and assign, or reject unexpired leases of nonresidential property to January 12, 2026. On July 14, 2025, the Bankruptcy Court entered an order approving the 365(d)(4) Extension Motion [Docket No. 301].

### B. Appointment of the Committee.

On June 27, 2025, the U.S. Trustee filed the N*otice of Appointment of Committee of Unsecured Creditors* [Docket No. 197] appointing the Committee. The Committee is comprised of the following entities: (1) CSC Delaware Trust Company, in its capacity as successor Trustee; (2) Realty Income Corporation; (3) Brentwood Originals, Inc.; (4) Jordan Manufacturing Co., Inc.; (5) Loloi Rugs; (6) Natco Products Corp.; and (7) Oriental Weavers USA. On July 15, 2025, the U.S. Trustee filed the *Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 306], which removed Oriental Weavers USA from the Committee and appointed CTM International Giftware Inc. in its place. On July 17, 2025, the U.S. Trustee filed the *Second Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 320], which removed CTM International Giftware Inc. from the Committee and reappointed Oriental Weavers USA in its place. On July 18, 2025, the U.S. Trustee filed the *Third Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 335], which removed Natco Products Corp. from the Committee.

Shortly after the Committee's appointment, the Debtors began actively engaging with the Committee regarding the key components of these Chapter 11 Cases. As discussed above in more detail, after the Committee's appointment, the Committee filed an objection to entry of an order approving the DIP Motion on a final basis which the Debtors and the Committee worked together to resolve informally.

### C. Retention of Professionals.

### 1. Retention of Debtor Professionals.

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed applications requesting that the Bankruptcy Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327, 328, and 363 of the Bankruptcy Code, as applicable:

- Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP, as Attorneys for the Debtors and Debtors in Possession Effective as of June 16, 2025 [Docket No. 203] filed on June 27, 2025, to retain Kirkland & Ellis LLP and Kirkland & Ellis International LLP as lead restructuring counsel, was approved by the Bankruptcy Court on July 24, 2025 [Docket No. 371];

- Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Young Conaway Stargatt & Taylor, LLP, as Co-Counsel for the Debtors, Effective as of the Petition Date [Docket No. 199] filed on June 27, 2025, to retain Young Conaway Stargatt & Taylor, LLP as co-counsel and conflicts counsel, was approved by the Bankruptcy Court on July 24, 2025 [Docket No. 375];

- Application of Debtors for Entry of an Order Authorizing the Retention and Employment of PJT Partners LP, as Investment Banker to the Debtors and Debtors in Possession, Effective as of the Petition Date, (II) Waving Certain Information Requirements Pursuant to Local Rule 2016-1, and (III) Granting Related Relief [Docket No. 168] filed on June 23, 2025, to retain PJT Partners, LP as investment banker, was approved by the Bankruptcy Court on July 18, 2025 [Docket No. 347];

- Application of Debtors for Entry of an Order Authorizing the Employment and Retention of AlixPartners, LLP, as Financial Advisor Effective as of the Petition Date [Docket No. 204] filed on June 27, 2025, to retain AlixPartners, LLP as financial advisor, was approved by the Bankruptcy Court on July 24, 2025 [Docket No. 372];

- Application of Debtors for Entry of an Order Authorizing the Debtors to Employ and Retain Omni Agent Solutions, Inc. as Administrative Agent Effective as of the Petition Date [Docket No. 205] filed on June 27, 2025, to retain Omni Agent Solutions, Inc. as claims and noticing agent, was approved by the Bankruptcy Court on July 24, 2025 [Docket No. 374];

- Application of Debtors for Entry of an Order (I) Authorizing the Retention and Employment of Ernst & Young LLP as Tax Advisory Services Provider Effective as of the Petition Date and (II) Granting Related Relief [Docket No. 169] filed on June 23, 2025 to retain Ernst & Young LLP as tax advisory services, was approved by the Bankruptcy Court on July 18, 2025 [Docket No. 348];

- Application of Debtors for Entry of an Order (I) Authorizing the Employment and Retention of Hilco Real Estate, LLC as Real Estate Consultant and Advisor to the Debtors and Debtors in Possession, (II) Approving the Terms of Hilco's Employment, (III) Waiving Certain Timekeeping Requirements, and (IV) Granting Related Relief [Docket No. 170] filed on June 23, 2025 to retain Hilco Real Estates, LLC as real estate advisor, was approved by the Bankruptcy Court on July 18, 2025 [Docket No. 349]; and

- Application of Debtors for Entry of an Order (I) Authorizing the Retention and Employment of KPMG LLP to Provide Accounting Advisory, Valuation, Tax Provision, Tax Consulting, and Tax Compliance Services Effective as of the Petition Date; and (II) Waiving the Information Requirements of Local Rule 2016-1(D) [Docket No. 225] filed on July 1, 2025 to retain KPMG LLP to provide accounting, advisory, valuation, tax provision, tax consulting, and tax compliance services, was approved by the Bankruptcy Court on July 24, 2025 [Docket No. 373].

**2.      Retention of Ordinary Course Professionals**.

On June 23, 2025, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business, (II) Establishing Procedures for Designating Such Professionals, (III) Waving Certain Information Requirements of Local Rule 2016-1, and (IV) Granting Related Relief* [Docket No. 167] (the "<u>Ordinary</u>

Course Professionals Motion"), seeking authorization to retain and compensate certain law firms, accountants, consultants, and other non-attorney professionals utilized in the ordinary course of business. On July 11, 2025, the Bankruptcy Court entered an order approving the Ordinary Course Professionals Motion [Docket No. 273]. On July 21, 2024, the Debtors filed the *Notice of Filing of First Amended List of Ordinary Course Professionals* [Docket No. 353]. On July 23, 2025, the Debtors filed the *Notice of Filing of Second Amended List of Ordinary Course Professionals* [Docket No. 367].

> **3.     Retention of Committee Professionals**.

After its appointment, the Committee filed applications requesting the Bankruptcy Court's authorization to retain and employ certain advisors pursuant to sections 327, 328, and 363 of the Bankruptcy Code, as applicable, including Pachulski Stang Ziehl & Jones LLP, as proposed counsel [Docket No. 427] and FTI Consulting, Inc., as proposed financial advisor [Docket No. 428]. As of the date hereof, the Bankruptcy Court has not entered orders authorizing retention of the Committee's proposed professionals.

> **D.     Bar Dates**.

On July 22, 2025, the Debtors filed the *Motion of Debtors Seeking Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II)* Establishing *Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Form and Manner of Notice Thereof* [Docket No. 355] (the "Bar Date Motion") which is set for a hearing on August 14, 2025. On August 8, 2025, the Bankruptcy Court entered an order approving the Bar Date Motion [Docket No. 499] (the "Bar Date Order"). Pursuant to the Bar Date Order, the bar dates are as follows:

- **General Bar Date**: September 8, 2025 at 11:59 p.m., prevailing Eastern Time;

- **Governmental Bar Date**: December 15, 2025 at 11:59 p.m., prevailing Eastern Time;

- **Amended Schedules Bar Date**: in the event that the Debtors amend or supplement their Schedules, the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, to such claim, and (b) 11:59 p.m., prevailing Eastern Time, on the date that is 30 days from the date on which the Debtors provide notice of the amendment to the Schedule**s**; and

- **Rejection Damages Bar Date**: in the event that an order authorizing the rejection of an executory contract or unexpired lease is entered, except as otherwise set forth in such order, the later of (i) the General Bar Date, (ii) 11:59 p.m., prevailing Eastern Time, on the date that is 30 days after the later of (A) entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors or (B) the effective date of a rejection of any executory contract or unexpired lease of the Debtors pursuant to operation of any Bankruptcy Court order.

> **E.     The Disinterested Directors' Investigation**.

As previously discussed in **Article VI.B.3** of this Disclosure Statement, prior to the Petition Date, the Disinterested Directors initiated the Investigation, with the assistance of Young Conaway.

From May 2025 to July 7, 2025, Ms. Frizzley and Ms. Abrams, with Young Conaway's assistance, oversaw and directed the Investigation which consisted of document review, interviews with Company

executives, board members, and advisors to certain of the transactions, and numerous update conferences between Young Conaway, Ms. Frizzley, and Ms. Abrams.  In connection with the Investigation, the Disinterested Directors reviewed thousands of pages of credit agreements, financial documents, and board presentation materials, in addition to interviews with management, board members, and legal and financial advisors.

The Investigation was designed to accomplish, and ultimately accomplished, the following goals:

- reviewing the factual and legal bases for potential claims;

- assessing the strengths and weaknesses of each claim to determine the proper treatment of claims in a chapter 11 plan and in connection with the DIP Facility;

- evaluating any proposed release, settlement, retention, or prosecution of claims or causes of action; and

- making determinations in connection with the release of claims or causes of action the Company might hold against Related Parties and others.

The Investigation focused particular attention on a financing transaction, referred to in the Company's first-day pleadings as the May 2023 liability management transaction, which involved a new money capital raise and Senior Unsecured Notes exchange with certain holders of the Senior Unsecured Notes.  In May 2023, the Company exchanged $442 million aggregate principal amount of Senior Unsecured Notes for $412 million aggregate principal amount of new Exchange Notes.  The Company also formed a new foreign entity, At Home Cayman, a restricted subsidiary of the Company, and completed a private placement of $200 million of new senior secured Cayman Notes, the net proceeds of which were then lent by At Home Cayman to At Home Group Inc. pursuant to the Intercompany Note.  The document review and interviews performed in connection with the Investigation helped to confirm that the liability management transaction was not only at arm's-length but that there were effectively no other realistic financing alternatives available to the Company, a fact confirmed by the absence of interest in other potential lenders who were contacted during a follow-on 60-day go-shop period.

As a result of the May 2023 liability management transaction, the Company received a significant cash infusion on pricing terms not otherwise available.  The proceeds for the transaction were applied by the Company to fund its operations and by virtue of the Company's integrated operations provided direct and indirect benefits to the Company's various subsidiaries and the business enterprise as a whole.  The Investigation also considered any alternative forms of financing that the Company might have pursued or considered in the run-up to its bankruptcy filing, as well as the operational factors and macroeconomic forces that the Company was facing as it sought to right its financial ship in the early months of 2025.

Particular focus was also given to the role of the Consenting Sponsor. What emerged from that analysis was that the Consenting Sponsor did not receive management fees, did not receive director fees for its appointees to the board, and contributed considerable manpower, resources, and expertise, even at a time when it became apparent that its capital investment of more than $1 billion would ultimately need to be written off. Specifically, the Investigation's findings did not yield any potential claims against the Consenting Sponsor for reimbursement of expenses, which, if anything, suggested that the Consenting Sponsor was intentionally vigilant about not compromising the Company's liquidity for its own benefit, and was also praised by officers at the Company for the expertise and resources provided to management. The Investigation also examined the Consenting Sponsor's transaction, which was a boon to the public stockholders being cashed out at a substantial premium. The Investigation was able to confirm that none of these stockholders ever commenced legal action to enjoin the go-private merger in 2021 or received a judicial appraisal opinion of their shares. Further, no evidence emerged that, in the wake of this merger, the Company was unable to timely pay its creditors. It continued to do so.

Beyond the specifics of certain transactions, the circumstances and nature of the relationship between the Company, its secured lenders, and the unsecured bond holders was also explored to determine any other possible claims that might have arisen in the context of any transaction. That analysis similarly failed to produce evidence of any viable claims. In addition, the Disinterested Directors analyzed possible claims around salaries and benefits that were paid to Company officers and directors in the year leading up to the bankruptcy filing, but the Investigation concluded that that such compensation was typical, market, and consistent with Company practices, particularly in the strained financial circumstances the Company was facing.

Based on the analysis presented by the Disinterested Directors, the board determined that the Company did not have any colorable or valuable claims and/or causes of action against the Company's Insiders relating to any prepetition conduct of such parties. Nonetheless, given other considerations relevant to these Chapter 11 Cases, the board determined that there is sufficient consideration for the Releases provided in the Plan.

Based on the results of the Investigation, the Debtors believe the Plan, and the transactions, settlements, and compromises embodied therein, are the best alternative available to the estates.

## VIII.    RISK FACTORS.

**Before taking any action with respect to the Plan, Holders of Claims should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement, the Plan, and the documents delivered together herewith, referred to, or incorporated by reference into this Disclosure Statement, including other documents filed with the Bankruptcy Court in the Chapter 11 Cases. The risk factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the restructuring and consummation of the Plan. Each of the risk factors discussed in this Disclosure Statement may apply equally to the Debtors and the Reorganized Debtors, as applicable and as context requires.**

A.      **Bankruptcy Law Considerations**.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan, but will not necessarily affect the validity of the vote of the Voting Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Voting Classes.

1.      **There Is a Risk of Termination of the RSA**.

The RSA contains provisions that give the signatories thereto (collectively or individually, as applicable) the ability to terminate the RSA upon the occurrence of certain events or if certain conditions are not satisfied, including the Debtors' failure to use commercially reasonable efforts to achieve the Milestones set forth therein. To the extent that events giving rise to termination of the RSA occur, the RSA may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies and could result in the loss of use of DIP Facility and/or Cash Collateral by the Debtors under certain circumstances. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan. In the event that the RSA is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

2.      **The Debtors May Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors**.

While the Debtors are permitted to evaluate restructuring alternatives under the RSA, they believe the Restructuring Transactions outlined in the RSA represent the best available means of implementing a needed comprehensive restructuring of their business. If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, commencing section 363 sales of the Debtors' assets, converting to a chapter 7 plan, and any other transaction that would maximize the value of the Debtors' Estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

3. **Parties in Interest May Object to the Plan's Classification of Claims and Interests**.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

4. **The Conditions Precedent to the Effective Date of the Plan May Not Occur**.

As more fully set forth in Article IX of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not met or waived with the consent of the Required Consenting Stakeholders, the Confirmation and Effective Date of the Plan will not take place. In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan. If the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

Specifically, the Effective Date may not occur if (i) import tariffs announced by the United States on jurisdictions material to the Debtors' business increase to a level higher than the levels that were in effect on June 16, 2025, and (ii) the Debtors' Revised Business Plan (as defined in the DIP Term Sheet attached as <u>Annex C</u> to the Restructuring Term Sheet) results in declines in Adjusted EBITDA (calculated in the same manner as calculated in the Debtors' business plan) of greater than $13,000,000 for the fiscal year 2026 or greater than $15,000,000 for the fiscal year 2027 as compared to the Debtors' business plan.

Additionally, the Effective Date may not occur if the Debtors shall have not previously entered into new leases or modifications or amendments to existing leases (or rejected existing leases) with the combined aggregate effect of reducing rental costs (through reductions in base rent or otherwise) by an amount and on terms acceptable to the Debtors and the Required Consenting Stakeholders.

5. **The Debtors Could Fail to Satisfy Vote Requirements**.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. If sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims or Interests as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

6. **The Debtors Might Not Be Able to Secure Confirmation of the Plan**.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or interests within a particular class under such plan will

not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them or Interests would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the RSA and subject to the consent of the Required Consenting Stakeholders, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 7. The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any Insider in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 8. Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' products, and increasing expenses. *See* **Article VIII.C** of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Business." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan to achieve the Debtors' stated goals.

9.      **The Chapter 11 Cases Could Be Converted to Cases under Chapter 7 of the Bankruptcy Code**.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

10.     **One or More of the Chapter 11 Cases May Be Dismissed**.

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial Consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases. In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Plan.

11.     **The Debtors May Object to the Amount or Classification of a Claim**.

Except as otherwise provided in the Plan or in prior orders entered by the Bankruptcy Court in the Chapter 11 Cases (including the DIP Orders), the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the RSA. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

12.     **The Total Amount of Allowed Administrative and Priority Claims May be Higher than Anticipated by the Debtors**.

The Debtors anticipate that they will have sufficient Cash, including from proceeds of the DIP Facility, to pay all Allowed Administrative Claims pursuant to the Plan. Nevertheless, the amount of Cash the Debtors ultimately retain prior to and following the Effective Date may be lower than anticipated. Additionally, Allowed Administrative Claims, Professional Fee Claims, and Priority Tax Claims may be higher than anticipated. Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims, Superpriority DIP Claims, Professional Fee Claims, and Priority Tax Claims on

the Effective Date as is required to confirm a chapter 11 plan of reorganization. In that instance, the Effective Date and prerequisite terms could be delayed and/or modified.

### 13.    Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or met, the Effective Date will not take place.

### 14.    Contingencies Could Affect Distributions to Holders of Allowed Claims.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of re-vote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 15.    Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of Liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization. The Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions, including by agreeing to reductions in the amounts of their Claims against the Debtors' Estates and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the RSA and Plan and the significant deleveraging and financial benefits that they embody.

### 16.    The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Its Confirmation.

The Debtors reserve the right, prior to the Confirmation or substantial Consummation thereof, subject to the provisions of Section 1127 of the Bankruptcy Code, applicable law, and the RSA, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are

necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (i) all Classes of adversely affected creditors and interest Holders accept the modification in writing or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification was de minimis or purely technical or otherwise did not adversely change the treatment of Holders accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

### 17. The RSA and the DIP Credit Agreement Contain Significant Conditions and Milestones That May Be Difficult to Satisfy.

There are certain material conditions that must be satisfied under the RSA and DIP Credit Agreement, including the timely satisfaction of milestones in the Chapter 11 Cases. The ability to timely complete such milestones is subject to risks and uncertainties, many of which are beyond the Debtors' control. As discussed further in the RSA, a copy of which is attached hereto as **Exhibit E**, failure to meet any of the milestones without the written consent of the Required Consenting Lenders (as defined in the RSA) shall amount to a breach of the RSA subject to customary cure provisions, including, but not limited to, termination of the RSA. Likewise, failure to meet any of the milestones under the DIP Credit Agreement without the written consent of the Required DIP Lenders, shall amount to an event of default under the DIP Credit Agreement subject to customary cure provisions, including, but not limited to, termination, reduction, or restriction of any further DIP Loan Commitment (as defined in the RSA).

### B. Risks Related to Recoveries Under the Plan.

### 1. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary.

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, contains estimates and assumptions that might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed. Among other things, estimates will fluctuate based on general economic and business conditions, capital market conditions, and industry-specific and Company-specific factors (including the ability of the Reorganized Debtors to achieve strategic goals, objectives, and targets over applicable periods).

### 2. The Reorganized Equity Is Subject to Dilution.

The ownership percentage represented by the Reorganized Equity distributed to Holders of First Lien Claims on the Effective Date under the Plan will be subject to dilution by the DIP Equity Conversion and the Management Incentive Plan.

### 3. The Debtors Might Be Controlled by Significant Holders.

Assuming that the Effective Date occurs, the Holders of Superpriority DIP Claims and First Lien Claims will receive distributions representing all of the outstanding shares of the Reorganized Equity. In addition, the New Organizational Documents will provide certain of these Holders with specifically enumerated rights. Such holders acting individually or as a group will be in a position to control the

outcome of many actions requiring shareholder approval, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors. Such Holders may have interests that differ from those of the other Holders of shares of Reorganized Equity and may vote in a manner adverse to the interests of such other Holders. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of the Reorganized Equity.

        **4.**      **Estimated Valuations of the Debtors and the Reorganized Equity, and Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent Potential Market Values**.

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the market value of the Debtors' securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

        **5.**      **The Terms of the New Organizational Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court**.

The terms of the New Organizational Documents are subject to change based on negotiations between the Debtors and the Consenting Stakeholders but will be included in the Plan Supplement. Holders of Claims that are not the Consenting Stakeholders will not participate in these negotiations and the results of such negotiations may affect the rights of equity holders in the Reorganized Debtors following the Effective Date.

        **6.**      **The Terms of the Exit ABL Facility Documents Are Not Yet Known**.

The terms of the Exit ABL Facility Documents are not yet known and subject to development and negotiations but will be included in the Plan Supplement. Holders of Claims that are not the Consenting Stakeholders will not participate in these negotiations and the results of such negotiations may affect the rights of equity holders in the Reorganized Debtors following the Effective Date.

        **7.**      **Certain Tax Implications of the Plan**.

Holders of Allowed Claims should carefully review **Article XII** of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the U.S. federal income tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

**C.**      **Risks Related to the Debtors' and the Reorganized Debtors' Business**.

        **1.**      **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the

Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 2. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business.

While the Debtors intend the chapter 11 process to be short, the Debtors' future results will be dependent upon the successful Confirmation and Consummation of the Plan. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of Chapter 11 Cases. If the Debtors are unable to obtain final approval of debtor-in-possession financing on favorable terms or at all, or if the Debtors are unable to fully draw on the availability under the DIP Facility, the chances of successfully reorganizing the Debtors' business may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 3.  Financial Results May Be Volatile and May Not Reflect Historical Trends.

The Financial Projections attached hereto as **Exhibit B** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the Reorganized Equity and the ability of the Debtors to make necessary payments. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur. The information included in this Disclosure Statement does not necessarily conform to the information, including with respect to the Financial Projections, that would be required if the Solicitation was made pursuant to a registration statement filed with the SEC or another securities regulator.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses and Claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.  In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting may be different from historical trends.  The Financial Projections contained herein do not currently reflect the impact of "fresh start" accounting.

### 4.  The Reorganized Debtors May Not Be Able to Implement the Business Plan.

While the Debtors believe that Consummation of the Plan will put them in a strong position to implement their go-forward business plan, various factors beyond the Reorganized Debtors' control may hinder or prevent their successful implementation of the business plan.  In particular, the Reorganized Debtors' successful implementation of the business plan depends significantly on maintaining and growing their customer base.  There can be no assurance that the Reorganized Debtors will maintain and grow their customer base.  The erosion of the Reorganized Debtors' customer base may materially and adversely affect their operating results and hinder or prevent their successful implementation of the business plan.

### 5.  The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business.

The Debtors' operations are subject to various federal, state, and local laws and regulations.  The Debtors may be required to make large expenditures to comply with such regulations.  Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil, and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations, and cash flows of the Reorganized Debtors.

6.      **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**.

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

7.      **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations**.

The Debtors' operations are dependent on a group of key management personnel and reliable employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for management personnel and employees.  As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition.  Because of competition in the marketplace, the Debtors may be unable to find replacements and the loss of such management personnel could adversely affect the Debtors' ability to operate their business.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' business and the results of operations.

8.      **The Debtors Face Significant Competition and May Lose Market Share to Their Competitors**.

The market for home décor and furnishings products is competitive and characterized by rapid changes in customer preferences, industry standards, and frequent introductions of new products.  As customer preferences evolve, and as new products are introduced, if the Debtors are unable to anticipate or effectively react to competitive challenges, the Debtors' competitive position could weaken, and they could experience a decline in revenue or growth rate that could materially and adversely affect their business and results of operations.

9.      **The Debtors Could Fail to Retain or Attract Customers, Which Would Adversely Affect the Debtors' Business and Financial Results**.

The Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base, in terms of customers continuing to purchase products.  Existing customers may purchase fewer of the Debtors' products and new customers may avoid purchasing products from the Debtors, which could have a material adverse effect on the Debtors' business and results of operations.  In such cases, there can be no assurance that the Debtors will be able to retain their current customers.

A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products, content, and merchandise, the level of customer spending for home furnishings and décor, the quality of the Debtors' customer service, and the Debtors' ability to update their products desired by customers.  Further, the industry in which the Debtors operate is highly competitive and the Debtors may not be able to compete effectively.  The Debtors' revenue comes from the sale of the Debtors' products, as well as merchandise and related offerings.  It is impossible to predict with perfect accuracy what market demand for such offerings will be.  Further, the Debtors' business is highly tied to discretionary consumer spending habits, and interest rates, tariffs, employment, and general economic conditions may impact customers' finances and therefore willingness to spend on the Debtors' products.

10. **The Cyclical Nature of the Home Décor and Furnishings Industry May Lead to Volatility**.

The Debtors business is highly cyclical. With respect to seasonality, the summer and holiday season are generally the Debtors' busiest seasons with substantially less sales volume and revenue during the rest of the year. Additionally, the Debtors' business operations are volatile and highly susceptible to a downturn in market conditions.

11. **Deteriorations in Business Relationships May Impact the Ability to Source Parts**.

The Debtors' success depends in part on their ability to source various goods and supplies necessary to sell the Debtors' products. These products and the materials for these products are sourced from a broad range of suppliers. As a result, the Debtors' business depends on maintaining productive business relationships with their global and dispersed network of third-party suppliers. The Debtors' operations could be disrupted if such business relationships decline, for whatever reason, or if such suppliers go out of business or are unable to provide parts to the Debtors as they have on a historical basis. There is a risk that economic conditions could lead to financial, operational, production, labor, regulatory, or quality assurance difficulties that could result in a reduction or interruption in the Debtors' goods and supplies.

D. **Risks Related to the Offer and Issuance of Securities Under the Plan**.

1. **The Debtors Do Not Intend to Register the Offer or Sale of Reorganized Equity and Holders of the Reorganized Equity May Be Restricted in Their Ability to Transfer or Sell Their Securities**.

The Reorganized Equity will not be registered under the Securities Act or any state securities laws and, subject to the discussion below and the discussion in Article XI of this Disclosure Statement entitled "Certain Securities Laws Matters," unless so registered, may not be re-offered or re-sold except pursuant to an exemption from the registration requirements of the Securities Act and applicable state securities laws. In addition, the Reorganized Debtors do not expect to be subject to the reporting requirements promulgated under U.S. federal securities Law, and Holders of the Reorganized Equity will not be entitled to any information except as expressly required in the applicable New Organizational Documents.

If shares of Reorganized Equity issued under the Plan are issued pursuant to section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; provided, however, shares of such securities will not be freely tradeable if, at the time of transfer, the Holder is an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer. Such affiliate Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. Resales by Holders who receive Reorganized Equity pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

Any Reorganized Equity that cannot be issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code, including the MIP Shares, will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted

securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and subject to any restrictions on the transferability of such Reorganized Equity Interests in the New Organizational Documents.

Recipients of the Reorganized Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws for resales of Reorganized Equity.

*See* **Article XI** of this Disclosure Statement, entitled "Certain Securities Law Matters," for additional details.

## 2.  The New Organizational Documents May Contain Restrictions on Transfer of the Reorganized Equity.

The New Organizational Documents will contain contractual restriction on holders' ability to transfer the Reorganized Equity.  In addition, to the extent the Reorganized Equity is issued pursuant to Section 4(a)(2) under the Securities Act (or another exemption from registration), such securities will be deemed "restricted securities" (as defined under the Securities Act and the rules promulgated thereunder). Such securities may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act.  In addition, the Reorganized Equity is not expected to be registered under any local or state securities Laws.  The Debtors make no representation regarding the right of any holder of Reorganized Equity Interest to freely transfer or resell the Reorganized Equity.  Resale restrictions and other restrictions on transfer are discussed in more detail in **Article XI** of this Disclosure Statement, entitled "Certain Securities Law Matters."  Further, the New Organizational Documents may also impose certain restrictions on transfer of the new Interests.

## 3.  A Liquid Trading Market for the Shares of Reorganized Equity May Not Develop.

The Debtors do not expect to list the Reorganized Equity on a national securities exchange, and even if they make such an application in the future, the Debtors make no assurance that they will be able to obtain this listing or, even if the Debtors do, that liquid trading markets for shares of Reorganized Equity will develop.  The liquidity of any market for Reorganized Equity will depend upon, among other things, the number of Holders of shares of Reorganized Equity, the Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the Reorganized Equity will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell shares of Reorganized Equity may be substantially limited, and the price for shares of the Reorganized Equity may decline or may be considered unfavorable.  You may be required to bear the financial risk of your ownership of the Reorganized Equity indefinitely.

In addition, the Reorganized Debtors do not expect to apply to be subject to the reporting requirements of the Securities Act, and Holders of the Reorganized Equity will not be entitled to any information except as expressly required by the New Organizational Documents.  As a result, the information which the Debtors are required to provide in order to issue the Reorganized Equity may be less than the Debtors would be required to provide if the Reorganized Equity were registered.  Among other things, the Debtors may not be required to provide:  (a) separate financial information for any subsidiary; (b) select annual audited financial data; (c) selected quarterly financial data; (d) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical

compensation information for their executive officers.  This lack of information could impair your ability to evaluate your ownership and the marketability of the Reorganized Equity.

## IX.    SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement is being distributed to Holders of Class 4, Class 5, Class 6, Class 7, Class 8, and Class 9 in connection with the solicitation of votes to accept or reject the Plan.  This Disclosure Statement is accompanied by the Ballot, a ballot to be used for voting on the Plan.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS
SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
PLEASE REFER TO THE DISCLOSURE STATEMENT MOTION FOR A MORE COMPREHENSIVE
DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A.    Holders of Claims Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in **Article III.D** of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim) under the Plan.

The Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 4, Class 5, Class 6, Class 7, Class 8, and Class 9 (collectively, the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, if the Plan is confirmed and consummated, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

Holders of Claims and Interests in Voting Classes will receive a solicitation package (the "Solicitation Package") that contains the following materials (each as defined in the Disclosure Statement Motion):  (a) the Disclosure Statement Order; (b) a Ballot; (c) the Cover Letter; and (d) the Confirmation Hearing Notice.

The Debtors are *not* soliciting votes on the Plan from Holders of Claims or Interests in Class 1, Class 2, Class 3, Class 10, Class 11, Class 12, or Class 13 (the "Non-Voting Classes").  Holders of Claims and Interests in the Non-Voting Classes will receive the Notice of Non-Voting Status and Opt-In Forms, as applicable (each as defined in the Disclosure Statement Motion).

### B.    Voting Record Date.

**The Voting Record Date is August 15, 2025** (the "Voting Record Date").  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan, and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.    Voting Deadline.

**The Voting Deadline is September 18, 2025, at 4:00 p.m. (prevailing Eastern Time).**  All Holders of Claims who are entitled to vote on the Plan must complete, execute, and return their applicable Ballot(s) in accordance with the instructions on the Ballots so that such Ballot(s) are actually received by

the Claims and Noticing Agent on or before the Voting Deadline in order for such Holder's vote to be counted.

**D.      Ballots Not Counted**.

**No Ballot will be counted toward Confirmation of the Plan if, among other things**:  (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (ii) it was transmitted by means other than as specifically set forth in the Ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was sent to any person or entity other than the Claims and Noticing Agent; (v) it is unsigned; (vi) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to your Ballot for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE THAT IS OTHERWISE IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN ARTICLE IX OF THIS DISCLOSURE STATEMENT OR THE DIRECTIONS AND REQUIREMENTS SET FORTH IN YOUR BALLOT WILL NOT BE COUNTED WITH RESPECT TO VOTING ON THE PLAN WITHOUT THE CONSENT OF THE COMPANY.**

**X.      CONFIRMATION OF THE PLAN**.

**A.      Requirements for Confirmation of the Plan**.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (a) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (b) the Plan is feasible; and (c) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for Confirmation; (ii) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for Confirmation; and (iii) the Plan has been proposed in good faith.

**B.      Best Interests of Creditors/Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors and reliance upon the valuation methodologies utilized by the Debtors' advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' business may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to Holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their business, which is reflected in the Reorganized Equity to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

C.     **Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows.  Creditors and other interested parties should review Article VIII of this Disclosure Statement entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit B** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

The Financial Projections are subject to ongoing analysis and subject to change based on new information that may arise between approval of this Disclosure Statement and the Confirmation Hearing. If applicable, the Debtors will file revised Financial Projections in advance of the Confirmation Hearing in support of the feasibility of the Plan.

D.     **Acceptance by Impaired Classes**.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[19]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of

---

[19]  A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that vote on the Plan actually cast their Ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the allowed interests in such Class that vote on the Plan actually cast their Ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests that are eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.    Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

F.    **Valuation Analysis.**

The Plan provides for the distribution of the Reorganized Equity to certain Holders of Claims upon Consummation of the Restructuring Transactions contemplated by the Plan.  Accordingly, PJT the Company's investment banker, performed an analysis of the estimated implied equity value of the Debtors as of an assumed Effective Date (the "Valuation Analysis") at the Debtors' request.  Based on the Valuation Analysis, which is attached hereto as **Exhibit C**, the enterprise value of the Reorganized Debtors will be approximately $500 million to approximately $800 million, with an estimated midpoint of approximately $650 million.

The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken, should be read in conjunction with **Article VIII** of this Disclosure Statement entitled "Risk Factors."  PJT makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

**XI.    CERTAIN SECURITIES LAW MATTERS.**

A.    **Reorganized Equity.**

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of Reorganized Equity to certain Holders of Claims against the Debtors.  The Debtors believe that the class of Reorganized Equity will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue-Sky Law.  Any Reorganized Equity issued under the Plan will be issued (a) to the fullest extent permitted and applicable, without registration under the Securities Act or similar federal, state, or local laws in reliance on the exemption set forth in section 1145 of the Bankruptcy Code or (b) to the extent section 1145 is not permitted or applicable, pursuant to other exemptions under the Securities Act.

The following discussion of the issuance and transferability of the Reorganized Equity relates solely to matters arising under U.S. federal and state securities laws.  The rights of holders of Reorganized Equity, including the right to transfer Reorganized Equity, will also be subject to any restrictions in the New Organizational Documents to the extent applicable.  Recipients of the Reorganized Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws.

B.    **Exemption from Registration Requirements; Issuance of Reorganized Equity Under the Plan.**

The Debtors believe that the issuance of the Reorganized Equity (other than the MIP Shares) will be exempt from federal registration requirements under section 1145 of the Bankruptcy Code, except in certain limited circumstances as explained in more detail in this Disclosure Statement and/or the Plan.  For the avoidance of doubt, any securities that may not be issued to persons pursuant to section 1145 of the

Bankruptcy Code are expected to be issued in reliance upon the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

Section 1145 of the Bankruptcy Code provides, among other things, that Section 5 of the Securities Act and any other applicable U.S. state or local law requirements for the registration of issuance of a security do not apply to the offering, issuance, distribution, or sale of stock, options, warrants or other securities by a debtor if (1) the offer or sale occurs under a plan of reorganization of the debtor, (2) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor or an affiliate thereof participating in the plan of reorganization, and (3) the securities are (i) issued in exchange for a claim against, interest in, or claim for an administrative expense against a debtor or an affiliate thereof participating in the plan of reorganization, or (ii) issued principally in such exchange and partly for cash or property. The Debtors believe that all shares of Reorganized Equity (other than the MIP Shares) issued after the Petition Date in exchange for the Claims described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

The MIP Shares will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial offer, issuance, and distribution of any Reorganized Equity.  Recipients of the Reorganized Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws.  As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

### C.    Resales of Reorganized Equity; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code.

#### 1.    Resales of Reorganized Equity Issued Pursuant to Section 1145.

The Reorganized Equity (other than the MIP Shares) to the extent offered, issued and distributed pursuant to section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or state or local securities laws, if any, applicable at the time of any future transfer of such securities or instruments.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with

the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10 percent or more of a class of voting securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the Reorganized Equity pursuant to the Plan by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of such Reorganized Equity who are deemed to be "underwriters" may be entitled to resell their Reorganized Equity pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of "control" securities received by such Person if the requirements for sales of such control securities under Rule 144 have been met, including that current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the Reorganized Equity would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such Reorganized Equity and, in turn, whether any Person may freely trade such Reorganized Equity under the federal securities laws.  The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, Rule 144 will not be available for resales of such Reorganized Equity by Persons deemed to be underwriters or otherwise.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS AND THE HIGHLY FACT SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATIONS CONCERNING THE ABILITY OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, POTENTIAL RECIPIENTS OF REORGANIZED EQUITY ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

2. **Resales of Reorganized Equity Issued Pursuant to Section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, and/or Regulation S under the Securities Act**.

To the extent the exemption set forth in section 1145(a) of the Bankruptcy Code is unavailable, Reorganized Equity will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable state securities laws.

Generally, Rule 144 of the Securities Act provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period. An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such Reorganized Equity by affiliates of the Debtors. Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

In addition, in connection with resales of any Reorganized Equity offered, issued and distributed pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period (six months for a reporting issuer), may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

All Reorganized Equity issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will bear a restrictive legend. Each certificate or book-entry interest representing, or issued in exchange for or upon the transfer, sale or assignment of, any Reorganized Equity issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION."

The Reorganized Debtors will reserve the right to require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the Reorganized Equity issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration. The Reorganized Debtors will also reserve the right to stop the transfer of any such Reorganized Equity if such transfer (x) is not effected in compliance with Rule 144 or in compliance with another applicable exemption from registration (including section 1145 of the Bankruptcy Code) or (y) would otherwise make the Debtors subject to the periodic reporting requirements under the Exchange Act.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this Disclosure Statement, including, for the avoidance of doubt, whether the Reorganized Equity is exempt from the registration requirements of section 5 of the Securities Act.

In addition to the foregoing restrictions, the Reorganized Equity will also be subject to any applicable transfer restrictions contained in the New Organizational Documents.

PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF REORGANIZED EQUITY MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.

## XII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

### A. Introduction.

The following discussion is a summary of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders (which, solely

for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims.  This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS, as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors, the Reorganized Debtors, or certain Holders of Claims in light of their individual circumstances.  This discussion does not address tax issues with respect to Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, brokers, mutual funds, governmental authorities or agencies, pass-through entities (including subchapter S corporations), beneficial owners of pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. Holders who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction).  This summary does not address any aspect of state, local, estate, gift, or non-U.S. taxation or U.S. federal non-income tax considerations (including estate or gift tax or the Medicare tax imposed on certain net investment income).  This summary assumes that a Holder of a Claim holds only Claims in a single Class and holds such Claims as "capital assets" within the meaning of section 1221 of the IRC (generally, property held for investment).  This summary also assumes that the various debt and other arrangements to which the Debtors and the Reorganized Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, none of the Allowed Claims is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for U.S. federal income tax purposes, that the Claims constitute Interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC, and that the Reorganized Equity will be treated as stock of a corporation for U.S. federal income tax purposes.  This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  This summary does not address the U.S. federal income tax consequences to Holders of Allowed Claims (a) that hold 10 percent or more of the equity of the Debtors or that will hold 10 percent or more of the equity of the Reorganized Debtors after receiving the distributions contemplated by the Plan or (b) (i) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (ii) that are deemed to reject the Plan, or (iii) that are otherwise not entitled to vote to accept or reject the Plan.  This summary also does not address the U.S. federal income tax consequences to Holders that are not Holders of Class 4, Class 5, Class 6, Class 7, Class 8, or Class 9 Claims.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that for U.S. federal income tax purposes is: (a) an individual that is a citizen or resident of the United States; (b) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or

(d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or such beneficial owner) and the activities of the partner (or such beneficial owner) and the partnership (or other pass-through entity).  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors**.

**1.      Characterization of the Restructuring Transactions**.

The Debtors expect that the Restructuring Transactions will be structured in one of two ways: (a) as a taxable sale of all or substantially all of the assets and/or stock of any Debtor (a "Taxable Transaction"); or (b) as a recapitalization of the existing Debtors (a "Recapitalization Transaction").  The Debtors have not yet determined whether the Restructuring Transactions will be consummated as a Taxable Transaction or a Recapitalization Transaction.  Such decision will depend on, among other things, finalizing certain modeling and analytical determinations.

In a Taxable Transaction, the Debtors are expected to realize gain or loss in an amount equal to the difference between the fair market value of the assets or stock transferred (or deemed transferred) and the Debtors' tax basis in such assets or stock.  Any such realized gain generally will be reduced by the amount of tax attributes available for use by the Debtors (if any), and any remaining gain will be recognized by the Debtors and result in a Cash tax obligation.  If a Reorganized Debtor purchases (or is deemed to purchase) assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized Debtor is expected to take a fair market value basis in the transferred assets or stock.  However, if a Taxable Transaction involves a purchase of stock, the Debtor whose stock is transferred will generally retain its basis in its assets, unless the Debtors and/or Reorganized Debtors timely make certain elections provided for under the IRC to treat such stock purchase as the purchase of the Debtors' assets or unless the application of certain complex "loss duplication" rules results in a reduction in the tax basis of such assets.  In a Taxable Transaction that does not involve a purchase of stock, the Reorganized Debtors generally will not succeed to any of the Debtors' existing tax attributes.

The Debtors will be subject to the rules discussed below with respect to cancellation of indebtedness income ("COD Income") and, other than in a Taxable Transaction that does not involve a transfer of stock, the limitations on net operating losses ("NOLs"), deferred deductions under section 163(j) of the IRC ("163(j) Deductions") and other tax attributes.

## 2.    Cancellation of Debt and Reduction of Tax Attributes.

As a result of the Restructuring Transactions, the Debtors are expected to recognize a substantial amount of COD Income.  In such case, the U.S. tax attributes of the Debtors may, depending on certain factors, be reduced by the amount of such COD Income excluded from U.S. federal taxable income under section 108 of the IRC.

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (i) the amount of any Cash, (ii) the issue price of any new indebtedness issued by the debtor, and (iii) the fair market value of the Reorganized Equity and any other consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange.  Unless an exception or exclusion applies, COD Income constitutes U.S. federal taxable income like any other item of taxable income.

Under section 108 of the IRC, however, a taxpayer will not be required to include any amount of COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  Such reduction in tax attributes occurs only after the taxable income (or loss) for the year in which the debt exchange occurs has been determined.  In general, tax attributes will be reduced in the following order:  (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtors remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers.  Deductions deferred under section 163(j) of the IRC are not subject to reduction under these rules.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC (which can include a reduction in the basis of a partnership interest, but only if the "inside" basis of assets in the partnership are also reduced), though it has not been determined whether the Debtors will make this election.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The aggregate tax basis of the Debtors in their assets is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that the relevant entity will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor").  Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The exact amount of any COD Income (if any) that will be realized by the Debtors will not be determinable until the Consummation of the Plan because the amount of COD Income will depend, in part, on the fair market value of the Reorganized Equity and any other consideration given in satisfaction of any Allowed Claims, none of which can be determined until after the Plan is consummated.  Accordingly, the

Debtors are currently unable to determine the precise effect that the COD Income exclusion rules will have on the Debtors and their U.S. federal income tax attributes.

As noted above, as a general matter, in a Taxable Transaction that does not involve the transfer of the stock of a Debtor, the attribute reduction rules discussed above will be inapplicable, and the Reorganized Debtors (a) will take a fair market value basis in the assets of the Debtors without any reduction from excluded COD Income and (b) will not otherwise inherit any of the Debtors' tax attributes.

### 3.    Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes.

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

### (a)    General Section 382 and 383 Annual Limitation.

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, net unrealized built-in losses ("NUBILs"), deductions deferred under section 163(j) of the IRC, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.  For this purpose, if a corporation (or consolidated group) has a NUBIL at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original NUBIL) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of Reorganized Equity pursuant to a Restructuring Transaction will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC (described below) applies.

As noted above, as a general matter, in a Taxable Transaction that does not involve the transfer of the stock of a Debtor, the rules under section 382 of the IRC discussed above and below will be inapplicable to the Reorganized Debtors.

### (b)    General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 3.71 percent for changes that occur in July 2025).  The 382 Limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change (the "Recognition Period") or are treated as recognizing built-

in gains pursuant to the safe harbors provided in IRS Notice 2003-65. If a loss corporation has a NUBIL immediately prior to the ownership change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of post-change losses and deductions that could be used by the loss corporation during the Recognition Period. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

Notwithstanding the rules described above, unless the special 382(l)(5) Exception (described below) applies, if the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (other than any increases due to recognized built-in gains). As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (c)    Special Bankruptcy Exceptions.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety. If the Reorganized Debtors were to undergo another "ownership change" after the expiration of this two-year period, the resulting 382 Limitation would be determined under the regular rules for ownership changes under sections 382 and 383 of the IRC.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the 382 Limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the ownership change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. Rather, the resulting limitation would be determined under the regular rules for ownership changes under sections 382 and 383 of the IRC.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application so that the 382(l)(6) Exception applies. Whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5)

Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if a subsequent "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

**C.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Claims**.

**1.      Consequences to U.S. Holders of Class 4, Class 5, Class 6, Class 7, or Class 8 Claims; General**.

Pursuant to the Plan and as described above, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, (i) each Holder of a Class 4, Class 5, Class 6, Class 7, or Class 8 Claim will receive its Pro Rata share of the First Lien Equity Distribution on the Effective Date.

**2.      Consequences to Holders of Class 9 Claims of the Restructuring Transactions; General**.

Pursuant to the Plan and as described above, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each Holder of a Class 9 Claim will receive its pro rata share of the Unsecured Claims Distribution Trust Beneficial Interests on the Effective Date.  For the avoidance of doubt, Holders of Class 9 First Lien Deficiency Claims shall not receive a distribution on account of such claims.

**3.      Consequences to Holders of Claims of the Restructuring Transactions**.

Regardless of whether the Restructuring Transactions are structured as a Taxable Transaction or a Recapitalization Transaction, the exchange of any Claims by a U.S. Holder is expected to be treated as a taxable exchange pursuant to section 1001 of the IRC.  In that case, a U.S. Holder of a Claim is expected to recognize gain or loss equal to (a) the fair market value of the Reorganized Equity or other consideration received as of the date such Interest is distributed less (b) the U.S. Holder's adjusted tax basis in its Claim. The adjusted tax basis of a U.S. Holder's Claims generally will equal such U.S. Holder's actual or deemed purchase price for such Claims, reduced in the event that such U.S. Holder claimed a bad debt deduction with respect to such Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Any gain or loss recognized by a U.S. Holder from the exchange will generally be capital gain or loss, except to the extent described below under "Market Discount." If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year.  Non-corporate taxpayers are generally subject to a reduced U.S. federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.  A U.S. Holder should obtain a tax basis in any Interest received equal to the fair market value of the Interest as of the date such Interest is distributed to such U.S. Holder.  The holding period for any such Interest should begin on the day following the receipt of such Interest.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

**4.      Accrued Interest**.

To the extent that the fair market value of the consideration received by a U.S. Holder on an exchange of its Allowed Claim under the Plan are attributable to accrued but unpaid interest on such

Allowed Claim, the receipt of such amount generally should be taxable to the U.S. Holder as ordinary interest income (to the extent such amount was not previously included in the gross income of such U.S. Holder). Conversely, a U.S. Holder of an Allowed Claim may be able to deduct a loss to the extent that any accrued interest on such debt instruments constituting such Allowed Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder of an Allowed Claim under the Plan is not sufficient to fully satisfy all principal and interest on its Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration distributed to U.S. Holders will be allocated first to the principal amount of the Allowed Claim, with any excess allocated to accrued but unpaid interest, if any, on such U.S. Holder's Allowed Claims. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated first to principal, rather than interest. Certain Treasury Regulations, however, allocate payments first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. ***U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the proper allocation of the consideration received under the Plan***.

### 5. Market Discount.

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Claim, who exchanges such Allowed Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such exchanged Allowed Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, by at least a *de minimis* amount (equal 1/4 of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the remaining number of complete years to maturity).

Any gain allocated to a U.S. Holder in connection the taxable disposition of an Allowed Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that a U.S. Holder exchanges any Allowed Claim that was acquired with market discount in a tax-free transaction for other property, any market discount that accrued on such Allowed Claim (*i.e.*, up to the time of the exchange), but was not recognized by such U.S. Holder, is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property will be treated as ordinary income to the extent of such accrued, but not recognized, market discount. ***U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Allowed Claim***.

### 6. Limitations on Capital Losses.

A U.S. Holder who recognizes capital losses as a result of the exchanges under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent

of the lesser of (a) $3,000 annually ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

> **7.  U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Reorganized Equity**.

> **(a)  Dividends on Reorganized Equity**.

Any distributions made on account of the Reorganized Equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. "Qualified dividend income" allocable to an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the Reorganized Equity. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as the Reorganized Debtors have sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

> **(b)  Sale, Redemption, or Repurchase of Reorganized Equity**.

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the Reorganized Equity. Such capital gain generally will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has a holding period in the Reorganized Equity of more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above. Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the Reorganized Equity as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claims or recognized an ordinary loss on the exchange of its Claims for Reorganized Equity.

> **D.  Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Claims**.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions as contemplated by the Plan and as described above, and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of Claims. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax

advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the Reorganized Equity.

**1.     U.S. Federal Income Tax Consequences to Non-U.S. Holders of the Restructuring Transactions**.

Whether a Non-U.S. Holder realizes gain or loss on the exchange of any Allowed Claims and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders holding the same class of Claims. Any gain realized by a Non-U.S. Holder of an Allowed Claim on the exchange of its Allowed Claims (other than any gain attributable to accrued but untaxed interest (or original issue discount, if any), which will be taxable in the same manner as described below in "Accrued Interest") generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

**2.     Accrued Interest**.

Subject to the discussion of backup withholding and FATCA below, payments to a Non-U.S. Holder that is attributable to accrued but untaxed interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID, if any) with respect to Allowed Claims that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, *provided* that:

- the Non-U.S. Holder does not own, actually or constructively, a 10 percent or greater interest in the Debtors within the meaning of section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to Debtors, actually or constructively through the ownership rules under section 864(d)(4) of the IRC;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives the Debtors an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest income allocable to a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders - Accrued Interest," under the Plan, the aggregate consideration to be distributed in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest on such Allowed Claims, if any.

If interest income allocable to a Non-U.S. Holder is effectively connected with a trade or business in the United States ("ECI") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply, *provided* the appropriate statement is provided to Debtors) unless an applicable income tax treaty provides otherwise.  To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  If a Non-U.S. Holder is eligible for the benefits of any applicable income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the applicable income tax treaty if the Non-U.S. Holder claims the benefit of the applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional branch profits tax at a 30 percent rate, or, if applicable, a lower applicable income tax treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically.   Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

3.      **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Reorganized Equity**.

(a)      **Dividends on Reorganized Equity**.

Any distributions made with respect to Reorganized Equity (other than certain distributions of stock of the Reorganized Debtors) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces such Non-U.S. Holder's basis in such Reorganized Equity and then, generally, capital gain). Except as described below, dividends paid with respect to Reorganized Equity that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an applicable income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or suitable substitute or successor form or such other form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to Reorganized Equity that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the Reorganized Debtors are considered "U.S. real property holding corporations" ("USRPHC"), distributions to a Non-U.S. Holder will generally be subject to withholding by such Reorganized Debtor at a rate of 15 percent to the extent they are not treated as dividends for U.S. federal income tax purposes. In the event the Reorganized Equity is regularly traded on an established securities market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of interests that includes Reorganized Equity during a specified testing period. Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations. The Debtors have not determined if they are, or whether the Reorganized Debtors will be, USRPHCs.

(b)      **Sale, Redemption, or Repurchase of Reorganized Equity**.

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of Reorganized Equity unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- the issuer of such Reorganized Equity is or has been during a specified testing period a USRPHC.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of the Reorganized Equity. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, a Non-U.S. Holder of Reorganized Equity generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of the Reorganized Equity under the Foreign Investment in Real Property Tax Act and the Treasury Regulations thereunder. Taxable gain from a disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and the Non-U.S. Holder's adjusted tax basis in such interest) would be treated as effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business. A Non- U.S. Holder would also be subject to withholding tax equal to 15 percent of the amount realized on the disposition and generally required to file a U.S. federal income tax return. The amount of any such withholding may be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund if the Non-U.S. Holder properly and timely files a tax return with the IRS. In the event the Reorganized Equity is regularly traded on an established securities market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of interests that includes Reorganized Equity during a specified testing period. Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations.

### 4.    FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that would have applied to payments of gross proceeds from the sale or other disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest have been effectively suspended under proposed Treasury Regulations, which can be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF REORGANIZED EQUITY.**

      E.      **Information Reporting and Back-Up Withholding**.

The Debtors, the Reorganized Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless such Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that such number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, TERRITORIAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIII.    RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  August 19, 2025                          AT HOME GROUP INC.
                                                 on behalf of itself and all other Debtors


                                        By:  */s/ Jeremy Aguilar*
                                             Name:  Jeremy Aguilar
                                             Title:  Authorized Signatory

## Exhibit A

**Plan of Reorganization**

*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AT HOME GROUP INC., *et al.*,[1] | ) Case No. 25-11120 (JKS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

### JOINT PLAN OF REORGANIZATION OF AT HOME GROUP INC.
### AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

---

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (DE Bar No. 2847)
Joseph M. Mulvihill (DE Bar No. 6061)
Timothy R. Powell (DE Bar No. 6894)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:   (302) 571-6600
Facsimile:   (302) 571-1253
Email:       rbrady@ycst.com
             jmulvihill@ycst.com
             tpowell@ycst.com

*Co-Counsel for the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Elizabeth H. Jones (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:       nicole.greenblatt@kirkland.com
             matthew.fagen@kirkland.com
             elizabeth.jones@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

Dated:  August 19, 2025

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are:  At Home Group Inc. (9563); Ambience Parent, Inc. (6231); Ambience Intermediate, Inc. (0692); At Home Holding II Inc. (9755); At Home Holding III Inc. (9930); At Home Companies LLC (6921); At Home Stores LLC (4961); At Home RMS Inc. (5235); At Home Gift Card LLC (0357); At Home Procurement Inc. (1777); At Home Properties LLC (2759); At Home Assembly Park Drive Condominium Association (N/A); 1600 East Plano Parkway, LLC (4757); 1944 South Greenfield Road LLC (4377); 2301 Earl Rudder Frwy S LLC (N/A); 3551 S 27th Street LLC (9350); 300 Tanger Outlet Blvd LLC (N/A); 3002 Firewheel Parkway LLC (2759); 2016 Grand Cypress Dr LLC (N/A); 8651 Airport Freeway LLC (0523); Transverse II Development LLC (8595); Rhombus Dev, LLC (4783); 1000 Turtle Creek Drive LLC (9177); 19000 Limestone Commercial Dr, LLC (3711); 4801 183A Toll Road, LLC (3909); 7050 Watts Rd LLC (N/A); 4700 Green Road LLC (9049); 361 Newnan Crossing Bypass LLC (N/A); 4304 West Loop 289 LLC (4302); 10460 SW Fellowship Way LLC (N/A); 1720 N Hardin Blvd LLC (N/A); Compass Creek Parkway LLC (N/A); 10800 Assembly Park Dr LLC (6145); Nodal Acquisitions, LLC (N/A); 15255 N Northsight Blvd LLC (N/A); 3015 W 86th St LLC (N/A); 9570 Fields Ertel Road LLC (N/A); 1376 E. 70th Street LLC (9942); 11501 Bluegrass Parkway LLC (3626); 12990 West Center Road LLC (9396); 334 Chicago Drive, LLC (2864); and 4200 Ambassador Caffery Pkwy LLC (5119).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  9000 Cypress Waters Blvd, Coppell, Texas 75019.

## TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW ................................................................................................................1
    A.     Defined Terms. .........................................................................................................1
    B.     Rules of Interpretation. ..........................................................................................16
    C.     Computation of Time. .............................................................................................17
    D.     Governing Law. ......................................................................................................17
    E.     Reference to Monetary Figures. .............................................................................17
    F.     Reference to the Debtors or the Reorganized Debtors. ..........................................17
    G.     Controlling Document. ...........................................................................................18
    H.     Nonconsolidated Plan. ...........................................................................................18
    I.     Consultation, Notice, Information, and Consent Rights..........................................18

ARTICLE II. ADMINISTRATIVE CLAIMS, SUPERPRIORITY DIP CLAIMS, PRIORITY CLAIMS,
      AND RESTRUCTURING EXPENSES ..............................................................................18
    A.     Administrative Claims. ..........................................................................................18
    B.     Priority Tax Claims. ...............................................................................................19
    C.     Superpriority DIP Claims.......................................................................................19
    D.     Professional Fee Claims. ........................................................................................20
    E.     Payment of United States Trustee Quarterly Fees..................................................21
    F.     Payment of Restructuring Expenses. ......................................................................21
    G.     Payment of the Senior Unsecured Notes Trustee Expenses. ..................................21

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....................21
    A.     Classification of Claims and Interests. ...................................................................21
    B.     Treatment of Claims and Interests. ........................................................................22
    C.     Special Provision Governing Unimpaired Claims. .................................................27
    D.     Elimination of Vacant Classes. ..............................................................................27
    E.     Voting Classes, Presumed Acceptance by Non-Voting Classes. ...........................27
    F.     Intercompany Interests. ..........................................................................................28
    G.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................28
    H.     Controversy Concerning Impairment.....................................................................28
    I.     Subordinated Claims and Interests. ........................................................................28
    J.     Distributions of Reorganized Equity.......................................................................28

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN....................................................28
    A.     General Settlement of Claims and Interests. ..........................................................28
    B.     Restructuring Transactions......................................................................................29
    C.     The Reorganized Debtors. ......................................................................................29
    D.     Sources of Consideration for Plan Distributions. ...................................................30
    E.     Corporate Existence. ..............................................................................................31
    F.     Vesting of Assets in the Reorganized Debtors. ......................................................32
    G.     Cancellation of Existing Securities, Agreements, and Interests. .............................32
    H.     Unsecured Claims Distribution Trust. ....................................................................33
    I.     Corporate Action. ...................................................................................................34
    J.     New Organizational Documents. ............................................................................34
    K.     Directors and Officers of the Reorganized Debtors. ..............................................35
    L.     Effectuating Documents; Further Transactions. .....................................................35
    M.     Certain Securities Law Matters. .............................................................................35
    N.     Section 1146 Exemption. .......................................................................................36
    O.     Private Company. ...................................................................................................37
    P.     Director and Officer Liability Insurance. ...............................................................37
    Q.     Management Incentive Plan. ...................................................................................37
    R.     Employment Obligations. .......................................................................................37

S.      Preservation of Causes of Action. ........................................................................37
T.      Tax Returns. ..........................................................................................................38
U.      Statutory Committee and Cessation of Fee and Expense Payment. .....................38
V.      Cashless Transactions. ..........................................................................................39
W.      Release of Ordinary Course Avoidance Actions ..................................................39

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................39
A.      Assumption of Executory Contracts and Unexpired Leases. ................................39
B.      Indemnification Obligations. .................................................................................40
C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. ...........40
D.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. .........41
E.      Insurance Policies. .................................................................................................42
F.      Preexisting Obligations to the Debtors Under Contracts and Unexpired Leases. ...42
G.      Employee Compensation and Benefits. .................................................................42
H.      Modifications, Amendments, Supplements, Restatements, or Other Agreements. .........43
I.      Reservation of Rights. ...........................................................................................43
J.      Nonoccurrence of Effective Date. .........................................................................43
K.      Contracts and Leases Entered Into After the Petition Date. ..................................43

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...............................................................43
A.      Timing and Calculation of Amounts to Be Distributed .........................................43
B.      Disbursing Agent. ..................................................................................................44
C.      Rights and Powers of Disbursing Agent. ..............................................................44
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ...........45
E.      Surrender and Cancelled Instruments or Securities. ..............................................46
F.      Manner of Payment. ...............................................................................................46
G.      Compliance with Tax Requirements. .....................................................................47
H.      Allocations. ............................................................................................................47
I.      No Postpetition Interest on Claims. .......................................................................47
J.      Foreign Currency Exchange Rate. .........................................................................47
K.      Setoffs. ...................................................................................................................47
L.      Claims Paid or Payable by Third Parties. ..............................................................48

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
        DISPUTED CLAIMS ......................................................................................................48
A.      Disputed Claims Process. .......................................................................................48
B.      Allowance of Claims. .............................................................................................49
C.      Claims Administration Responsibilities. ................................................................49
D.      Estimation of Claims. .............................................................................................49
E.      Adjustment to Claims without Objection. ..............................................................50
F.      Time to File Objections to Claims. ........................................................................50
G.      Disallowance of Claims. .........................................................................................50
H.      No Distributions Pending Allowance. ....................................................................50
I.      Distributions After Allowance. ..............................................................................50
J.      Single Satisfaction of Claims. ...............................................................................51

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .............................51
A.      Discharge of Claims and Termination of Interests. ................................................51
B.      **Release of Liens.** ...................................................................................................51
C.      **Releases by the Debtors.** ......................................................................................52
D.      **Releases by Holders of Claims and Interests.** ...................................................53
E.      **Exculpation.** ........................................................................................................54
F.      **Injunction.** ...........................................................................................................55
G.      Protections Against Discriminatory Treatment. .....................................................55
H.      Document Retention. ..............................................................................................55
I.      Reimbursement or Contribution. ............................................................................56

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN ........................................56
    A.     Conditions Precedent to the Effective Date. ...........................................................................56
    B.     Waiver of Conditions. ............................................................................................................57
    C.     Effect of Failure of Conditions. .............................................................................................57
    D.     Substantial Consummation. ....................................................................................................57

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN ...........................58
    A.     Modification and Amendments. .............................................................................................58
    B.     Effect of Confirmation on Modifications. ..............................................................................58
    C.     Revocation or Withdrawal of Plan. .......................................................................................58

ARTICLE XI. RETENTION OF JURISDICTION ...............................................................................................58

ARTICLE XII. MISCELLANEOUS PROVISIONS ...............................................................................................60
    A.     Immediate Binding Effect. .....................................................................................................60
    B.     Additional Documents. ...........................................................................................................60
    C.     Reservation of Rights. ............................................................................................................61
    D.     Successors and Assigns. .........................................................................................................61
    E.     Notices. ...................................................................................................................................61
    F.     Enforcement of Confirmation Order. .....................................................................................63
    G.     Term of Injunctions or Stays. .................................................................................................63
    H.     Entire Agreement. ...................................................................................................................63
    I.     Exhibits. ..................................................................................................................................63
    J.     Nonseverability of Plan Provisions. ......................................................................................63
    K.     Votes Solicited in Good Faith. ...............................................................................................64
    L.     Closing of Chapter 11 Cases. .................................................................................................64
    M.     Waiver or Estoppel. ................................................................................................................64
    N.     Creditor Default. .....................................................................................................................64
    O.     Removal or Abandonment of Third Parties' Property. ..........................................................64

**INTRODUCTION**

At Home Group Inc. and the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") propose this joint chapter 11 plan of reorganization (including all exhibits, supplements (including the Plan Supplement), appendices, and schedules, as amended, supplemented, or otherwise modified from time to time in accordance with its terms and the RSA (as defined below), this "<u>Plan</u>") for the resolution of the outstanding Claims against and Interests in the Debtors. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in <u>Article I.A</u> of this Plan. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor, and the classification of Claims and Interests set forth in <u>Article III</u> of this Plan shall apply separately to each of the Debtors. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters. Each Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code. This Plan does not contemplate substantive consolidation of any of the Debtors.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS PLAN IN FULL.

THE ISSUANCE OF ANY SECURITIES REFERRED TO IN THIS PLAN SHALL NOT CONSTITUTE AN INVITATION OR OFFER TO SELL, OR THE SOLICITATION OF ANY INVITATION OR OFFER TO BUY, ANY SECURITIES IN CONTRAVENTION OF APPLICABLE LAW IN ANY JURISDICTION. NO ACTION HAS BEEN TAKEN, NOR WILL BE TAKEN IN ANY JURISDICTION THAT WOULD PERMIT A PUBLIC OFFERING OF ANY SECURITIES REFERRED TO IN THIS PLAN (OTHER THAN SECURITIES ISSUED PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE IN A DEEMED PUBLIC OFFERING) IN ANY JURISDICTION WHERE SUCH ACTION FOR THAT PURPOSE IS REQUIRED.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*ABL Agent*" means Bank of America, National Association, or any assigns or successors thereto, in its capacity as collateral agent and administrative agent under the ABL Credit Agreement.

2.    "*ABL Credit Agreement*" means that certain asset-based revolving credit agreement dated as of July 23, 2021, by and among, *inter alios*, At Home Group Inc., the lenders party thereto in their capacities as lenders thereunder, letter of credit issuers in their capacities as letter of credit issuers thereunder, and Bank of America, National Association, as administrative agent and collateral agent, and the other agents and other parties thereto (as amended, supplemented, or otherwise modified from time to time).

3.    "*ABL Facility*" means the $675 million asset-backed facility issued under the ABL Credit Agreement.

4.    "*ABL Facility Claims*" means any Claim against any of the Debtors on account of the ABL Facility, including any letters of credit issued and outstanding and any cash management obligations or hedging obligations outstanding, if any, under the ABL Facility.

5.    "*ABL Lenders*" means the lenders and issuing banks party to the ABL Credit Agreement.

6.    "*ABL Loans*" means the revolving credit loans due under the ABL Facility.

7.    "*ABL Obligations*" means, at any time, all indebtedness and other obligations owing under the ABL Facility at such time and any outstanding adequate protection payments for Prepetition ABL Obligations (as such term is defined in the DIP Orders).

8.    "*ABL Secured Parties*" means, collectively, the ABL Agent, the ABL Lenders, and the other "Secured Parties" as defined in the ABL Credit Agreement.

9.    "*Ad Hoc Group*" means that certain ad hoc group of Consenting Term Loan Lenders and Consenting Noteholders as identified on the *Verified Statement of the Ad Hoc Group of At Home Prepetition Secured Creditors Pursuant to Bankruptcy Rule 2019* [Docket No. 302].

10.    "*Administrative Claim*" means a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors; (b) the Allowed Professional Fee Claims; (c) any Claims arising from that certain Letter of Credit issued by Bank of America, N.A. on July 2, 2025; and (d) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

11.    "*Administrative Claims Bar Date*" means the applicable deadline for Filing requests for payment of all Administrative Claims except as otherwise provided for in this Plan, which shall be (a) 30 days after the Effective Date for Administrative Claims other than Professional Fee Claims and (b) 60 days after the Effective Date for Professional Fee Claims.

12.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Entity that is not a Debtor, the term "Affiliate" shall apply to such Entity as if the Entity were a Debtor.

13.    "*Agent*" means any administrative agent, collateral agent, or similar Entity under the Term Loan Facility, the ABL Facility, and the DIP Facility, including any assigns or successors thereto.

14.    "*Agents/Trustees*" means, collectively, each of the Agents and Trustees.

15.    "*Allowed*" means, except as otherwise provided herein:  (a) a Claim that is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim a Proof of Claim is not required under this Plan, the Bankruptcy Code, or a Final Order, including the DIP Orders); *provided* that no objection to the allowance thereof is interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or a timely objection is interposed and the Claim has been Allowed by a Final Order; (b) a Claim that is scheduled by the Debtors as neither contingent, unliquidated, nor Disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed or stipulated to pursuant to this Plan or a Final Order, including the DIP Orders; *provided* that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or, if such an objection is so interposed, such Claim shall have been Allowed by a Final Order . For the avoidance of doubt, any Claim that is hereafter scheduled by the Debtors as contingent, unliquidated, or Disputed, and for which no contrary or superseding Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Unless expressly waived by this Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtors or Reorganized Debtors, as applicable.  For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

16.     "*Assigned Preference Actions*" means Preference Actions against Persons that are not (i) Ordinary Course Non-Insider Counterparties or (ii) Released Parties, which shall be retained by the Debtors and assigned to the Unsecured Claims Distribution Trust pursuant to this Plan.  For the avoidance of doubt, Assigned Preference Actions shall not include any Causes of Action that are settled, released, or exculpated under this Plan.  The Assigned Preference Actions shall be listed in the Schedule of Retained Causes of Action included in the Plan Supplement.

17.     "*At Home*" means Ambience Parent, Inc., a company incorporated under the Laws of Delaware.

18.     "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common Law, including fraudulent transfer Laws and Preference Actions.

19.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

20.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware presiding over the Chapter 11 Cases, or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the District of Delaware.

21.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time and applicable to the Chapter 11 Cases.

22.     "*Business Day*" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks in the State of Texas or the State of New York are closed for business as a result of a federal, state, or local holiday.

23.     "*Cash*" means the legal tender of the United States of America or the equivalents thereof, including bank deposits and checks.

24.     "*Cash Collateral*" has the meaning ascribed to it in section 363(a) of the Bankruptcy Code.

25.     "*Causes of Action*" means, including, without limitation, any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, direct or indirect, choate or inchoate, disputed or undisputed, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, under the Bankruptcy Code or applicable nonbankruptcy law, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) any and all claims based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal Law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any and all rights to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate or disallow Claims or Interests; (d) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

26.     "*Cayman Notes*" means the $200 million aggregate principal amount of outstanding 11.50% senior secured notes due 2028 under the Cayman Notes Indenture.

27.     "*Cayman Notes Claims*" means all claims against any of the Debtors arising under, derived from, based on, or related to the Cayman Notes Obligations.

28.     "*Cayman Notes Indenture*" means that certain indenture, dated as of May 12, 2023, among At Home Cayman, as issuer, the guarantors party thereto, and Wilmington Trust, National Association, as trustee and notes collateral agent (as amended, supplemented, or otherwise modified from time to time).

29.     "*Cayman Notes Obligations*" has the meaning assigned to the term "Obligations" in the Cayman Notes Indenture.

30.     "*CEO*" means the Chief Executive Officer of the Reorganized Debtors as of the Effective Date.

31.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, and (b) when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

32.     "*Claim*" means any "claim," as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

33.     "*Claims and Noticing Agent*" means Omni Agent Solutions, Inc., solely in its capacity as notice, claims, and solicitation agent for the Debtors in the Chapter 11 Cases.

34.     "*Claims Bar Date*" means the applicable bar date by which Proofs of Claim, if applicable, must be Filed, as established by:  (a) a Final Order of the Bankruptcy Court, including any Final Order establishing a deadline to File Proofs of Claim; or (b) this Plan; *provided* that if there is a conflict relating to the bar date for a particular Claim, this Plan shall control.

35.     "*Claims Register*" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent or the clerk of the Bankruptcy Court.

36.     "*Class*" means a class of Claims or Interests as set forth in <u>Article III</u> of this Plan pursuant to section 1122(a) of the Bankruptcy Code.

37.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

38.     "*Committee*" means the official committee of unsecured creditors of the Debtors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on June 27, 2025 [Docket No. 197], the membership of which may be reconstituted from time to time, including as provided in amended notices of appointment filed by the U.S. Trustee (including Docket Nos. 306, 320 and 335).

39.     "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, wages, compensation, and benefit plans and policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs, and payments, life and accidental death and dismemberment insurance plans and programs, for all employees of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and managers, in each case existing with the Debtors as of immediately prior to the Effective Date.

40.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

41.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

42.     "*Confirmation Hearing*" means the hearing(s) held by the Bankruptcy Court to consider Confirmation of this Plan, pursuant to Bankruptcy Rule 3020(b)(3) and section 1128 of the Bankruptcy Code, as applicable, as such hearing(s) may be adjourned or continued from time to time.

43.     "*Confirmation Order*" means the order entered by the Bankruptcy Court confirming this Plan, pursuant to section 1129 of the Bankruptcy Code.

44.     "*Consenting Cayman Noteholders*" means the holders (or beneficial holders) of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold, Cayman Notes Claims that executed and delivered counterpart signature pages to the RSA, a joinder, or a transfer agreement to counsel to the Debtors.

45.     "*Consenting Exchange Noteholders*" means holders (or beneficial holders) of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold, Exchange Notes Claims that have executed and delivered counterpart signature pages to the RSA, a joinder, or a transfer agreement to counsel to the Debtors.

46.     "*Consenting Noteholders*" means, collectively, the Consenting Exchange Noteholders, the Consenting Cayman Noteholders, and the Consenting Senior Secured Noteholders.

47.     "*Consenting Senior Secured Noteholders*" means holders (or beneficial holders) of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold, Senior Secured Notes Claims that have executed and delivered counterpart signature pages to the RSA, a joinder, or a transfer agreement to counsel to the Debtors.

48.     "*Consenting Sponsor*" means Hellman & Friedman LLC, on behalf of itself and each of its affiliated investment funds or investment vehicles managed or advised by it, and its affiliates that directly or indirectly hold Interests in the Debtors.

49.     "*Consenting Stakeholders*" means, collectively, the Consenting Term Loan Lenders and the Consenting Noteholders.

50.     "*Consenting Term Loan Lenders*" means holders of Term Loan Claims that have executed and delivered counterpart signature pages to the RSA, a joinder, or a transfer agreement to counsel to the Debtors.

51.     "*Consummation*" means the occurrence of the Effective Date as to the applicable Debtor.

52.     "*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults and other non-monetary defaults to the extent required by section 365 of the Bankruptcy Code, under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors or assumed and assigned by the Debtors, as applicable, pursuant to sections 365 or 1123(a) of the Bankruptcy Code.

53.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy" or run-off endorsement) that have been issued at any time to any of the Debtors providing current or former directors', managers', officers', and/or employees' liability coverage, and all agreements, documents, or instruments relating thereto.

54.     "*Debtor Release*" means the release set forth in <u>Article VIII.C</u> of this Plan.

55.     "*Debtors*" has the meaning set forth in the preamble.

56.     "*Dechert*" means Dechert LLP, as counsel to the Ad Hoc Group.

57.     "*Definitive Documents*" means the following and includes any exhibits, schedules, amendments, modifications, or supplements thereto:  (a) the First Day Pleadings; (b) the DIP Documents, including the DIP Credit Agreement and the DIP Orders; (c) this Plan; (d) the Disclosure Statement; (e) the Disclosure Statement Order; (f) the Confirmation Order; (g) the Exit ABL Facility Documents, including the Exit ABL Facility Credit Agreement; (h) the

Plan Supplement (including any Restructuring Transaction Memorandum); and (i) the New Organizational Documents.

58.    "*DIP Agent*" means GLAS USA LLC, or any assigns or successors thereto, in its capacity as administrative agent and collateral agent under the DIP Facility.

59.    "*DIP Commitments*" has the meaning ascribed to it in the DIP Orders.

60.    "*DIP Credit Agreement*" means that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of June 18, 2025, by and among certain of the Debtors, the DIP Agent, and the DIP Lenders setting forth the terms and conditions of the DIP Facility (as amended, supplemented, or otherwise modified from time to time).

61.    "*DIP Documents*" means, collectively, the documentation governing the DIP Facility, including the DIP Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the DIP Orders, and the DIP Motion (including any amendments, restatements, supplements, or modifications of any of the foregoing as may be approved by the DIP Lenders satisfying such consent threshold as is required to effect such amendments, restatements, supplements, or modifications as specified herein or in the DIP Credit Agreement).

62.    "*DIP Equity Conversion*" means the conversion of the Superpriority DIP Claims into 98% of the Reorganized Common Stock upon the Effective Date subject to dilution by the MIP Shares.

63.    "*DIP Facility*" means the superpriority, senior secured, debtor in possession term loan facility in an aggregate principal amount of $600 million, plus any fees and interest that have been paid in kind, provided to the Debtors under the DIP Documents.

64.    "*DIP Lenders*" means the lenders party from time to time to the DIP Credit Agreement.

65.    "*DIP Motion*" means the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 16].

66.    "*DIP Obligations*" has the meaning ascribed to "Obligations" in the DIP Credit Agreement.

67.    "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

68.    "*DIP Secured Parties*" means, collectively, the DIP Agent and the DIP Lenders.

69.    "*Disbursing Agent*" means, with respect to all distributions to be made under this Plan, the Debtors, the Reorganized Debtors, or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with this Plan, which Entity may include the Claims and Noticing Agent, the Agents/Trustees, and the Unsecured Claims Distribution Trustee, as applicable.

70.    "*Disclosure Statement*" means the *Disclosure Statement for the Joint Plan of Reorganization of At Home Group Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (including all exhibits, supplements, appendices, and schedules, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time) filed contemporaneously herewith.

71.    "*Disclosure Statement Order*" means the order of the Bankruptcy Court approving the Disclosure Statement and setting forth the procedures for solicitation of votes on this Plan.

72. "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest (or portion thereof): (a) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment; (b) that is not Allowed; and (c) that is not disallowed by this Plan, the Bankruptcy Code, or a Final Order, as applicable.

73. "*Distribution Record Date*" means, other than with respect to Securities of the Debtors deposited with DTC, the date for determining which Holders of Allowed Claims are eligible to receive distributions hereunder, which shall be the Confirmation Date, or such other date as is announced by the Debtors with the consent of the Required Consenting Stakeholders or designated in a Final Order. For the avoidance of doubt, the Distribution Record Date shall not apply to any Securities of the Debtors deposited with the DTC, and the Holders of such Securities shall receive a distribution in accordance with this Plan and, as applicable, the customary procedures of DTC.

74. "*DTC*" means The Depository Trust Company or its nominees (or any successors thereto, in each case).

75. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of this Plan have been satisfied or waived in accordance with Article IX.B of this Plan; and (c) this Plan is declared effective by the Debtors. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

76. "*Employment Agreement*" means any new and/or existing employment agreement or letter, indemnification agreement, severance agreement, or other agreement entered into with the Debtors' current and former officers and other employees by the Reorganized Debtors.

77. "*Entity*" has the meaning ascribed to it in section 101(15) of the Bankruptcy Code.

78. "*Equity Security*" has the meaning set forth in section 101(16) of the Bankruptcy Code.

79. "*Estate*" means, as to each Debtor, the estate created for the Debtors in their Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

80. "*Exchange Act*" means the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78a *et seq*, or any similar federal, state, or local Law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

81. "*Exchange Notes*" means the $483 million aggregate principal amount of outstanding 7.125%/8.625% Cash/PIK toggle Senior Secured Notes due 2028, issued under the Exchange Notes Indenture.

82. "*Exchange Notes Claims*" means all claims against any of the Debtors arising under, derived from, based on, or related to the Exchange Notes Obligations.

83. "*Exchange Notes Indenture*" means that certain indenture, dated as of May 12, 2023, among At Home Group Inc., as issuer, the guarantors party thereto, and Wilmington Trust, National Association, as trustee and notes collateral agent (as amended, supplemented, or otherwise modified from time to time).

84. "*Exchange Notes Obligations*" has the meaning assigned to the term "Obligations" in the Exchange Notes Indenture.

85. "*Exculpated Partie*s" means, collectively, and in each case solely in its capacity as such (and to the extent permitted by Law): (a) each of the Debtors; (b) the Reorganized Debtors; (c) with respect to the Debtors, each of their respective former and current directors, managers, officers, attorneys, financial advisors, consultants, or other professionals or advisors that served in such capacity between the Petition Date and Effective Date; (d) the Professionals retained during the Chapter 11 Cases; and (e) the Committee and each of its present and former members, solely in their capacity as members of the Committee.

86.     "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

87.     "*Existing Equity Interests*" means the existing equity Interests of At Home.

88.     "*Exit ABL Facility*" means that certain new, asset-backed loan facility to be entered into by the Reorganized Debtors on the Effective Date in accordance with the Exit ABL Facility Documents.

89.     "*Exit ABL Facility Agent*" means the agent under the Exit ABL Facility.

90.     "*Exit ABL Facility Credit Agreement*" means the credit agreement governing the Exit ABL Facility.

91.     "*Exit ABL Facility Documents*" means the Exit ABL Facility Credit Agreement and any other documentation necessary or appropriate to effectuate the incurrence of the Exit ABL Facility.

92.     "*Exit ABL Facility Lenders*" means those lenders from time-to-time party to the Exit ABL Facility Documents, solely in their capacity as such.

93.     "*Exit ABL Loans*" means, as applicable, the loans provided under the Exit ABL Facility on the terms and conditions set forth in the Exit ABL Facility Documents.

94.     "*Federal Judgment Rate*" means the federal judgment rate specified by 28 U.S.C. § 1961 in effect as of the Petition Date.

95.     "*File*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

96.     "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 344] entered by the Bankruptcy Court.

97.     "*Final Order*" means, including, without limitation, any order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought, or if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

98.     "*First Day Declaration*" means the *Declaration of Jeremy Aguilar, Chief Financial Officer of At Home Group Inc. and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 4].

99.     "*First Day Pleadings*" means the pleadings and related documentation requesting certain emergency, interim, and/or final relief, or supporting the request for such relief, to be filed on or around the Petition Date and to be heard at the "first day" hearing.

100. "*First Lien Claims*" means, collectively, the Cayman Notes Claims, the Intercompany Note Claims, the Term Loan Claims, the Senior Secured Notes Claims, and the Exchange Notes Claims.

101. "*First Lien Debt*" means, collectively, the Exchange Notes, the Cayman Notes, the Intercompany Note, the Term Loans, and the Senior Secured Notes.

102. "*First Lien Deficiency Claims*" means any unsecured deficiency Claim in respect of the First Lien Debt which for the purposes of this Plan shall be deemed Allowed in an amount equal to $1,196,503,659.24.

103. "*First Lien Equity Distribution*" means 100% of Reorganized Common Stock subject to dilution by the DIP Equity Conversion and the MIP Shares.

104. "*First Lien Obligations*" means, collectively, the Term Loan Obligations, the Senior Secured Notes Obligations, the Exchange Notes Obligations, the Cayman Notes Obligations and the Intercompany Note Obligations.

105. "*General Unsecured Claim*" means any Unsecured Claim that is not: (a) paid in full prior to the Effective Date; (b) an Administrative Claim; (c) a Priority Tax Claim; (d) a Superpriority DIP Claim; (e) an Other Priority Claim; (f) an Intercompany Claim; and (g) a Section 510(b) Claim. For the avoidance of doubt, (i) Senior Unsecured Notes Claims, (ii) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, (iii) Unsecured Claims resulting from litigation against one or more of the Debtors, and (iv) the First Lien Deficiency Claims, in each case shall be General Unsecured Claims.

106. "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

107. "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

108. "*Holder*" means an Entity that is the record owner of a Claim against or Interest in any of the Debtors, as applicable.

109. "*Impaired*" means, when used in reference to a Claim or Interest, a Claim or Interest that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

110. "*Insider*" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

111. "*Intercompany Claim*" means any Claim held by a Debtor or Affiliate of a Debtor against another Debtor or Affiliate of a Debtor. For the avoidance of doubt, the Intercompany Note Claim is not an Intercompany Claim.

112. "*Intercompany Interest*" means any Interest in one Debtor held by another Debtor.

113. "*Intercompany Note*" means that certain intercompany note, dated as of May 12, 2023, among At Home Group Inc., At Home Cayman, the guarantors party thereto from time to time, and Acquiom Agency Services LLC (as successor to Delaware Trust Company), as administrative agent and intercompany note collateral agent (as amended, restated, supplemented, or otherwise modified from time to time), providing for the issuance to At Home Cayman of a $200 million intercompany note which matures on May 12, 2028.

114. "*Intercompany Note Claim*" means all claims against any of the Debtors arising under, derived from, based on, or related to the Intercompany Note Obligations.

115. "*Intercompany Note Obligations*" has the meaning assigned to the term "Obligations" in the Intercompany Note.

116.    "*Interest*" means the common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, or other Securities or agreements to acquire the common stock (including convertible debt), preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement).

117.    "*Interim DIP Order*" means the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 98] entered by the Bankruptcy Court.

118.    "*IRS*" means the United States Internal Revenue Service.

119.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

120.    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

121.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

122.    "*Management Incentive Plan*" means a management incentive plan providing for the issuance of up to 10% of the Reorganized Equity (on a fully diluted and fully distributed basis) for management and the New Board, which may be granted in any form acceptable to the New Board, including without limitation, in the form of options, restricted stock, restricted stock units, warrants, stock appreciations rights, or any combination thereof, and which will be approved by the New Board on or within 90 days of the Effective Date.

123.    "*MIP Shares*" means a pool of a to be determined percentage of Reorganized Equity (of up to 10%), reserved for issuance under the Management Incentive Plan.

124.    "*New Board*" means the new board of directors of the Reorganized Debtors, which shall be selected in accordance with Article IV.J. of this Plan.

125.    "*New Organizational Documents*" means documentation establishing the corporate governance for the Reorganized Debtors, including charters, bylaws, operating agreements, or other organization documents, which (a) shall be consistent with the Restructuring Term Sheet, the RSA, and section 1123(a)(6) of the Bankruptcy Code, (b) shall have terms acceptable to the Required Consenting Stakeholders, and (c) shall include provisions consistent with those set forth in Annex C of the Restructuring Term Sheet which shall be subject to the consent rights set forth therein.

126.    "*Ordinary Course Non-Insider Counterparties*" means (i) Persons party to at least one Executory Contract or Unexpired Lease of a kind entered into in the ordinary course of the Debtors' business and assumed by the Debtors pursuant to the Plan, (ii) Persons that have entered into an agreement with the Debtors of a kind entered into in the ordinary course of the Debtors' business after the Petition Date and which has not been terminated as of the Effective Date of the Plan, and (iii) Persons that have entered into an agreement with the Debtors of a kind entered into in the ordinary course of the Debtors' business after the Effective Date which agreement designates such Person as an Ordinary Course Non-Insider Counterparty.

127.    "*Ordinary Course Professional*" means an Entity (other than a Professional) retained or compensated by the Debtors in accordance with the Ordinary Course Professionals Order.

128.    "*Ordinary Course Professionals Order*" means the *Order (I) Authorizing the Debtors' to Retain and Compensation Professionals Utilized in the Ordinary Course of Business, (II) Establishing Procedures for Designating Such Professionals, (III) Waiving Certain Information Requirements of Local Rule 2106-1 and*

*(IV) Granting Related Relief* [Docket No. 273] (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof).

129.   "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

130.   "*Other Secured Claim*" means any Secured Claim other than the Superpriority DIP Claims, the ABL Facility Claims, the Intercompany Note Claim, the Cayman Notes Claims, the Term Loan Claims, the Senior Secured Notes Claims, or the Exchange Notes Claims.

131.   "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

132.   "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

133.   "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims or other eligible Entities under and in accordance with this Plan.

134.   "*Plan Supplement*" means collectively, the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules), including the following, as applicable: (a) the Schedule of Rejected Executory Contracts and Unexpired Leases; (b) the Schedule of Assumed Executory Contracts and Unexpired Leases; (c) the Schedule of Retained Causes of Action, which shall also identify the Assigned Preference Actions; (d) the Restructuring Transactions Memorandum; (e) the identity of the members of the New Board (if known at the time of Filing); (f) the New Organizational Documents; (g) the Exit ABL Facility Documents; (h) the Unsecured Claims Distribution Trust Agreement; and (i) the identity of the Unsecured Claims Distribution Trustee.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement in accordance with this Plan and the RSA on or before the Effective Date.  The Plan Supplement shall be deemed incorporated into and part of this Plan as if set forth herein in full; *provided*, *however*, that in the event of a conflict between this Plan and the Plan Supplement, the Plan Supplement shall control in accordance with <u>Article I.G</u>.

135.   "*Preference Action*" means any and all causes of action that any of the Debtors, the Reorganized Debtors, or the Estates have asserted or may assert under section 547of the Bankruptcy Code.

136.   "*Prepetition Finance Documents*" means the documentation governing the ABL Facility, the First Lien Debt, and the Senior Unsecured Notes.

137.   "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

138.   "*Pro Rata Share*" means, (a) with respect to each Cayman Notes Claim, Intercompany Note Claim, Term Loan Claim, Senior Secured Notes Claim, and Exchange Notes Claim, the proportion that such Claim bears to all Allowed First Lien Claims and (b) with respect to any other class of Claims or Interests (including the Senior Unsecured Notes Claims), the proportion that such Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that same Class.

139.   "*Professional*" means an Entity (other than an Ordinary Course Professional):  (a) employed, or proposed to be employed by the Debtors or by the Committee prior to the Confirmation Date, in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

140.   "*Professional Fee Amount*" means the reasonable estimate of the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services to the

Debtors or the Committee prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.D of this Plan.

141.    "*Professional Fee Claim*" means any Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred on or after the Petition Date by such Professional through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

142.    "*Professional Fee Escrow Account*" means an account funded by the Debtors with Cash as soon as practicable after Confirmation and not later than the Effective Date in an amount equal to the Professional Fee Amount.

143.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

144.    "*Quarterly Fees*" means all fees payable pursuant to section 1930 of the Judicial Code, together with the statutory rate of interest set forth in section 3717 of title 31 of the United States Code, to the extent applicable.

145.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to a Claim or an Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

146.    "*Related Party*" means, collectively, with respect to any Person or Entity, each of, and in each case in its capacity as such, such Person's or such Entity's current and former directors, managers, officers, observers, committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, secondees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

147.    "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Ad Hoc Group and each Consenting Stakeholder; (d) the DIP Lenders; (e) the ABL Secured Parties; (f) the DIP Agent; (g) the Agents/Trustees; (h) the Consenting Sponsor; (i) At Home Cayman; (j) At Home Cayman Holdings; (k) the Committee, each of its current and former members (solely in their capacity as such), and its Professionals; (l) the Senior Unsecured Notes Trustee and counsel thereto; (m) each current and former Affiliate of each Entity in clause (a) through the preceding clause (l); and (n) each Related Party of each Entity in clauses (a) through the preceding clause (l); *provided* that, in each case, an Entity in clauses (c) through (l) shall not be a Released Party if it:  (x) was provided with an opportunity to opt in to the releases described in Article VIII.D of this Plan by returning an "opt in" form and did not do so; or (y) timely objects to the releases contained in Article VIII.D of this Plan and such objection is not resolved before Confirmation.

148.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Ad Hoc Group and each Consenting Stakeholder; (d) the DIP Lenders; (e) the ABL Secured Parties; (f) the DIP Agent; (g) the Agents/Trustees; (h) the Consenting Sponsor; (i) the Committee; (j) the Senior Unsecured Notes Trustee; (k) all Holders of Claims that vote to accept this Plan and that affirmatively opt into the releases provided for in this Plan; (l) all Holders of Claims that are deemed to accept this Plan and that affirmatively opt into the releases provided for in this Plan; (m) all Holders of Claims that abstain from voting on this Plan and that affirmatively opt into the releases provided for in this Plan; (n) all Holders of Claims that vote to reject this Plan and that affirmatively opt into the releases provided for in this Plan; (o) all Holders of Interests that affirmatively opt into the releases provided for in this Plan; (p) each current and former Affiliate of each Entity in clause (a) through the preceding clause (o); and (q) each Related Party of each Entity in clauses (a) through the preceding clause (o) for which such Entity is legally entitled to bind such Related Party to the releases contained herein under applicable law; *provided* that, in each case, an Entity in clauses (k) through (o) shall not be a Releasing Party if it:  (x) was provided with an opportunity to opt in to the releases described in Article VIII.D of this Plan by returning an "opt in" form and

did not do so; or (y) timely objects to the releases contained in Article VIII.D of this Plan and such objection is not resolved before Confirmation.

149.    "*Reorganized Common Stock*" means the common stock of reorganized At Home.

150.    "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under this Plan, on and after the Effective Date, or any successors or assigns thereto including by transfer, merger, consolidation, or otherwise, and including any new Entity established in connection with the implementation of the Restructuring Transactions, and which shall include, without limitation, any newly created parent holding company, if any, as applicable, pursuant to this Plan.

151.    "*Reorganized Equity*" means the common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, or profits interests of any Reorganized Debtor, and options, warrants, rights, or other Securities or agreements to acquire the common stock (including convertible debt), preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Reorganized Debtor (whether or not arising under or in connection with any employment agreement) including Reorganized Common Stock.

152.    "*Required Consenting Stakeholders*" means, as of the relevant date, Consenting Stakeholders holding at least 50.01% of the Voting Amounts held by all Consenting Stakeholders party to the RSA as of such date as confirmed in writing by Dechert (email being sufficient).

153.    "*Restructuring Expenses*" means the reasonable and documented fees and expenses accrued from the inception of their respective engagements related to the implementation of the Restructuring Transactions and not previously paid by, or on behalf of, the Debtors of:  (i) any professional retained by the Ad Hoc Group; and (ii) each of the Trustees and Agents, including each of their respective legal counsel, in respect of the First Lien Claims, the DIP Facility, and the ABL Loans.

154.    "*Restructuring Term Sheet*" means the term sheet attached to the RSA as Exhibit B.

155.    "*Restructuring Transactions*" means the transactions described in Article IV of this Plan and the Restructuring Transactions Memorandum.

156.    "*Restructuring Transactions Memorandum*" means the description of the steps acceptable to the required Consenting Stakeholders and the Consenting Sponsor (in accordance with the terms of the RSA) to be carried out to effectuate the Restructuring Transactions in accordance with this Plan and the RSA, and as set forth in the Plan Supplement, and otherwise in a manner consistent with the Definitive Documents.

157.    "*RSA*" means that certain Restructuring Support Agreement, dated as of June 16, 2025, by and among the Debtors, the Consenting Stakeholders, and the Consenting Sponsor, including all exhibits, schedules, and other attachments thereto, as may be amended, modified, or supplemented from time to time, in accordance with its terms, attached to the First Day Declaration as Exhibit B.

158.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any amendments, supplements, or modifications thereto) of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or the Reorganized Debtors with the consent of the Required Consenting Stakeholders, as applicable, in accordance with this Plan.  For the avoidance of doubt, the schedule shall be included in the Plan Supplement.

159.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments, supplements, or modifications thereto) of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or the Reorganized Debtors with the consent of the Required Consenting Stakeholders, as applicable, in accordance with this Plan.  For the avoidance of doubt, the schedule shall be included in the Plan Supplement.

160.    "*Schedule of Retained Causes of Action*" means the schedule of Causes of Action of the Debtors that shall vest in the Reorganized Debtors on the Effective Date, that are not settled, released, waived, exculpated, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall specify which of such Causes of Action shall be retained by the Reorganized Debtors and which Causes of Action shall be assigned to the Unsecured Claims Distribution Trust as Assigned Preference Actions under this Plan.

161.    "*Schedules*" means, collectively, the schedules of assets and liabilities, statements of financial affairs, lists of Holders of Claims and Interests, and all amendments or supplements thereto to be Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

162.    "*SEC*" means the United States Securities and Exchange Commission.

163.    "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

164.    "*Secured Claim*" means a Claim that is:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to this Plan, or separate order of the Bankruptcy Court, as a secured claim.

165.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

166.    "*Security*" or "*Securities*" has the meaning ascribed to it in section 2(a)(1) of the Securities Act.

167.    "*Senior Secured Notes*" means the 4.875% Senior Secured Notes due 2028 issued pursuant to the Senior Secured Notes Indenture.

168.    "*Senior Secured Notes Claims*" means all Claims against any of the Debtors arising under, derived from, based on, or related to the Senior Secured Notes Obligations.

169.    "*Senior Secured Notes Indenture*" that certain indenture, dated as of July 12, 2021, by and among At Home Group Inc., as issuer, and Computershare Trust Company (as successor to U.S. Bank Trust Company, National Association), as trustee and notes collateral agent (as amended, restated, supplemented, or otherwise modified from time to time).

170.    "*Senior Secured Notes Obligations*" has the meaning assigned to the term "Obligations" in the Senior Secured Notes Indenture.

171.    "*Senior Unsecured Notes*" means the 7.125% Senior Unsecured Notes due 2029, issued under the Senior Unsecured Notes Indenture.

172.    "*Senior Unsecured Notes Claims*" means all claims against any of the Debtors arising under, derived from, based on, or related to the Senior Unsecured Notes Obligations.

173.    "*Senior Unsecured Notes Indenture*" means that certain indenture, dated as of July 12, 2021, between At Home Group Inc., the guarantors party thereto from time to time, and CSC Delaware Trust Company (as successor to U.S. Bank Trust Company, National Association), as trustee (as amended, supplemented, or otherwise modified from time to time).

174. "*Senior Unsecured Notes Obligations*" has the meaning assigned to the term "Obligations" in the Senior Unsecured Notes Indenture.

175. "*Senior Unsecured Notes Trustee*" means CSC Delaware Trust Company, in its capacity as indenture trustee under the Senior Unsecured Notes Indenture, including any successor thereto.

176. "*Senior Unsecured Notes Trustee Expenses*" means the reasonable and documented fees and expenses of the Senior Unsecured Notes Trustee not previously paid by, or on behalf of, the Debtors; *provided* that such amount shall not exceed $365,000.00 in total.

177. "*Superpriority DIP Claims*" means Claims against any of the Debtors arising under, derived from, based on, or related to the DIP Obligations.

178. "*Tariff Event*" has the meaning ascribed to it in the DIP Credit Agreement.

179. "*Term Loan Facility*" means the approximately $579 million prepetition term loan facility issued under the Term Loan Credit Agreement.

180. "*Term Loans*" means the term loans due under the Term Loan Credit Agreement.

181. "*Term Loan Claims*" means all Claims against any of the Debtors arising under, derived from, based on, or related to the Term Loan Facility.

182. "*Term Loan Credit Agreement*" means that certain term loan credit agreement between, *inter alios*, At Home Group Inc., as borrower, the lenders party thereto, and Wilmington Trust, National Association (as successor to Bank of America, N.A.), as administrative agent and collateral agent, dated as of July 23, 2021.

183. "*Term Loan Obligations*" has the meaning assigned to the term "Obligations" in the Term Loan Credit Agreement.

184. "*Third-Party Release*" means the release set forth in Article VIII.D of this Plan.

185. "*Trustee*" means any indenture trustee, collateral trustee, administrative agent, or other trustee or similar entity under the Cayman Notes, the Senior Secured Notes, the Exchange Notes, the Intercompany Note, and the Senior Unsecured Notes.

186. "*Unclaimed Distribution*" means any distribution under this Plan on account of an Allowed Claim to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check within 90 calendar days of receipt; (b) given notice to the Reorganized Debtors or the Unsecured Claims Distribution Trustee, as applicable, of an intent to accept a particular distribution within 90 calendar days of receipt; (c) responded to the Debtors' or Reorganized Debtors' or Unsecured Claims Distribution Trustee's requests for information necessary to facilitate a particular distribution prior to the deadline included in such request for information; or (d) timely taken any other action necessary to facilitate such distribution.

187. "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

188. "*Unexpired Lease*" means a lease of non-residential, real property to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

189. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

190. "*Unsecured Claim*" means any Claim that is not a Secured Claim.

191.    "*Unsecured Claims Distribution Trust*" means the trust or other similar legal entity established for the benefit of the Unsecured Claims Distribution Trust Beneficiaries on the Effective Date in accordance with this Plan and pursuant to the Unsecured Claims Distribution Trust Agreement.

192.    "*Unsecured Claims Distribution Trust Agreement*" means that certain trust agreement governing the Unsecured Claims Distribution Trust, the form of which shall be included in the Plan Supplement.

193.    "*Unsecured Claims Distribution Trust Assets*" means, collectively, (a) all of the Debtors' right, title, and interest in the Assigned Preference Actions set forth on the Schedule of Retained Causes of Action, including the proceeds thereof, and (b) $3.9 million in Cash *plus* the difference (which may be a positive or negative number) calculated by subtracting (x) the amount of the Allowed fees and expenses of the Committee and its Professionals from (y) the amount set forth for such fees and expenses in the Approved Budget (as defined in the DIP Orders).

194.    "*Unsecured Claims Distribution Trust Beneficiaries*" means, collectively, the Holders of Allowed General Unsecured Claims; provided, however, for the avoidance of doubt, the Holders of any First Lien Deficiency Claims shall not be Unsecured Claims Distribution Trust Beneficiaries.

195.    "*Unsecured Claims Distribution Trust Beneficial Interests*" means the beneficial interest in the Unsecured Claims Distribution Trust granted to each Unsecured Claims Distribution Trust Beneficiary, which shall entitle each Unsecured Claims Distribution Trust Beneficiary to its Pro Rata Share of the Unsecured Claims Distribution Trust Net Assets, subject to the terms of this Plan and the Unsecured Claims Distribution Trust Agreement.

196.    "*Unsecured Claims Distribution Trust Fees and Expenses*" means all reasonable and documented fees, expenses, and costs (including any taxes imposed on or payable by the Unsecured Claims Distribution Trust or in respect of the Unsecured Claims Distribution Trust Assets) incurred by the Unsecured Claims Distribution Trust, any professionals retained by the Unsecured Claims Distribution Trust, and any additional amount determined necessary by the Unsecured Claims Distribution Trustee to adequately reserve for the operating expenses of the Unsecured Claims Distribution Trust that shall be paid out of the Unsecured Claims Distribution Trust Assets.

197.    "*Unsecured Claims Distribution Trust Net Assets*" means the Unsecured Claims Distribution Trust Assets less the Unsecured Claims Distribution Trust Fees and Expenses.

198.    "*Unsecured Claims Distribution Trustee*" means the trustee, who shall be selected by the Committee and whose identity shall be disclosed in the Plan Supplement, and who shall coordinate administration and other activities of the Unsecured Claims Distribution Trust in accordance with the Unsecured Claims Distribution Trust Agreement.

199.    "*Voting Amount*" means with respect to any Consenting Stakeholder (a) at any time while the DIP Commitments are held by such Consenting Stakeholder and remain outstanding (whether funded or unfunded), the aggregate principal amount of all DIP Commitments of such Consenting Stakeholder; and (b) at all other times, the sum of (i) the aggregate principal amount of the Exchange Notes, Senior Secured Notes, and Term Loans held by such Consenting Stakeholder, plus (ii) two times the aggregate principal amount of the Cayman Notes held by such Consenting Stakeholder.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (ii) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto as provided for in the RSA; (iii) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or the Confirmation Order, as applicable; (iv) any reference to an Entity as a Holder of a

Claim or Interest includes that Entity's successors and assigns; (v) unless otherwise specified, all references herein to "Articles" are references to Articles hereof; (vi) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (vii) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (viii) subject to the provisions of any contract, charter, bylaws, limited liability company agreements, operating agreements, certificates of incorporation, or other organizational documents or shareholders' agreements, as applicable, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable Law, including the Bankruptcy Code and the Bankruptcy Rules; (ix) any immaterial effectuating provisions may be interpreted by the Debtors or Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval, of the Bankruptcy Court or any other Entity; (x) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (xi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (xii) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (xiii) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (xiv) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (xv) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (xvi) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (xvii) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; and (xviii) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective Person or Entity that have such consent, acceptance, or approval rights, including by electronic mail.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Except to the extent a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code or the Bankruptcy Rules) and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed, implemented, and enforced in accordance with, the Laws of the State of New York, without giving effect to the principles of conflict of Laws; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the Laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

*G.    Controlling Document.*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and this Plan, including the Plan Supplement, or the Disclosure Statement, the Confirmation Order shall control.

*H.    Nonconsolidated Plan.*

Although for purposes of administrative convenience and efficiency this Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, this Plan does not provide for the substantive consolidation of any of the Debtors.  Except as expressly provided herein, nothing in this Plan, the Confirmation Order, or the Disclosure Statement shall constitute or be deemed to constitute a representation that any one or all of the Debtors is subject to or liable for any Claims or Interests against or in any other Debtor.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under this Plan on account of any Allowed Claim exceed the amount of the Allowed Claim.

*I.    Consultation, Notice, Information, and Consent Rights.*

Notwithstanding anything herein to the contrary, all respective consultation, information, notice, and consent rights of set forth in the DIP Documents and the RSA, with respect to the form and substance of this Plan, all exhibits to this Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein until such time as the DIP Documents and/or the RSA, as applicable, are terminated in accordance with its terms.

Failure to reference in this Plan the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the DIP Documents or the RSA, as applicable, shall not impair such rights and obligations.

## ARTICLE II.
### ADMINISTRATIVE CLAIMS, SUPERPRIORITY DIP CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Superpriority DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

*A.    Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Superpriority DIP Claims, if applicable, Professional Fee Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code) that has not been paid in full prior to the Effective Date, will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such

time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in this Article II.A of this Plan, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors by the applicable Administrative Claims Bar Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed. **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or the Reorganized Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Notwithstanding anything else herein, the Allowed Superpriority DIP Claims shall not be subject to the Administrative Claims Bar Date.**

B.     *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter).

C.     *Superpriority DIP Claims.*

All Superpriority DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility in accordance with the terms and in the amounts specified under the DIP Orders and the DIP Documents on such date, (ii) all interest accrued and unpaid thereon to the date of payment, and (iii) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Documents and the DIP Orders.

Except to the extent that a Holder of an Allowed Superpriority DIP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Superpriority DIP Claim, each Holder of an Allowed Superpriority DIP Claim, including the DIP Agent, shall receive either (i) payment in full in Cash of its Allowed Superpriority DIP Claim in accordance with the terms and in the amounts specified under the DIP Orders and the DIP Documents, (ii) its pro rata share of the DIP Equity Conversion (subject to dilution on account of the MIP Shares), or (iii) such other treatment as to which the Debtors and the Holders of the Allowed Superpriority DIP Claims will have agreed upon in writing. For the avoidance of doubt, all accrued and unpaid fees, expenses, and non-contingent indemnification obligations (if any) payable under the DIP Documents and the DIP Orders (including applicable Restructuring Expenses) constituting Superpriority DIP Claims shall be paid in full in Cash on the Effective Date, unless otherwise expressly provided under the applicable DIP Documents. Holders of Superpriority DIP Claims that receive Reorganized Equity pursuant to the DIP Equity Conversion shall be permitted to direct distributions of their Reorganized Equity to designees with the consent of the Required Consenting Stakeholders.

Following such satisfaction of the Allowed Superpriority DIP Claims, the DIP Facility, the DIP Documents, and all related loan documents shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case, without further action by the DIP Agent or the DIP Lenders and without further order of the Bankruptcy Court, and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the Superpriority DIP Claims shall be automatically discharged and released, in each case, without further action by the DIP Agent or the DIP Lenders. At the expense of the Debtors or Reorganized Debtors, the DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

D.      *Professional Fee Claims.*

    1.      Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 60 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of this Plan.

    2.      Professional Fee Escrow Account.

No later than the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, including any Cash from the Funded Reserve Amount (as defined in the DIP Orders). The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors, as applicable. The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

    3.      Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors or the Committee before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than three Business Days before the Effective Date; *provided, however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional; *provided, however,* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.

    4.      Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. A good faith estimate of the fees owed to Professionals incurred following the Confirmation Date shall be included in the Professional Fee Escrow Account and paid in the ordinary course of business; *provided, however*, that such estimate shall not be deemed to limit the amount of fees and expenses actually incurred by such Professionals.

E.      *Payment of United States Trustee Quarterly Fees.*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors and the Reorganized Debtors shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, each of the Reorganized Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  Each and every one of the Debtors and the Reorganized Debtors shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Claim in the case, and shall not be treated as providing any release under this Plan.

F.      *Payment of Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases), without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, Restructuring Expenses related to implementation of this Plan and Consummation thereof, whether incurred before, on, or after the Effective Date in accordance with, if applicable, the respective engagement letter or fee letter and solely upon receipt of an invoice from any Entity requesting such Restructuring Expenses with reasonable detail (but without the need for time detail).

G.      *Payment of the Senior Unsecured Notes Trustee Expenses.*

On the Effective Date, the Debtors shall pay the Senior Unsecured Notes Trustee Expenses without the requirement for the Senior Unsecured Notes Trustee to file with the Bankruptcy Court either a retention application or a fee application, which shall not be subject to setoff, recoupment, reduction, or reallocation of any kind.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

This Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors (except for the Class 12 Existing Equity Interests, which shall apply only to Ambience Parent, Inc.).  All of the potential Classes for the Debtors are set forth herein.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ABL Facility Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | Cayman Notes Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Note Claims | Impaired | Entitled to Vote |
| Class 6 | Term Loan Claims | Impaired | Entitled to Vote |
| Class 7 | Senior Secured Notes Claims | Impaired | Entitled to Vote |
| Class 8 | Exchange Notes Claims | Impaired | Entitled to Vote |
| Class 9 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 10 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 11 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 12 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 13 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with such Claim's terms in the ordinary course of business) or as soon as reasonably practicable thereafter.  In no event shall any Holder of an Allowed Claim or Allowed Interest receive more than such Holder's Allowed amount on account of such Claim or Interest.

1.      <u>Class 1 – Other Secured Claims</u>.

(a)      *Classification*: Class 1 consists of all Allowed Other Secured Claims against any Debtor.

(b)      *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Allowed Other Secured Claim, in full and final

satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, on the Effective Date or as soon as reasonably practicable thereafter, shall receive either:

(i)     payment in full in Cash of its Allowed Other Secured Claim;

(ii)    delivery of the collateral securing its Allowed Other Secured Claim;

(iii)   Reinstatement of its Allowed Other Secured Claim; or

(iv)    such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting*: Class 1 is Unimpaired under this Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

2.    Class 2 – Other Priority Claims.

(a)     *Classification*: Class 2 consists of all Allowed Other Priority Claims against any Debtor.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, on the Effective Date, each Holder of such Allowed Other Priority Claim shall receive treatment in a manner consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)     *Voting*: Class 2 is Unimpaired under this Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

3.    Class 3 – ABL Facility Claims.

(a)     *Classification*: Class 3 consists of all Allowed ABL Facility Claims against any Debtor.

(b)     *Allowance*:  All ABL Facility Claims shall be Allowed in the aggregate principal amount of approximately $377,925,500, *plus* any and all unpaid interest, fees, premiums, and all other obligations (including any letter of credit obligations), amounts, and expenses due and owing under the ABL Credit Agreement or related documents (including postpetition interest at the rate set forth in the DIP Orders) as of the Effective Date.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed ABL Facility Claim agrees to less favorable treatment of its Allowed ABL Facility Claim, on the Effective Date, each Holder of an Allowed ABL Facility Claim will receive, in full and final satisfaction, settlement, release, and discharge of such Allowed ABL Facility Claim, payment in full in Cash with the proceeds of the Exit ABL Facility, including termination and/or cash collateralization of any outstanding letters of credit, cash management obligations, or hedging obligations.

(d)     *Voting*: Class 3 is Unimpaired under this Plan.  Holders of Allowed ABL Facility Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

4.  <u>Class 4 – Cayman Notes Claims</u>.

    (a)    *Classification*:  Class 4 consists of all Allowed Secured Claims arising out of the Cayman Notes against any Debtor.

    (b)    *Allowance*:  The Cayman Notes Claims shall be deemed Allowed in the aggregate principal amount under the Cayman Notes Indenture, *plus* accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing pursuant to the Cayman Notes Indenture.  The amount of the Allowed Secured Claim in respect of the Cayman Notes Claims shall be $8,152.

    (c)    *Treatment*:  Except to the extent that a Holder of an Allowed Cayman Notes Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Cayman Notes Claim shall receive (i) such Holder's Pro Rata Share of the First Lien Equity Distribution and (ii) such Holder's Pro Rata Share of all Class 5 Intercompany Note Claims recoveries distributed to the Trustee in respect of the Cayman Notes in accordance with <u>Article III.B.5(c)</u> of this Plan.

    (d)    *Voting*:  Class 4 is Impaired under this Plan.  Holders of Allowed Secured Claims arising out of the Cayman Notes Claims are entitled to vote to accept or reject this Plan.

5.  <u>Class 5 – Intercompany Note Claims</u>.

    (a)    *Classification*:  Class 5 consists of all Allowed Secured Claims arising out of the Intercompany Note against any Debtor.

    (b)    *Allowance*: The Intercompany Note Claims shall be deemed Allowed in the aggregate principal amount under the Intercompany Note, plus accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing pursuant to the Intercompany Note.  The amount of the Allowed Secured Claim in respect of the Intercompany Note Claims shall be $8,152.

    (c)    *Treatment*:  Except to the extent that a Holder of an Allowed Intercompany Note Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Intercompany Note Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution; *provided* that such Holder's recovery under this Plan shall be payable to the indenture trustee and collateral agent for the Cayman Notes for distribution to the Holders of the Allowed Cayman Notes Claims in accordance with the documents governing the Cayman Notes only until such Cayman Notes are repaid in full.

    (d)    *Voting*:  Class 5 is Impaired under this Plan.  Holders of Allowed Secured Claims arising out of the Intercompany Note Claims are entitled to vote to accept or reject this Plan.

6.  <u>Class 6 – Term Loan Claims</u>.

    (a)    *Classification*:  Class 6 consists of all Allowed Secured Claims arising out of the Term Loan Facility against any Debtor.

    (b)    *Allowance*:  The Term Loan Claims shall be deemed Allowed in the aggregate principal amount under the Term Loan Credit Agreement, *plus* accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing

pursuant to the Term Loan Credit Agreement.  The amount of the Allowed Secured Claim in respect of the Term Loan Claims shall be $2,623,466.

(c)  *Treatment*:  Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each holder of an Allowed Secured Claim arising out of its Term Loan Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution.

(d)  *Voting*:  Class 6 is Impaired under this Plan.  Holders of Allowed Secured Claims arising out of the Term Loan Claims are entitled to vote to accept or reject this Plan.

7.  <u>Class 7 – Senior Secured Notes Claims</u>.

(a)  *Classification*:  Class 7 consists of all Allowed Secured Claims arising out of the Senior Secured Notes against any Debtor.

(b)  *Allowance*: The Senior Secured Notes Claims shall be deemed Allowed in the aggregate principal amount under the Senior Secured Notes Indenture, plus accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing pursuant to the Senior Secured Notes Indenture.  The amount of the Allowed Secured Claim respect of Senior Secured Notes Claims shall be $1,866,102.

(c)  *Treatment*:  Except to the extent that a Holder of an Allowed Senior Secured Notes Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Senior Secured Notes Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution.

(d)  *Voting*:  Class 7 is Impaired under this Plan.  Holders of Allowed Secured Claims arising out of Senior Secured Notes Claims are entitled to vote to accept or reject this Plan.

8.  <u>Class 8 – Exchange Notes Claims</u>.

(a)  *Classification*:  Class 8 consists of all Allowed Secured Claims arising out of the Allowed Exchange Notes against any Debtor.

(b)  *Allowance*: The Exchange Notes Claims shall be deemed Allowed in the aggregate principal amount under the Exchange Notes Indenture, plus accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing pursuant to the Exchange Notes Indenture.  The amount of the Allowed Secured Claim in respect of the Exchange Notes Claims shall be $2,994,126.

(c)  *Treatment*:  Except to the extent that a Holder of an Allowed Exchange Notes Claim agrees to less favorable treatment of its Allowed Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim, on the Effective Date, each Holder of an Allowed Secured Claim arising out of its Exchange Notes Claim shall receive such Holder's Pro Rata Share of the First Lien Equity Distribution.

(d)  *Voting*:  Class 8 is Impaired under this Plan.  Holders of Allowed Secured Claims arising out of Exchange Notes Claims are entitled to vote to accept or reject this Plan.

9. <u>Class 9 – General Unsecured Claims</u>.

    (a)    *Classification*:  Class 9 consists of all Allowed General Unsecured Claims against any Debtor.

    (b)    *Allowance:*  The First Lien Deficiency Claims shall be Allowed in the amount of $1,196,503,659.24 and is comprised of:  (i) $1,300,612.98 of the Cayman Notes Claims; (ii) $1,300,612.98 of the Intercompany Note Claims; (iii) $418,531,599.52 of the Term Loan Claims;  (iv) $297,706,463.49 of the Senior Secured Notes Claims; (v) $477,664,370.27 of the Exchange Notes Claims.  The Unsecured Notes Claims will be allowed in the amount of $59,885,777.21.

    (c)    *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment of its Allowed General Unsecured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim, on the Effective Date, each Holder of any Allowed General Unsecured Claim (other than a Holder of any First Lien Deficiency Claim) shall receive its Pro Rata Share of the Unsecured Claims Distribution Trust Beneficial Interests.  For the avoidance of doubt, Holders of First Lien Deficiency Claims shall not receive any Unsecured Claims Distribution Trust Beneficial Interests or any recovery from the Unsecured Claims Distribution Trust or the Unsecured Claims Distribution Trust Net Assets on account of such First Lien Deficiency Claim.

    (d)    *Voting*:  Class 9 is Impaired under this Plan and Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject this Plan.

10. <u>Class 10 – Intercompany Claims</u>.

    (a)    *Classification:*  Class 10 consists of all Intercompany Claims.

    (b)    *Treatment:*  On the Effective Date, all Intercompany Claims shall be (i) reinstated, or (ii) set off, settled, discharged, contributed, cancelled, released, and extinguished without any distribution on account of such Intercompany Claim, in each case, at the Reorganized Debtors' election with the consent of the Required Consenting Stakeholders.

    (c)    *Voting:*  Class 10 is Unimpaired if the Allowed Intercompany Claims are Reinstated or Impaired if the Allowed Intercompany Claims in Class 10 are set off, settled, discharged, contributed, cancelled, released, and extinguished.  Holders of Allowed Intercompany Claims in Class 10 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

11. <u>Class 11 – Intercompany Interests</u>.

    (a)    *Classification:*  Class 11 consists of all Intercompany Interests.

    (b)    *Treatment:*  On the Effective Date, all Intercompany Interests shall be (a) reinstated, or (b) set off, settled, discharged, contributed, cancelled, released, and extinguished and without any distribution on account of such Intercompany Interests, in each case, at the Reorganized Debtors' election with the consent of the Required Consenting Stakeholders.

(c)     *Voting*:  Class 11 is Unimpaired if the Allowed Intercompany Interests are Reinstated or Impaired if the Allowed Intercompany Interests are set off, settled, discharged, contributed, cancelled, released, and extinguished.  Holders of Allowed Intercompany Interests in Class 11 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

12.  Class 12 – Existing Equity Interests.

(a)     *Classification*:  Class 12 consists of all Existing Equity Interests.

(b)     *Treatment*:  On the Effective Date, all Existing Equity Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect.  Holders of Existing Equity Interests shall receive no recovery or distribution on account thereof and each Holder of an Existing Equity Interest shall not receive or retain any distribution, property, or other value on account of such Existing Equity Interest.

(c)     *Voting*:  Class 12 is Impaired under this Plan.  Holders of Existing Equity Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

13.  Class 13 – Section 510(b) Claims.

(a)     *Classification*:  Class 13 consists of all Section 510(b) Claims.

(b)     *Treatment*:  On the Effective Date, all Section 510(b) Claims shall be cancelled, released, extinguished, and discharged and will be of no further force or effect.  Holders of Section 510(b) Claims shall receive no recovery or distribution on account thereof and each Holder of a Section 510(b) Claim shall not receive or retain any distribution, property, or other value on account of such Section 510(b) Claim.

(c)     *Voting*:  Class 13 is Impaired under this Plan.  Holders of Section 510(b) Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

C.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan or the Plan Supplement shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.     *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class votes to accept or reject this Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted this Plan.

F.      *Intercompany Interests.*

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure, for the ultimate benefit of the Holders of the Reorganized Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims. For the avoidance of doubt, unless otherwise set forth in the Restructuring Transactions Memorandum, to the extent Reinstated pursuant to this Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to Article III.B of this Plan. The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. Subject to the consent rights set forth in the RSA, the Debtors reserve the right to modify this Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

J.      *Distributions of Reorganized Equity*

Holders of First Lien Claims entitled to receive Reorganized Equity pursuant to this Plan shall be permitted to direct distributions of their Reorganized Equity to designees with the consent of the Required Consenting Stakeholders.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

A.      *General Settlement of Claims and Interests.*

To the greatest extent permissible under the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to this Plan. To the greatest extent permissible under the Bankruptcy Code, this Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section

1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims against and Interests in the Debtors. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final.

B.    *Restructuring Transactions.*

On or before the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions and are authorized in all respects to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan that are consistent with and pursuant to the terms and conditions of this Plan, including, as applicable: (i) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, formation, organization, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of this Plan, the Plan Supplement, and the RSA and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Plan Supplement, and the RSA and having other terms to which the applicable Entities may agree; (iii) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state Law, including any applicable New Organizational Documents; (iv) the issuance and distribution of the Reorganized Equity as set forth in this Plan; (v) with respect to the Reorganized Debtors, the implementation of the Management Incentive Plan and the approval of the issuance of the MIP Shares; (vi) the consummation of the Exit ABL Facility, including the execution, delivery, and filing of all Exit ABL Facility Documents; (vii) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Transactions Memorandum; (viii) the establishment and funding of the Unsecured Claims Distribution Trust in accordance with this Plan and the Unsecured Claims Distribution Trust Agreement; and (ix) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with this Plan.

Subject to the consent of the Required Consenting Stakeholders, the Debtors may, but shall not be required to, create one or more additional companies, including a new parent holding company, or convert At Home into a limited liability company, in each case, as necessary, to effect the Restructuring Transactions. For the avoidance of doubt, the Reorganized Common Stock shall include the Reorganized Equity of the parent holding company of the Reorganized Debtors and may be issued in the form of limited liability company units, if applicable.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 105, 363, 1123, and 1141 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan. The Confirmation Order shall authorize the Debtors, the Reorganized Debtors, and the Consenting Stakeholders, as applicable, to undertake the Restructuring Transactions contemplated by this Plan, the RSA, and the other Definitive Documents.

C.    *The Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and each Reorganized Debtor shall adopt its New Organizational Documents, which shall include provisions consistent with Annex C attached to the Restructuring Term Sheet. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under this Plan as necessary to consummate this Plan consistent with the consent rights set forth in the RSA. Cash payments to be made pursuant to this Plan will be made by the Debtors or the Reorganized Debtors, as applicable. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under this Plan. Except as set forth herein or as otherwise provided for in the Restructuring Transactions Memorandum, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of this Plan.

From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement, the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court, to raise additional capital, including issuing additional Reorganized Equity and obtaining additional financing, subject to, the terms of the New Organizational Documents, as the New Board deems appropriate.

D.    *Sources of Consideration for Plan Distributions*.

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under this Plan, including the conveyance and funding of the Unsecured Claims Distribution Trust Assets, as applicable, with: (i) the Debtors' Cash on hand as of the Effective Date; (ii) the Reorganized Equity; and (iii) the proceeds from the Exit ABL Facility. The Unsecured Claims Distribution Trust shall fund its distributions, as contemplated by this Plan and the Unsecured Claims Distribution Trust Agreement, solely from the Unsecured Claims Distribution Trust Net Assets. Each distribution and issuance referred to in Article VI of this Plan shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with this Plan, including the Reorganized Equity, will be exempt from registration under the Securities Act, as described more fully in Article IV.M hereof.

1.    Use of Cash.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand and proceeds of the DIP Facility and the Exit ABL Facility, as applicable, to fund distributions to certain Holders of Allowed Claims, consistent with the terms of this Plan.

2.    Issuance of Reorganized Equity.

The Reorganized Debtors shall be authorized to issue the Reorganized Equity (including the MIP Shares) pursuant to the New Organizational Documents. The issuance of the Reorganized Equity shall be authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors. On the Effective Date, the Reorganized Equity shall be issued and distributed as provided for in the Restructuring Transactions Memorandum pursuant to, and in accordance with, this Plan. Holders of Superpriority DIP Claims and holders of First Lien Claims entitled to receive Reorganized Equity pursuant to this Plan shall be permitted to direct distributions of their Reorganized Equity to designees with the consent of the Required Consenting Stakeholders.

All of the shares (or comparable units) of Reorganized Equity issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable and shall be issued in book-entry form. Each distribution and issuance of Reorganized Equity shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of Reorganized Equity shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, without the need for execution by any party thereto other than the applicable Reorganized Debtor(s). The Reorganized Equity will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not be required to meet the eligibility requirements of DTC. Additional information relating to the applicability of the securities Laws is available in Article IV. L

The forms of the New Organizational Documents shall be included in the Plan Supplement filed ahead of the deadline to object to Confirmation of this Plan.

3.    Exit ABL Facility.

On the Effective Date, the Reorganized Debtors shall enter into the Exit ABL Facility, pursuant to the Exit ABL Facility Documents. Confirmation of this Plan shall constitute (a) approval of the Exit ABL Facility and the Exit ABL Facility Documents; and (b) authorization for the Debtors and the Reorganized Debtors, as applicable, to

take any and all actions necessary or appropriate to consummate the Exit ABL Facility (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), in each case, without any further notice to or order of the Bankruptcy Court.

In the event the Exit ABL Facility is entered into with the ABL Lenders, the ABL Loans may be refinanced by means of a cashless settlement, whereby such ABL Loans shall be converted on a dollar-for-dollar basis into the Exit ABL Loans in accordance with the Exit ABL Facility Documents, and all collateral that secures the ABL Obligations under the ABL Credit Agreement shall be reaffirmed and ratified, and shall automatically secure all obligations under the Exit ABL Facility Documents.

As of the Effective Date, all of the Liens and security interests to be granted by the Debtors in accordance with the Exit ABL Facility Documents:  (a) shall be deemed to be granted in good faith, for legitimate business purposes, and for reasonably equivalent value; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral specified in the Exit ABL Facility Documents; and (c) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.  To the extent provided in the Exit ABL Facility Documents, the Exit ABL Facility Agent is authorized to file with the appropriate authorities, mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests.  The priorities of such Liens and security interests shall be as set forth in the Exit ABL Facility Documents.  The Exit ABL Facility Agent shall be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.  The guarantees granted under the Exit ABL Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy Law.

The material terms of the Exit ABL Facility shall be included in the Plan Supplement filed prior to the deadline to object to Confirmation of this Plan.

E.      *Corporate Existence.*

Except as otherwise provided in this Plan, the Confirmation Order, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated therein, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under this Plan or otherwise, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings, approvals, or consents required under applicable state, provincial, or federal Law).  On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.        *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in this Plan or the Confirmation Order, (including to the extent any ABL Loan is refinanced and/or converted into the Exit ABL Facility) on the Effective Date, all property in each Debtors' Estate, all Causes of Action belonging to the Debtors or the Estates, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor or the Unsecured Claims Distribution Trust, as applicable, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances (except for Liens securing obligations under the Exit ABL Facility Documents, and Liens securing Other Secured Claims that are Reinstated pursuant to this Plan, as applicable). On and after the Effective Date, except as otherwise provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound down and liquidated in connection with the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum) shall be treated as being liable on any Claim that is discharged pursuant to this Plan or the Confirmation Order.

G.        *Cancellation of Existing Securities, Agreements, and Interests.*

On the Effective Date, except to the extent otherwise provided in this Plan or the Confirmation Order (including to the extent any ABL Loan is refinanced and/or converted into the Exit ABL Facility), as applicable, all notes, instruments, certificates, credit agreements, note purchase agreements, indentures, and other documents evidencing Claims (other than those Reinstated Claims) or Existing Equity Interests, shall, be cancelled, and all obligations and liabilities, actions, suits, accounts or demands, covenants, and indemnities (both actual and contingent) thereunder, including those of any non-Debtor Affiliates thereunder, or in any way related thereto, shall be deemed satisfied in full, released, cancelled, discharged, and of no force or effect, without any need for further action or approval by the Bankruptcy Court or for a Holder to take further action, and the Agents/Trustees and their respective agents, successors and assigns, shall each be automatically and fully released and discharged of and from all duties and obligations thereunder.

Holders of or parties to such cancelled instruments, Existing Equity Interests, and other documentation will have no rights arising from or relating to such instruments, Interests, and other documentation, or the cancellation thereof, except the rights provided for or reserved pursuant to this Plan. Notwithstanding anything to the contrary herein, but subject to any applicable provisions of <u>Article VI</u> hereof, the Prepetition Finance Documents and the DIP Documents shall continue in effect after the Effective Date to the extent necessary to: (a) permit Holders of Claims under the Prepetition Finance Documents and the DIP Documents to receive and accept their respective distributions on account of such Claims, if any; (b) permit the Disbursing Agent or the Agents/Trustees, as applicable, to make distributions on account of the Allowed Claims under the Prepetition Finance Documents and the DIP Documents; (c) preserve any rights of the Agents/Trustees, to maintain, exercise, and enforce any applicable rights of indemnity, expense reimbursement, priority of payment, contribution, subrogation, or any other similar claim or entitlement (whether such claims accrued before or after the Effective Date), and preserve any exculpations of the Agents/Trustees, all of which shall remain fully enforceable against the Reorganized Debtors and all other applicable Persons under the Prepetition Finance Documents and the DIP Documents; (d) permit the Agents/Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including to enforce the respective obligations owed to them under this Plan and to enforce any obligations owed to their respective Holders of Claims under this Plan in accordance with the applicable Prepetition Finance Documents and the DIP Documents; and (e) permit the Agents/Trustees to perform any functions that are necessary to effectuate the foregoing; *provided, however*, that (1) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in this Plan (including clause (c) of the preceding proviso), and (2) except as otherwise provided in this Plan, the terms and provisions of this Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under this Plan. For the avoidance of doubt, the Prepetition Finance Documents and the DIP Documents shall continue in full force and effect (other than any Liens or other security interests terminated pursuant to this section) after the Effective Date with respect to any contingent or unsatisfied obligations and any other provisions that expressly survive the cancellation of the Prepetition Finance Documents and the termination of the DIP Facility in accordance with the terms of the DIP Documents.

If the record holder of any of the Senior Unsecured Notes Claims, the Cayman Notes Claims, the Intercompany Note Claims, the Senior Secured Notes Claims, or the Exchange Notes Claims is DTC or its nominee or another securities depository or custodian thereof, and such underlying Securities are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of Senior Unsecured Notes Claims, Cayman Notes Claims, Intercompany Note Claims, Senior Secured Notes Claims, or Exchange Notes Claims shall be deemed to have surrendered such Holder's Securities underlying such Senior Unsecured Notes Claims, Cayman Notes Claims, Intercompany Note Claims, Senior Secured Notes Claims, or Exchange Notes Claims upon surrender of such global security by DTC or such other securities depository or custodian thereof.

H.    *Unsecured Claims Distribution Trust.*

On or before the Effective Date, the Debtors and the Unsecured Claims Distribution Trustee shall enter into the Unsecured Claims Distribution Trust Agreement and, on the Effective Date, the Unsecured Claims Distribution Trust Assets shall vest or be deemed to be vested in the Unsecured Claims Distribution Trust irrevocably and automatically without further action by any Person or Entity, free and clear of all Claims, Liens, and Interests, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax. Under no circumstance shall the Debtors or the Reorganized Debtors or any other party be required to contribute any additional assets to the Unsecured Claims Distribution Trust other than the Unsecured Claims Distribution Trust Assets. After the Effective Date, neither the Debtors, Reorganized Debtors, nor any other party shall have any interest in the Unsecured Claims Distribution Trust Assets except as expressly set forth herein. For the avoidance of doubt, the Holders of any First Lien Deficiency Claims shall not be Unsecured Claims Distribution Trust Beneficiaries and shall have no interest in the Unsecured Claims Distribution Trust.

The Debtors and the Reorganized Debtors shall make their employees and books and records reasonably available to the Unsecured Claims Distribution Trustee and any professionals retained by the Unsecured Claims Distribution Trust (at the sole cost and expense of the Unsecured Claims Distribution Trust in the case of any third party service providers reasonably needed by the Debtors or the Reorganized Debtors to provide such information, with such cost and expense to be disclosed in advance to the Unsecured Claims Distribution Trustee) to retrieve or access data reasonably necessary to investigate, review, and reconcile General Unsecured Claims and investigate, pursue or otherwise dispose of the Assigned Preference Actions. To the extent the Unsecured Claims Distribution Trust receives information from the Debtors or the Reorganized Debtors in connection with the General Unsecured Claims, the Unsecured Claims Distribution Trust's receipt of such documents, information, or communications shall not constitute a waiver of any privilege. All privileges shall remain in the control of the Debtors or the Reorganized Debtors, as applicable, and the Debtors or the Reorganized Debtors, as applicable, retain the sole right to waive their own privileges. Reasonable agreements will be made with the Unsecured Claims Distribution Trustee such that confidential information and privileges are preserved, while permitting the Unsecured Claims Distribution Trustee to use, as necessary to administer the Unsecured Claims Distribution Trust, such information and privilege; absent such agreements, either the Unsecured Claims Distribution Trustee or the Reorganized Debtors may present the issue to the Bankruptcy Court for resolution.

The Unsecured Claims Distribution Trust shall be governed by the Unsecured Claims Distribution Trust Agreement and administered by the Unsecured Claims Distribution Trustee. The Unsecured Claims Distribution Trustee shall be chosen by the Committee, and the Unsecured Claims Distribution Trustee's identity and compensation shall be identified in the Plan Supplement. The powers, rights, and responsibilities of the Unsecured Claims Distribution Trustee shall be specified in the Unsecured Claims Distribution Trust Agreement and shall include, without limitation, the authority and responsibility to take the actions set forth in this <u>Article IV.H</u>. Among other things, the Unsecured Claims Distribution Trustee shall have the power and authority to (a) distribute and allocate the Unsecured Claims Distribution Trust Net Assets to the Unsecured Claims Distribution Trust Beneficiaries on account of such beneficiaries' Unsecured Claims Distribution Trust Beneficial Interests in accordance with the treatment set forth in this Plan for Class 9, (b) investigate, prosecute, compromise, adjust, arbitrate, sue on, abandon, dismiss, or otherwise resolve, settle, or litigate Assigned Preference Actions, and (c) enter into any contingency fee agreements or litigation funding agreements as may be necessary in the Unsecured Claims Distribution Trustee's reasonable discretion to liquidate any claims or causes of action included in the Unsecured Claims Distribution Trust Assets; *provided*, however, any such funding agreement must be on market terms and subject to Bankruptcy Court approval. For the avoidance of doubt, the Unsecured Claims Distribution Trustee shall have the sole discretion to release any

Assigned Preference Action.  In the event of any conflict between the terms of this Plan and the Unsecured Claims Distribution Trust Agreement, the terms of this Plan shall govern.

From and after the Effective Date, the Unsecured Claims Distribution Trustee, on behalf of the Unsecured Claims Distribution Trust, shall, in the ordinary course of business and without the need for any approval by the Bankruptcy Court, pay the Unsecured Claims Distribution Trust Fees and Expenses solely from the Unsecured Claims Distribution Trust Assets.  The Debtors, the Reorganized Debtors, and their Affiliates (and anyone acting on their behalf) shall not be responsible for any costs, fees, or expenses of the Unsecured Claims Distribution Trust.  The Unsecured Claims Distribution Trustee and the Unsecured Claims Distribution Trust shall be discharged or dissolved, as the case may be, such time as all distributions required to be made by the Unsecured Claims Distribution Trustee under this Plan have been made, but in no event later than the fifth anniversary of the Effective Date (unless extended by order of the Bankruptcy Court).  Upon dissolution of the Unsecured Claims Distribution Trust, any remaining Unsecured Claims Distribution Trust Net Assets shall be distributed to all Holders of Allowed General Unsecured Claims in accordance with the Plan and the Unsecured Claims Distribution Trust Agreement as appropriate.

I.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under this Plan (including under the Restructuring Transactions Memorandum and the other documents contained in the Plan Supplement) shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate, Governing Body, or equity holder action, including, as and if applicable:  (i) selection of the directors, including the New Board, officers, or managers of the Reorganized Debtors in accordance with the New Organizational Documents; (ii) the authorization, issuance and distribution of the Reorganized Equity; (iii) implementation of the Restructuring Transactions; (iv) the entry into the Exit ABL Facility Documents and the execution, delivery, and filing of any documents pertaining thereto; (v) all other actions contemplated under this Plan (whether to occur before, on, or after the Effective Date); (vi) adoption of the New Organizational Documents; (vii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (viii) the authorization and reservation of the MIP Shares; (ix) formation of the Reorganized Debtors; (x) adoption or assumption, as applicable, of the Compensation and Benefits Programs and all obligations related thereto; (xi) formation of the Unsecured Claims Distribution Trust, issuance of the Unsecured Claims Distribution Trust Beneficial Interests, execution and delivery of the Unsecured Claims Distribution Trust Agreement, and the vesting of the Unsecured Claims Distribution Trust Assets in the Unsecured Claims Distribution Trust; and (xii) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by this Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors, as applicable, in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Holders of Existing Equity Interests or Holders of Reorganized Equity, members directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable.  On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed, without any further corporate, Governing Body, or equity holder action, to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Reorganized Debtors, including the Reorganized Equity, the Exit ABL Facility Documents, the New Organizational Documents, any other Definitive Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this <u>Article IV.H</u> shall be effective notwithstanding any requirements under non-bankruptcy Law.

J.      *New Organizational Documents.*

On or immediately prior to the Effective Date, except as otherwise provided in this Plan and subject to local Law requirements, the New Organizational Documents shall be adopted or amended as may be necessary to effectuate the transactions contemplated by this Plan.  To the extent required under this Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Organizational Documents with the secretaries of state and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate Laws of the respective state, province, or country of incorporation to the extent such filing is required for each such

document.  The New Organizational Documents will, among other things (a) authorize the issuance of the Reorganized Equity and (b) prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the Laws of its jurisdiction of formation and the terms of such documents, and the Reorganized Debtors may file such amended certificates or articles of incorporation or other applicable formation and constituent documents as permitted by the Laws of the applicable states, provinces, or countries of incorporation or formation and the New Organizational Documents.  For the avoidance of doubt, any Holder's acceptance of the Reorganized Equity shall be deemed to constitute its agreement to be bound by the New Organizational Documents without the need for execution by any party other than the Reorganized Debtors.

From and after the Effective Date, all Holders of Reorganized Equity shall be subject to the terms and conditions of the New Organizational Documents.  On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Organizational Documents to each Holder of Reorganized Equity, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Holders of Reorganized Equity shall be deemed to have executed the New Organizational Documents and be parties thereto, without the need to deliver signature pages thereto.

The forms of the New Organizational Documents shall be included in the Plan Supplement filed ahead of the deadline to object to Confirmation of this Plan.

K.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of each of the Debtors shall expire, such current members shall be deemed to have resigned, and the members of the board of directors or other Governing Body for the initial term of the New Board and the other Governing Bodies shall be appointed in accordance with the New Organizational Documents.  The New Board will consist of seven directors and include:  (a) the CEO; and (b) six directors selected as follows, in each case, in consultation with the CEO, (i) four directors selected by Redwood Capital Management, LLC, (ii) one director selected by Anchorage Capital Advisors, L.P., and (iii) one director selected by Farallon Capital Advisors, L.L.C.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and each officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

L.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, the Exit ABL Facility Documents entered into, and the Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

M.      *Certain Securities Law Matters.*

Any Reorganized Equity issued under this Plan will be issued (a) to the fullest extent permitted and applicable, without registration under the Securities Act or similar federal, state or local Laws in reliance on the exemption set forth in section 1145 of the Bankruptcy Code or (b) to the extent section 1145 is not permitted or applicable, pursuant to other applicable exemptions under the Securities Act.  For the avoidance of doubt, the MIP Shares will not be issued in reliance on section 1145 of the Bankruptcy Code.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the Reorganized Equity in reliance on the exemption set forth in section 1145 of the Bankruptcy Code shall be exempt from, among

other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local Laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

Such shares of Reorganized Equity issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code (a) will not be "restricted securities" as defined in rule 144(a)(3) under the Securities Act, and (b) will be freely tradable and transferable in the United States by each recipient thereof that (i) is an entity that is not an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code, (ii) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (iii) has not been such an "affiliate" within 90 days of the time of the transfer, and (iv) has not acquired such securities from an "affiliate" within one year of the time of transfer. Notwithstanding the foregoing, the shares of Reorganized Equity issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code will remain subject to compliance with applicable securities Laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities and subject to any restrictions in the New Organizational Documents. The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities Laws shall not be a condition to the occurrence of the Effective Date.

Any Reorganized Equity that cannot be issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code, including the MIP Shares, will be offered, issued, and distributed in reliance upon 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and subject to any restrictions on the transferability of such Reorganized Equity in the New Organizational Documents.

The Debtors recommend that potential recipients of Securities issued under this Plan consult their own counsel concerning their ability to freely trade such Securities in compliance with the federal securities Laws and any applicable "Blue Sky" laws. The Debtors make no representation concerning the ability of a person to dispose of such Securities.

The Reorganized Debtors need not provide any further evidence other than this Plan or the Confirmation Order to any Entity (including DTC or any transfer agent for the Reorganized Equity) with respect to the treatment of the Reorganized Equity to be issued under this Plan under applicable securities Laws. DTC and any transfer agent for the Reorganized Equity shall be required to accept and conclusively rely upon this Plan and Confirmation Order in lieu of a legal opinion regarding whether the Reorganized Equity to be issued under this Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable). Notwithstanding anything to the contrary in this Plan, no Entity (including DTC and any transfer agent for the Reorganized Equity) may require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the Reorganized Equity to be issued under this Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

N.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor, as applicable, or to or from any other Person) of property under this Plan or pursuant to (i) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, including the Reorganized Equity, (ii) the Restructuring Transactions, (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (iv) the making, assignment, or recording of any lease or sublease, (v) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit ABL Facility, or (vi) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental

officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.      *Private Company.*

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private companies on the Effective Date and the Reorganized Equity shall not be listed on a recognized U.S. stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC or any other securities regulatory body, and (iii) shall not be required to list the Reorganized Equity on a recognized U.S. stock exchange, except in each case (if at all), as otherwise may be required pursuant to the New Organizational Documents.

P.      *Director and Officer Liability Insurance.*

Notwithstanding anything in this Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in this Plan, Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under this Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors, and officers remain in such positions on or after the Effective Date.

Q.      *Management Incentive Plan.*

On or within 90 days of the Effective Date, the New Board shall adopt the Management Incentive Plan, which will provide up to 10% of the Reorganized Equity (on a fully diluted and fully distributed basis) for management and the New Board of the Reorganized Debtors, which may be granted in any form acceptable to the New Board, including without limitation, in the form of options, restricted stock, restricted stock units, stock appreciations rights, or any combination thereof.

R.      *Employment Obligations.*

On the Effective Date, the Reorganized Debtors will either assume or reject the existing agreements with the current members of the senior management team of the Debtors, or will enter into new compensation arrangements, as applicable, on the Effective Date with some or all such individuals who agree to such new arrangements, which assumption or rejection must be approved by the Required Consenting Stakeholders and which new arrangements, as applicable, must be acceptable to the Reorganized Debtors and the Required Consenting Stakeholders.

S.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and

the Reorganized Debtors' or Unsecured Claims Distribution Trust's, as applicable, rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of this Plan to the contrary, other than the Causes of Action released or exculpated herein by the Debtors pursuant to the releases and exculpations contained in this Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, as of the Effective Date.   The Schedule of Retained Causes of Action shall specify which Assigned Preference Actions shall be deemed transferred to the Unsecured Claims Distribution Trust on the Effective Date.

The Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Unsecured Claims Distribution Trustee, as applicable.  **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, will not pursue any and all available retained Causes of Action against it.  The Debtors, the Reorganized Debtors, and the Unsecured Claims Distribution Trust, as applicable, expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity, except as otherwise expressly provided in this Plan.**  The Reorganized Debtors and the Unsecured Claims Distribution Trustee, as applicable, may settle any such retained Cause of Action without further notice to or action, order, or approval of the Bankruptcy Court.  Unless any retained Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Final Order, the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, expressly reserve all retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor or the Unsecured Claims Distribution Trust, as applicable, except as otherwise expressly provided in this Plan. The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such retained Causes of Action.  The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.R include any Claim or Cause of Action against a Released Party or Exculpated Party that is subject to release or exculpation under the terms of this Plan.

T.      *Tax Returns.*

After the Effective Date, the Reorganized Debtors shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

U.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, the Committee shall dissolve, and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; *provided*, however, that following the Effective Date, the Committee shall continue to have standing and a right to be heard solely with respect to Professional Fee Claims.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date except with respect to fees and expenses incurred by the Committee's Professionals after the Effective Date relating to the defense and prosecution of the Committee's Professional Fee Claims; *provided* however, that in no event shall the Reorganized Debtors be

responsible for paying the Committee's Professional Fee Claims in excess of the amount set forth for such fees and expenses in the Approved Budget (as defined in the DIP Orders).

V.    *Cashless Transactions.*

Notwithstanding anything to the contrary set forth herein, the treatment of Claims, distributions, and other transactions contemplated hereby including, without limitation, the funding of the Exit ABL Facility, if any, may, at the election of the applicable participating parties, be effectuated by netting or other form of cashless implementation.

W.    *Release of Ordinary Course Avoidance Actions*

Notwithstanding anything to the contrary in this Plan, on the Effective Date, the Debtors, on behalf of themselves and their Estates, shall release any and all Avoidance Actions against Ordinary Course Non-Insider Counterparties (including, without limitation, vendors, landlords, and other parties) arising from transactions conducted in the ordinary course of business, *provided* such release shall only apply to counterparties that continue to do business with the Reorganized Debtors in the ordinary course following the Effective Date.  For the avoidance of doubt, nothing in this Article IV.W shall be deemed to limit the Unsecured Claims Distribution Trustee's ability to settle, litigate, or otherwise address any Assigned Preference Claims under this Plan.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in this Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code, each Executory Contract or Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically assumed *unless* such Executory Contract or Unexpired Lease: (i) is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases, (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject Filed on or before the Effective Date; or (iv) is an insurance policy (which shall be treated in accordance with Article V.E); *provided* that the assumption, assumption and assignment, or rejection of all Executory Contracts and Unexpired Leases shall be subject to the consent of the Required Consenting Stakeholders (not to be unreasonably withheld, conditioned, or delayed).  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all assumptions, assumptions and assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided for in this Plan, the Plan Supplement, and the Confirmation Order, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to this Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed (or assumed and assigned) Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in this Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including 45 days after the Effective Date; *provided* that such alteration, amendment, modification, or supplement shall be subject to the consent rights set forth herein.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

B.      *Indemnification Obligations.*

Subject to the Bankruptcy Court's entry of the Confirmation Order approving the releases as contemplated in this Plan, all indemnification provisions, consistent with applicable law, currently in place as of the Effective Date, including under the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise for the benefit of current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as of the Effective Date, as applicable, shall:  (a) to the extent permitted by applicable law (i) be reinstated and remain intact, irrevocable, and shall survive the Effective Date, on terms no less favorable to such current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date, and (ii) shall be assumed by the Reorganized Debtors; or (b) to the extent not permitted to be assumed by applicable law, shall be included in the New Organizational Documents of the Reorganized Debtors on terms no less favorable to such directors, officers, managers, and employees than the indemnification provisions in place prior to the Effective Date.

For the avoidance of doubt, nothing herein shall expand any of the Debtors' indemnification obligations in place as of the Petition Date or constitute a finding or conclusion that any party that may seek indemnification is entitled to indemnification under the terms of such indemnification provisions or is intended to effectuate the survival of any indemnification obligations for any party other than the current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as of the Effective Date.

C.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim based on the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court and served on the Debtors or, after the Effective Date, the Reorganized Debtors, as applicable, no later than 30 days after the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation order) approving such rejection, and (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease.  The notice of the Plan Supplement shall be deemed appropriate notice of rejection when served on applicable parties.

**Any Claim arising from the rejection of an Executory Contract or Unexpired Lease with respect to which a Proof of Claim is not Filed with the Bankruptcy Court within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, the Unsecured Claims Distribution Trust, or their property without the need for any objection by the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim**

**arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged and shall be subject to the permanent injunction set forth in <u>Article VIII.F</u> of this Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim as set forth in <u>Article III.B</u> of this Plan and may be objected to in accordance with the provisions of <u>Article VII</u> of this Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.  For the avoidance of doubt, nothing provided herein shall extend or modify any previously established deadline to File a claim arising from the rejection of an Executory Contract or Unexpired Lease previously rejected by the Debtors.

D.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter in the ordinary course of business.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to a proposed assumption, including pursuant to this Plan, or related Cure amount must be Filed, served, and actually received by counsel to the Debtors and the U.S. Trustee no later than the deadline to object to Confirmation of this Plan or any other deadline that may be set by the Bankruptcy Court.  Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, as applicable, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors, as applicable, of the applicable Cure costs; *provided, however,* that nothing herein shall prevent the Reorganized Debtors from paying any Cure costs despite the failure of the relevant counterparty to File such request for payment of such Cure costs.  The Reorganized Debtors also may settle any Cure costs without any further notice to or action, order, or approval of the Bankruptcy Court.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or such other setting as requested by the Debtors for which such objection is timely Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure costs shall occur as soon as reasonably practicable after (i) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (ii) as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  The Debtors and the Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute.  If a Cure Claim, as ruled by the Bankruptcy Court, is more than what was proposed by the Debtors, the Debtors and the Reorganized Debtors reserve the right to reject such Executory Contract or Unexpired Lease.  The Debtors shall include a non-exhaustive Schedule of Assumed Executory Contracts and Unexpired Leases that will include proposed Cure costs in the Plan Supplement.

Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise and payment of any applicable Cure cost pursuant to this Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this <u>Article V.D</u>, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under this Plan.  Unless otherwise provided in this Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (ii) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors and all obligations of the Debtors under such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall continue as obligations of the Reorganized Debtors.

F.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases including, for the avoidance of doubt, rights to indemnification or contribution in respect of product liability or claims arising under any rejected Executory Contract or rejected Unexpired Lease.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

G.      *Employee Compensation and Benefits.*

1.      Compensation and Benefits Programs.

Except as otherwise set forth herein, on the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall assume all Employment Agreements, which shall thereafter be assigned to the Reorganized Debtors. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Subject to the provisions of this Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under this Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:  (a) all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Interests, Existing Equity Interests, or Reorganized Equity, which shall not constitute or be deemed to constitute Executory Contracts and shall be deemed terminated on the Effective Date; (b) Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court; and (c) Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

A counterparty to a Compensation and Benefits Program assumed pursuant to this Plan shall have the same rights under such Compensation and Benefits Program as such counterparty had thereunder immediately prior to such assumption (unless otherwise agreed by such counterparty and the applicable Reorganized Debtor(s)).

2.      Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under:  (a) all applicable workers' compensation Laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance.  All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable Law, including non-bankruptcy Law with respect to any such contracts, agreements, policies, programs, and plans; *provided, further*, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable non-bankruptcy Law.

*H.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Final Order of the Bankruptcy Court to the contrary.

*I.      Reservation of Rights.*

Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under this Plan.

*J.      Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

*K.      Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtor liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A.      Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in this Plan, on the Effective Date, or as soon as reasonably practicable thereafter (or, if a Claim or Interest is not an Allowed Claim on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class. Specifically with respect to Holders of Allowed General Unsecured Claims (but, for the avoidance of doubt, excluding any Holders of First Lien Deficiency Claims), each such Holder shall receive, upon completion of the Claims reconciliation process, its Pro Rata Share of Unsecured Claims Distribution Trust Beneficial Interests in accordance with Article III.B.9 of this Plan and the Unsecured Claims Distribution Trust Agreement. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in this Plan, Holders of Allowed Claims

or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. For the avoidance of doubt, distributions on account of General Unsecured Claims shall be governed by the Unsecured Claims Distribution Trust Agreement.

Notwithstanding the foregoing, (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Allowed Priority Tax Claims shall be paid in accordance with Article II.B of this Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy Law or in the ordinary course of business.

B.    *Disbursing Agent.*

All distributions under this Plan shall be made by the Disbursing Agent or the Unsecured Claims Distribution Trustee, acting on behalf of the Unsecured Claims Distribution Trust, as applicable, on the Effective Date or at such other time as provided for in this Plan. The Disbursing Agent and the Unsecured Claims Distribution Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent or the Unsecured Claims Distribution Trustee is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors or the Unsecured Claims Distribution Trustee, respectively. For the avoidance of doubt, the Unsecured Claims Distribution Trustee may, in its sole discretion, retain or employ a disbursing agent, which may be the Disbursing Agent, in accordance with the Unsecured Claims Distribution Trust Agreement.

All Plan distributions to any Disbursing Agent on behalf of the Holders of Claims listed on the Claims Register (or the designees of such Holders, as applicable) shall be deemed completed by the Debtors when received by such Disbursing Agent. Distributions under this Plan shall be made to any such Holders (or the designees of such Holders, as applicable) by the applicable Disbursing Agent.

Notwithstanding any provision in this Plan to the contrary, the Trustees, acting in their respective capacity as a Disbursing Agent, may, to the extent applicable, transfer or direct the transfer of distributions to be made via DTC directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under this Plan with the respective Holders of such Claims to the extent consistent with the customary practices of DTC. Notwithstanding anything to the contrary herein, such distributions shall be subject in all respects to any rights of the Trustees to assert a charging lien against such distributions. To the extent any distributions are to be made through DTC, such distributions shall be made eligible for distribution through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Trustees be responsible for making or required to make any such distributions under this Plan if such distributions are not eligible to be distributed through the facilities of DTC.

C.    *Rights and Powers of Disbursing Agent.*

    1.    Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    Fees of Disbursing Agent and Expenses Incurred on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.  Notwithstanding anything herein to the contrary, each potential recipient of the Reorganized Equity pursuant to this Plan shall be required to deliver information sufficient, in the reasonable determination of the Disbursing Agent (with the consent of the Required Consenting Stakeholders), to permit the issuance of the Reorganized Equity in book-entry form in accordance with the New Organizational Documents on the Effective Date, in each case, by no later than the Distribution Record Date or by such alter date agreed to by the Debtors with the consent of the Required Consenting Stakeholders.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date (or the designees of such Holders, as applicable).

2.    Delivery of Distributions in General.

Except as otherwise provided herein or in the Plan Supplement, the Disbursing Agent or the Unsecured Claims Distribution Trustee, as applicable, shall make distributions to Holders of Allowed Claims, as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate: (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors, the Disbursing Agent, or the Unsecured Claims Distribution Trustee, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

For the avoidance of doubt, the Distribution Record Date shall not apply to Securities held through DTC, which shall receive distributions in accordance with the applicable procedures of DTC.

3.    Minimum Distribution; No Fractional Distributions.

In the discretion of the Reorganized Debtors or the Unsecured Claims Distribution Trustee, as applicable, (x) no cash payments of less than $250 and (y) no distribution and issuance of Reorganized Equity to any single Holder of Allowed Claims whose aggregate sum of Reorganized Equity to be distributed to such holder would be worth less than $250 value shall be made, in each case, to a Holder of an Allowed Claim (taken together with such Holder's affiliates for the purposes of the foregoing calculations) on account of such Allowed Claim.  No fractional shares of Reorganized Equity shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to this Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of Reorganized Equity that is not a whole number, the actual distribution of shares of Reorganized Equity shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of Reorganized Equity to be distributed under this Plan shall be adjusted as necessary to account for the foregoing rounding.

4.    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Interests (as applicable) is returned as undeliverable, no distribution to such Holder (or its designees, as applicable) shall be made unless and until the

Disbursing Agent  or the Unsecured Claims Distribution Trustee, as applicable, is notified in writing of such Holder's (or its designee, as applicable) then-current address or other necessary information for delivery (including all signatures, certificates, and other documents that are required of the Holder to receive such distribution), at which time such distribution shall be made to such Holder (or its designee, as applicable) on the next distribution date without interest.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors, or the Unsecured Claims Distribution Trust (in the case of distributions from the Unsecured Claims Distribution Trust Net Assets), as applicable, until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to this Article VI.D.4, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

Any distribution under this Plan that is an Unclaimed Distribution or remains undeliverable (including due to such Holder not delivering all signatures, certificates, and other documents that are required of the Holder to receive such distribution) for a period of 90 days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution or undeliverable distribution shall revest in the applicable Reorganized Debtor automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property Laws to the contrary) and, to the extent such Unclaimed Distribution is comprised of Reorganized Equity, such Reorganized Equity shall be cancelled unless determined otherwise by the New Board.  Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.  The Disbursing Agent shall adjust the distributions of Reorganized Equity to reflect any such cancellation.

Subject to Article III herein, any distribution under this Plan on account of a Class 9 General Unsecured Claim that constitutes an Unclaimed Distribution or remains undeliverable for a period of 90 days after distribution shall not revest in the applicable Reorganized Debtor, and instead shall revest in the Unsecured Claims Distribution Trust and be distributed for the benefit of other Unsecured Claims Distribution Trust Beneficiaries in accordance with Article III of this Plan.  For the avoidance of doubt, treatment of undeliverable distributions on account of General Unsecured Claims shall be governed by the Unsecured Claims Distribution Trust Agreement.

E.      *Surrender and Cancelled Instruments or Securities.*

On the Effective Date, or as soon as reasonably practicable thereafter, each Holder (and the applicable Agents for such Holder, including the Agents/Trustees) of a certificate or instrument evidencing a Claim or an Equity Interest that has been cancelled in accordance with Article IV.G hereof, shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and any non-Debtor Affiliates, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties (other than the non-Debtor Affiliates) in respect of one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for the purposes of allowing Holders to receive distributions under this Plan, charging Liens, priority of payment, and indemnification rights.  Notwithstanding anything to the contrary in this Plan, the foregoing shall not apply to certificates or instruments evidencing Claims that are Unimpaired under this Plan.

F.      *Manner of Payment.*

Except as otherwise provided in this Plan, or any agreement, instrument, or other document incorporated herein, all distributions of the Reorganized Equity to the Holders of the applicable Allowed Claims (or its designees, as applicable), in each case if any, under this Plan shall be made by the Disbursing Agent on behalf of the Debtors or the Reorganized Debtors, as applicable.

All distributions of Cash to the Holders of the applicable Allowed Claims, in each case if any, under this Plan shall be made by the Disbursing Agent or the Unsecured Claims Distribution Trustee, as applicable, on behalf of the applicable Debtor or Reorganized Debtor, as applicable.

At the option of the Disbursing Agent or the Unsecured Claims Distribution Trustee, as applicable, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

G.    *Compliance with Tax Requirements.*

In connection with this Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Disbursing Agent, the Unsecured Claims Distribution Trust, and any applicable withholding or reporting agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and the Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances. A General Unsecured Claim may be deemed disallowed in the event no written response is received to a request for tax identification information by the Unsecured Claims Distribution Trust upon not less than 90 days' notice.

H.    *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.    *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in this Plan, the DIP Orders, or the Confirmation Order, or required by the Bankruptcy Code or applicable non-bankruptcy Law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

J.    *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than United States dollars shall be automatically deemed converted to the equivalent United States dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Petition Date.

K.    *Setoffs.*

Except as expressly provided in this Plan, each Reorganized Debtor or the Unsecured Claims Distribution Trustee, as applicable, may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all Claims, rights, and Causes of Action that such Reorganized Debtor or the Unsecured Claims Distribution Trustee, as applicable, may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (i) agreed in amount among the relevant Reorganized Debtor(s) or the Unsecured Claims Distribution Trustee, as applicable, and the Holder of the Allowed Claim or (ii) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor or the Unsecured Claims Distribution Trustee, as applicable, of any and all Claims, rights, and Causes of Action that such Reorganized Debtor or its successor or the Unsecured Claims

Distribution Trustee, as applicable, may possess against the applicable Holder. In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors or the Unsecured Claims Distribution Trustee, as applicable, in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

L.    *Claims Paid or Payable by Third Parties.*

1.    Claims Paid by Third Parties.

The Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trustee, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or the Unsecured Claims Distribution Trust, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or the Unsecured Claims Distribution Trust, as applicable, on account of such Claim, such Holder shall, within five Business Days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor or the Unsecured Claims Distribution Trust (in the case of distributions from the Unsecured Claims Distribution Trust Net Assets), to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor or the Unsecured Claims Distribution Trust (in the case of distribution from the Unsecured Claims Distribution Trust Net Assets) annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the five Business Day grace period specified above until the amount is fully repaid.

2.    Claims Payable by Third Parties.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy or is found liable for satisfying in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article III of this Plan), nothing contained in this Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.    *Disputed Claims Process.*

Except as otherwise provided in a Final Order (including the DIP Orders), the Debtors (subject to the consent of the Required Consenting Stakeholders), the Reorganized Debtors, or the Unsecured Claims Distribution Trustee, as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file,

settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan. **Except as otherwise provided herein, all Proofs of Claim Filed after the earlier of: (a) the Effective Date; or (b) the Claims Bar Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor, any Reorganized Debtor, and/or the Unsecured Claims Distribution Trust, as applicable, without the need for any objection by the Debtor, the Reorganized Debtors, or the Unsecured Claims Distribution Trustee, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors or the Unsecured Claims Distribution Trust (solely with respect to General Unsecured Claims) shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be Allowed under applicable non-bankruptcy Law. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim unless and until such Claim or Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed on or prior to the applicable Claims Bar Date, or that is not or has not been Allowed by this Plan or a Final Order is not considered Allowed and shall be disallowed and expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in this Plan, after the Effective Date, the Reorganized Debtors or the Unsecured Claims Distribution Trustee (solely with respect to General Unsecured Claims), as applicable, shall have the sole authority: (i) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (ii) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor, or the Unsecured Claims Distribution Trust, as applicable, shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to this Plan.

Notwithstanding the foregoing, the Debtors, the Reorganized Debtors, and the Unsecured Claims Distribution Trust (solely with respect to General Unsecured Claims), as applicable, shall be entitled to dispute and/or otherwise object to any Claim in accordance with applicable non-bankruptcy Law.

To the extent a Claim is Filed against the Debtors that asserts Claims in more than one Class or asserting multiple priorities, the Reorganized Debtors and the Unsecured Claims Distribution Trust shall cooperate in good faith on an efficient method to address, object to, or otherwise administer such Claim. The Reorganized Debtors will not seek to reclassify any Claim as a General Unsecured Claim without either the consent of the Unsecured Claims Distribution Trustee (which consent shall not be unreasonably withheld) or an order of the Bankruptcy Court.

D.      *Estimation of Claims.*

Before or after the Effective Date, the Debtors (with the consent of the Required Consenting Stakeholders), the Reorganized Debtors, or the Unsecured Claims Distribution Trustee, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to

such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in this Plan, a Disputed Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under this Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to the allowance of, or any ultimate distribution on, such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 14 days after the date on which such Disputed Claim is estimated.

E.      *Adjustment to Claims without Objection.*

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to this Plan) on the Claims Register by the Reorganized Debtors, the Claims and Noticing Agent, and/or the Unsecured Claims Distribution Trust (with respect to General Unsecured Claims), as applicable, without the Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Bankruptcy Court upon a motion by the Debtors or the Reorganized Debtors, as applicable, *provided* that the deadline to object to Claims shall automatically be extended pending the Bankruptcy Court's ruling on such motion.

G.      *Disallowance of Claims.*

All Claims of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors, as applicable, allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed pursuant to section 502(d) of the Bankruptcy Code if: (i) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (ii) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

H.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of this Plan, if any portion of a Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

I.      *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan, and as applicable, the Unsecured Claims Distribution Trust Agreement. On or as soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent or the Unsecured Claims Distribution Trustee, as applicable, shall provide to the Holder of such Claim the distribution

(if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy Law.

J.      *Single Satisfaction of Claims.*

Holders of Allowed Claims may assert such Claims against the Debtor(s) obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the applicable Debtor(s) based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under this Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan or the Confirmation Order, including the Plan Supplement and Definitive Documents, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action (including any Causes of Action or Claims based on theories or allegations of successor liability) that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted this Plan. Except as otherwise provided herein, any default by the Debtors or their non-Debtor Affiliates with respect to any Claim or Interest existing immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Reinstated Claims) and Interests (other than any Intercompany Interests that are Reinstated), subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan.

B.      **Release of Liens.**

**Except as otherwise provided in the Exit ABL Facility Documents, this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a secured claim or any related claim that may be asserted against a non-Debtor Affiliate, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any non-Debtor Affiliate shall be fully released and discharged, and all of the right, benefit, title, and interest of any Holder (and the applicable Agents of such Holder, including the Agents/Trustees) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns. Any Holder of such secured claim or claim against a non-Debtor Affiliate (and the applicable agents for such Holder, including the Agents/Trustees) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or**

other property of any Debtor or non-Debtor Affiliate (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder, including the Agents/Trustees) and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, at the sole cost and expense of the Reorganized Debtors, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

C.      *Releases by the Debtors.*

Except as otherwise specifically provided in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Released Party is deemed, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of each and all of the Debtors, their Estates, and the Reorganized Debtors in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, and the Reorganized Debtors, whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein-after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the Restructuring Transactions, the Chapter 11 Cases, the Debtors' in- or out- of- court restructuring efforts, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the RSA, the DIP Facility, the DIP Documents, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, this Plan, the Plan Supplement or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, this Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement under the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided, however,* that, nothing in this Article VIII.C shall be construed to release the Released Parties from any criminal act or intentional fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under this Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contribution to facilitating the Restructuring Transactions and implementing this Plan; (ii) a good faith settlement and compromise of the Claims and Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for a hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtor, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.       *Releases by Holders of Claims and Interests.*

Except as otherwise specifically provided in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Releasing Party is deemed to have, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, and their Estates (as applicable) whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the purchase, sale, or recission of any Security of the Debtors or the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the RSA, the DIP Facility, the DIP Documents, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, this Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, this Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under this Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the Confirmation of this Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing this Plan; (iv) a good faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for a hearing; and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

Without limiting the foregoing, from and after the Effective Date, any Entity that votes to accept this Plan or that is given the opportunity to opt into the releases contained in this Plan and exercises such opportunity to opt into the releases may not assert any claim, Claim, or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors. From and after the Effective Date, any such Entity may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in this Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in this Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in this Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

E.      *Exculpation.*

Except as otherwise expressly provided in this Plan or the Confirmation Order, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Claim or Cause of Action arising between the Petition Date and the Effective Date prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, this Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the filing of the Chapter 11 Cases, the negotiation and pursuit of the RSA, the Definitive Document, the Plan Supplement, the Exit ABL Facility Documents, or the filing of the Chapter 11 Cases, the participation in the DIP Facility, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to this Plan and, therefore, are not, and on account of such distributions will not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.

The Exculpated Parties have, and upon consummation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

F.      **Injunction.**

**Except as otherwise specifically provided in this Plan or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, settled, or are subject to exculpation under this Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Causes of Action, Claims or Interests; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Causes of Action, Claims or Interests; (iv) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities, in each case, on account of or in connection with or with respect to any such Causes of Action, Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, Claims or Interests released, discharged, subject to exculpation, or settled pursuant to this Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan.  Each Holder of an Allowed Claim by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this Plan.**

**No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action released, discharged, settled, or that is subject to exculpation pursuant to this Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.**

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, subject to Article IV.H hereof, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (i) such Claim has been adjudicated as non-contingent or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      the Bankruptcy Court shall have entered the Confirmation Order and such order shall be (a) in form and substance materially consistent with the RSA (subject to all consent rights therein), (b) acceptable to the Debtors and Required Consenting Stakeholders, and (c) a Final Order (or such requirement shall be waived by the Required Consenting Stakeholders);

2.      each document or agreement constituting the applicable Definitive Documents shall (a) have been executed and/or effectuated and remain in full force and effect, (b) be in form and substance reasonably acceptable or acceptable (as applicable) to the Debtors, the Required Consenting Stakeholders, and the Consenting Sponsor (in accordance with the terms of the RSA) and (c) be materially consistent with the RSA, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

3.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring Transactions and this Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

4.      all governmental and third-party approvals and consents that may be necessary in connection with the Restructuring Transactions shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on the Restructuring Transactions;

5.      no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing, or prohibiting the consummation of any of the Restructuring Transactions;

6.      the RSA shall be in full force and effect, no termination event or event that would give rise to a termination event under the RSA upon the expiration of the applicable grace period shall have occurred, and the RSA shall not have been validly terminated prior to the Effective Date;

7.      the steps to cancel the Existing Interests and, subject to the consent of the Required Consenting Stakeholders, not unreasonably withheld, any Intercompany Interests and/or Intercompany Claims shall be completed in accordance with the Restructuring Transactions Memorandum;

8.      the Reorganized Equity shall have been issued by the Reorganized Debtors in accordance with the Restructuring Transactions Memorandum which will be reasonably acceptable to the Debtors and Required Consenting Stakeholders;

9.    the Reorganized Debtors shall have entered into the Exit ABL Facility on terms reasonably acceptable to the Debtors and the Required Consenting Stakeholders;

10. the Unsecured Claims Distribution Trust Agreement shall have been executed and the Unsecured Claims Distribution Trust Assets shall have vested or be deemed to have vested in the Unsecured Claims Distribution Trust;

11.    the Debtors shall have previously entered into new leases or modifications or amendments to existing leases (or rejected existing leases) with the combined aggregate effect of reducing rental costs (through reductions in base rent or otherwise) by an amount and on terms acceptable to the Debtors and the Required Consenting Stakeholders;

12.    no Tariff Event shall have occurred;

13.    on the Effective Date, after giving effect to any distributions or other payments to be made pursuant to this Plan (including the funding of any applicable reserves or payments of Administrative Claims) on or as soon as practicable after the Effective Date, the Reorganized Debtors shall have access to liquidity on terms reasonably acceptable to the Required Consenting Stakeholders;

14.    the releases and exculpation materially consistent with the terms of this Plan shall have gone into full force and effect; and

15.    (a) all of the reasonable and documented fees and expenses payable to the Ad Hoc Group, the DIP Secured Parties, the ABL Secured Parties and the Pari First Lien Secured Parties (as defined in the DIP Orders) under the RSA and the DIP Documents shall have been paid in full; and (b) all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account.

B.    *Waiver of Conditions.*

The conditions to the Effective Date set forth in this Article IX may be waived in whole or in part at any time by the Debtors only with the prior written consent (email shall suffice) of the Required Consenting Stakeholders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.

C.    *Effect of Failure of Conditions.*

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in the RSA, this Plan, or the Disclosure Statement shall: (i) constitute a waiver or release by the Debtors or any Holder of Claims or Interests of any Claim or Interest; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

D.    *Substantial Consummation.*

"Substantial Consummation" of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the RSA and the consent rights set forth therein, the Debtors reserve the right to modify this Plan with the consent of the Required Consenting Stakeholders, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in this Plan and the RSA, and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, to alter, amend, or modify this Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the RSA and with the consent of the Required Consenting Stakeholders, the Debtors reserve the right to revoke or withdraw this Plan, including the right to revoke or withdraw this Plan for any or all of the Debtors, prior to the Confirmation Date and to File subsequent plans of reorganization.  In such event, the Classes pertaining to such Debtor(s) shall be removed from this Plan, and this Plan shall omit any treatment of the assets and liabilities of such Debtor(s).  The removal of any Debtor from this Plan shall not affect this Plan with respect to any other Debtor.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then: (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain, and including the Allowance or disallowance, of all or any portion of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (iii) nothing contained in this Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of such Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

3.          resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease to the maximum extent permitted under applicable law; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed, assumed and assigned, or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.          grant any consensual request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

5.          ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

6.          adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.          adjudicate, decide, or resolve any and all matters related to sections 1141and 1145 of the Bankruptcy Code;

8.          enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

9.          enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.          resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

11.          issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan;

12.          resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, discharges, exculpations, and other provisions contained in this Plan, including under Article VIII hereof, whether arising prior to or after the Effective Date, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

13.          resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

14.          hear and determine all disputes relating to or arising out of the administration of the Unsecured Claims Distribution Trust;

15.          enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.          determine any other matters that may arise in connection with or relate to this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan, the Plan Supplement, or the Disclosure Statement;

17.        enter an order concluding or closing the Chapter 11 Cases;

18.        adjudicate any and all disputes arising from or relating to distributions under this Plan or any transactions contemplated herein;

19.        consider any modifications of this Plan, to Cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.        determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

21.        hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

22.        hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.        hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

24.        enforce all orders previously entered by the Bankruptcy Court; and

25.        hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article IXI to the contrary, the New Organizational Documents and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.      Immediate Binding Effect.*

Subject to Article IX.A hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or Interest has voted on this Plan.

*B.      Additional Documents.*

Subject to and in accordance with the RSA, on or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan. The Debtors, the Reorganized Debtors, and the Unsecured Claims Distribution Trust, as applicable, and all Holders of Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

C.      *Reservation of Rights.*

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

D.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of such Entity.

E.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.      <u>if to the Debtors, to</u>:

At Home Group Inc.
Meredith Hampton, General Counsel

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention: Nicole Greenblatt, P.C.
           Matthew Fagen, P.C.
           Elizabeth Jones
E-mail:   nicole.greenblatt@kirkland.com
          matthew.fagen@kirkland.com
          elizabeth.jones@kirkland.com


-and-

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Attention: Robert S. Brady
           Joseph M. Mulvihill
           Timothy R. Powell
E-mail:   rbrady@ycst.com
          jmulvihill@ycst.com
          tpowell@ycst.com

2.   <u>if to the Ad Hoc Group, to</u>:

      Dechert LLP
      1095 Avenue of the Americas
      New York, NY 10036
      Attention: Stephen Zide
               Eric Hilmo
      E-mail:  Stephen.Zide@dechert.com
               Eric.Hilmo@dechert.com

3.   <u>if to the Consenting Sponsor, to</u>:

      Fried, Frank, Harris, Shriver & Jacobson LLP
      One New York Plaza
      New York, New York 10004
      Attention: Rachel Strickland
              Erin Ryan
      E-mail:   Rachel.Strickland@friedfrank.com
              Erin.Ryan@friedfrank.com

4.   <u>If to the ABL Lenders, to</u>:

      Choate, Hall & Stewart LLP
      Two International Place
      Boston, Massachusetts 02110
      Attention: Kevin J. Simard
              Mark D. Silva
      E-mail:   ksimard@choate.com
              msilva@choate.com
      -and-

      Reed Smith LLP
      1201 North Market Street, Suite 1500
      Wilmington, DE 19801
      Attention: Kurt F. Gwynne
      E-mail:   kgwynne@reedsmith.com

5.   <u>If to the U.S. Trustee, to</u>:

      Office of the United States Trustee for the District of Delaware
      844 King Street, Suite 2207, Lockbox 35
      Wilmington, DE 19801
      Attention: Jon Lipshie
              Megan Seliber
      E-mail:   jon.lipshie@usdoj.gov
              megan.seliber@usdoj.gov

6.   <u>If to the Committee, to</u>:

      Pachulski, Stang, Ziehl & Jones LLP
      1700 Broadway, 36th Floor
      New York, NY 10019
      Attention:  Robert J. Feinstein
              Judith Elkin
              Shirley S. Cho

Email:    rfeinstein@pszjlaw.com
jelkin@pszjlaw.com
scho@pszjlaw.com

After the Effective Date, the Reorganized Debtors have authority to notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.    *Enforcement of Confirmation Order.*

On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to enforce the terms of the Confirmation Order and this Plan (which shall include, for the avoidance of doubt, the Plan Supplement).

G.    *Term of Injunctions or Stays.*

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect from and after the Effective Date in accordance with their terms.

H.    *Entire Agreement.*

Except as otherwise indicated, this Plan (including the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

I.    *Exhibits.*

All exhibits and documents included in the Plan Supplement are an integral part of this Plan and are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://omniagentsolutions.com/AtHome or the Bankruptcy Court's website at https://www.deb.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the Plan Supplement exhibit or document shall control.

J.    *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to this Plan and may not be deleted or modified without the Debtors' or the Reorganized Debtors' consent, as applicable; and (iii) nonseverable and mutually dependent.

K.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan and any previous plan, and, therefore, no such parties nor individuals or the Reorganized Debtors will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and any previous plan.

L.      *Closing of Chapter 11 Cases.*

For the avoidance of doubt, upon the occurrence of the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall be permitted, subject to the Filing of any appropriate motion by the Reorganized Debtors and reasonable consultation in advance with the Unsecured Claims Distribution Trustee, to close all of the Chapter 11 Cases except one, and all contested matters relating to any of the Debtors, including objections to Claims and any adversary proceedings, shall be administered and heard in such remaining Chapter 11 Case, irrespective of whether such Claim(s) were Filed or such adversary proceedings was commenced against a Debtor whose Chapter 11 Case was closed.

M.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

N.      *Creditor Default.*

An act or omission by a Holder of a Claim or Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan. Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default. Upon the finding of such a default by a Holder of a Claim or Interest, the Bankruptcy Court may: (a) designate a party to appear, sign, and/or accept the documents required under this Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce this Plan by order of specific performance; (c) award a judgment against such defaulting Holder of a Claim or Interest in favor of the Reorganized Debtors in an amount, including interest, if applicable, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of this Plan.

O.      *Removal or Abandonment of Third Parties' Property.*

Nothing in this Plan shall impose upon the Reorganized Debtors any obligation to store or protect any third party's property, all of which property will be deemed abandoned and surrendered to the Reorganized Debtors if such property has not been removed (by its owner in a commercially reasonable manner, and with insurance to cover any damage from such removal) from any real property owned or leased by the Reorganized Debtors within 45 days after Confirmation of this Plan. Following the abandonment and surrender of any such property, the Reorganized Debtors may sell, transfer, assign, scrap, abandon, or otherwise dispose of such property and retain any proceeds resulting therefrom.

*[Remainder of page intentionally left blank.]*

Dated:  August 19, 2025

AT HOME GROUP INC.
on behalf of itself and all other Debtors


By: /s/ Jeremy Aguilar
     Name:  Jeremy Aguilar
     Title:  Authorized Signatory

**<u>Exhibit B</u>**

**Financial Projections**

# FINANCIAL PROJECTIONS

## Introduction to Financial Projections

As a condition to Confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that entry of a Confirmation Order is not likely to be followed by either a liquidation or the need to further reorganize the Debtors or any successor to the Debtors.  In accordance with this condition and in order to assist each Holder of a Claim in determining whether to vote to accept or reject the Plan, the Debtors' management team ("Management"), with the assistance of its advisors, developed financial projections (the "Financial Projections") to support the feasibility of the Plan.[1]  The Debtors prepared the Financial Projections presented herein to show the next five years (2025-2029) of projected financial statements as of the Debtors' fiscal year-end on January 25, 2025.

The Financial Projections were prepared in good faith by Management, with the assistance of its advisors, and are based on a number of assumptions made by Management, within the bounds of Management's knowledge of the Debtors' business and operations, with respect to the future performance of the Debtors' operations.  Forward-looking statements in these projections include the intent, belief, or current expectations of the Debtors and members of its Management with respect to the timing of, completion of, and scope of the current restructuring, the Plan, the Debtors' strategic business plan, bank financing, debt and equity market conditions, and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.  Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will be realized.  Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Financial Projections herein and from those contemplated by such forward-looking statements.  No representations can be made as to the accuracy of the Financial Projections or the Debtors' ability to achieve the projected results.  Therefore, the Financial Projections may not be relied upon as a guarantee or as any other form of assurance as to the actual results that will occur.  The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance.  Accordingly, in deciding whether to vote to accept or reject the Plan, creditors should review the Financial Projections in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions and risks described herein, including all relevant qualifications and footnotes.

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation of the Plan is not likely to be followed by a liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.  In connection with the planning and development of the Plan and for the purposes of determining whether the Plan would satisfy

---

[1]    Capitalized terms used but not defined herein have the meanings set forth in the *Disclosure Statement Relating to the Joint Plan of Reorganization of At Home Group Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 250] (as may be amended, modified, and/or supplemented from time to time, the "Disclosure Statement"), to which the Financial Projections are attached as Exhibit B, or in the *Joint Plan of Reorganization of At Home Group Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 249] (as may be amended, modified, and/or supplemented from time to time, the "Plan").

this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.[2]

The Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or the American Institute of Certified Public Accounts for preparation and presentation of prospective financial information. An independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in these Financial Projects and accordingly, it does not express an opinion or any other form of assurance on such information or its attainability. The Debtors' independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.

The Debtors do not intend to and disclaim any obligation to: (a) furnish updated Financial Projections to Holders of Claims or Interests prior to the Effective Date or to any other party after the Effective Date, except as required by the Plan; (b) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (c) otherwise make such updated information publicly available.

**Assumptions of the Financial Projections**

The Financial Projections are based on, but not limited to, factors such as industry performance, general business, economic, competitive, regulatory, market, and financial conditions, as well as the assumptions detailed below. Many of these factors and assumptions are beyond the control of the Debtors and do not take into account the uncertainty and disruptions of business that may accompany an in-court restructuring. Accordingly, the assumptions should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement.

- **Forecast Methodology:** In light of the form of distributions contemplated by the Plan, the Financial Projections were developed on a consolidated basis rather than on a legal entity basis. The Debtors' projected financial statements represent a consolidated view of the Debtors' long-range business plan ("LRP") developed by Management using a store level forecast across the United States and the Debtors' e-commerce sales through their online website. In creating the LRP, which outlines projected operating and financial performance for the next five fiscal years, such that each fiscal year closes at the end of January of the year for which the fiscal year is named,[3] management analyzed various factors and relevant industry metrics which included, but are not limited to: (i) projected store count; (ii) projected store level unit economics and revenue (*e.g.*, average unit revenue, unit per transaction, store traffic, and traffic conversion rate); (iii) projected store level operating expenses; (iv) projected corporate operating expenses, (v) maintenance and growth capital expenditures; and (vi) various business initiatives, each of which may contribute to revenue growth, operating efficiency, cost reductions, or inventory efficiency.

---

[2]    The Financial Projections contained herein are subject to change in advance of the Confirmation Hearing to account for any outstanding analyses, including but not limited, a final tax analysis. Additionally, if applicable, the Debtors will file revised Financial Projections prior to the Confirmation Hearing.

[3]    For example, the Company's fiscal year 2025 ended on January 25, 2025.

The Financial Projections assume 28 store locations will cease contributing to sales by the end of July 2025.[4]  The total number of stores that will ultimately be closed is dependent upon lease negotiations.

The Financial Projections have been prepared using accounting policies that are consistent with the Debtors' historical financial statements.  Upon emergence from chapter 11, the Debtors anticipate that the Reorganized Debtors will implement "fresh start" reporting pursuant to Accounting Standards Codification ("ASC") Topic 852, "Reorganization."  "Fresh start" reporting requires that the reorganization value of the emerging entity be allocated to all of the entity's assets and liabilities in accordance with the guidance in ASC Topic 805, "Business Combinations."  Any portion of the reorganization value not attributable to specific tangible or identifiable intangible assets or liabilities of the emerging entity is required to be reported as goodwill.  The Financial Projections may not reflect all adjustments necessary to implement "fresh start" reporting.

- **Projection Assumptions with Respect to the Income Statement:**

*Revenue Forecast*:  The Debtors primarily operate through 260 brick-and-mortar retail stores, as of the Petition Date, and their e-commerce sales channels, and developed revenue forecasts by projecting, among other key drivers, future store openings and closings, store comparable performance, omnichannel e-commerce expansion, new loyalty program rollout, and product mix and margin.  The Debtors considered industry trends and target customer purchasing habits within the U.S. home furnishings and décor market.

*Gross Profit*:  The Debtors' consolidated gross profit is forecasted based on cost of sales expenses projected for product sales margin, distribution center expenses, and store occupancy costs across the brick-and-mortar fleet.  Cost of sales forecasts are consistent with historical cost trends within each respective retail location and distribution center.  Product sales margin incorporates, among other key variables, product cost, damages, outbound freight, shrink, initial markup expansion opportunities, and projected tariff impacts.  Other efficiency initiatives were considered for retail store sizing and distribution center operations.

*Selling, General & Administrative Expenses ("SG&A")*:  The Debtors' consolidated SG&A expenses are commensurate with forecasted store footprint, headquarter staffing and departmental scope, information technology requirements, and distribution operations.

*Depreciation and Amortization*:  The Debtors' consolidated depreciation and amortization is forecasted based on anticipated depreciation and amortization on current book values and current accounting methodologies.  Additionally, depreciation expense recognized in fiscal years 2026 through 2030 includes amounts related to projected capital expenditures expected to occur in those years.  Depreciation and amortization schedules have not been adjusted for fresh start accounting and could vary pending final accounting analysis of the restructuring.

---

[4]    The Financial Projections are based on a business plan that anticipated closing 28 stores by the end of July 2025.  As of the date hereof, there are 30 stores on the closing list.  *See Interim Order (I) Authorizing the Debtors to Assume the Agency Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, (III) Modifying Customer Programs at the Closing Stores, and (IV) Granting Related Relief* [Docket No. 126] (Exh. A); *Notice of Removal of Closing Stores from the Store Closing List* [Docket No. 303]; and *Notice of Filing of Additional Store Closing List* [Docket No. 369].  These changes do not materially change the Financial Projections set forth herein.

*Stock Based Compensation & Other*:  The Debtors forecast stock-based compensation ("SBC") and other non-core or non-cash expenses from fiscal year 2026 onwards.  SBC and other non-core or non-cash expenses are generally consistent with historical trends and forecasted expense recognition.

*Cash Taxes*:  The Debtors forecast cash taxes from fiscal year 2026 onwards, as taxable income is generated.  The projections do not account for any tax obligations as a result of consummating the Plan.  These amounts could vary significantly pending final tax analysis of the transaction.

- **Projection Assumptions with Respect to the Cash Flow Statement and Capital Structure:**

*Cash*:  Beginning cash balances reflect the Debtors' projected consolidated balance sheet cash at an illustrative effective date of October 25, 2025, reflecting the Debtors' estimated outside emergence date from chapter 11.  Such amounts may differ as of the Effective Date depending on the actual results associated with several assumptions, including the Debtors' actual cash balance immediately prior to the Effective Date, actual and projected remaining cash flows and expenses during the bankruptcy, and other related amounts.

*Debt*:  The Financial Projections are illustrative and inclusive of a proposed Exit ABL Facility on substantially the same terms as the existing prepetition ABL Loans, drawn in the amount of approximately $255 million upon emergence, which represents the outstanding prepetition balance less any projected liquidation proceeds resulting from the sale of ABL priority collateral over the duration of these Chapter 11 Cases.  However, the existence, terms, conditions, commitment amount, and placement of the Exit ABL Facility are subject to ongoing negotiation and availability.

*Working Capital*:  The Debtors' consolidated working capital has been forecasted based on working capital needs projected at the store and corporate level, consistent with historical costs and projected needs within each respective retail location and/or distribution center.

*Capital Expenditures*:  The Debtors' consolidated capital expenditures are forecasted based on projected capital expenditures at each store and at the corporate level, as presented in the Debtors' long-term forecasts.  Projected capital expenditures include required maintenance capital expenditures and growth capital expenditures associated with the strategic initiatives in the LRP projections.

*[Financial Projections follow]*

## Projected P&L and Free Cash Flow

*$ in thousands*

| | FY 2026 Q4[(1)] | FY 2027 | FY 2028 | FY 2029 | FY 2030 |
|---|---|---|---|---|---|
| **Financial Performance** | | | | | |
| **Net Sales** | $ 508,807 | $ 1,719,000 | $ 1,848,979 | $ 1,984,243 | $ 2,128,421 |
| *% YoY* | | | *7.6%* | *7.3%* | *7.3%* |
| **Gross Profit** | $ 154,305 | $ 471,356 | $ 553,231 | $ 654,082 | 724,299 |
| *Gross Profit Margin* | *30.3%* | *27.4%* | *29.9%* | *33.0%* | *34.0%* |
| **SG&A** | $ (119,241) | $ (455,232) | $ (465,713) | $ (485,757) | (508,007) |
| *SG&A %* | *23.4%* | *26.5%* | *25.2%* | *24.5%* | *23.9%* |
| **Operating Income** | $ 35,064 | $ 16,123 | $ 87,518 | $ 168,325 | 216,292 |
| (+) Depreciation & Amortization | 23,270 | 86,828 | 79,634 | 79,274 | 80,620 |
| (+) SBC / Other | 4,090 | 18,312 | 18,693 | 20,077 | 20,615 |
| **Adjusted EBITDA** | $ 62,423 | $ 121,263 | $ 185,845 | $ 267,676 | 317,528 |
| *EBITDA Margin* | *12.3%* | *7.1%* | *10.1%* | *13.5%* | *14.9%* |
| ( - ) Capex | (12,225) | (39,855) | (61,755) | (63,455) | (55,455) |
| ( - ) Cash Taxes | (1,569) | (2,081) | (3,090) | (5,028) | (6,342) |
| +/- Changes in W/C | 56,098 | (28,029) | 38,650 | (10,636) | 37,063 |
| **Unlevered Free Cash Flow** | $ 104,727 | $ 51,298 | $ 159,649 | $ 188,556 | 292,794 |
| ( - ) Cash Interest | (2,976) | (10,428) | (6,041) | (1,397) | (1,350) |
| ( - ) Mandatory Principal Repayment | - | - | - | - | - |
| **Levered Free Cash Flow** | $ 101,752 | $ 40,870 | $ 153,609 | $ 187,160 | 291,444 |

*(1) FY 2026 illustratively reflects performance beginning in Q4 (10/25/2025), the Debtors' estimated outside exit date from chapter 11*

5

## Projected Cash Flow Statement

| $ in thousands | FY 2026 Q4[1] | FY 2027 | FY 2028 | FY 2029 | FY 2030 |
|---|---|---|---|---|---|
| **Cash Flow** | | | | | |
| **Net Income** | $ 30,520 | $ 3,615 | $ 78,387 | $ 161,900 | $ 208,601 |
| ( + ) Depreciation & Amortization | 23,270 | 86,828 | 79,634 | 79,274 | 80,620 |
| ( + ) Other | 4,090 | 18,312 | 18,693 | 20,077 | 20,615 |
| **Change in Working Capital** | | | | | |
| Accounts Receivable | 5,531 | (335) | (1,112) | (1,201) | (1,231) |
| Inventory | 78,216 | (53,813) | 36,211 | (15,383) | 26,396 |
| Accounts Payable | (27,649) | 26,119 | 3,551 | 5,949 | 11,898 |
| **Cash Flow from Operating Activities** | $ 113,977 | $ 80,726 | $ 215,364 | $ 250,615 | $ 346,899 |
| **Investing Activity** | | | | | |
| Capital Expenditures | (12,225) | (39,855) | (61,755) | (63,455) | (55,455) |
| **Cash Flow from Investing Activities** | (12,225) | (39,855) | (61,755) | (63,455) | (55,455) |
| **Financing Activity** | | | | | |
| New Borrowings | - | - | - | - | - |
| Net Revolver Draw (Repayment)[2] | (101,752) | (40,870) | (132,239) | - | - |
| **Cash Flow from Financing Activities** | (101,752) | (40,870) | (132,239) | - | - |
| **Net Change in Cash** | $ - | $ (0) | $ 21,370 | $ 187,160 | $ 291,444 |
| Beginning Book Cash Balance | $ 10,000 | $ 10,000 | $ 10,000 | $ 31,370 | $ 218,530 |
| Net Change in Cash | - | (0) | 21,370 | 187,160 | 291,444 |
| **Ending Book Cash Balance** | $ 10,000 | $ 10,000 | $ 31,370 | $ 218,530 | $ 509,973 |

(1) FY 2026 illustratively reflects performance beginning in Q4 (10/25/2025), the Debtors' estimated outside exit date from chapter 11
(2) Assumes discretionary deleveraging monthly based on available amounts in excess of an illustrative $10.0 million minimum cash balance

## Summary Capital Structure

| $ in thousands | FY 2026 | FY 2027 | FY 2028 | FY 2029 | FY 2030 |
|---|---|---|---|---|---|
| **Rolling Capital Structure** | | | | | |
| New Revolver[1] | 173,109 | 132,239 | | | |
| Gross Debt[1] | $ 173,109 | $ 132,239 | - | - | - |
| (-) Cash | (10,000) | (10,000) | (31,370) | (218,530) | (509,973) |
| Net Debt | $ 163,109 | $ 122,239 | (31,370) | (218,530) | (509,973) |

(1) Assumes discretionary deleveraging monthly based on available amounts in excess of an illustrative $10.0 million minimum cash balance

## Select Balance Sheet and Cash Flow Items[1]

*$ in thousands*

|  | FY 2026 | FY 2027 | FY 2028 | FY 2029 | FY 2030 |
|---|---|---|---|---|---|
| **Net Working Capital** | | | | | |
| Accounts Receivable | 11,260 | 11,595 | 12,707 | 13,908 | 15,139 |
| Inventory | 407,319 | 461,132 | 424,921 | 440,305 | 413,909 |
| Accounts Payable | 66,925 | 93,045 | 96,595 | 102,544 | 114,442 |
| Net Working Capital | $   351,653 | $   379,682 | $   341,033 | $   351,668 | $   314,606 |
| Change in Net Working Capital | (56,098) | $   28,029 | (38,650) | $   10,636 | (37,063) |
| Fixed Assets | $   517,250 | $   451,965 | $   415,393 | $   379,498 | $   333,717 |

*(1) Figures shown are prior to any chapter 11-related adjustments, if applicable*

**Exhibit C**

**Valuation Analysis**

**Valuation Analysis**[1]

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED FROM ANY FUNDED INDEBTEDNESS OR SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE IN RESPECT OF THE SOLICITATION OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST OR INTEREST IN THE DEBTORS OR ANY OF THEIR AFFILIATES.

A.    General Methodology

Solely for the purposes of the Plan and the Disclosure Statement, PJT Partners LP ("PJT"), as investment banker to the Debtors, has estimated a potential range of total enterprise value ("Enterprise Value") and implied equity value ("Equity Value") for the Reorganized Debtors *pro forma* for the restructuring transactions contemplated by the Plan (the "Valuation Analysis"). The Valuation Analysis is based on financial and other information provided to PJT by the Debtors' management and third-party advisors, the Financial Projections attached to the Disclosure Statement as Exhibit B, and information provided by other sources. The Valuation Analysis is as of July 1, 2025, with an estimated Effective Date of the Plan of September 30, 2025. The Valuation Analysis utilizes market data as of July 1, 2025. The valuation estimates set forth herein represent valuation analyses generally based on the application of customary valuation techniques to the extent deemed appropriate by PJT.

In preparing its valuation, PJT considered a variety of factors and evaluated a variety of financial analyses, including, among others: (a) comparable companies analysis; (b) discounted cash flow analysis ("DCF"); and (c) precedent transactions analysis. The preparation of a valuation analysis is a complex analytical process involving subjective determinations about which methodologies of financial analysis are most appropriate and relevant to the subject company and the application of those methodologies to particular facts and circumstances in a manner that is not readily susceptible to summary description.

B.    Enterprise and Equity Value

Based on the aforementioned analyses and other information described herein and solely for purposes of the Plan, the estimated range of Enterprise Value of the Reorganized Debtors,

---

[1]    Capitalized terms used but not defined herein have the meanings set forth in the *Disclosure Statement Relating to the Joint Plan of Reorganization of At Home Group Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 250] (as may be amended, modified, and/or supplemented from time to time, the "Disclosure Statement"), to which the Liquidation Analysis is attached as Exhibit D, or in the *Joint Plan of Reorganization of At Home Group Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 249] (as may be amended, modified, and/or supplemented from time to time, the "Plan").

collectively, as of July 1, 2025, is approximately $500 million to approximately $800 million (with the mid-point of such range being approximately $650 million).

In addition, based on the estimated range of Enterprise Value of the Reorganized Debtors and other information described herein and solely for purposes of the Plan, PJT estimated a potential range of Equity Value of the Reorganized Debtors, which consists of the Enterprise Value less net funded indebtedness and capital leases on the estimated Effective Date of the Plan.  The Reorganized Debtors are projected to have funded indebtedness and capital leases on the estimated Effective Date consisting of approximately $255 million from the Exit ABL Facility and approximately $30 million of capital leases.  PJT has thus assumed that, as of the estimated Effective Date, the Reorganized Debtors will have approximately $285 million of total funded indebtedness and capital leases, balance sheet excess cash of approximately $10 million, and net debt of approximately $275 million.

Based on the above, PJT estimated that the potential range of Equity Value for the Reorganized Debtors, as of the estimated Effective Date, is between approximately $225 million and approximately $525 million (with the mid-point of such range being approximately $375 million).

C.    Additional Considerations

For purposes of the Valuation Analysis, PJT assumed that no material changes that would affect estimated value occur between the date of the Disclosure Statement and the estimated Effective Date of the Plan. PJT's Valuation Analysis does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

The Financial Projections include certain illustrative assumptions regarding expected cash tax liabilities.  The impact of any changes to these illustrative assumptions regarding cash tax liabilities, including as a result of the tax consequences of the Restructuring Transactions (which could include elimination of or limitation of tax attributes, changes to the tax basis of assets, and the triggering of other tax implications) could materially impact the Valuation Analysis.  Such matters are subject to many uncertainties and contingencies that are difficult to predict, certain of which rely on the form of the Restructuring Transactions, and some of which cannot be determined with certainty until after the Restructuring Transactions are consummated.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY PJT ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO PJT AS OF JULY 1, 2025.  IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY HAVE AFFECTED OR MAY AFFECT PJT'S CONCLUSIONS IN RESPECT OF THE VALUATION ANALYSIS, PJT DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATES OR THE VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO.

PJT DID NOT INDEPENDENTLY VERIFY THE FINANCIAL PROJECTIONS OR OTHER INFORMATION THAT PJT USED IN THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS OR THEIR ASSETS

OR LIABILITIES WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH.  THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER.  THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES OR FUNDED DEBT TO BE ISSUED PURSUANT TO, OR ASSETS SUBJECT TO, THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS.  AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NONE OF THE DEBTORS, PJT, OR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.  IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED OR INCURRED FUNDED DEBT AND SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH FUNDED DEBT AND SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL FUNDED DEBT AND SECURITIES HOLDINGS OF PREPETITION CREDITORS AND EQUITYHOLDERS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT IMMEDIATELY RATHER THAN HOLD THEIR INVESTMENT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO ANY MANAGEMENT INCENTIVE PLAN ESTABLISHED, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF FUNDED DEBT AND SECURITIES.

The Debtors' management advised PJT that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Reorganized Debtors.  The Valuation Analysis assumed that the actual performance of the Reorganized Debtors will correspond to the Financial Projections in all material respects.  If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on the Valuation Analysis, estimated potential ranges of valuation of the Reorganized Debtors, and the Enterprise Value thereof.

In preparing the Valuation Analysis, PJT:  (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain financial and operating data of the Debtors, including the Financial Projections; (c) discussed the Debtors' operations and future prospects with the Debtors' senior management team and third-party

advisors; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that PJT deemed generally relevant in analyzing the value of the Reorganized Debtors; (e) reviewed certain publicly available data for, and considered the market values implied therefrom, recent transactions in the retail industry involving companies comparable (in certain respects) to the Reorganized Debtors; and (f) considered certain economic and industry information that PJT deemed generally relevant to the Reorganized Debtors. PJT assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

The Valuation Analysis does not constitute a recommendation to any Holder of Allowed Claims, or any other person as to how such person should vote or otherwise act with respect to the proposed Restructuring Transactions provided in the Plan. PJT has not been requested to, and does not express any view as to, the potential value of the Reorganized Debtors' funded debt and securities on issuance or at any other time.

THE SUMMARY SET FORTH HEREIN DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY PJT. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. THE VALUATION ANALYSIS PERFORMED BY PJT IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

PJT IS ACTING AS INVESTMENT BANKER TO THE DEBTORS, AND HAS NOT BEEN AND WILL NOT BE RESPONSIBLE FOR, AND HAS NOT AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE TO THE DEBTORS OR ANY OTHER PARTY IN CONNECTION WITH THE DEBTORS' CHAPTER 11 CASES, THE PLAN OR OTHERWISE.

**<u>Exhibit D</u>**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS

**Introduction to Liquidation Analysis**

Under what is often called the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of an allowed claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan[1] satisfies the best interests of creditors test, the Debtors, with the assistance of their restructuring advisors, AlixPartners, LLC, have prepared the hypothetical liquidation analysis (the "Liquidation Analysis"), which represents the Debtors' reasonable and good faith estimate of the cash proceeds, net of liquidation-related costs, which would be available for distribution to the Holders of Claims and Interests if the Debtors' assets were to be liquidated pursuant to a chapter 7 proceeding.  This Liquidation Analysis is based upon certain assumptions discussed in the Disclosure Statement and accompanying notes to the Liquidation Analysis.

The Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests upon disposition of assets pursuant to a hypothetical chapter 7 liquidation.[2]  As illustrated by the Liquidation Analysis, Holders of Claims in certain Unimpaired Classes that would receive a full recovery under the Plan would receive less than a full recovery in a hypothetical liquidation.  Additionally, Holders of Claims or Interests in Impaired Classes would receive a lower recovery in a hypothetical liquidation than they would under the Plan.  Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a chapter 7 liquidation.  Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

**Statement of Limitations**

THIS ILLUSTRATIVE LIQUIDATION ANALYSIS PRESENTED HEREIN HAS BEEN PREPARED SOLELY FOR THE PURPOSES DESCRIBED ABOVE AND MAY NOT BE USED FOR ANY OTHER PURPOSE.

The preparation of a liquidation analysis is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive risks, uncertainties and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors, their management, and their advisors.  Inevitably, some assumptions in the

---

[1]   Capitalized terms used but not defined herein have the meanings set forth in the *Disclosure Statement Relating to the Joint Plan of Reorganization of At Home Group Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 250] (as may be amended, modified, and/or supplemented from time to time, the "Disclosure Statement"), to which the Liquidation Analysis is attached as Exhibit D, or in the *Joint Plan of Reorganization of At Home Group Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 249] (as may be amended, modified, and/or supplemented from time to time, the "Plan").

[2]   The Liquidation Analysis accounts for cash proceeds, net of liquidation-related costs for both encumbered and unencumbered assets.  Any such unencumbered assets are not expected to provide any recovery to unsecured creditors after satisfying applicable Wind Down Expenses and DIP Facility claims.

Liquidation Analysis would not materialize in an actual chapter 7 liquidation and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. The underlying financial information in the Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of claims against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of claims asserted during the pendency of the chapter 7 cases. Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in the Liquidation Analysis.

The Liquidation Analysis was prepared for the sole purpose of generating a reasonable and good faith estimate of the recoveries that would result if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code and is not intended and should not be used for any other purpose. This Liquidation Analysis does not represent values applicable in the context of the Restructuring Transactions. Nothing contained in this Liquidation Analysis is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical liquidation analysis to illustrate the substantial loss in value the Debtors' stakeholders will suffer if the Restructuring Transactions are not consummated, and the Debtors are forced to convert their Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. The Liquidation Analysis does not include estimates for: (i) the tax consequences, either foreign or domestic, that may be triggered upon the liquidation and sale of assets or (ii) certain claims that may be entitled to priority under the Bankruptcy Code, including administrative priority claims under sections 503(b) and 507(b) of the Bankruptcy Code. More specific assumptions are detailed in the notes below. ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

In preparing the Liquidation Analysis, the Debtors and their advisors estimated Allowed Claims based upon a review of the Debtors' financial statements to account for other known liabilities, as necessary. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in these Chapter 11 Cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims and chapter 7 administrative claims such as wind down costs and trustee fees. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL

AMOUNT OF ALLOWED CLAIMS IN THESE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

THE DEBTORS RESERVE THE RIGHT TO SUPPLEMENT, MODIFY, OR ADJUST ANY PART OF THE ILLUSTRATIVE LIQUIDATION ANALYSIS, INCLUDING A CHANGE OF THE UNDERLYING ASSUMPTIONS AND ANALYSIS SET FORTH HEREIN.

**Basis of Presentation**

*Chapter 7 Liquidation*:  The Liquidation Analysis has been prepared assuming that the Debtors converted their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about October 14, 2025 (the "Liquidation Date").  It is assumed that on the Liquidation Date, the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the Debtors' estates, during which time all of the assets of the Debtors (the "Liquidating Entities") would be sold and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law.

*Professionals Involved in the Chapter 7 Cases*:  This Liquidation Analysis assumes that as part of the chapter 7 cases, the chapter 7 trustee would choose to retain certain professionals, including counsel, financial advisors, and/or investment bankers, among others, pursuant to section 327 of the Bankruptcy Code to provide expertise and assistance in the liquidation of the Debtors, in lieu of the professionals and advisors retained by the Debtors in these Chapter 11 Cases.

*Timing Considerations*:  The Liquidation Analysis has been prepared assuming that these Chapter 11 Cases convert to chapter 7 on the Liquidation Date.  The Liquidation Analysis utilizes the book values of the Debtors' assets and liabilities as of May 24, 2025 as a starting point, or more recent values where available. The Debtors' management team reasonably believes that the May 24, 2025 book value of assets and certain liabilities are a proxy for such book values as of the Liquidation Date.  The Debtors have also projected cash balances, merchandise inventory, ABL Facility Claims, and the DIP Facility claim balances forward to the Liquidation Date.  This Liquidation Analysis assumes operations of the Liquidating Entities will cease and the related individual assets will be sold in a rapid sale under an approximately four-month store liquidation process (the "Liquidation Timeline") under the direction of the Trustee, utilizing the Debtors' resources and third-party advisors, with a subsequent orderly wind down of the Debtors' estates.  There can be no assurance that the liquidation would be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously possible (generally at distressed prices), consistent with the best interests of parties-in-interest.  The Liquidation Analysis is also based on the assumptions that:  (i) the Debtors have continued access to cash collateral during the course of the Liquidation Timeline to fund wind down expenses and (ii) the Debtors will pay store expenses (*e.g.*, rent, utilities, and personnel expenses), accounting, treasury, information technology, and other management services needed to wind down the estates continue.

*Presentation on Consolidated Basis*:  This Liquidation Analysis was analyzed on a legal entity basis but is presented on a consolidated basis for ease of presentation and because there is no material difference to the recoveries of any Class of Claims or Interests under either methodology.

## Conclusion

The Debtors have determined, as summarized in the following analysis, that confirmation of the Plan will provide creditors with a recovery that is not less than what they would otherwise receive in connection with a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

*[Liquidation Analysis follows]*

| Liquidation Analysis - Summary of Recoveries from Debtors | | | | | |
|---|---|---|---|---|---|
| | | | Recovery % | | Recovery $ | Recovery $ |
| *In $Thousands* | Note: | Book Value | Low | High | Low | High |
| Cash and Cash Equivalents | [A] | $ 51,058 | 100.0% | 100.0% | $ 51,058 | $ 51,058 |
| Accounts Receivable | [B] | 31,768 | 74.4% | 89.0% | 23,649 | 28,260 |
| Inventory | [C] | 500,483 | 94.6% | 104.6% | 473,457 | 523,505 |
| Prepaid Expenses | [D] | 32,792 | 12.3% | 21.7% | 4,023 | 7,102 |
| Property, Plant and Equipment | [E] | 564,296 | 5.1% | 8.2% | 28,925 | 46,549 |
| Other Non-Current Assets | [F] | 1,257,333 | 0.3% | 0.9% | 3,779 | 11,338 |
| **Total Assets** | | **$ 2,437,730** | **24.0%** | **27.4%** | **$ 584,890** | **$ 667,812** |
| | | | | | | |
| **Wind-Down Expenses** | | | | | | |
| Wind-Down Expenses | [G] | | | | $ 88,603 | $ 93,578 |
| Wind-Down Expenses Recovery | | | | | 88,603 | 93,578 |
| *Wind-Down Recovery %* | | | | | *100.0%* | *100.0%* |
| | | | | | | |
| **Net Proceeds from Liquidation** | | | | | **$ 496,287** | **$ 574,233** |
| | | | | | | |
| **ABL Facility Claims** | | | | | $ 390,452 | $ 390,452 |
| ABL Facility Claims Recovery | [H] | | | | 390,452 | 390,452 |
| *ABL Facility Claims Recovery %* | | | | | *100.0%* | *100.0%* |
| | | | | | | |
| **Tranche A DIP Loan Claims** | | | | | $ 227,107 | $ 227,107 |
| Tranche A DIP Loan Recovery | [I] | | | | 105,835 | 183,781 |
| *Tranche A DIP Loan Recovery %* | | | | | *46.6%* | *80.9%* |
| | | | | | | |
| **Tranche B DIP Loan Claims** | | | | | $ 406,860 | $ 406,860 |
| Tranche B DIP Loan Recovery | [J] | | | | - | - |
| *Tranche B DIP Loan Recovery %* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| **First Lien Claims** | | | | | $ 1,202,765 | $ 1,202,765 |
| First Lien Recovery | [K] | | | | - | - |
| **First Lien Deficiency Claims** | | | | | **$ 1,202,765** | **$ 1,202,765** |
| *First Lien Recovery %* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| **General Unsecured Claims** | | | | | $ 2,022,893 | $ 1,944,947 |
| General Unsecured Recovery | [L] | | | | - | - |
| *General Unsecured Recovery %* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| **Total Creditor Recovery** | | | | | **$ 496,287** | **$ 574,233** |

4

## NOTES TO LIQUIDATION ANALYSIS

Asset book values and unsecured trade claims shown above are as of May 24, 2025 unless otherwise noted.

[A] _Cash and Cash Equivalents_:  The cash balance is a projected balance as of the Liquidation Date. Recovery is estimated to be 100% of the pro forma balance as of the Liquidation Date on both a lower and higher recovery basis.

[B] _Accounts Receivable_:  These assets are primarily composed of credit card receivables, gift card receivables, and other trade receivables.  Recovery estimates for accounts receivable are made at the sub-classification level, and take certain factors into consideration, such as counterparty, aging, concentration, and potential offsets.  The recovery estimates by category result in a blended recovery of 74.4% to 89.0%.

[C] _Inventory_:  Eligible on-hand inventory as of the Liquidation Date is assumed to result in a lower recovery estimate of 94.6% and a higher recovery estimate of 104.6%.  This level of recovery has been informed by the net orderly liquidation value estimate contained within the Debtors' most recent inventory appraisal.  The estimated recovery also assumes that "equity bids" are received from liquidators and that the recoveries are net of store related liquidation expenses, including items such as payroll and rent.

[D] _Prepaid Expenses_:  These assets consist of prepaid items that may be irrecoverable in the event of a liquidation, including prepaid maintenance, rent, insurance, taxes, and other expenses that are amortized over the applicable rental, policy term, or other period.  On a blended basis, a 12.3% to 21.7% recovery has been estimated for these prepaid amounts, on a lower and a higher recovery basis, respectively.

[E] _Property, Plant and Equipment ("PP&E")_:  The net book value of PP&E consists of land, buildings, leasehold improvements, furniture, fixtures, equipment, computer equipment and applications, and vehicles.  Recovery was estimated by asset type.  For land and buildings, appraised values were used to inform the recovery range.  No recovery has been assigned to construction-in-progress and financing leases of right-of-use assets, as these assets are not owned by the Debtors.  In total, the implied recovery of PP&E relative to net book value is 5.1% on a lower recovery estimate and 8.2% on a higher recovery estimate.

[F] _Other Non-Current Assets_: These assets include the Debtors' investments in subsidiaries, goodwill, and intangible assets, including the Debtors' trade name assets.  For purposes of the Liquidation Analysis, no value has been assigned to the Debtors' investment in subsidiaries and goodwill.  The value of trade names was estimated by examining actual trade name transactions that resulted from the liquidation of other retailers.  The value of the trade names was estimated to be $3.8 million to $11.3 million on a lower and higher recovery basis, respectively.  On a blended basis, the recovery is approximately 0.3% to 0.9% of net book value on a lower and higher recovery basis, respectively.

[G] _Wind-Down Expenses_:  Chapter 7 wind-down expenses consist of priority liabilities, estimated at approximately $43.8 million, wind-down expenses of approximately $12.8 million, and a 3% trustee fee and 3% chapter 7 legal/professional fees, estimated at a combined trustee and legal/professional fee of $32.0 million to $37.0 million.  Wind-down expenses exclude store-related wind-down expenses which have been factored into the recovery rates assigned to inventory above.

[H] _ABL Facility Claims_:  These claims represent the aggregate principal amount outstanding under the ABL Credit Agreement, plus any accrued and unpaid interest and fees, and outstanding letters of credit as of the Liquidation Date.  The Liquidation Analysis provides a 100% recovery on these claims on both a lower and higher recovery estimate.

[I] *Tranche A DIP Loan Claims*:  These claims represent the estimated Tranche A DIP Loan balance as of the Liquidation Date, including any accrued and unpaid interest and fees.  The Debtors estimate a recovery of 46.6% to 80.9% on these claims.  Per the DIP Credit Agreement, all such amounts shall be applied first, to the amount of the outstanding DIP Obligations with respect to the Tranche A DIP Loan Claims until the DIP Obligations in respect to the Tranche A DIP Loan Claims are paid and satisfied in full, and second, to the amount of the outstanding DIP Obligations with respect to the Tranche B DIP Loans.

[J] *Tranche B DIP Loan Claims*:  These claims represent the estimated Tranche B DIP Loan balance as of the Liquidation Date, including any accrued and unpaid interest and fees and the $200 million Cayman Notes roll-up amount.  The Debtors estimate a recovery of 0% to 0% with respect to the Tranche B DIP Loan Claims.

[K] *First Lien Claims*:  These claims represent the projected balances of the Senior Secured Notes, Term Loans, and Exchange Notes, including accrued interest and fees, as of the Liquidation Date under the applicable debt documentation.  The Liquidation Analysis provides a 0% recovery on these claims on both a lower and higher recovery basis.  This Liquidation Analysis assumes that all claims associated with the Cayman Notes are rolled-up into the Tranche B DIP Loan and there would not be any First Lien Claims associated with the Cayman Notes.

[L] *General Unsecured Claims*:  The estimate of General Unsecured Claims is based on the anticipated amount that will be included in the Debtors' schedules of assets and liabilities.  This estimate includes first lien deficiency claims and Tranche A and Tranche B deficiency claims.  This estimate does not include any General Unsecured Claims for which the Claim amount is uncertain as of the date of this Liquidation Analysis.  This estimate also does not include potential unsecured damages claims resulting from the rejection of any Executory Contracts or Unexpired Leases.  Additional General Unsecured Claims may be asserted against the Debtors prior to the applicable deadlines for filing proofs of Claim or Interests in these Chapter 11 Cases, which, as of the date of this Liquidation Analysis, have not passed.  The Debtors estimate a 0% recovery on these claims.

**<u>Exhibit E</u>**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 15.02, this "**Agreement**") is made and entered into as of June 16, 2025 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (vi) of this preamble, collectively, the "**Parties**"):[1]

    i.    Ambience Parent, Inc., a company incorporated under the Laws of Delaware ("**At Home**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders and counsel to the Consenting Sponsor (the Entities in this clause (i), collectively, the "**Company Parties**");

    ii.    the undersigned holders (or beneficial holders) of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold, Cayman Notes Claims that have executed and delivered counterpart signature pages to this Agreement, a joinder, or a transfer agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting Cayman Noteholders**");

    iii.    the undersigned holders of Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a joinder, or a transfer agreement to counsel to the Company Parties (the Entities in this clause (iii), collectively, the "**Consenting Term Loan Lenders**" and, together with the Consenting Noteholders (defined below), the "**Consenting Stakeholders**");

    iv.    the undersigned holders (or beneficial holders) of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold, 4.875% Secured Notes Claims that have executed and delivered counterpart signature pages to this Agreement, a joinder, or a transfer Agreement to

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

counsel to the Company Parties (the Entities in this clause (iv), collectively, the "**Consenting 4.875% Secured Noteholders**");

v.    the undersigned holders (or beneficial holders) of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold, PIK Notes Claims that have executed and delivered counterpart signature pages to this Agreement, a joinder, or a transfer agreement to counsel to the Company Parties (the Entities in this clause (v), collectively, the "**Consenting PIK Noteholders**" and, together with the other entities in clause (ii) and clause (iv), the "**Consenting Noteholders**"); and

vi.    Hellman & Friedman LLC, on behalf of itself and each of its affiliated investment funds of investment vehicles managed or advised by it, and its affiliates that directly or indirectly hold Equity Interests in the Company Parties (the "**Consenting Sponsor**").

### *RECITALS*

**WHEREAS**, the Company Parties, the Consenting Sponsor, and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (together with all exhibits, annexes, and schedules attached thereto, the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

### *AGREEMENT*

**Section 1.**    *Definitions and Interpretation*.

1.01.    <u>Definitions</u>.  The following terms shall have the following definitions:

"**4.875% Secured Notes**" means the 4.875% senior secured notes due July 2028 under the 4.875% Secured Notes Indenture.

2

"**4.875% Secured Notes Claims**" means all claims against any of the Company Parties arising under, derived from, based on, or related to the 4.875% Secured Notes Obligations.

"**4.875% Secured Notes Indenture**" means that certain indenture among At Home Group Inc., as issuer, the guarantors party thereto and U.S. Bank Trust Company, National Association as trustee and collateral agent, dated as of July 12, 2021 (as amended, supplemented or otherwise modified).

"**4.875% Secured Notes Obligations**" has the meaning assigned to the term "Obligations" in the 4.875% Secured Notes Indenture.

"**ABL Credit Agreement**" means that certain asset-based revolving credit agreement dated as of July 23, 2021, by and among the At Home Group Inc., the lenders party thereto in their capacities as lenders thereunder, letter of credit issuers in their capacities as letter of credit issuers thereunder, and Bank of America, National Association, as administrative agent and collateral agent, and the other agents and other parties thereto (as amended, supplemented, or otherwise modified from time to time).

"**ABL Facility**" means the $675 million asset-backed facility issued under the ABL Credit Agreement due July 2026.

"**ABL Facility Claims**" means any Claim against any of the Company Parties on account of the ABL Facility.

"**ABL Loans**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Ad Hoc Group**" means that certain ad hoc group of Consenting Term Loan Lenders and Consenting Noteholders represented by Dechert LLP ("**Dechert**").

"**Ad Hoc Group Advisor Agreements**" has the meaning ascribed to it in Section 2(c)(i).

"**Ad Hoc Group Advisors**" means (a) Dechert, (b) Evercore, (c) Potter Anderson & Corroon LLP and (d) such other professionals that may be retained by or on behalf of the Ad Hoc Group with the prior written consent of the Company Parties (each individually an "**Ad Hoc Group Advisor**").

"**Ad Hoc Group Fees and Expenses**" has the meaning ascribed to it in Section 2(c)(i).

"**Affiliate**" means, with respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such Entity. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the Term Loan, the ABL Facility, and the DIP Facility, including any successors thereto.

"**Agreement**" has the meaning ascribed to it in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 15.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions ascribed to it in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means, including, without limitation, any inquiry, proposal, offer, bid, term sheet, discussion, agreement, or otherwise with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization (whether a standalone plan or otherwise), share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is different than the Restructuring Transactions.

"**At Home**" has the meaning ascribed to it in the preamble to this Agreement.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral**" has the meaning ascribed to it in section 363(a) of the Bankruptcy Code.

"**Causes of Action**" has the meaning ascribed to it in Annex A of the Restructuring Term Sheet.

"**Cayman Notes**" means the 11.50% senior secured notes due 2028 under the Cayman Notes Indenture.

"**Cayman Notes Claims**" means all claims against any of the Company Parties arising under, derived from, based on, or related to the Cayman Notes Obligations.

"**Cayman Notes Indenture**" means that certain indenture between At Home Cayman, as issuer, the guarantors party thereto, and Wilmington Trust, National Association, as trustee and notes collateral agent, dated as of May 12, 2023 (as amended, supplemented or otherwise modified).

4

"**Cayman Notes Obligations**" has the meaning assigned to the term "Obligations" in the Cayman Notes Indenture.

"**Chapter 11 Cases**" has the meaning ascribed to it in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party or a wholly or partially owned direct or indirect subsidiary of any Company Party, including the ABL Facility Claims, Term Loan Claims, PIK Notes Claims, Cayman Notes Claims, 4.875% Secured Notes Claims, Unsecured Note Claims, and Existing Interests.

"**Company Parties**" has the meaning ascribed to it in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation**" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan, pursuant to sections 1125 and 1129 of the Bankruptcy Code, which shall constitute a "Definitive Document" under, and be subject to and consistent in all respects with, this Agreement.

"**Consenting 4.875% Secured Noteholders**" has the meaning ascribed to it in the preamble of this Agreement.

"**Consenting Cayman Noteholders**" has the meaning ascribed to it in the preamble of this Agreement.

"**Consenting Noteholders**" has the meaning ascribed to it in the preamble of this Agreement.

"**Consenting PIK Noteholders**" has the meaning ascribed to it in the preamble of this Agreement.

"**Consenting Sponsor**" has the meaning ascribed to it in the preamble of this Agreement.

"**Consenting Stakeholders**" has the meaning ascribed to it in the preamble to this Agreement.

"**Consenting Term Loan Lenders**" has the meaning ascribed to it in the preamble to this Agreement.

5

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Agent**" has the meaning ascribed to it in the DIP Term Sheet.

"**DIP Credit Agreement**" has the meaning ascribed to it in the DIP Term Sheet.

"**DIP Loan Documents**" means, collectively, the documentation governing the DIP Facility, including the DIP Term Sheet, the DIP Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the DIP Orders, and the DIP Motion (including any amendments, restatements, supplements, or modifications of any of the foregoing as may be approved by the Required DIP Lenders and such other consent threshold as is required to effect such amendments, restatements, supplements, or modifications as specified herein or in the DIP Term Sheet).

"**DIP Facility**" has the meaning ascribed to it in the DIP Term Sheet.

"**DIP Motion**" means any motions Filed with the Bankruptcy Court seeking approval of the DIP Facility and authorizing the Debtors to use Cash Collateral.

"**DIP Obligations**" has the meaning ascribed to it in the DIP Term Sheet.

"**DIP Orders**" means the order(s) of the Bankruptcy Court setting forth the terms of the Debtors' consensual use of cash collateral and debtor-in-possession financing pursuant to sections 363 and 364 of the Bankruptcy Code.

"**Disclosure Statement**" means a disclosure statement containing adequate information in respect of the Plan and in form and substance reasonably acceptable to the Company Parties and Required Consenting Stakeholders.

"**Disclosure Statement and Solicitation Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and setting forth the procedures for solicitation of votes on the Plan.

"**DIP Term Sheet**" means the term sheet attached as Annex D to the Restructuring Term Sheet.

"**Encumbrances**" means Liens (as defined in the Bankruptcy Code), covenants, conditions, restrictions, easements, title defects, options, rights of first offer, rights of first refusal, restrictions on transfer (other than restrictions on transfer under applicable securities laws), rights of other parties, limitations on use, limitations on voting rights, or other encumbrances of any kind or nature.

"**Enforcement Action**" means any action of any kind, except as necessary to File and defend any Company Claims/Interests in conjunction with the Chapter 11 Cases, to (a) exercise or enforce any right under any guarantee or any right in respect of any Lien, in each case granted in

6

relation to (or given in support of) all or any part of any Company Claims/Interests or (b) sue, claim, or institute or continue any legal proceedings against any Company Party or the Consenting Sponsor.

"**Entity**" has the meaning ascribed to it in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Exculpated Parties**" has the meaning ascribed to it in Annex A of the Restructuring Term Sheet.

"**Execution Date**" has the meaning ascribed to it in the preamble to this Agreement.

"**Existing Interests**" means the existing Equity Interests of At Home.

"**Exit ABL Facility**" means that certain new, asset-backed loan facility to be entered into by the Reorganized Debtors on the Plan Effective Date in accordance with the Exit ABL Facility Documents.

"**Exit ABL Facility Credit Agreement**" means the credit agreement governing the Exit ABL Facility.

"**Exit ABL Facility Documents**" means the Exit ABL Facility Credit Agreement and any other documentation necessary or appropriate to effectuate the incurrence of the Exit ABL Facility.

"**Evercore**" means Evercore Group L.L.C.

"**File**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"**Final Order**" means, including, without limitation, any order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought, or if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules

of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

"**First Day Pleadings**" means the pleadings and related documentation requesting certain emergency, interim, and/or final relief, or supporting the request for such relief, to be filed on or around the Petition Date and to be heard at the "first day" hearing.

"**Final DIP Order**" has the meaning ascribed to it in the DIP Term Sheet.

"**Intercompany Claim**" means any Claim against a Debtor held by another Debtor.  For the avoidance of doubt, the Intercompany Note Claim is not an Intercompany Claim.

"**Intercompany Interest**" means any Interest in one Debtor held by another Debtor.

"**Intercompany Note Claim**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Interests**" means the common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, or other Securities or agreements to acquire the common stock (including convertible debt), preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement).

"**Interim DIP Order**" has the meaning ascribed to it in the DIP Term Sheet.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Lien**" has the meaning ascribed to it in section 101(37) of the Bankruptcy Code.

"**Milestones**" has the meaning ascribed to it in Section 6.01(m).

"**New Organizational Documents**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Outside Date**" means October 31, 2025, as such date may be extended by the Company Parties and Required Consenting Stakeholders.

"**Parties**" has the meaning ascribed to it in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Permitted Transfer**" means each transfer of any Company Claims/Interests that meet the requirements of Section 8.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**PIK Notes**" means the 7.125%/8.625% cash/PIK toggle senior secured notes due May 2028, issued under the PIK Notes Indenture.

"**PIK Notes Claims**" means all claims against any of the Company Parties arising under, derived from, based on, or related to the PIK Notes Obligations.

"**PIK Notes Indenture**" means that certain indenture among At Home Group Inc., as issuer, the guarantors party thereto, and Wilmington Trust, National Association, as trustee and notes collateral agent, dated as of May 12, 2023 (as amended, supplemented, or otherwise modified from time to time).

"**PIK Notes Obligations**" has the meaning assigned to the term "Obligations" in the PIK Notes Indenture.

"**PJT**" means PJT Partners, the investment bank to the Company Parties.

"**PJT Engagement Letter**" has the meaning ascribed to it in Section 4.01(a)(ix) of this Agreement.

"**Plan**" means the joint plan Filed by the Debtors under chapter 11 of the Bankruptcy Code to implement the Restructuring Transactions in a manner consistent with the terms set forth in the Restructuring Term Sheet (subject to all applicable consent rights therein) and the other applicable provisions of this Agreement or on terms as otherwise agreed to by the Debtors and the Consenting Stakeholders in accordance with Section 3 of this Agreement.

"**Plan Effective Date**" means the first Business Day after the Confirmation Order is entered on which (a) all conditions precedent to the Consummation of the Plan have been satisfied or waived in accordance with the terms of the Plan and (b) the Plan is declared effective by the Debtors.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be Filed by the Debtors with the Bankruptcy Court.

"**Proof of Claim**" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Releases**" means the releases contemplated by Section 14 of this Agreement.

"**Reorganized Debtors**" means the Debtors, as reorganized pursuant to and under the Plan, on and after the Plan Effective Date, or any successors or assigns thereto including by transfer, merger, consolidation, or otherwise, and including any new Entity established in connection with the implementation of the Restructuring Transactions.

"**Required Consenting Stakeholders**" means, as of the relevant date, Consenting Stakeholders holding at least 50.01% of the Voting Amounts held by all Consenting Stakeholders party to this Agreement as of such date as confirmed in writing by Dechert (email being sufficient).

"**Required DIP Lenders**" has the meaning ascribed to it in the DIP Term Sheet attached to the Restructuring Term Sheet.

"**Restructuring Term Sheet**" has the meaning ascribed to it in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning ascribed to it in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Security**" or "**Securities**" has the meaning ascribed to it in section 2(a)(1) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code (as such materials may be modified, supplemented, or amended), which shall constitute a "Definitive Document" under, and be subject to and consistent in all respects with, this Agreement.

"**Supermajority Consenting Stakeholders**" means, as of the relevant date, Consenting Stakeholders holding at least 66.67% of the Voting Amounts held by all Consenting Stakeholders party to this Agreement as of such date as confirmed in writing by Dechert (email being sufficient).

"**Superpriority DIP Claims**" means Claims against any of the Company Parties arising under, derived from, based on, or related to the DIP Obligations.

"**Term Loan**" means the $600 million term loan issued under the Term Loan Credit Agreement.

"**Term Loan Claims**" means any Claim against any of the Company Parties on account of the Term Loan.

"**Term Loan Credit Agreement**" means that certain term loan credit agreement between At Home Group Inc., as borrower, the lenders party thereto, and Bank of America, National Association, as administrative agent and collateral agent, dated as of July 23, 2021.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01 through 12.04.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

"**Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar entity under the Cayman Notes, the 4.875% Secured Notes, the PIK Notes, and the Unsecured Notes.

"**United States Trustee**" means the Office of the United States Trustee for the judicial district in which the Chapter 11 Cases are Filed.

"**Unsecured Notes**" means the 7.125% senior unsecured notes due July 2029, issued under the Unsecured Notes Indenture.

"**Unsecured Notes Claims**" means all claims against any of the Company Parties arising under, derived from, based on, or related to the Unsecured Notes Obligations.

"**Unsecured Notes Indenture**" means that certain indenture among At Home Group Inc., the guarantors party thereto from time to time, and U.S. Bank Trust Company, National Association, as trustee dated as of July 12, 2021 (as amended, supplemented, or otherwise modified from time to time).

"**Unsecured Notes Obligations**" has the meaning assigned to the term "Obligations" in the Unsecured Notes Indenture.

"**Voting Amount**" means with respect to any Consenting Stakeholder (a) at any time while the DIP Commitments (as defined in the DIP Orders) are held by such Consenting Stakeholder and remain outstanding (whether funded or unfunded), the aggregate principal amount of all DIP Commitments of such Consenting Stakeholder; and (b) at all other times, the sum of (i) the aggregate principal amount of the PIK Notes, 4.875% Secured Notes, and Term Loans held by such Consenting Stakeholder, *plus* (ii) two times the aggregate principal amount of the Cayman Notes held by such Consenting Stakeholder.

1.02.    Interpretation. This Agreement and the Restructuring Term Sheet are the product of negotiations among the Parties, and the enforcement or interpretation hereof is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof shall not be effective in regard to the interpretation hereof.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

11

(b)     capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)     unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein that are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     the use of "include" or "including" is without limitation, whether stated or not; and

(j)     the use of "or" shall not be exclusive.

**Section 2.     *Effectiveness of this Agreement*.** This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties shall have executed and delivered (email being sufficient) counterpart signature pages of this Agreement to counsel to each other Party;

(b)     the following shall have executed and delivered (email being sufficient) counterpart signature pages of this Agreement to the Company Parties:

(i)     holders of at least two-thirds of the aggregate outstanding principal amount of Cayman Notes;

12

(ii)    holders of at least two-thirds of the aggregate outstanding principal amount of the Term Loan;

(iii)    holders of at least two-thirds of the aggregate outstanding principal amount of 4.875% Secured Notes;

(iv)    holders of at least two-thirds of the aggregate outstanding principal amount of PIK Notes; and

(v)    the Consenting Sponsor;

(c)    (i) the Company Parties shall have executed and delivered agreements (the "**Ad Hoc Group Advisor Agreements**") under which the Company Parties shall have agreed to pay reasonable and documented fees and expenses of each of (A) Dechert, legal counsel to the Ad Hoc Group, (B) Potter Anderson & Corroon LLP, local counsel to the Ad Hoc Group, and (B) Evercore, as financial advisor to the Ad Hoc Group (collectively, the "**Ad Hoc Group Fees and Expenses**"), in each case, on the terms set forth therein, which agreements shall be in form and substance satisfactory to the Company Parties, Dechert, and Evercore and which shall remain in effect and which shall have not been terminated; and (ii) the Company Parties shall have paid in cash in full all reasonable and documented outstanding Ad Hoc Group Fees and Expenses earned and payable prior to or upon the Agreement Effective Date under the Ad Hoc Group Advisor Agreements to the extent invoiced at least two (2) Business Days prior to the Agreement Effective Date;

(d)    the Company Parties shall have delivered (i) a five-year business plan; (ii) flash Q1 financials which include financial statements similar to At Home's quarterly financials; (iii) Weekly Comparable Store Sales Metrics through the end of May 2025 (including Transactions, Traffic, Conversion, ADS, AUR and UPT metrics (as defined in the most recent comparable stores information shared with Evercore)); (iv) the Company's current year bonus plan and details of current KERP/KEIP plans; (v) an initial proposed lease rejection list; (vi) a GOB sales update; and (vii) the Company's latest view on its critical vendor matrix; and

(e)    counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders and counsel to the Consenting Sponsor in the manner set forth in Section 15.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2(a) have occurred.

**Section 3.**    *Definitive Documents*.

3.01.    The Definitive Documents governing the Restructuring Transactions shall mean the following and include any exhibits, schedules, amendments, modifications, or supplements thereto:  (A) the First Day Pleadings, (B) the DIP Loan Documents, including the DIP Term Sheet, the DIP Credit Agreement, and the DIP Orders; (C) the Plan; (D) the Disclosure Statement; (E) the Disclosure Statement and Solicitation Order; (F) the Confirmation Order; (G) the Exit ABL Facility Documents, including the Exit ABL Facility Credit Agreement; (H) the Plan Supplement (including any restructuring steps memorandum); and (I) New Organizational Documents.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the

Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 13. Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to (i) the Required Consenting Stakeholders, (ii) the Company Parties, (iii) the Consenting Sponsor to the extent any provision of a Definitive Document materially or adversely affects the Consenting Sponsor, such provision must be in form and substance reasonably acceptable to the Consenting Sponsor; *provided* that, for the avoidance of doubt, the treatment and cancellation of Existing Interests as set forth in the Restructuring Term Sheet is agreed and shall not require additional consent rights, and (iv) the Supermajority Consenting Stakeholders, to the extent such consent is required under this Agreement, including the Restructuring Term Sheet or the DIP Loan Documents.

**Section 4.**    *Commitments of the Consenting Stakeholders and the Consenting Sponsor*.

4.01.   General Commitments, Forbearances, and Waivers.

(a)     During the Agreement Effective Period, subject to the terms and conditions hereof, each Consenting Stakeholder, severally and not jointly, and the Consenting Sponsor agrees, in respect of all of its Company Claims/Interests, as applicable, to:

(i)     support, approve, implement, cooperate with each of the Parties, and take all actions necessary to facilitate the implementation and consummation of the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions; *provided* that no Consenting Stakeholder or Consenting Sponsor shall be obligated to (x) waive (to the extent waivable by such Consenting Stakeholder or Consenting Sponsor) any condition to the consummation of any part of the Restructuring Transactions set forth in (or to be set forth in) any Definitive Document, or (y) approve any Definitive Document that is not in form and substance consistent with its consent rights as set forth herein;

(ii)     take any and all actions as may be necessary or required to implement, give effect to, or facilitate the implementation and consummation of the Restructuring Transactions in accordance with Cayman Islands law;

(iii)     use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders to the extent reasonably prudent;

(iv)     give any notice, order, instruction, or direction to the applicable Agents and Trustees necessary to give effect to the Restructuring Transactions;

(v)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party;

14

(vi)    cooperate in good faith and to the extent commercially reasonable with the Company Parties to obtain any and all regulatory, governmental, and third-party approvals that are necessary to effectuate and consummate the Restructuring Transactions;

(vii)    subject to any consent rights set forth herein, negotiate in good faith and use commercially reasonable efforts to execute, deliver, and perform its obligations under any other agreements reasonably necessary or desirable to effectuate or consummate the Restructuring Transactions as contemplated by this Agreement;

(viii)    not object to or otherwise seek to hinder the Company Parties' payment of the fees and expenses of PJT, as set forth in that certain engagement letter by and among At Home and PJT, dated as of June 12, 2025 (the "**PJT Engagement Letter**");

(ix)    implement the Restructuring Transactions in accordance with the Milestones set forth in **Exhibit C** hereto (the "**Milestones**") unless waived or extended in writing by the Company Parties and the Required Consenting Stakeholders (which waiver or extension may be effected through email exchanged between counsel to the Company Parties and counsel to the Plan Sponsors);

(x)    take such actions reasonably requested by the Debtors, the DIP Agent, and the Pari First Lien Agents to give effect to the "roll-up" of the Pari First Lien Obligations (as such terms are defined in the DIP Term Sheet) including actions as may be required to effectuate the cancellation and extinguishment of any securities or loans evidencing such Pari First Lien Obligations refinanced with Tranche B DIP Loans pursuant to the roll-up; and

(xi)    if requested by the Debtors, each Consenting Stakeholder that holds Cayman Notes shall deliver a consent or instruction to the Trustee under the Cayman Notes Indenture in a form reasonably acceptable to the Consenting Stakeholders to effectuate the Restructuring Transactions contemplated hereby in accordance with the laws of the Cayman Islands.

(b)    During the Agreement Effective Period, each Consenting Stakeholder and the Consenting Sponsor, severally and not jointly, agrees, in respect of all of its Company Claims/Interests, as applicable, that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)    in the case of the Consenting Sponsor, propose, File, support, participate in, deliver consents with respect to, tender any securities of the Company Parties in connection with, or vote for any Alternative Restructuring Proposal and, in the case of Consenting Stakeholders, propose, File, support, participate in, deliver consents with respect to, or vote for any Alternative Restructuring Proposal;

(iii)    File any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

15

(iv)    solely with respect to the Consenting Stakeholders, direct or otherwise cause any Agent or Trustee, as applicable, to (1) take any Enforcement Actions or exercise any right or remedy that is inconsistent with this Agreement for the enforcement, collection, or recovery of any of the Company Claims/Interests, including rights or remedies arising from the Term Loan, the ABL Facility, the Cayman Notes, the 4.875% Secured Notes, the PIK Notes, or the Unsecured Notes, or (2) assert or bring any Claims under or with respect to the Term Loan, the ABL Facility, the Cayman Notes, the 4.875% Secured Notes, the PIK Notes, or the Unsecured Notes that is inconsistent with this Agreement;

(v)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or, other than to enforce the terms of this Agreement or in response to a breach hereof by the Company Parties, interfere with the automatic stay arising under section 362 of the Bankruptcy Code;

(vi)    file any motion or other pleading or other document seeking to (1) dismiss the Chapter 11 Cases, (2) convert the Chapter 11 Cases to those under chapter 7, or (3) terminate the exclusivity period of the Company Parties in the Chapter 11 Cases under section 1121(d)(1) of the Bankruptcy Code or otherwise; or

(vii)    seek or direct any other person to seek enforcement, collection, or recovery in respect of any Party to this Agreement arising out of or relating to any Claims against or Interests in the Company Parties.

4.02.    <u>Commitments with Respect to Chapter 11 Cases.</u>

(a)    During the Agreement Effective Period, the Consenting Sponsor and each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees, severally and not jointly, that it shall, subject to receipt by such Consenting Stakeholder and/or the Consenting Sponsor, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)    vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above.

(b)    During the Agreement Effective Period, each Consenting Stakeholder and the Consenting Sponsor, in respect of each of its Company Claims/Interests, as applicable, will, subject to the consent rights set forth herein, support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document Filed by a Company Party in the Bankruptcy Court that is in furtherance of this Agreement.

16

(c)      During the Agreement Effective Period, with respect to each of the Consenting Stakeholders, consent to, and direct the Agents and Trustees to consent to (1) the Company Parties' entry into the DIP Credit Agreement and related ancillary documentation under the terms set forth in the DIP Term Sheet, (2) the terms of the DIP Orders, and (3) the Company Parties' use of Cash Collateral in accordance with the DIP Orders.

**Section 5.      *Additional Provisions Regarding the Consenting Stakeholders' and the Consenting Sponsor's Commitments.*** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) affect the ability of any Consenting Sponsor to consult with the Company Parties or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (c) impair or waive the rights of any Consenting Stakeholder or the Consenting Sponsor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (d) prevent any Consenting Stakeholder or the Consenting Sponsor from enforcing this Agreement or the DIP Loan Documents or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the DIP Loan Documents; (e) limit the rights of any Consenting Stakeholder or the Consenting Sponsor in the Chapter 11 Cases, including any appearing as a party in interest, by itself or as part of the Ad Hoc Group, in any matter to be heard concerning any matter arising in the Chapter 11 Cases or any foreign proceeding, in each case, so long as the exercise of any such right is not materially inconsistent with such Consenting Stakeholder's obligations under this Agreement and the terms of this Agreement; (f) except as expressly provided for in this Agreement, the Restructuring Transactions, any nondisclosure agreement, and the Definitive Documents, limit the ability of a Consenting Stakeholder or the Consenting Sponsor to purchase, sell or enter into any transactions regarding the Superpriority DIP Claims or the Company Claims/Interests, subject to the terms of this Agreement including Section 8 hereof; (g) except as and to the extent explicitly set forth in this Agreement or as otherwise expressly agreed (email being sufficient), require any Consenting Stakeholder or the Consenting Sponsor to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Stakeholder; (h) prevent a Consenting Stakeholder or the Consenting Sponsor from taking any action that is required to comply with applicable Law; *provided* that if any Consenting Stakeholder proposes to take any action that is otherwise inconsistent with this Agreement or the Restructuring Transactions to comply with applicable Law, such Consenting Stakeholder or the Consenting Sponsor shall provide, to the extent possible without violating applicable Law, at least four (4) Business Days' advance, written notice to the Parties; (i) prohibit any Consenting Stakeholder or the Consenting Sponsor from taking any action that is not inconsistent with this Agreement or the Restructuring Transactions); (j) require any Consenting Stakeholder to fund or commit to fund any additional amounts (other than as agreed in connection with the DIP Loan Documents) without such Consenting Stakeholder's written consent; or (k) require or obligate any Consenting Stakeholder or the Consenting Sponsor to (1) waive any condition to the consummation of any part of the Restructuring Transactions set forth in (or to be set forth in) any Definitive Document, or (2) approve any Definitive Document that does not satisfy its consent rights set forth herein.

**Section 6.**      *Commitments of the Company Parties*.

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)      support, act in good faith, and take all commercially reasonable steps necessary or desirable or reasonably requested by the Consenting Stakeholders to implement and consummate the Restructuring Transactions in accordance with this Agreement;

(b)      take any and all actions as may be necessary or required to implement, give effect to, or facilitate the implementation and consummation of the Restructuring Transactions in accordance with Cayman Islands law;

(c)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment, including, timely filing a formal objection to any motion, application or other proceeding filed with the Bankruptcy Court by any person or entity seeking the entry of an order:  (i) directing the appointment of an examiner with expanded powers or a trustee; (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iii) dismissing the Chapter 11 Cases; (iv) approving an Alternative Restructuring Proposal; (v) for relief that (x) is inconsistent with this Agreement in any material respect, or (y) would, or would reasonably be expected to, frustrate the purposes of this Agreement in any material respect, including by preventing the consummation of the Restructuring Transactions; (vi) modifying or terminating any Debtor's exclusive right to file and/or solicit acceptances of a plan of reorganization; or (vii) challenging (x) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting Stakeholders, or (y) the validity, enforceability or perfection of any lien or other encumbrance securing (or purporting to secure) any Company Claims/Interest of any of the Consenting Stakeholders;

(d)      use commercially reasonable efforts to obtain any and all required permits, consents, including any governmental, regulatory and/or third-party approvals reasonably necessary to consummate the Restructuring Transactions;

(e)      negotiate in good faith and use commercially reasonable efforts to execute, deliver, perform their obligations under, and consummate transactions contemplated by the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(f)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(g)      (1) provide counsel for the Consenting Stakeholders and counsel for the Consenting Sponsor a reasonable opportunity to review and comment on draft copies of all First Day Pleadings, (2) to the extent reasonably practicable, provide a reasonable opportunity to counsel for any Consenting Stakeholder or Consenting Sponsor materially affected by such filing to review draft copies of other documents that the Company Parties intend to file with Bankruptcy Court, as applicable; (3) provide drafts of each of Definitive Documents to, and afford a reasonable

opportunity for comment and review of such documents by, the Ad Hoc Group Advisors, which opportunity of comment and review shall be not less than three (3) days in advance of any filing with the Bankruptcy Court; provided that if delivery of such document at least three (3) days in advance of such filing is impracticable under the circumstances, such document shall be delivered as soon as otherwise practicable, and shall afford them a reasonable opportunity under the circumstances to comment on such documents, and (4) consult with the Ad Hoc Group Advisors regarding the form and substance of each Definitive Document, sufficiently in advance of the filing with the Bankruptcy Court, to the extent practicable, and not file the Definitive Document unless such document is in form and substance consistent with the consent rights set forth herein; provided that, for the avoidance of doubt, this Section 6.01(g) shall not apply to any monthly or quarterly operating reports, retention applications, fee applications, fee statements, and any declarations in support thereof or related thereto.

(h)     to the extent permitted by Law, promptly notify the Ad Hoc Group Advisors in writing (email being sufficient) (and in any event, for items (1)-(6) of this paragraph, within three (3) Business Days) of (1) the initiation, institution, or commencement of any proceeding by a governmental authority (or communications indicating that the same may be contemplated or threatened) involving any of the Company Parties (including any assets, permits, businesses, operations, or activities of any of the Company Parties) or any of their respective current or former officers, employees, managers, directors, members, or equity holders (in their capacities as such), (2) the initiation, institution, or commencement by any person or entity of any proceeding involving any of the Company Parties (or communications indicating that the same may be contemplated or threatened) that would result in or is likely to have a material impact in any manner on any of the Company Parties' businesses (including any assets, businesses, operations, or activities of any of the Company Parties) or any of their respective current or former officers, employees, managers, directors, members, or equity holders (in their capacities as such), (3) the initiation, institution, or commencement of any proceeding by a governmental authority or other entity challenging the validity of the transactions contemplated by this Agreement or any other Definitive Document or seeking to enjoin, restrain, or prohibit this Agreement or any other Definitive Document or the consummation of the transactions contemplated hereby or thereby, (4) any material breach by any of the Company Parties in any respect of any of their obligations, representations, warranties, or covenants set forth in this Agreement, (5) the happening or existence of any event that shall have made any of the conditions precedent to any person's obligations set forth in (or to be set forth in) any of the Definitive Documents or this Agreement incapable of being satisfied prior to the Outside Date, and (6) the occurrence of a "Termination Event" pursuant to Section 12.

(i)     maintain the good standing and legal existence of each Company Party under the Laws of the state or jurisdiction in which it is incorporated, organized, or formed, except to the extent that any failure to maintain such Company Party's good standing arises solely as a result of the filing of the Chapter 11 Cases;

(j)     subject to the rights and duties set forth and referenced herein, if any Company Party receives an Alternative Restructuring Proposal, promptly notify the Ad Hoc Group Advisors (in each case, no later than two (2) Business Days after the receipt of such Alternative Restructuring Proposal), with such notification to include the material terms thereof;

19

(k)      from the date hereof until the Plan Effective date, unless otherwise approved by an order of the Bankruptcy Court (1) operate their businesses in the ordinary course in a manner that is consistent with past practices and this Agreement, and use commercially reasonable efforts to preserve intact the Company Parties' business organization and relationships with third parties and employees (which shall not prohibit the Company Parties from taking actions outside of the ordinary course of business with the consent of the Required Consenting Stakeholders); and (2) operate the business in the ordinary course, in a manner consistent with applicable law and actions taken by similarly situated companies in the industry in which the Company Parties operate, and maintain good standing (or equivalent status under the laws of its incorporation or organization) under the laws of the jurisdiction in which the Company Parties are incorporated, taking into account the Restructuring Transactions;

(l)      act in good faith to respond in a reasonably timely manner, whether by directing the Company Parties' advisors to respond or otherwise, to reasonable diligence requests from the Ad Hoc Group Advisors for purposes of the Ad Hoc Group's due diligence investigation in respect of the assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs of the Company Parties;

(m)      pay the Ad Hoc Group Fees and Expenses in accordance with the Ad Hoc Group Advisor Agreements; and

(n)      comply with the Milestones unless waived or extended in writing by the Required Consenting Stakeholders (which waiver or extension may be effected through email exchanged between counsel to the Company Parties and counsel to the Ad Hoc Group).

6.02.    <u>Negative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement, the Plan, or any of the Definitive Documents;

(c)      modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(d)      unless otherwise permitted by an order of the Bankruptcy Court, without the consent of the Required Consenting Stakeholders, transfer any asset or right of the Company Parties or any asset or right used in the business of the Company Parties to any person or Entity outside the ordinary course of business;

(e)      (1) execute, deliver, and/or file with the Bankruptcy Court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or effectuate, or that otherwise relates to, this Agreement, the Plan, and/or the Restructuring Transactions, including any Definitive Documents, that, in whole or in part, is not (x) consistent in any material respect with this Agreement or (y) otherwise in form and substance reasonable acceptable to the Required

Consenting Stakeholders, or (2) waive, amend, or modify any of the Definitive Documents, or file with the Bankruptcy Court a pleading seeking to waive, amend, or modify any term or condition of any of the Definitive Documents, in either case, which waiver, amendment, modification, or filing contains any provision that is not (x) consistent in all material respects with this Agreement and the Restructuring Term Sheet or (y) otherwise acceptable to the Required Consenting Stakeholders (and the Supermajority Consenting Stakeholders to the extent of their consent rights set forth herein);

(f)      (i) seek formal discovery in connection with, prepare, or commence any proceeding or other action that challenges (1) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting Stakeholders, or (2) the validity, enforceability, or perfection of any lien or other encumbrance securing any Company Claims/Interests of any of the Consenting Stakeholders; (ii) otherwise seek to restrict any contractual rights of any of the Consenting Stakeholders; (iii) otherwise commence any action against any of the Consenting Stakeholders; or (iv) support any Person in connection with any of the acts described in clauses (i) through (iii) of this Section 6.02(f);

(g)      except as contemplated by this Agreement, consummate any transaction pursuant to any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements without the advance written consent of the Required Consenting Stakeholders;

(h)      grant or agree to grant any increase in the wages, salary, bonus, commissions, retirement benefits, severance, or other compensation or benefits of any director, manager, employee, or officer of any Company Party, whether scheduled prior to, as of or after the Agreement Effective Date, except for any increase that is done in the ordinary course of business, in accordance with the Restructuring Transactions contemplated by this Agreement, or otherwise with the consent of the Required Consenting Stakeholders; or

(i)      except to the extent permitted by this Agreement or permitted by the Bankruptcy Court, amend or propose to amend any Company Party's certificate or articles of incorporation, certificate of formation, bylaws, limited liability company agreement, partnership agreement, or similar organizational documents.

**Section 7.      *Additional Provisions Regarding Company Parties' Commitments*.**

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent they determine in good faith that taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement; *provided*, that if (and on each occasion) a Company Party determines to take any action or refrain from taking any action with respect to the Restructuring Transactions on account of this Section 7.01, such Company

Party shall provide written notice of such determination to the Ad Hoc Group Advisors no later than two (2) Business Days of such determination.

7.02.   Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder or Consenting Sponsor), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.

7.03.   Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**     *Transfer of Interests and Securities*.

8.01.   During the Agreement Effective Period, except pursuant to the consummation of the Restructuring Transactions, neither any Consenting Stakeholder nor the Consenting Sponsor shall be permitted to Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Superpriority DIP Claims or any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)     in the case of any Superpriority DIP Claims or any Company Claims/Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), (4) a Consenting Stakeholder, or (5) a Consenting Sponsor; and

(b)     either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder or a Consenting Sponsor and the transferee provides notice of such Transfer (including the amount and type of any Superpriority DIP Claims or any Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

8.02.   Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the

extent of the rights and obligations in respect of such transferred Superpriority DIP Claims or Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders or the Consenting Sponsor from acquiring additional Superpriority DIP Claims or Company Claims/Interests; *provided, however*, that (a) such additional Superpriority DIP Claims or Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder or the Consenting Sponsor be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties, counsel to the Consenting Stakeholders, or counsel to the Consenting Sponsor) and (b) such Consenting Stakeholder or the Consenting Sponsor must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties and counsel to the Consenting Stakeholders within five Business Days of such acquisition.

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder or the Consenting Sponsor to Transfer any of its Superpriority DIP Claims or any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Superpriority DIP Claims or Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Superpriority DIP Claims or Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Superpriority DIP Claims or Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Superpriority DIP Claims or Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 8.01.  To the extent that a Consenting Stakeholder or the Consenting Sponsor is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Superpriority DIP Claims or Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Superpriority DIP Claims or Company Claims/Interests who is not a Consenting Stakeholder or the Consenting Sponsor without the requirement that the transferee be a Permitted Transferee.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**     ***Representations and Warranties of Consenting Stakeholders and the Consenting Sponsor.***  Each Consenting Stakeholder and the Consenting Sponsor severally, and not jointly, represent and warrant, as applicable, that, in addition to the representations and warranties set forth in Section 11 hereof, as of the date such Consenting Stakeholder and the Consenting Sponsor execute and deliver this Agreement and as of the Agreement Effective Date:

9.01.   it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's or the Consenting Sponsor's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

9.02.   it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

9.03.   such Company Claims/Interests are, and will be on the Agreement Effective Date, free and clear of Encumbrances of any kind that would adversely affect in any way such Consenting Stakeholder's or the Consenting Sponsor's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

9.04.   solely with respect to the Consenting Sponsor, all of the Consenting Sponsor's Equity Interests have been duly authorized and are validly issued, and no amounts are owing with respect to such Consenting Sponsor's equity interests;

9.05.   it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law; and

9.06.   solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder or the Consenting Sponsor, as applicable, in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.**     ***Representations and Warranties of the Company Parties***

10.01.  Each Company Party severally, and not jointly, represents and warrants that, as of the date such Company Party executes and delivers this Agreement and as of the Plan Effective Date, to the best of its knowledge, that:

(a)       the diligence materials and other information concerning the Company Parties that the Company Parties or their advisors provided to any other Party are true and correct in all material respects as of the date such diligence materials and other information was provided to any other Party;

24

(b)      the Company Parties will not take from the Agreement Effective Date through the Plan Effective Date, absent the prior written consent of the Required Consenting Stakeholders, any of the actions prohibited by Section 6.02;

(c)      the following representations are true in all respects:

     i.      each of the Company Parties and any direct or indirect subsidiaries thereof have obtained and are in compliance in all material respects with all material Authorizations required by applicable Law including but not limited to any environmental, customs, import and export, and criminal Laws (collectively, the "**Fundamental Operations Laws**") to operate their respective businesses as currently conducted;

     ii.      there are no pending or threatened claims, investigations, complaints, or litigation proceedings involving environmental matters, anti-money laundering, anti-corrupt practices, hazardous materials, customs matters, import or export matters, criminal actions of any kind, or Fundamental Operations Laws against any the Company Parties and any direct or indirect subsidiaries thereof; and

     iii.      each of the Company Parties and each of their direct and indirect subsidiaries have instituted and maintain policies, procedures, systems of accounting and operational controls, designed to ensure, and which are reasonably expected to continue to ensure, continued compliance with all Fundamental Operations Laws.

(d)      none of the Company Parties or any direct or indirect subsidiaries thereof have any material off-balance sheet transactions, arrangements, obligations (including contingent obligations), or any other similar relationships with unconsolidated entities or other persons.

**Section 11.    *Mutual Representations, Warranties, and Covenants.*** Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Plan Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.    *Termination Events*.**

12.01.    <u>Consenting Stakeholder Termination Events</u>.  This Agreement may be terminated by the Required Consenting Stakeholders by the delivery to the Company Parties of a written notice in accordance with Section 15.10 hereof upon the occurrence of the following events:

(a)      the execution and/or filing of any Definitive Document that is not acceptable to Required Consenting Stakeholders pursuant to their consent rights set forth herein and that remains unacceptable to the Required Consenting Stakeholders for three (3) Business Days after the Required Consenting Stakeholders transmit a written notice to the Company Parties, which may be by email from the Ad Hoc Group Advisors to counsel to the Company Parties, detailing any such lack of acceptance.  For the avoidance of doubt, any such cure period shall apply solely to the Required Consenting Stakeholders' lack of consent;

(b)      the breach or gross inaccuracy, as applicable, in any material respect by a Company Party of any of the representations, warranties, obligations, or covenants of the Company Parties set forth in this Agreement that (1) is materially adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (2) remains uncured (if susceptible to cure) for five (5) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 15.10 hereof detailing any such breach;

(c)      any of the Milestones is not achieved, which failure has not been waived or extended in a manner consistent with this Agreement, unless such failure to achieve the Milestone is directly caused by, or directly results from an act, omission, or delay by one or more Consenting Stakeholder;

(d)      the happening or existence of any event that shall have made any of the conditions precedent to the consummation of the Restructuring Transactions as set forth in this Agreement (if any), the Plan, or the section of the Restructuring Term Sheet entitled "Conditions Precedent to the Plan Effective Date," if applicable, incapable of being satisfied prior to the Outside Date, except where such condition precedent has been waived by the applicable Parties; *provided* that the right to terminate this Agreement under this Section 12.01(d) shall not be available to any Consenting Stakeholders if the happening or existence of such event is the result of a breach by such Consenting Stakeholders of its covenants, agreements, or other obligations under this Agreement;

(e)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any Final Order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with

26

Section 15.10 hereof detailing any such issuance; *provided* that this termination right may not be exercised by any Party that sought or requested such Final Order in contravention of any obligation set out in this Agreement;

(f)      any Company Party (i) publicly announces in a writing or a public forum to any other Party that it will not pursue the Restructuring Transactions; (ii) provides notice to the Ad Hoc Group Advisors that it is exercising its rights pursuant to Section 7.01; or (iii) publicly announces in a writing or a public forum that it has entered into definitive documentation with respect to an Alternative Restructuring;

(g)      the Plan Effective Date has not occurred by the Outside Date (as such date may have been extended in accordance with the provisions of this Agreement);

(h)      the Bankruptcy Court enters a Final Order denying Confirmation of the Plan and such order remains in effect for five (5) Business Days after entry of such order;

(i)      the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect, unless otherwise consented to by the Required Consenting Stakeholders;

(j)      (i) the occurrence of the Maturity Date (as defined in DIP Credit Agreement) without the Plan having been substantially consummated or (ii) following the occurrence of an "Event of Default" under the DIP Credit Agreement and the acceleration of the loans thereunder, which termination shall be effective automatically upon any such acceleration;

(k)      if applicable, the entry of a Final Order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner or a trustee in one or more of the Chapter 11 Cases of a Company Party (not including the appointment of a fee examiner to assist in reviewing applications for compensation by professionals), (iii) dismissing any of the Chapter 11 Cases, (iv) approving an Alternative Restructuring Proposal, or (v) rejecting this Agreement;

(l)      the Bankruptcy Court enters an order terminating any Company Party's exclusive right to file and/or solicit acceptances of a plan of reorganization or the Company Parties let such periods/rights lapse;

(m)      without the prior written consent of the Required Consenting Stakeholders, any Debtor (i) withdraws the Plan; (ii) publicly announces in a writing or public forum to any other Party that it will not effectuate the Plan; (iii) moves to voluntarily dismiss any of the Chapter 11 Cases; or (iv) moves for court authority to sell any material asset or assets other than in the ordinary course of business without the written consent of the Required Consenting Stakeholders;

(n)      any of the Company Parties (i) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Company Claims/Interests, lien, or interest held by any Consenting Stakeholder in any capacity; or (ii) shall have supported any application, adversary proceeding, or cause of action referred to in the immediately preceding clause (i) filed by a third

party, or consents to the standing of any such third party to bring such application, adversary proceeding, or cause of action; or

(o)    the occurrence of any default or event of default under the DIP Loan Documents or DIP Orders, as applicable, that has not been cured or waived (if susceptible to cure or waiver) by the applicable percentage of lenders in accordance with the terms of the DIP Loan Documents or DIP Orders, as applicable.

12.02.  <u>Company Party and Consenting Sponsor Termination Events</u>.  (i) Any Company Party may terminate this Agreement as to all Parties, and (ii) the Consenting Sponsor may terminate this Agreement as to itself, in each case, upon prior written notice to all Parties in accordance with Section 15.10 hereof upon the occurrence of any of the following events:

(a)    the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement that remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting Stakeholders of notice of such breach;

(b)    a sufficient number of Consenting Stakeholders exercise their termination rights under Section 12 of this Agreement such that the Company Parties cannot consummate the Plan contemplated by this Agreement;

(c)    the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (1) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (2) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(d)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any Final Order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Company Party transmits a written notice in accordance with Section 15.10 hereof detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by any Company Party that sought or requested such Final Order in contravention of any obligation or restriction set out in this Agreement; or

(e)    the Bankruptcy Court enters an order denying Confirmation of the Plan and such order remains in effect for five (5) Business Days after entry of such order.

12.03.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting Stakeholders; (b) the Consenting Sponsor; and (c) each Company Party.

12.04.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice:  (a) immediately after the Plan Effective Date; or (b) on the Outside Date (as such date may be extended in accordance with this Agreement).

12.05.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to

such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided*, *however*, any Consenting Stakeholder or the Consenting Sponsor withdrawing or changing its vote pursuant to this Section 12.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, File notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party, the Consenting Sponsor, or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder or the Consenting Sponsor, and (b) any right of any Consenting Stakeholder or the Consenting Sponsor, or the ability of any Consenting Stakeholder or the Consenting Sponsor, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party, the Consenting Sponsor, or any Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 12.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.01(g), (j), (k), (m), and (n), 12.02(b) and (d), and 12.04(b).  Nothing in this Section 12.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(b).

12.06.  <u>Singular Termination</u>.  Each Consenting Stakeholder and the Consenting Sponsor shall be permitted to terminate this Agreement as to itself only following the execution of any modification, amendment, waiver, or supplement to this Agreement by the Company Parties and the Required Consenting Stakeholders for which such Consenting Stakeholder's or Consenting Sponsor's individual consent is required under Section 13(b)(ii) and which consent was not obtained at the time of such execution.

## Section 13.    *Amendments and Waivers*.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13 or as otherwise specifically stated in this Agreement.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party, and (b) the Required Consenting Stakeholders; *provided*, that:

(i)    if the proposed modification, amendment, waiver, or supplement amends (w) the Plan's treatment for any Company Claims/Interests arising in respect of the Cayman Notes, the PIK Notes, the 4.875% Notes, the Cayman Intercompany Note, or the Term Loans from that treatment set forth in the Restructuring Term Sheet as of the date hereof, (x) any provision in the Definitive Documents that requires the approval or consent of the Supermajority Consenting Stakeholders, (y) the composition of the New Board provided for in the Restructuring Term Sheet, or (z) the "sacred rights" included in the DIP Loan Documents or the treatment of the Superpriority DIP Claims on the Plan Effective Date, then, in each case, the consent of the Supermajority Consenting Stakeholders shall also be required to effectuate such modification, amendment, waiver or supplement;

(ii)    if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on the treatment of any of the Company Claims/Interests held by a specific Consenting Stakeholder or the Consenting Sponsor, then the consent of each such affected Consenting Stakeholder or the Consenting Sponsor shall also be required to effectuate such modification, amendment, waiver or supplement; and

(iii)    any modification, amendment, or supplement to this Section 13.01(b) or Section 13.01(c) shall require the consent of all Parties.

(c)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.    *Releases, Injunction, Exculpation, and Discharge.*[2]**    Subject to the Special Committee's investigation, the Plan shall include customary release, injunction, exculpation, and discharge provisions, acceptable to the Required Consenting Stakeholders and the Company Parties, a form of which is attached to the Restructuring Term Sheet as <u>Annex B</u>.

14.01.    <u>Mutual Releases</u>.    Immediately upon the occurrence of the Agreement Effective Date, except with respect to obligations contained in this Agreement, in consideration of the other parties' execution of this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby confirmed, (a) each Consenting Stakeholder is hereby deemed to release and discharge the Consenting Sponsor and its Related Parties, and (b) the Consenting Sponsor is hereby deemed to release and discharge each of the Consenting Stakeholders and their respective Related Parties, in each case of the foregoing clauses (a) and (b), on behalf of themselves

---

[2]    Unless otherwise explicitly set forth in this Agreement, nothing herein shall constitute or be deemed a waiver of any Causes of Action that the Debtors may hold against any Entity.

and their respective successors, assigns, and representatives from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Consenting Stakeholder and Consenting Sponsor or that the Consenting Stakeholder and Consenting Sponsor would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, (i) the negotiation, formulation, preparation, dissemination, or performance of or under this Agreement, or, in each case, related agreements and term sheets, instruments, or other documents and the transactions contemplated thereby or hereby, (ii) the ABL Loans, the Cayman Secured Debt, the Term Loans, the 4.875% Notes, the PIK Notes, the Unsecured Notes, and all existing Equity Interests, and (iii) any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to the Consenting Stakeholders or the Consenting Sponsor, taking place on or before the Agreement Effective Date. In the event this Agreement is terminated with respect to any Party, or in the event that the Plan Effective Date does not occur as contemplated by the Restructuring Transactions contained in this Agreement, the release provisions of this Section 14.01 shall be deemed void *ab initio* and of no force and effect and shall not apply to such Party.

**Section 15.    *Miscellaneous.***

15.01. <u>Acknowledgement</u>. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

15.02. <u>Exhibits Incorporated by Reference; Conflicts</u>. Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

15.03. <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

15.04. <u>Complete Agreement</u>. Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

15.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO

CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

15.06.  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties, the Consenting Sponsor, and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties, the Consenting Sponsor, and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

15.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

15.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

At Home Group Inc.
Attention: Meredith Hampton, General Counsel
E-mail:    MHampton@athome.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention: Nicole Greenblatt, P.C.
                 Matthew Fagen, P.C.
                 Elizabeth Jones
                 Jimmy Ryan
E-mail:    ngreenblatt@kirkland.com
                 matthew.fagen@kirkland.com
                 elizabeth.jones@kirkland.com
                 jimmy.ryan@kirkland.com
-and-

Young Conaway Stargatt & Taylor LLP
1000 North King Street
Wilmington, DE 19801
Attention: Robert S. Brady
                 Edwin J. Harron
                 Joseph M. Mulvihill
E-mail:    rbrady@ycst.com
                 eharron@ycst.com
                 jmulvihill@ycst.com

(b)     if to the Ad Hoc Group, to:

Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Attention: Stephen Zide
                 Eric Hilmo
E-mail:    Stephen.Zide@dechert.com
                 Eric.Hilmo@dechert.com

(c)     if to the Consenting Sponsor, to:

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Attention: Rachel Strickland
                 Erin Ryan

33

E-mail:    Rachel.Strickland@friedfrank.com
Erin.Ryan@friedfrank.com

Any notice given by delivery, mail, or courier shall be effective when received.

15.11.  <u>Independent Due Diligence and Decision Making</u>.  The Consenting Sponsor and each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

15.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

15.13.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

15.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

15.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.17.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.18.  <u>Capacities of the Consenting Sponsor and Consenting Stakeholders</u>.  The Consenting Sponsor and each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it

manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

15.19.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 15 and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.  For the avoidance of doubt, the Parties acknowledge and agree that if this Agreement is terminated, Section 15 shall survive such termination, and any and all Releases shall remain in full force and effect.

15.20.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 13, or otherwise, including a written approval by the Company Parties, the Required Consenting Stakeholders, or the Consenting Sponsor such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

15.21.  <u>Non-Disclosure of DIP Allocations</u>.  Absent the prior written consent of a Consenting Stakeholder (or the Required Consenting Stakeholders), the Company Parties shall not disclose orally or in writing to anyone (including to any other Party to this Agreement) such Consenting Stakeholder's allocation set forth in Schedule A to the DIP Term Sheet.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**AMBIENCE PARENT, INC.**
**AMBIENCE INTERMEDIATE, INC.**
**AT HOME GROUP INC.**
**AT HOME HOLDING II INC.**
**AT HOME HOLDING III INC.**
**AT HOME COMPANIES LLC**
**AT HOME STORES LLC**
**AT HOME RMS INC.**
**AT HOME GIFT CARD LLC**
**AT HOME PROCUREMENT INC.**
**AT HOME PROPERTIES LLC**
**1600 EAST PLANO PARKWAY, LLC**
**4304 WEST LOOP 289 LLC**
**1944 SOUTH GREENFIELD ROAD LLC**
**10460 SW FELLOWSHIP WAY LLC**
**2301 EARL RUDER FRWY S LLC**
**1720 N HARDIN BLVD LLC**
**3551 S 27TH STREET LLC**
**COMPASS CREEK PARKWAY LLC**
**300 TANGER OUTLET BLVD LLC**
**10800 ASSEMBLY PARK DR LLC**
**3002 FIREWHEEL PARKWAY LLC**
**NODAL ACQUISITIONS, LLC**
**2016 GRAND CYPRESS DR LLC**
**15255 N NORTHSIGHT BLVD LLC**
**8651 AIRPORT FREEWAY LLC**
**3015 W 86TH ST LLC**
**TRANSVERSE II DEVELOPMENT LLC**
**9570 FIELDS ERTEL ROAD LLC**
**RHOMBUS DEV, LLC**
**1376 E. 70TH STREET LLC**
**1000 TURTLE CREEK DRIVE LLC**
**11501 BLUEGRESS PARKWAY LLC**
**19000 LIMESTONE COMMERCIAL DR, LLC**
**12990 WEST CENTER ROAD LLC**
**4801 183A TOLL ROAD, LLC**
**334 CHICAGO DRIVE, LLC**
**7050 WATTS RD LLC**
**4200 AMBASSADOR CAFFERY PKWAY LLC**
**4700 GREEN ROAD LLC**
**361 NEWNAN CROSSING BYPASS LLC**
**AT HOME ASSEMBLY PARK DRIVE CONDOMINIUM ASSOCIATION**

By: **[SIGNATURE ON FILE WITH THE DEBTORS]**

Name:

Authorized Signatory:

**[CONSENTING SPONSOR SIGNATURE PAGE OMITTED]**

**[ON FILE WITH THE DEBTORS]**

**[CONSENTING STAKEHOLDERS SIGNATURE PAGES OMITTED]**

**[ON FILE WITH THE DEBTORS]**

# EXHIBIT A

## Company Parties

Ambience Parent, Inc.
Ambience Intermediate, Inc.
At Home Group Inc.
At Home Holding II Inc.
At Home Holding III Inc.
At Home Companies LLC
At Home Stores LLC
At Home RMS Inc.
At Home Gift Card LLC
At Home Procurement Inc.
At Home Properties LLC
1600 East Plano Parkway, LLC
4304 West Loop 289 LLC
1944 South Greenfield Road LLC
10460 SW Fellowship Way LLC
2301 Earl Ruder Frwy S LLC
1720 N Hardin Blvd LLC
3551 S 27th Street LLC
Compass Creek Parkway LLC
300 Tanger Outlet Blvd LLC
10800 Assembly Park Dr LLC
3002 Firewheel Parkway LLC
Nodal Acquisitions, LLC
2016 Grand Cypress Dr LLC
15255 N Northsight Blvd LLC
8651 Airport Freeway LLC
3015 W 86th St LLC
Transverse II Development LLC
9570 Fields Ertel Road LLC
Rhombus Dev, LLC
1376 E. 70th Street LLC
1000 Turtle Creek Drive LLC
11501 Bluegress Parkway LLC
19000 Limestone Commercial Dr, LLC
12990 West Center Road LLC
4801 183A Toll Road, LLC
334 Chicago Drive, LLC
7050 Watts Rd LLC
4200 Ambassador Caffery Pkway LLC
4700 Green Road LLC
361 Newnan Crossing Bypass LLC
At Home Assembly Park Drive Condominium Association

# **EXHIBIT B**

**Restructuring Term Sheet**

**AMBIENCE PARENT, INC.**

**RESTRUCTURING TERM SHEET**

This restructuring term sheet (the "*Term Sheet*") sets forth the principal terms and conditions of a proposed restructuring (the "*Restructuring*") of the existing indebtedness of and equity interests in Ambience Parent, Inc. ("*At Home*" and certain of its subsidiaries (collectively, the "*Company*"), via a prearranged chapter 11 plan of reorganization to be filed in chapter 11 cases (the "*Chapter 11 Cases*") to be commenced in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"). This Term Sheet does not address all terms, conditions, or other provisions that would be required in connection with the Restructuring or that will be set forth in the definitive documents (the "*Definitive Documents*"), which remain subject to agreement and, in certain instances, approval of the Bankruptcy Court.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 OR 1126 OF TITLE 11 OF THE UNITED STATES CODE (AS AMENDED, THE "*BANKRUPTCY CODE*") OR ANY OTHER PLAN OF REORGANIZATION OR SIMILAR PROCESS UNDER ANY OTHER APPLICABLE LAW. SUCH A SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAW. NOTHING IN THIS TERM SHEET SHALL (I) CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER OF ANY RIGHTS OR REMEDIES UNDER APPLICABLE LAW, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE AND WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS, AND DEFENSES OF EACH PARTY HERETO OR (II) BE DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THE MATTERS DESCRIBED HEREIN, INCLUDING ALL COMMITMENTS AND OBLIGATIONS IN RESPECT, AND THE IMPLEMENTATION, THEREOF, SHALL BE SUBJECT TO THE NEGOTIATION AND COMPLETION OF SUCH DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CONSUMMATION THEREOF SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH AGREED DEFINITIVE DOCUMENTS, WHICH DEFINITIVE DOCUMENTS REMAIN SUBJECT TO NEGOTIATION AND COMPLETION IN ACCORDANCE WITH THE RESTRUCTURING SUPPORT AGREEMENT TO WHICH THIS TERM SHEET IS AFFIXED (THE "*RSA*")[1] AND APPLICABLE LAW. THE RESTRUCTURING AND DEFINITIVE DOCUMENTS SHALL BE CONSISTENT IN ALL RESPECTS WITH THIS TERM SHEET AND THE RSA, AND SHALL BE SUBJECT TO THE CONSENT AND APPROVAL RIGHTS SET FORTH HEREIN AND THEREIN. THIS TERM SHEET INCORPORATES THE RULES OF CONSTRUCTION AS SET FORTH IN THE RSA.**

**THE REGULATORY, TAX, ACCOUNTING, AND OTHER LEGAL AND FINANCIAL MATTERS AND EFFECTS RELATED TO THE RESTRUCTURING OR ANY RELATED OR SIMILAR TRANSACTION HAVE NOT BEEN FULLY EVALUATED AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF ANY RESTRUCTURING OR RELATED TRANSACTIONS.**

**THIS TERM SHEET IS PROFFERED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PARTY OR PERSON PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE RULE, STATUTE, OR DOCTRINE OF SIMILAR IMPORT PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the RSA.

| Overview | |
|---|---|
| **Restructuring Implementation** | The Restructuring shall be effectuated with support of the Ad Hoc Group pursuant to a prearranged plan of reorganization (the "*Plan*") in accordance with the terms and conditions set forth in this Term Sheet and otherwise having terms and conditions acceptable to the Required Consenting Stakeholders and the Company.  The Company, Hellman & Friedman LLC (the "*Consenting Sponsor*") and the Ad Hoc Group (collectively, the "*Parties*") shall enter into a RSA with respect to the Restructuring prior to filing of the Chapter 11 Cases.  The Restructuring shall be funded through a priming superpriority senior secured debtor in possession financing comprised of delayed draw term loans in the amount of $600,000,000 (the "*DIP Facility*" and the Claims thereunder, the "*Superpriority DIP Claims*"). |
| **Debtors** | The Company entities that are listed on <u>Exhibit A</u> to the RSA, which shall also be signatories to the RSA (each a "*Debtor*" and collectively, the "*Debtors*"). |
| **Ad Hoc Group** | The term "*Ad Hoc Group*" has the meaning ascribed to it in the RSA. |
| **Definitive Documents** | Any documents contemplated by this Term Sheet, including any Definitive Documents, that remain the subject of negotiation as of the effective date of the RSA shall be subject to the rights and obligations set forth in <u>Section 3</u> of the RSA.  Failure to reference such rights and obligations as it relates to any document referenced in this Term Sheet shall not impair such rights and obligations. |
| **Cash Collateral and DIP Facility** | The DIP Facility will be backstopped by the Ad Hoc Group and have the terms set forth in *Annex D* hereto (the "*DIP Term Sheet*").  The proceeds of the DIP Facility will be applied (i) to roll up $400 million of the First Lien Debt on the terms set forth in the DIP Term Sheet and (ii) to fund the Chapter 11 Cases.  <br><br>The DIP Facility shall be structured as a delayed draw term loan facility and may be repaid on the Plan Effective Date (a) with 98% of the common stock of the Reorganized Debtors (the "*Reorganized Equity*") in accordance with this Term Sheet (the "*DIP Equity Conversion*") or (b) with cash in full.  <br><br>The Ad Hoc Group and the Company have agreed, pursuant to the RSA and subject to the DIP Orders (as defined in the RSA), to the Company's consensual use of cash collateral, pursuant to the terms and conditions set forth in the DIP Orders, which shall be consistent with the RSA and the rights set forth therein.  The Debtors shall seek approval of the DIP Facility through the DIP Orders, consistent with the DIP Term Sheet. |
| **ABL Facility** | Amounts outstanding under the ABL Facility (as defined herein) shall remain outstanding during the pendency of the Chapter 11 Cases and shall receive the adequate protection set forth in the DIP Term Sheet (as defined in the DIP Documents). |
| **Exit ABL Facility** | On the Plan Effective Date, the Reorganized Debtors shall enter into an Exit ABL Facility in a form reasonably acceptable to the Reorganized Debtors and |

| | |
|---|---|
| | the Required Consenting Stakeholders, which shall be applied to refinance the ABL Loans in full. |
| **Debt and Interests to be Addressed** | The indebtedness of the Company that shall be restructured or otherwise addressed pursuant to the Restructuring shall include, *inter alia*:<br><br>(i) **ABL Loans**:  the revolving credit loans due under that certain asset-based revolving credit agreement dated as of July 23, 2021, by and among the At Home Group Inc. ("*At Home Group*"), the lenders party thereto in their capacities as lenders thereunder, letter of credit issuers in their capacities as letter of credit issuers thereunder, and Bank of America, National Association, as administrative agent and collateral agent, and the other agents and other parties thereto, with approximately \$378 million[2] in principal amount outstanding (the "*ABL Loans*," and the debt facilities related thereto, as amended, supplemented or otherwise modified, the "*ABL Facility*");<br><br>(ii) **Cayman Secured Debt**:  The Restructuring will address all claims on account of:  (a) the 11.50% senior secured notes due 2028 under that certain indenture between At Home Cayman, as issuer, the guarantors party thereto, and Wilmington Trust, National Association, as trustee and notes collateral agent, dated as of May 12, 2023, with approximately \$200 million in principal amount outstanding (as amended, supplemented or otherwise modified, the "*Cayman Notes*"); and (b) the Intercompany Note, dated as of May 12, 2023, by and among At Home Group Inc., as the Company, the guarantors party thereto from time to time, At Home Cayman ("*At Home Cayman*") and Delaware Trust Company, as the administrative agent and intercompany note collateral agent with approximately \$200 million in principal amount outstanding (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Intercompany Note*");<br><br>(iii) **Term Loans**: the term loans due under that certain term loan credit agreement between At Home Group, as borrower, the lenders party thereto, and Bank of America, National Association, as administrative agent and collateral agent, dated as of July 23, 2021, with approximately \$579 million in principal amount outstanding (the "*Term Loans*" and the debt facilities related thereto, as amended, supplemented or otherwise modified, the "*Term Loan Facility*");<br><br>(iv) **4.875% Notes**: the 4.875% senior secured notes due 2028 under that certain indenture among At Home Group, as issuer, the guarantors party thereto and U.S. Bank Trust Company, National Association as trustee and collateral agent, dated as of July 12, 2021, with approximately \$300 million in principal amount outstanding (as amended, supplemented or otherwise modified the "*4.875% Secured Notes*");<br><br>(v) **PIK Notes**: the 7.125%/ 8.625% cash/PIK toggle senior secured notes due 2028 under that certain indenture among At Home Group, as issuer, the |

---

[2] **NTD**:  All outstanding amounts indicated herein are approximate amounts as of June 13, 2025.

guarantors party thereto, and Wilmington Trust, National Association, as trustee and notes collateral agent, dated as of May 12, 2023, with approximately $483 million in principal amount outstanding (as amended, supplemented or otherwise modified, the "*PIK Notes*" and, together with the Cayman Notes, the Intercompany Note, the Term Loans, and the 4.875% Secured Notes, collectively, the "*First Lien Debt*");

(vi)  **Unsecured Notes**:  the 7.125% senior notes due 2029 under that certain indenture among At Home Group, the guarantors party thereto from time to time, and U.S. Bank Trust Company, National Association, as trustee dated as of July 12, 2021, with approximately $58 million in principal amount outstanding (as amended, supplemented or otherwise modified, the "*Unsecured Notes*");

(vii)    all general unsecured claims; and

(viii)    all existing Equity Interests.

The secured Claims in respect of the First Lien Debt are referred to individually herein as the "*Cayman Notes Claims*", "*Intercompany Note Claims*", "*Secured Term Loan Claims*", "*4.875% Secured Notes Claims*", and the "*Secured PIK Notes Claims*" as applicable, and collectively as, the "*First Lien Claims*".  The unsecured deficiency Claims in respect of the First Lien Debt are collectively referred to herein as the "*First Lien Deficiency Claims.*"[3]

---

[3]    A portion of the First Lien Claims shall be rolled up into the Tranche B DIP Loans (as defined in the DIP Term Sheet) prior to the Plan Effective Date.  As used herein, the terms "First Lien Claims" and "First Lien Deficiency Claims" shall refer to those claims that remain outstanding following the partial refinancing with Tranche B DIP Loans.

| Treatment of Claims and Interests | | | |
|---|---|---|---|
| Each holder of an allowed Claim or Interest, as applicable, shall receive the treatment described below in full and final satisfaction, settlement, release, and discharge of, such allowed Claim or Interest. | | | |
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Unclassified Non-Voting Claims** | | | |
| N/A | **Administrative Claims[4]** | Unless a holder agrees to less favorable treatment, each holder of an allowed Administrative Claim (including all professional fee claims) shall have such Claim satisfied in full, in Cash, which payments shall be made in the ordinary course of business or on the later of the Plan Effective Date and the date on which such Claim become an allowed Claim (or as soon as reasonably practicable thereafter), or otherwise receive treatment consistent with the provisions of section 1129(a)(9)(2) of the Bankruptcy Code. | N/A |
| N/A | **Priority Tax Claims[5]** | On or as soon as reasonably practicable after the Plan Effective Date, except to the extent that a holder of an allowed Priority Tax Claim agrees to less favorable treatment, each holder of an allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| N/A | **Superpriority DIP Claims** | On or prior to the Plan Effective Date, in full and final satisfaction, settlement, release, and discharge of each allowed Superpriority DIP Claim, each holder of such allowed Superpriority DIP Claim shall receive either (a) payment in full in cash, (b) payment in full in Reorganized Equity by the DIP Equity Conversion (subject to dilution on account of the MIP) in accordance with this Term Sheet, or (c) such other treatment as to which the Debtors and the holders of the allowed Superpriority DIP Claims will have agreed upon in writing. | N/A |

---

[4] "*Administrative Claim*" means any Claim for the costs and expenses of administration of the Chapter 11 Case.

[5] "*Priority Tax Claim*" means any Claim pursuant to section 507(a)(8) of the Bankruptcy Code.

| Classified Claims and Interests of the Debtors[6] | | | |
|---|---|---|---|
| Class 1 | **Other Secured Claims** | Except to the extent that a holder of an allowed Other Secured Claim agrees to less favorable treatment of its allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge of each allowed Other Secured Claim, on the Plan Effective Date or as soon as reasonably practicable thereafter, each holder of an allowed secured Claim that is not one of the First Lien Claims or an ABL Facility Claim shall receive (i) payment in full in cash, (ii) delivery of the collateral securing such allowed Other Secured Claim, (iii) reinstatement of such allowed Other Secured Claim, or (iv) such other treatment rendering such allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| Class 2 | **Other Priority Claims** | Except to the extent that a holder of an allowed Other Priority Claim agrees to less favorable treatment of such allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of each allowed Other Priority Claim, on the Plan Effective Date, each holder of such allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| Class 3 | **ABL Facility Claims** | Except to the extent that a holder of an Allowed ABL Facility Claim agrees to less favorable treatment of its Allowed ABL Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed ABL Facility Claim, on the Plan Effective Date, each Holder of an allowed ABL Facility Claim shall receive payment in full in cash with the proceeds of the Exit ABL Facility. | Unimpaired / Presumed to Accept |
| Class 4 | **Cayman Notes Claims** | Except to the extent that a holder of an Allowed Cayman Notes Claim agrees to less favorable treatment of its allowed Cayman Notes Claim, in full and final satisfaction, settlement, release, and discharge of each allowed Cayman Notes Claim, on the Plan Effective Date, each holder of an allowed Cayman Notes Claim shall receive such | Impaired/Entitled to Vote |

---

[6]   The Debtors reserve the right to classify all Classes of First Lien Claims (Class 4, Class 5, Class 6, Class 7, and Class 8) in one class in any Plan filed in the Chapter 11 Cases with the reasonable consent of the Required Consenting Stakeholders.

| | | holder's Pro Rata Share[7] of the First Lien Equity Distribution.[8] | |
|---|---|---|---|
| **Class 5** | **Intercompany Notes Claims** | Except to the extent that a holder of an Allowed Intercompany Note Claim agrees to less favorable treatment of its Allowed Intercompany Note Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Intercompany Note Claim, on the Plan Effective Date, each holder of an Allowed Intercompany Notes Claim shall receive such holder's Pro Rata Share of the First Lien Equity Distribution; *provided* that such holder's recovery under the Plan shall be payable to the indenture trustee and collateral agent for the Cayman Notes for distribution to the holders of the allowed Cayman Notes Claims in accordance with the documents governing the Cayman Notes only until such Cayman Notes are repaid in full. | Impaired/Entitled to Vote |
| **Class 6** | **Secured Term Loan Claims** | Except to the extent that a holder of an allowed Secured Term Loan Claim agrees to less favorable treatment of its allowed Secured Term Loan Claim, in full and final satisfaction, settlement, release, and discharge of each allowed Secured Term Loan Claim, on the Plan Effective Date, each holder of an allowed Secured Term Loan Claim shall receive such holder's Pro Rata Share of the First Lien Equity Distribution. | Impaired / Entitled to Vote |
| **Class 7** | **4.875% Secured Notes Claims** | Except to the extent that a holder of an allowed 4.875% Secured Notes Claim agrees to less favorable treatment of its allowed 4.875% Secured Notes Claim, in full and final satisfaction, settlement, release, and discharge of each allowed 4.875% Secured Notes Claim, on the Plan Effective Date, each holder of an allowed 4.875% Secured Notes Claim shall receive such holder's Pro Rata Share of the First Lien Equity Distribution. | Impaired / Entitled to Vote |

---

[7]  "Pro Rata Share" means, (a) with respect to each Cayman Notes Claim, Intercompany Note Claim, Secured Term Loan Claim, 4.875% Secured Notes Claim, and Secured PIK Notes Claim, the proportion that such Claim bears to all Allowed First Lien Claims and (b) with respect to any other class of Claims or Interests (including the Unsecured Claims), the proportion that such allowed Claim or allowed Interest in a particular Class bears to the aggregate amount of allowed Claims or allowed Interests in that same Class.

[8]  "*First Lien Equity Distribution*" means 100% of the Reorganized Equity subject to dilution by the DIP Equity Conversion and the MIP.

| Class 8 | **Secured PIK Notes Claims** | Except to the extent that a holder of an allowed Secured PIK Notes Claim agrees to less favorable treatment of its allowed Secured PIK Notes Claim, in full and final satisfaction, settlement, release, and discharge of each allowed Secured PIK Notes Claim, on the Plan Effective Date, each holder of an allowed Secured PIK Notes Claim shall receive such holder's Pro Rata Share of the First Lien Equity Distribution. | Impaired / Entitled to Vote |
|---|---|---|---|
| Class 9 | **Unsecured Claims** | Except to the extent that a holder of an allowed Unsecured Claim agrees to less favorable treatment of its allowed Unsecured Claim, in full and final satisfaction, settlement, release, and discharge of each allowed Unsecured Claim, on the Plan Effective Date, each holder of any allowed Unsecured Claim that is not an Administrative Claim, Priority Tax Claim, or Intercompany Claim (and including, the Unsecured Notes Claims and the First Lien Deficiency Claims) shall receive its Pro Rata Share of [●]. | Impaired / Entitled to Vote |
| Class 10 | **Intercompany Claims** | On the Plan Effective Date, all Intercompany Claims shall be (a) reinstated, or (b) set off, settled, discharged, contributed, cancelled, released, and extinguished and without any distribution on account of such Intercompany Claim, in each case, at the Reorganized Debtors' election with the consent of the Required Consenting Stakeholders. | Unimpaired / Presumed to Accept or Impaired / Deemed to Reject |
| Class 11 | **Intercompany Interests** | On the Plan Effective Date, all Intercompany Interests shall be (a) reinstated, or (b) set off, settled, discharged, contributed, cancelled, released, and extinguished and without any distribution on account of such Intercompany Interests, in each case, at the Reorganized Debtors' election with the consent of the Required Consenting Stakeholders. | Unimpaired / Presumed to Accept or Impaired / Deemed to Reject |
| Class 12 | **Existing Interests**[9] | On the Plan Effective Date, each holder of the existing equity interests of Ambience Parent, Inc. shall have its interests cancelled, released, and extinguished, and shall receive no distribution or other consideration on account of such interests. | Impaired / Deemed to Reject |

---

[9]    For the avoidance of doubt, any section 510(b) claims shall receive the same treatment as Existing Interests.

8

| General Provisions Regarding the Restructuring | |
|---|---|
| **Releases** | Plan shall include customary release, injunction, exculpation, and discharge provisions, acceptable to the Required Consenting Stakeholders and the Company, a form of which is attached hereto as *Annex B*. All Plan releases are subject to the Special Committee's ongoing investigation. |
| **Executory Contracts and Unexpired Leases** | The Debtors shall seek to retain Hilco Global as an estate professional under the Bankruptcy Code to evaluate their current real estate lease portfolio and shall work with the Ad Hoc Group to identify those executory contracts and unexpired leases which, subject to the consent of the Required Consenting Stakeholders, will be assumed or rejected and the allowed amount of any claims in respect thereto (including after giving effect to all available defenses and caps under Section 502 of the Bankruptcy Code). |
| **Retained Causes of Action** | The Reorganized Debtors shall retain all rights to commence and pursue any Causes of Action, other than those that the Debtors release pursuant to the release and exculpation provisions outlined in this Term Sheet and as set forth in the Plan. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled, and the Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Conditions Precedent to the Plan Effective Date** | The following shall be conditions precedent to the Plan Effective Date which may only be waived with the consent of the Debtors and the Required Consenting Stakeholders:<br><br>1. the Bankruptcy Court shall have entered the Confirmation Order and such order shall be (a) in form and substance materially consistent with the RSA (subject to all consent rights therein), (b) acceptable to the Debtors and Required Consenting Stakeholders, and (c) a Final Order (or such requirement shall be waived by the Required Consenting Stakeholders);<br><br>2. each document or agreement constituting the applicable Definitive Documents shall (a) have been executed and/or effectuated and remain in full force and effect, (b) be in form and substance reasonably acceptable or acceptable (as applicable, materially consistent with the RSA) to the Debtors and Required Consenting Stakeholders, and (c) be materially consistent with the RSA, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Plan Effective Date or otherwise waived;<br><br>3. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring Transactions and the Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated; |

4. all governmental and third-party approvals and consents that may be necessary in connection with the Restructuring Transactions shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on the Restructuring Transactions;

5. no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing, or prohibiting the consummation of any of the Restructuring Transactions;

6. the RSA shall be in full force and effect, no termination event or event that would give rise to a termination event under the RSA upon the expiration of the applicable grace period shall have occurred, and the RSA shall not have been validly terminated prior to the Plan Effective Date;

7. the steps to cancel the Existing Interests and, subject to the consent of the Required Consenting Stakeholders, not unreasonably withheld, any Intercompany Interests and/or Intercompany Claims shall be completed in accordance with the Transaction Steps Plan;

8. the Reorganized Equity shall have been issued by the Reorganized Debtors in accordance with the restructuring steps memorandum which will be reasonably acceptable to the Debtors and Required Consenting Stakeholders;

9. the Reorganized Debtors shall have entered into the Exit ABL Facility on terms reasonably acceptable to the Debtors and the Required Consenting Stakeholders;

10. the Debtors shall have previously entered into new leases or modifications or amendments to existing leases (or rejected existing leases) with the combined aggregate effect of reducing rental costs (through reductions in base rent or otherwise) by an amount and on terms acceptable to the Debtors and the Required Consenting Stakeholders;

11. no Tariff Event (as defined in the DIP Term Sheet) shall have occurred;

12. on the Plan Effective Date, after giving effect to any distributions or other payments to be made pursuant to the Plan (including the funding of any applicable reserves or payments of Administrative Claims) on or as soon as practicable after the Plan Effective Date, the Reorganized Debtors shall have access to liquidity on terms reasonably acceptable to the Required Consenting Stakeholders;

13. the releases materially consistent with the terms of this Restructuring Term Sheet shall have gone into full force and effect;

| | |
|---|---|
| | 14. (a) all of the reasonable and documented fees and expenses payable to the Ad Hoc Group, the DIP Secured Parties, the ABL Secured Parties and the Pari First Lien Secured Parties under the RSA and the DIP Term Sheet shall have been paid in full; and (b) all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date have been placed in the professional fee escrow account; and |
| | 15. the fees of the official committee of unsecured creditors shall not have exceeded the amount permitted under the Approved Budget. |

| | |
|---|---|
| **New Board of Directors and Governance** | The new board of directors of the Reorganized Debtors (the "*New Board*") will consist of seven (7) directors and include: (a) the Chief Executive Officer of the Reorganized Debtors (the "*CEO*"), and (b) six (6) directors selected as follows, in each case, in consultation with the CEO: (i) four (4) directors selected by Redwood, and (ii) one director selected by Anchorage, and (iii) one director selected by Farallon. The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing.<br><br>Corporate governance for the Reorganized Debtors, including charters, bylaws, operating agreements, or other organization documents (collectively, the "*New Organizational Documents*"), as applicable, (a) shall be consistent with this Restructuring Term Sheet, the RSA, and section 1123(a)(6) of the Bankruptcy Code, (b) shall have terms acceptable to the Required Consenting Stakeholders, and (c) shall include provisions set forth in **Annex C** which shall be subject to the consent rights set forth in **Annex C**. |
| **Management Incentive Plan** | On the Plan Effective Date, the Reorganized Debtors will authorize the issuance of up to 10% of the Reorganized Equity (on a fully diluted and fully distributed basis) for management and the New Board (the "*MIP*"), which may be granted in any form acceptable to the New Board, including without limitation, in the form of options, restricted stock, restricted stock units, warrants, stock appreciations rights, or any combination thereof, and which will be awarded under the MIP to be approved by the New Board on or within 90 days of the Plan Effective Date. |
| **Employment Obligations** | On the Plan Effective Date, the Reorganized Debtors will either assume or reject the existing agreements with the current members of the senior management team of the Debtors, or will enter into new compensation arrangements, as applicable, on the Plan Effective Date with some or all such individuals who agree to such new arrangements, which assumption or rejection must be approved by the Required Consenting Stakeholders and which new arrangements, as applicable, must be acceptable to the Reorganized Debtors and the Required Consenting Stakeholders. |

| | |
|---|---|
| **Survival of Indemnification Provisions and D&O Insurance** | Subject to the Bankruptcy Court's entry of the Confirmation Order approving the releases as contemplated in the RSA and this Term Sheet, all indemnification provisions, consistent with applicable law, currently in place, including under the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise for the benefit of current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company, as of the Effective Date, as applicable, shall (a) to the extent permitted by applicable law (i) be reinstated and remain intact, irrevocable, and shall survive the Effective Date, on terms no less favorable to such current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company than the indemnification provisions in place prior to the Effective Date, and (ii) shall be assumed by the Reorganized Debtors; or (b) to the extent not permitted to be assumed by applicable law, shall be included in the new organizational documents of the Reorganized Debtors on terms no less favorable to such directors, officers, managers, and employees than the indemnification provisions in place prior to the Effective Date.[10] |
| | After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date (the "*D&O Policy*"), and all members, managers, directors, and officers of the Company who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions on or after the Effective Date. |
| **Retention Of Jurisdiction** | The Plan shall provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |
| **Tax Matters** | The Restructuring Transactions contemplated by this Term Sheet will be structured so as to obtain the most beneficial tax structure for the Company, as determined by the Company. |
| **Exemption from SEC Registration** | The issuance of all securities under the Definitive Documents will be (a) exempt from registration under the Securities Act and applicable Law to the fullest extent applicable and (b) permitted by Law in reliance on the Section 1145 Exemption or section 4(a)(2) of the Securities Act (or another applicable exemption under the Securities Act), subject to any other applicable local or state securities Laws. |
| | For the avoidance of doubt, the Reorganized Equity is expected to be issued in reliance upon the Section 1145 Exemption, to the extent permissible and available. If the Section 1145 Exemption is not available, such Reorganized Equity is expected to be issued in reliance upon the exemptions provided by section 4(a)(2) of the Securities Act (or another applicable exemption under the Securities Act). |

| | |
|---|---|
| **Other Customary Plan Provisions** | The Plan will provide for other standard and customary provisions, including, among other things, provisions addressing the vesting of assets, release of liens, the compromise and settlement of Claims and Equity Interests, and the resolution of disputed Claims. |
| **Company and Ad Hoc Group Expenses** | The Plan shall provide for the payment in full in cash on the Plan Effective Date of all reasonable and documented fees and expenses of (i) Dechert LLP, as counsel to the Ad Hoc Group, (ii) any other professional retained by the Ad Hoc Group, (iii) each of the indenture trustees, administrative agents, and collateral agents in respect of the First Lien Claims, the DIP Facility, and the ABL Loans.<br><br>The Plan shall provide for the payment of the final allowed amount of the reasonable and documented fees and expenses of (i) Kirkland & Ellis LLP, as counsel to the Company, (ii) AlixPartners LLP, as financial advisor to the Company, and (iii) PJT Partners, as investment banker to the Company, and (iv) any other professional retained by the Company.<br><br>For the avoidance of doubt, the Approved Budget (as defined in the DIP Documents) shall not operate as a cap on any Debtors' professional fees. |

---

[10]    Debtors to provide a schedule of potential indemnification obligations not included in the corporate organizational documents of the Debtors (including any agreements with senior management, attorneys, accountants, investment bankers, or other professionals, if applicable).

**Annex A to Term Sheet**

**Defined Terms**

| DEFINITIONS | |
|---|---|
| **Administrative Claim** | A Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Fee Claims; (c) all fees and charges assessed against the estates under chapter 123 of the Judicial Code; and (d) any superpriority claims, claims pursuant to section 507(b) of the Bankruptcy Code, or adequate protection claims provided for in the DIP Orders. |
| **Administrative Claims Bar Date** | The deadline for Filing requests for payment of Administrative Claims, which shall be (a) 30 days after the Effective Date for Administrative Claims other than Professional Fee Claims and (b) 60 days after the Effective Date for Professional Fee Claims. |
| **Affiliate** | With respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such Entity. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise. |
| **Allowed** | Except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim a Proof of Claim is not required under the Plan, the Bankruptcy Code, or a Final Order, including the DIP Orders); *provided* that no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or a timely objection is interposed and the Claim has been Allowed by a Final Order; (b) a Claim that is scheduled by the Debtors as neither contingent, unliquidated, nor Disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order, including the DIP Orders. For the avoidance of doubt, any Claim that is hereafter scheduled by the Debtors as contingent, unliquidated, or Disputed, and for which no contrary or superseding Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Unless expressly waived by the Plan, |

| | |
|---|---|
| | the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtors or Reorganized Debtors, as applicable. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings. |
| **Causes of Action** | Including, without limitation, any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, direct or indirect, choate or inchoate, disputed or undisputed, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, under the Bankruptcy Code or applicable non-bankruptcy law, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws. |
| **Claims Bar Date** | The applicable bar date by which Proofs of Claim must be Filed with respect to Claims (other than Administrative Claims allowable under sections 503(b) or 507(a)(2) of the Bankruptcy Code as an expense of administration incurred in the ordinary course), as established by a bar date Final Order or the Plan; *provided* that if there is a conflict relating to the bar date for a particular Claim, the Plan shall control. |
| **Exculpated Parties** | Exculpated Parties means, collectively, and in each case solely in its capacity as such: (a) each of the Debtors; and (b) with respect to the Debtors, each of their respective current and former directors, managers, officers, attorneys, financial advisors, consultants, or other professionals or advisors that served in such capacity between the Petition Date and Plan Effective Date. |
| **Other Priority Claim** | Any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |

16

| | |
|---|---|
| **Other Secured Claim** | Any Secured Claim against the Debtors other than the Superpriority DIP Claims, the ABL Facility Claims, the Intercompany Note Claims, the Cayman Notes Claims, the Term Loans, the 4.875% Secured Notes Claims, or the PIK Notes Claims. |
| **Priority Tax Claims** | Any Claim pursuant to section 507(a)(8) of the Bankruptcy Code. |
| **Professional** | An Entity: (a) employed, or proposed to be employed prior to the Confirmation Date, in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code. |
| **Professional Fee Claim** | Any Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred on or after the Petition Date by such Professional through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim. |
| **Related Party** | Collectively, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former directors, managers, officers, committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees. |
| **Released Parties** | Collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the Ad Hoc Group and each Consenting Stakeholder; (d) the DIP Lenders; (e) the ABL Lenders; (f) the ABL Agent; (g) the DIP Agent; (h) the Agents and the Trustees; (i) the Consenting Sponsor; (j) At Home Cayman; (k) At Home Cayman Holdings; (l) each current and former Affiliate of each Entity in clause (a) through the preceding clause (k); and (m) each Related Party of each Entity in clauses (a) through the preceding clause (l); *provided, however*, that each Entity that timely and properly opts out of the releases contemplated herein shall not be a Released Party. |
| **Releasing Parties** | Collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the Ad Hoc Group and each |

|  | Consenting Stakeholder; (d) the DIP Lenders; (e) the ABL Lenders; (f) the ABL Agent; (g) the DIP Agent; (h) the Agents and the Trustees; (i) the Consenting Sponsor; (j) all Holders of Claims that vote to accept the Plan; (k) all Holders of Claims that are deemed to accept the Plan and that do not opt out of the releases provided for in the Plan; (l) all Holders of Claims that abstain from voting on the Plan and that do not opt out of the releases provided for in the Plan; (m) all Holders of Claims that vote to reject the Plan and that do not opt out of the releases provided for in the Plan; (n) all Holders of Interests that do not opt out of the releases provided for in the Plan; (o) each current and former Affiliate of each Entity in clause (a) through the preceding clause (n); and (p) each Related Party of each Entity in clauses (a) through the preceding clause (o) for which such Entity is legally entitled to bind such Related Party to the releases contained herein under applicable law; *provided, however*, that each Entity that timely and properly opts out of the releases contemplated herein shall not be a Releasing Party. |
|---|---|
| **Secured Claim** | A Claim secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code. |
| **Unsecured Claims** | Any Claim that is not a Secured Claim, Administrative Claim, Priority Tax Claim, or Intercompany Claim (and including, for the avoidance of doubt, the Unsecured Notes Claims and the First Lien Deficiency Claims). |

**Annex B to Term Sheet**[1]

**Release, Exculpation, and Injunction**

| **RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS**[2] | |
|---|---|
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan or the Confirmation Order, including the Plan Supplement and Definitive Documents, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Plan Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action (including any Causes of Action or Claims based on theories or allegations of successor liability) that arose before the Plan Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Plan Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted this Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Reinstated Claims) and Interests (other than any Intercompany Interests that are Reinstated), subject to the occurrence of the Plan Effective Date. |

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the RSA or the Plan, as applicable.

[2]   Subject to ongoing review and revisions in all respects.

| Releases by the Debtors[3] | Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, as of the Plan Effective Date, each Released Party is deemed, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, their Estates, and the Reorganized Debtors in each case on behalf of themselves and their respective successors, assigns, and representatives from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, and the Reorganized Debtors that the Debtors, their Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof or otherwise), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the RSA, the DIP Facility, the DIP Documents, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Plan Supplement or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, the Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement under the Restructuring, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.<br><br>Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, |
|---|---|

---

[3]    All releases and recipients of the Debtor release contemplated in this Term Sheet are subject to ongoing review and subject to approval by the Special Committee, including the result of a potential investigation to be conducted thereby.

| | |
|---|---|
| | which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contribution to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Reorganized Debtor, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release. |
| **Releases by Holders of Claims and Interests of the Debtors** | Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Effective Date, each Releasing Party is deemed to have, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Debtors and their Estates (as applicable) that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors' (including the management, ownership, or operation thereof or otherwise), the purchase, sale, or recission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the RSA, the DIP Facility, the DIP Documents, the Disclosure Statement Order, the Confirmation Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, the Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of |

|  | retained Causes of Action to be attached as an exhibit to the Plan Supplement. |
|  | Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third Party Release. |
|  | Without limiting the foregoing, from and after the Plan Effective Date, any Entity that is given the opportunity to opt out of the releases contained in the Plan and does not exercise such opt out may not assert any claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors. From and after the Plan Effective Date, any Entity (i) that opted out of the releases contained in the Plan or (ii) was deemed to reject the Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action |
| **Exculpation** | Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the participation in the DIP Facility, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, |

| | |
|---|---|
| | including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
| **Injunction** | Except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, settled, or are subject to exculpation under the Plan are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities, in each case, on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Plan Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, discharged, subject to exculpation, or settled pursuant to the Plan.<br><br>Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as |

|  | applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action released, discharged, settled, or that is subject to exculpation pursuant to the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party. |
|---|---|

## Annex C

The corporate governance documents of the parent company of the Reorganized Debtors shall provide:

i. ***Board Composition***: Each of Anchorage and Farallon shall have an irrevocable right to appoint a member of the board for so long as such member holds 5% of the common equity of the Reorganized Debtors.

ii. ***Transferability***: All equity interests of the Reorganized Debtors shall be freely transferrable, subject to (a) customary restrictions for regulatory matters and/or law, (b) tag-along rights to each of Redwood, Anchorage, Farallon, Glendon, and Silver-Rock (collectively, the "Steerco" and each a "Steerco Member") in the event Redwood proposes to transfer more than 30% of its then-outstanding equity (other than to a permitted transferee or in connection with an IPO) in a transaction or series of related transactions and (c) customary drag-along obligations of all members in the event the Steerco Members, collectively, transfer more than 50% of the then-outstanding equity (other than to a permitted transferee or in connection with an IPO) in a transaction or series of related transactions.

iii. ***Amendments to Governance / Organizational Documents:*** Any amendment, modification, or supplement of the governance documents or the organizational documents that is materially and disproportionately adverse to a Steerco Member relative to any other Steerco Member shall require consent of that adversely affected Steerco Member.

The language of all provisions of the governance documents (ex. charter documents, bylaws, shareholders' agreement and registration rights) will require Required Consenting Stakeholder approval; however, the following provisions will require approval of the Supermajority Consenting Stakeholders:

i. ***Information Rights***: Approval of information rights will require Supermajority Consenting Stakeholders approval.

ii. ***Securities Issuances & Preemptive Rights***: Any rights of the Company to issue equity securities in a manner not subject to pro rata preemptive rights as to the Steerco Members will require Supermajority Consenting Stakeholders approval.

iii. ***Non-Pro Rata Redemptions / Repurchases / Dividends***: Redemptions and repurchases are permitted so long as they are pro rata or made in connection with the termination of employment (e.g., call rights over management equity); any provisions providing for non-pro rata redemptions or repurchases to certain members of SteerCo but not others will require Supermajority Consenting Stakeholders approval. Any rights to make dividends or distributions that are not paid pro rata as between the SteerCo Members holders will require Supermajority Consenting Stakeholders approval.

iv. ***D&O Indemnity / Expense Reimbursement***: Customary indemnification, exculpation and expense reimbursement for directors and officers, in each case relating to the company will be included and the specific language will require Supermajority Consenting Stakeholders approval.

v. ***Affiliate Transactions***: Definition of "affiliate transaction" to be agreed by Supermajority Consenting Stakeholders approval. Affiliate transactions will be prohibited with

exceptions approved by Supermajority Consenting Stakeholders approval, approved by a majority of the disinterested members of the board and occurring on terms no less favorable than would be obtained in an arms'-length transaction.

## **Annex D**

### **DIP Term Sheet**

*Execution Version*

# SENIOR SECURED SUPERPRIORITY
# DEBTOR-IN-POSSESSION CREDIT FACILITY

## June 16, 2025

This term sheet (the "DIP Term Sheet") sets forth certain of the terms of the proposed DIP Facility, subject to the conditions set forth below, among the Debtors, the Backstop Parties, and the DIP Agent (each as defined below). This DIP Term Sheet is preliminary and non-binding and does not attempt to describe all of the terms, conditions, and requirements that would pertain to the financing described herein, but rather is intended to be a summary outline of certain basic items, and is subject to change. No DIP Lender (as defined below) is under any obligation to make a loan or make any commitment to lend, and this DIP Term Sheet does not constitute a commitment, a contract to provide a commitment or any agreement by the DIP Lenders to provide any financing. The terms and conditions of the financing contemplated hereby shall be set forth in final documentation in form and substance acceptable to the DIP Agent, the Required DIP Lenders, and the Debtors (each as defined below). In addition, the pricing and all other terms included herein are based on market conditions on the date hereof and are subject to change in all respects. This DIP Term Sheet is confidential and is delivered to you with the understanding that neither it nor its substance shall be disclosed to any third party.

| | |
|---|---|
| **Credit Parties** | Ambience Intermediate, Inc., a Delaware corporation, together with its affiliates and subsidiaries that are debtors and debtors in possession (collectively, the "Debtors") in the jointly administered cases (the "Bankruptcy Cases") under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") commenced in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on the Petition Date (as defined below). At Home Group Inc. shall be the "Borrower" under the DIP Facility. |
| **DIP Backstop Parties** | An ad hoc group (the "Ad Hoc Group") represented by Dechert LLP ("Dechert") and certain other Consenting Stakeholders party to the RSA (as defined below) as of the Petition Date that are comprised of holders of certain of the Debtors' Pari First Lien Obligations (as defined below) and/or each of their designated affiliate(s) or managed entities (collectively, the "Backstop Parties"). |
| **DIP Lenders** | The Backstop Parties and the Pari First Lien Secured Parties that affirmatively elect to purchase from the Fronting Lender (as defined below) their allocated share of a portion of the Tranche A DIP Loan Commitment as set forth on Schedule A attached hereto, subject to the Holdback and the Initial Syndication (as defined in the DIP Credit Agreement) and pursuant to Syndication Procedures (as defined in the DIP Credit Agreement) acceptable to the Backstop Parties (collectively, the "DIP Lenders") and the Debtors. <br><br> "Holdback" means, with respect to the Backstop Parties, 50% of the Tranche A DIP Loan Commitment. |
| **Fronting Lender** | Barclays Bank PLC (the "Fronting Lender"). |

| | |
|---|---|
| **DIP Agent** | GLAS USA LLC will act as administrative agent and collateral agent with respect to the DIP Facility (in such capacities, the "<u>DIP Agent</u>"). |
| **DIP Facility** | A senior secured, first-lien and super-priority and priming debtor-in-possession multiple draw term loan credit facility (the "<u>DIP Facility</u>") in the aggregate principal amount of up to $600 million subject to the terms and conditions set forth in this DIP Term Sheet (the "<u>DIP Loan Commitment</u>") comprised of:<br><br>(i)     new money first-out delayed draw term loans (the "<u>Tranche A DIP Loans</u>" and such facility, the "<u>Tranche A DIP Facility</u>") in an aggregate amount of $200 million (the "<u>Tranche A DIP Loan Commitment</u>") of which the amount set forth in the Initial Approved Budget (as defined below) for the four weeks commencing on the Petition Date (the "<u>Initial DIP Period</u>"), will be available upon entry of the Interim DIP Order (as defined below) (the "<u>Initial Tranche A DIP Draw</u>"). The Tranche A DIP Loans shall be available, subject to the terms and conditions set forth herein, in (a) one draw on the Closing Date (as defined below) in an amount equal to the Initial Tranche A DIP Draw and (b) subject to the Approved Budget (as defined below), bi-weekly draws commencing after the Initial DIP Period until the Termination Date in an amount equal to the "DIP Draw Amount" set forth in the Approved Budget for the two week period commencing on the date of such draw (each, an "<u>Additional Tranche A DIP Draw</u>"); *provided* that (1) on the Closing Date, the Initial Tranche A DIP Draw shall be funded in full by the Fronting Lender, and on the Initial Syndication Date (as defined in the DIP Credit Agreement), in accordance with the Syndication Procedures, the Fronting Lender shall assign such Tranche A DIP Loans (together with all capitalized interest and fees related thereto) to the Backstop Lenders in accordance with their allocated share of the Tranche A DIP Loans as set forth on <u>Schedule A</u> attached hereto, (2) the aggregate principal amount of each Additional Tranche A DIP Draw shall not be less than $25.0 million and not greater than the amount of the unfunded Tranche A DIP Loan Commitments then in effect; and (3) that, all unfunded Tranche A DIP Loan Commitments shall be funded at least one (1) business day prior to the date that an Acceptable Plan is effective unless otherwise directed by the Required DIP Lenders.<br><br>(ii)    a second-out roll up facility (the "<u>Tranche B DIP Loans</u>" and such facility, the "<u>Tranche B DIP Facility</u>"; the Tranche B DIP Loans, together with the Tranche A DIP Loans, collectively, the "<u>DIP Loans</u>" and the Tranche B DIP Facility, together with the Tranche A DIP Facility, the "<u>DIP Facility</u>"), pursuant to which, effective immediately on the Closing Date, with respect to the DIP Lenders (or their designated affiliates) holding Tranche A DIP Loan Commitments on the Closing Date following the Initial Syndication, and with respect to all other DIP Lenders (or their designated |

|  | affiliates) upon the completion of the syndication, an amount up to $400 million (the "Pari First Lien Debt Repayment Amount") of Pari First Lien Obligations held by DIP Lenders shall be automatically deemed "rolled up" and converted on a cashless basis into Tranche B DIP Loans (i) upon the completion of the Initial Syndication, in an amount equal to $150,000,000 (the "Initial Tranche B DIP Draw" and together with the Initial Tranche A DIP Draw, collectively, the "Initial DIP Draw") and (ii) upon the entering of the Final DIP Order and the completion of the syndication (the "Subsequent Roll-Up Date"), in an amount equal to $250,000,000, and, in each case, automatically be deemed to be Tranche B DIP Loans for all purposes hereunder as if originally funded on the Closing Date, in the case of the roll-up on the completion of the Initial Syndication, and on the Subsequent Roll-Up Date, in the case of roll-up on the Subsequent Roll-Up Date; provided that, any Pari First Lien Secured Party that is also a Cayman Holder shall roll up 100% of the Cayman Note Secured Obligations held by such Pari First Lien Secured Party before any roll up of any other Pari First Lien Obligations held by such Pari First Lien Secured Party (it being understood that the roll up described in this proviso shall not affect or modify the order of priority as between each Pari First Lien Secured Party). For the avoidance of doubt, any Pari First Lien Obligations that are deemed repaid with proceeds of the Initial Tranche B DIP Draw shall be deemed "rolled up" and converted into the Tranche B DIP Facility. In no event shall the Tranche B Loans exceed the Pari First Lien Debt Repayment Amount, other than as a result of interest paid in kind as described herein.[1]<br><br>The aggregate principal amount of outstanding DIP Loans shall not exceed the DIP Facility, in each case subject to the terms and conditions herein and in the DIP Loan Documents. Once repaid or prepaid, the DIP Loans incurred under the DIP Facility may not be reborrowed.<br><br>As used herein, "DIP Obligations" means, at any time, all indebtedness and other obligations (including, without limitation, principal, interest, fees and expenses) owing under the DIP Facility at such time. |
|---|---|
| **Syndication** | All beneficial holders of Pari First Lien Obligations (other than the Intercompany Note Holder) who sign the RSA or a joinder related thereto on or before closing of the syndication process may participate in the DIP Facility on a pro rata basis based upon their holdings of Pari First Lien Obligations pursuant to syndication procedures acceptable to the Required DIP Lenders and the Debtors. |

---

[1]    Notwithstanding anything in this DIP Term Sheet to the contrary, the Debtors' stipulations, admissions, and releases contained in the Interim DIP Order with respect to the Prepetition Secured Parties and the Prepetition Secured Obligations are subject to completion of the investigation by the Special Committee of the Parent Boards (both as defined in the First Day Declaration) and shall be automatically binding upon the Debtors in all circumstances and for all purposes upon the earlier of the (a) entry of the Final DIP Order and (b) completion of the investigation by the Special Committee of the Parent Boards.

| | |
|---|---|
| **Fees** | <u>Backstop Fee</u>: 5.00% of the initial principal amount of the Tranche A DIP Loan Commitment payable pro rata to the Backstop Parties in proportion to their backstop allocation of Tranche A DIP Loan Commitment, which shall be earned, due and payable in-kind on the Closing Date by adding the amount of such fee to the principal amount of the Tranche A DIP Facility.<br><br><u>Unused Facility Fee</u>: 4.00% per annum of the average daily unused portion of the maximum amount approved to be funded with respect to the Tranche A DIP Loan Commitment.  The Unused Line Fee shall be payable in kind by being capitalized and added to the principal amount of outstanding Tranche A DIP Loans, on the last day of each fiscal quarter in arrears from the Closing Date until the Termination Date.<br><br><u>Upfront Fee</u>: 3.00% of the initial principal amount of the Tranche A DIP Loan Commitment payable pro rata to the DIP Lenders in proportion to their allocation of Tranche A DIP Loan Commitments, which shall be earned, due and payable in-kind (x) with respect to the Initial Tranche A DIP Draw, on the Closing Date, and (y) with respect to Tranche A DIP Loan Commitments, on the date of entry of the Final DIP Order, in each case, by adding the amount of such fee to the principal amount of the Tranche A DIP Facility (and which shall be allocated to the DIP Lenders in accordance with the syndication mechanics).<br><br><u>Exit Fee</u>:  3.00% of the principal amount of the Tranche A DIP Loan funded. The Exit Fee shall be fully earned on the Closing Date and payable in-kind on the Termination Date by adding the amount of such fee to the principal amount of the Tranche A DIP Facility pro rata to the DIP Lenders in proportion to their holding of Tranche A DIP Loans.<br><br><u>Agency Fee</u>: The Debtors shall pay an agency fee to the DIP Agent commencing on the Closing Date in an amount to be agreed between the Debtors and the DIP Agent and acceptable to the Required DIP Lenders.<br><br>All fees set forth in this section shall be non-refundable. |
| **Interest Rate; Default Rate** | <u>Interest Rate</u>. At any time prior to the occurrence of an Event of Default (as defined below), interest on the DIP Obligations outstanding at such time shall accrue at a rate per annum equal to (x) with respect to the Tranche A DIP Loans, Term SOFR + 8.00% per annum and (y) with respect to the Tranche B DIP Loans, Term SOFR + 4.00% per annum.  All interest on the Tranche A DIP Loans and the Tranche B DIP Loans shall be payable in kind by being capitalized and added to the principal amount of outstanding Tranche A DIP Loans or Tranche B DIP Loans, as applicable, on the last day of the applicable interest period (each of which shall be three months).<br><br><u>Default Rate</u>. Upon an Event of Default, interest on the DIP Obligations shall accrue at the otherwise applicable interest rate plus an additional 4.00% per annum, which shall be payable in kind by being capitalized and added to the principal amount of outstanding DIP Loans, on the last day of each fiscal quarter in arrears. |
| **Termination Date** | The DIP Facility shall terminate and all DIP Obligations shall be payable in full in cash on the date of the earliest to occur of (the "<u>Termination Date</u>"): (a) four (4) months from the Closing Date (as defined below) (as such date |

| | |
|---|---|
| | may be extended with the prior written consent of the Supermajority DIP Lenders (as defined below) in their sole discretion), (b) conversion of any of the Debtors' chapter 11 cases to a case under chapter 7 without the prior written consent of the Required DIP Lenders, (c) dismissal of any of the Debtors' chapter 11 cases without the prior written consent of the Required DIP Lenders, (d) the appointment of a trustee or examiner without the prior written consent of the Required DIP Lenders (but not including the appointment of a fee examiner to assist in reviewing applications for compensation by professionals), (e) the date of consummation of a sale of all or substantially all of the Debtors' assets, (f) the effective date of a chapter 11 plan, (g) the date the DIP Obligations become due and payable in full under the DIP Loan Documents (as defined below), whether by acceleration or otherwise, and (h) if the Final DIP Order has not been entered by the date that is thirty-five (35) days after the Petition Date (which date may be extended with the prior written consent of the Required DIP Lenders). |
| **Prepetition Secured Indebtedness** | |
| **Prepetition ABL Facility** | That certain Asset Based Revolving Credit Agreement, dated as of July 23, 2021, among the Debtors party thereto, each of the other loan parties party thereto, Bank of America, N.A. in its capacity as administrative agent and collateral agent (in such capacities, the "ABL Agent"), and the lenders party thereto from time to time (collectively, the "ABL Lenders", and together with the ABL Agent and the other secured parties under the ABL Credit Agreement and the other Loan Documents (as defined under the ABL Credit Agreement) (the "ABL Loan Documents"), collectively, the "ABL Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "ABL Credit Agreement"; the obligations thereunder and under the other ABL Loan Documents, the "ABL Secured Obligations"; and the liens and security interests granted in connection therewith, including under the Interim DIP Order and Final DIP Order, the "ABL Liens,") (the "ABL Facility"). |
| **Prepetition Cayman Notes** | That certain Indenture, dated as of May 12, 2023, by and among At Home Cayman, as the Issuer (as defined therein) (the "Cayman Notes Issuer"), the Guarantors party thereto, and Wilmington Trust, National Association, as Trustee and as Notes Collateral Agent (each, as defined therein) (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "Cayman Note Indenture"; the notes issued with respect thereto, the "Cayman Notes"; the obligations thereunder and under the applicable Notes Documents, the "Cayman Note Secured Obligations"; each holder of the Cayman Secured Notes Obligations (a "Cayman Holder"); and the liens and security interests granted in connection therewith, the "Cayman Note Liens"). |
| **Prepetition Intercompany Note Facility** | That certain Intercompany Note, dated as of May 12, 2023, by and among At Home Group Inc., as the Company, the Guarantors party thereto from time to time, At Home Cayman (the "Intercompany Note Holder") and Delaware Trust Company, as the Administrative Agent and Intercompany Note Collateral Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Intercompany Note"; the obligations thereunder and under the Intercompany Note Documents (as defined therein), the "Intercompany Note Secured Obligations"; the holders |

| | |
|---|---|
| | of the Intercompany Note Secured Obligations (the "Intercompany Note Holders"); and the liens and security interests granted in connection therewith, the "Intercompany Note Liens")) (the "Intercompany Note Facility").  On and after the Closing Date, the Intercompany Note Secured Obligations shall be deemed repaid on a dollar-for-dollar basis with the "roll up" of Cayman Note Secured Obligations into Tranche B DIP Loans as set forth herein. |
| **Prepetition Term Loan Facility** | That certain Term Loan Credit Agreement, dated as of July 23, 2021, among the Debtors party thereto, each of the other loan parties party thereto, Wilmington Trust, National Association (as successor to Bank of America, N.A.), in its capacity as administrative agent and collateral agent (in such capacities, the "Term Loan Agent"), and the lenders party thereto from time to time (collectively, the "Term Loan Lenders", and together with the Term Loan Agent and the other secured parties under the Term Loan Agreement and the other Loan Documents (as defined therein), collectively, the "Term Loan Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Term Loan Agreement"; the obligations thereunder and under the applicable Loan Documents, the "Term Loan Secured Obligations"; and the liens and security interests granted in connection therewith, the "Term Loan Liens") (the "Term Loan Facility"). |
| **Prepetition 4.875% Secured Notes** | That certain Indenture, dated as of July 12, 2021, by and among At Home Group Inc., as the Issuer (as defined therein), the Guarantors party thereto, and U.S. Bank Trust Company National Association, as Trustee and as Notes Collateral Agent (each, as defined therein) (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "4.875% Secured Notes Indenture"; the  notes issued with respect thereto, the "4.875% Secured Notes"; the obligations thereunder and under the applicable Notes Documents (as defined therein), the "4.875% Secured Notes Obligations"; the liens and security interests granted in connection therewith, the "4.875% Secured Note Liens"; and the holders of the 4.875% Secured Notes Obligations, the "4.875% Notes Secured Parties"). |
| **Prepetition Exchange Notes Facility** | That certain Indenture, dated as of May 12, 2023, by and among At Home Group Inc., as the Company, the Guarantors party thereto from time to time, and Wilmington Trust, National Association, as Trustee and as Notes Collateral Agent (each as defined therein) (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "Secured Exchange Notes Indenture"; the notes issued with respect thereto, the "Secured Exchange Notes"; the obligations thereunder and under the applicable Notes Documents (as defined therein), the "Secured Exchange Notes Obligations"; the liens and security interests granted in connection therewith, the "Secured Exchange Notes Liens"; and the holders of the Secured Exchange Notes Obligations, the "Exchange Notes Secured Parties"). |

6

| | |
|---|---|
| **Pari First Lien Secured Parties** | "Pari First Liens" shall mean collectively, the Term Loan Liens, the 4.875% Secured Notes Liens, the Secured Exchange Notes Liens, the Cayman Note Liens and the Intercompany Note Liens. |
| | "Pari First Lien Agents" means the Pari First Lien Collateral Agents, the Term Loan Agent, and each trustee in respect of each of the 4.875% Secured Notes, the Secured Exchange Notes, the Cayman Note and the Intercompany Note. |
| | "Pari First Lien Collateral" means all assets subject to the Pari First Liens. |
| | "Pari First Lien Collateral Agents" means Wilmington Trust, National Association (as successor to Bank of America, National Association), in its capacity as Term Loan Collateral Agent, U.S. Bank Trust Company National Association, in its capacity as Notes Collateral Agent in respect of the 4.875% Secured Notes, Wilmington Trust, National Association, in its capacities as Notes Collateral Agent in respect of the Secured Exchange Notes and the Trustee and Collateral Agent in respect of the Cayman Notes and Delaware Trust Company, as the Administrative Agent and Intercompany Note Collateral Agent in respect of the Intercompany Notes. |
| | "Pari First Lien Debt Documents" means the "Loan Documents" (as defined in the Term Loan Agreement), the "Notes Documents" (as such term is defined in each of the indenture governing the 4.875% Secured Notes, the Secured Exchange Notes and the Cayman Notes), the "Intercompany Note Documents" (as defined in the Intercompany Note). |
| | "Pari First Lien Obligations" shall mean collectively, the Term Loan Obligations, the 4.875% Secured Notes Obligations, the Secured Exchange Notes Obligations, the Cayman Note Secured Obligations and the Intercompany Note Secured Obligations. |
| | "Pari First Lien Secured Parties" shall mean collectively, the Term Loan Secured Parties, the 4.875% Notes Secured Parties, the Exchange Notes Secured Parties, Cayman Note Holder and the Intercompany Note Holder. |
| **Existing Intercreditor Agreements** | (i) That certain ABL Intercreditor Agreement, dated as of July 23, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Bank of America, N.A. (or any successor thereof, as applicable), as ABL Credit Agreement Agent, as Equal Priority Collateral Agent and Intercreditor Agent (each, as defined therein) Wilmington Trust, National Association (as successor to Bank of America, N.A.), as administrative agent and collateral agent under the Term Loan Agreement, U.S. Bank Trust Company National Association, as Notes Trustee and Notes Collateral Agent (each, as defined therein), Ambience Intermediate, Inc., as Holdings (as defined therein), Ambience Merger Sub Inc., as the Initial Borrower (as defined therein), At Home Group, Inc., as the Borrower (as defined therein), and the Subsidiaries of the Borrower party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "ABL-Fixed Asset Intercreditor Agreement") and (ii) that certain Equal Priority Intercreditor Agreement, dated as of July 23, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Wilmington Trust, National Association (as successor to Bank of America, National Association), as collateral agent under the Term Loan Agreement, U.S. Bank Trust Company National Association, as Notes Collateral Agent (as defined therein), |

| | Ambience Intermediate, Inc., as Holdings (as defined therein), Ambience Merger Sub, Inc., the Initial Borrower (as defined therein), and At Home Group, Inc., as the Borrower (as defined therein) (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Equal Priority Intercreditor Agreement" and together with the ABL-Fixed Asset Intercreditor Agreement, the "Existing Intercreditor Agreements"). |
| --- | --- |
| | As used herein, (i) "ABL Priority Collateral" means assets of the Debtors of the type constituting ABL Priority Collateral (as defined in the ABL-Fixed Asset Intercreditor Agreement) including all proceeds of section 549 actions and other avoidance actions related to ABL Priority Collateral and the ABL True Up Account and amounts therein (but, for the avoidance of doubt, excluding proceeds of the DIP Facility in the DIP Proceeds Account) and (ii) "ABL Collateral" means all assets of the Debtors that are subject to any ABL Lien. |
| **DIP Facility Provisions** | |
| **Use of Proceeds; Budget** | Proceeds of the Tranche A DIP Loans made under the DIP Facility will be used solely to the extent set forth in the Approved Budget for: (i) general corporate and working capital purposes, in accordance with the Approved Budget; (ii) costs of the administration of the Debtors' Bankruptcy Cases, including to pay professional fees and expenses; (iii) payment of transaction costs, fees and expenses with respect to the DIP Facility, including reasonable and documented fees and expenses of legal and other professional advisors to the DIP Lenders and DIP Agent; and (iv) to pay obligations arising from or related to the Carve-Out (as defined below). |
| | The initial budget shall consist of forecasted receipts and disbursements of the Debtors on a line-item basis for the 13-weeks commencing on the Closing Date, which initial budget shall be satisfactory to the Required DIP Lenders (the "Initial Approved Budget"), and updated by Thursday of every 4 weeks thereafter (each, an "Approved Budget"; provided that, for the avoidance of doubt, any budget delivered by the Debtors that is not in form and substance satisfactory to the Required DIP Lenders shall not be an Approved Budget for any purpose hereunder), provided further that, neither the Initial Approved Budget nor any subsequent Approved Budget shall be modified in any manner without the prior written consent of the Required DIP Lenders; provided further that once deemed an Approved Budget, such Approved Budget shall remain the 'Approved Budget' in effect with respect to the period covered by such Approved Budget until the Required DIP Lenders approve a supplemental proposed budget (a "Proposed Budget") submitted for approval. The Required DIP Lenders will use commercially reasonable efforts to, within five (5) Business Days of their receipt of a Proposed Budget, inform the Debtors whether such Proposed Budget is acceptable to the Required DIP Lenders. |
| **Permitted Prior Liens** | "Permitted Prior Liens" means any valid liens ("Permitted Prior Liens") that are (i) in existence on the Petition Date, (ii) either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the |

| | |
|---|---|
| | Bankruptcy Code, (iii) senior in priority to the Pari First Liens or ABL Liens, as applicable, and (iv) permitted to be incurred, as applicable, under the Pari First Lien Debt Documents or the ABL Loan Documents. |
| **DIP Collateral and Priority** | Subject to the lien priorities set forth on Annex I hereto (including the Carve-Out (as attached hereto as Annex II, the "Carve Out")) and any Permitted Prior Liens, as security for the prompt payment and performance of all amounts due under the DIP Facility, including, without limitation all DIP Obligations, effective as of the Petition Date, the DIP Agent, for the benefit of itself and the DIP Lenders, shall be granted automatically and properly perfected liens and security interests ("DIP Liens") in all assets and properties of each of the Debtors and their bankruptcy estates, whether tangible or intangible, real, personal or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, including, without limitation, all of the Debtor' rights, title and interests in (w) the DIP Proceeds Account, (x) all ABL Collateral and Pari First Lien Collateral, (y) subject to entry of a Final DIP Order, the proceeds of any claims and causes of action of any Debtors' estate under chapter 5 of the Bankruptcy Code, whether by judgment, settlement or otherwise ("**Avoidance Actions**"); and (z) all products, offspring, profits, and proceeds of any assets subject to such liens and security interests and all accessions to, substitutions and replacements for, and rents, profits and products thereof, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Credit Party from time to time with respect to any of such assets (collectively, the "**DIP Collateral**"); provided, that DIP Collateral shall exclude assets to be mutually agreed among the Debtors and the Required DIP Lenders, but shall include any and all proceeds and products of such excluded assets, unless such proceeds and products otherwise separately constitute excluded assets.

Notwithstanding anything herein to the contrary, the security interest over the DIP Collateral shall be created and perfected by the Interim DIP Order and Final DIP Order, as applicable, and no mortgages or other perfection documentation, including mortgages, control agreements, landlord waivers, foreign law perfection actions or third-party consents or orders, shall be required for the perfection of such security interest in the DIP Collateral; provided, further, the Required DIP Lenders may reasonably require the execution, filing or recording of any or all of the documents described in this sentence and/or the taking of any action so that the DIP Agent obtains possession or control of any collateral.

The DIP Liens shall have the following priorities:

(i) *First Liens on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to valid, perfected and non- |

avoidable liens or security interests in existence as of the Petition Date (or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), including, subject to entry of the Final DIP Order, the proceeds of Avoidance Actions (collectively, "Unencumbered Property"), which DIP Liens shall be subject and subordinate only to the Carve-Out and ABL Liens (solely (i) with respect to ABL Priority Collateral and (ii) to the extent any ABL Obligations remain outstanding).

(ii) *Priming DIP Liens and Liens Junior to Certain Other Liens*. Pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected in all DIP Collateral (other than as described in clause (i) above), which DIP Liens (a) shall be subject and subordinate only to (1) the Carve-Out, (2) Permitted Prior Liens, (3) solely with respect to ABL Priority Collateral, the ABL Liens and the ABL Adequate Protection Liens, in each case, solely to the extent the ABL Obligations remain outstanding, (b) shall be senior to any and all other liens and security interests in DIP Collateral, including, without limitation, all liens and security interests in any DIP Collateral that would otherwise be subject to the Pari First Liens (including, without limitation, any Pari First Lien Adequate Protection Liens) and (c) shall otherwise be subject to the priorities set forth in Annex I attached hereto.

(iii) *Liens Senior to Other Liens*. Except to the extent expressly permitted hereunder, subject to the Carve-Out and Permitted Prior Liens, the DIP Liens shall not be made subject to or *pari passu* with (a) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien or security interest granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (b) any lien or security interest that is avoided or preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (c) any intercompany or affiliate claim, lien or security interest of the Debtors or their affiliates, or (d) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof; *provided* that solely with respect to the ABL Priority Collateral, the DIP Liens and the Superpriority DIP Claims shall have the priority set forth in Annex I hereto.

Subject to entry of the Final DIP Order, the DIP Obligations, at the option of the Required DIP Lenders, to be exercised in their sole discretion, shall be repaid (a) first, from the DIP Collateral comprising Unencumbered Property and (b) second, from all other DIP Collateral.

| | |
|---|---|
| **Adequate Protection** | As adequate protection against the risk of any post-petition diminution in the value of (x) the ABL Collateral and (y) the Pari First Lien Collateral ((x) and (y) collectively, the "<u>Prepetition Collateral</u>"), in each case, which is as a result of, or arises from, or is attributable to, among other things, the imposition of the automatic stay, the use, sale or lease of such Prepetition Collateral, including cash collateral, the granting of priming liens and claims as set forth herein and the imposition of the Carve-Out (any such diminution, "<u>Diminution in Value</u>"), the ABL Secured Parties and the Pari First Lien Secured Parties (together, the "<u>Prepetition Secured Parties</u>") shall be granted the following adequate protection (the "<u>Adequate Protection Obligations</u>"), subject in all cases to the Carve-Out, the Permitted Prior Liens, the Challenge Period (as defined herein) and, to the extent set forth in <u>Annex I</u> attached hereto, the DIP Liens, the Pari First Liens, the ABL Liens and the Superpriority DIP Claims (as defined below):<br><br>(a) The Pari First Lien Secured Parties shall receive the following as adequate protection: (A) to the extent of any Diminution in Value of the Pari First Lien Collateral, the Pari First Lien Collateral Agents shall be granted validly perfected replacement liens on any security interests in all DIP Collateral (the "<u>Pari First Lien Adequate Protection Liens</u>"), which replacement liens shall have the priority set forth on <u>Annex I</u> attached hereto, as applicable; (B) to the extent of any Diminution in Value of the Pari First Lien Collateral, a superpriority administrative expense claim under section 503(b) of the Bankruptcy Code with the priority set forth in section 507(b) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claim shall (i) have priority over any and all other claims against the Debtors and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code (other than the Carve-Out) (the "<u>Pari First Lien 507(b) Claims</u>"), and (ii) be subject to the priorities set forth on <u>Annex I</u> attached hereto, as applicable; and (C) the payment of the reasonable and documented out-of-pocket fees and expenses of each of the Pari First Lien Agents and the Ad Hoc Group;<br><br>(b) The ABL Secured Parties, shall receive the following adequate protection: (A) to the extent of any Diminution in Value of the ABL Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "<u>ABL Adequate Protection Liens</u>" and together with the Pari First Lien Adequate Protection Liens, the "<u>Adequate Protection Liens</u>"), which replacement liens shall have the priority set forth on <u>Annex I</u> attached hereto, as applicable; (B) to the extent of any Diminution in Value of the ABL Collateral, a superpriority administrative expense claim under section 503(b) of the Bankruptcy Code with the priority set forth in section 507(b) of the Bankruptcy Code against each of the Credit Parties, on a joint |

and several basis, which claim shall (i) have priority over any and all other claims against the Credit Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code (other than the Carve-Out) (the "ABL 507(b) Claims" and, together with the Pari First Lien 507(b) Claims, the "507(b) Claims")), and (ii) be subject to the priorities set forth on Annex I attached hereto, as applicable; (C) payment of accrued but unpaid post-petition interest in cash at the non-default rate as the same becomes due and payable under the ABL Credit Agreement; (D) the payment of the reasonable and documented out-of-pocket fees and expenses of a single law firm as counsel (together with applicable local counsel) to the ABL Agent; (E) copies of any financial reports (including the bi-weekly delivery of a rolling 13 week cash flow, budget, and supporting information and Borrowing Base Certificate) to the ABL Agent with copies to aforementioned counsel and advisors to the extent otherwise provided to the DIP Lenders; (F) (x) validly perfected liens in the ABL True Up Account (as defined below), and (y) the benefit of the ABL True Up (as defined below); and (G) delivery of Borrowing Base Certificates on a weekly basis.

The ABL Secured Parties shall also receive such other adequate protection and other protections acceptable to the Debtors and the Required DIP Lenders as are set forth in the DIP Orders.

| | |
|---|---|
| | The DIP Order shall provide for the following ABL True Up mechanism:<br><br>If the Debtor delivers a Borrowing Base Certificate (as defined in the ABL Credit Agreement and consistent with the terms hereof) to the DIP Agent and ABL Agent that provides a Post-Petition Borrowing Base (as defined below) that is less than the sum of the aggregate principal amount of loans and the face amount of letters of credit outstanding under the ABL Facility at such time and the "Minimum Availability Threshold" (as defined in the ABL Credit Agreement) (a "<u>True Up Event</u>," and the amount of such shortfall, the "<u>Borrowing Base Shortfall</u>"), the Debtors shall, by the end of the second business day thereafter, deposit cash in an amount equal to the Borrowing Base Shortfall (the "<u>ABL True Up</u>") into a controlled segregated reserve account maintained by the ABL Agent (the "<u>ABL True Up Account</u>"), with all funds held in the ABL True Up Account deemed ABL Priority Collateral and subject to all liens on ABL Priority Collateral in the same priority set forth in <u>Annex I</u>, *provided that* the Post-Petition Borrowing Base shall be adjusted on a dollar-for-dollar basis by the amount of cash then held in the ABL True Up Account which shall be reflected in each Borrowing Base Certificate. The Debtors may withdraw cash from the ABL True Up Account at any time by delivering an updated Borrowing Base Certificate to the DIP Agent and the ABL Agent along with an officer's certificate certifying that following such withdrawal no True Up Event shall be in effect. |
| **DIP Proceeds Account** | All proceeds of the DIP Facility shall be deposited into a deposit account maintained at a bank acceptable to the Required DIP Lenders (which account shall not be maintained with the ABL Agent) (such Account, the "<u>DIP Proceeds Account</u>").  Subject to the Carve Out, all proceeds of the DIP Facility shall be held by the Debtors in the DIP Proceeds Account, and shall not be transferred to the Debtors' operating account, until such proceeds are required by the Debtors to be disbursed in accordance with the applicable Approved Budget. Subject to the Carve Out, as long as the value of unrestricted cash of the Debtors (excluding any cash deposited in the DIP Proceeds Account) at any time is in excess of $35,000,000, the Debtors shall use such unrestricted cash to satisfy the payments approved in the applicable Approved Budget prior to the use of any proceeds of the DIP Facility held in the DIP Proceeds Account.  For the avoidance of doubt, any funds held in the ABL True Up Account shall not be considered unrestricted cash. |
| **Post-Petition Borrowing Base** | The DIP Order shall provide that any borrowing base for the ABL Facility (or any successor asset-based lending facility) of the Debtors post-petition shall be based on and calculated consistently with the "Borrowing Base" as defined in the ABL Credit Agreement on the date hereof and as set forth initially in the most recent Borrowing Base Certificate delivered prior to the Petition Date and thereafter in the most recent Borrowing Base Certificate delivered prior to any such date of determination (the "<u>Post-Petition Borrowing Base</u>").  For the avoidance of doubt, the Post-Petition Borrowing Base shall not reflect any new or increased reserves or any modifications of eligibility criteria or advance rates, subject to increase on account of seasonal advance rates in accordance with the ABL Credit Agreement, unless permitted by the DIP Orders. |

| | |
|---|---|
| **Superpriority DIP Claims** | All of the claims of the DIP Agent and DIP Lenders under the DIP Facility shall, subject to the Carve-Out and to the rights of the ABL Secured Parties with respect to ABL Priority Collateral (in each case, to the extent the ABL Obligations remain outstanding), be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having a superpriority over any and all administrative expenses of the kind that are specified in, or contemplated by, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code (collectively, the "<u>Superpriority DIP Claims</u>"). |
| **Carve-Out** | See Annex II. |
| **Prohibited Actions** | No portion of the Carve-Out or the DIP Collateral (each as defined above) or the proceeds thereof may be used directly or indirectly for any of the following: (a) in connection with the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties (as defined in the Interim DIP Order), the Pari First Lien Secured Parties, the ABL Secured Parties or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, in each case in their respective capacity as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, Superpriority DIP Claims, Pari First Lien Obligations, the Pari First Liens, the ABL Obligations, the ABL Liens and/or the Adequate Protection Obligations and Adequate Protection Liens granted under the DIP Orders, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Pari First Lien Obligations, the ABL Obligations and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations, the Pari First Lien Obligations or the ABL Obligations granted under the Interim DIP Order, the Final DIP Order, the DIP Loan Documents, or the applicable Pari First Lien Debt Documents or ABL Loan Documents, including, in the case of each of (i) and (ii), without limitation, any claims or challenges relating to the allocation of value as between encumbered or unencumbered assets of the Debtors or claims alleged for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) except for the right of the Debtors and the Committee (as defined in the Interim DIP Order) to contest whether a DIP Event of Default (as defined in the Interim DIP Order) has occurred and/or is continuing during the Remedies Notice Period, to prevent, hinder, or otherwise delay or interfere with the Pari First Lien Secured Parties', the DIP Agent's, or the DIP Lenders', as applicable, enforcement or realization on the Pari First Lien Obligations, Pari First Lien Collateral, DIP Obligations, DIP Collateral, the Adequate Protection Obligations and Adequate Protection Liens and the liens, claims and rights granted to such parties under the Interim DIP Order each in accordance with the DIP Loan Documents, the applicable Pari First Lien Debt Documents and the DIP Orders; (c) to seek to subordinate, recharacterize, disallow, or avoid any of the DIP Obligations, Pari First Lien Obligations or the ABL Obligations; (d) to seek to modify any of the rights and remedies granted to the Pari First Lien Secured Parties, the DIP Agents, or the DIP |

| | |
|---|---|
| | Lenders under the Interim DIP Order, the Pari First Lien Debt Documents or the DIP Loan Documents, as applicable; (e) to apply to the Bankruptcy Court for authority to approve superpriority claims or grant liens or security interests in the DIP Collateral or any portion thereof that are, in each case, senior to, or on parity with, the DIP Liens, Superpriority DIP Claims, Adequate Protection Liens and Adequate Protection 507(b) Claims granted to the Pari First Lien Secured Parties; (f) make any payment in respect of Committee Professionals in excess of the amounts set forth in the Initial Approved Budget or (g) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are included in the Approved Budget, approved or authorized by the Bankruptcy Court, agreed to in writing by the Required DIP Lenders, expressly permitted under the Interim DIP Order or permitted under the DIP Loan Documents (including the Approved Budget (subject to the Prohibited Variances)), in each case unless all DIP Obligations, Pari First Lien Obligations, Adequate Protection Obligations and claims granted to the DIP Agent, DIP Lenders or the Pari First Lien Secured Parties under the Interim DIP Order, have been refinanced or paid in full in cash or otherwise agreed to in writing by the Required DIP Lenders.<br><br>Notwithstanding the above, the Committee may use the proceeds of the DIP Collateral to investigate but not to prosecute (A) the claims and liens of the Pari First Lien Secured Parties and the ABL Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Pari First Lien Secured Parties and the ABL Secured Parties, in each case, subject to an aggregate cap of no more than $75,000. |
| **Conditions Precedent** | The DIP Loan Documents shall contain usual and customary conditions for transactions of this type (the first date on which all of such conditions to effectiveness of the DIP Facility shall have been satisfied, or waived by the Required DIP Lenders, being the "<u>Closing Date</u>"), including, without limitation:<br><br>i.   as conditions precedent to effectiveness of the DIP Facility:<br><br>    a.  the DIP Credit Agreement and all DIP Loan Documents required to be executed by the Closing Date shall have been duly executed and delivered to the DIP Agent and the DIP Lenders;<br><br>    b.  a DIP Order shall have been entered, in form and substance acceptable to the Required DIP Lenders and the Debtors, approving the DIP Facility, including the "roll up" of Pari First Lien Obligations as set forth herein;<br><br>    c.  the DIP Lenders shall have (i) received a Proposed Budget and (ii) confirmed that such Proposed Budget is satisfactory to the Required DIP Lenders, deeming such Proposed Budget an Approved Budget;<br><br>    d.  no Tariff Event shall have occurred;<br><br>    e.  no default or Event of Default shall have occurred and be continuing; |

|  |  |
|---|---|
|  | f.    each of the representations and warranties shall be true and correct in all material respects on the Closing Date (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date); and<br><br>g.    all DIP Professional Fees for which the Debtors have received an invoice shall have been paid or will be paid concurrently with the proceeds of loans under the DIP Facility on the Closing Date to the extent invoiced at least one (1) Business Day prior to the Closing Date.<br><br>ii.    as conditions precedent to each subsequent drawing (with a maximum of one (1) draw per calendar week in an amount no less than $25.0 million):<br><br>a.    the DIP Lenders shall have received a borrowing request consistent with the Approved Budget;<br><br>b.    all representations and warranties under the DIP Loan Agreement shall be true and correct in all material respects (without any repetition of materiality qualifiers included therein) as of the date hereof (or, if relating to an earlier time, as of such earlier time);<br><br>c.    all Milestones required to be satisfied as of such date have been satisfied;<br><br>d.    no Tariff Event shall have occurred;<br><br>e.    no Prohibited Variance or Prohibited Professional Fee Variance shall have occurred;<br><br>f.    no default or Event of Default shall have occurred and be continuing;<br><br>g.    all DIP Professional Fees for which the Debtors have received an invoice shall have been paid or will be paid concurrently with the proceeds of such drawing to the extent invoiced at least one (1) Business Day prior to the date of such drawing; and<br><br>h.    there shall have been no Material Adverse Effect (as defined below). |
| **Representations and Warranties** | The DIP Loan Documents shall contain usual and customary representations and warranties for transactions of this type to be made by the Debtors as of the date they execute the DIP Loan Documents, and as of the date of any borrowing under the DIP Facility, subject to qualifications, disclosure schedules and limitations for materiality to be mutually agreed-upon, and shall include without limitation: valid existence and good standing; requisite power, due authorization and validity; no conflict with post-petition agreements, orders or applicable law; governmental consents; enforceability of DIP Loan Documents; accuracy of financial statements, projections, budgets and all other information provided; absence of Material Adverse Effect (since the Closing Date); no default or Event of Default under the DIP Loan Documents; absence of material unstayed litigation and contingent |

16

| | |
|---|---|
| | obligations; payment of taxes and other material post-petition obligations; subsidiaries; ERISA, pension and benefit plans; absence of other liens on assets (other than permitted liens); ownership of assets and necessary rights to intellectual property; insurance; inapplicability of Investment Company Act; environmental matters; use of proceeds; compliance with anti-corruption laws, margin regulations, the Patriot Act, environmental laws and sanctions; labor laws; and validity, priority and perfection of liens and security interests in the DIP Collateral. <br><br> "<u>Material Adverse Effect</u>" shall mean a circumstance or condition that would, individually or in the aggregate, materially and adversely affect (a) the business, assets, financial condition or results of operations of the Debtors (taken as a whole), (b) the ability of the Debtors, taken as a whole, to perform their obligations under the DIP Loan Documents, (c) the ability of the DIP Agent and the DIP Lenders (taken as a whole) to exercise their rights and remedies under the DIP Loan Documents, (d) the validity or enforceability of any DIP Loan Document or the validity, enforceability or collectability of any DIP Loan, or (e) the status, existence, perfection, priority of enforceability of the DIP Agent's security interests in and liens on the DIP Collateral. |
| **Mandatory Prepayments** | In addition to other customary mandatory prepayment provisions for transactions of this type and, other than with respect to ABL Priority Collateral (in each case, to the extent the ABL Obligations remain outstanding), and unless otherwise agreed to by the Required DIP Lenders, the Debtors shall, within five (5) Business Days of the receipt thereof, offer (which such offer, for the avoidance of doubt, may be rejected by each DIP Lender in their sole discretion) to prepay the outstanding principal amount of DIP Loans in an amount equal to (i) 100% of the net cash proceeds from the non-ordinary course sale or disposition of any DIP Collateral, and sales of subsidiaries; (ii) 100% of the net cash proceeds from incurrence of indebtedness or issuance of equity, (iii) 100% of insurance proceeds, including condemnation and similar proceeds unless reinvested in the business on terms to be mutually agreed (including an aggregate cap on the amount to be reinvested); and (iv) other extraordinary receipts not provided for or assumed in the Approved Budget, including any proceeds recovered from litigation settlements; <u>provided</u>, that, at the option of the Required DIP Lenders, each such mandatory prepayment under clauses (i), (ii), (iii) or (iv) above may take the form of an immediate dollar-for-dollar permanent reduction in the DIP Loan Commitment in lieu of such mandatory prepayment. <br><br> Proceeds from any mandatory prepayment shall first be applied toward the repayment of the Tranche A DIP Loans on a pro rata basis and then to the repayment of the Tranche B DIP Loans on a pro rata basis. |
| **Voluntary Prepayments** | Permitted, in whole only, subject to limitations as to minimum amounts, without premium or penalty. Proceeds from any voluntary prepayment shall first be applied toward repayment of the Tranche A DIP Loans on a pro rata basis and then to the repayment of the Tranche B DIP Loans on a pro rata |

| | |
|---|---|
| | basis. For the avoidance of doubt, no partial voluntary prepayment of the DIP Loans shall be permitted. |
| **Affirmative Covenants** | The DIP Loan Documents shall contain the following affirmative covenants: delivery of monthly, quarterly and annual financial statements (along with compliance certificates, if applicable) and Borrowing Base Certificates as and when delivered to the ABL Agent; budgets and variance reports in accordance herewith; other information reasonably requested from time to time by any DIP Lender; payment of post-petition obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws; payment of taxes; use of proceeds; further assurances; location of collateral; good repair; additional collateral and guarantors; maintenance of property in present condition and maintenance of insurance; maintenance of books and records; right of the DIP Lenders and DIP Agent to inspect property and books and records (including periodic field examinations and inventory, equipment and real estate appraisals); delivery of bankruptcy documents; notices of defaults, litigation and other material events; compliance with laws, including ERISA and environmental laws; Milestones; bi-weekly lender calls; and use of proceeds (subject to exceptions to be negotiated in good faith between the parties). |
| **Negative Covenants** | The DIP Loan Documents shall contain the following negative covenants: the Debtors shall not (other than pursuant to certain exceptions set forth in the DIP Loan Documents): incur indebtedness (including guarantee obligations); incur liens; merge, consolidate, liquidate, dissolve or make other fundamental changes; sell assets; make restricted payments (including dividends and other payments in respect of capital stock); make investments (including acquisitions), loans and advances; enter into sale and leaseback transactions; enter into swap agreements; making optional payments and entering into modifications of subordinated and other debt instruments; transactions with affiliates; changes in fiscal year; negative pledge clauses; passive holding company; and amendment of material documents. |
| **Tariff Event** | If import tariffs announced by the United States on jurisdictions material to the Debtors' business increase to a level higher than the levels that are in effect on the date hereof (disregarding, for purposes of calculating tariff levels on the date hereof, any announced increases as of the date hereof), the Debtors, within 5 days of any such announcement, will provide to the DIP Lenders, revisions to the Debtors' Business Plan (as defined below) (each such revised business plan, a "<u>Revised Business Plan</u>"), with such revisions limited solely to the projected tariff impacts to Adjusted EBITDA that would result from the announced tariff increases (otherwise holding constant all other assumptions from the Business Plan), and such revisions shall not result in declines in Adjusted EBITDA (calculated in the same manner as calculated in the Business Plan) in the Revised Business Plan of greater than $13,000,000 for the fiscal year 2026 or greater than $15,000,000 for the fiscal year 2027 as compared to the Business Plan (any such decline in excess of such threshold, a "<u>Tariff Event</u>").  The Debtors and their professional advisors shall consult in good faith with designated representatives of the DIP Lenders and the DIP Lenders' financial advisors in connection with preparation of the Revised Business Plan. |

| | |
|---|---|
| | "Business Plan" means the long term business plan delivered to the DIP Lenders on June 8, 2025. |
| **Budget Variance Report and Testing** | Commencing on the second Friday after the Closing Date, and on each Friday thereafter (or the next business day if such Friday is not a business day), the Debtors shall deliver to the DIP Agent a variance report for the immediately preceding Variance Period[2] comparing the actual cash receipts and cash disbursements of the Debtors, during such Variance Period, on a line-item basis, from the values set forth in the Approved Budget (each, a "Budget Variance Report")  with an explanation of each Prohibited Variance (as defined below) and each Prohibited Professional Fee Variance (as defined below), if any, accompanied by an officer's certificate attesting to the truth and accuracy of such Budget Variance Report.  The Borrower and each other Credit Party shall not permit (i) (1) (x) actual "Total Receipts" for the initial Variance Period (which, for avoidance of doubt shall end on the second Friday after the Closing Date (the "Initial Variance Period")) to be less than 82.5% of forecasted "Total Receipts" set forth in the Approved Budget for such Variance Period and (y) actual "Total Operating Disbursements" to be more than 117.5% of forecasted "Total Operating Disbursements" set forth in the Approved Budget for the Initial Variance Period and (2) (x) actual "Total Receipts" for the each Variance Period after the Initial Variance Period to be less than 87.5% of forecasted "Total Receipts" set forth in the Approved Budget for such Variance Period and (y) actual "Total Operating Disbursements" to be more than 112.5% of forecasted "Total Operating Disbursements" set forth in the Approved Budget for the each Variance Period after the Initial Variance Period (any such variance, a "Prohibited Variance"); *provided* that, for the avoidance of doubt, "Total Operating Disbursements" shall exclude Restructuring Professional Fees[3] and fees payable to Hilco Real Estate, LLC and any advisor to the DIP Lenders; and (ii) actual "Total Professional Fee Cash Payment"[4] since the Closing Date to the date of such Budget Variance Report to be more than 110% of forecasted "Total Professional Fee Cash Payment" set forth in the Initial Approved Budget through the date of such Budget Variance Report (any such variance, a "Prohibited Professional Fee Variance," *provided* that neither the Approved Budget nor any Prohibited Professional Fee Variance will operate as a cap on the Debtors' professional fees).  Until replaced by an updated Approved Budget, the prior Approved Budget shall remain in effect. |

---

[2]     "Variance Period" shall mean each rolling cumulative four-week period; provided that  with respect to any Variance Period that would commence prior to the Closing Date, such Variance Period shall only include the period of time from and after the Closing Date.

[3]     "Restructuring Professional Fee" shall mean the Debtors' projected or actual (as the case may be) disbursements in respect of restructuring professional fees (including, without limitation, payments made to the secured parties on account of professional fees and professional fee payments to other creditors or creditor groups) during the applicable Variance Period.

[4]     "Total Professional Fee Cash Payment" shall mean the aggregate payments made to all professionals cases included in the line item having same name in the Initial Approved Budget; *provided* that (x) any payments made to Hilco, any advisor to the DIP Lenders, and (y) any payments made to professionals retained by the Debtors pursuant to the [OCP Motion], in each case, shall not be included in Total Professional Fee Cash Payment.

| Milestones | The DIP Loan Documents shall contain the following milestones (collectively, the "<u>Milestones</u>") related to the Bankruptcy Cases which may be extended in writing (email from counsel being sufficient) by an agreement among the Required DIP Lenders and the Debtors: |
|---|---|
|  | i. the Debtors shall commence the Bankruptcy Cases in the Bankruptcy Court no later than June 16, 2025 (the "<u>Petition Date</u>"); |
|  | ii. on or prior to the Petition Date, the Debtors' board shall have approved a restructuring support agreement (the "<u>RSA</u>") that contemplates the filing of an Acceptable Plan and sets forth the key terms of such Acceptable Plans; |
|  | iii. the Debtors shall file a motion seeking approval of the DIP Facility on or about the Petition Date; |
|  | iv. the Debtors shall file an Acceptable Plan with an associated Disclosure Statement no later than twenty-one (21) days after the Petition Date; |
|  | v. the Interim DIP Order, in form and substance reasonably acceptable to the Required DIP Lenders and DIP Agent, approving the DIP Facility on an interim basis (the "<u>Interim DIP Order</u>") shall be entered in the Bankruptcy Cases no later than five (5) business days after the Petition Date; |
|  | vi. the Final DIP Order, in form and substance reasonably acceptable to the Required DIP Lenders and DIP Agent, approving the DIP Loan Documents attached thereto on a final basis shall be entered in the Bankruptcy Cases by no later than thirty-five (35) days after the Petition Date; |
|  | vii. an order (the "<u>Disclosure Statement Order</u>") approving a disclosure statement, which disclosure statement shall be reasonably acceptable to the Required DIP Lenders, for an Acceptable Plan, shall be entered in the Bankruptcy Cases by no later than thirty-eight (38) days after the filing of an Acceptable Plan; |
|  | viii. an order (the "<u>Confirmation Order</u>") confirming an Acceptable Plan, shall be entered in the Bankruptcy Cases by no later than sixty (60) days after entry of the Disclosure Statement Order; and |
|  | ix. such confirmed Acceptable Plan shall become effective by no later than fourteen (14) days after entry of the Confirmation Order. |
|  | The Debtors shall use commercially reasonably efforts to provide the DIP Lenders with any information or materials reasonably requested by the DIP Lenders in connection with the Debtors' progress on achieving any Milestone. |
|  | The Debtors shall use commercially reasonable efforts to provide the DIP Lenders and DIP Agent with drafts of all material pleadings (together with proposed orders attached thereto, as applicable), which, for the avoidance of doubt, shall not include any professional retention applications, fee applications, and/or monthly operating reports, to be filed in the Bankruptcy |

| | |
|---|---|
| | Cases, before filing and, to the extent practicable, with reasonable time for the DIP Lenders and DIP Agent to comment thereon, and such material pleadings shall not be materially inconsistent with the terms of this DIP Term Sheet or the DIP Loan Documents. All orders the Debtors submit to the Bankruptcy Court shall be consistent with the Approved Budget and the DIP Orders.<br><br>"Acceptable Plan" means a chapter 11 plan in form and substance reasonably acceptable to the Required DIP Lenders, which plan shall provide for (a) releases and indemnification for the DIP Lenders to the maximum extent permitted by applicable law and (b) the repayment of the DIP Obligations held by each DIP Lender (x) in full in cash or (y) with such other treatment as set forth in the RSA and acceptable to the Required DIP Lenders. |
| **Documentation Principles** | The DIP Facility will be evidenced by (a) a credit agreement, in form and substance satisfactory to the Required DIP Lenders and the Debtors (the "DIP Credit Agreement"), which shall be based on the Term Loan Agreement with (but not limited to) the modifications described herein, (b) an interim order entered by the Bankruptcy Court approving the DIP Facility and authorizing use of Debtors' cash collateral on an interim basis, in form and substance satisfactory to the Required DIP Lenders and the Debtors (the "Interim DIP Order"), (c) a final order entered by the Bankruptcy Court approving the DIP Facility on a final basis and authorizing use of Debtors' cash collateral, in form and substance satisfactory to the Required DIP Lenders and the Debtors (the "Final DIP Order", and together with the Interim DIP Order, the "DIP Orders") and (d) as applicable, the related notes, security agreements, collateral agreements, pledge agreements, control agreements, guarantees, mortgages, the fee letters and other legal documentation or instruments required by the DIP Lenders to be delivered in connection with the foregoing (which shall, to the extent applicable, be based on the corresponding documentation entered into in connection with the Term Loan Facility), in each case, in form and substance satisfactory to the Required DIP Lenders and the Debtors (together with the DIP Credit Agreement and the DIP Orders, collectively, the "DIP Loan Documents").<br><br>The DIP Loan Documents shall be consistent with this Term Sheet and shall contain such other terms and conditions as are usual and customary for transactions of this type. |
| **Events of Default** | The DIP Loan Documents shall contain the following events of default (any such event, an "Event of Default"), subject to customary cure provisions: (i) nonpayment of DIP Obligations (including, without limitation, all principal, interest and fees); (ii) non-performance of covenants and obligations under the DIP Credit Agreement and other DIP Loan Documents, with customary grace periods for certain affirmative covenants; (iii) cross default on other material post-petition funded indebtedness in excess of $10 million (other than any indebtedness the payment of which is stayed as a result of the filing of the Chapter 11 Cases); (iv) inaccuracy of any representation or warranty in any material respect when made; (v) the Debtors, directly or indirectly, contesting, delaying, impeding or taking any other action, (including the commencement by or on behalf of the Debtors of an avoidance action or other legal proceeding seeking any of the following relief or seeking the |

entry of any order by the Bankruptcy Court or any other court with appropriate jurisdiction) objecting, challenging, invalidating, avoiding, subordinating, disallowing, recharacterizing or limiting in any respect, as applicable, either (a) the enforceability, extent, priority, characterization, perfection, validity or non-avoidability of any of the liens securing the DIP Obligations or (b) the validity, enforceability, characterization or non-avoidability of any of the DIP Obligations; (vi) entry by the Bankruptcy Court of an order (a) directing the appointment of an examiner with expanded powers or a chapter 11 trustee without the prior written consent of the Required DIP Lenders (but not including the appointment of a fee examiner to assist in reviewing applications for compensation by professionals), (b) converting the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing the Bankruptcy Cases, or (d) terminating or modifying the exclusive right of the Debtors to file a plan under section 1121 of the Bankruptcy Code; (vii) any Prohibited Variance shall have occurred; (viii) any breach by the Debtors of any obligation under any DIP Order shall have occurred; (ix) the filing of a chapter 11 plan by the Debtors that is not an Acceptable Plan except a plan that repays the DIP Obligations in full in cash on the effective date of such plan; (x) an Acceptable Plan is withdrawn or modified in any respect without the prior written consent of the Required DIP Lenders except in favor of an alternative plan or transaction that repays the DIP Obligations in full in cash on the effective date of such plan; (xi) the failure to meet any of the Milestones without the written consent of the Required DIP Lenders; (xii) any of the Debtors filing a pleading seeking to vacate or modify any DIP Order over the objection of the Required DIP Lenders; (xiii) the entry of an order without the prior consent of the Required DIP Lenders amending, supplementing or otherwise modifying any DIP Order; (xiv) reversal, vacation or stay of the effectiveness of any DIP Order without the written consent of the Required DIP Lenders; (xv) any sale of all or substantially all assets of the Debtors pursuant to section 363 of the Bankruptcy Code, unless (a) the proceeds of such sale indefeasibly satisfy the DIP Obligations in full in cash and (b) such sale is supported by the Required DIP Lenders; (xvi) the granting of relief from the automatic stay in the Bankruptcy Cases to permit foreclosure or enforcement on assets of any Debtor in excess of $5,000,000; (xvii) payment of or granting adequate protection with respect to prepetition debt, other than as expressly agreed in the DIP documentation, in any DIP Order; (xviii) the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or lien (except as contemplated herein) which is senior to or pari passu with the DIP Lenders' claims under the DIP Facility (except as would result in the payment in full of the DIP Facility and the adequate protection payments with respect to the Pari First Lien Obligations as are described herein); (xix) cessation of the DIP Liens or the Superpriority DIP Claims to be valid, perfected and enforceable in all respects; (xx) subject to the Carve Out, any of the Debtors use cash collateral or DIP Loans for any item other than those set forth in the Approved Budget; (xxi) any uninsured judgments are entered with respect to any post-petition liabilities against any of the Debtors or any of their respective properties in an aggregate amount in excess of $5,000,000, (xxii) the termination of the RSA; (xxiii) the Debtors' failure to deliver a Borrowing Base Certificate within

| | |
|---|---|
| | two (2) Business Days after such Borrowing Base Certificate is required to be delivered pursuant to the Interim DIP Order; (xxiv) the Debtors' failure to fund the ABL True Up Account in accordance with the Interim DIP Order within two (2) Business Days of a True Up Event; or (xxv) the occurrence of an "ABL Cash Collateral Termination Event" (as defined in the DIP Orders). |
| **Remedies** | The DIP Loan Documents shall include provisions modifying the automatic stay to the extent necessary to permit the DIP Agent (acting at the direction of the Required DIP Lenders) to take any or all of the following actions, at the same time or different times, in each case without further order or application of the Bankruptcy Court and immediately upon the occurrence of an Event of Default: (i) deliver a notice of an Event of Default to the Debtors; (ii) declare the termination, reduction or restriction of any further DIP Loan Commitment to the extent any such DIP Loan Commitment remains unfunded; (iii) declare the termination of the DIP Loan Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations); (iv) declare all applicable DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors; and (v) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral provided that, such declaration shall be subject to the Carve Out and effective five (5) Business Days following delivery of a notice of an Event of Default by the DIP Agent to the Debtors (and their lead restructuring counsel); (any such declaration of the foregoing (i) through (vi), a "<u>Termination Declaration</u>" and the date of such Termination Declaration, the "<u>Termination Declaration Date</u>"). The Termination Declaration shall be given by electronic mail (or other electronic means) to the Debtors (and their lead restructuring counsel), counsel to a Committee (if appointed), and to the U.S. Trustee. The automatic stay otherwise applicable to the DIP Agent, the DIP Lenders and the Pari First Lien Secured Parties shall be modified so that, five (5) Business Days after the date a Termination Declaration is delivered (the "<u>Remedies Notice Period</u>"): (A) the DIP Agent acting at the direction of the Required DIP Lenders shall be entitled to exercise its rights and remedies in accordance with the respective DIP Loan Documents and the DIP Orders and shall be permitted to satisfy the relevant DIP Obligations, Superpriority DIP Claims and DIP Liens, subject to the Carve Out and the Permitted Prior Liens (if any), (B) the applicable Pari First Lien Secured Parties shall be entitled to exercise their rights and remedies to satisfy their respective Pari First Lien Obligations, Pari First Lien Adequate Protection Obligations, Pari First Lien 507(b) Claims, and Pari First Lien Adequate Protection Liens, in each case (A) and (B), subject to and consistent with (i) the Carve Out, (ii) the rights of the ABL Secured Parties in respect of the ABL Priority Collateral (in each case, to the extent the ABL Obligations remain outstanding), (iii) the DIP Orders, (iv) the DIP Loan Documents, and (v) any Permitted Prior Liens, as applicable. Following expiration of the Remedies Notice Period, whether or not the maturity of any of the DIP Obligations shall have been accelerated, the automatic stay imposed under section 105 or section 362(a) of the Bankruptcy Code or otherwise will automatically be terminated with respect |

23

to the DIP Secured Parties and the Pari First Lien Secured Parties, unless (a) the DIP Agent (acting at the direction of the Required DIP Lenders), the Required DIP Lenders, or the Pari First Lien Secured Parties that hold at least a majority of Pari First Lien Obligations, as applicable, elect otherwise in a written notice to the Debtors and/or (b) the Bankruptcy Court has determined that an Event of Default has not occurred and/or is not continuing or the Bankruptcy Court orders otherwise.  Following expiration of the Remedies Notice Period and termination of the automatic stay, the DIP Agent, DIP Lenders, and the Pari First Lien Secured Parties shall be permitted to proceed to protect, enforce and exercise all other rights and remedies provided for in the DIP Loan Documents and the Pari First Lien Debt Documents and under applicable law, including, but not limited to, by (w) bringing any action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in any such DIP Loan Document or Pari First Lien Debt Document or any instrument pursuant to which such DIP Obligations or Pari First Lien Obligations are evidenced, (x) foreclosing on all of or any portion of the DIP Collateral or Pari First Lien Collateral including freezing any Cash Collateral held in the Debtors' accounts, (y) immediately setting-off any and all amounts in accounts maintained by the Debtors against the DIP Obligations or the Pari First Lien Obligations, or otherwise enforcing any and all rights against any DIP Collateral or Pari First Lien Collateral in the possession of the DIP Agent, the Pari First Lien Agents, or otherwise, including, without limitation, disposition of the DIP Collateral or the Pari First Lien Collateral and application of net cash proceeds thereof to satisfaction of the DIP Obligations and the Pari First Lien Obligations, and (z) taking any other actions or exercising any other rights or remedies permitted under the DIP Orders, the DIP Loan Documents, the Pari First Lien Debt Documents or applicable law, in each case without further notice to or order of the court unless the Debtors, the Committee (if appointed), and/or any other party in interest have obtained an order of the Bankruptcy Court preventing such action.  During the Remedies Notice Period, (i) the Debtors shall be prohibited from requesting any further draws under the DIP Facility (subject to the Carve-Out) and (ii) the Debtors, the Committee (if appointed), and/or any other party in interest shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Bankruptcy Court solely to contest whether an Event of Default has occurred and/or is continuing and the DIP Agent and the Required DIP Lenders shall consent to such emergency hearing; provided that if a request for such hearing is made prior to the end of the Remedies Notice Period, then the Remedies Notice Period will be continued until the Bankruptcy Court hears and rules with respect thereto. For the avoidance of doubt, the DIP Agent, the DIP Lenders and the Pari First Lien Secured Parties shall not exercise any rights or remedies while the hearing is pending.  Except as expressly provided for in the DIP Orders, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agent, the DIP Lenders, the Pari First Lien Secured Parties or the ABL Secured Parties.

24

| | |
|---|---|
| **Credit Bid** | The DIP Agent, at the direction of the Required DIP Lenders and the Pari First Lien Secured Agents, at the direction of their respective Pari First Lien Secured Parties, shall have the right to credit bid all or any portion of the DIP Obligations or the Pari First Lien Obligations (excluding the ABL Priority Collateral to the extent not paid off, which shall be subject to the ABL Agent and ABL Secured Parties consent), as applicable, whether pursuant to a sale under section 363 of the Bankruptcy Code, a chapter 11 plan pursuant to section 1129(b) of the Bankruptcy Code, or otherwise. |
| **Assignments** | The DIP Lenders shall, pursuant to and in accordance with the RSA, be permitted to assign any or all of the DIP Loans with the consent of the DIP Agent (such consent not to be unreasonably withheld) consistent with the requirements of the RSA; provided that all assignments shall be required to consist of ratable amounts of the Tranche A DIP Loans and Tranche B DIP Loans. |
| **Required DIP Lenders** | DIP Lenders holding a majority of the aggregate outstanding principal amount of the Tranche A DIP Loans and Tranche A DIP Commitments and a majority of the aggregate outstanding amount of Tranche B DIP Loans (the "Required DIP Lenders"). <br><br> No DIP Lender will raise an objection to or oppose a motion in respect of the treatment of DIP Loans under any plan of reorganization if the Supermajority DIP Lenders have consented to such plan of reorganization. <br><br> For purposes hereof, "Supermajority DIP Lenders" shall mean DIP Lenders holding at least 66.67% of the aggregate outstanding principal amount of the Tranche A DIP Loans and Tranche A DIP Commitments and 66.67% of the aggregate outstanding amount of Tranche B DIP Loans. |
| **DIP Professional Fees** | The Debtors shall be jointly and severally liable to pay all reasonable fees, costs, disbursements and expenses of (i) Moses & Singer LLP as legal counsel to the DIP Agent; (ii) each of Dechert LLP and Potter Anderson & Corroon LLP as legal counsel to the DIP Lenders; (iii) Evercore Group LLC as financial advisor to the DIP Lenders; and (iv) any other local legal counsel or other advisors in any foreign jurisdictions, and any other advisors in connection with the negotiation, preparation, execution, administration and enforcement of rights and remedies with respect to the DIP Facility, the DIP Loan Documents, and/or the DIP Collateral, including, without limitation, on account of due diligence therefor and negotiation thereof, and search, filing and recording fees associated therewith and otherwise in connection with the Bankruptcy Cases (collectively, the "DIP Professional Fees"). The DIP Professional Fees shall be payable at closing upon entry of the Interim DIP Order (as defined above) and thereafter in accordance with the DIP Credit Agreement pursuant to the procedures approved in the DIP Orders. |
| **Indemnification** | The DIP Loan Documents shall provide that the Debtors agree, jointly and severally, to indemnify and hold the DIP Agent and the DIP Lenders and their respective partners (general and limited), shareholders, members, principals, agents, advisors, officers, professionals (including, without limitation, counsel), subsidiaries and affiliates (each, in such capacity only, an "Indemnified Person") harmless from and against any and all damages, |

| | |
|---|---|
| | losses, settlement payments, obligations, liabilities, claims, actions, causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person solely by reason of or resulting from the DIP Facility, the DIP Loan Documents, the DIP Collateral, this DIP Term Sheet, the transactions contemplated thereby or hereby or by any thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any such Indemnified Person is a party thereto and whether or not brought by any Debtor or any other person or entity, except to the extent resulting from the gross negligence, material breach, fraud or willful misconduct of an Indemnified Person as determined by a final non-appealable order of a court of competent jurisdiction.  The indemnity includes, without limitation, indemnification for the DIP Lender and DIP Agent, only in such capacity, exercising discretionary rights granted under the DIP Facility.  In all such litigation, or the preparation therefor, the DIP Agent and the DIP Lender shall each be entitled to select one counsel (and, solely in the case of a conflict of interest, one additional counsel, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such persons, taken as a whole and, solely in the case of any such conflict of interest, one additional local counsel to all affected Indemnified Persons, taken as a whole, in each such relevant material jurisdiction)) and, in addition to the foregoing indemnity, the Debtors agree to pay promptly the reasonable and documented fees and expenses of all such counsel. |
| **Stipulations** | Subject to the Challenge Period, the Debtors shall stipulate (a) to the validity, extent, security, enforceability, priority and perfection of the Pari First Liens and the ABL Liens, (b) to the amount, validity and lack of defense, counterclaim or offset of any kind to the Pari First Lien Obligations and the ABL Obligations, and (c) that all cash of the Debtors constitutes "cash collateral" of the ABL Secured Parties and the Pari First Lien Secured Parties for purposes of section 363 of the Bankruptcy Code ("<u>Cash Collateral</u>"). The DIP Orders shall provide that the Committee (if appointed) and any other party in interest must file a pleading with the Bankruptcy Court challenging any releases granted under the DIP Order or the validity, extent, perfection and/or priority of any claims or security interest of the Pari First Lien Secured Parties or the ABL Secured Parties no later than (A) seventy-five (75) days after the Bankruptcy Court enters the Interim DIP Order and (B) any later date agreed to in writing by the Pari First Lien Agents (with the consent of the controlling Pari First Lien Secured Parties under their respective Pari First Lien Debt Documents) and ABL Agent (with the consent of the controlling ABL Secured Parties) (the time period established by the foregoing clauses (A) and (B), the "<u>Challenge Period</u>"). Failure of the Committee or any other party in interest to file such a pleading with the Bankruptcy Court shall forever bar such party from making such a challenge. |
| **Releases** | Subject to the Final DIP Order, the DIP Orders shall provide the DIP Agent, the DIP Lenders, and the Indemnified Persons with customary releases consistent with the Documentation Principles reasonably acceptable to the DIP Agent and the Required DIP Lenders. |

| **Section 506(c) Waiver** | The Final DIP Order shall include a waiver of any surcharge to the DIP Collateral, the ABL Collateral and the Pari First Lien Collateral under section 506(c) of the Bankruptcy Code or otherwise. |
|---|---|
| **Marshalling Waiver** | The Loan Parties shall, subject to the Final DIP Order, waive the equitable doctrine of "marshalling" against the DIP Collateral with respect to the DIP Lenders, the ABL Collateral with respect to the ABL Lenders and the Pari First Lien Collateral with respect to the Pari First Lien Secured Parties. |
| **Section 552(b) Benefits** | The Pari First Lien Secured Parties, the DIP Lenders and the ABL Lenders shall each, subject to the Final DIP Order, be entitled to the benefit of section 552(b) of the Bankruptcy Code, and the Debtors shall waive the "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to the Pari First Lien Secured Parties, the DIP Lenders and/or the ABL Lenders. |
| **Governing Law** | The laws of the State of New York (excluding the laws applicable to choice of law), except as governed by the Bankruptcy Code. |

**Annex I**

| Priority | DIP Collateral that constitutes ABL Priority Collateral | DIP Collateral that constitutes DIP Priority Collateral | Liens on Unencumbered Property | Claims with respect to ABL Priority Collateral | Claims with respect to the DIP Priority Collateral | Claims with respect to Unencumbered Property |
|---|---|---|---|---|---|---|
| *First* | Carve-Out and Permitted Prior Liens | Carve-Out and Permitted Prior Liens | Carve-Out | Carve-Out[5] | Carve-Out | Carve Out |
| *Second* | ABL Adequate Protection Liens | DIP Liens | DIP Liens | ABL 507(b) Claims | Superpriority DIP Claims | Superpriority DIP Claims |
| *Third* | ABL Liens | Pari First Lien Adequate Protection Liens | Pari First Lien Adequate Protection Liens | Superpriority DIP Claims | Pari First Lien 507(b) Claims | Pari First Lien 507(b) Claims |
| *Fourth* | DIP Liens | Pari First Liens | ABL Adequate Protection Liens | Pari First Lien 507(b) Claims | ABL 507(b) Claims | ABL 507(b) Claims |
| *Fifth* | Pari First Lien Adequate Protection Liens | ABL Adequate Protection Liens | | | | |
| *Sixth* | Pari First Liens | ABL Liens | | | | |

---

[5]      For the avoidance of doubt, the Carve-Out Reserves shall not be funded with ABL Priority Collateral.

## Annex II

## Carve Out[6]

(a)      *Carve Out*.  As used in this Term Sheet, the "Carve Out" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) (x) subject to the following clause (y), to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee (if appointed), pursuant to section 328 or 1103 of the Bankruptcy Code  (the "Committee  Professionals"  and,  together  with  the  Debtor  Professionals,  the "Professional Persons") at any time before or on the first Business Day following delivery by the Prepetition ABL Agent or the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; *provided* (y) Allowed Professional Fees of Committee Professionals under this clause (iii) shall not exceed (x) the lesser of (A) the aggregate amounts budgeted for such Allowed Professional Fees of Committee Professionals in the Approved Budget through the first business day following delivery of a Carve Out Trigger Notice, and (B) the aggregate amount of such Allowed Professional Fees of Committee Professionals actually incurred through the first business day following delivery of

---

[6]      NTD: Capitalized terms used but not defined on this Annex II shall have the meanings provided to such terms in the Interim DIP Order.

a Carve Out Trigger Notice *minus* (y) the aggregate amount of Allowed Professional Fees of Committee Professionals previously paid as of the time of determination of the amount of obligations under this clause (iii) (the amounts set forth in this clause (iii)(y) being the "Committee Pre-Carve Out Trigger Notice Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first business day following delivery by the Prepetition ABL Agent or the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap" of which the foregoing $2,500,000 shall be funded into the Funded Reserve Account (as defined herein) from proceeds from the Interim Draw of DIP Term Loans.  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition ABL Agent or the DIP Agent (acting at the direction of the Required DIP Lenders), as applicable, to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Creditors' Committee (if appointed) and Prepetition ABL Agent or the DIP Agent, as applicable, which notice may be delivered by the Prepetition ABL Agent or the DIP Agent, as applicable, following the occurrence and during the continuation of a ABL Cash Collateral Termination Event and upon termination of the Debtors' right to use Cash Collateral by the Prepetition ABL Agent or following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Credit Agreement, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)      Fee Estimates.  Not later than 7:00 p.m. New York time on the third Business Day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate

of the unpaid amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); *provided* that within one (1) Business Day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional Weekly Statement (the "Final Statement") setting forth a good-faith estimate of unpaid amount of fees and expenses incurred during the period commencing on the calendar day after the prior Calculation Date and concluding on the Termination Declaration Date (and the Debtors shall cause each such Weekly Statement or Final Statement to be delivered promptly to the Prepetition ABL Agent and the DIP Agent).  If any Professional Person fails to deliver a Weekly Statement or Final Statement within two (2) calendar days after such Weekly Statement or Final Statement is due, such Professional Person's entitlement to any funds in the Pre-Carve Out Trigger Notice Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement or Final Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person.

        (c)     Carve Out Reserves.

        (i)     Commencing on [●], 2025, and on or before the Thursday of each week thereafter until a Termination Declaration Date, the Debtors shall utilize all cash on hand as of such date (other than cash on deposit in the ABL True Up Account) and cash in the DIP Proceeds

Account to fund a reserve in an amount equal to the sum of (A) the greater of (1) the aggregate

unpaid amount of all Estimated Fees and Expenses of Debtor Professionals reflected in the Weekly

Statements delivered on the immediately prior Wednesday (or next succeeding Business Day) to

the Debtors and the Prepetition ABL Agent and the DIP Agent and (2) the aggregate amount of

unpaid Allowed Professional Fees of Debtor Professionals contemplated to be incurred in the

Approved Budget during such week,  *plus* (B) the lesser of (1) the aggregate unpaid amount of all

Estimated Fees and Expenses of Committee Professionals reflected in the Weekly Statements

delivered on the immediately prior Wednesday (or next succeeding Business Day) to the Debtors

and the Prepetition ABL Agent and the DIP Agent and (2) the aggregate amount of unpaid Allowed

Professional Fees of Committee Professionals contemplated to be incurred in the Approved Budget

during such week, *plus* (C) the Post-Carve Out Trigger Notice Cap, which amount shall be funded

into the Funded Reserve Account (as defined herein) from proceeds from the Interim Draw of DIP

Term Loans in accordance with this paragraph [6](a), *plus* (D) an amount equal to the amount of

Allowed Professional Fees set forth in the Approved Budget for the next week occurring after the

most recent Calculation Date.  The Debtors shall deposit and hold such amounts in a segregated

account maintained by the Debtors in trust (the "Funded Reserve Account") to pay such Allowed

Professional Fees (the "Funded Reserves") prior to any and all other claims, and all payments of

Allowed Professional Fees incurred prior to the Termination Declaration Date shall be paid first

from such Funded Reserve Account.  The Funded Reserve Account shall be recalculated each

week so that at any given time it holds no more than the sum of clauses (c)(i)(A), (B), and (C) in

this paragraph [6].

        (ii)      On the day on which a Carve Out Trigger Notice is given by either

the Prepetition ABL Agent or DIP Agent to the Debtors with a copy to counsel to the Creditors'

Committee, if any, (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors, and the Debtors shall utilize the Funded Reserve Account, cash in the DIP Proceeds Account and to the extent insufficient utilize all cash on hand as of such date (excluding, for the avoidance of doubt, any amounts held in any Controlled Account or ABL True Up Account ), to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees plus the amounts set forth in paragraph [6](a)(i)-(ii); *provided* that any such draw from the DIP Proceeds Account shall be honored notwithstanding any conditions in the DIP Term Loan Documents. The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such then unpaid Estimated Fees and Expenses (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.

(iii)   On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize cash in the Funded Reserve Account, cash in the DIP Proceeds Account, and all cash on hand as of such date (excluding, for the avoidance of doubt, any amounts held in any Controlled Account or ABL True UP Account), to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap; *provided* that any such draw from the DIP Proceeds Account shall be honored notwithstanding any conditions in the DIP Term Loan Documents. The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.

(iv)   For the avoidance of doubt, the DIP Agent, for the benefit of the DIP Secured Parties, shall maintain a first priority security interest in the Funded Reserve Account and the Carve Out Reserves, junior only to the Carve Out, in the amount of the Post-Carve Out Trigger

Notice Cap.  No other party, including the Prepetition ABL Secured Parties, shall be entitled to a *pari passu* or residual interest in the Funded Reserve Account until the DIP Agent (for the benefit of the DIP Secured Parties) has received payment in full in an amount equal to the Post-Carve Out Trigger Notice Cap.  To the extent that the Funded Reserve Account contains more than the Post-Carve Out Trigger Notice Cap after accounting for payments made on account of Pre-Carve Out Amounts and Post-Carve Out Amounts, then the DIP Agent, for the benefit of the DIP Secured Parties, shall be granted and hold a *pari passu*, first-priority secured interest in the Funded Reserve Account, and the Carve Out Reserves, junior only to the Carve Out, with the residual interest to be *pro rata* based on the funds deposited by each set of DIP Secured Parties into such accounts and reserves, which accounts and proceeds thereof to be utilized in accordance with this paragraph [6].

      (d)    <u>Application of Carve Out Reserves</u>.

      (i)    All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (a)(i) through (a)(iii) of the definition of Carve Out set forth above (the "<u>Pre-Carve Out Amounts</u>"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until the obligations set forth in clauses (a)(i) through (a)(iii) are paid in full.

      (ii)    All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "<u>Post-Carve Out Amounts</u>").

      (iii)    If either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph [6](c), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively

(subject to the limits contained in the Post-Carve Out Trigger Notice Cap), shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in paragraph [6](c), prior to making any payments to the DIP Agent (as set forth above) on account of the DIP Obligations until indefeasibly Paid in Full, and thereafter to the Prepetition Secured Parties in accordance with their rights and priorities as set forth in this DIP Term Sheet and the Lien/Claim Priorities **Exhibit [X]** attached to the Interim DIP Order.

(iv)    Following delivery of a Carve Out Trigger Notice, neither the DIP Agent nor the Pari First Lien Secured Parties shall sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, for the avoidance of doubt the Prepetition ABL Agent shall be permitted to sweep and foreclose on cash deposited in the Controlled Accounts and the ABL True Up Account.

(v)    Furthermore, notwithstanding anything to the contrary in this DIP Term Sheet, (A) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (B) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall (as described below), and (C) subject to the limitations with respect to the DIP Agents, DIP Lenders, and the Prepetition Secured Parties set forth in this paragraph [6], in no way shall the Initial DIP Budget, any subsequent Approved Budget, the Carve Out, the Post-Carve Out Trigger Notice Cap, or the Carve Out Reserves, or any of the foregoing, be construed as a cap or limitation on the amount of the Allowed Professional Fees of Debtor Professionals due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this DIP Term Sheet, the Prepetition ABL Credit Agreement, or the DIP Credit Agreement, the

Carve Out shall be senior to all liens and claims securing the Prepetition ABL Credit Agreement, the DIP Credit Agreement, the Adequate Protection Liens, and the 507(b) Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations; *provided* that, in no event, shall (i) the funds in the Controlled Account after a Carve Out Trigger Notice has been sent; or (ii) ABL True Up Account be used for the Carve Out; *provided, further*, that the Prepetition ABL Agent shall be permitted to sweep and foreclose on cash deposited in the Controlled Accounts, ABL True UP Account, and ABL Priority Collateral free and clear of all liens, claims, and encumbrances.

(e)    No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this DIP Term Sheet or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)    Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(g)    Payment of Carve Out On or After the Termination Declaration Date.  Following the delivery of the Carve Out Trigger Notice, all Allowed Professional Fees shall be paid from the applicable Carve Out Reserve, and no Professional Person shall seek payment of any Allowed Professional Fees from any other source until the applicable Carve Out Reserve has

been exhausted.    Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.    Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this DIP Term Sheet, the DIP Documents, the Bankruptcy Code, and applicable law.

## Schedule A

## Backstop Commitments and Initial Loan Allocations

[*Omitted*]

## **EXHIBIT C**

The Company Parties shall implement the Restructuring Transactions in accordance with the Milestones set forth below unless waived or extended in writing by the Required Consenting Stakeholders (which waiver or extension may be effected through email exchanged between counsel to the Company Parties and counsel to the Ad Hoc Group):

i.     the Debtors' Petition Date shall be no later than June 16, 2025;

ii.    on or prior to the Petition Date, the Company Parties' boards shall have approved execution of this Agreement;

iii.   the Debtors shall file a motion seeking approval of the DIP Facility on or about the Petition Date;

iv.    the Debtors shall file the Plan with the associated Disclosure Statement no later than twenty-one (21) days after the Petition Date;

v.     the Interim DIP Order, in form and substance reasonably acceptable to the Required Consenting Stakeholders, the Required DIP Lenders and DIP Agent, shall be entered in the Chapter 11 Cases no later than five (5) Business Days after the Petition Date;

vi.    the Final DIP Order, in form and substance reasonably acceptable to the Required Consenting Stakeholders, the Required DIP Lenders and DIP Agent, approving the DIP Loan Documents attached thereto on a final basis shall be entered in the Chapter 11 Cases by no later than thirty-five (35) days after the Petition Date;

vii.   a Disclosure Statement and Solicitation Order approving a Disclosure Statement and the procedures for solicitation of the Plan, which Disclosure Statement and Solicitation Order shall be reasonably acceptable to the Required Consenting Stakeholders, shall be entered in the Chapter 11 Cases by no later than thirty-nine (39) days after the filing of the Plan;

viii.  the Company Parties shall have entered into amendments to existing leases or rejected leases, in each case, projected to yield per annum cost savings in an amount and on terms acceptable to the Required Consenting Stakeholders by no later than one hundred and twenty (120) days after the Petition Date;

ix.    the Company Parties shall have commenced solicitation on the Plan no later than the date falling five (5) Business Days after entry of the Disclosure Statement and Solicitation Order, or as soon as reasonably practicable thereafter;

x.     a Confirmation Order confirming the Plan shall be entered in the Chapter 11 Cases by no later than sixty (60) days after entry of the Disclosure Statement Order; and

xi.    such confirmed Plan shall become effective by no later than fourteen (14) days after entry of the Confirmation Order.

## <u>EXHIBIT D</u>

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among [Ambience Parent, Inc.] and its affiliates and subsidiaries bound thereto, the Consenting Sponsor, and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a ["Consenting Cayman Noteholder"] ["Consenting Term Loan Lender"] ["Consenting PIK Noteholder"] ["Consenting Secured Noteholder"] under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):


| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Cayman Notes | |
| Term Loan | |
| 4.875% Secured Notes | |
| PIK Notes | |
| Unsecured Notes | |
| Equity Interests | |

---

[1] Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.