## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AT HOME GROUP INC., *et al.*,[1] | ) | Case No. 25-11120 (JKS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) | **Re: Docket No. 348** |

## NOTICE OFADDITIONAL ENGAGEMENT
## LETTER RELATED TO THE RETENTION AND EMPLOYMENT
## OF ERNST & YOUNG LLP AS TAX ADVISORY SERVICES PROVIDER

**PLEASE TAKE NOTICE** that, on June 23, 2025, the Debtors filed the *Application of the Debtors for Entry of an Order (I) Authorizing the Retention and Employment of Ernst & Young LLP as Tax Advisory Services Provider Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 169] (the "Application").

**PLEASE TAKE FURTHER NOTICE** that, on July 18, 2025, the Court entered the *Order (I) Authorizing the Retention and Employment of Ernst & Young LLP as Tax Advisory Services Provider Effective as of the Petition Date and (II) Granting Related Relief*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are: At Home Group Inc. (9563); Ambience Parent, Inc. (6231); Ambience Intermediate, Inc. (0692); At Home Holding II Inc. (9755); At Home Holding III Inc. (9930); At Home Companies LLC (6921); At Home Stores LLC (4961); At Home RMS Inc. (5235); At Home Gift Card LLC (0357); At Home Procurement Inc. (1777); At Home Properties LLC (2759); At Home Assembly Park Drive Condominium Association (N/A); 1600 East Plano Parkway, LLC (4757); 1944 South Greenfield Road LLC (4377); 2301 Earl Rudder Frwy S LLC (N/A); 3551 S 27th Street LLC (9350); 300 Tanger Outlet Blvd LLC (N/A); 3002 Firewheel Parkway LLC (2759); 2016 Grand Cypress Dr LLC (N/A); 8651 Airport Freeway LLC (0523); Transverse II Development LLC (8595); Rhombus Dev, LLC (4783); 1000 Turtle Creek Drive LLC (9177); 19000 Limestone Commercial Dr, LLC (3711); 4801 183A Toll Road, LLC (3909); 7050 Watts Rd LLC (N/A); 4700 Green Road LLC (9049); 361 Newnan Crossing Bypass LLC (N/A); 4304 West Loop 289 LLC (4302); 10460 SW Fellowship Way LLC (N/A); 1720 N Hardin Blvd LLC (N/A); Compass Creek Parkway LLC (N/A); 10800 Assembly Park Dr LLC (6145); Nodal Acquisitions, LLC (N/A); 15255 N Northsight Blvd LLC (N/A); 3015 W 86th St LLC (N/A); 9570 Fields Ertel Road LLC (N/A); 1376 E. 70th Street LLC (9942); 11501 Bluegrass Parkway LLC (3626); 12990 West Center Road LLC (9396); 334 Chicago Drive, LLC (2864); and 4200 Ambassador Caffery Pkwy LLC (5119). The location of the Debtors' service address for purposes of these chapter 11 cases is: 9000 Cypress Waters Blvd, Coppell, Texas 75019.

[Docket No. 348] (the "Order"), [2] pursuant to which the Court authorized the Debtors to retain and employ Ernst & Young LLP ("EY LLP") as the Debtors' tax advisory services provider on the terms set forth in the Application and the Order.

**PLEASE TAKE FURTHER NOTICE** that EY LLP and the Debtors desire to enter into an additional engagement letter, dated as of September 8, 2025 (the "Additional Engagement Letter"), attached hereto as **Exhibit A**, for the engagement of EY LLP to audit and report on the consolidated financial statements of At Home Group Inc.

**PLEASE TAKE FURTHER NOTICE** that fees will be paid by the Debtors for the services, as set forth in the Additional Engagement Letter and in accordance with the procedures set forth in the Application and Order.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to paragraph 9 of the Order, the Debtors must file the Additional Engagement Letter with the Court, serve the Additional Engagement Letter upon the U.S. Trustee and the Committee, and the U.S. Trustee and Committee may object to the proposed Additional Engagement Letter and file an objection with the Court within 14 days of service of this notice.  To the extent the U.S. Trustee or the Committee file an objection, the Debtors will promptly request that the Court set a hearing on the matter.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to paragraph 9 of the Order, absent an objection within 14 days of the filing and service of the Additional Engagement Letter, such Additional Engagement Letter and the expansion of EY LLP's scope of services thereunder shall be deemed approved pursuant to the Order (without any further order being required to be entered by the Court).

