# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AT HOME GROUP INC., *et al.*,[1] | ) | Case No. 25-11120 (JKS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### DEBTORS' MEMORANDUM OF LAW
### IN SUPPORT OF AN ORDER CONFIRMING
### THE AMENDED JOINT PLAN OF REORGANIZATION OF AT HOME GROUP INC.
### AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (DE Bar No. 2847)
Joseph M. Mulvihill (DE Bar No. 6061)
Timothy R. Powell (DE Bar No. 6894)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:    rbrady@ycst.com
    jmulvihill@ycst.com
    tpowell@ycst.com

*Co-Counsel for the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Elizabeth H. Jones (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    nicole.greenblatt@kirkland.com
    matthew.fagen@kirkland.com
    elizabeth.jones@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

Dated:  September 24, 2025

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are:  At Home Group Inc. (9563); Ambience Parent, Inc. (6231); Ambience Intermediate, Inc. (0692); At Home Holding II Inc. (9755); At Home Holding III Inc. (9930); At Home Companies LLC (6921); At Home Stores LLC (4961); At Home RMS Inc. (5235); At Home Gift Card LLC (0357); At Home Procurement Inc. (1777); At Home Properties LLC (2759); At Home Assembly Park Drive Condominium Association (N/A); 1600 East Plano Parkway, LLC (4757); 1944 South Greenfield Road LLC (4377); 2301 Earl Rudder Frwy S LLC (N/A); 3551 S 27th Street LLC (9350); 300 Tanger Outlet Blvd LLC (N/A); 3002 Firewheel Parkway LLC (2759); 2016 Grand Cypress Dr LLC (N/A); 8651 Airport Freeway LLC (0523); Transverse II Development LLC (8595); Rhombus Dev, LLC (4783); 1000 Turtle Creek Drive LLC (9177); 19000 Limestone Commercial Dr, LLC (3711); 4801 183A Toll Road, LLC (3909); 7050 Watts Rd LLC (N/A); 4700 Green Road LLC (9049); 361 Newnan Crossing Bypass LLC (N/A); 4304 West Loop 289 LLC (4302); 10460 SW Fellowship Way LLC (N/A); 1720 N Hardin Blvd LLC (N/A); Compass Creek Parkway LLC (N/A); 10800 Assembly Park Dr LLC (6145); Nodal Acquisitions, LLC (N/A); 15255 N Northsight Blvd LLC (N/A); 3015 W 86th St LLC (N/A); 9570 Fields Ertel Road LLC (N/A); 1376 E. 70th Street LLC (9942); 11501 Bluegrass Parkway LLC (3626); 12990 West Center Road LLC (9396); 334 Chicago Drive, LLC (2864); and 4200 Ambassador Caffery Pkwy LLC (5119). The location of the Debtors' service address for purposes of these chapter 11 cases is:  9000 Cypress Waters Blvd, Coppell, Texas 75019.

## TABLE OF CONTENTS

**Page(s)**

Relief Requested ................................................................................................1

Preliminary Statement ........................................................................................2

Background ......................................................................................................4

I.      Procedural History ....................................................................................4

II.     Disinterested Directors' Investigation ........................................................8

III.    The Solicitation Process and Voting Results. ............................................10

IV.     Objections. ............................................................................................14

Argument ......................................................................................................14

I.      The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code and Should Be Confirmed. ..............................................................14

        A.      The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)). ..............................................15

                1.      The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ................................15

                2.      The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code. ..........................18

        B.      The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)). ..............................................23

                1.      The Debtors Complied with Section 1125 of the Bankruptcy Code.................................................................24

                2.      The Debtors Complied with Section 1126 of the Bankruptcy Code.................................................................25

        C.      The Plan Was Proposed in Good Faith (§ 1129(a)(3)). ................27

        D.      The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)). .....29

        E.      The Debtors Have Complied with the Governance Disclosure Requirement (§ 1129(a)(5)). ..................................................30

F.      The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)) ................................................................................31

G.     The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)) ................................................................................31

H.     The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. .....................................34

I.       The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)) ................................................................................35

J.       At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)). ............................................................37

K.     The Plan Is Feasible (§ 1129(a)(11)). ...........................................38

L.      The Plan Provides for the Payment of Certain Statutory Fees (§ 1129(a)(12)) ................................................................................40

M.    All Retiree Benefits Will Continue Post-Confirmation (Section 1129(a)(13)). ..............................................................................41

N.     Sections 1129(a)(14)–(16) of the Bankruptcy Code Do Not Apply to the Plan. ....................................................................................42

O.     The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code. ..........................................................42

        1.     The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (§ 1129(b)(1)). .......................................................................43

        2.     The Plan Is Fair and Equitable (§ 1129(b)(2)). ...................45

P.      The Plan Complies with the Remaining Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)). .................................47

II.    The Discretionary Contents of the Plan Are Appropriate Under Section 1123(b) of the Bankruptcy Code. .................................................48

A.     Overview of the Plan's Compliance with Section 1123(b) of the Bankruptcy Code. ......................................................................48

B.     The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code. ....................................51

        1.     The Debtor Releases in the Plan Are Appropriate. ...............52

      2.      The Third-Party Release is Consensual and Appropriate and Should be Approved. ...................................................................59

      3.      The Exculpation Provision Is Appropriate. ...........................................64

      4.      The Injunction Provision Is Appropriate. ..............................................68

  C.      The Plan Complies with Section 1123(d) of the Bankruptcy Code. ................68

  D.      Modifications to the Plan Do Not Require Resolicitation. ..............................69

III.    The Remaining Objections Should be Overruled. .........................................................71

  A.      The Resolution of Cure Objections After the Effective Date is Proper. .........71

  B.      The Bowersox Objection Should be Overruled. .................................................72

IV.    Good Cause Exists to Waive the Stay of the Confirmation Order. ...........................74

Conclusion .........................................................................................................................75

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbotts Dairies of Pa., Inc.*,
788 F.2d 143 (3d Cir. 1986)....................................................................27

*In re Accuride Corporation*,
No. 24-12289 (JKS) (Bankr. D. Del. Feb. 12, 2025)....................................53, 61, 71

*In re Aegean Marine Petroleum Network, Inc.*,
599 B.R. 717 (Bankr. S.D.N.Y. 2019)..........................................................65

*In re AeroCision Parent, LLC*,
No. 23-11032 (KBO) (Bankr. D. Del. Mar. 4, 2024) .........................................60

*In re Aleris Int'l, Inc.*,
No. 09-10478 (BLS) 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)..................23, 39, 43

*In re Ambanc La Mesa L.P.*,
115 F.3d 650 (9th Cir. 1997) ................................................................42, 43

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006)................................................................14, 15, 43

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ......................................................43

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)..........................................................................32, 45

*In re Boy Scouts of Am. & Delaware BSA, LLC*,
650 B.R. 87 (D. Del. 2023) ..................................................................69

*In re Boy Scouts of Am.*,
137 F.4th 126 (3d Cir. 2025) ................................................................14

*In re Burns & Roe Enters., Inc.*,
No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) .............................69

*In re Celsius Network LLC*,
656 B.R. 327 (Bankr. S.D.N.Y. 2023)........................................................69

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986)..........................................................29

*In re Charter Comm's*,
419 B.R. 221 (Bankr. S.D.N.Y 2011) ...................................................................23

*In re Chateaugay Corp.*,
10 F.3d 944 (2d Cir. 1993)..........................................................................16, 17

*In re Congoleum Corp.*,
362 B.R. 1677 (Bankr. D.N.J. 2007) ....................................................................64

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ...............................................................*passim*

*In re Drexel Burnham Lambert Grp., Inc.*,
960 F.2d 285 (2d Cir. 1992)................................................................................67

*In re Emerge Energy Servs. LP*,
No. 19-11563 (KBO), 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ............60

*In re Enron Corp.*,
326 B.R. 497 (S.D.N.Y. 2005)..............................................................................67

*In re Exaeris, Inc.*,
380 B.R. 741 (Bankr. D. Del. 2008) .....................................................................51

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) .......................................................................52

*In re EXP OldCo Winddown, Inc.*,
No. 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024)...................................53, 61

*In re FAH Liquidating Corp.*,
No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) .............................................65

*In re Flintkote Co.*,
486 B.R. 99 (Bankr. D. Del. 2012) .......................................................................38

*In re Franchise Group, Inc.*,
No. 24-12480 (LSS) (Bankr. D. Del. June 2, 2025) ...................................61, 71, 73

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ..............................................................43

*In re Future Energy Corp.*,
83 B.R. 470 (Bankr. S.D. Ohio 1988)...................................................................29

*In re G-I Holdings Inc.*,
420 B.R. 216 (Bankr. D.N.J. 2009) ......................................................................69

*In re Glob. Safety Textiles Holdings LLC*,
    No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009)...........................69

*Harrington v. Purdue Pharma L. P.*,
    603 U.S. 204 (2024)................................................................................................60, 61

*In re Hercules Offshore, Inc.*,
    565 B.R. 732 (Bankr. D. Del. 2016) ...................................................................................55

*In re Indianapolis Downs. LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) .........................................................................*passim*

*In re ION Media Networks, Inc.*,
    419 B.R. 585 (Bankr. S.D.N.Y. Nov. 24, 2009) ..................................................................46

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987)..............................................................................................16

*In re Joann Inc.*,
    No. 25-10068 (CTG) (Bankr. D. Del. July 10, 2025).................................................53, 61, 73

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993).........................................................................................16, 42

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)................................................................................................38

*In re Lab'y Partners, Inc.*,
    No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) ..........................................................65

*In re Lapworth*,
    No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998).............................23

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003) ...................................................................................43

*In re Lisanti Foods, Inc.*,
    329 B.R. 491 (D.N.J. 2005) ................................................................................................29

*In re Lucky Bucks*,
    No. 23-10758 (KBO) (Bankr. D. Del. July 28, 2023) ...........................................................60

*In re Martin*,
    91 F.3d 389 (3d Cir. 1996)..................................................................................................49

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994).........................................................................52, 56

**Page(s)**

*In re Mercy Hosp.*,
No. 23-00623 (TJC), 2024 WL 2890139 (Bankr. N.D. Iowa June 7, 2024) .........................57

*In re Midway Gold US, Inc.*,
575 B.R. 475 (Bankr. D. Colo. 2017) ..........................................................................54

*In re Momentum Mfg. Corp.*,
25 F.3d 1132 (2d Cir. 1994).....................................................................................24

*In re MVK FarmCo LLC*,
No. 23-11721 (LSS)...........................................................................................71, 73

*In re Neshaminy Office Bldg. Assocs.*,
62 B.R. 798 (E.D. Pa. 1986) ..................................................................................49

*In re NII Holdings, Inc.*,
288 B.R. 356 (Bankr. D. Del. 2002) ..........................................................................27

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ..........................................................................15

*In re Nuverra Env't Sols., Inc.*,
590 B.R. 75 (D. Del. 2018)..............................................................................16, 43

*In re Oldco Tire Distribs., Inc.*,
No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025).................................................53, 61

*In re Premier Int'l Holdings, Inc.*,
No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) .................54, 55, 65

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ..........................................................................38

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)......................................................................27, 64, 65, 67

*In re S&W Enter.*,
37 B.R. 153 (Bankr. N.D. Ill. 1984) ..........................................................................15

*In re Smallhold, Inc.*,
665 B.R. 704 (Bankr. D. Del. 2024) .......................................................................59, 60

*In re Spansion, Inc.*,
426 B.R. 114 (Bankr. D. Del. 2010) ....................................................................52, 59, 60

*In re Spansion*,
No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. 2010) .........................................65

*In re Specialty Equip. Cos., Inc.*,
  3 F.3d 1043 (7th Cir. 1993) ........................................................................59

*In re Stone & Webster, Inc.*,
  286 B.R. 532 (Bankr. D. Del. 2002) ...........................................................32

*In re Sun Country Dev., Inc.*,
  764 F.2d 406 (5th Cir. 1985) ...............................................................27, 28

*In re SunPower Corp.*,
  No. 24-11649 (CTG) ............................................................................71, 73

*In re T-H New Orleans Ltd. P'ship*,
  116 F.3d 790 (5th Cir. 1997) ...............................................................27, 28

*In re Tonopah Solar Energy, LLC*,
  657 B.R. 393 (Bankr. D. Del. 2022) .....................................................38, 59

*In re Tribune*,
  464 B.R. 126 (Bankr. D. Del. 2011) .............................................................57

*In re Virgin Orbit*,
  No. 23-10405 (KBO) (Bankr. D. Del. July 31, 2023) ..................................60

*In re Vyaire Med., Inc.*,
  No. 24-11217 (BLS) (Bankr. D. Del. Nov. 14, 2024) .............................53, 73

*In re W. Coast Video Enters., Inc.*,
  174 B.R. 906 (Bankr. E.D. Pa. 1994) ...........................................................60

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2025), *aff'd*, 729 F.3d 311 (3d Cir. 2013) ..............20, 28, 38

*In re Wash. Mut., Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011) ...........................................52, 53, 59, 64

*In re WCI Cable, Inc.*,
  282 B.R. 457 (Bankr. D. Or. 2002) ..............................................................52

*In re World Health Alts., Inc.*,
  344 B.R. 291 (Bankr. D. Del. 2006) .............................................................51

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ..........................................52, 54, 55, 58

**Statutes**

11 U.S.C. § 101(51D)(B) ..............................................................................47

**Page(s)**

11 U.S.C. §§ 101-1532 ..........................................................................................................1

11 U.S.C. § 365 ...........................................................................................................49, 68

11 U.S.C. § 365(f) ...............................................................................................................73

11 U.S.C. § 502 ...................................................................................................................25

11 U.S.C. § 503(b) ..............................................................................................................35

11 U.S.C. § 507(a)(2) ...............................................................................................35, 40, 41

11 U.S.C. § 507(a)(4) ..........................................................................................................35

11 U.S.C. § 507(a)(5) ..........................................................................................................35

11 U.S.C. § 507(a)(6) ..........................................................................................................35

11 U.S.C. § 507(a)(7) ..........................................................................................................35

11 U.S.C. § 507(a)(8) ..........................................................................................................35

11 U.S.C. § 510(b) ...................................................................................................12, 26, 45

11 U.S.C. § 1107(a) ...............................................................................................................5

11 U.S.C. § 1108 ...................................................................................................................5

11 U.S.C. § 1114 .................................................................................................................41

11 U.S.C. § 1122 .............................................................................................15, 16, 18, 19

11 U.S.C. § 1122(a) .....................................................................................................15, 16

11 U.S.C. § 1123 .............................................................................................49, 50, 51

11 U.S.C. § 1123(a) .............................................................................................................18

11 U.S.C. § 1123(a)(1) ........................................................................................................19

11 U.S.C. § 1123(a)(2) ........................................................................................................19

11 U.S.C. § 1123(a)(3) ........................................................................................................19

11 U.S.C. § 1123(a)(4) ........................................................................................................20

11 U.S.C. § 1123(a)(5) ...................................................................................................20, 21

11 U.S.C. § 1123(a)(6) ...................................................................................................21, 22

**Page(s)**

11 U.S.C. § 1123(a)(7)................................................................22, 23

11 U.S.C. § 1123(b)................................................................*passim*

11 U.S.C. § 1123(b)(1)................................................................48

11 U.S.C. § 1123(b)(2)................................................................48

11 U.S.C. § 1123(b)(3)................................................................49

11 U.S.C. § 1123(b)(3)(A)................................................................51

11 U.S.C. § 1123(b)(1)–(6)................................................................48

11 U.S.C. § 1123(d)................................................................68

11 U.S.C. § 1125................................................................*passim*

11 U.S.C. § 1125(a)................................................................24

11 U.S.C. § 1125(b)................................................................24

11 U.S.C. § 1125(c)................................................................24

11 U.S.C. § 1126................................................................*passim*

11 U.S.C. § 1126(a)................................................................26

11 U.S.C. § 1126(c)................................................................27, 34

11 U.S.C. § 1126(d)................................................................34

11 U.S.C. § 1126(f)................................................................11, 26, 27

11 U.S.C. § 1126(g)................................................................11, 26

11 U.S.C. § 1127................................................................70

11 U.S.C. § 1127(a)................................................................68

11 U.S.C. § 1129................................................................1, 14, 46

11 U.S.C. § 1129(a)................................................................42

11 U.S.C. § 1129(a)(1)................................................................15

11 U.S.C. § 1129(a)(2)................................................................23, 27, 65

11 U.S.C. § 1129(a)(3)................................................................27, 28, 29, 65

**Page(s)**

11 U.S.C. § 1129(a)(4)................................................................................................29, 30

11 U.S.C. § 1129(a)(5)..........................................................................................23, 30, 31

11 U.S.C. § 1129(a)(5)(A)(ii) .........................................................................................30

11 U.S.C. § 1129(a)(6) ....................................................................................................31

11 U.S.C. § 1129(a)(7)..........................................................................................31, 32, 33

11 U.S.C. § 1129(a)(7)(A)(ii) .........................................................................................31

11 U.S.C. § 1129(a)(8)..........................................................................................34, 37, 42

11 U.S.C. § 1129(a)(9)..........................................................................................35, 36, 37

11 U.S.C. § 1129(a)(9)(A) .........................................................................................35, 36

11 U.S.C. § 1129(a)(9)(B) .........................................................................................35, 36

11 U.S.C. § 1129(a)(9)(C) ....................................................................................35, 36, 37

11 U.S.C. § 1129(a)(10) .............................................................................................37, 38

11 U.S.C. § 1129(a)(10) and 1129(b) ..............................................................................34

11 U.S.C. § 1129(a)(11) .............................................................................................38, 40

11 U.S.C. § 1129(a)(12) .............................................................................................40, 41

11 U.S.C. § 1129(a)(13) ..................................................................................................41

11 U.S.C. §1129(a)(14) ..............................................................................................41, 42

11 U.S.C. § 1129(a)(15) ..................................................................................................42

11 U.S.C. § 1129(a)(16) ..................................................................................................42

11 U.S.C. § 1129(b) ...................................................................................................*passim*

11 U.S.C. § 1129(b)(1) ..............................................................................................42, 43

11 U.S.C. § 1129(c) .........................................................................................................46

11 U.S.C. § 1129(d) ...................................................................................................46, 47

11 U.S.C. § 1129(e) .........................................................................................................47

15 U.S.C. § 77e ...............................................................................................................47

**Page(s)**

Securities Act of 1933 ........................................................................................................47

**Rules**

Fed. R. Bankr. P. 1015(b) ....................................................................................................5

Fed. R. Bankr. P. 2019 ......................................................................................................70

Fed. R. Bankr. P. 3017 ......................................................................................................24

Fed. R. Bankr. P. 3018 ......................................................................................................24

Fed. R. Bankr. P. 3019 ................................................................................................68, 69

Fed. R. Bankr. P. 3019(a) ..................................................................................................69

Fed. R. Bankr. P. 3020 ......................................................................................................73

Fed. R. Bankr. P. 3020(e) ..................................................................................................73

Fed. R. Bankr. P. 6004(h) ..................................................................................................73

Fed. R. Bankr. P. 6006(d) ..................................................................................................73

Fed. R. Bankr. P. 9019 ..........................................................................................49, 50, 51

Local Rule 1015-1 ...............................................................................................................5

**Other Authorities**

7 Collier on Bankruptcy ¶ 1129.02[5][b] (16th ed. 2021) ...............................................30

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C. C.A.N. 5963 ...................................15, 23

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C. C.A.N. 5787.......................................15, 23

### Relief Requested

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law (this "Memorandum") in support of Confirmation of the *Amended Joint Plan of Reorganization of At Home Group Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "Plan"),[2] filed contemporaneously herewith, pursuant to sections 1125, 1126, and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").

