**IN THE UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>AT HOME GROUP INC., *et al.*,[1]<br><br>　　　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 25-11120 (JKS)<br><br>(Jointly Administered) |

**DECLARATION OF JEREMY AGUILAR,**
**CHIEF FINANCIAL OFFICER OF AT HOME GROUP INC.**
**IN SUPPORT OF CONFIRMATION OF THE AMENDED JOINT PLAN**
**OF REORGANIZATION OF AT HOME GROUP INC. AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Jeremy Aguilar, Chief Financial Officer of At Home Group Inc., a Delaware corporation (collectively, with its Debtor affiliates, the "Debtors" and, together with their non-Debtor affiliates, "At Home" or the "Company"), hereby declare under penalty of perjury as follows:

**Background and Qualifications**

1. I am the Chief Financial Officer of the Company. I joined At Home as Chief Financial Officer in December 2024, with over 19 years of experience in the retail space. Prior to my tenure with At Home, I worked as Chief Financial Officer at Trinity Solar, Inc. for

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are: At Home Group Inc. (9563); Ambience Parent, Inc. (6231); Ambience Intermediate, Inc. (0692); At Home Holding II Inc. (9755); At Home Holding III Inc. (9930); At Home Companies LLC (6921); At Home Stores LLC (4961); At Home RMS Inc. (5235); At Home Gift Card LLC (0357); At Home Procurement Inc. (1777); At Home Properties LLC (2759); At Home Assembly Park Drive Condominium Association (N/A); 1600 East Plano Parkway, LLC (4757); 1944 South Greenfield Road LLC (4377); 2301 Earl Rudder Frwy S LLC (N/A); 3551 S 27th Street LLC (9350); 300 Tanger Outlet Blvd LLC (N/A); 3002 Firewheel Parkway LLC (2759); 2016 Grand Cypress Dr LLC (N/A); 8651 Airport Freeway LLC (0523); Transverse II Development (8595); Rhombus Dev, LLC (4783); 1000 Turtle Creek Drive LLC (9177); 19000 Limestone Commercial Dr, LLC (3711); 4801 183A Toll Road, LLC (3909); 7050 Watts Rd LLC (N/A); 4700 Green Road LLC (9049); 361 Newnan Crossing Bypass LLC (N/A); 4304 West Loop 289 LLC (4302); 10460 SW Fellowship Way LLC (N/A); 1720 N Hardin Blvd LLC (N/A); Compass Creek Parkway LLC (N/A); 10800 Assembly Park Dr LLC (6145); Nodal Acquisitions, LLC (N/A); 15255 N Northsight Blvd LLC (N/A); 3015 W 86th St LLC (N/A); 9570 Fields Ertel Road LLC (N/A); 1376 E. 70th Street LLC (9942); 11501 Bluegrass Parkway LLC (3626); 12990 West Center Road LLC (9396); 334 Chicago Drive, LLC (2864); and 4200 Ambassador Caffery Pkwy LLC (5119). The location of the Debtors' service address for purposes of these chapter 11 cases is: 9000 Cypress Waters Blvd, Coppell, Texas 75019.

approximately 11 months.  Before that, I worked as Chief Financial Officer at Bob's Discount Furniture, LLC from July 2016 to June 2023.  In addition, I held Chief Financial Officer roles at The Sports Authority, Inc. from January 2014 to July 2016 and at H. H. Gregg from February 2009 to January 2014, where I originally began as Vice President in August 2005.  I started my career working as a Manager for KPMG US.  I hold a Bachelor's Degree in Accounting and Computer Information Systems from Indiana University, Kelley School of Business.

2.      I submit this declaration (this "Declaration") in support of confirmation of the *Amended Joint Plan of Reorganization of At Home Group Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "Plan"), filed contemporaneously herewith.[2]

3.      As Chief Financial Officer, I am generally familiar with the Debtors' business and financial affairs, day-to-day operations, and underlying books and records.  I am authorized to submit this Declaration on behalf of the Debtors in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases").  Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' management team, employees, and advisors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  Any references to the Bankruptcy Code, the chapter 11 process, and related legal matters herein reflect my understanding of such matters based on the explanations and advice counsel to the Debtors have provided.