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Application or Order, as applicable.

Dated:  September 9, 2025
Wilmington, Delaware

/s/ Timothy R. Powell
_____

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (DE Bar No. 2847)
Joseph M. Mulvihill (DE Bar No. 6061)
Timothy R. Powell (DE Bar No. 6894)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:        rbrady@ycst.com
              jmulvihill@ycst.com
              tpowell@ycst.com


*Co-Counsel for the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Elizabeth H. Jones (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        nicole.greenblatt@kirkland.com
              matthew.fagen@kirkland.com
              elizabeth.jones@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

## Exhibit A

**Additional Engagement Letter**



**EY**

Shape the future
with confidence

Ernst & Young LLP          Tel: +1 214 969 8000
One Victory Park            Fax: +1 214 969 8587
Suite 2000                 ey.com
2323 Victory Avenue
Dallas, TX 75219

At Home Group Inc.                              September 8, 2025
Attn: Jeremy Aguilar
9000 Cypress Waters Blvd.
Coppell, TX 75019

Ladies and Gentlemen:

1.  This agreement (together with all attachments hereto, the "Agreement") confirms the
    engagement of Ernst & Young LLP ("we" or "EY") to audit and report on the consolidated
    financial statements of At Home Group Inc. (the "Company") for the year ended January 31,
    2026, and the related notes subsequent to Company filing a petition under Chapter 11 ("Chapter
    11") of the United States Bankruptcy Code  ("Bankruptcy Code") on or about June 16, 2025 with
    the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"). All of the
    services described in this Agreement are referred to collectively as either the "Audit Services" or
    the "audit." Our performance of Audit Services is contingent upon the Bankruptcy Court's
    approval of our retention in accordance with the terms and conditions that are set forth in this
    Agreement.  This Agreement shall be effective as of June 16, 2025.

**Audit responsibilities and limitations**

2.  We will conduct the audit in accordance with auditing standards generally accepted in the United
    States of America ("GAAS"), as established by the American Institute of Certified Public
    Accountants ("AICPA"). We are required to be independent of the Company and to meet our
    other ethical responsibilities in accordance with the relevant ethical requirements relating to our
    audit. Should conditions not now anticipated preclude us from completing the audit and issuing
    an auditor's report, we will advise you, the Audit Committee, and Bankruptcy Court promptly
    and take such action as we deem appropriate.

3.  The objective of the audit is to obtain reasonable assurance about whether the consolidated
    financial statements as a whole are free from material misstatement, whether due to fraud or
    error, and to issue an auditor's report that includes our opinion on whether the consolidated
    financial statements are presented fairly, in all material respects, in accordance with accounting
    principles generally accepted in the United States of America. Reasonable assurance is a high
    level of assurance but is not absolute assurance and therefore is not a guarantee that an audit
    conducted in accordance with GAAS will always detect a material misstatement when it exists.
    The risk of not detecting a material misstatement resulting from fraud is higher than for one
    resulting from error, as fraud may involve collusion, forgery, intentional omissions,
    misrepresentations, or the override of internal control. Misstatements are considered material if
    there is a substantial likelihood that, individually or in the aggregate, they would influence the
    judgment made by a reasonable user based on the financial statements. As part of an audit in

accordance with GAAS, we exercise professional judgment and maintain professional skepticism throughout the audit. We also identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. There are inherent limitations in the audit process, including, for example, the use of judgment and selective testing of data and the possibility that collusion or forgery may preclude the detection of material error, fraud or non-compliance with laws and regulations. Accordingly, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with GAAS. Also, an audit is not designed to detect error or fraud that is immaterial to the consolidated financial statements.

4.    As part of the audit, we will also:

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, no such opinion will be expressed.
- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements, including the related disclosures, and whether the consolidated financial statements represent the underlying transactions and events in a manner that achieves fair presentation.
- Conclude, based on the audit evidence obtained, whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for a reasonable period of time.