In support of Confirmation of the Plan, the Debtors have also filed the following contemporaneously herewith:  (a) the *Declaration of Jeremy Aguilar in Support of Confirmation of the Amended Joint Plan of Reorganization of At Home Group Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Aguilar Declaration"); (b) the *Declaration of Jeffrey Kopa in Support of Confirmation of the Amended Joint Plan of Reorganization of At Home Group Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Kopa Declaration"); (c) the *Declaration of Scott Mates in Support of Confirmation of the Amended Joint Plan of Reorganization of At Home Group Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Mates Declaration"); (d) the *Declaration of Jill Frizzley in Support of Confirmation of the Amended Joint Plan of Reorganization of At Home Group Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Frizzley Declaration"); and (e) the *Declaration of Jeriad R. Paul With Respect to the Tabulation of Votes*

---

[2] A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of Jeremy Aguilar, Chief Financial Officer of At Home Group Inc. and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 4] (the "First Day Declaration"), incorporated by reference herein.  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or the Disclosure Statement Order (as defined herein), as applicable.

*on the Amended Joint Plan of Reorganization of At Home Group Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>Voting Report</u>," and together with the Aguilar Declaration, the Kopa Declaration, the Mates Declaration, and the Frizzley Declaration, collectively, the "<u>Declarations</u>").  In further support of Confirmation of the Plan, and in response to objections thereto, the Debtors state the following:

## Preliminary Statement

1.    The Court should confirm the Plan.  The Debtors commenced these Chapter 11 Cases to consummate a prearranged restructuring transaction aimed at significantly deleveraging their balance sheet and rationalizing their lease portfolio.  Since the Petition Date, the Debtors have engaged in months of good-faith, arm's-length negotiations with the Committee and other key stakeholders, ultimately formulating a Plan designed to maximize value and recoveries for all stakeholders.  Importantly, the Plan deleverages the Debtors' balance sheet by approximately $1.7 billion, preserves thousands of jobs, reduces the Debtors' real estate footprint, and positions the Company for long-term profitability.  In addition, the Plan provides unsecured creditors a meaningful recovery through a comprehensive, multi-party settlement, and secures a $500 million Exit ABL Facility to support post-emergence operations and fund administrative expenses for the go-forward business.

2.    Now, nearly three months later, the Debtors stand on the precipice of confirming a value-maximizing Plan that has garnered virtually unanimous support from all stakeholders.  The Plan has been accepted by every voting class of Holders of Claims that submitted Ballots, including 100% of the voting Holders of the Cayman Notes Claims, the Intercompany Notes Claims, the Term Loan Claims, the Senior Secured Notes Claims, and the Exchange Notes Claims, as well as approximately 98.98% of the voting Holders of the General Unsecured Claims.  The Plan is also supported by the Committee and the U.S. Trustee did not object to Confirmation of the Plan.  As

2

the creditor body has made clear through their nearly unanimous support, the Plan represents the most value-maximizing path to concluding these Chapter 11 Cases.

3.     As of the filing of this Memorandum, there are no substantive objections to the Plan.  The Debtors have received ten formal objections and certain informal objections and comments.[3]  Of the formal objections, nine of these concern Cure disputes, including two that also raise additional issues regarding the Plan's provisions governing the assumption and assignment of Unexpired Leases, which have since been resolved through revisions to the Plan and/or the Confirmation Order.[4]  The remaining objection relates to the treatment of personal injury claims under the Plan.[5]  A number of the objections have been resolved through revisions to the Plan, language in the Confirmation Order, or as otherwise set forth in the Objection Chart.  The Debtors are continuing to work with all parties to resolve the open Cure objections and the Bowersox Objection, however, to the extent such objections are not resolved in advance of the Confirmation Hearing, they should be overruled for the reasons set forth herein.

4.     The Plan satisfies the Bankruptcy Code's requirements for Confirmation and faces limited opposition.  Timely Confirmation and consummation of the Plan will allow the Debtors to bring these Chapter 11 Cases to an orderly, value-maximizing conclusion.  For the reasons stated

---

[3]     A comprehensive chart summarizing the substance and status of all formal objections and reservations of rights is attached hereto as **Exhibit A** (the "Objection Chart").  The Debtors also received several informal objections and other comments from various parties in interest, which have been incorporated in the Plan.

[4]     *See* Docket Nos. 632, 640, 646, 642, 643, 644, 648, 650, and 652.  The Debtors are actively working with various parties that filed cure objections to address their objections, and all parties' respective rights are reserved to address any unresolved matters at a future hearing, if necessary.

[5]     *See Objection to Plan and Reservation of Rights of Catheryn Bowersox to the Joint Plan of Reorganization of At Home Group Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 653] (the "Bowersox Objection").

herein and in light of the evidentiary support to be offered at the Confirmation Hearing, all outstanding objections should be overruled, and the Plan should be confirmed.

## Background

### I.     Procedural History.

5.     Headquartered in Coppell, Texas, At Home is a home décor and furnishings brand that offers its customers a broad assortment of everyday and seasonal products for every room in the home.  With more than 45 years of experience, At Home has built a loyal customer base by leveraging its omnichannel platform and deep expertise in design, product development, sourcing, and merchandising.  Despite its strong brand recognition, customer loyalty, and management's efforts to execute strategic initiatives, the Company faced a number of financial and operational headwinds that ultimately led the Debtors to utilize in-court restructuring measures.   On June 16, 2025, following good faith, arm's-length negotiations, the Debtors entered into the RSA with the support of holders of approximately 96% of the Company's first lien debt.  The RSA contemplated a comprehensive balance sheet restructuring, including the equitization of most of the Debtor's prepetition secured debt.  Additionally, pursuant to the RSA, the Ad Hoc Group agreed to backstop a $600 million senior secured first lien super-priority debtor-in-possession financing comprised of delayed draw term loans, $200 million of which are in respect of "new money" and $400 million of which has been "rolled up" from existing debt held by the Pari First Lien Secured Parties (as defined in the DIP Orders).

6.     Consistent with the RSA, on the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[6]  During these Chapter 11 Cases, the Debtors have operated their business and managed their property as debtors in possession pursuant

---

[6]    *See* Docket 1.

to sections 1107(a) and 1108 of the Bankruptcy Code.  On June 17, 2025, the Bankruptcy Court entered an order [Docket No. 92] authorizing the procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  On June 27, 2025, the U.S. Trustee appointed the Committee [Docket No. 197] and subsequently amended the Committee on July 15, 2025 [Docket No. 306], on July 17, 2025 [Docket No. 320], and on July 18, 2025 [Docket No. 335].

7.      On July 7, 2025, the Debtors filed the *Joint Plan of Reorganization of At Home Group Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 249] and the *Disclosure Statement Relating to the Joint Plan of Reorganization of At Home Group Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 250].  On July 24, 2025, the Debtors filed the *Motion of Debtors for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures with Respect to Confirmation of the Debtors' Joint Chapter 11 Plan, (III) the Form of Ballot and Notices in Connection Therewith, (IV) Certain Dates and Deadlines with Respect Thereto, and (V) Granting Related Relief* [Docket No. 376].  After discussions and negotiations with various stakeholders, on July 29, 2025, the Debtors filed a revised Plan [Docket No. 391] and Disclosure Statement [Docket No. 392].

8.      On July 18, 2025, the Debtors, the Committee, the Ad Hoc Group, the Prepetition ABL Secured Parties, and certain landlord parties reached a consensual resolution regarding objections and joinders to the Final DIP Order filed by the Committee [Docket No. 279] and various landlord groups [Docket Nos. 268, 271, 275, and 283].  That same day, the Bankruptcy Court held a hearing to consider final approval of the DIP Facility and entered the Final DIP Order, authorizing the Debtors to access the $125 million remaining in new money financing.

9.      On August 11, 2025, after several weeks of hard-fought negotiations, the Debtors, the Committee, the Ad Hoc Group, and the Prepetition ABL Secured Parties reached a global resolution with the Committee regarding its objections to the Disclosure Statement and Plan.[7]  The resolution with the Committee is reflected in the further revised Plan [Docket No. 507] and Disclosure Statement [Docket No. 509], and provides value to Holders of General Unsecured Claims in the form of Unsecured Claims Distribution Trust Assets consisting of approximately $3.9 million in Cash and the Assigned Preference Actions, which include certain claims and causes of action held by the Debtors and their respective Estates (the "Committee Settlement").  The Committee is supportive of the Plan and has recommended that Holders of Class 9 General Unsecured Claims vote in favor of the Plan.  Accordingly, approximately 98.98% percent in number of General Unsecured Claims who voted and approximately 99.99% percent in amount of General Unsecured Claims who voted accepted the Plan.

10.      On August 14, 2025, the Bankruptcy Court held a hearing to consider the adequacy of the Disclosure Statement.  On August 18, 2025, the Bankruptcy Court entered an order approving the Disclosure Statement on a final basis and establishing a schedule for Confirmation [Docket No. 536] (the "Disclosure Statement Order").  The Disclosure Statement Order also approved procedures for (a) the solicitation and tabulation of votes on the Plan and (b) Holders of Claims or Interests not entitled to vote on the Plan (collectively, the "Non-Voting Classes") to opt

---

[7]     *See Objection of the Official Committee of Unsecured Creditors to Approval of the Disclosure Statement Relating to the Joint Plan of Reorganization of At Home Group Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 486].

in to the Plan's Third-Party Release (collectively, the "Solicitation Procedures").  On August

19, 2025, the Debtors commenced solicitation of votes on the Plan.[8]

11.     On September 5, 2025, the Debtors filed with this Court the *Plan Supplement for

the Joint Plan of Reorganization of At Home Group Inc. and its Debtor Affiliates Pursuant to

Chapter 11 of the Bankruptcy Code* [Docket No. 601], which included the initial (a) Schedule of

Rejected Executory Contracts and Unexpired Leases, and (b) Schedule of Assumed Executory

Contracts and Unexpired Leases.  On September 12, 2025, the Debtors filed the *First Amended

Plan Supplement for the Joint Plan of Reorganization of At Home Group Inc. and its Debtor

Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 611],[9] which included (a) an

amended Schedule of Rejected Executory Contracts and Unexpired Leases, (b) an amended

Schedule of Assumed Executory Contracts and Unexpired Leases, (c) the Schedule of Retained

Causes of Action, (d) the Restructuring Transactions Memorandum, (e) the New Organizational

Documents, and (f) the Unsecured Claims Distribution Trust Agreement (as may be amended,

modified, or supplemented from time to time, the "Plan Supplement").  The Debtors intend to file

one or more supplemental Plan Supplements prior to the Confirmation Hearing.

12.     Contemporaneously herewith, the Debtors filed the *Amended Joint Plan of

Reorganization of At Home Group Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the

Bankruptcy Code*, which sets forth technical and clarifying modifications and addresses certain

informal objections to the Plan, including those raised by the U.S. Trustee and various landlord

---

[8]     *Affidavit of Service* [Docket No. 506], *Affidavit of Supplement Service* [Docket No. 588], and *Affidavit of Supplement Service* [Docket No. 589] (the "Solicitation Affidavits").

[9]     On September 11, 2025, the Debtors filed the *First Amended Plan Supplement for the Joint Plan of Reorganization of At Home Group Inc. and its Debtor Affiliates pursuant to Chapter 11 of the Bankruptcy Code*, in accordance with the Disclosure Statement Order.  The Debtors subsequently withdrew and refiled the document on September 12, 2025, to incorporate non-substantive revisions.

parties. The deadline (a) to file objections to the Plan, and (b) for all Holders of Claims entitled to vote on the Plan to cast their ballots was September 18, 2025, at 4:00 p.m. (prevailing Eastern Time).[10] The Confirmation Hearing is scheduled for September 30, 2025, at 9:00 a.m. (prevailing Eastern Time).

## II.   Disinterested Directors' Investigation.

13.   Prior to the Petition Date, the Company's board of directors appointed two disinterested directors: Jill Frizzley and Elizabeth Abrams (collectively, the "Disinterested Directors") and formed the special committee, comprised of Ms. Frizzley, Ms. Abrams, and John Butcher (the "Special Committee").[11] The scope of the Special Committee's authority included, among other things, decision-making authority with respect to any matters in which a conflict of interests exists or is reasonably likely to exist (the "Conflict Matters") between the Company, on the one hand, and any of the Related Parties, on the other hand. In May 2025, the Disinterested Directors initiated an independent investigation (the "Investigation") into the Conflict Matters, such as potential claims and causes of action that the Company may hold against Related Parties.[12]

14.   The Disinterested Directors, with the assistance of the Debtors and Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), as independent legal counsel, reviewed the factual and legal bases for potential claims and causes of action arising from the Company's

---

[10]   The Debtors extended the objection deadline for certain parties to September 19, 2025, at 4:00 p.m. (prevailing Eastern Time) and September 25, 2025, at 4:00 p.m. (prevailing Eastern Time). All related issues concerning these extensions were resolved prior to the filing of this Memorandum.

[11]   *See* Frizzley Decl. ¶ 7.

[12]   *Id*. ¶ 9. Mr. Butcher, who served on the board of directors of the Company from 2020 to 2021, and then rejoined the board in June 2023, recused himself from the Investigation in light of his tenure as a board member with the Company during the time period on which the Investigation focused, though he remained as a member of the Special Committee for all other purposes.

transactions to ensure that any releases to be provided under a plan of reorganization or otherwise in the Chapter 11 Cases are appropriate in scope and nature.[13]  As part of the Investigation, Young Conaway requested and received documents from the Company and also conducted interviews of relevant persons.[14]

15.    The Disinterested Directors, with assistance from Young Conaway, evaluated a wide range of transactions and other activities, including the May 2023 liability management transaction involving a new money capital raise and Senior Unsecured Notes exchange with certain holders of the Senior Unsecured Notes.[15]  Beyond the specifics of certain transactions, the circumstances and nature of the relationship between the Company, its secured lenders, and the unsecured bond holders was also explored to determine any other possible claims that might have arisen in the context of any transaction.[16]  In addition, the Disinterested Directors analyzed possible claims around salaries and benefits that were paid to Company officers and directors in the year leading up to the bankruptcy filing, but the Investigation concluded that that such compensation was typical, market, and consistent with Company practices.[17]  The Investigation was comprehensive, and the Disinterested Directors did not identify any Claims and/or Causes of

---

[13]    *See* Frizzley Decl. ¶ 10.

[14]    *See id*.

[15]    *See* Disclosure Statement § VII.E.

[16]    *Id.; see* Frizzley Decl. ¶ 11.

[17]    *See* Disclosure Statement § VII.E.