4.      I am over the age of eighteen and if called to testify, I would testify competently to the facts set forth in this Declaration.

---

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan, as applicable.

**Introduction and Development of the Plan**

5.      The Debtors commenced these Chapter 11 Cases to deleverage the Company's balance sheet and rationalize their lease portfolio.[3]  The Plan is the product of months of extensive, good faith, arm's length negotiations, both pre- and postpetition, and, as a result, is supported by a significant majority of the Debtors' stakeholders.  The Plan proposes a value maximizing restructuring that will return substantial value to the Debtors' stakeholders.  Furthermore, the Plan will allow the Debtors to expeditiously exit chapter 11 as a going concern and preserve thousands of jobs.  Pursuant to the Plan, the DIP Facility will convert to equity in the Reorganized Debtors upon exit.  The Plan embodies widespread support from the DIP Lenders, the ABL Lenders, the Exit ABL Facility Lenders, the Consenting Stakeholders, and the Committee, and all the voting classes, who voted to accept the Plan.  I believe that the Plan is the best outcome available for the Debtors, their Estates, and all parties in interest and should be confirmed.

6.      The Plan has been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information.  The Debtors have undertaken great efforts to efficiently close the Restructuring Transactions and march toward their exit from chapter 11 as soon as practicable.  Additionally, each day the Debtors remain in chapter 11 they stand to incur significant administrative and professional costs, which will be significantly reduced if the Debtors emerge expeditiously.

7.      For these reasons, the Debtors, their advisors, and other key constituents are working to expedite the Debtors' entry in to and consummation of the documents and transactions

---

[3] For a full recitation of the facts about the commencement of these cases, I respectfully refer the Court to the *Declaration of Jeremy Aguilar, Chief Financial Officer of At Home Group Inc. and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 4], which is incorporated by reference hereto.

related to the Plan so that the Effective Date of the Plan may occur as soon as possible after entry of the Confirmation Order.

**Relevant Provisions of the Plan**

8. I, along with the other members of management, were deeply involved in the formulation and negotiations of the Plan. Based on my involvement in the negotiations with the various creditor constituencies regarding the Plan, I believe that the Plan is proposed in good faith with the legitimate honest purposes of restructuring the Debtors' balance sheet and enabling the Debtors to reorganize and achieve a fresh start. The Plan is the product of months of extensive and difficult arm's-length negotiations between the Debtors, their lenders, unsecured creditors, and other key constituents. Earning the Committee's support for the Plan was a significant achievement and reflects that the Plan is the best path forward for the Estates. In support of the *Debtors' Memorandum of Law in Support of an Order Confirming the Amended Joint Plan of Reorganization of At Home Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith, below I highlight some critical components of the Plan.

9. The Plan classifies Claims and Interests into 13 separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class based on legal or factual distinctions or other relevant criteria.

10. Article III of the Plan provides for the following classification scheme for Claims and Interests:

      (i)     Class 1: Other Secured Claims;
      (ii)    Class 2: Other Priority Claims;
      (iii)   Class 3: ABL Facility Claims;
      (iv)   Class 4: Cayman Notes Claims;

      (v)        <u>Class 5</u>:  Intercompany Notes Claims;

      (vi)       <u>Class 6</u>:  Term Loan Claims;

      (vii)      <u>Class 7</u>:  Senior Secured Notes Claims;

      (viii)     <u>Class 8</u>:  Exchange Notes Claims;

      (ix)       <u>Class 9</u>:  General Unsecured Claims;

      (x)        <u>Class 10</u>:  Intercompany Claims;

      (xi)       <u>Class 11</u>:  Intercompany Interests;

      (xii)      <u>Class 12</u>:  Existing Equity Interests; and

      (xiii)     <u>Class 13</u>:  Section 510(b) Claims.

11. I believe that the differences in classification are in the best interests of creditors, foster the Debtors' restructuring efforts and do not needlessly increase the number of classes. I believe there is valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and that no unfair discrimination exists between or among Holders of Claims and Interests. In general, the Plan's classification scheme follows the Debtors' capital structure. For example, debt and equity are separately classified and secured debt is separately classified from unsecured debt. It is my understanding that other aspects of the classification scheme reasonably recognize the different legal or factual nature of Claims or Interests, such as structural seniority. Furthermore, each Claim or Interest in each particular Class is substantially similar to every other Claim or Interest in that Class.