5.    In accordance with GAAS, we will communicate certain matters related to the conduct and results of the audit to the Audit Committee. Such matters include:

- Our responsibility under GAAS for forming and expressing an opinion on the consolidated financial statements that have been prepared by management with the oversight by the Audit Committee and that such an audit does not relieve management and the Audit Committee of their responsibilities.
- An overview of the planned scope and timing of the audit, including the significant risks that we have identified.
- Significant findings from the audit, which include: (1) our views about the significant qualitative aspects of the Company's accounting practices, including accounting policies, accounting estimates, and financial statement disclosures; (2) significant unusual transactions,

if any; (3) significant difficulties, if any, encountered during the audit; (4) significant corrected and uncorrected misstatements, other than those we believe are trivial; (5) disagreements with management, if any, whether or not satisfactorily resolved; (6) significant matters subject to management's consultations with other accountants, if any, and (7) other matters, if any, arising during the audit that are, in our professional judgment, significant and relevant to the Audit Committee regarding the oversight of the financial reporting process, including significant matters in connection with the Company's related parties.

- Circumstances that affect the form and content of our auditor's report.

Changes to the scope of the Audit Services may occur as a result of the issuance of new standards and interpretations or inspection findings. We will communicate any significant changes in the scope of the Audit Services and related procedures to management and the Audit Committee on a timely basis.

6. If we determine that there is evidence that fraud or possible non-compliance with laws and regulations may have occurred, we will bring such matters to the attention of the appropriate level of management. If we become aware of fraud involving senior management or fraud (whether committed by senior management or other employees) that causes a material misstatement of the consolidated financial statements, we will report this matter directly to the Audit Committee. We will determine that the Audit Committee and appropriate members of management are adequately informed of instances of non-compliance with laws and regulations that come to our attention unless they are clearly inconsequential.

7. We will communicate in writing to management and the Audit Committee all significant deficiencies and material weaknesses identified during the audit, including those that were remediated during the audit. We also will communicate any significant deficiencies and material weaknesses communicated to management and the Audit Committee in previous audits that have not yet been remediated.

8. We also may communicate other opportunities we observe for economies in or improved controls over the Company's operations.

**Circumstances that affect the form and content of our auditor's report**

9. The final form and content of our auditor's report will reflect the results of our final audit findings and conclusions. We will communicate to management and the Audit Committee all circumstances affecting the final form and content of our auditor's report.

**Management's responsibilities and representations**

10. The consolidated financial statements (including related disclosures) are the responsibility of management. Management also is responsible for the design, implementation, and maintenance

of internal control relevant to the preparation and fair presentation of financial statements that are free of material misstatement, whether due to error or fraud, for properly recording transactions in the accounting records, for safeguarding assets, and for the preparation and fair presentation of the consolidated financial statements, in accordance with accounting principles generally accepted in the United States of America. In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for one year after the date that the financial statements are available to be issued, and to provide appropriate financial statement disclosure, when applicable, related to going concern and using the going concern basis of accounting unless management is required to prepare the financial statements in accordance with the liquidation basis of accounting. Management also is responsible for the identification of, and for the Company's compliance with, laws and regulations applicable to its activities.

11. Management is responsible for adjusting the consolidated financial statements to correct material misstatements. Management also will affirm to us in its letter of representations certain representations made to us during the performance of the Audit Services, including that the effects of any uncorrected misstatements aggregated by us during the current audit and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the consolidated financial statements as a whole.

12. Management is responsible for communicating to us on a timely basis all instances of alleged, identified or suspected non-compliance with laws and regulations that could have an effect on the financial statements or the effects of which should be considered by management when preparing the financial statements, and all instances of alleged, identified or suspected financial improprieties, of which management or the Audit Committee is aware (regardless of the source or form in which they may have been discovered or communicated to them and including, without limitation, instances identified by "whistle-blowers") and providing us full access to information, any internal investigations, and any intended public or regulatory communications related to them. Such instances include, without limitation, manipulation of financial results by management or employees, misappropriation of assets by management or employees, intentional circumvention of internal controls, inappropriate influence on related party transactions by related parties, intentionally misleading EY, or other alleged, identified or suspected illegal acts or fraud that could result in a misstatement of the financial statements or otherwise affect the financial reporting of the Company. If the Company limits the information otherwise available to us under this paragraph (based on the Company's claims of attorney/client privilege, work product doctrine or otherwise), the Company will immediately inform us of the fact that certain information is being withheld from us. Any such withholding of information could be considered a restriction on the scope of the audit and may prevent us from opining on the Company's financial statements; alter the form of report we may issue on such financial statements; or

otherwise affect our ability to continue as the Company's independent auditors. We will disclose any such withholding of information to the Audit Committee.