Action against the Company's insiders relating to any prepetition conduct of such parties that were worthy of pursuit.[18]

## III.   The Solicitation Process and Voting Results.

16.     In accordance with the Solicitation Procedures, the Debtors served the Solicitation Packages on Holders of Claims entitled to vote on the Plan (the "Voting Classes").   The Solicitation Packages, served on August 19, 2025, included:  (a) the Disclosure Statement Order; (b) a Ballot[19] with applicable voting instructions; (c) a cover letter describing the contents of the Solicitation Package, providing a link to solicitation versions of the Plan, Disclosure Statement, and Disclosure Statement Order; (d) the Confirmation Hearing Notice; and (e) the Committee Cover Letter, detailing the Committee's support for the Plan and urging the Holders of Claims in the Voting Classes to vote to accept the Plan.   In lieu of a Solicitation Package, Holders in the Non-Voting Classes received an applicable notice of non-voting status (the "Notice of Non-Voting Status") and an opt in form related to the Plan's Third-Party Releases (the "Opt-In Form").[20]   Each Notice of Non-Voting Status and/or Opt-In Form included, among other things:  (a) instructions as to how to view or obtain copies of the Disclosure Statement, the Plan, the Plan Supplement, and related documents from the Claims and Noticing Agent; (b) an Opt-In Form by which all Holders or potential Holders of Claims or Interests can elect to opt in to the Third-Party Releases contained in Article VIII of the Plan; (c) a disclosure regarding the releases and the settlement, release, exculpation, and injunction language set forth in Article VIII of the Plan; (d) notice of the Voting

---

[18]   *See* Frizzley Decl. ¶ 13.

[19]   The forms of ballots used in solicitation were included as Exhibit 3A, 3B, 3C, 3D, 3E, 3F, 3G, 3H, 3I, 3J, and 3K, attached to the Disclosure Statement Order.

[20]   *See* Voting Report, ¶ 5.

Deadline (as defined herein); and (e) information related thereto.  The Debtors also published the Publication Notice in *The New York Times* (national edition) on August 20, 2025, as evidenced by the *Certificate of Publication*.[21]

17.     The Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein applies separately to each of the Debtors.  For purposes of administrative convenience, the Plan consolidates the process by which distributions will be made under the Plan, but the Plan does not contemplate substantive consolidation.

18.     In compliance with the Bankruptcy Code and the Disclosure Statement Order, only Holders of Claims and Interests in Impaired Classes receiving or retaining property on account of such Claims or Interests were entitled to vote on the Plan.[22]  Holders of Claims and Interests were not entitled to vote if their rights are (a) Unimpaired under the Plan (in which case such Holders were conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code) or (b) Impaired and such Holders are not entitled to receive any distribution under the Plan (in which case such Holders were conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).   Accordingly, the following Classes of Claims and Interests were ***not*** entitled to vote on the Plan, and the Debtors did not solicit votes from Holders of such Claims and Interests:

| Class | Claim or Interest | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | ABL Facility Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 10 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

---

[21]     *See Certificate of Publication* [Docket No. 552].

[22]     *See* 11 U.S.C. § 1126.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 11 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 12 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 13 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

19.    The Debtors solicited votes on the Plan only from Holders of Claims in Class 4 (Cayman Notes Claims), Class 5 (Intercompany Note Claims), Class 6 (Term Loan Claims), Class 7 (Senior Secured Notes Claims), Class 8 (Exchange Notes Claims), and Class 9 (General Unsecured Claims).  The deadline for all Holders of Claims entitled to vote on the Plan to cast their Ballots was September 18, 2025, at 4:00 p.m. (prevailing Eastern Time) (the "Voting Deadline").  The deadline to object to Confirmation of the Plan was also set for September 18, 2025, at 4:00 p.m. (prevailing Eastern Time) (the "Plan Objection Deadline"), but was extended by the Debtors for certain parties.  The voting results, as reflected in the Voting Report, are summarized as follows:[23]

---

[23]    These voting results are presented on a consolidated basis.  A detailed debtor-by-debtor breakdown is provided in Exhibit A attached to the Voting Report.

| VOTING CLASS[24] | ACCEPT | | REJECT | |
| --- | --- | --- | --- | --- |
| | NUMBER (% of Number Voted) | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) | AMOUNT (% of Amount Voted) |
| Class 4 – Cayman Notes Claims | 100% | 100% | 0% | 0% |
| Class 5 – Intercompany Note Claims | 100% | 100% | 0% | 0% |
| Class 6 – Term Loan Claims | 100% | 100% | 0% | 0% |
| Class 7 – Senior Secured Notes Claims | 100% | 100% | 0% | 0% |
| Class 8 – Exchange Notes Claims | 100% | 100% | 0% | 0% |
| Class 9 – General Unsecured Claims | 98.98% | 99.998% | 1.02% | 0.002% |

20.      All Holders of Claims and Interests, regardless of whether they were entitled to vote on the Plan, had the opportunity to "opt in" to the Third-Party Release through their Ballots or Opt-In Forms, as applicable.  The Debtors received 205 affirmative opt-ins.  The Debtors strongly believe that the Plan is in the best interests of the Debtors, their Estates, and other parties in interest.

21.      The transactions contemplated under the Plan represent a significant achievement for the Debtors and are the direct result of extensive, good-faith negotiations with the Debtors' key stakeholders.  The transactions embodied in the Plan will maximize the value of the Estate and maximize recoveries to Holders of Claims and Interests as demonstrated by the Voting Class's unanimous acceptance of the Plan.  Because the Plan meets the requirements of section 1129(b) as described below, the Court should confirm the Plan over the Non-Voting Classes that were deemed to reject the Plan.

---

[24]   The Debtors did not receive any votes on the Plan from Holders of Claims in the Voting Classes for the following two Debtor entities:  Ambience Parent, Inc. and At Home Assembly Park Drive Condominium Association.  For the avoidance of doubt, all Impaired Classes have accepted the Plan. Pursuant to Articles III.D and III.E of the Plan, the Classes of Claims at these entities are either (i) deemed eliminated from the Plan for purposes of determining acceptance or rejection, or (ii) deemed to have accepted the Plan.

## IV.      Objections.

22.      The Debtors have worked with various parties in interest to resolve both formal and informal objections in advance of the Confirmation Hearing, including through various revisions to the Plan.  The majority of the objections have been resolved, except for six objections relating exclusively to Cure disputes and the Bowersox Objection, each of which is addressed in the Objection Chart.  The Debtors reserve their rights to address objections, if any, at the Confirmation Hearing.

<u>**Argument**</u>

23.      This memorandum is organized as follows:  ***First***, the Debtors present their "case-in-chief" that the Plan satisfies the applicable requirements of section 1129 of the Bankruptcy Code by a preponderance of the evidence and should therefore be confirmed.  ***Second***, as part of the Debtors' case in chief, the Debtors set forth how the release, exculpation, and injunction provisions of the Plan comply with the Bankruptcy Code, prevailing law, and are in the best interests of the Debtors' Estates.  ***Third,*** the Debtors request approval of technical modifications made to the Plan since solicitation and explain why such modifications do not require resolicitation.  ***Fourth***, the Debtors request that the Bankruptcy Court overrule the remaining objections.  ***Finally***, the Debtors submit that good cause exists to waive the stay of the Confirmation Order.

## I.      **The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code and Should Be Confirmed.**

24.      To confirm the Plan, the Bankruptcy Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[25]

---

[25]      *See In re Boy Scouts of Am.*, 137 F.4th 126, 158 n.18 (3d Cir. 2025) ("To confirm a consensual reorganization plan, on the other hand, the debtor must carry its burden of satisfying § 1129(a)'s sixteen statutory requirements

As set forth herein, the Plan complies with all relevant sections of the Bankruptcy Code—including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable non-bankruptcy law.  The evidence the Debtors submitted in support of Confirmation of the Plan far exceeds the preponderance of evidence standard set forth in the Bankruptcy Code and will be further supported by evidence that will be submitted at the Confirmation Hearing, if necessary.  The Debtors therefore request that the Bankruptcy Court confirm the Plan.

**A.      The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).**

25.      Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a chapter 11 plan, respectively.[26]  As explained below, the Plan complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

**1.      The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

26.      The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, that "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the

---

by a preponderance of evidence . . .  And those requirements increase when a debtor seeks to cram down a plan over the objection of a nonconsenting impaired class.") (citing *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006)) (internal quotations marks omitted); *In re Armstrong*, 348 B.R. at 120, n.15 (applying the preponderance of the evidence standard).

[26]      S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368; *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

other claims or interests of such class."[27]  For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all substantially similar claims or interests need to be grouped in the same class.[28]  Instead, claims or interests designated to a particular class must be substantially similar to each other.[29]  Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[30]

27.    The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into thirteen separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class based on legal or factual criteria or other relevant criteria.[31]  Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

---

[27]    11 U.S.C. § 1122(a).

[28]    *See In re Nuverra Env't Sols., Inc.*, 590 B.R. 75, 96 (D. Del. 2018) ("Section 1122 of the [Bankruptcy] Code provides that claims that are not substantially similar may not be placed in the same class; it does not expressly prohibit placing 'substantially similar' claims in separate classes.") (quoting *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del. 2004)) (internal quotation marks omitted).

[29]    *Id.*

[30]    *Id.*  Courts have identified grounds justifying separate classification, including (a) where members of a class possess different legal rights and (b) where there are good business reasons for separate classification.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *see also In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *accord In re Chateaugay Corp.*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because the classification scheme had a rational basis on account of the bankruptcy court-approved settlement).

[31]    *See* Plan, Art. III.

a.       Class 1:  Other Secured Claims;

b.       Class 2:  Other Priority Claims;

c.       Class 3:  ABL Facility Claims;

d.       Class 4:  Cayman Notes Claims;

e.       Class 5:  Intercompany Note Claims;

f.       Class 6:  Term Loan Claims;

g.       Class 7:  Senior Secured Notes Claims;

h.       Class 8:  Exchange Notes Claims;

i.       Class 9:  General Unsecured Claims;

j.       Class 10:  Intercompany Claims;

k.       Class 11:  Intercompany Interests;

l.       Class 12:  Existing Equity Interests; and

m.       Class 13:  Section 510(b) Claims.[32]

28.    Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in each such Class.[33]  The Plan's classification scheme generally corresponds to the Debtors' corporate and capital structure, thereby taking into account the relative priority among Claims and Interests, including the relative priorities between secured and unsecured claims.  In addition, valid legal and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[34]

---

[32]   *Id.*

[33]   *See* Aguilar Decl. ¶ 9.

[34]   *See id.* ¶ 11.

Namely, the Plan separately classifies the Claims because each Holder of such Claims or Interests may hold (or may have held) rights in the Estates legally dissimilar to the Claims or Interests in other Classes.[35]

29.    For example, Class 4 Cayman Notes Claims, Class 5 Intercompany Note Claims, Class 6 Term Loan Claims, Class 7 Senior Secured Notes Claims, and Class 8 Exchange Notes Claims are classified in their own Classes to account for certain legal rights such Holders of those Claims have under their prepetition credit agreements, including their secured status, and, in some cases, different collateral.[36]  The classification scheme distinguishes Classes 4, 5, 6, 7, and 8 from Class 9 (Holders of General Unsecured Claims), because, unlike the Claims for Classes 4, 5, 6, 7, and 8, General Unsecured Claims are not secured and are entirely unrelated to the loans in Classes 4, 5, 6, 7, and 8.  Other Secured Claims (Class 1) and Other Priority Claims (Class 2) are classified separately due to their required treatment under the Bankruptcy Code.[37]

30.    Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class, and the separation of Classes is based on valid factual and legal distinctions.  The Plan therefore complies with and satisfies section 1122 of the Bankruptcy Code.

**2.    The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

31.    The seven applicable requirements of section 1123(a) of the Bankruptcy Code generally relate to the specification of claims treatment and classification, the equal treatment of

---

[35]    *See id.*

[36]    *See* Plan, Art. III.

[37]    *See id.*

claims within classes, and the mechanics of implementing a plan.  The Plan satisfies each of these requirements.

>    *(1)     Designation   of   Classes   of   Claims   and   Equity   Interests (§ 1123(a)(1)).*

32.     Section 1123(a)(1) requires that the Plan designate "classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interest."[38]  For the reasons set forth above, Article III of the Plan properly designates classes of Claims and Interests and thus satisfies the requirement of section 1122 of the Bankruptcy Code.[39]

>    *(2)     Specification of Unimpaired Classes (§ 1123(a)(2)).*

33.     Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan. . . ."[40]  The Plan meets this requirement by identifying each Class that is Unimpaired.[41]

>    *(3)     Treatment of Impaired Classes (§ 1123(a)(3)).*

34.     Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."[42] The Plan meets this requirement by setting forth the treatment of each Class that is Impaired in Article III.[43]

---

[38]   11 U.S.C. § 1123(a)(1).

[39]   *See* Plan, Art. III.A.

[40]   11 U.S.C. §1123(a)(2).

[41]   *See* Plan, Art. III.A.

[42]   11 U.S.C. §1123(a)(3).

[43]   *See* Plan, Art. III.B.

*(4)     Equal Treatment within Classes (§ 1123(a)(4)).*

35.     Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[44]  A plan provides equal treatment if:  (a) all class members are subject to the same process for claim satisfaction; (b) all class members' claims are of "equal value" through the application of the pro rata distribution or payment percentage procedures to all claims; and (c) all class members give up the same degree of consideration for their distribution under the plan.[45]  The Bankruptcy Code does not require perfect or precise equality, only approximate equality.[46]  The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.[47]

*(5)     Means for Implementation (§ 1123(a)(5)).*

36.     Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[48]  The Plan, together with the documents and forms of agreement included in the Plan Supplement, provides a detailed blueprint for the transactions underlying the Plan, which are focused on a reorganization of the Debtors' business through an equitization of the DIP Facility and portions of the Debtors' prepetition secured debt.

---

[44]    11 U.S.C. § 1123(a)(4).

[45]    *In re W.R. Grace & Co.*, 475 B.R. 34, 121 (D. Del. 2025), *aff'd*, 729 F.3d 311 (3d Cir. 2013) (internal quotation marks and citations omitted).

[46]    *Id.*

[47]    *See* Plan, Art. III.B.

[48]    11 U.S.C. § 1123(a)(5).

37.     Article IV of the Plan, in particular, sets forth the means for implementation of the Plan, which include, *inter alia*:  (a) the Restructuring Transactions, including the execution and delivery of any appropriate agreements or documents pursuant to the Plan; (b) the sources of consideration for Plan distributions, including the Exit ABL Facility; (c) a description of the Reorganized Debtors; (d) the adoption of the New Organizational Documents; (e) the consummation of various corporate transaction steps necessary to implement the new corporate structure upon emergence; (f) the preservation of certain Causes of Action; and (e) the processes for the vesting of Estate assets in the Reorganized Debtors, the assumption or assumption and assignment of Executory Contracts and Unexpired Leases, and the settlement of Claims and Interests.[49]  In addition to these core transactions, the Plan sets forth other critical mechanics of the Debtors' reorganization, such as the establishment of the Unsecured Claims Distribution Trust in accordance with the Committee Settlement, the cancellation of existing securities and agreements, payment of certain fees, and a description of the Management Incentive Plan.[50]

38.     The precise terms governing the execution of these transactions are set forth in the applicable definitive documents or forms of agreements included in the Plan Supplement. The Debtors believe that the Plan sets forth adequate means for its implementation and satisfies section 1123(a)(5) of the Bankruptcy Code and no party has asserted otherwise.

*(6)     Issuance of Non-Voting Securities (§ 1123(a)(6)).*

39.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate documents prohibit the issuance of nonvoting equity securities.[51]  Article IV.J of the Plan provides

---

[49]   *See* Plan, Art. IV.

[50]   *Id.*

[51]   11 U.S.C. § 1123(a)(6).

that the New Organizational Documents shall contain a provision prohibiting the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.[52] In accordance with Article IV.J of the Plan, on or as soon as reasonably practicable after the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors and will prohibit the issuance of non-voting equity securities pursuant to the Plan. Accordingly, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.

*(7)    Directors and Officers (§ 1123(a)(7)).*

40.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[53] As of the Effective Date, the term of the current members of the board of directors or other Governing Body of each of the Debtors will expire.[54] The members of the board of directors or other Governing Body for the initial term of the New Board and the other Governing Bodies shall be appointed in accordance with the New Organizational Documents.[55] The New Board will consist of seven directors and include: (a) the CEO; and (b) six directors selected as follows, in each case, in consultation with the CEO, (i) four directors selected by Redwood Capital Management, LLC, (ii) one director selected by Anchorage Capital Advisors, L.P., and (iii) one

---

[52]    Plan, Art. IV.J.

[53]    11 U.S.C. §1123(a)(7).

[54]    Plan, Art. IV.K.

[55]    *Id.*

director selected by Farallon Capital Advisors, L.L.C.[56]  To the extent known, the identities of the initial members of the New Board will be set forth in Exhibit E of the Plan Supplement.[57]  The members and officers of the New Board that remain unknown at the time of the Confirmation Hearing shall be identified prior to the Effective Date and/or appointed in accordance with procedures identified in the Plan and the New Organizational Documents.[58]  Accordingly, the Plan satisfies section 1123(a)(7).

      **B.**      **The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).**

41.      The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.[59]  The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended to encompass the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[60]  As set forth herein, the Debtors have complied with these provisions, including sections 1125 and 1126 of the

---

[56]    *Id.*

[57]    Plan, Art. IV.K; *In re Charter Comm's*, 419 B.R. 221, 260 n.30 (Bankr. S.D.N.Y 2011) ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at [confirmation] of the identities of the *known* directors.") (emphasis in original).

[58]    Plan, Art. IV.K.

[59]    *See* 11 U.S.C. § 1129(a)(2).

[60]    *In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS) 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) ("The legislative history of section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the solicitation and disclosure requirements under sections 1125 and 1126 of the Bankruptcy Code."); S. Rep. No. 95-989, at 126 (1978); H.R. Rep. No. 95-595, at 412 (1977).

Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by soliciting votes on the Plan in accordance with the Disclosure Statement Order.