12. Under the Plan, Classes 1, 2, and 3 are deemed to have accepted the Plan, while Holders of Claims and Interests in Classes 12 and 13 are deemed to have rejected the Plan and thus were not entitled to vote. Classes 4, 5, 6, 7, 8, and 9 voted to accept the Plan. Based on my review

of the Voting Report, Holders of Claims in all Voting Classes, which are each Impaired, voted to accept the Plan at every Debtor entity independent of any insiders' votes.[4]

13. The Plan treats all similarly situated Holders of Claims and Interests at each applicable Debtor similarly. More specifically, Claims in the non-accepting Impaired Classes—*i.e.*, Classes 10, 11, 12, and 13—are not similarly situated to any other classes, given their distinctly different legal character from all other Claims and Interests. Intercompany Claims in Class 10 and Intercompany Interests in Class 11 are not similarly situated to any other Classes given their distinctly different legal character from all other Claims and Interests and may be Unimpaired. These Intercompany Claims and Intercompany Interests, which exist to support the Debtors' corporate structure, may be Reinstated because Reinstatement of intercompany claims and interests advances an efficient reorganization by avoiding the need to unwind and recreate the corporate structure and relationships of the Reorganized Debtors. This Reinstatement does not affect the economic substance of the Plan for the Debtors' stakeholders.

14. With respect to Existing Equity Interests (Class 12), the Debtors formed Class 12 to include Holders of Existing Equity Interests in the Debtors. Existing Equity Interests are classified separately from Intercompany Interests because they reflect the economic entitlements of shareholders that own the Existing Equity Interests in the Debtors' enterprise. In addition, no similarly situated Class will receive more favorable treatment—Holders of Intercompany Interests will not receive a recovery under the Plan and Intercompany Interests may be Reinstated only for administrative convenience in the restructuring process.

15. Finally, with respect to Section 510(b) Claims (Class 13), the Debtors do not believe any Section 510(b) Claims exist. The Debtors formed Class 13 to include Holders of

---

[4] No Holders of the types of Claims specified by section 1129(a)(9)(B) of the Bankruptcy Code are Impaired under the Plan.

Claims that may be subordinated pursuant to section 510(b) of the Bankruptcy Code. As there are no Holders of Section 510(b) Claims, no distributions should or will be made to Class 13, and no party in interest has asserted otherwise. Under the Plan, no Holder of a Claim or Interest junior to a non-accepting Impaired Class of Claims or Interests will receive any recovery under the Plan on account of such Claim or Interest. To the extent that Intercompany Interests and Intercompany Claims are Reinstated under the Plan, distributions on account of Intercompany Interests and Intercompany Claims are not being received by Holders of such Intercompany Interests or Intercompany Claims on account of their Intercompany Interests or Intercompany Claims but for the purposes of administrative convenience, for the ultimate benefit of all parties in interest. Any Reinstatement of Intercompany Interests or Intercompany Claims will thus have no economic substance.

16. The Plan also includes the general settlement of Claims and Interests, debtor and third-party releases, an exculpation provision, and an injunction provision. I believe these provisions represent a valid exercise of the Debtors' business judgement, are fair, reasonable, and in the best interests of the Debtors' Estates, are the product of extensive arm's-length negotiations, were a material inducement for parties to enter into the Committee Settlement and support the Plan, and are overwhelmingly supported by the Debtors and their key stakeholders (including a majority of the Voting Classes). Furthermore, these provisions were fully and conspicuously disclosed to all parties in interest through the Confirmation Hearing Notice, the Opt-In Form, and the Ballots, each of which excerpted the full text of the releases, exculpation, and injunction provision as set forth in the Plan.