13. Management is responsible for communicating to us on a timely basis, to the extent that management is aware, of (1) unauthorized access to information technology systems that either occurred or is reasonably likely to have occurred up to the date of our auditor's report based on the Company's investigation, including of reports submitted by third parties (including regulatory agencies, law enforcement agencies and security consultants), to the extent that such unauthorized access to information technology systems is reasonably likely to have a material effect on the financial statements, including related disclosures, in each case or in the aggregate, and (2) ransomware attacks when the Company paid or is contemplating paying the ransom, regardless of the amount of ransom.

14. Management is responsible for providing us access to: all information of which management is aware that is relevant to the Audit Services, (including information obtained from outside of the general and subsidiary ledgers) such as records, documentation and other matters to complete the Audit Services on a timely basis (it being understood that such access must be granted without the use of technological restrictions on access in order to enable us to comply with our professional obligations involving documentation of our procedures); additional information that we may request from management for purposes of the audit; and unrestricted access to persons within the Company from whom we determine it necessary to obtain audit evidence. This responsibility includes identifying the use of new technologies or techniques in preparing such information (e.g., the use of generative artificial intelligence), and additional details we may require regarding the use of any such technologies and techniques in order to perform our audit procedures. Management's failure to comply with this paragraph may cause us to delay our report, modify our procedures, or even terminate the Audit Services.

15. As required by GAAS, we will make specific inquiries of management about the representations contained in the consolidated financial statements. GAAS also require that, at the conclusion of the applicable Audit Services, we obtain a letter of representations from certain members of management about these matters and to represent that management has fulfilled its responsibilities as set forth in this Agreement, including that all material transactions have been recorded in the accounting records and are reflected in the financial statements. The responses to those inquiries, the written representations, and the results of our procedures comprise evidence on which we will rely in completing the applicable Audit Services.

16. Management shall promptly assist EY in identifying the Company's affiliates, as defined in the AICPA Code of Professional Conduct, officers and directors.

17. Management shall make appropriate inquiries to determine whether the Company has a business relationship with EY or any other member firm of the global Ernst & Young organization (any of

which, an "EY Firm") other than one pursuant to which an EY Firm performs professional services.

18. Management shall discuss any independence matters with EY that, in management's judgment, could bear upon EY's independence.

19. The Company shall be responsible for its personnel's compliance with the Company's obligations under this Agreement.

**Fees and billings**

20. We estimate that our fees for the Fiscal 2026 Audit Services will be $711,280 plus expenses. However, our actual fees may exceed this amount based on changes to the business (e.g., nature of the business or change in business entities) or additional unplanned effort. If we anticipate our actual fees exceeding this estimate, we will notify the Company for approval before proceeding forward with any additional audit work and related fees. Our fees are exclusive of taxes or similar charges, as well as customs, duties or tariffs imposed in respect of the Audit Services, all of which the Company shall pay (other than taxes imposed on our income generally). We may submit additional invoices resulting from changes in the business or additional unplanned effort as set forth in this paragraph in accordance with the following hourly rates, by level of professional.

| Level | Rate per hour |
|---|---|
| National Partner | $1,500 |
| Engagement Partner | $1,110 |
| Managing Director | $930 |
| Senior Manager | $655 |
| Manager | $440 |
| Senior | $290 |
| Staff | $190 |

21. In addition, the Company shall reimburse us for direct expenses incurred in connection with the performance of the Audit Services. Direct expenses include reasonable and customary out-of-pocket expenses such as travel, meals, accommodations and other expenses specifically related to this engagement. EY may receive rebates in connection with certain purchases, which are used to reduce charges that EY would otherwise pass on to its clients.