### 1.    The Debtors Complied with Section 1125 of the Bankruptcy Code.

42.    Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a chapter 11 plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[61]    Section 1125 ensures that parties in interest are fully informed regarding a debtor's condition so that they may make an informed decision whether to approve or reject the plan.[62]

43.    Section 1125 is satisfied here.  Before the Debtors solicited votes on the Plan, the Bankruptcy Court approved the Disclosure Statement.[63]  The Bankruptcy Court also approved the Solicitation Packages provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.[64]  As stated in the Voting Report, the Debtors, through their Claims and Noticing Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.[65]  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure

---

[61]    11 U.S.C. § 1125(b).

[62]    *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[63]    *See generally* Disclosure Statement Order.

[64]    *See generally* Disclosure Statement Order.

[65]    *See* Solicitation Affidavits.

statement must be transmitted to each holder of a claim or interest in a particular Class.  Here, the Debtors caused the same Disclosure Statement to be transmitted to all parties entitled to vote on the Plan and all parties deemed to accept or reject the Plan.[66]

44.     Based on the foregoing, the Debtors have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order, and no party has asserted otherwise.

**2.      The Debtors Complied with Section 1126 of the Bankruptcy Code.**

45.     Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a chapter 11 plan.  Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and equity interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.  Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

>      (a)     The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan . . . .

>      (f)     Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

>      (g)     Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.[67]

---

[66]   *See* Solicitation Affidavits.

[67]   11 U.S.C. §§ 1126(a), (f), (g).

46.     As set forth above, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders of Allowed Claims in Class 4 (Cayman Notes Claims), Class 5 (Intercompany Note Claims), Class 6 (Term Loan Claims), Class 7 (Senior Secured Claims), Class 8 (Exchange Notes Claims), and Class 9 (General Unsecured Claims).[68]   The Debtors did not solicit votes from Holders of Claims and Interests in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), and Class 3 (ABL Facility Claims) because Holders of Claims in these Classes are Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.[69] Depending on their ultimate treatment by the Debtors, Holders of Claims and Interests in Class 10 (Intercompany Claims) and Class 11 (Intercompany Interests) will be either conclusively presumed to accept or deemed to reject the Plan, and in either scenario are not entitled to vote on the Plan.[70]

47.     As set forth in the Disclosure Statement, Holders of Claims or Interests in Class 12 (Existing Equity Interests) and Class 13 (Section 510(b) Claims) will receive no distribution under the Plan and, pursuant to section 1126(g) of the Bankruptcy Code, are deemed to reject the Plan (the "Deemed Rejecting Classes").[71]   Thus, pursuant to section 1126(a) of the Bankruptcy Code,

---

[68]    *See* Solicitation Affidavits.

[69]    *See* Plan, Art. III.B; *see also* 11 U.S.C. § 1126(f).

[70]    *See* Plan, Art. III.B.

[71]    *See id*.

only Holders of Claims in Classes 4, 5, 6, 7, 8, and 9 were entitled to vote to accept or reject the Plan.[72]

48.    With respect to the Voting Classes, section 1126(c) of the Bankruptcy Code provides that a class accepts a plan where holders of claims holding at least two-thirds in amount and more than one-half in number of allowed claims voting in such class vote to accept such plan. The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[73]    As set forth in the Voting Report, Classes 4, 5, 6, 7, 8, and 9 each overwhelmingly voted to accept the Plan.  Based on the foregoing, the Debtors have satisfied the requirements of section 1129(a)(2).[74]

### C.    The Plan Was Proposed in Good Faith (§ 1129(a)(3)).

49.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[75]  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[76]  To determine whether a plan seeks

---

[72]    *See id.*; *see also* Solicitation Affidavits.

[73]    *See generally* Voting Report.

[74]    *See* Voting Report, <u>Ex. A</u>.

[75]    11 U.S.C. § 1129(a)(3).

[76]    *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) ("'[F]or purposes of determining good faith under section 1129(a)(3) ... the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'") (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)) (alteration in original); *see also In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002) ("[T]he Plan has been proposed with the legitimate purpose of reorganizing the business affairs of each of the Debtors and maximizing the returns available to creditors of the Debtors.  Accordingly, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code."); *accord In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997) ("Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." (quoting *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985))).

relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[77]

50.     The Debtors negotiated, developed, and proposed the Plan in good faith, and the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  Throughout these Chapter 11 Cases, the Debtors worked to build consensus among their various stakeholders, as evidenced by, among other things, the Committee Settlement incorporated in the Plan and the absence of any substantive objections filed in opposition to Confirmation of the Plan.  The Plan and the process leading up to its formulation are the result of extensive, arm's-length negotiations among the Debtors, the Ad Hoc Group, the Prepetition ABL Secured Parties, the Committee, and other parties in interest.[78] The Plan delivers significant value to creditors (including one hundred percent recoveries for all Holders of Other Secured Claims, Other Priority Claims, and ABL Facility Claims), and preserves the Debtors' business as a going concern.[79]   Additionally, the Plan has been accepted by the Voting Classes and no Voting Class has voted to reject the Plan.[80]   The Plan was proposed in good faith and not by any means forbidden by law, has a high likelihood of success, and will achieve a result consistent with the objectives of the Bankruptcy Code.

---

[77] *E.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012) ("[A] determination of good faith associated with a Chapter 11 reorganization plan requires a factual inquiry into a totality of the circumstances surrounding the plan's proposal.") (citing *Brite v. Sun Country Dev., Inc.,* 764 F.2d 406, 408 (5th Cir. 1985); *Century Glove*, 1993 WL 239489, at *4 ("The 'requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start.'") (quoting *Sun Country Dev., Inc.*, 764 F.2d at 408); *T-H New Orleans*, 116 F.3d at 802 (same).

[78]     *See* Aguilar Decl. ¶ 16.

[79]     *See* Kopa Decl. ¶ 20.

[80]     *See generally* Voting Report.

51.    Here, the Plan will enable the Debtors to deleverage their balance sheet and maintain their business as a going concern.  The Plan's unanimous support by the Voting Classes is strong evidence that the Plan is likely to succeed.[81]  Finally, throughout the negotiation of the Plan and these Chapter 11 Cases, the Debtors have upheld their fiduciary duties to stakeholders and protected the interests of all constituents with an even hand.  Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code, and no party has asserted otherwise.

**D.    The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

52.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Bankruptcy Court as reasonable.[82]  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Bankruptcy Court as to their reasonableness.[83]

53.    The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  All payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Effective Date, including all Professional Fee Claims, have been

---

[81]    *See generally* Voting Report.

[82]    *See* 11 U.S.C. § 1129(a)(4).

[83]    *See In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) (holding that fees and expenses related to the plan are subject to the approval by the bankruptcy court); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

approved by, or are subject to approval of, the Bankruptcy Court.[84]  Article II.D of the Plan

provides that all final requests for payment of Professional Fee Claims shall be filed no later than

sixty days after the Effective Date for determination by the Bankruptcy Court, after notice and a

hearing, in accordance with the procedures established by the Bankruptcy Court.[85]  Accordingly,

the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

      **E.**     **The Debtors Have Complied with the Governance Disclosure Requirement (§ 1129(a)(5)).**

     54.     Section 1129(a)(5)(A)(ii) of the Bankruptcy Code requires the plan proponent to

disclose the identity and affiliation of any individual proposed to serve as a director or officer of

the debtor or a successor to the debtor under the plan and that the appointment or continuation of

such officers and directors be consistent with the interests of creditors and equity security holders

and public policy.[86]  The "public policy requirement would enable [the court] to disapprove plans

in which demonstrated incompetence or malevolence is a hallmark of the proposed

management."[87]

     55.     The Plan satisfies section 1129(a)(5) of the Bankruptcy Code because the Debtors

will disclose the identities and affiliations of the members of the New Board, as applicable, the

officers of the Reorganized Debtors, if any, and other information required to be disclosed in

accordance with section 1129(a)(5) of the Bankruptcy Code prior to the Effective Date of the Plan.

Article IV.K of the Plan provides that the members of the board of directors or other Governing

---

[84]   *See* Plan, Art. II.

[85]   Plan, Art. II.D.

[86]   11 U.S.C. § 1129(a)(5)(A)(ii).

[87]   7 Collier on Bankruptcy ¶ 1129.02[5][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2021).

Body for the initial term of the New Board and the other Governing Bodies shall be appointed in accordance with the New Organizational Documents.[88]   The New Board will consist of seven directors and include: (a) the CEO; and (b) six directors selected as follows, in each case, in consultation with the CEO, (i) four directors selected by Redwood Capital Management, LLC, (ii) one director selected by Anchorage Capital Advisors, L.P., and (iii) one director selected by Farallon Capital Advisors, L.L.C.[89]   Accordingly, the Plan complies with and satisfies all of the requirements of section 1129(a)(5) of the Bankruptcy Code, and no party has asserted otherwise.

> **F.     The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

56.     Section 1129(a)(6) of the Bankruptcy Code requires that any rate change provided for in a plan be approved by or subject to the approval of all governmental regulatory commissions with jurisdiction, if any.   The Plan does not provide for any rate changes, and the Debtors are not subject to any such regulation.   Thus, section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases, and no party has asserted otherwise.

> **G.     The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).**

57.     Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a value of not less than the value such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.[90]   The best interests test applies to individual dissenting holders of

---

[88]     Plan, Art. IV.K.

[89]     *Id.*

[90]     *See* 11 U.S.C. § 1129(a)(7)(A)(ii).

impaired claims or interests rather than classes and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's chapter 11 plan.[91]

58.     The Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.  As set forth in the Disclosure Statement[92] and the Kopa Declaration, the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis that estimates recoveries for members of each Class under the Plan.[93]  As set forth in the Kopa Declaration, projected recoveries for each Class under the Plan are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation.[94]

59.     In a hypothetical chapter 7 liquidation, Holders of Claims in Classes 1, 3, 4, 5, 6, 7, 8, and 9 would recover less than they would under the Plan.  In particular, Holders of Other Secured Claims and ABL Facility Claims are estimated to recover in full under the Plan.[95] Additionally, all Holders of Claims entitled to vote on the Plan received the Liquidation Analysis (which was attached as <u>Exhibit D</u> to the Disclosure Statement) and have been provided ample time

---

[91]  *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The best interests test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.") (internal quotation marks omitted); *see also In re Stone & Webster, Inc.*, 286 B.R. 532, 544–45 (Bankr. D. Del. 2002) ("The application of the best interest test involves a hypothetical application of chapter 7 to a chapter 11 plan.  A liquidation and distribution analysis is performed to see whether each holder of a claim or interest in each impaired class, as such classes are defined in the subject plan, receive not less than the holders would receive in a hypothetical Chapter 7 distribution to those classes." (internal quotation marks and citation omitted)).

[92]  *See* Disclosure Statement, <u>Exhibit D</u>.

[93]  *See* Kopa Decl. ¶ 17.

[94]  *See id.* ¶ 20.

[95]  *See id.* ¶ 21.

to consider the contents thereof.  Accordingly, the Plan complies with section 1129(a)(7), and no party has asserted otherwise.

60.    Moreover, the Plan provides for the establishment of the Unsecured Claims Distribution Trust, wherein the Unsecured Claims Distribution Trust Assets will be distributed to Unsecured Claims Distribution Trust Beneficiaries in accordance with the Unsecured Claims Distribution Trust Agreement.[96]  The Unsecured Claims Distribution Trust construct reflected in the Plan provides Holders of General Unsecured Claims with a potential recovery opportunity that they otherwise would not have in a chapter 7 liquidation.[97]  Specifically, the Ad Hoc Group agreed to support a revised Plan that gives $3.9 million in Cash *plus* the difference (which may be a positive or negative number) calculated by subtracting (x) the amount of the Allowed fees and expenses of the Committee and its Professionals from (y) the amount set forth for such fees and expenses in the Approved Budget (as defined in the DIP Orders) to the Unsecured Claims Distribution Trust for the benefit of Holders of General Unsecured Claims.[98]  Additionally, pursuant to the Committee Settlement, Holders of First Lien Claims agreed to waive any recovery on account of their First Lien Deficiency Claims—further enhancing the pool of assets available to the Unsecured Claims Distribution Trust and thereby increasing potential recoveries for Holders of General Unsecured Claims.[99]  In light of the foregoing, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

---

[96]    Plan, Art. IV.H.

[97]    *See* Kopa Decl. ¶ 17.

[98]    Plan, Art. IV.H.

[99]    *Id*.

**H.      The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

61.      Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  Pursuant to section 1126(c) of the Bankruptcy Code, a class of claims accepts a plan if holders of at least two thirds in amount and more than one half in number of the allowed claims voting in that class vote to accept the plan. Pursuant to section 1126(d) of the Bankruptcy Code, a class of interests accepts a plan if holders of at least two thirds in amount of the allowed interests in that voting class vote to accept the plan. A class that is not impaired under a plan, and each holder of a claim or interest in such a class, is conclusively presumed to have accepted the plan.  On the other hand, a class is deemed to have rejected a plan if the plan provides that the claims or interests of that class do not receive or retain any property under the plan on account of such claims or interests.  If any class of claims or interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.[100]

62.      As set forth above and as reflected in the Voting Report, Classes 1, 2, and 3 are deemed to have accepted the Plan, and Classes 4, 5, 6, 7, 8, and 9 voted to accept the Plan.[101] Moreover, Holders of Claims and Interests in Classes 12 and 13 are deemed to have rejected the Plan and thus were not entitled to vote.[102]  While the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Impaired Classes that were deemed to reject the Plan, the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the

---

[100]   11 U.S.C. § 1129(b).

[101]   *See* Voting Report; Plan, Art. II.B.

[102]   Plan, Art. II.B.

Bankruptcy Code, as discussed below, as at least one Impaired Class of Claims has voted to accept the Plan, and the Plan does not discriminate unfairly and is fair and equitable with respect to the Classes deemed to reject.

### I. The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).

63.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan or receive certain other specified treatment as agreed upon by the claim holder in satisfaction of the claim and that the holders of certain other priority claims receive deferred cash payments.[103]  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code— must receive on the effective date cash equal to the allowed amount of such claims.[104] Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or 507(a)(4)–(7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[105]  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not

---

[103]   *See* 11 U.S.C. § 1129(a)(9).

[104]   11 U.S.C. § 1129(a)(9)(A).

[105]   11 U.S.C. § 1129(a)(9)(B).

to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.[106]

64.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  *First*, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Claim will receive payment in an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.[107]

65.    ***Second***, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Allowed Claims specified by 1129(a)(9)(B) are Impaired under the Plan

---

[106]   11 U.S.C. § 1129(a)(9)(C).

[107]   *See* Plan, Art. II.A.

and such Claims have been paid in the ordinary course.[108]  More specifically, under Article III.B of the Plan, except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, on the Effective Date, each Holder of such Allowed Other Priority Claim shall receive treatment in a manner consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code rendering such Holder's Allowed Other Priority Claim Unimpaired.[109]

**Third**, Article II.B of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that Holders of Allowed Priority Tax Claims shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.[110]  The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.

> **J.     At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

66.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[111]  As detailed herein and in the Voting Report, Holders of Claims in all Voting Classes—which are each an Impaired Class under the

---

[108]  *See* Aguilar Decl. ¶ 15.

[109]  *See* Plan, Art. III.B

[110]  *See* Plan, Art. II.B.

[111]  11 U.S.C. § 1129(a)(10).

Plan—overwhelmingly voted to accept the Plan, independent of any insiders' votes.[112]  With respect to the Voting Classes at Ambience Parent, Inc. and At Home Assembly Park Drive Condominium Association, such Classes are either (i) deemed eliminated from the Plan for purposes of determining acceptance or rejection, or (ii) deemed to have accepted the Plan. Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

### K.     The Plan Is Feasible (§ 1129(a)(11)).

67.     Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that a plan is feasible as a condition precedent to Confirmation.  Specifically, the Bankruptcy Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[113] To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[114] Rather, a debtor must provide only a reasonable assurance of success.[115]  There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[116]

---

[112]   *See* Voting Report, Ex. A.

[113]   11 U.S.C. § 1129(a)(11).

[114]   *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012) (stating that the bankruptcy court "need not require a guarantee of success" (citations omitted) (internal quotation marks omitted)); *In re W.R. Grace & Co.*, 475 B.R. at 115 (same); *accord Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed.").

[115]   *Kane*, 843 F.2d at 649; *In re Flintkote Co.*, 486 B.R. at 139; *In re W.R. Grace & Co.*, 475 B.R. at 115.

[116]   *See, e.g.*, *In re Tonopah Solar Energy, LLC*, 657 B.R. 393, 410 (Bankr. D. Del. 2022) ("As the Debtor correctly notes, [plan feasibility] is a low threshold."); *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) ("The Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility.") (internal citation omitted).

68.    In determining standards of feasibility, courts have identified the following probative factors:

     a.    the adequacy of the capital structure;

     b.    the earning power of the business;

     c.    the economic conditions;

     d.    the ability of management;

     e.    the probability of the continuation of the same management; and

     f.    any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[117]

69.    The Plan is feasible. As set forth in the Kopa Declaration, the Debtors and their advisors have thoroughly analyzed the Reorganized Debtors' ability to meet their post-Confirmation obligations under the Plan and continue as a going concern without the need for further financial restructuring.[118] The Debtors are satisfied as to their ability to make all distributions contemplated by the Plan and fund post-Confirmation obligations from, among other things, (a) Cash on hand, including Cash from operations, (b) the proceeds from the Exit ABL Facility, (c) the Reorganized Equity, and (d) the proceeds of any Retained Causes of Action (if any).[119] The Debtors negotiated and secured exit financing in the form of the Exit ABL Facility to fund Plan distributions, manage post-emergence liquidity, and meet their obligations in the ordinary course.[120] The Debtors' management team and their advisors have made significant

---

[117]    *See, e.g., In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010) (internal citations omitted).