17. Without the contributions of the Released Parties, the Plan and the transactions contemplated therein, which maximizes the value of the Estates for the benefit of all stakeholders,

would not be possible. Each Released Party has made a substantial contribution to the reorganization of the Debtors' Estates. Specifically, the Plan provides for meaningful recoveries for the Classes affected by the Debtor Release—recoveries that would be unavailable absent the Plan, especially with respect to certain Holders of General Unsecured Claims that seek to recover their Pro Rata share of the Unsecured Claims Distribution Trust Beneficial Interests. The Ad Hoc Group played a critical role in facilitating the Debtors' restructuring by providing the DIP Facility and agreeing to support a revised Plan that gives $3.9 million in cash to fund the Unsecured Claims Distribution Trust. Likewise, the ABL Secured Parties contributed significant value by consenting to the Debtors' continued use of Cash Collateral. Furthermore, the Debtors' directors, officers, employees, professionals, and other agents, as well as the creditors' professionals and other agents, who served in such capacity on or after the Petition Date have been instrumental in negotiating, formulating, and implementing the Restructuring Transactions contemplated under the Plan. The Ad Hoc Group and the ABL Secured Parties, among other Released Parties, were critical participants in the Plan process, both in terms of negotiating and formulating a consensual deal for the benefit of all stakeholders and securing approval of the Restructuring Transactions, which I believe were integral to maximize the value of the Debtors' Estates.

18.    The Debtor Release is limited in scope and is given in exchange for valuable consideration provided by the Released Parties for the benefit of all parties in interest. The Debtor Release appropriately offers protection to parties that participated in the Debtors' restructuring process, each of whom made significant contributions to and concessions in these Chapter 11 Cases. Absent the support of the Released Parties, the Debtors would not have: (i) secured DIP financing to fund these Chapter 11 Cases; (ii) secured Exit financing to fund Plan distributions and manage post-emergency liquidity; (iii) been able to provide a recovery for Holders of General

Unsecured Claims; and (iv) been able to obtain the votes necessary to confirm the Plan on an efficient timeline. This strong support was predicated on the Debtors' agreement to provide the Debtor Release contemplated in the Plan. Based on my review of the Debtors' books and records, familiarity with the Debtors' business and operations, and discussions with the Debtors' advisors, directors, and management, I do not believe that the Debtors have material causes of action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan. The Debtor Release provides finality, underpins the global settlement and compromise of issues achieved by the Plan, and avoids significant delay in consummating the Plan; therefore, I believe that the inclusion of the Debtor Release is worthwhile and for the benefit of all the Debtors' stakeholders.

19. In addition, the Third-Party Release is critical to the success of the Plan. For months prior to the commencement of these Chapter 11 Cases and continuing after the Petition Date, the Released Parties worked constructively with the Debtors to negotiate and implement a value-maximizing reorganization embodied in the Plan that enables the Reorganized Debtors to emerge with a right-sized capital structure and viable go forward business plan. The Released Parties have provided material concessions, benefits, and commitments to the Debtors, during the pendency of these cases, such as: (a) the DIP Facility in an aggregate principal amount of $600 million, including $200 million of new money commitment, and the ABL Secured Parties' consent to the Debtors' use of Cash Collateral during the Chapter 11 Cases; (b) the Ad Hoc Group's concession of approximately $3.9 million to the Unsecured Claims Distribution Trust; and (c) the negotiation of the Third-Party Release as part of the Plan, which provided concrete evidence to the market of the high level of consensus among the Debtors' key stakeholders for the Plan while providing stability to the Debtors' business while the Debtors navigated the restructuring process.

In addition, the Debtors' directors and officers steadfastly maintained their duties to maximize value for the benefit of all stakeholders, investing countless hours both prior to and after filing these Chapter 11 Cases in addition to performing their ordinary course responsibilities. The Debtors' management has provided their extensive industry knowledge to the Debtors during the Plan negotiations, including regular engagement with their stakeholders, including their vendor and landlord constituencies. As an officer of the Debtors, I believe that management will continue to facilitate the restructuring process and has been and will continue to be critical to the successful reorganization of the Debtors.

## Conclusion

20. In conclusion, it is my opinion as the Chief Financial Officer of the Debtors, and having been involved in virtually every aspect of the Chapter 11 Cases and the negotiation of the Plan, that Confirmation of the Plan is appropriate, is in the best interests of all parties in interest, and should be approved.

[*Remainder of page left intentionally blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:  September 24, 2025

/s/ *Jeremy Aguilar*
Jeremy Aguilar
Chief Financial Officer
At Home Group, Inc.