22. We will submit an itemized and detailed billing statement, and we will request payment of our fees and expenses, in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules for the United States Bankruptcy Court for the District of Delaware ("Local Rules") and any relevant administrative orders.  We will submit our invoices as the work progresses and payment of them will be made upon receipt, or as quickly as the Bankruptcy Code, the Bankruptcy Rules, Local Rules and any relevant administrative orders allow. We acknowledge that payment of our fees and expenses hereunder is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code, any order of the Bankruptcy Court approving the retention of us and the U.S. Trustee Guidelines, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications.

23. Our estimated pricing and schedule of performance are based upon, among other things, our preliminary review of the Company's records and the representations Company personnel have made to us and are dependent upon the Company's personnel providing a reasonable level of assistance. Should our assumptions with respect to these matters be incorrect or should the condition of records, degree of cooperation, or other matters beyond our reasonable control require additional commitments by us beyond those upon which our estimates are based, we may adjust our fees, subject to Bankruptcy Court approval, and planned completion dates. Fees for any special audit-related projects, such as fresh start accounting, proposed business combinations or research and/or consultation on special business or financial issues, will be billed separately from the fees referred to above and will be the subject of other written agreements which shall be subject to Bankruptcy Court approval.

**Other matters**

24. From time to time, and depending on the circumstances, subject to Bankruptcy Court approval, (1) we may subcontract portions of the Audit Services to other EY Firms (listed at www.ey.com), who may deal with the Company or its affiliates directly, although EY alone will remain responsible to you for the Audit Services, and (2) personnel (including non-certified public accountants) from an affiliate of EY or another EY Firm or any of their respective affiliates, or from independent third-party service providers (including independent contractors), may participate in providing the Audit Services. Unless prohibited by applicable law, we may provide Company information to other EY Firms and their personnel, as well as third-party service providers acting on our or their behalf, who may collect, use, transfer, store or otherwise process

(collectively, "Process") it in various jurisdictions in which they operate to facilitate performance of the Audit Services, to comply with regulatory requirements, to check conflicts, to provide financial accounting and other administrative support services, or for quality and risk management purposes. We shall be responsible to you for maintaining the confidentiality of Company information, regardless of where or by whom such information is Processed on our behalf. Either EY or the Company may use electronic media to correspond or transmit information relating to the Audit Services, and such use will not, in itself, constitute a breach of any confidentiality obligations.

25. Our auditor independence and our ability to provide the Audit Services may be impaired if you solicit or hire certain EY personnel as described below. The Company shall not, during the term of this Agreement and for 12 months following its termination for any reason, without the prior written consent of EY, solicit for employment or a position on its Board of Directors, or hire or appoint to its Board of Directors, any current or former partner, principal, or professional employee of EY or its network firms if any such professional either: (i) performed any audit, review, attest, or related service for or relating to the Company at any time (a) during the then current fiscal year of the Company up to and including the date of the auditor's report for that year, or (b) in the 12 months ended on the auditor's report date for the immediately preceding fiscal year; or (ii) influences the operations or financial policies of EY or its network firms or has any capital balances or any other continuing financial arrangement with EY or its network firms.

26. EY shall remain fully responsible for the Audit Services and for all of its other responsibilities, covenants and obligations under this Agreement, notwithstanding that we may subcontract portions of the Audit Services to other EY Firms or that other EY Firms may participate in the provision of the Audit Services. The Company may not make a claim or bring proceedings relating to the Audit Services or otherwise under this Agreement against any other EY Firm and EY shall not contest its responsibility for the Audit Services on the basis that any of them were performed by another EY Firm. The Company shall make any claim or bring proceedings only against EY. This paragraph is intended to benefit the other EY Firms, which shall be entitled to enforce it. Each EY Firm is a separate legal entity.