[118]    *See* Kopa Decl. ¶ 14.

[119]    *See id.*

[120]    *See id.* ¶ 14.

progress in designing and implementing a business plan that will enable the Reorganized Debtors to succeed in their go-forward operations.[121]   Additionally, the Debtors' Financial Projections[122] demonstrate that the Reorganized Debtors will be well positioned to execute their business plan, service their significantly reduced debt obligations, and successfully operate their businesses.[123] By deleveraging the Debtors' balance sheet by approximately $1.7 billion of prepetition funded debt, the Plan will provide the Reorganized Debtors with a significantly improved liquidity profile and an improved ability to hit their operational targets and achieve the financial results contemplated in the Financial Projections.[124]   Thus, if confirmed as proposed, the Plan satisfies the feasibility requirement under section 1129(a)(11) of the Bankruptcy Code, and no party has asserted otherwise.

**L.      The Plan Provides for the Payment of Certain Statutory Fees (§ 1129(a)(12)).**

70.      Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."[125]   Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.[126]

---

[121]   *See* Aguilar Decl. ¶ 19.

[122]   *See Notice of Filing Revised Financial Projections as an Exhibit to the Disclosure Statement*, filed contemporaneously herewith.

[123]   *See* Kopa Decl. ¶ 13.

[124]   *See id*.

[125]   11 U.S.C. § 1129(a)(12).

[126]   11 U.S.C. § 507(a)(2).

71.     The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article II.E of the Plan provides that all Quarterly Fees due and payable pursuant to section 1930 of Title 28 of the Judicial Code before the Effective Date shall be paid by the Debtors.[127]  After the Effective Date, to the extent applicable, the Reorganized Debtors (or the Unsecured Claims Distribution Trustee, in accordance with the Unsecured Claims Distribution Trust Agreement) shall be liable to pay any and all Quarterly Fees when due and payable and shall file with the Bankruptcy Court quarterly reports when they become due.[128]  Accordingly, the Plan complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code, and no party has asserted otherwise.

**M.     All Retiree Benefits Will Continue Post-Confirmation (Section 1129(a)(13)).**

72.     Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.[129]

73.     The Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code because Article V.G of the Plan provides that from and after the Effective Date, all retiree benefits, as defined in section 1114 of the Bankruptcy Code, if any, will be paid in accordance with applicable law.[130]  The Plan therefore satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code, and no party has asserted otherwise.

---

[127]   *See* Plan, Art. II.E.

[128]   *Id.*

[129]   11 U.S.C. § 1129(a)(13).

[130]   *See* Plan, Art. V.G.

N.  **Sections 1129(a)(14)–(16) of the Bankruptcy Code Do Not Apply to the Plan.**

74.  Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.  Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, each of the Debtors are a moneyed, business, or commercial corporation and, therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of non-bankruptcy law, is not applicable to these Chapter 11 Cases.

O.  **The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

75.  Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[131]

---

[131]  *John Hancock*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("[T]he Plan satisfies the cramdown alternative . . . found in 11 U.S.C. § 1129(b), which requires that the Plan does not discriminate unfairly against and is fair and equitable towards each impaired class that has not accepted the Plan.") (internal citations and quotation marks omitted).

76.     As noted above, all Impaired Classes of Claims entitled to vote on the Plan voted in favor of the Plan.[132]  The Deemed Rejecting Classes, however, are deemed to have rejected the Plan.  Nonetheless, as set forth below, the Plan satisfies the requirements under section 1129(b) of the Bankruptcy Code, and no party has asserted otherwise.

### 1.      The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (§ 1129(b)(1)).

77.     The Plan does not unfairly discriminate with respect to Classes 10, 11, 12, and 13. Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[133]  In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[134]  A threshold inquiry to assessing whether a proposed chapter 11 plan

---

[132]   As previously noted, pursuant to Articles III.D and III.E of the Plan, with respect to the Voting Classes at Ambience Parent, Inc. and At Home Assembly Park Drive Condominium Association, such Classes are either (i) deemed eliminated from the Plan for purposes of determining acceptance or rejection, or (ii) deemed to have accepted the Plan.

[133]   *In re Nuverra Env't Sols., Inc.*, 590 B.R. 75, 93 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021), *as amended* (Feb. 2, 2021) ("As unfair discrimination is not defined in the Bankruptcy Code, courts must examine the facts and circumstances of the particular case to determine whether unfair discrimination exists."); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination.").

[134]   *See In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *accord In re Ambanc La Mesa*, 115 F.3d at 656–57 (same).

unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[135]

78.     Here, the Plan's treatment of the non-accepting Impaired Classes is proper because all similarly situated Holders of Claims and Interests at each applicable Debtor will receive substantially similar treatment, and the Plan's classification scheme rests on a legally acceptable rationale, including in relation to their priority within the Debtors' capital structure, their differing legal nature, and their respective rights against the Debtors.  Intercompany Claims in Class 10 and Intercompany Interests in Class 11 are not similarly situated to any other Classes given their distinctly different legal character from all other Claims and Interests and may be Unimpaired.  These Intercompany Claims and Intercompany Interests, which exist to support the Debtors' corporate structure, may be Reinstated because Reinstatement of intercompany claims and interests advances an efficient reorganization by avoiding the need to unwind and recreate the corporate structure and relationships of the Reorganized Debtors.  This Reinstatement does not affect the economic substance of the Plan for the Debtors' stakeholders.

79.     With respect to Existing Equity Interests (Class 12), the Debtors formed Class 12 to include Holders of Existing Equity Interests in At Home.  Existing Equity Interests are classified separately from Intercompany Interests because they reflect the economic entitlements of shareholders that own the Existing Equity Interests in the Debtors' enterprise.  In addition, no similarly situated Class will receive more favorable treatment–Holders of Intercompany Interests

---

[135]    *See In re Aleris Int'l*, No. 09-10478 (BLS) 2010 WL 3492664, at *31 (Bankr. D. Del. May 13, 2010) ("[S]ection 1129(b) of the Bankruptcy Code ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value the dissenting class will receive under a plan when compared to the value given to all other similarly situated classes.") (internal citation omitted)); *In re Armstrong World Indus.*, 348 B.R. at 122 ("A finding that all classes of the same priority will receive the identical amount under the proposed Plan is not necessary to find that the Plan does not discriminate. . . . [T]he presumption of unfair discrimination only arises if the dissenting class would receive a 'materially lower' percentage recovery or will have a 'materially greater risk' in connection with the distribution.") (internal citation omitted)).

will not receive a recovery under the Plan and Intercompany Interests may be Reinstated only for administrative convenience in the restructuring process.  Thus, the Plan's treatment of Class 12 is proper, and no party has asserted otherwise.

80.    Finally, with respect to Section 510(b) Claims (Class 13), the Debtors do not believe any Section 510(b) Claims exist.  The Debtors formed Class 13 to include Holders of Claims that may be subordinated pursuant to section 510(b) of the Bankruptcy Code.  The Plan's treatment of Class 13 is proper because no similarly situated Class will receive more favorable treatment.  As there are no Holders of Section 510(b) Claims, no distributions should or will be made to Class 13, and no party in interest has asserted otherwise.

81.    Accordingly, the Plan does not discriminate unfairly with respect to Classes 10, 11, 12, or 13, who are deemed to reject the Plan and, therefore, satisfies the requirements of section 1129(b).

### 2.    The Plan Is Fair and Equitable (§ 1129(b)(2)).

82.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[136]  The absolute priority rule requires either that an impaired rejecting class of claims or interests be paid in full or that any class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[137]

---

[136]    *Bank of Am.*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property[.]'  That latter condition is the core of what is known as the 'absolute priority rule.'") (internal citations omitted).

[137]    *See id.*

83.    Here, the Plan is "fair and equitable" to Holders of Claims and Interests in those Classes that were deemed to reject the Plan because the Plan satisfies the absolute priority rule with respect to each of these non-accepting Impaired Classes.  Specifically, no holder of any junior Claim or Interest will receive or retain any property under the Plan on account of such junior Claim or Interest.[138]  In addition, to the extent that Intercompany Interests and Intercompany Claims are Reinstated under the Plan, distributions on account of Intercompany Interests and Intercompany Claims are not being received by Holders of such Intercompany Interests or Intercompany Claims on account of their Intercompany Interests or Intercompany Claims but for the purposes of administrative convenience, for the ultimate benefit of all parties in interest.  Any Reinstatement of Intercompany Interests or Intercompany Claims will thus have no economic substance.[139]  Accordingly, the Plan is "fair and equitable" with respect to all non-accepting Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.

84.    For the foregoing reasons, and further supported by the lack of objections on any grounds related to Section 1129(b)(2), the Plan can be crammed down on the non-consenting Impaired Classes.

---

[138]    *See* Aguilar Decl. ¶ 15; *see generally* Plan, Art. III.

[139]    *See In re ION Media Networks, Inc.*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. Nov. 24, 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan. The Plan's retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure.").

**P.** **The Plan Complies with the Remaining Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)).**

85.     The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  *First*, section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans,[140] is not implicated because there is only one proposed plan.

86.     *Second*, section 1129(d) of the Bankruptcy Code provides that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[141]  The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[142]  Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds.  As provided in the Aguilar Declaration, the Plan was proposed in good faith and not by any means forbidden by law.[143]

87.     *Lastly*, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' Chapter 11 Cases are a "small business case."[144]  Accordingly, the Plan satisfies the requirements of sections 1129(c)–(e) of the Bankruptcy Code.

---

[140]   *See* 11 U.S.C. § 1129(c).

[141]   *See id*. § 1129(d).

[142]   *See* 15 U.S.C. § 77e.

[143]   *See* Aguilar Decl. ¶ 8.

[144]   *See* 11 U.S.C. § 1129(e).  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $3,424,000 (excluding debt owed to 1 or more affiliates or insiders)."  11 U.S.C. § 101(51D)(B).

II.     **The Discretionary Contents of the Plan Are Appropriate Under Section 1123(b) of the Bankruptcy Code.**

    A.     **Overview of the Plan's Compliance with Section 1123(b) of the Bankruptcy Code.**

88.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) modify or leave unaffected the rights of holders of secured or unsecured claims; (c) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (d) provide for the assumption or rejection of executory contracts and unexpired leases; (e) provide for the sale of all or substantially all of the property of the debtor's estates, and the distribution of the proceeds of such sale among holders of claims or interests; or (f) include any other appropriate provision not inconsistent with the Bankruptcy Code.[145]

89.     As set forth below, the Plan includes certain of these discretionary provisions, such as releases and general settlement of certain Claims and Interests.  The Debtors have determined, as fiduciaries of their Estates and in the exercise of their reasonable business judgment, that each of the discretionary provisions of the Plan is appropriate given the circumstances of these Chapter 11 Cases.

90.     The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically, under Article III of the Plan, Classes 1, 2, 3, and, potentially, 10 and 11, are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within

---

[145]   *See* 11 U.S.C. § 1123(b)(1)–(6).

such Classes.[146]  On the other hand, Classes 4, 5, 6, 7, 8, 9, 12, 13, and potentially 10 and 11 are Impaired since the Plan modifies the rights of the Holders of Claims and Interests within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.[147]

91.    In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article V.A of the Plan provides for the assumption of all Executory Contracts and Unexpired Leases not previously rejected, assumed, or assumed and assigned under section 365 of the Bankruptcy Code, except to the extent set forth in the Plan.[148]

92.    The Plan provides for a general settlement of all Claims and Interests and pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.  The standards for approval of a settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019.[149]  The Third Circuit has provided the following four criteria that a bankruptcy court should consider when approving a settlement pursuant to Bankruptcy Rule 9019:

a.    the probability of success in litigation;

b.    the likely difficulties in collection;

c.    the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and

---

[146]    *See* Plan, Art. III.  Holders of Intercompany Claims and Intercompany Interests in Class 10 and Class 11, respectively, will either be Reinstated and therefore, Unimpaired, or set off, settled, discharged, contributed, cancelled, or released without any distribution on account of such Claims or Interests, and therefore, Impaired, at the option of the Reorganized Debtors.  *Id.*

[147]    *See* Plan, Art. III.

[148]    *See* Plan, Art. V.A.

[149]    *See In re Coram Healthcare Corp.*, 315 B.R. at 334–35.

d.      the paramount interest of creditors.[150]

93.      The Debtors satisfy the above factors, as discussed herein.  The Debtors and their advisors have worked diligently to ensure the Debtors' creditors are receiving the greatest value on their Claims or Interests through the Plan, in the best interest of all stakeholders.  The Plan and proposed Confirmation Order embody a settlement of Claims and Interests between the Debtors and certain other parties in interest.  If the Debtors were forced to litigate the issues necessary to resolve such Claims and Interests outside of the Plan, such litigation would be costly, protracted, inherently uncertain, and would leave the Debtors and all stakeholders in a substantially worse-off position.  Litigation would prolong the Debtors' bankruptcy process, draining the Debtors' Estates and distracting the Debtors' key personnel and advisors, who would otherwise be focused on implementing the Restructuring Transactions and strengthening the Debtors' go-forward business.  Accordingly, the Plan's discretionary general settlement provisions satisfy the requirements of section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

94.      Each of these provisions are appropriate because, among other things, they are the product of arm's-length negotiations and have been critical to obtaining the support of the various constituencies for the Plan.  Such provisions are discussed in turn below but, in summary, satisfy the requirements of section 1123(b).[151]

---

[150]   *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (citing *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986)).

[151]   *See* Aguilar Decl. ¶ 5.

**B.     The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.**

95.     The Plan also includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision.[152]   These discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations between the Debtors, the Releasing Parties, and the Released Parties.[153]  Moreover, the overwhelming approval of the Plan by the Debtors' stakeholders and the election to opt in to the Third-Party Release strongly support the conclusion that the release and exculpation provisions are appropriate.[154]  Additionally, these provisions are fair, reasonable, and in the best interests of the Debtors and their Estates, and are consistent with the Bankruptcy Code and applicable precedent.   Further, these provisions were fully and conspicuously disclosed to all parties in interest through the Confirmation Hearing Notice, the Ballots,[155] the Plan,[156] the Disclosure Statement,[157] the Publication Notice,[158] and the applicable Notice of Non-Voting Status, which excerpted the full text of the releases, exculpation, and injunction provision as set forth in the Plan. In addition, the Ballots include in bolded frame an explanation in plain English that a Holder's decision to opt in will not affect its distribution under the Plan.  Accordingly, and as set forth more

---

[152]   *See generally* Plan, Art. VIII.

[153]   *See* Aguilar Decl. ¶ 5.

[154]   *See* Voting Report, Ex. A.

[155]   *See* Disclosure Statement Order Exs. 3A, 3B, 3C, 3D, 3E, 3F, 3G, 3H, 3-I, 3J, and 3K.

[156]   *See* Plan Art. VIII.

[157]   *See* Disclosure Statement § III.P.

[158]   *See Certificate of Publication* [Docket No. 552].

fully below, the Debtors request that the Bankruptcy Court approve the Plan's release, exculpation, and injunction provisions.

### 1. The Debtor Releases in the Plan Are Appropriate.

96.     Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[159]   Furthermore, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[160]   In determining whether a debtor release is proper, courts in this jurisdiction and elsewhere generally may consider the following five factors:

   a.     whether the non-debtor has made a substantial contribution to the debtor's reorganization;

   b.     whether the release is essential to the debtor's reorganization;

   c.     whether there is an agreement by a substantial majority of creditors to support the release;

   d.     whether there is an identity of interest between the debtor and the third party; and

---

[159]   *See In re Coram*, 315 B.R. at 334–35 ("The standards for approval of settlement under section 1123 [of the Bankruptcy Code] are generally the same as those under [Bankruptcy] Rule 9019."). Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness." *Id.* at 330 (internal citations omitted); *e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 746 (Bankr. D. Del. 2008); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be "within the reasonable range of litigation possibilities") (internal quotation marks omitted).

[160]   *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'"); *accord In re WCI Cable, Inc.*, 282 B.R. 457, 469 (Bankr. D. Or. 2002) ("A debtor-in-possession has the burden of proof by a preponderance of the evidence to establish that a proposed settlement is reasonable, adequate, fair and equitable.").

e.      whether a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.[161]

These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining the fairness of a debtor's releases.[162]

97.      Article VIII.C of the Plan provides for releases by the Debtors, the Reorganized Debtors, and their Estates, as of the Effective Date, of, among other things, various Claims and Causes of Action, including any derivative claims, that the Debtors, the Reorganized Debtors, or their Estates or affiliates could assert against each of the Released Parties.[163]   The scope of the Debtor Release is tailored to exclude any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order to have constituted intentional fraud, gross negligence, or willful misconduct.[164]   The Debtor Release meets the applicable business judgment standard because it is fair, reasonable, and in the best interests of the Debtors' Estates, the product of extensive arm's-length negotiations, and was critical to obtaining

---

[161]  *See, e.g.*, *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.,* 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *In re Spansion, Inc.*, 426 B.R. at 143 n.47 (citing the *Zenith* factors).

[162]  *See, e.g.*, *In re Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness.") (internal citation omitted); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements).