27. If we Process Company information that can be linked to specific individuals ("Personal Data"), we will Process it in accordance with paragraph 24 of this Agreement, as well as law and professional regulations applicable to us. We will also require any service provider that Processes Personal Data on our behalf to provide at least the same level of protection for such data as is required by such legal and regulatory requirements. EY is required to exercise its own judgment in determining the purposes and means of processing any Personal Data when providing the Audit Services. Accordingly, EY acts as an independent controller (or equivalent legal status), and not as a processor (or equivalent) under the Company's control or as a joint controller with the Company. If Personal Data relating to a data subject in the UK, European Union or Switzerland (collectively, "European Personal Data") is required for EY to perform the Audit

Services, the parties agree to negotiate in good faith a data transfer addendum intended to validate the transfer of such European Personal Data by the Company to EY prior to such transfer. If any Company information is protected health information under the Health Insurance Portability and Accountability Act, as amended, this Agreement is deemed to incorporate all of the terms otherwise required to be included in a business associate contract relating to such information. The Company warrants that it has the authority to provide the Personal Data to EY in connection with the performance of the Audit Services and that the Personal Data provided to us has been Processed in accordance with applicable law.

28. In order to provide the Audit Services, we may need to access Personal Data consisting of protected health information, financial account numbers, Social Security or other government-issued identification numbers, or other data that, if disclosed without authorization, would trigger notification requirements under applicable law ("Restricted Personal Data"). In the event that we need access to such information, you will consult with us on appropriate measures (consistent with professional standards applicable to us) to protect the Restricted Personal Data, such as deleting or masking unnecessary information before it is made available to us, encrypting any data transferred to us, or making the data available for on-site review at a Company site. You will provide us with copies of any Restricted Personal Data only in accordance with mutually agreed protective measures.

29. In order to facilitate performance of the Audit Services and for EY to more readily provide Audit Services, including audit services for subsequent audit periods and engagements, we may utilize certain internal tools, automated techniques, software solutions and other technologies ("EY Tools") to extract, process, analyze and retain Company information, including data. EY owns all right, title, interest and all intellectual property rights in and to the EY Tools, including any enhancements, modifications, and derivative works thereof. You agree that we may, subject to applicable laws, regulations and professional standards, utilize such EY Tools and retain Company information within the EY Tools to facilitate performance of the Audit Services, including, without limitation, audit services for subsequent audit periods and engagements. In the event of any such retention, we will continue to extend the protections set forth in this Agreement to any such information retained.

30. You acknowledge that to the extent the Company is regulated by or under the supervision of a federal, state or other regulator (including, without limitation, the Board of Governors of the Federal Reserve, the Office of the Comptroller of the Currency and the New York State Department of Financial Services), you may be in possession of confidential supervisory information as defined in relevant law or regulations ("CSI"), including without limitation documents and information comprising CSI arising from, relating to, or concerning inspections and examinations by such regulator(s). As set forth in paragraph 14, we may require access to such CSI in order to perform the Audit Services. However, CSI may be subject to regulatory restrictions on disclosure to and/or use by third parties. Accordingly: (1) management will

identify to EY the regulators that regulate and/or exercise supervisory oversight over the Company and have specific requirements relating to CSI (each, a "Regulator"); (2) management will identify to EY all CSI in your possession; (3) to the extent management's provision of CSI to EY is not authorized by applicable law or regulation absent Regulator approval, management will obtain authorization from the applicable Regulator to provide us access to any and all CSI for the purposes of performing the Audit Services with respect to CSI already in the Company's possession immediately following execution of this Agreement (and with respect to any later-identified CSI immediately upon learning of the examination, inspection or other activity that could result in such materials being deemed CSI); and (4) management will not provide any such access prior to having received such authorization and having identified to EY with specificity the information that constitutes CSI. You acknowledge that any failure to provide any such information could be considered a restriction on the scope of the audit, and the parties agree that they shall engage in good faith discussions regarding the effect of any withholding on the Audit Services.

31. The U.S. Department of Labor (DOL) regulations, at 20 CFR § 655.734(a)(1)(ii)(A), require the posting of notice of a Labor Condition Application (LCA) in instances where individuals holding certain visas will be working on the Company's premises. Where applicable, EY and the Company will work together to develop an appropriate notice to enable compliance with this requirement.