[163]  Article I.A.147 of the Plan defines "Released Parties" as, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the Ad Hoc Group and each Consenting Stakeholder; (d) the DIP Lenders; (e) the ABL Secured Parties; (f) the DIP Agent; (g) the Agents/Trustees; (h) the Consenting Sponsor; (i) At Home Cayman; (j) At Home Cayman Holdings; (k) the Committee, each of its current and former members (solely in their capacity as such), and its Professionals; (l) the Senior Unsecured Notes Trustee and counsel thereto; (m) each current and former Affiliate of each Entity in clause (a) through the preceding clause (l); and (n) each Related Party of each Entity in clauses (a) through the preceding clause (l); *provided* that, in each case, an Entity in clauses (c) through (l) shall not be a Released Party if it: (x) was provided with an opportunity to opt in to the releases described in Article VIII.D of this Plan by returning an "opt in" form and did not do so; or (y) timely objects to the releases contained in Article VIII.D of this Plan and such objection is not resolved before Confirmation.

[164]  *See* Plan, Art. VIII.C.

support for the Plan. Indeed, the Debtor Release was negotiated as part of the Plan and is an indispensable component to achieve final resolution of potential disputes that would otherwise negatively affect the Debtors' Estates and the recoveries available to creditors under the Plan. Further, the scope of the Debtor Release is consistent with those regularly approved in this district.[165]

98. ***First***, each Released Party has made a substantial contribution to the reorganization of the Debtors' Estates. Delaware bankruptcy courts have recognized that a wide variety of acts may illustrate a substantial contribution to a debtor's reorganization.[166] The Released Parties played an integral role in the formulation of the Plan and contributed to the Plan not only by expending significant time and resources analyzing and negotiating the terms of a comprehensive restructuring, but also in giving up material economic interests to ensure the success of the Plan. For example, the Debtor Release was a material inducement for the Ad Hoc Group and the ABL Secured Parties to support the Plan.[167] The Ad Hoc Group played a critical role in facilitating the Debtors' restructuring by providing the DIP Facility, which enabled the Debtors to fund operations

---

[165] *See In re Joann Inc.,* No. 25-10068 (CTG) (Bankr. D. Del. July 10, 2025) (confirming a chapter 11 plan including a similar scope of debtor releases); *In re Oldco Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025) (same); *In re Accuride Corporation*, No. 24-12289 (JKS) (Bankr. D. Del. Feb. 12, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024) (same); *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. Nov. 14, 2024) (same).

[166] *See In re Indianapolis Downs. LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) (finding that the non-debtor party had substantially contributed by performing services for the debtors post-petition without receiving compensation); *In re Wash. Mut., Inc.*, 442 B.R. at 347 (finding substantial contribution required the contribution of "cash or anything else of a tangible value to the [chapter 11 plan] or to creditors"); *In re Zenith Elecs. Corp.*, 241 B.R. at 111 (finding that directors' and officers' prepetition contribution of work in negotiating a plan constituted adequate consideration for debtor's release).

[167] *See In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) ("[T]he releases are an integral part of the agreement with the [non-debtor parties] to finance the chapter 11 cases and to fund the [p]lan."); *In re Midway Gold US, Inc.*, 575 B.R. 475, 510 (Bankr. D. Colo. 2017) (finding that without the contributions of the third parties being granted releases by the debtors, which included the provision of financing for the chapter 11 cases and consent to the use of their cash collateral by the debtors, the chapter 11 cases would not likely have reached confirmation).

and navigate the Chapter 11 process.[168]   In parallel, the ABL Secured Parties contributed

significant value by consenting to the Debtors' continued use of Cash Collateral.[169]   As a

component of the global resolution, the Ad Hoc Group also agreed to support a revised Plan that

gives $3.9 million to the Unsecured Claims Distribution Trust and to waive recovery on account

of their First Lien Deficiency Claims, providing a meaningful recovery for Holders of General

Unsecured Claims.[170]   Furthermore, the Debtors' directors, officers, employees, professionals, and

other agents, as well as the creditors' professionals and other agents, who served in such capacity

on or after the Petition Date have been instrumental in negotiating, formulating, and implementing

the Restructuring Transactions contemplated under the Plan.[171]   These measures, among others,

provided the Debtors' with access to the liquidity necessary to commence, and operate during,

these Chapter 11 Cases and have allowed the Debtors to chart a path toward emergence on the

terms set forth in the Plan.  The Releases provide finality and facilitate the consummation of the

Plan.  The Debtor Release, therefore, is key to the success of the Debtors' Plan.

99.     ***Second***, the Plan, including the Debtor Release, was vigorously negotiated by

sophisticated entities that were represented by able counsel and financial advisors.  The release

---

[168]   *See* Aguilar Decl. ¶ 17.

[169]   *See id*.

[170]   *See id.* ¶ 17.

[171]   *See In re Zenith Elecs. Corp.*, 241 B.R. at 111 (holding that directors, officers, bondholders' committee, and others made a substantial contribution to the case by designing, negotiating, and implementing the financial restructuring); *In re Hercules Offshore, Inc.*, 565 B.R. 732, 757–60 (Bankr. D. Del. 2016) (holding that a release of the debtors' officers, directors, and professionals was appropriate where the record reflected an "intensive and thoughtful effort by management and the [s]pecial [c]ommittee," with the advice and assistance of its hired professionals, "to respond to the market challenges" and who "chose the option that they believed would conserve the value of the [e]states and maximize recovery for all stakeholders, including equity holders"); *In re Premier Int'l Holdings*, 2010 WL 2745964, at *10 (holding that release of directors and officers was proper under *Zenith* to ensure the "continued success of the [r]eorganized [d]ebtors").

provisions were a necessary element of consideration that the Releasing Parties required before supporting Confirmation of the Plan.  Indeed, absent the Debtor Release, it is highly unlikely the Debtors would have been able to build the extraordinary level of consensus with respect to the Plan and the settlements and transactions contemplated thereby.  As described above, each Released Party contributed substantial value to these Chapter 11 Cases and did so with the understanding that they would receive releases from the Debtors.  Importantly, the Debtor Release is the product of arm's-length negotiations between the Debtors and their key stakeholders.  In consideration for the Debtor Release, the Debtors and their Estates will receive releases from potential Claims and Causes of Action of each of the Releasing Parties in addition to the significant benefits provided to the Debtors through this prearranged chapter 11 process.  The Debtors do not believe that they have material causes of action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan.  Moreover, the Debtor Release provides finality, underpins the various compromises of issues achieved by the Plan, and avoids significant delay in consummating the Plan.  There is no question that directors, managers, officers, and employees of the Debtors provided (and continue to provide) valuable consideration to the Debtors, as they commit substantial time and effort (in addition to their daily responsibilities) to the Debtors' Estates and restructuring efforts throughout this chapter 11 process.  Therefore, the inclusion of the Debtor Release is integral to the Plan's success, is worthwhile, and it inures to the benefit of the Debtors' stakeholders.

100.    ***Third,*** no party in interest has contested the Debtor Release of any hypothetical claims, and as evidenced by the Voting Report and noted herein, the vast majority of the Voting Classes have overwhelmingly voted in favor of the Plan, including the Debtor Release, and no

stakeholder has objected to the Debtor Release contained in the Plan.[172]  This degree of consensus evidences the Debtors' stakeholders' support for the Debtor Release and Plan.

101.    ***Fourth***, an identity of interest exists between the Debtors and the Released Parties. Whether there is an identity of interest depends on whether the debtor and non-debtor are sufficiently interlinked such that a lawsuit against the non-debtor would effectively be a lawsuit against the debtor or would deplete the assets of the debtor's estate.[173]  Lawsuits against the Released Parties may implicate the Debtors, and each Released Party, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and implementing the Restructuring Transactions contemplated thereunder.[174]  Moreover, with respect to certain of the releases—*e.g.*, those releasing the Debtors' current and former directors, officers, and principals—there is a clear identity of interest supporting the release because the Debtors will assume certain indemnification obligations under the Plan that will be honored by the Reorganized Debtors.[175]  Thus, a lawsuit commenced by the Debtors (or derivatively on behalf of the Debtors) against certain individuals would effectively be a lawsuit against the Reorganized Debtors' own interests.

---

[172]    *See* Voting Report, Exs. A, B.

[173]    *In re Master Mortg*, 168 B.R. at 935 (Bankr. W.D. Mo. 1994).

[174]    *See In re Mercy Hosp.*, No. 23-00623 (TJC), 2024 WL 2890139, at *4 (Bankr. N.D. Iowa June 7, 2024) ("Particularly persuasive [to finding that there exists an identity of interest] is the fact that these releases were integral to the consensual nature of the Plan and necessary to avoid the prospect of immense and complex litigation absent the releases."); *see also In re Tribune*, 464 B.R. 126, 187 (Bankr. D. Del. 2011) (finding that the debtors and released parties "share the common goal" of confirming a plan dependent on settlement of complex multi-party litigation resulted in an "identity of interest").

[175]    Plan, Art. V.B.  *See In re Indianapolis Downs*, 486 B.R. at 303 (Bankr. D. Del. 2013) ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release.").

102.    ***Fifth***, the Plan maximizes the value of the Debtors' assets and the distribution of available proceeds to creditors.  The Plan provides for meaningful recoveries for creditors in exchange for, among other things, the Debtors' Release of potential claims, and the Plan has been carefully crafted to maximize value and provides meaningful recoveries for all stakeholders under the circumstances.

103.    Further, as described in the Frizzley Declaration, the Debtors' Disinterested Directors, with the assistance of Young Conaway, as independent legal counsel, conducted the Investigation to determine whether the Debtors hold any viable claims and causes of action against any of the Related Parties.  Young Conaway undertook extensive discovery of the Debtors and the Related Parties.[176]  Young Conaway propounded a total of 13 requests for production on the Debtors, held numerous meet and confers, and received thousands of pages of relevant documents in response.[177]  Young Conaway also conducted interviews of eight individuals, including members of the Company's board and upper management, certain former directors and/or officers, and representatives of Hellman & Friedman.[178]  From the review and analysis of those documents, and based upon the recommendation of the Disinterested Directors, the board determined that the Company did not have any colorable or valuable claims and/or causes of action against the Company's Insiders or Related Parties relating to any prepetition conduct of such parties.[179]

---

[176]    *See* Frizzley Decl. ¶ 10.

[177]    *See id.*

[178]    *See id.*

[179]    *See id.* ¶ 16.

104.    For the reasons set forth above, and as supported by the Frizzley Declaration, the *Zenith* factors support approval of the Debtor Release, and the Debtors have satisfied the business judgment standard in granting the Debtor Release under the Plan.  Thus, the Bankruptcy Court should approve the Debtor Release in the Plan.

### 2.      The Third-Party Release is Consensual and Appropriate and Should be Approved.

105.    In addition to the Debtor Release, the Plan provides for releases by certain Holders of Claims and Interests.  Specifically, Article VIII.D of the Plan provides that each Releasing Party who elects to opt in shall release any and all Claims and Causes of Action such parties could assert against the Released Parties, with certain limited exceptions.[180]  The Releasing Parties include, each of, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Ad Hoc Group and each Consenting Stakeholder; (d) the DIP Lenders; (e) the ABL Secured Parties; (f) the DIP Agent; (g) the Agents/Trustees; (h) the Consenting Sponsor; (i) the Committee; (j) the Senior Unsecured Notes Trustee; (k) all Holders of Claims that vote to accept this Plan and that affirmatively opt into the releases provided for in this Plan; (l) all Holders of Claims that are deemed to accept this Plan and that affirmatively opt into the releases provided for in this Plan; (m) all Holders of Claims that abstain from voting on this Plan and that affirmatively opt into the releases provided for in this Plan; (n) all Holders of Claims that vote to reject this Plan and that affirmatively opt into the releases provided for in this Plan; (o) all Holders of Interests that affirmatively opt into the releases provided for in this Plan; (p) each current and former Affiliate of each Entity in clause (a) through the preceding clause (o); and (q) each Related Party of each Entity in clauses (a) through the preceding clause (o) for which such Entity is legally entitled to

---

[180]    *See* Plan, Art. VIII.D.

bind such Related Party to the releases contained herein under applicable law; *provided* that, in each case, an Entity in clauses (k) through (o) shall not be a Releasing Party if it: (x) was provided with an opportunity to opt in to the releases described in Article VIII.D of this Plan by returning an "opt in" form and did not do so; or (y) timely objects to the releases contained in Article VIII.D of this Plan and such objection is not resolved before Confirmation.  The Third-Party Releases are consensual, consistent with established Third Circuit law, and integral to the Plan.  The Third-Party Releases should therefore be approved.

106.     Courts in this jurisdiction routinely approve such release provisions if, as here, they are consensual.[181]   Ultimately, the value-maximizing restructuring contemplated by the Plan would not be possible absent the support of the Released Parties.  Thus, the Third-Party Release operates to maximize the Debtors' fresh start by minimizing the possibility of distracting post-emergence litigation or other disputes.

107.     Numerous courts have recognized that a chapter 11 plan may include a release of non-debtors by other non-debtors when such release is consensual.[182]   Consensual releases are

---

[181]   *See, e.g., In re Smallhold, Inc*., 665 B.R. 704, 708 (Bankr. D. Del. 2024) (post-*Purdue* observing that "*[c]onsensual* releases, on the other hand, are commonplace") (emphasis in original); *In re Indianapolis Downs*, 486 B.R. at 304–06 (approving third-party release that applied to unimpaired holders of claims deemed to accept the plan as consensual); *In re Spansion*, 426 B.R. at 144 ("Courts have determined that a third party release may be included in a plan if the release is consensual and binds only those creditors voting in favor of the plan.") (citing *In re Specialty Equip. Cos., Inc.*, 3 F.3d 1043, 1047 (7th Cir. 1993)); *In re Wash. Mut., Inc*., 442 B.R. at 352 (observing that consensual third-party releases are permissible); *cf. In re Tonopah Solar Energy, LLC*, 657 B.R. 393, 407 (D. Del. 2022) (holding that creditors were not impaired by plan's consensual third-party release that they did not opt in to).

[182]   *See, e.g., In re Indianapolis Downs*, 486 B.R. at 305 (collecting cases); *In re Spansion*, 426 B.R. at 144 (stating that "a Third-Party Release may be included in a plan if the release is consensual"); *see also Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 206 (2024) ("Today's decision is a narrow one. Nothing in the opinion should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan.").

permissible on the basis of general principles of contract law.[183]   Courts have also held that an

affirmative agreement from an affected creditor will render a release consensual.[184]   The law is

clear that a release is consensual where parties have received sufficient notice and have had an

opportunity to object to and/or opt in to the releases.   In *Emerge*, this Court recognized that a

release by a non-debtor third party is consensual where the releasing party indicates its consent by

an affirmative act.[185]   Since *Emerge*, this Court and others have approved numerous third-party

releases as consensual where the releasing third parties were required to indicate their consent by

returning a form indicating the party's desire to participate in the third-party release.[186]

108.    Furthermore, the Supreme Court's decision in *Purdue* is not at odds with the release

provisions commonly approved by this Court, and its holding is generally inapplicable to the

release provisions contemplated by the Debtors.   In *Purdue*, the Supreme Court made clear the

narrow scope of the decision by pointing out that "nothing in [this opinion] should be construed to

---

[183]   *See In re Smallhold, Inc.*, 665 B.R. at 722–23 (following the "contract model" of evaluating third-party releases); *In re Coram Healthcare Corp.*, 315 B.R. at 336 ("[A] [p]lan is a contract that may bind those who vote in favor of it.").

[184]   *See id.* ("[T]o the extent creditors or shareholders voted in favor of [a plan providing for the release of their claims] they are bound by that [plan].");  *In re W. Coast Video Enters., Inc.*, 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) ("[E]ach creditor bound by the terms of the [non-debtor] release must individually affirm same, either with a vote in favor of a plan including such a provision, or otherwise.").

[185]   *Compare In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (declining to approve third-party release where holders of claims and interests were presumed to consent to participation in the third-party release if they did not return an opt-out form, regardless of whether such holder returned a ballot);  *with, e.g., In re AeroCision Parent, LLC*, No. 23-11032 (KBO) (Bankr. D. Del. Mar. 4, 2024) (approving a consensual third-party release that included, among others, all holders of claims who return a ballot voting to accept the plan, with no option to opt out);  *In re Virgin Orbit*, No. 23-10405 (KBO) (Bankr. D. Del. July 31, 2023) (same);  *In re Lucky Bucks,* No. 23-10758 (KBO) (Bankr. D. Del. July 28, 2023) (same, also including all holders of claims who return a ballot voting to reject plan who do not opt out).

[186]   *See In re Joann Inc.,* No. 25-10068 (CTG) (Bankr. D. Del. July 10, 2025) (confirming a chapter 11 plan including opt-in third-party releases);  *In re Franchise Group, Inc.,* No. 24-12480 (LSS) (Bankr. D. Del. June 2, 2025) (same);  *In re Oldco Tire Distribs., Inc.,* No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025) (same);  *In re Accuride Corporation*, No. 24-12289 (JKS) (Bankr. D. Del. Feb. 12, 2025) (same);  *In re EXP OldCo Winddown, Inc.*, No. 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024) (same).

call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan."[187]  Therefore, *Purdue*'s applicability is limited to cases where a debtor or debtors seek non-consensual third-party releases.