32. In connection with their respective rights and obligations under this Agreement, EY and the Company each will comply with all laws, rules, and regulations of any jurisdiction applicable to it from time to time concerning or relating to: (i) bribery or corruption, including, without limitation, the U.S. Foreign Corrupt Practices Act ("FCPA"); (ii) anti-money laundering, including, without limitation the Bank Secrecy Act of 1970 and the USA PATRIOT Act of 2001, and (iii) economic or financial sanctions, export controls, trade embargoes or other similar prohibitions or restrictions on activity imposed by a government authority having jurisdiction over such party, including without limitation the U.S. Office of Foreign Assets Control ("OFAC") sanctions and the U.S. Export Administration Regulations ("EAR") (collectively, "Sanctions Laws"). The Company represents that it is not, nor is it 50% or more owned or otherwise controlled by a person or persons subject to Trade Restrictions. The term "subject to Trade Restrictions," as applied to a person, means that person falls into one or more of the following categories: (i) an individual located or ordinarily resident in, or an entity legally organized in a country listed on, any embargoed country list maintained by an applicable jurisdiction; (ii) an individual or entity listed on or covered by, or an entity 50% or more owned or otherwise controlled by a person or persons listed on or covered by, any sanctions asset blocking list, export denial list or other prohibited transactions list, directive, rule or regulation maintained or issued by an applicable jurisdiction; or (iii) an individual or entity engaged in activities prohibited by the export controls or sanctions laws and regulations of an applicable jurisdiction. If the Company, or any agent, owner, investor, manager, partner, director, or officer

of the Company or any beneficiary of the Audit Services (including, without limitation, any affiliate of the Company) is or becomes subject to Trade Restrictions, or if any of the Company's representations in this paragraph otherwise cease to be true at any time, the Company shall notify EY immediately in writing. If the Company is an investment fund or fund manager, it represents that no limited partner or other partner, manager or investor within the fund is subject to Trade Restrictions (unless disclosed to EY in writing) and that the Audit Services are not being used for the specific benefit of any party subject to Trade Restrictions. The Company further represents that the Company is not aware of any facts or circumstances that would cause EY, which is a U.S. person, to be in violation of any Sanctions Laws in its performance of the Audit Services. The Company shall not use the Audit Services to circumvent or facilitate any export control or Sanctions Law violations, or to facilitate any transaction with any person subject to Trade Restrictions. In the event that (1) any of the Company's representations in this paragraph cease to be true at any time for any reason (including, without limitation, any change in applicable law), (2) the Company otherwise breaches any of the provisions of this paragraph, or (3) EY determines any Audit Services can no longer be performed as contemplated by this Agreement due to the effects of Sanctions Laws or other applicable legal or regulatory restrictions on trade, then in each such case EY may immediately terminate this Agreement, or any particular Audit Services, in whole or in part. EY shall use commercially reasonable efforts to notify the Company of any Audit Services that will no longer be provided as a result of any termination pursuant to this paragraph, provided that any failure to give any such notice shall not limit or otherwise affect the effectiveness of any such termination.

33. By your signature below, you confirm that the Company, through its Board of Directors, has expressly authorized you to enter into this Agreement on behalf of, and to bind, the Company. In addition, you confirm that management agrees to, acknowledges, and understands its responsibilities as outlined in *Management's responsibilities and representations*. Either EY or the Company may execute this Agreement (and any supplements or modifications hereto) by electronic means, and each of EY and the Company may sign a different copy of the same document.

34. EY retains ownership in the workpapers compiled in connection with the performance of the Audit Services.

35. Marie Dhimmar will be the Audit Partner responsible for the provision of our audit services. Marie Dhimmar, Partner, Kathryn Beck, Senior Manager, and Chelsea Jackson, Manager, will work closely with management in performing all required Audit Services.  If one or more of these individuals ceases to provide audit services to the Company pursuant to this Agreement, EY will so advise the Company and, if that professional is replaced, provide the Company with the name of that professional's replacement.  Other partners and staff, not identified herein, may be utilized as required to conduct our work in an efficient manner.

36. If we are required by government regulation, subpoena or other legal process to produce EY workpapers or other information received from the Company, we will cooperate with such legal process.