109.    Approval of the Third-Party Release under the circumstances of these Chapter 11 Cases is appropriate because they are not binding on any non-consenting parties.  Here, all parties in interest were provided extensive notice of these Chapter 11 Cases, the Plan, and the deadline to object to Confirmation of the Plan.  Moreover, the Disclosure Statement, the Confirmation Hearing Notice, the Ballots, the Notices of Non-Voting Status, and the Opt-In Forms provided recipients with timely, sufficient, appropriate, and adequate notice of the Third-Party Releases.  The Debtors required all Holders of Claims or Interests to affirmatively opt in to the Third-Party Releases by either checking a box on the Ballot and returning the Ballot, or by completing and returning the applicable Opt-In Form, and provided each Holder of a Claim or Interest with ample notice and instructions on how to do so.  As of the Voting Deadline, 205 parties have affirmatively opted into the Third-Party Release by completing and returning a Ballot with the applicable box checked, or by completing and returning the applicable Opt-In Form.

110.    For all these reasons, the inclusion of Holders of Claims Against or Interests in the Debtors who affirmatively opt in to the releases provided by the Plan as "Releasing Parties" under the Plan and with respect to the Third-Party Release is appropriate and should be approved.  All parties had ample opportunity to evaluate and opt in to the Third-Party Release.  Importantly, the Confirmation Hearing Notice, the Opt-In Forms, and the Ballots, as applicable, quoted the entirety of the Third-Party Release in bold, conspicuous font, and clearly provided such Holders with

---

[187]    *Purdue Pharma*, 603 U.S. at 226.

detailed instructions on how to opt-in to the Third-Party Release.  Thus, affected parties were on notice of the Third-Party Release, including the option to opt in to the Third-Party Release.  All Holders of Claims and Interests also had the opportunity to object to the Third-Party Release by timely filing an objection to the Plan.  The Third-Party Release is therefore consensual as to all creditors and interest holders who affirmatively opted in to the Third-Party Release.

111.    The Third-Party Release brought key stakeholders to the table for negotiations around the Plan, each of which contributed to the Debtors' success in these Chapter 11 Cases.  As noted in the Aguilar Declaration, the Third-Party Release was necessary to secure support for the Plan.[188]  And importantly, the Third-Party Release only applies to parties who have (a) actively participated in the chapter 11 or Plan process, including in the formulation and negotiation of the Third-Party Release or (b) manifested their affirmative consent to the Third-Party Release.  Thus, the Third-Party Release is wholly consensual.

112.    The circumstances of these Chapter 11 Cases warrant the Third-Party Release because it is critical to the success of the Plan, it is fair, and it is appropriate.  Without the efforts of the Released Parties in providing material concessions, benefits, and commitments to the Debtors, including providing the DIP Facility and consenting to the use of Cash Collateral, and actively participating in Plan negotiations, the Debtors would not have been able to navigate the restructuring process and implement the value-maximizing equitization reorganization in the Plan for the benefit of all stakeholders.[189]  The Released Parties have been instrumental in supporting these Chapter 11 Cases and facilitating a smooth administration thereof.  Finally, throughout the

---

[188]  *See* Aguilar Decl. ¶ 19.

[189]  *See* Aguilar Decl. ¶ 19.

entire case and all these negotiations, the Debtors' directors and officers steadfastly maintained their duties to maximize value for the benefit of all stakeholders, investing countless hours both pre- and post- petition.[190]

113.    The Third-Party Releases are consensual and are an integral and necessary part of the Plan.  Accordingly, the Third-Party Releases should be approved.

### 3.    The Exculpation Provision Is Appropriate.

114.    Article VIII.E of the Plan provides that the Exculpated Parties[191] shall be exculpated to the fullest extent permissible under applicable law from any claims or Causes of Action taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with these Chapter 11 Cases and certain related transactions except for any Causes of Action rising from willful misconduct, actual fraud, or gross negligence (the "Exculpation Provision").[192]  The Exculpation Provision is intended to prevent collateral attacks against the estate fiduciaries that have acted in good faith to help facilitate the Debtors' restructuring.  The Exculpation Provision is an integral part of the Plan and otherwise satisfies the governing standards in the Third Circuit.  The Exculpation Provision provides necessary and customary protections to estate fiduciaries whose efforts were and continue to be vital to implementing the Plan.

---

[190]    *See id.*

[191]    Article I.A.85 of the Plan defines Exculpated Parties as collectively, and in each case solely in its capacity as such (and to the extent permitted by Law): (a) each of the Debtors; (b) the Committee and each of its present and former members, solely in their capacity as members of the Committee; and (c) with respect to the Debtors and the Committee, their respective current and former (i) directors, limited liability company managers, officers, and (ii) attorneys, financial advisors, or other professionals that were retained with Bankruptcy Court approval during any portion of the Chapter 11 Cases.

[192]    Plan, Art. VIII.E.

115.    In the Third Circuit, courts evaluate the appropriateness of exculpation provisions based on a number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[193] Exculpation provisions that are limited to claims not involving a criminal act, actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[194]  Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for claims arising over the course of the Chapter 11 Cases.[195]  Exculpation provisions for parties participating in the Plan process is appropriate where Plan negotiations could not have occurred without protection from liability.[196]

116.    Article VIII.E of the Plan provides for the exculpation of the Exculpated Parties. The exculpation is fair and appropriate under both applicable law and the facts and circumstances

---

[193]    *See In re Congoleum Corp*., 362 B.R. 167, 19597 (Bankr. D.N.J. 2007) (evaluating the appropriateness of the plan's exculpation provisions based on whether the parties played a significant role in the negotiations that led to the plan and whether the exculpation is necessary to the plan).

[194]    *See In re PWS Holding Corp*., 228 F.3d 224, 246 (3d Cir. 2000) (holding that committee members as fiduciaries in the case are entitled to immunity); *In re Wash. Mut., Inc*., 442 B.R. 314, 35051 (Bankr. D. Del. 2011) (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the debtors' directors and officers" was appropriate).

[195]    *See In re PWS Holding Corp.*, 228 F.3d at 245 (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion*, No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. 2010) (same).

[196]    *In re Aegean Marine Petroleum Network, Inc*., 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) ("I believe that an appropriate exculpation provision should say that it bars claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court.").

of these Chapter 11 Cases.[197]    The Plan's Exculpation Provision is the product of good-faith, arm's-length negotiations, is critical to obtaining the support of various constituencies for the Plan, and, as part of the Plan, has received support from the Debtors' major stakeholders.    The Exculpation Provision was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the exculpation.

117.    Moreover, the Exculpation Provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors.    As discussed above, this Court must find, under section 1129(a)(2) of the Bankruptcy Code, that the Debtors have complied with the applicable provisions of the Bankruptcy Code.    This Court must also find, under section 1129(a)(3) of the Bankruptcy Code, that the Plan has been proposed in good faith and not by any means forbidden by law.    These findings apply to the Debtors and, by extension, to certain of the Debtors' officers, directors, employees, and professionals.    Furthermore, these findings imply that the Plan was negotiated at arm's-length and in good faith.    Where such findings are made, parties who have been actively involved in such negotiations should be protected from collateral attack.

118.    Here, the Debtors and their officers, directors, and professionals actively negotiated with Holders of Claims across the Debtors' capital structure as part of the Plan and these Chapter 11 Cases.    Such negotiations were extensive, and the resulting agreements and

---

[197]    *See In re Lab'y Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) (finding that exculpation was appropriately extended to secured lender who funded the chapter 11 case); *In re FAH Liquidating Corp.*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor purchaser was appropriate under section 1123(b)).

compromises were implemented in good faith with a high degree of transparency.[198]  As a result, the Plan enjoys unanimous support from Holders of Claims entitled to vote, as well as by the Committee.[199]  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Disclosure Statement, the Plan, and related documents in furtherance of the Restructuring Transactions.  Accordingly, the Court's findings of good faith vis-à-vis the Debtors' Chapter 11 Cases should also extend to the Exculpated Parties.  In short, the Exculpation Provision represents an integral piece of the overall settlement embodied in the Plan and is the product of good-faith, arm's-length negotiations, and significant sacrifice by the Exculpated Parties.

119.    In addition, the promise of exculpation played a significant role in facilitating Plan negotiations.  All the Exculpated Parties played a key role in developing the Plan that paved the way for a successful resolution of these Chapter 11 Cases, and such parties may not have been inclined to participate in the plan process without the promise of exculpation.  Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.[200]

120.    Accordingly, under the circumstances, it is appropriate for the Court to approve the Exculpation Provision and to find that the Exculpated Parties have acted in good faith and in compliance with the law.[201]

---

[198]    *See* Aguilar Decl. ¶ 19.

[199]    *See, e.g.*, Voting Report, Ex. A.

[200]    *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[201]    *See In re PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision exception for willful misconduct and gross negligence); *In re Indianapolis Downs*, 486 B.R. at 306 (same).

### 4. The Injunction Provision Is Appropriate.

121. The injunction provision set forth in Article VIII.F of the Plan merely implements the Plan's release, discharge, and exculpation provisions by permanently enjoining all entities from commencing or maintaining any action against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties on account of or in connection with or with respect to any Claims, Interests, or Causes of Action released, discharged, settled, or subject to exculpation pursuant to Article VIII.E. of the Plan (the "<u>Injunction Provision</u>"). Thus, the Injunction Provision is a key provision of the Plan because it enforces the release and exculpation provisions that are centrally important to the Plan. Moreover, this Injunction Provision is narrowly tailored to achieve its purpose. As such, to the extent the Bankruptcy Court finds that the exculpation and release provisions are appropriate, the Injunction Provision must also be appropriate.

122. Accordingly, the discretionary provisions of the Plan are consistent with and are permissible under section 1123(b) of the Bankruptcy Code.

### C. The Plan Complies with Section 1123(d) of the Bankruptcy Code.

123. Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and non-bankruptcy law."[202]

124. The Plan complies with section 1123(d) of the Bankruptcy Code. Article V.D of the Plan provides for the satisfaction of all monetary and non-monetary defaults under each Executory Contract and Unexpired Lease assumed pursuant to the Plan in accordance with section 365 of the Bankruptcy Code by payment of the default amount, if any, on the Effective Date or as soon as reasonably practicable thereafter, subject to certain limitations set

---

[202] 11 U.S.C. § 1123(d).

forth in the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired

Leases may otherwise agree.[203]

125.    Accordingly, the Plan complies with section 1123(d) of the Bankruptcy Code.

**D.    Modifications to the Plan Do Not Require Resolicitation.**

126.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may

modify its plan at any time before confirmation as long as such modified plan meets the

requirements of sections 1122 and 1123 of the Bankruptcy Code.[204]  Further, when the proponent

of a plan files the plan with modifications with the court, the plan as modified becomes the plan.

Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed

accepted by all creditors and equity security holders who have previously accepted the plan if the

court finds that the proposed modifications do not adversely change the treatment of the claim of

any creditor or the interest of any equity security holder.   Interpreting Bankruptcy Rule 3019,

courts consistently have held that a proposed modification to a previously accepted plan will be

deemed accepted where the proposed modification is not material or does not adversely affect the

way creditors and stakeholders are treated.[205]  Resolicitation is not required if a modified plan does

not materially and adversely affect any Voting Class.[206]  As courts have recognized, "a plan

---

[203]    Plan, Art. V.D.

[204]    *See* 11 U.S.C. § 1127(a).

[205]    *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

[206]    *C.f. In re Boy Scouts of Am. & Delaware BSA, LLC*, 650 B.R. 87, 167–68 (D. Del. 2023) ("Bankruptcy Rule 3019(a) specifies that post-solicitation plan modifications do not require re-solicitation if the modifications do not adversely change the treatment of parties who previously voted for the plan.  As such, courts have found that only 'material' and 'adverse' modifications require re-solicitation." (citations omitted)); *In re G-I Holdings Inc.*,

modification is immaterial unless it will 'so affect a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.'"[207]   Modifications to exit financing provisions that do not impact recoveries are unlikely to be considered material or adverse under these standards.[208]

127.    Contemporaneously herewith, the Debtors filed a modified version of the Plan, which makes technical clarifications regarding the Debtors' exit financing and resolves certain formal objections and informal comments by various parties in interest.  The modifications are immaterial and do not adversely affect the way creditors and stakeholders who have previously accepted the Plan are treated and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 2019.  Therefore, resolicitation of the Plan is not required, as no Holder of Claims is materially and adversely affected by the Plan, and the Disclosure Statement sufficiently disclosed that various forms of exit financing were being negotiated and considered prior to the commencement of solicitation.[209]   Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

---

420 B.R. 216, 256 (Bankr. D.N.J. 2009) ("[T]he modifications to the Plan after the balloting have not adversely affected the treatment of any creditor that previously voted to accept the Plan. The only party that has objected to a post-balloting modification is the IRS. Given that the IRS's claims are deemed unimpaired after the modifications, re-solicitation would not cause any party who previously voted to accept the Plan to reconsider their vote.")

[207]   *In re Boy Scouts of Am. & Delaware BSA, LLC*, 650 B.R at 168.

[208]   *See In re Celsius Network LLC*, 656 B.R. 327, 331, 348 (Bankr. S.D.N.Y. 2023) (overruling the U.S. Trustee objection and finding that a modification involving alternate financing terms did not constitute a material adverse effect on creditors and therefore did not require resolicitation).

[209]   *See* Disclosure Statement § VIII.B.6.

### III.    The Remaining Objections Should be Overruled.

128.    The Debtors received ten formal objections and other informal comments related to Confirmation of the Plan.[210]  As of the filing of this Memorandum, the Debtors have resolved all the objections and informal comments, except for six objections relating exclusively to Cure disputes and the Bowersox Objection.  As discussed below, the remaining objections should be overruled, and the Plan should be confirmed.

### A.    The Resolution of Cure Objections After the Effective Date is Proper.

129.    The Debtors received several formal and informal objections relating to the Debtors' proposed Cure amounts with respect to Executory Contracts and Unexpired Leases to be assumed as identified in the Plan Supplement.[211]  Certain objecting parties believe that the proposed Cure amount is incorrect and must be corrected before such contract or lease may be assumed, and further request adequate assurance of future performance under the Executory Contracts and Unexpired Leases.  The Debtors have made substantial progress in resolving a significant number of Cure disputes as of the date hereof and are continuing to engage with various parties to reach a consensual resolution on the remaining Cure disputes.  To the extent the Debtors and the contract counterparties are unable to reach a consensual resolution on these Cure-related matters, the Debtors may seek relief from the Court and all parties' rights are reserved with respect thereto.  To the extent that the Debtors are unable to consensually resolve the proposed Cure

---

[210]    A detailed description of all objections to the Plan can be found on **Exhibit A**, attached hereto.

[211]    Plan Supplement, Ex. B.

amount, the Debtors will schedule a hearing to have the matter heard before the Court.  Pursuant to the Plan, the Debtors are not required to resolve Cure disputes prior to Confirmation.[212]

130.    Courts in this district and others often resolve cure objections post-confirmation.[213] Accordingly, the Debtors submit that these objections are properly post-Confirmation matters and should not delay Confirmation of the Plan.

### B.    The Bowersox Objection Should be Overruled.

131.    The Bowersox Objection does not present a basis to deny Confirmation of the Plan and should be overruled to the extent not otherwise resolved.  As a preliminary matter, Ms. Bowersox does not object to Confirmation of the Plan generally but takes issue with the Plan's treatment of unliquidated personal injury claims—specifically, her position that any portion of her claim covered by the Debtors' insurance should not be treated as a General Unsecured Claim.[214] Rather, Ms. Bowersox seeks to preserve her ability to pursue insurance proceeds in excess of any self-insured retention ("SIR") maintained by the Debtors.[215]  While the Ms. Bowersox agrees that the portion of the claim equal to the Debtor's SIR can be treated as a General Unsecured Claim,

---

[212]    Pursuant to Article III.D of the Plan, "[t]he Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on or prior to the Effective Date or as soon as reasonably practicable thereafter in the ordinary course of business[,]" and if there is any dispute regarding any Cure costs, then payment of any Cure costs "shall occur as soon as reasonably practicable after (i) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (ii) as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease."

[213]    *See, e.g., In re Franchise Group, Inc.* No. 24-12480 (LSS), ¶ 60 (Bankr. D. Del. June 2, 2025), ECF No. 1596 (allowing for payment of cure costs "as soon as reasonably practicable" after the effective date or "seven (7) days after the date on which such Cure Dispute has been resolved."); *In re Accuride Corp.*, No. 24-12289 (JKS), ¶58 (Bankr. D. Del. Feb. 12, 2025), ECF No. 704 ("[I]f a dispute regarding assumption or Cure Cost is unresolved as of the Effective Date, then payment of the applicable Cure Cost shall occur as soon as reasonably practicable after such dispute is resolved."); *In re SunPower Corp.*, No. 24-11649 (CTG), ¶43 (Bankr. D. Del. Oct. 18, 2024), ECF No. 872 (allowing for payment of cure costs "as soon as reasonably practicable" after the effective date); *In re MVK FarmCo LLC*, No. 23-11721 (LSS), ¶41 (Bankr. D. Del. Mar. 29, 2024), ECF No. 858 (same).

[214]    *See* Bowersox Obj. ¶ 9.

[215]    *Id*. ¶ 10.

she argues that any portion of her claim above the SIR that is covered by insurance should not be treated as a General Unsecured Claim. Instead, she should be allowed to pursue that amount directly from the insurance provider.[216]

132. Ms. Bowersox is correct that any portion of her claim equal to the Debtors' SIR must be treated as a General Unsecured Claim, as those amounts are payable from Estate property and must be administered accordingly. But the Plan does not impair Ms. Bowersox's ability to pursue recovery from applicable insurance policies for any portion of her claim in excess of the SIR in accordance with the terms of the relevant policies. Nothing in the Plan prohibits personal injury claimants from seeking recovery from available insurance proceeds, provided such recovery does not impose liability on the Estate beyond what is permissible under the Plan. The Plan expressly provides that claims covered by the Debtors' insurance policies will not be paid under the Plan until the claimant has exhausted all remedies available under the insurance policy, hereby requiring claimants to first seek payment from the insurer.[217] Additionally, the Plan provides that distributions to claimholders shall be made in accordance with the terms and conditions of any applicable insurance policies.[218] To the extent Ms. Bowersox's claim exceeds the SIR and is otherwise covered by insurance, the Plan does not bar her from pursuing such recovery directly from the insurer after the Effective Date.