37. Any controversy or claim with respect to, in connection with, arising out of, or in any way related to this Agreement or the services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of Company or its subsidiaries or of EY) shall be brought in the Bankruptcy Court or the applicable district court (if such district court withdraws the reference) and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made. If the Bankruptcy Court, or the district court upon withdrawal of the reference, does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and all successors and assigns thereof, agree to submit first to nonbinding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures as set forth in the attachment to this Agreement, which is incorporated herein by reference. Judgment on any arbitration award may be entered in any court having proper jurisdiction. The foregoing is binding upon Company, EY and any all successors and assigns thereof. This Agreement, and any non-contractual matters or obligations arising out of this Agreement or the Audit Services, including (without limitation) claims arising in tort, fraud, under statute or otherwise relating to the Audit Services, or questions relating to the scope or enforceability of this paragraph, shall be governed by, and construed in accordance with, the laws of New York applicable to agreements made, and fully to be performed, therein by residents thereof.

38. By agreement to the provision of the Audit Services, we are not providing a guarantee to you that our performance of those services pursuant to the terms and conditions set forth in this Agreement will guarantee your successful reorganization under Chapter 11.

39. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect. This Agreement applies to all Audit Services (as defined in paragraph 1), including any such services performed or begun before the date of this Agreement.

To the extent that EY agrees to perform Audit Services for a subsequent fiscal year and subject to Bankruptcy Court approval, the terms and conditions set forth in this Agreement shall apply to the performance of such Audit Services, except as specifically modified, amended or supplemented in writing by the parties. Changes in the scope of the Audit Services and estimated fees for such services in subsequent fiscal years will be communicated in supplemental agreements. We may terminate

performance of the Audit Services and this Agreement upon written notice if we reasonably determine that we can no longer provide the Audit Services in accordance with applicable law or professional obligations, but in any event, this Agreement will expire upon the effective date of the Company's confirmed plan of reorganization, or liquidation of the Company's assets, under Chapter 11 or 7 of the Bankruptcy Code, or otherwise. Upon any termination of the Audit Services or this Agreement, the Company shall pay EY for all work-in-progress, Audit Services already performed and expenses incurred by us up to and including the effective date of such termination. The provisions of this Agreement that give either of us rights or obligations beyond its termination including, without limitation, paragraph 37, shall continue indefinitely following the termination of this Agreement and shall survive completion of the Company's bankruptcy whether through a confirmed plan of reorganization under Chapter 11, liquidation of the Company's assets under Chapter 7 of the Bankruptcy Code, or otherwise.

EY appreciates the opportunity to be of assistance to the Company. If this Agreement accurately reflects the terms on which the Company has agreed to engage EY, please sign below on behalf of the Company and return it to Ernst & Young LLP Attn: Marie Dhimmar, 2323 Victory Avenue, Suite 2000, Dallas, TX, 75219.

Very truly yours,

*Ernst & Young LLP*

Agreed and accepted by:

At Home Group Inc.

By: _Jeremy Aguilar_ _____    9/8/2025
      Jeremy Aguilar
      Chief Financial Officer



Ernst & Young LLP
One Victory Park
Suite 2000
2323 Victory Avenue
Dallas, TX 75219

Tel: +1 214 969 8000
Fax: +1 214 969 8587
ey.com

# Dispute resolution procedures

## Mediation

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties and must confirm in writing that he or she is not, and will not become during the term of the mediation, an employee, partner, executive officer, director of or beneficial owner with significant influence over any EY Firm audit client.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the mediation requirement to have been waived and may proceed with arbitration.

## Arbitration

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless he or she has agreed in writing to these procedures and has confirmed in writing that he or she is not, and will not become during the term of the arbitration, an employee, partner, executive officer, director of or beneficial owner with significant influence over any EY Firm audit client.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort or to make an award or impose a remedy that (i) is inconsistent with the agreement to which these procedures are attached or any other agreement relevant to the dispute, or (ii) could not be made or imposed by a court deciding the matter in the same jurisdiction. In deciding the dispute, the arbitration panel shall apply the limitations period that would be applied by a court deciding the matter in the same jurisdiction, and shall have no power to decide the dispute in any manner not consistent with such limitations period.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.