133. Accordingly, Ms. Bowersox's objection reflects, at most, a misunderstanding of the Plan's treatment of insurance-related claims, not a legitimate basis to deny Confirmation. The

---

[216] *Id.*

[217] *See* Plan, Art. VI.L.2.

[218] *See* Plan, Art. VI.L.3.

Debtors are continuing to engage with counsel for Ms. Bowersox to clarify these issues and reserve all rights to address the objection further at the Confirmation Hearing, if necessary.

**IV.    Good Cause Exists to Waive the Stay of the Confirmation Order.**

134.    Bankruptcy Rule 3020(e) provides that "[u]nless the court orders otherwise, a confirmation order is stayed for 14 days after its entry."[219]   Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

135.    Here, good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order will be effective immediately upon its entry.[220]   As noted above, these Chapter 11 Cases and the related transactions under the Plan are consensual and have been negotiated and implemented in good faith and with a high degree of transparency.  Additionally, for each day the Debtors remain in chapter 11, they incur administrative and professional costs, which will be significantly reduced if the Debtors emerge expeditiously.[221]

---

[219]    Fed. R. Bankr. P. 3020(e).

[220]    *See, e.g., In re Joann Inc.,* No. 25-10068 (CTG), ¶ 132 (Bankr. D. Del. July 10, 2025) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re Franchise Group, Inc.,* No. 24-12480 (LSS), ¶ 206 (Bankr. D. Del. June 2, 2025) (same); *In re Vyaire Med., Inc.,* No. 24-11217 (BLS), ¶ 129 (Bankr. D. Del. Nov. 14, 2024) (same); *In re SunPower Corp.,* No. 24-11649 (CTG), ¶ 131 (Bankr. D. Del. Oct. 18, 2024) [Docket No. 872] (same); *In re MVK FarmCo LLC,* No. 23-11721 (LSS), ¶ 154 (Bankr. D. Del. Mar. 29, 2024) [Docket No. 858] (same).

[221]    *See* Aguilar Decl. ¶ 6.

136.     For these reasons, the Debtors, along with their advisors and other key constituents, are working to expedite the Debtors' entry into, and consummation of, the documents and transactions related to the Plan, ensuring that the Effective Date occurs as soon as possible after the Confirmation Date.  Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## Conclusion

137.     For all of the reasons set forth herein and in the Declarations, and as will be further shown at the Confirmation Hearing, the Debtors request that the Bankruptcy Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order, overruling all outstanding objections, and granting such other and further relief as is just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated:  September 24, 2025
Wilmington, Delaware

/s/ Joseph M. Mulvihill
<div style="display:flex">
<div>

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (DE Bar No. 2847)
Joseph M. Mulvihill (DE Bar No. 6061)
Timothy R. Powell (DE Bar No. 6894)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:     (302) 571-1253
Email:          rbrady@ycst.com
                    jmulvihill@ycst.com
                    tpowell@ycst.com


*Co-Counsel for the Debtors and Debtors in Possession*

</div>
<div>

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Elizabeth H. Jones (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900
Email:          nicole.greenblatt@kirkland.com
                    matthew.fagen@kirkland.com
                    elizabeth.jones@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

</div>
</div>

**Exhibit A**

**Objection Chart**

**At Home Group, Inc., *et al.*, Case No. 25-11120 (JKS)**

**Plan Objection Chart[1]**

| Objecting Party | Summary of Objection | Status / Debtors' Response |
|---|---|---|
| **Formal Objections Filed** | | |
| Oracle America, Inc. ("Oracle") [Docket No. 632] | • The Debtors may not assume the Oracle vendor agreements without Oracle's consent because the agreements relate to intellectual property licenses.<br><br>• To assume Oracle's agreements, the Debtors must cure all existing defaults, or provide adequate assurance of prompt cure, and provide adequate assurance of future performance under the contract.<br><br>• While the Cure amounts identified by the Debtors in the Plan Supplement amount to $253,036.32, Oracle alleges other invoices have or will come due prior to the plan confirmation hearing. In total, Oracle represents that it is owed no less than $1,141,897.87. | • Under Article III.D. of the Plan, the Debtors are not required to resolve Cure disputes prior to Confirmation, and any Cure payments will be made on the Effective Date or as soon as reasonably practicable thereafter, either following a Final Order resolving the dispute or as agreed between the parties.<br><br>• **Cure issues reserved**: The Debtors are working with the applicable counterparty to resolve the Cure objection. |

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, the Confirmation Order, the relevant objection, or the Memorandum, as applicable.

| Objecting Party | Summary of Objection | Status / Debtors' Response |
|---|---|---|
| 5Rivers CRE, LLC<br><br>Brixmor Property Group Inc.<br><br>Benderson Development Company LLC<br><br>Brookfield Properties Retail, Inc.<br><br>Kite Realty Group<br><br>NNN REIT, Inc.<br><br>Realty Income Corporation<br><br>SITE Centers Corp.<br><br>Petty Partners, LLC<br><br>TLM Realty Holdings LLC<br><br>(collectively, the "<u>KDW Landlords</u>")<br><br>[Docket No. 640] | • KDW Landlords filed this objection to ensure the prompt cure of all defaults, and compensation for losses incurred by the Landlords in connection with those defaults as required by section 365 of the Bankruptcy Code.<br><br>• Specifically, KDW Landlords request that the Debtors (i) cure all amounts due and owing under the applicable leases, including non-monetary defaults, and compensate the KDW Landlords for any pecuniary losses in connection with such defaults; and (ii) timely pay all post-petition rent and additional rent due under the leases.<br><br>• KDW Landlords dispute Debtors' proposed Cure amounts for the leases listed in the Plan Supplement and offer "corrected" Cure amounts which include attorney's fees accrued to date.<br><br>• KDW Landlords also reserve the right to amend the Cure amount if they incur additional fees or expenses. | • Under Article III.D. of the Plan, the Debtors are not required to resolve Cure disputes prior to Confirmation, and any Cure payments will be made on the Effective Date or as soon as reasonably practicable thereafter, either following a Final Order resolving the dispute or as agreed between the parties.<br><br>• **Cure issues reserved**: The Debtors are working with the applicable counterparty to resolve the Cure objection. |
| Uber Freight US LLC<br>("<u>Uber Freight</u>")<br><br>[Docket No. 646] | • Uber Freight alleges that the Debtors' representation of its Cure amount as $0.00 in the Plan Supplement is incorrect. Instead, it purports that the correct Cure amount is $53,400.<br><br>• Uber Freight asserts a reservation of rights regarding the Debtors' compliance with providing adequate assurance. | • **The Debtors have resolved the Cure issues set forth in Uber Freight's objection, and as such, such objection is resolved.** |
| ShopperTrak RCT LLC<br>("<u>ShopperTrak</u>")<br><br>[Docket No. 642] | • ShopperTrak objects to the Debtors' proposed Cure amount listed the Plan Supplement.<br><br>• Debtors listed a cumulative Cure amount of $62,295.20. ShopperTrak requests a Cure amount of no less than $83,130.26 before the Debtors can assume the identified contracts. | • **The Debtors have resolved the Cure issues set forth in ShopperTrak's objection, and as such, such objection is resolved.** |
| Northtown Property Owner LLC<br>("<u>Northtown Landlord</u>")<br><br>[Docket No. 643] | • Northtown Landlord objects to the Debtors' proposed Cure amount listed in the Plan Supplement.<br><br>• Debtors' proposed Cure amount is stated as $83,610.41, but Northtown Landlord requests that the Cure amount be no less than $115,873.80 for rent and related charges. | • **The Debtors have resolved the Cure issues set forth in Northtown Landlord's objection, and as such, such objection is resolved.** |

| Objecting Party | Summary of Objection | Status / Debtors' Response |
|---|---|---|
| DLC Management Corp.<br><br>North River Village GEC, LLC<br><br>Pyramid Management Group, LLC<br>Rivercrest Realty Associates, LLC<br><br>Urban Edge Properties<br><br>(collectively, the "<u>Ballard & Barclay Landlord Group</u>")<br><br>[Docket No. 644] | • The Ballard & Barclay Landlord Group requests that the Debtors provide each landlord with adequate assurance of future performance.<br><br>• The Ballard & Barclay Landlord Group objects to the Debtors' proposed Cure amounts listed in the Plan Supplement because they do not include attorneys' fees, Adjustments, and Indemnity Obligations.<br><br>• The Ballard & Barclay Landlord Group also requests that any assumption and assignment be *cum onere*, and any proposed assignee must assume liability for all Adjustments and Indemnity Obligations.<br><br>• The Ballard & Barclay Landlord Group raised the following additional concerns regarding the Plan:<br><br>   o The Plan treats all claims arising from rejection as general unsecured claims, except where setoff or security deposits apply.<br><br>   o The Debtors propose a 30-day deadline after the Effective Date for administrative priority claims, but landlords seek exclusion for claims related to assumed leases and prefer filing proofs of claim instead of payment requests.<br><br>   o The Exit ABL Facility should have the same lease-related limitations as the DIP Orders, including no liens on leases and restricted lender access.<br><br>   o The Plan authorizes Debtors to take all actions to effectuate the Restructuring Transactions, but the Ballard & Barclay Landlord Group seek revisions ensuring such actions do not violate any assumed leases.<br><br>   o The Plan sets a 180-day deadline for claim objections, but the Ballard & Barclay Landlord Group request a shorter 60-day deadline for administrative claims objections, subject to extension by motion and order. | • Under Article III.D. of the Plan, the Debtors are not required to resolve Cure disputes prior to Confirmation, and any Cure payments will be made on the Effective Date or as soon as reasonably practicable thereafter, either following a Final Order resolving the dispute or as agreed between the parties.<br><br>• **Cure issues reserved**: The Debtors are working with the applicable counterparty to resolve the Cure issues.<br><br>• **The additional Plan concerns have been resolved for purposes of Confirmation**: The Debtors understand that concerns regarding the assumption of leases *cum onere* (including assumption of liability for all Adjustments and Indemnity Obligations), the preservation of creditors' setoff and recoupment rights, limitations related to the Exit ABL Facility, and the deadline for filing claim objections have been addressed and resolved through modifications to the Plan. *See* Plan Articles IV.D.3, V.A, V.F, VI.K, and VII.F. The parties continue to work collaboratively to resolve the remaining Plan-related issues through mutually agreed-upon language, which will be incorporated into the Confirmation Order or a subsequently amended Plan. |

| Objecting Party | Summary of Objection | Status / Debtors' Response |
|---|---|---|
| The Retail Equation, Inc. ("TRE")<br><br>[Docket No. 648] | • TRE does not generally oppose the assumption of its agreements, but it objects to the proposed Cure amount of $0.00 listed in the Plan Supplement. TRE alleges the proper Cure amount is $99,322.12, which remains subject to change. | • Under Article III.D. of the Plan, the Debtors are not required to resolve Cure disputes prior to Confirmation, and any Cure payments will be made on the Effective Date or as soon as reasonably practicable thereafter, either following a Final Order resolving the dispute or as agreed between the parties.<br><br>• **Cure issues reserved**: The Debtors are working with the applicable counterparty to resolve the Cure issues. |
| KDW Landlords<br>Oleta Partners Biscayne Parcel LLC<br><br>(collectively, the "<u>Applicable Landlords</u>," as defined in the Confirmation Order)<br><br>[Docket No. 650] | • Debtors must provide the Applicable Landlords with evidence of adequate assurance of future performance. Specifically, the Applicable Landlords require Adequate Assurance Information, at a minimum.<br><br>• The Applicable Landlords require that the leases are assumed *cum onere*, with all the obligations and burdens thereunder.<br><br>• Specifically, guaranties and letters of credit must be reaffirmed and remain in full effect, indemnification obligations must continue post-effective date, existing Leases cannot be modified under the Plan or Confirmation Order, Master Leases must be assumed in full, payment in full of rent and additional rent on the first day of each month, and Debtors cannot assign Leases to other debtor entities, without providing the information required under section 365(b)(3) of the Bankruptcy Code.<br><br>• The Applicable Landlords request certain language be included in the Confirmation Order to preserve creditors' setoff and recoupment rights.<br><br>• The Exit ABL Facility should have the same lease-related limitations as the DIP Orders, including no liens on leases and restricted lender access. | • Under Article III.D. of the Plan, the Debtors are not required to resolve Cure disputes prior to Confirmation, and any Cure payments will be made on the Effective Date or as soon as reasonably practicable thereafter, either following a Final Order resolving the dispute or as agreed between the parties.<br><br>• **Cure issues reserved**: The Debtors are working with the applicable counterparty to resolve the Cure and adequate assurance related issues.<br><br>• **The Plan concerns have been resolved for purposes of Confirmation**: The Debtors understand that concerns regarding the assumption of leases *cum onere*, the continued enforceability of guaranties, letters of credit, and indemnification obligations post-emergence, the preservation of creditors' setoff and recoupment rights, and limitations related to the Exit ABL Facility have been addressed and resolved through modifications to the Plan. *See* Plan Articles IV.D.3, V.A, V.F, and VI.K. Corresponding agreed-upon language will also be incorporated into the Confirmation Order. |
| Boulevard at Box Hill 5 LLC<br>Broadstone Home NC, LLC<br>Broadstone Home Texas, LLC | • Ballard Landlords do not object to confirmation of the Plan or assumption of the Leases but reserve all rights relating to Cure amounts under the Leases. | • Under Article III.D. of the Plan, the Debtors are not required to resolve Cure disputes prior to Confirmation, and any Cure payments will be made on the Effective Date or as soon as |

| Objecting Party | Summary of Objection | Status / Debtors' Response |
|---|---|---|
| FR Huntington Square LLC<br>RR Town Center Associates, LLC<br>Seritage SRC Finance LLC<br>STORE Master Funding III, LLC<br>Yavapai-Prescott Indian Tribe<br><br>(collectively, the "<u>Ballard Landlords</u>")<br><br>[Docket No. 652] | • Ballard Landlords request payment for all Cure charges including rent, attorneys' fees, costs, CAM fees, and interest.<br><br>• Ballard Landlords find no distinction between attorneys' fees incurred in connection with pre-petition defaults and fees incurred with post-petition defaults.<br><br>• Ballard Landlords estimate that the attorneys' fees incurred per Lease are in an amount not less than $5,000.00 per lease.<br><br>• Ballard Landlords require that any order approving the assumption of the Leases, including the Confirmation Order, must preserve the Ballard Landlords' right to collect all accrued or accruing charges—such as unbilled taxes, reconciliations, and percentage rent—related to periods before and after the assumption, and require the Debtors to pay these obligations when due.<br><br>• Assumption must maintain all lease terms, including indemnification and insurance obligations for claims arising before assumption, and explicitly preserve the Ballard Landlords' rights to pursue the Debtors, their insurers, or other liable parties regardless of any cure payments made.<br><br>• Ballard Landlords require payments of undisputed Cure amounts immediately, while escrowing disputed amounts. | reasonably practicable thereafter, either following a Final Order resolving the dispute or as agreed between the parties.<br><br>• **Cure issues reserved**: The Debtors are working with the applicable counterparty to resolve the Cure issues. |
| Catheryn Bowersox<br><br>("<u>Bowersox</u>")<br><br>[Docket No. 653] | • Prior to the Petition Date, Bowersox filed a personal injury action against Debtor At Home Stores, LLC in the District Court of Harris County, Texas, 125th Judicial District.<br><br>• Bowersox does not generally object to the Plan but objects to the treatment of unliquidated personal injury claims in the same manner as general unsecured claims.<br><br>• Specifically, Bowersox asserts that to the extent the Debtors have insurance coverage above the amount of the insurance policy's self-insured retention provision ("<u>SIR</u>"), the Plan should permit Bowersox to pursue and collect those amounts.<br><br>• Bowersox requests that the Debtors: (a) carve out a separate distribution system for personal injury claimants to allow for | • The Bowersox Objection does not present a basis to deny Confirmation of the Plan and should be overruled to the extent not otherwise resolved.<br><br>• The Plan does not impair Bowersox's ability to pursue recovery from applicable insurance policies for any portion of her claim in excess of the SIR in accordance with the terms of the relevant policies.<br><br>• Accordingly, Ms. Bowersox's objection reflects, at most, a misunderstanding of the Plan's treatment of insurance-related claims, not a legitimate basis to deny Confirmation. |

| Objecting Party | Summary of Objection | Status / Debtors' Response |
|---|---|---|
| | recovery under insurance policy limits, and (b) retain, as a general unsecured claim, that portion of Bowersox's claim which Debtor is contractually obligated to pay, if a judgment is awarded, pursuant to a SIR provision. | |
| **Informal Objections Received** | | |
| Landlords for the following locations:<br><br>3201 N Mayfair Road, Wauwatosa, WI<br>4480 Indian Ripple Road, Dayton, OH | • The parties have been negotiating lease amendments for the landlords' properties, and the landlords have reserved all rights with respect to any leases assumed under the Plan. | • **The Debtors have resolved the Cure issues with the landlords, and as such, such informal objection is resolved.** |